**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re:<br><br>YSA INVESTMENTS 1, LLC,<br><br>Debtor. | Case No. 26-12806-SAH<br>Chapter 11 |

**DEBTOR'S APPLICATION TO EMPLOY**
**CAPITAL ASSETS, INC. AS PROPERTY MANAGER,**
**WITH BRIEF IN SUPPORT AND NOTICE OF OPPORTUNITY FOR HEARING**

**NOTICE OF OPPORTUNITY FOR HEARING**

**Your rights may be affected. You should read this Document carefully and consult your attorney about your rights and the effect of this Document.** If you do not want the Court to grant the motion, or you wish to have your views considered, you must file a written response to the motion with the Clerk of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean McGee Avenue, Oklahoma City, OK 73102 no later than 14 days from the date of filing of the motion. You should also serve a file-stamped copy of the response to the undersigned [and others who are required to be served] and file a certificate or affidavit of service with the Court.

**[Note – this is a flat fourteen (14) days regardless of the manner of service.]**

Debtor, YSA Investments 1, LLC, ("Debtor"), by and through the undersigned counsel, respectfully files this *Debtor's Application to Employ Capital Assets, Inc. as Property Manager* (the "Application"). In support of this Application, the Debtor submits the Declaration of Greg Wright (the "Declaration") attached hereto as **Exhibit 1**, which is hereby incorporated by reference. In support of this Application, the Debtor would show the Court as follows:

**JURISDICTION AND STATUTORY AUTHORITY**

1. The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. The statutory predicates for the relief requested are sections 105, 327, 328, and 330 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1, 2016-1 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Western District of Oklahoma (the "Local Rules").

## BACKGROUND

4. On July 28, 2026 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its affairs as a debtor in possession pursuant to sections 1107 and 1108. No trustee, examiner, or committee has been appointed.

5. Capital Assets, Inc. ("Capital Assets") is a Tulsa-based multifamily property manager founded in 1979. It reports more than 45 years of regional experience, a portfolio of approximately 4,500 units, and approximately $400 million of assets under management in Oklahoma and Northwest Arkansas. Capital Assets specializes in multifamily operations, lease-up, maintenance, financial reporting, and related services.

6. On July 17, 2026, prior to the Petition Date, Debtor and Capital Assets executed a Residential Management Agreement (the "Engagement Agreement"). A copy of the Engagement Agreement is attached as **Exhibit 2**. Capital Assets has been performing property-management services in connection with certain multifamily communities. The properties covered by the Engagement Agreement are the following:

a. 5530 Colony Way, Bartlesville, OK 74006 ("Lexington Commons");

b. 7803 S. Wheeling Ave., Tulsa, OK 74136 ("Riverpark")

c. 204 S Riverfront Dr, Jenks, OK 74037 ("Thrive Jenks");

d. 2186 S 99th E Ave, Tulsa, OK 74129 ("Lakeside Place");

e. 2001 E Skelly Dr, Tulsa, OK 74105 ("Villas at Midtown");

f. A-V Village Creek Owner LLC ("Village Creek");

g. 5160 S Yale Ave, Tulsa, OK 74135 ("Barcelona Apartments");

h. 9601 E 21st Pl, Tulsa, OK 74129 ("Shoreline");

i. 727 E Main Pl, Jenks, OK 74037 ("727 Lofts");

j. 8111 E 60th St, Tulsa, OK 74145 ("One Eton Square"); and

k. 11321 E 23rd St, Tulsa, OK 74129 ("23 East")

(collectively the "Subject Properties").

7. On August 28, 2026, the Court directed the Debtor to file an application to employ Capital Assets as property manager. This Application follows that instruction.

8. Nothing in this Application is intended to, or shall, adjudicate ownership of, or the validity, extent, or priority of any interest in, any Subject Property. Employment of Capital Assets is requested solely to preserve and operate the communities presently under the Debtor's control or possession and to provide transparent reporting to the estate and parties in interest.

## RELIEF REQUESTED AND BRIEF IN SUPPORT

9. The Debtor seeks entry of an order authorizing the Debtor to employ and retain Capital Assets as property manager for the Subject Properties pursuant to Bankruptcy Code sections 327 and 328, effective as of August 1, 2026, on the terms of the Engagement Agreement as modified by this Application, as applicable.

10. Bankruptcy Code section 327(a) permits a debtor in possession, with court approval, to employ professionals "that do not hold or represent an interest adverse to the estate,

and that are disinterested persons, to represent or assist the debtor in carrying out the debtor's duties. 11 U.S.C. § 327(a). Bankruptcy Code section 101(14) defines a "disinterested person" as a person that:

(a) is not a creditor, an equity security holder, or an insider;

(b) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(c) does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

11. Bankruptcy Code section 328(a) authorizes the employment of a professional person "on any reasonable terms and conditions of employment, including on a retainer . . . ." 11 U.S.C. § 328(a).

12. The anticipated scope of the services to be provided by Capital Assets are as follows:

a. Recruit, train, supervise, and evaluate on-site personnel; implement company policies and operating procedures; and maintain appropriate staffing levels for leasing, administration, and maintenance.

b. Serve as the primary point of contact for residents; respond to inquiries and service requests; enforce lease terms and community rules; and promote a well-maintained community residents can proudly call home.

c. Collect rents and other charges; post and track payments; pursue delinquent accounts; and, when necessary, initiate and manage notices, collections, and eviction proceedings in accordance with law and owner direction.

d. Oversee routine, preventive, and emergency maintenance; inspect units and common areas; manage work orders; supervise vendors and contractors; and keep the physical asset in good repair.

e. Prepare accountings, operating budgets and capital plans; monitor income and expenses against budget; implement cost controls; and manage accounts payable and receivable.

f. Maintain property books and records using property-management software; provide regular financial reporting, rent rolls, occupancy reports, variance analyses, and other owner-requested reports; and support year-end and audit needs.

g. Administer the Property in compliance with leases, fair housing laws, applicable housing program requirements (if any), insurance requirements, and owner policies; maintain required notices, files, and records.

h. Solicit, negotiate, and oversee contracts for utilities, landscaping, trash, security, make-ready, and other services, subject to owner approval where required.

i. Provide regular performance updates, attend owner meetings as requested, and maintain a collaborative, transparent working relationship so the Property is managed to the owner's stated objectives and highest reasonably attainable earnings potential.

13. Capital Assets is already in place, is familiar with the communities, and is equipped to provide these services. Continuity of professional on-site management is necessary to collect

rents, maintain habitability, supervise vendors and staff, enforce leases, and preserve value at the Subject Properties. These services will help in maximizing the value received for the Debtor's assets.

14. To the best of the Debtor's knowledge, Capital Assets is (a) a disinterested person as defined by Bankruptcy Code section 101(14), (b) does not hold or represent an interest adverse to the Debtor or its estate with respect to matters as to which Capital Assets is to be employed, and (c) has no connection to the Debtor, its creditors, or related parties, other than as may be disclosed in the Declaration.

15. Subject to this Court's approval, the Engagement Agreement between the Debtor and Capital Assets provides, in part, that the Debtor agrees to pay Capital Assets as follows:[1]

> Section 7.01. For services rendered pursuant to this Agreement, [Debtor] shall pay [Capital Assets] three percent (3.00%), of the gross monthly income collected from the property, or a minimum of $6,000 for the properties less than 400 units and $7,500 for the properties 400 units plus, whichever is greater, which shall be deducted by [Capital Assets] each month from the gross monthly income. The fee may be adjusted from time to time upon prior written agreement executed by both parties. [Capital Assets] will be owed a "disposition fee" of $15,000 for the properties less than 400 units and $20,000 for the properties above 400 units, upon the sale of the property for duties associated with the sales and closing process and finalize accounting.

[1] The following summary is intended to be illustrative and not a complete representation of all terms and conditions of the Engagement Agreement. To the extent this paragraph is inconsistent with the Engagement Agreement, the terms of the Engagement Agreement shall control.

16. The Debtor requests authority, pursuant to sections 327, 328, and 363 of the Bankruptcy Code, for Capital Assets to pay itself only the monthly management fee, and to pay ordinary-course on-site payroll and property operating expenses, from receipts of the applicable Subject Property in the ordinary course, consistent with any approved budget and any cash-collateral or financing order.

17. The Debtor is not requesting approval under section 328 of the disposition fee or the five percent project fees. Those amounts, if earned, shall be paid only after separate approval of the Court.

18. While Capital Assets was retained approximately eight (8) days prior to the Petition Date, Capital Assets has not received any pre-petition compensation from the estate. There is no pre-petition unpaid balance owed to Capital Assets as no expenses were incurred pre-petition.

19. Capital Assets intends to apply for compensation for its professional services rendered to the Debtor in this Chapter 11 Case and reimbursement of expenses incurred in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

20. The Debtor submits that the terms and conditions of Capital Assets' retention, as described herein, are reasonable and in the best interests of the Debtor, its estate, the creditors, and all parties in interest.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Debtor respectfully requests that this Court enter an order, effective as of August 1, 2026, authorizing the employment of Capital Assets as property manager for the Subject Properties.

Respectfully submitted,

*/s/ Jason A. Sansone*

Clayton D. Ketter, OBA No. 30611
Jason A. Sansone, OBA No. 30913
Nicholas J. Candido, OBA No. 36069
PHILLIPS MURRAH P.C.
424 N.W. 10th St., Suite 300
Oklahoma City, OK 73103
(405) 235-4100 - telephone
(405) 235-4133 – facsimile
cdketter@phillipsmurrah.com
jasansone@phillipsmurrah.com
njcandido@phillipsmurrah.com
**Proposed Attorneys**
**for YSA Investments 1, LLC**

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re:<br><br>YSA INVESTMENTS 1, LLC,<br><br>Debtor. | Case No. 26-12806-SAH<br>Chapter 11 |

**DECLARATION OF GREG WRIGHT**
**IN SUPPORT OF DEBTOR'S APPLICATION TO EMPLOY**
**CAPITAL ASSETS, INC. AS PROPERTY MANAGER**

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, I, GREG WRIGHT, declare that the following is true to the best of my knowledge, information, and belief:

1. I am the President of Capital Assets, Inc. ("Capital Assets"), which maintains an office at 8002 S. 101st E. Ave. Tulsa, OK 74133, and I am authorized to execute this affidavit (the "Affidavit") on behalf of Capital Assets.

2. The facts set forth in this declaration are based upon my personal knowledge, discussions with other Capital Assets employees, and Capital Assets' business records that were reviewed by me or other Capital Assets employees acting under my supervision and direction. To the extent any information disclosed in this declaration requires amendment or modification upon Capital Assets' completion of further review or as additional information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended and modified information.

3. Capital Assets has been contacted by YSA Investments 1, LLC (the "Debtor") regarding serving as a property manager for the following properties:

a. 5530 Colony Way, Bartlesville, OK 74006 ("Lexington Commons");

b. 7803 S. Wheeling Ave., Tulsa, OK 74136 ("Riverpark")

c. 204 S Riverfront Dr, Jenks, OK 74037 ("Thrive Jenks");

d. 2186 S 99th E Ave, Tulsa, OK 74129 ("Lakeside Place");

e. 2001 E Skelly Dr, Tulsa, OK 74105 ("Villas at Midtown");

f. A-V Village Creek Owner LLC ("Village Creek");

g. 5160 S Yale Ave, Tulsa, OK 74135 ("Barcelona Apartments");

h. 9601 E 21st Pl, Tulsa, OK 74129 ("Shoreline");

i. 727 E Main Pl, Jenks, OK 74037 ("727 Lofts");

j. 8111 E 60th St, Tulsa, OK 74145 ("One Eton Square"); and

k. 11321 E 23rd St, Tulsa, OK 74129 ("23 East")

(collectively the "Subject Properties").

4. Capital Assets is a Tulsa-based multifamily property manager founded in 1979. It reports more than 45 years of regional experience, a portfolio of approximately 4,500 units, and approximately $400 million of assets under management in Oklahoma and Northwest Arkansas. Capital Assets specializes in multifamily operations, lease-up, maintenance, financial reporting, and related services.

5. The anticipated scope of services to be provided by Capital Assets to the Debtor are as follows:

a. Recruit, train, supervise, and evaluate on-site personnel; implement company policies and operating procedures; and maintain appropriate staffing levels for leasing, administration, and maintenance.

b. Serve as the primary point of contact for residents; respond to inquiries and service requests; enforce lease terms and community rules; and promote a well-maintained community residents can proudly call home.

c. Collect rents and other charges; post and track payments; pursue delinquent accounts; and, when necessary, initiate and manage notices, collections, and eviction proceedings in accordance with law and owner direction.

d. Oversee routine, preventive, and emergency maintenance; inspect units and common areas; manage work orders; supervise vendors and contractors; and keep the physical asset in good repair.

e. Prepare accountings, operating budgets and capital plans; monitor income and expenses against budget; implement cost controls; and manage accounts payable and receivable.

f. Maintain property books and records using property-management software; provide regular financial reporting, rent rolls, occupancy reports, variance analyses, and other owner-requested reports; and support year-end and audit needs.

g. Administer the Property in compliance with leases, fair housing laws, applicable housing program requirements (if any), insurance requirements, and owner policies; maintain required notices, files, and records.

h. Solicit, negotiate, and oversee contracts for utilities, landscaping, trash, security, make-ready, and other services, subject to owner approval where required.

i. Provide regular performance updates, attend owner meetings as requested, and maintain a collaborative, transparent working relationship so the Property is managed to the owner’s stated objectives and highest reasonably attainable earnings potential.

6. The Engagement Agreement, attached to *Debtor's Application to Employ Capital Assets, Inc. as Property Manager* as **Exhibit 2**, provides, in part, that the Debtor agrees to pay Capital Assets as follows:[1]

> Section 7.01. For services rendered pursuant to this Agreement, [Debtor] shall pay [Capital Assets] three percent (3.00%), of the gross monthly income collected from the property, or a minimum of $6,000 for the properties less than 400 units and $7,500 for the properties 400 units plus, whichever is greater, which shall be deducted by [Capital Assets] each month from the gross monthly income. The fee may be adjusted from time to time upon prior written agreement executed by both parties. [Capital Assets] will be owed a "disposition fee" of $15,000 for the properties less than 400 units and $20,000 for the properties above 400 units, upon the sale of the property for duties associated with the sales and closing process and finalize accounting.

7. While Capital Assets was retained approximately eight (8) days prior to the Petition Date, Capital Assets has not received any pre-petition compensation from the estate. There is no pre-petition unpaid balance owed to Capital Assets as no expenses were incurred pre-petition.

8. Capital Assets intends to apply for compensation for its professional services rendered to the Debtor in this Chapter 11 Case and reimbursement of expenses incurred in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

9. Except as specifically set forth herein, neither I nor Capital Assets, to the best of my knowledge, represents any other entity in conjunction with the Debtor's Chapter 11 case. In addition, except as specifically set forth herein, to the best of my knowledge, neither I nor Capital Assets is an insider of the Debtor, nor has any connection with the Debtor, any of its affiliated

[1] The following summary is intended to be illustrative and not a complete representation of all terms and conditions of the Engagement Agreement. To the extent this paragraph is inconsistent with the Engagement Agreement, the terms of the Engagement Agreement shall control.

entities, its creditors, or any other parties in interest herein, or its respective attorneys and accountants, except as otherwise disclosed herein.

10. Neither I nor Capital Assets, insofar as I have been able to ascertain, holds or represents any interest adverse to the estate with respect to the matters upon which Capital Assets is to be engaged.

11. Capital Assets and its principals: (i) are not equity security holders, or insiders of the Debtor or its bankruptcy estate; (ii) have not been, within three years before the date of the filing of the petition, property managers for the Debtor; (iii) are and were not, within two years before the date of the filing of the petition, directors, officers, or employees of the Debtor; and (iv) do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason, except as specifically disclosed and described herein.

12. I believe Capital Assets is a "disinterested person" within the meaning of Bankruptcy Code section 101.

13. No promises have been received by Capital Assets as to compensation or payment in connection with this case other than in accordance with the provisions of the Bankruptcy Code. Capital Assets has no agreement with any other entity to share with such entity any compensation received by Capital Assets in connection with the Debtor's Chapter 11 case.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on August 31, 2026

Greg Wright
Capital Assets, Inc., President

# EXHIBIT 2

# RESIDENTIAL MANAGEMENT AGREEMENT

ARTICLE 1. PARTIES

YSA Investments, LLC, a Delaware limited liability company, hereinafter referred to as “Owner" and Capital Assets, Inc., an Oklahoma corporation, hereinafter referred to as "Manager", in consideration of the mutual promises herein contained, agree as follows:

ARTICLE 2. PROFESSIONAL MANAGEMENT STANDARDS

Section 2.01. Manager is hereby retained by Owner to act as Owner's exclusive agent to manager, operate, lease, and rent the Property described as follows, hereinafter referred to as the "Property":

See Attached List

The legal description of the Property is contained in attached Exhibit A.

Section 2.02. Manager agrees to exert its best efforts to furnish the services of its organization and to use due diligence in managing the property for the period and upon the terms herein provided. Manager shall perform the services under this Agreement in a businesslike manner, with reasonable care and diligence as an experienced property manager would perform, in each case in accordance with the standard of management and leasing for comparable apartment communities (in terms of size, quality and rental rates) in the submarket in which the individual buildings comprising the Property are located.

Section 2.03. Within thirty (30) days following the date hereof, and thereafter annually on or before November 1st of each calendar year, the Manager will prepare and, submit to the Owner for review and approval, an annual operating budget (the “Budget”) for the Property for the succeeding calendar year. In the event that the Owner objects to such annual operating budget, the Owner will notify the Manager of its objections and the Owner and the Manager will work together to agree upon a budget acceptable to the Owner; provided, however, that the Manager will have the authority to continue to operate the Property in accordance with the annual operating budget for the immediately preceding calendar year until a new budget is approved in writing

ARTICLE 3. LEASING OF PROPERTY

Obligation to Lease

Section 3.01. Manager agrees to use its best efforts, utilizing the full range of services and facilities of its organization, to obtain tenants for presently vacant space within the property, or space, which may become vacant during the term of this Agreement.

Advertisements

Section 3.02. Manager is authorized to and agrees to promote leasing and renting by full use of available advertising devices such as newspapers, signs, media campaigns, press releases and press conferences, direct mail, and brochures in accordance with the Budget. Actual hard costs for materials and travel expense relative to these devices will be included in the Budget and paid by Owner, but all other salaries and overhead are included in the management fee. Additional outside public relations services and other promotions for resident retention and leasing may also be employed by Owner or Manager at Owner's expense and with Owner's written approval.

Leasing Standards

Section 3.03. The Manager will prepare all residential leases and parking permits (if any), and will carry out the same in its name, identified thereon as agent for the Owner. Residential leases will be in a form approved by the Owner, but individual dwelling leases and parking permits need not be submitted for approval by the Owner, so long as such leases and permits shall be on standard twelve (12) month terms. Any month-to-month leases must be approved by Owner in writing. Rent for units and parking permits will be determined by the Manager based on its assessment of market conditions and will be subject to review by, and written approval of, the Owner. The Manager and the Owner agree that they are aware of the requirements of the Fair Housing Amendment Act of 1988, the Rehabilitation Act of 1974, and the Americans with Disabilities Act of 1992, and the Manager will conduct all rental activities in accordance with these acts at all times.

Action Authorized With Respect to Leases

Section 3.04. Manager will use reasonable best efforts to secure full compliance by each tenant with the term of the tenant's lease. Manager is authorized to negotiate and execute on behalf of the Owner, all leases, rental agreements, renewals and cancellations on the terms and conditions provided by Owner or, in the event that Owner fails to provide such terms and conditions, upon terms and conditions deemed reasonable by Manager. The Manager may lawfully terminate any tenancy when sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Manager is authorized to consult with legal counsel to bring actions for eviction and to execute notices to vacate and judicial pleadings incident to such actions provided, however, that the Manager will keep the Owner informed of such actions and will follow such instructions as the Owner may prescribe for the conduct of any such action. Manager may discontinue any such action or proceeding, compromise or settle any such action or proceeding brought in Owner's name only with Owner's approval, but Owner's approval will not be required in the event that such action or proceeding is brought in Manager's name. Notwithstanding anything to the contrary herein, Manager is authorized to retain attorneys on behalf of Owner, and at Owner's expense, to institute any such required actions; provided, however, that the Manager will keep the Owner informed of such actions and will follow such instructions as the Owner may prescribe for the conduct of any such action

Tenant's Problems

Section 3.05. Manager shall maintain business-like relations with tenants who place service requests and shall deal with such requests in a manner which Manager deems reasonable and appropriate but in no event less than a commercially reasonable and diligent manner. Problems determined by Manager to be of a serious nature shall be reported to the Owner with appropriate recommendations. The Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified, and will keep records of the same.

ARTICLE 4. OPERATIONS AND MAINTENANCE

Employees

Section 4.01. Manager shall have full responsibility and authority for recruiting, hiring, firing, training, and supervising adequate personnel and scheduling work for all permanent or part time services of Manager under this Agreement, it being understood that the salary, payroll costs and taxes, along with fringe benefits of these employees shall be an expense of Owner, paid by Manager, and repaid to Manager out of the Operating Account. Manager shall, on behalf of Owner, fully comply with all applicable laws and regulations having to do with Workers' Compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer-employee related subjects. Manager, as Owner's representative, agrees that it has heretofore and will continue to be an equal opportunity employer.

Maintenance and Repairs

Section 4.02. (a) Manager shall cause the Property and its appurtenances and grounds, to be maintained in good condition and repair and according to standards acceptable to Owner, including, but not limited to, interior and exterior cleaning, painting, decorating, plumbing, heating and ventilating systems, elevators, carpentry and such other normal maintenance and repair work as may be necessary. Manager will familiarize itself with the character, location, construction layout, plan and operation of the Property and especially of the electrical, heating, plumbing, air conditioning and ventilation systems, the elevator, and all other mechanical equipment. Manager agrees to use commercially reasonable efforts to obtain contract materials, supplies and services at the lowest possible cost and on the terms most advantageous to the Property and, provided that there are sufficient funds therefore, to secure and credit to the Property all available discounts.

(b) In fulfillment of its duties under (a) of this section, Manager is authorized to purchase, at the expense of the Owner, such supplies, equipment, and services as are necessary for the operation and maintenance of the property in accordance with the Budget; provided, however, that no disbursement for this purpose shall be made in excess of $5,000 unless specifically authorized by Owner, except that emergency repairs involving manifest danger to life or property, or immediately necessary for the preservation and safety of the property, or for the safety of its tenants, or required to avoid suspension of any necessary service to the property, may be made by Manager irrespective to the cost limitation imposed by this section. Manager

will contract with qualified independent contractors for extraordinary maintenance and repairs beyond the capability of regular maintenance employees at the Property. Notwithstanding this authority as to emergency repairs, it is understood and agreed that Manager will, if at all possible, confer with Owner regarding every such expenditure before proceeding.

Services and Utilities

Section 4.03. Manager is authorized to contract, on behalf of Owner, in the property's name or the name of Owner, for all services and utilities necessary for the efficient operation and maintenance of the property, including, but not limited to, water, electricity, gas, fuel, telephone, pest control, rubbish hauling, and window cleaning; provided, however, that Manager shall not enter into any contract on behalf of Owner lasting more than one year from its execution without prior written approval of Owner or enter into any arrangement not an arm's length transaction and consistent with pricing for the market in which the Property is located.

Compliance with Governmental Regulations

Section 4.04. Manager and manager's employees shall comply with all local, state, and federal laws in the management of the Property. Manager shall use reasonable diligence to discover and correct conditions which are (a) hazardous to human health and safety, (b) detrimental to the preservation of the Property, and (c) in violation of local, state, or federal laws, including but not limited to employment discrimination, employee safety requirements, employment hiring practices, employee screening, employee drug testing, drug policies, handicap/disability construction requirements, gas pipeline safety, freon recapture, resident security and safety, lighting, self-closing and self-latching devices for swimming pool fences, and landlord-tenant relationships. Manager's right to expend money to remedy unsafe or unlawful conditions shall be subject to Owner's approval and funding of any costs of remedying such conditions. Manager shall make recommendations to Owner for any capital expenditures and security/safety measures which are reasonably needed in Manager's judgment.

Insurance Coverage

Section 4.05. Manager shall advise and consult with Owner concerning all insurance.

(a) Owner's general liability insurance. Owner shall, at Owner's expense, carry and maintain the insurance set forth on Exhibit B. All mortgagees of the Property shall be named as mortgagees on fire and casualty policies. Owner shall furnish to Manager a list of names, addresses, and telephone number of all mortgagees. Certificates of such insurance shall be provided by Manager to any lender(s) having a lien in the Property.

(b) Manager's liability insurance. Manager shall, at Manager's expense, carry and maintain the insurance set forth on Exhibit B. The Manager will investigate and furnish the Owner will full reports as to all accidents, claims, and potential claims for damage relating to the Property, and will cooperate with the Owner's insurers in connection therewith.

(d) Workers' comp insurance - on-site personnel. Manager shall carry workers'

compensation insurance for all on-site employees. Owner shall reimburse Manager for the cost of same as an expense of the Property.

(e) Fidelity bond. Manager shall, at Manager's sole expense, carry a fidelity bond on all employees who have depository or check-writing authority for Owner's funds in amount sufficient to protect the Owner against misapplication of Property funds by the Manager and its employees.

(f) Notice of insurance cancellation. Manager and Owner shall obtain a provision in all of Owner's insurance policies that Owner will be given at least 30-days notice prior to alteration, cancellation or material change by endorsement of the coverage, to the extent that same is lawful and obtainable. (Insurance carriers are not required by law to give more than 10 days advance notice to Owner).

(g) Evidence of insurance. If Manager contracts for any insurance relating to the Property, Manager shall be the custodian of any policies or certificates of insurance furnished by the carriers and shall promptly provide Owner a copy of same upon Owner's request. If Owner contracts directly for any insurance relating the Property, Owner shall promptly provide Manager with a copy of such policies, including waivers of subrogation or satisfactory evidence of same.

### Taxes

Section 4.06. Manager shall, if so requested, obtain and verify bills for real estate and personal property taxes, improvements, assessments and other like charges which are or may become liens against the Project and recommend payment or appeal, whichever, in its best judgment, it may decide. Manager shall forward such bills to Owner (or, in lieu thereof, a designated escrow agent) for payment by Owner in such time to permit Owner to avoid penalty for late payments or to take advantage of discounts or Manager shall make such payments to the extent cash receipts (excluding security deposits) received by Manager from the Project are available.

## ARTICLE 5.
## COLLECTION AND DISBURSEMENT OF REVENUES

### Collection of Rent

Section 5.01. Manager shall use its best efforts to collect all rents and revenues from the property.

### Deposit of Collections

Section 5.02. Manager shall establish and maintain, in a bank whose bank deposits are insured by the Federal Deposit Insurance Corporation, a trust account for the deposit of monies collected from the property. Such account will be kept and maintained separately and apart from the accounts of the Manager and the Owner's funds will not be co-mingled with the Manager's funds. Manager shall have the authority to draw on this account for any payments which

Manager must make to discharge any liabilities or obligations incurred pursuant to this Agreement, and for the payment of Manager's fee, all of which payments shall be subject to the limitations of this Agreement. Where law requires that tenant security deposits be separately maintained, a separate account (or separate interest-bearing account) will be opened by Manager. Such account shall be maintained in accordance with applicable law. The account will be used only for maintaining tenant security deposits. Adjustments to this account to reflect actual deposit balances will be made each month.

Access to Account

Section 5.03. Through the use of signature cards, authorized representatives of the Owner shall be permitted access to any and all funds in the bank accounts described in Section 5.02 above and funds will be disbursed or transferred only as the Owner may from time to time direct in writing.

Authorized Expenditures

Section 5.04. From the funds collected and deposited in the trust account, Manager shall cause to be disbursed regularly and punctually, all expenses authorized in other sections of this Agreement. In addition, unless otherwise provided herein, Manager shall cause to be disbursed punctually, mortgage, interest and amortization, real estate and other taxes, water and sewer rents and all other expenses, charges, licenses, taxes or assessments of every nature with respect to the property, including Manager's compensation. Manager shall not be liable for failure to pay any expense of the property if sufficient funds are not made available to Manager. These expenses may include but are not limited to:

(a) Cost of printed forms and supplies required for use at the property;
(b) Actual and reasonable cost of making all repairs, decorations and alterations to the property and grounds;
(c) Legal fees of attorneys, provided such attorneys have been approved of by Owner in advance of retention and the specific amount of such attorney's fee has been approved by Owner in advance of payment;
(d) Cost of collection of delinquent rentals collected through a collection agency which has been approved in writing in advance by Owner and Manager (provided the Owner retains any actual amounts covered through such process);
(e) Cost of capital expenditures, as approved in advanced in writing by Owner;
(f) Cost of printed checks, and bank charges for each bank account required by Owner;[1]
(g) Cost of office furniture and equipment at property, as approved in advanced in writing by Owner;
(h) Cost of service contracts approved by Owner and cost of utilities (subject to the requirements of this Agreement).

(i) Training costs, including but not limited to, continuing education and seminar fees and associated travel and lodging costs, as approved by Owner;

(j) Costs of forms, papers, ledgers and other supplies used in the Manager's office for the Property so long as such costs are in accordance with the Budget;

(l) Postage and telephone and photocopies; and,

(m) Payroll processing costs.

ARTICLE 6.
FINANCIAL RECORDS AND REPORTS

Records

Section 6.01. Manager agrees to keep accurate, complete and separate records in accordance with accepted accounting standards and procedures, showing income and expenditures in connection with the operation of the property, to the end that any accounts payable, other obligations, cash, accounts receivable, and other assets pertaining thereto can be identified and the amount determined at all times. Owner shall have the right at any reasonable time, through his representatives or in person, to inspect any record of Manager which, in his opinion, may verify the financial or monthly reports, including, but not limited to, all checks, bills, vouchers, statements, cash receipts, correspondence, and all other records in connection with the management of the property. Owner shall further have the right to cause an audit to be made of all account books and records connected with the management of the property, at Owner's expense.

Monthly and Annual Statements

Section 6.02. (a) Manager shall prepare a monthly statement showing in detail all receipts and disbursements for the previous month, itemizing all delinquent accounts and vacant space, and an annual statement summarizing receipts and disbursements of the preceding calendar year or portion thereof.

(b) Owner shall make every effort to maintain sufficient funds in the trust account to enable Manager to pay all obligations of the property in a timely manner. In instances where collections are projected to be insufficient, or will not be received in time to pay necessary obligations, Owner shall promptly provide Manager with the necessary funds, upon notification by Manager.

(c) Manager shall not be required to advance funds for Owner's account. However, should Manager advance funds for Owner's account to cover a deficit in the property trust account, upon written notification from Manager, Owner shall remit sufficient funds to repay Manager.

Reports

Section 6.03. By the 15th day of the following month, the Manager will furnish Owner with a statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, and reconciled bank statements as of the end of the previous month. Month end reports to include the following:

(a) All payroll forms and reports concerning property employees.
(b) Workers' Compensation forms.
(c) Business Tax Forms and Oklahoma Sales Tax Report.
(d) Personal property declarations.
(e) Budget/Actual Variance Report Statement of Operations
(f) Statement of Cash Flows
(g) Balance Sheet
(h) Accounts Payable Aging
(i) Detailed Rent Roll
(j) Delinquency Report
(k) Reconciled Bank Statements
(l) Disbursement Summary
(m) Such other reports as the Owner requires, including but not limited to any reports necessary for Rent Manager.

All corporate and individual income tax returns are the responsibility of Owner, except that the records and reports furnished Owner by Manager shall be sufficient for these purposes.

Owner's Responsibility to Furnish Documents

Section 6.04. Owner shall promptly furnish Manager with all documents and records required for the property management of the property including, but not limited to, all leases and rental agreements, and amendments and pertinent correspondence relating thereto; the status of rental payments; mortgage loan information and payment instructions; copies of all service contracts in effect; and all applicable insurance policies which are carried by Owner from time to time during the term of this Agreement and the endorsement called for herein.

ARTICLE 7. COMPENSATION

Fees

Section 7.01. For services rendered pursuant to this Agreement, Owner shall pay Manager three percent (3.00%), of the gross monthly income collected from the property, or a minimum of $6,000 for the properties less than 400 units and $7,500 for the properties 400 units plus, whichever is greater, which shall be deducted by Manager each month from the gross monthly income. The fee may be adjusted from time to time upon prior written agreement executed by both parties. The Manager will be owed a "disposition fee" of $15,000 for the properties less than 400 units and $20,000 for the properties above 400 units, upon the sale of the property for duties associated with the sales and closing process and finalize accounting.

Leasing Commissions

Section 7.02. Manager shall not be entitled to any commission upon the leasing of space within the property, or upon the renewal or extension of any leases. Owner may authorize leasing or occupancy related bonuses or other incentive programs shared by Manager's employees. Commissions paid other brokers for such services shall be deemed an operating expense of the property.

Definition of Income

Section 7.03. Gross monthly income shall mean all receipts from the rental (not including security deposits prior to forfeiture, but including the proceeds of rent or business interruption insurance) of apartments together with all receipts otherwise derived from the operation of the property such as, but not limited to, receipts from garage rentals, laundry, utility income, late charges, ice or other vending machine or service-type equipment. Gross monthly income shall not include: (i) fire loss or other insurance proceeds (other than rental or business interruption insurance); (ii) security deposits and pet security deposits (except for the portion applied to past-due rent or in the event of indemnification or compensation for loss, damage or liability sustained by Owner); (iii) prepaid rents except for that portion applied to the then-current month; (iv) interest on any funds in a bank account; (v) income or awards arising out of the sale or taking by eminent domain of the Property; (vi) tax refunds or abatements; (vii) sums collected or paid for sales, excise or use taxes; (viii) the proceeds of any financing, sale, exchange or other disposition or encumbrance of all or any part of the Property; (ix) discounts and dividends on insurance policies; (x) delinquent rents (until paid); (xi) refund of overpayments; (xii) Owner's capital contributions or working capital advances (including any interest advanced thereon), or (xiii) utility charges or utility reimbursements.

Limitations on Compensation

Section 7.04. Except as otherwise herein expressly provided, Manager shall not collect or charge any undisclosed fee, rebate, discount, or commission relating to the operation of and purchasing of supplies and services for the property without crediting same to the account of Owner.

ARTICLE 8. CONTRACT TERMS

Base Period

Section 8.01. This Agreement shall become effective as of August 1, 2026 and shall continue until midnight on July 31, 2027.

Renewals

Section 8.02. Unless written notice from either party is received thirty (30) days before the expiration of this Agreement, this Agreement shall be renewed for additional twelve (12) month periods and the same notice and renewal terms shall apply to each renewed period.

Early Termination

Section 8.03. Either party to this Agreement, after it has been in effect for sixty (60) days from the date hereof, may elect to cancel and terminate this Agreement for any reason whatsoever by giving written notice to the other party not less than thirty (30) days prior to the effective termination date.

The Owner shall have the right to terminate this Agreement if the Manager shall breach any term, covenant or condition of this Agreement (other than related to the payment of money due Owner hereunder) and does not cure such breach within ten (10) days after written notice from the Owner specifying the breach; provided, however, that if such breach cannot reasonably be cured within such ten (10) day period, the Manager shall have such additional time as may reasonably be necessary to cure such breach as long as the Manager begins the cure within such ten (10) day period and thereafter diligently continues such cure to completion. The Owner shall also have the right to terminate this Agreement due to the failure by the Manager to timely pay any and all amounts required to be paid to the Owner here under within five (5) business days after such amounts become due and payable.

The Manager shall have the right to terminate this Agreement if the Owner shall breach any material term, covenant or condition of this Agreement and does not cure such breach (i) within ten (10) business days after written notice from the Manager in the event such breach is the failure of the Owner to pay any undisputed amount due to the Manager under this Agreement or to remit funds to the Manager to cover any deficiency required hereunder, (ii) within thirty (10 days after written notice from the Manager specifying the breach in the event of any other breach hereunder; provided, however, that if a breach specified under this clause (ii) cannot reasonably be cured within such ten (10) day period, the Owner shall have such additional time as may reasonably be necessary to cure such breach as long as the Owner begins the cure within such ten (10) day period and thereafter diligently continues such cure to completion.

In the event a petition in bankruptcy is filed by or against either of the parties, or in the event that either makes an assignment for the benefit of creditors or takes advantages of any insolvency act, the other party may terminate this Agreement immediately without notice to the other.

Termination Upon Sale

Section 8.04. Owner shall immediately notify Manager of any anticipated transfer of title of the Property or in the event of a merger, reorganization, a sale of the equity or substantially all of the assets of the Owner, and upon such transfer of title, this Agreement shall automatically terminate. This Agreement may not be transferred or assigned by Owner except with the prior written consent of Manager.

Consequences of Termination

Section 8.05. Upon termination of this Agreement, it is agreed:

(a) That copies of all of the records in the possession of Manager pertaining to the operation of the property, together with any other property of Owner in Manager's possession, shall be immediately delivered to Owner, at Owner's expense in an orderly and timely manner.

(b) That Manager's right to compensation shall immediately cease, except for any amounts payable hereunder before the date of termination and any out-of-pocket costs involved in performing the acts upon termination as required by this Agreement, which shall be paid by Owner.

(c) That the limited agency created hereby shall immediately cease, and Manager shall have no further right or obligation to act for Owner.

(d) Upon termination, the Manager shall (i) deliver to the Owner a final accounting reflecting the balance of the deposits, income and expenses of the Property as of the date of the termination of this Agreement, together with all funds generated from the Property which Manager has in its possession or has deposited in a bank account for the benefit of Owner (including, without limitation, any tenant security deposits), (ii) reasonably cooperate with the Owner in the transition of the management of the Property to the Owner or another management company as determined by the Owner, (iii) deliver to Owner all materials and supplies, keys and documents, and such other accountings, papers and records pertaining to this Agreement, as Owner reasonably requests; (d) to the extent not in Owner's name, assign all existing contracts relating to the operations and maintenance of the Property to Owner; and (e) at its sole cost vacate any occupied space on the Property.

Indemnification

Section 8.06. Owner agrees to indemnify, defend and hold harmless Manager, its agents and employees of and from all claims, actions, demands, damages, liability, and costs attendant to defending against the same (including, but not limited to, reasonable attorney's fees, court costs, investigation expenses, and expert witness fees) ("Losses") brought or made for or on account of any injuries or damages received or sustained by any person or persons or property, arising out of or occasioned by the acts of Manager, his agents or employees, in the execution or performance of this Agreement, except in cases of willful misconduct or gross negligence of Manager, his agents or employees. The Manager shall indemnify, defend, and hold harmless Owner and all of its partners, affiliates, members, officers, directors, agents, and employees against any and all Losses in connection with third party claims against Owner as a result of (i) the Manager's or its agents' or employees' negligence, willful misconduct, or fraud, (ii) the Manager's breach of its obligations under this Agreement, or (iii) any acts of the Manager that are beyond the scope of the Manager's authority hereunder.

Neither Owner or its members, managers, or any officer, director, employee, or agent of such parties shall have any personal liability (directly or indirectly) under or in connection with this

Agreement and Manager hereby waives all such personal liability. Manager and all other persons claiming by, through, or under Manager shall look solely to Owner's interest in the Property with respect to any claim arising under or in connection with this Agreement.

The obligations of indemnification by each party hereunder shall survive termination of this Agreement.

Notice

Section 8.07. All notices required under this Agreement shall be in writing delivered by registered or certified mail, postage prepaid, return receipt requested, or by personal delivery. Notices shall be deemed communicated forty-eight (48) hours after deposit in the United States mail, or upon personal delivery, as the case may be. The places to which notices shall be addressed to each party appear after the signatures below; provided, however, that each party may change its address by notice in accordance with this section.

Miscellaneous

Section 8.08. This Agreement may not be amended, altered, or modified except by a writing signed by the party against whom such amendment, alteration, or modification is to be enforced.

Section 8.9. This Agreement is intended to be interpreted in accordance with the laws of the State of Texas, and any action based upon this Agreement, or the respective rights or obligations of the parties hereunder, shall be brought in either the Municipal or Superior Courts of the State of Oklahoma, in the County of Tulsa.

Section 8.10. Captions are for convenience only and shall not be considered an interpretation of any of the provisions of this Agreement.

Section 8.11. Should it be necessary for either party to institute legal action to enforce such party's rights hereunder, the prevailing party in such action shall be entitled to recover its reasonable attorney's fees and actual, out-of-pocket costs from the losing party in addition to any other recovery to which such party may be entitled.

Section 8.12. In the event of a casualty loss to the property, and Owner requests in writing Manager to supervise the resulting repair and rehabilitation, Manager shall be entitled to a fee equal to five percent (5%) of the greater of the cost of repairs or the amount of the casualty loss proceeds, upon Owner's prior approval. Such casualty loss is defined as a loss in excess of one thousand dollars ($1,000). Manager, acting in the capacity of supervisor and upon Owner's prior written approval, shall also be entitled to a five percent (5%) fee for special rehabilitation or capital improvement projects where the cost of the project exceeds ten thousand dollars ($10,000) per occurrence.

Section 8.13. Owner agrees to reimburse Manager for travel expenses incurred by property management and marketing personnel supervising the property operation so long as such costs are in accordance with the Budget. The monthly travel allowance for this purpose will

not exceed actual costs.

Section 8.14. Nothing contained herein shall be deemed to render the Manager and the Owner as joint ventures or partners of each other and neither shall have the power to bind or obligate the other party, except in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Manager shall have the sole and exclusive right to undertake the day-to-day management and operation of the Property, subject to the terms and conditions set forth in this Agreement.

Section 8.15 This agreement together with all exhibits attached hereto and made a part hereof, supersedes and takes the place of any and all previous management agreements entered into between the parties hereto.

ARTICLE 9. CONFIDENTIALITY, ACCESS, AND DISBURSEMENTS

Section 9.01. Owner and Manager will keep confidential all information (i) obtained by one from the other in connection with this agreement or (ii) created in the performance of the agreement, including but limited to all records related to tenants, banking records, and the financial records and reports required by Article 6. The parties will not disclose such information to any third party (other than their respective agents, representatives, officers, managers, directors. accountants, and legal counsel), unless specifically authorized in writing by the other party or if disclosure is required by subpoena, court order, judicial decree, or law, or is otherwise required to enable Manager or Owner to perform its duties under the agreement or to enable Owner to comply with the terms of any documents with respect to any financing or sale of the Property. Manager agrees to provide Owner with immediate notice of any subpoena, court order or decree related to the Property. This confidentiality obligation will not be binding on any party with respect to information in the public domain or information that enters the public domain through no fault of that party. The provisions of this Section 9.01 will survive the expiration or termination of this Agreement.

Section 9.02. Manager will not grant any third-party access to the Property except as permitted by the Agreement and in the ordinary course of business, or with the prior written consent of Owner.

Section 9.03. Except as permitted under this agreement and in the ordinary course of business, Manager shall not transfer, turn over or disburse, or otherwise pay any rents, income, or other monies related to the Property to any third-party without Owner's prior written consent, unless or if such disbursement is required by court order, judicial decree, or law (in such cases, Manager shall notify Owner before making such disbursement).

[SIGNATURES ON THE FOLLOWING PAGE]

EXECUTED on this the 17th day of July, 2026.

MANAGER:

CAPITAL ASSETS, INC.
Greg Wright

BY: ______________________
President

OWNER:

YSA Investments 1 LLC

BY: ______________________
Authorized Representative

ADDRESS:
8002 S. 101st E. Ave.
TULSA, OK 74133

ADDRESS:
Mr. Aharon Diveroli
YSA Investments 1, LLC

# EXHIBIT A

Properties Included in Management Agreement

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 23 East Apartments | 236 | 1971 | 11327 E 23rd | Tulsa | OK | 74129 | 11327 E 23rd StTulsa, OK 74129 |
| 727 Lofts | 99 | 2019 | 727 E Main Pl | Jenks | OK | 74037 | 727 E Main PlJenks, OK 74037 |
| Barcelona Apartments | 232 | 1968 | 5160 S Yale A | Tulsa | OK | 74135 | 5160 S Yale AveTulsa, OK 74135 |
| Lakeside Place Apartments | 208 | 1975 | 9601 E 21st P | Tulsa | OK | 74129 | 9601 E 21st PlaceTulsa, OK 74129 |
| Lexington Commons | 206 | 1985 | 5530 Colony \ | Bartlesville | OK | 74006 | 5530 Colony WayBartlesville, OK 74006 |
| One Eton Square Apartments | 448 | 1985 | 8111 E 60th St | Tulsa | OK | 74145 | 8111 E 60th StTulsa, OK 74145 |
| Riverpark at Kensington | 400 | 1983 | 7803 S Wheel | Tulsa | OK | 74136 | 7803 S Wheeling AveTulsa, OK 74136 |
| Shoreline Apartments | 464 | 1974 | 9601 E 21st | Tulsa | OK | 74129 | 9601 E 21stTulsa, OK 74129 |
| Thrive Jenks | 168 | 2018 | 204 S Riverfro | Jenks | OK | 74037 | 204 S Riverfront DrJenks, OK 74037 |
| Village Creek at 67th | 226 | 1972 | 6630 S Zunis | Tulsa | OK | 74136 | 6630 S Zunis AveTulsa, OK 74136 |
| Villas at Midtown | 478 | 1966 | 2001 E Skelly | Tulsa | OK | 74105 | 2001 E Skelly DrTulsa, OK 74105 |

# EXHIBIT B

***Owner's Insurance Requirements***

Owner shall maintain, at its expense, during the term of this Agreement, the following insurance policies and coverages:

"All-risk" or "special perils" commercial property insurance on replacement cost terms for the full value of the structure and improvements, including builder's risk insurance (when applicable) and demolition, debris removal, loss adjustment expense, loss of rental income, business interruption and extra expense coverage to cover physical loss or damage to the Property from all perils.

Commercial general liability insurance, on an occurrence (not claims-made) form, with limits of at least $5,000,000 each occurrence with respect to the Property and covering third-party personal injury, property damage, and bodily injury (including death). Such limits may be achieved through the purchase of several policies including an excess or umbrella insurance policy. Owner shall ensure that the Manager is named as an additional insured by definition or endorsement.

Boiler and machinery insurance covering the building, fixtures and equipment located at the Property for mechanical failure or explosion of pipes or boilers (such insurance to include loss of use coverage/business interruption due to such failures).