**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re:<br><br>YSA INVESTMENTS 1, LLC,<br><br>Debtor. | Case No. 26-12806-SAH<br>Chapter 11 |

**DEBTOR'S OMNIBUS RESPONSE IN OPPOSITION TO MOTIONS TO APPOINT A CHAPTER 11 TRUSTEE**

Debtor, YSA Investments 1, LLC (the "Debtor"), by and through its undersigned counsel, respectfully files its *Omnibus Response in Opposition* to *Fairfax Investors, LLC's* ("Fairfax") *Amended Motion for Appointment of a Chapter 11 Trustee* [Doc. 232 as amended at Doc. 232]; *ACRE Q018 Retention Holder, LLC's* ("ACRE") *Motion to Appoint Chapter 11 Trustee* [Doc. 168]; and *Amended Emergency Motion of CREO QRS VC LLC and CRE QRS NP LLC* ("CREO") *to Appoint a Chapter 11 Trustee, or Alternatively, to Dismiss the Chapter 11 Case of YSA Investments 1, LLC* [Doc. 184 as amended at Doc. 184] (collectively the "Motions").[1] In support hereof, the Debtor would show the Court as follows:

## I. INTRODUCTION

The Motions seek the extraordinary remedy of displacing the Debtor's management and installing a Chapter 11 trustee or, in CREO's case, dismissing the case outright. That relief is unwarranted.

This case arises from a complex, multi-party dispute with Mark Kulick ("Kulick") and the entities he formerly controlled. After Kulick defaulted on loans he himself proposed and after the Delaware Chancery Court ruled against him, Kulick launched a wave of bankruptcy filings across multiple jurisdictions aimed at avoiding the state court's findings. The resulting chaos forced the

[1] Fairfax, ACRE, and CREO are collectively referred to as the "Movants."

Debtor to seek chapter 11 protection to consolidate the disputes, preserve the value of the portfolio, and protect the thousands of tenants living in the affected properties.

The movants now attempt to impute Kulick's improper conduct to the Debtor and seek to transform ownership and financing disputes—disputes that belong in adversary proceedings and contested hearings—into "cause" for the appointment of a trustee. But those unsubstantiated allegations do not meet the high burden required under 11 U.S.C. § 1104(a) to replace a debtor in possession with a Chapter 11 trustee.

Far from establishing "cause," the Debtor's pre- and post-petition conduct has been undertaken in good faith to stabilize the properties, protect tenants, and maximize value for all stakeholders. Those are appropriate chapter 11 purposes. Appointment of a trustee is thus not required and would only add cost and delay, to the prejudice of the estate. Therefore, the Motions should be denied in their entirety.

## II. BACKGROUND FACTS

1. Kulick formerly owned, in whole or in part, controlled, and/or managed a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas. **Exhibit 1 (JX-185).**

2. In February of 2025, Kulick requested a $1,500,000 loan from the Debtor. At the time of this request, the Debtor had already loaned Kulick $4,775,000 over six loans which had been untimely repaid (though they were ultimately satisfied).

3. In light of prior late repayment history and the fact that this loan was twice as large as any of the prior loans, the Debtor conditioned any further advances on additional collateral. In order to secure financing, Kulick offered to join his "entire portfolio" and "any asset controlled by any affiliate of mine." **Exhibit 2 (JX12); Exhibit 3 (JX13).**

4. In February, April, and July of 2025, Kulick and the Debtor entered into certain loan agreements pursuant to which the Debtor loaned in excess of $2,000,000. The loan documents are attached hereto as **Composite Exhibit 4**. As part of these loans, Kulick executed a promissory note, a Collateral Pledge and Security Agreement (the "CPSA"), a personal guaranty, and a Joinder in which he agreed, "as manager, member or other authorized person of any and all Guarantor Entities and any other entities in which [Kulick] does now own or control or may hereinafter own or control" to jointly and severally assume all obligations of the pledgor." *Id.* The CPSA and Guaranty also granted the Debtor a security interest in the membership interests of numerous Kulick-controlled entities and an irrevocable power of attorney authorizing the Debtor to take all steps necessary to protect its collateral, including actions against real property owned by those entities. *Id.*

5. On or about October 2025, the Debtor's representatives inspected the collateral properties to assess their condition.

6. The extent of the problems with the properties became apparent upon these visits. The Debtor observed severe disrepair; overflowing trash; pests living inside the apartments, including bats, mice, roaches, and bugs; black mold, no functioning air conditioning, no electricity, no running water, among other severe issues affecting the safety and habitability of thousands of tenants.

7. Kulick and his former entities ultimately defaulted on all four loans. As a result of Kulick's defaults under the loan documents and the condition of the properties, the Debtor exercised its rights under the loan documents and acquired control of the properties.

8. On October 31, 2025, the Debtor recorded second mortgages against certain of the properties and filed UCC financing statements against Kulick's former entities. This course of

action was consistent with the broad powers given to the Debtor via the Power of Attorney contained in the CPSA and the Guaranty executed by Kulick. A Delaware Chancery Court Post-Trial Memorandum Opinion dated June 9, 2026, to this effect is attached hereto as **Exhibit 5.**

9. The Debtor thereafter replaced Kulick's management entity with Capital Assets, Inc. ("Capital Assets") to act as property manager for the properties. Capital Assets is a well-known and reputable multi-family management firm that has been operating in Oklahoma for over 45 years. Since its appointment, Capital Assets has substantially increased the living conditions of those properties. By way of example, the units have been provided with functioning air conditioning units, the overflowing trash has been cleaned out, pests have been addressed, potable water and electricity have been established, among other improvements.

10. Days after losing in Delaware Chancery Court, Kulick took to the bankruptcy courts of this state and several other forums and filed the following petitions:

a. On June 12, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Western District of Oklahoma on behalf of Fairfax Best Living, LLC (Case No.: 26-11985) and Fairfax Investors LLC (Case No.: 26-11984);

b. Also on June 12, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Western District of Oklahoma on behalf of Woodland Oaks Best Living, LLC (Case No.: 26-11986), and Woodland Oaks Investors, LLC (Case No.: 26-11987);

c. On June 25, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of 727 Lofts Best Living, LLC (Case No. 26-12825), and 727 Lofts Holdings, LLC (Case No. 26-12826);

d. On June 26, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of Remington Ranch's Best Living, LLC (Case No.: 26-12842);

e. On July 2, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of A-V Village Creek Owner LLC (Case No.: 26-12846), and Lofts at North Penn Best Living LLC (Case No.: 26-12844);

f. On July 9, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of Barcelona Best Living, LLC (Case No.: 26-12850);

g. On July 10, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of Louis Investments, LLC (Case No.: 26-12851);

h. On July 14, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of Woodland Manor Best Living, LLC (Case No.: 26-12858), and Woodland Manor TIC 1, LLC (Case No.: 26-12859); and,

i. On July 15, 2026, Kulick executed a Voluntary Petition for Bankruptcy in the Northern District of Texas on behalf of Ridge Best Living, LLC (Case No.: 26-12869).

11. The Debtor was named as a creditor, interested party, and/or adversary defendant in each of these proceedings and was quickly forced to defend itself in four different jurisdictions.

12. To consolidate the litigation, address the concerns of the many parties involved, and ensure the safety of the tenants under those conditions, the Debtor filed for bankruptcy on July 28, 2026, in the District of Delaware, where it is organized. The filing was intended to promote efficient administration.

13. All related cases have since been transferred to this Court, confirming that these matters are best addressed together.

14. On August 18, 2026, Fairfax filed a Motion for the Appointment of a Chapter 11 Trustee over this estate. (Doc. 154.) On August 25, 2026, Fairfax filed an Amended Motion with the only material change being the addition of a Notice of Opportunity for Hearing as procedurally required by this Court. (Doc. 232.)

15. On August 20, 2026, ACRE also filed a Motion to Appoint a Chapter 11 Trustee. (Doc. 168.)

16. On August 20, 2026, CREO filed a Motion to Appoint Chapter 11 Trustee (Doc. 172), which was later superseded by CREO's Amended Emergency Motion to Appoint a Chapter 11 Trustee on August 21, 2026. (Doc. 184.) CREO's Amended Motion lengthened the notice period from 14 days to 21 days and relabeled the paper as a second amendment, but it did not address any new substantive arguments.

## III. <u>LEGAL STANDARD</u>

Bankruptcy Code section 1104(a)(1) provides that a trustee shall be appointed for cause, which includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C. § 1104(a). Section 1104(a)(2) provides a separate, discretionary basis for appointment if the Court finds that a trustee would be in the interests of creditors, equity security holders, and other interests of the estate. 11 U.S.C. § 1104(a)(2). That

inquiry balances the benefits of appointment against its costs and does not require a finding of fraud, dishonesty, incompetence, or gross mismanagement.

While courts are vested with broad discretion in deciding whether cause exists, "[t]he appointment of a trustee to replace a debtor in possession is an extraordinary remedy, and there is a strong presumption in favor of leaving this debtor in possession." *In re Am. Nat. Res., LLC*, 15-80355-TRC, 2015 WL 4480361, at *4 (Bankr. E.D. Okla. July 21, 2015). Thus, the appointment of a chapter 11 trustee "must be considered a last resort." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).

Accordingly, the party seeking appointment of a trustee must meet a "very high" standard to justify appointment of a trustee. *In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005). The movant bears the burden of proving cause by clear and convincing evidence. *In re Mako, Inc.*, 102 B.R. 809, 811 (Bankr. E.D. Okla. 1988).

## IV. LEGAL ARGUMENT AND AUTHORITIES

### A. No Cause Exists Under § 1104(a)(1) Based on Debtor's Pre-Petition Conduct.

The Movants present a laundry list of pre-petition allegations they assert are grounds for appointment of a trustee. Such allegations, however, do not support a finding that "cause" exists for the appointment of a trustee.

For instance, Fairfax complains that prior to this Petition the Debtor was involved in substantial litigation involving multifamily real estate properties located in multiple jurisdictions, and mortgage foreclosure proceedings had been initiated by Bancorp Bank, N.A. ("Bancorp"). What Fairfax omits is that this pre-petition litigation was precipitated by the actions and inactions of Kulick and his former entities, including Fairfax—not the Debtor's current management. The

actions or inactions of a third-party over which the Debtor has no control should not be imputed on the Debtor.

It was likewise Kulick who initiated the lawsuit against the Debtor in Delaware Chancery Court when he defaulted on the loans made by the Debtor to Kulick and his former entities. To the extent that the Movants complain that the loan terms with Kulick involved any fraudulent conduct, this issue was addressed by the Delaware Chancery Court, which found that the loan terms were proposed by Kulick himself. **Exhibit 5 at pp. 1-2, 4-5.**

The Movants further argue that the Debtor engaged in bad faith conduct by recording second mortgages on the properties. As above, this issue was addressed by the Delaware Chancery Court. ***Id.* at pp. 1, 23-24, 30-32.** To the extent Kulick did not have authorization to pledge certain properties pursuant to loan documents with secured creditors, without the Debtor's knowledge, such conduct is Kulick's alone. At the time the second mortgages were recorded, the Debtor, who was not a party to Kulick's loan documents, was under no obligation to notify or discuss the second mortgages any other lender. Now, it is the Debtor who has demonstrated it is committed to work cooperatively with the secured lenders to ensure the efficient reorganization of the estate and protect the interests of all creditors.

The Debtor's intention has always been to stabilize the emergency conditions for the benefit of the tenants and then follow the proper process to dispose of the collateral—a process that will now be overseen by this Court. Consistent with that approach, the Debtor has worked cooperatively with Saperean, Fannie Mae, the Term Fund lenders, First United Bank, and others, including by stipulating to stay relief so certain lenders may proceed with foreclosure sales. That good faith cooperation confirms that appointment of a Chapter 11 trustee is unnecessary.

While undoubtedly disputes exist as to the parties' rights in the properties, the deeds in lieu, the claimed missing approvals, and potential claims under § 548, those disputes can be properly addressed and fully adjudicated by this Court without the need to appoint a Chapter 11 Trustee. Ownership disputes, however vigorously pressed, are not "cause" under § 1104(a)(1), and the Debtor's pre-petition conduct does not merit this extraordinary remedy.

**B. No Cause Exists Under § 1104(a)(1) Based on Debtor's Post-Petition Conduct.**

*i. This Case was Filed and Advanced in Good Faith.*

The Movants imply that this case was filed in bad faith to prevent Mr. Diveroli from taking the stand, rather than for a valid bankruptcy purpose. The Debtor's conduct plainly demonstrates the opposite. Mr. Diveroli took the stand and testified in front of the Hon. Brendan L. Shannon on August 14, 2026. He also appeared in person before this Court on August 18, 2026, and attended this Court's remote hearings on August 19, 2026. Contrary to the Movants' suggestions, the Debtor's petition was a legitimate corporate decision to preserve and maximize the value of assets, claims, and disputed property interests, including in a liquidating or control-dispute setting. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003).

The Debtor filed the instant case to consolidate multi-jurisdictional disputes into a single forum, stabilize and preserve the value of the disputed portfolio for the benefit of all stakeholders, and allow orderly adjudication of competing ownership and creditor claims. Those are *bona fide* purposes. *Id.*; *see also In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).

Further, while the movants complain of the Debtor's failure to file first-day motions promptly, any delay was a consequence of the then-existing circumstances created by the numerous pending cases. Where, as here, a delay in filing case disclosures is not a deliberate attempt to conceal information, it does not constitute cause to appoint a trustee. *See, e.g.*, *In re Sundale, Ltd.*,

400 B.R. 890, 905 (Bankr. S.D. Fla. 2009). In any event, the Debtor is now compliant with all disclosure and filing requirements arising under the Bankruptcy Code and Bankruptcy Rules.

*ii.* *The Debtor Has Made Good Faith Efforts to Secure Insurance.*

As above, the Debtor acknowledges that at times it has not possessed sufficient insurance coverage. However, as evidenced on the record, the Debtor has obtained coverage of the properties under its control and is in the process of confirming appropriate insurance for all property claimed on the Debtor's Schedules. In any event, the Debtor will be in full compliance with the Code, Rules, and US Trustee Guidelines well-prior to a hearing on the Motions. To wit, the Court has ordered the Debtor to file a report on or before September 14, 2026, detailing the Debtor's policies and coverage.

*iii.* *The Appointment of Capital Assets Weighs Against Appointing a Trustee.*

CREO complains that the Debtor replaced Vesta Realty, Kulick's management company, with Capital Assets as property manager for certain properties of which the Debtor took possession for preservation purposes. This change was necessary because of the deteriorated and unsafe conditions that existed under Vesta's management that placed the tenants' health and safety at risk. This decision, which has proven to be effective, was made in good faith to protect the properties, the interests of all creditors, and, most importantly, the safety of thousands of tenants. It does not constitute cause for the appointment of a Chapter 11 Trustee.

*iv.* *Proposed DIP Financing and Cash Collateral Issues Do Not Require Appointment of a Chapter 11 Trustee.*

The movants next argue that the Debtor's proposed post-petition financing and use of cash collateral somehow establish "cause" for the appointment of a trustee. Seeking authority to obtain DIP financing and to use cash collateral is a routine and necessary step in chapter 11 cases, particularly where the Debtor must stabilize properties and pay essential operating expenses. The

suggestion that the Debtor's motions somehow justify appointment of a trustee is unpersuasive. Notwithstanding, the Court has entered interim orders on the Debtor's use of cash collateral and the Debtor has withdrawn without prejudice its motion for post-petition financing.

The mere fact that the Debtor sought certain relief from this Court does not constitute fraud, dishonesty, incompetence, or gross mismanagement under § 1104(a)(1). The movants' specific complaints have already been addressed through hearings on the motions. The continued existence of any dispute does not support the extraordinary remedy of displacing the Debtor's management.

**C. The Best Interests of the Estate are Not Met by Appointing a Chapter 11 Trustee.**

Appointment of a trustee at this juncture would be value-destructive and diminish recoveries available to stakeholders. The Debtor is already working in close collaboration with key creditors, the Chapter 11 Trustee appointed in the related Northern District of Texas cases, and the United States Trustee. Appointing yet another fiduciary would require substantial time to become familiar with the complex, multi-property portfolio and the pending ownership disputes, a delay and expense that would further erode the estate's value. Because the costs and disruption of a trustee far outweigh any marginal benefit, appointment is not in the best interests of the estate or its stakeholders.

**D. CREO's Motion to Dismiss Under § 1112(b) Must Also be Denied.**

Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that the court shall dismiss a case under this chapter if, upon notice and a hearing, the movant establishes cause and if it is in the best interests of the creditors and the estate. The Tenth Circuit considers the following nonexclusive factors when determining whether a debtor has filed a bankruptcy petition in bad faith: (1) the debtor has one asset; (2) the pre-petition conduct of the debtor has been improper; (3) there are only a few unsecured creditors; (4) the debtor's property has been posted for

foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court; (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost; (6) the filing of the petition effectively allows the debtor to evade court orders; (7) the debtor has no ongoing business or employees; and (8) the debtor lacks a possibility of reorganization. *In re Frontline Med. Servs. LLC*, 665 B.R. 818, 827 (10th Cir. 2024).

Applying these factors confirms the absence of bad faith. First, this is not a single-asset case. Second, as stated above, the Debtor has not engaged in improper pre-petition conduct. Third, there are multiple creditors, as evidenced by their active involvement in this case. The fourth, fifth, and sixth factors are inapplicable, and therefore weigh in favor of the Debtor. Seventh, though the Debtor currently has no employees, it is a functioning lending entity with a substantial portfolio of secured claims and related property interests. Eighth and last, Debtor has a realistic possibility of reorganization, and it is actively exploring restructuring options, and seeks to quiet the multi-jurisdictional litigation so that the value of its assets can be maximized for the benefit of all stakeholders.

For these reasons, the dismissal CREO seeks, largely based on improper conduct by Kulick that should not and cannot be imputed to the Debtor, is not appropriate. In fact, the Debtor represents to the Court that, given the several complex issues in dispute, dismissing this bankruptcy proceeding is not in the best interest of any of creditors or parties involved, CREO and the Debtor included.

## V. CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter an order denying Fairfax's Motion for Appointment of a Chapter 11 Trustee (Docs. 154 and 232); denying ACRE's Motion to Appoint Chapter 11 Trustee (Doc. 168); denying CREO's Emergency Motion

to Appoint a Chapter 11 Trustee or, Alternatively, to Dismiss the Chapter 11 Case (Doc. 172 and 184); and granting the Debtor such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Jason A. Sansone*

Clayton D. Ketter, OBA No. 30611
Jason A. Sansone, OBA No. 30913
Nicholas J. Candido, OBA No. 36069
PHILLIPS MURRAH P.C.
424 N.W. 10th St., Suite 300
Oklahoma City, OK 73103
(405) 235-4100 - telephone
(405) 235-4133 – facsimile
cdketter@phillipsmurrah.com
jasansone@phillipsmurrah.com
njcandido@phillipsmurrah.com
**Proposed Attorneys**
**for YSA Investments 1, LLC**

# EXHIBIT 1



# Real Estate Investment Portfolio

Vesta Capital is a fully integrated real estate investment firm that specializes in the acquisition, renovation, and ongoing management of multifamily communities in Arkansas, Kansas, and Oklahoma



## Resident-Focused Approach

Our dedicated management team is here to ensure your living experience is exceptional. We take pride in being responsive to your needs, from maintenance requests to community suggestions. Your comfort and satisfaction are our top priorities.

At Vesta Realty, we believe that a home is not just a place to live; it's a community that enriches your life.

Join us and discover the unique culture that sets our apartment complexes apart. We're more than property management; we're your partner in creating a thriving and connected community.



EXHIBIT # 32
DATE
DEPONENT
PROFESSIONAL REPORTERS (800) 376-1006

# Promoting Wellness and Recreation

Experience a well-rounded lifestyle with our thoughtfully designed wellness and recreation spaces. Take a dip in our sparkling pools, break a sweat in the fitness center, or unwind in our beautifully landscaped outdoor areas. We believe in providing amenities that cater to your well-being and enhance your daily living.





# Fostering Connection & Community

At Vesta, we understand that community is more than just a location; it's about the people. Our management team organizes events that bring neighbors together, fostering connections that turn our apartment complexes into true communities. Whether you're a social butterfly or someone who enjoys a more laid-back atmosphere, there's something for everyone.

# Our Communities

**Arkansas**

- The Canopy

**Kansas**

- Eaton Place

- The Canopy

**Kansas**

- Eaton Place

**Oklahoma: *Tulsa***

- 23 East
- 727 Lofts
- Barcelona
- Lakeside Place
- Lexington Commons
- One Eton Square
- Riverpark at Kensington
- Shoreline
- The Villas at Midtown
- Thrive Jenks
- Village Creek at 67th
- Woodland Oaks
- Woodland Manor

***Oklahoma: Oklahoma City***

- Bryan Hill
- Capitol on 28th
- Copperfield
- Drexel Flats
- Fairfax
- Muntage
- Putnam Green
- Remington Ranch
- Sand Hills
- Seminole Ridge
- Springdale Village
- Summer Oaks
- The Classen
- The Lofts at North Penn
- The Montgomery
- The Ridge
- Tuscany Village
- WoodScape

Vesta's Communities

This map was made with Google My Maps. Create your own.




## Arkansas:



The Canopy

240 Units - Section 8 Friendly

9201 Kanis RD Little Rock, AR 72205



### The Canopy

240 Units - Section 8 Friendly
9201 Kanis RD Little Rock, AR 72205
Property Website | Resident Portal

## Kansas:



### Eaton Place

116 Unit Multifamily in Wichita, KS
517 E Douglas Ave, Wichita, KS 67202
Property Website | Resident Portal

## Oklahoma: Tulsa DMA:



### 23 East

235 Unit Multifamily in Tulsa, OK
11321 E 23rd St Unit 1 Tulsa, OK 74129
Property Website | Resident Portal



### 727 Lofts

99 Unit Multifamily in Jenks, OK
727 E Main Pl Jenks, OK 74037
Property Website | Resident Portal



### Barcelona

232 Unit Class B Multifamily in Tulsa, OK
5160 S Yale Ave Tulsa, OK 74135
Property Website | Resident Portal



## 23 East

235 Unit Multifamily in Tulsa, OK
11321 E 23rd St Unit 1 Tulsa, OK 74129
Property Website | Resident Portal



## 727 Lofts

99 Unit Multifamily in Jenks, OK
727 E Main Pl Jenks, OK 74037
Property Website | Resident Portal



## Barcelona

232 Unit Class B Multifamily in Tulsa, OK
5160 S Yale Ave Tulsa, OK 74135
Property Website | Resident Portal



## Lakeside Place

208 Units - Section 8 Friendly
2186 S 99th E Ave Tulsa, OK 74129
Property Website | Resident Portal



## Lexington Commons

206 Unit Class B Multi-Family in Bartlesville, OK
5530 Colony Way Bartlesville, OK 74006
Property Website | Resident Portal



## One Eton Square

448 Unit Multifamily in Tulsa, OK
8111 E 60th St Tulsa, OK 74145
Property Website | Resident Portal




## Riverpark at Kensington

400 Unit Multifamily in Tulsa, OK
7803 S Wheeling Ave Tulsa, OK 74136
Property Website | Resident Portal



## Shoreline

464 Unit Class C+ Multi-Family in Tulsa, OK
9601 E 21st Pl Tulsa, OK 74129
Property Website | Resident Portal



## The Villas at Midtown

476 Units - Section 8 Friendly
2001 E Skelly Dr Tulsa, OK 74105
Property Website | Resident Portal









## Thrive Jenks

168 Unit Class A Multi-Family In Jenks, OK
204 S Riverfront Dr Jenks, OK 74037
Property Website | Resident Portal




## Village Creek at 67th

226 Units - Section 8 Friendly
6630 S Zunis Ave Tulsa, OK 74136
Property Website | Resident Portal



## Woodland Manor

305 Units - Senior Community
8641 E 61st St, Tulsa, OK 74133
Property Website | Resident Portal



## Woodland Oaks

428 Unit Multifamily in Tulsa, OK
7142 South 92nd East Avenue Tulsa, OK 74133
Property Website | Resident Portal

**Oklahoma: Oklahoma City DMA:**









## Bryan Hill

232 Units - Section 8 Friendly
7204 NW 36th St Bethany, OK 73008
Property Website | Resident Portal




## Capitol on 28th

231 Unit Multifamily in Oklahoma City, OK
215 NE 28th St, Oklahoma City, OK 73105
Property Website | Resident Portal



## Copperfield

262 Unit Multifamily in Oklahoma City, OK
2400 NW 30th St, Oklahoma City, OK 73112
Property Website | Resident Portal



## Drexel Flats

400 Units
8800 Drexel Ave Oklahoma City, OK 73159
Property Website | Resident Portal



## Fairfax

252 Units - Section 8 Friendly
7801 NE 10th St Midwest City, OK 73110
Property Website | Resident Portal



## Muntage

165 Units - Section 8 Friendly
3041 NW 41st St Oklahoma City, OK 73112
Property Website | Resident Portal




## Putnam Green

250 Units - Section 8 Friendly
7525 Knight Lake Dr Oklahoma City, OK 73132
Property Website | Resident Portal




## Remington Ranch

292 Units - Section 8 Friendly
1815 N. Boomer Rd. Stillwater, OK 74075
Property Website | Resident Portal



## Sand Hills

200 Units - Section 8 Friendly
1312 N Midwest Blvd Oklahoma City, OK 73110
Property Website | Resident Portal

250 Units - Section 8 Friendly
7525 Knight Lake Dr Oklahoma City, OK 73132
Property Website | Resident Portal

292 Units - Section 8 Friendly
1815 N. Boomer Rd. Stillwater, OK 74075
Property Website | Resident Portal

200 Units - Section 8 Friendly
1312 N Midwest Blvd Oklahoma City, OK 73110
Property Website | Resident Portal



## Seminole Ridge

224 Units - Section 8 Friendly
125 W Interstate 240 Service Rd. Oklahoma City, OK 73139
Property Website | Resident Portal



## Springdale Village

128 Units - Section 8 Friendly
4330 S Barnes Ave Oklahoma City, OK 73119
Property Website | Resident Portal




## Summer Oaks

197 Units - Section 8 Friendly
5744 NW 16th St Oklahoma City, OK 73127
Property Website | Resident Portal



## The Classen

66 Unit Class A High Rise in Oklahoma City, OK
2200 N Classen Blvd Oklahoma City, OK 73106
Property Website | Resident Portal




## The Lofts at North Penn

192 Unit Multifamily in Edmond, OK
15501 N Pennsylvania Ave Edmond, OK 73013
Property Website | Resident Portal



## The Montgomery

70 Unit Multifamily in Oklahoma City, OK
500 W Main Street Oklahoma City, OK 73102
Property Website | Resident Portal











## The Ridge

278 Units - Section 8 Friendly
3834 N Oak Grove Dr Midwest City, OK 73110
Property Website | Resident Portal



## Tuscany Village

308 Units - Section 8 Friendly
6900 London Way Oklahoma City, OK 73132
Property Website | Resident Portal



## WoodScape

498 Unit Multifamily in Oklahoma City, OK
4200 N Meridian Ave Oklahoma City, OK 73112
Property Website | Resident Portal

# Contact Us

First Name

Last Name

Company

Phone

Email

Please Select Which Department To Message

Comments or Questions

SEND EMAIL

### Main Phone

(918) 770-7528

### Corporate Office

1422 E 71st, Suite J. Tulsa, OK 74136

### Email

feedback@vestarealproperty.com
reception@vestarealproperty.com

### Follow Us

Privacy - Terms

# Contact Us

First Name | Last Name

Company

Phone | Email

Please Select Which Department To Message

Comments or Questions

SEND EMAIL

## Main Phone

(918) 770-7528

## Corporate Office

1422 E 71st, Suite J. Tulsa, OK 74136

## Email

feedback@vestarealproperty.com
reception@vestarealproperty.com

## Follow Us

VESTA CAPITAL

ABOUT US

Vesta Capital is a fully integrated real estate investment firm that specializes in the acquisition, renovation, and ongoing management of multifamily communities in Arkansas, Kansas, and Oklahoma

CONTACT INFORMATION

Phone: (918) 770-7528

Address: 1422 E 71st, Suite J .Tulsa, OK 74136

reception@vestarealproperty.com

QUICK LINKS

- Home
- About Us
- Invest With Us
- Our Communities
- Join Our Team
- News & Media

© 2025 Vesta Realty - All Rights Reserved.

Privacy Policy | Investment Disclai

Document title: Our Portfolio | Real Estate Investment | Vesta Capital
Capture URL: https://vestarealproperty.com/portfolio/
Capture timestamp (UTC): Sat, 20 Dec 2025 23:32:46 GMT

# EXHIBIT 2

# Conversation Details

| | |
|---|---|
| **Custodian:** Marc Kulick | **Custodian Phone Number:** +19132779535 |
| **Message Count:** 26 | **Start Date/Time (UTC):** 2025-02-18 14:26:47 |
| **Attachment Count:** 2 | **End Date/Time (UTC):** 2025-02-18 21:59:04 |
| **Participants:** Robert EFRAIM (+16784648773),Efriam Deveroli (+13057478978),Efriam Deveroli (+13057478978),Robert EFRAIM (+16784648773),Robert EFRAIM (+16784648773),Marc Kulick (+19132779535) | |

Morning guys! How are we looking

2025-02-18 14:26:47

Robert EFRAIM (+16784648773)

Hey Marc. I'll have updates to you as soon as I have them myself. I'm reviewing everything you sent and will be speaking with Christopher shortly

2025-02-18 15:04:11

Robert EFRAIM (+16784648773)

Hey guys. Senr email re outline of terms, the two docs Christopher wanted to understand differences on I'm no longer ahead of schedule due to other matters today. Will still get this done quickly but I can't talk until in Christopher hands so please email text with specificity

2025-02-18 18:52:47

Robert EFRAIM (+16784648773)

meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities? If just names, it's easier. If we want to include the capital contribution for each as in prior version though, that's more tedious and I need the exact numbers Thanks, guys

2025-02-18 19:01:32

The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole

2025-02-18 19:02:55

Robert EFRAIM (+16784648773)

Marc, re your email "On the final point, point 5, I'd just say that the T3 NOI from Jan, December and November will be no less than 5.3m on accrual accounting", are you suggesting that instead of reconciliation with t12s or in addition to? Agreed it would be the individualized and consolidated? Efraim, please let me know what's acceptable. Just need final answer if yall can give to me

2025-02-18 19:23:16

1) as discussed on the phone reconciliation isn't the right word. It's more just justifying my numbers from the other spreadsheet 2) what was sent to you was consolidated so the above will he consolidated as well 3) however the DOMO report will be individualized per asset

2025-02-18 19:25:22

But my biggest concern is as usual (lol) funding. Do we have enough time to get this done?

2025-02-18 19:26:10

Robert EFRAIM (+16784648773)

Yes, pretty certain. I wanted to get it to you earlier. I need to learn to hang up on calls/say no to odds and ends (nothing to do with this project whatsoever) and somehow control my schedule and workload. Just wanted things to you sooner

2025-02-18 19:32:36

Efraim can we please get signed so we can push aheadM

2025-02-18 19:38:15

Ahead*

2025-02-18 19:38:17

Robert EFRAIM (+16784648773)

Together with that, can yall give me consensus on the entity language for collateral agreement. I can't get in weeds on it, but I can copy and paste whatever we want to include re other entities Unless counsel were to say otherwise, main pain point thouvh is keeping encumbered and unencumbered entities separate. There are covenants on unencumbered that would cause problems if we got them backwards, I think

2025-02-18 19:45:29

Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?

2025-02-18 19:46:41

Robert EFRAIM (+16784648773)

It may, I would think so which makes life easier if so. Sounds viable to me

2025-02-18 19:47:55

Robert EFRAIM (+16784648773)

All docs in christopher's hands, have asked him to ensure whatever he sends back is final. Will furtber ask that whatever he sends can be directly forwarded by me to Marc for execution. If any possible issue identified by either of you in any doc, plz let me know as quickly as feasible

2025-02-18 21:14:42

Can we find a way to fund today still

2025-02-18 21:15:01

Efriam Deveroli (+13057478978)

I can make it happen if we sign in next 20 min

2025-02-18 21:17:56

First two docs witned

2025-02-18 21:40:56

Signed and sent

2025-02-18 21:40:58

Jay Saunders 2:08 PM
to me

I have not heard back from Goldman. Not sure what that means.

If the money comes in before we hear anything from Goldman, please flip it around and wire it out.

Very Best,
Jay

*Jay Saunders*
*Thirty Capital Financial*
***Hedging Advisory***
*O: 980-313-4371*
*M: 704-756-9582*
*F: 980-224-5478*
*E: jsaunders@thirtycapitalfinancial.com*

Show quoted text

2025-02-18 21:41:43

Honestly would be game changing for me to still be able to turn this around

2025-02-18 21:42:53

Robert EFRAIM (+16784648773)

Did you see note come in at few mins ago

2025-02-18 21:47:02

Robert EFRAIM (+16784648773)

On with banker

2025-02-18 21:47:10

Signing now

2025-02-18 21:47:20

Signed

2025-02-18 21:48:50

Wire out?

2025-02-18 21:59:04

# EXHIBIT 3

**From:** Marc Kulick [marc@vestarealproperty.com]
**Sent:** 2/18/2025 3:28:46 PM
**To:** Robert Miley [robert@vdacquisitions.com]
**CC:** Christopher Rogers [crogers@capitalfundlaw.com]; Efraim Diveroli [ed@vdacquisitions.com]
**Subject:** Re: YSA x Vesta Loan Docs - T12 Justification

Robert the entity list would remain exactly the same. No change to this document at all except to add a joinder that joins any asset controlled by any affiliate of mine

On Tue, Feb 18, 2025, 2:26 PM Robert Miley <robert@vdacquisitions.com> wrote:

Note attached. Btw, I think it's obvious, but I mistyped the maturity date in earlier email. It would be May 19 (May 18 is weekend). Assuming no heartburn was created by my error, but flagging it

Btw, concern that Marc gave a proposed solution for - collateral agreement included list of encumbered and unencumbered entities (17 total; 4 unencumbered). I don't have a paragraph ready to go w/ the contribution amounts for the full suite of entities, nor am I clear on which entities are unencumbered vs encumbered (likely have that info from Marc, but not time to hunt for it). Marc suggested adding joinder to his portfolio as a whole. Is that easy to integrate, and do you have language ready to go for it? Thank you as always,
Christopher

---

**From:** Robert Miley <robert@vdacquisitions.com>
**Sent:** Tuesday, February 18, 2025 2:42 PM
**To:** crogers@capitalfundlaw.com <crogers@capitalfundlaw.com>
**Cc:** Efraim Diveroli <ed@vdacquisitions.com>; Marc Kulick <marc@vestarealproperty.com>
**Subject:** Fw: YSA x Vesta Loan Docs - T12 Justification

Christopher, attaching first two items. Marc cc'd just so he can see anything in real time, but feel free to remove him from replies as necessary and I'll keep him updated. Attaching first two docs (COJ and Guaranty). Haven't created redlines, but main edits are Sections 4 and 5 of Guaranty. Language is currently messy, but I think I caught intent. Where we want attestation re all documents provided, I didn't have time to name each and every one of them so I provided file names, date, and total file size which inherently provides specificity

---

**From:** Marc Kulick <marc@vestarealproperty.com>
**Sent:** Tuesday, February 18, 2025 2:01 PM
**To:** Robert Miley <robert@vdacquisitions.com>
**Cc:** Efraim Diveroli <ed@vdacquisitions.com>
**Subject:** Re: YSA x Vesta Loan Docs - T12 Justification

Robert

My summary is using T3 financials tracking Jan 25, December 24 and November 24th. What Kara sent on the T12 was Jan 24 - December 24. Beyond that I am using cash accounting whereas the sheet Kara sent is using accrual accounting. Therr are always differences.

On the final point, point 5, I'd just say that the T3 NOI from Jan, December and November will be no less than 5.3m on accrual accounting

On Tue, Feb 18, 2025, 12:50 PM Robert Miley <robert@vdacquisitions.com> wrote:
Hi Marc,

I'm attaching the docs that I believe created the confusion. Basic question that Christopher has asked for an answer to: why does one of the attachments reference $45m NOI and the other reference $54m NOI

Efraim/Marc,

I'm outlining all terms as I understand them below. If either of you see any error or omission, please email or text me with specificity on the mistake. I can't be on any more calls until this is done and in Christopher's hands. This includes any changes to the proposed dates below - made efforts to verify all dates fall on weekdays, no issues on that end. Thanks guys

Working to make edits as rapidly as possible. May silence my phone until I'm done - once I'm done, I'll get them in Christopher's hands to review like lightning

To ensure there's no hiccup at the finish line, I'm summarizing the edits/terms below:

1. Loan Amount - $1.5m

a. Day One Deductions:

i. 2% origination fee

ii. $15k legal/admin fees

iii. First month's interest of $166,666.67 (regardless of whether we call it interest, effectively saying $166k~ is being paid on the first day of each month)

b. Wire Amount to Vesta - $1,288,333.33

2. Repayment Schedule (3-month term)

a. $166,666.67 on Feb 18, March 18, April 18 (Feb 18 payment is the same as referenced above)

b. Principal Repayment - April 18

c. 10-day extension option: Vesta may provide written notice no later than 5 days prior to April 18 electing to exercise a 10-day option period. If exercised, Vesta will pay $75k on April 18 and principal payment by April 28

3. Warranties and Reps:

a. Attestations that provided DD items are true and correct; warrant no material changes since providing docs; affirmative duty to advise if there is a negative material change (will ask Christopher for proposed language re negative material change)

4. Reporting:

a. Vesta will provide constant access via DOMO to a report tracking each property's NOI on a monthly, annualized 3-month annualized, and 12-month period. In the event that YSA requests other info/data, Vesta will make good faith effort to provide

5. Post-Closing Obligation:

a. By February 28, provide consolidated and individual T12s and T3s (from Jan through Dec 2023?). Maximum margin of error - .1% (example: for every $1m, max margin of error of $100)

# EXHIBIT 4

# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **VSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

E. Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F. In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. PLEDGE.

1.1 SECURITY INTEREST.

(a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

(b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

---

[1] Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrmefbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

4.2 COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4 OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an **"Event of Default"** by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 <u>Remedies upon Default</u>. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. <u>LIMITATION AS TO PLEDGOR</u>.

6.1 OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 <u>CLAIMS UNDER SEAL</u>. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 <u>DEFAULT BY LENDER</u>. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 <u>ADDITIONAL WAIVERS</u>. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 <u>MODIFICATIONS</u>. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 <u>SEVERABILITY</u>. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 <u>FURTHER ASSURANCES</u>. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 <u>LIMITATIONS OF LAW</u>. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

ASSET HOLDER, LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

**PLEDGOR**

VESTA HOLDINGS LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

**LENDER**

**YSA INVESTMENTS I, LLC**, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: ______________________
Name: Marc Kulick
Date:

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as and individual.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

______________________
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of April 9, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **PARC 1010 HOLDCO., LLC**, a Delaware limited liability company, **PARC 1010 GP, LLC**, a Delaware limited liability company and **PARC 1010 INVESTORS, LLC**, a Delaware limited liability company (collectively, "**Borrower**"), and **KULICK MANAGER, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower upon closing of the purchase of Wellsford Oaks LP, an Oklahoma limited partnership holds the rights, title, and interests (collectively, the "**Encumbered Interests**") in and to the following entity (the "**Borrower Entity**"): all of the limited partnership interest in Wellsford Oaks LP, an Oklahoma limited partnership and through its ownership of the Borrower Entity all rights, title, and interests in and to the that certain property located at 1010 E. 66th Pl., Tulsa Oklahoma (the "**Property**") subject to a first lien mortgage from Fannie Mae or Feddie Mac (the "**First Lien Holder**") to be issued at time of purchase of the Borrower Entity and secured by the Encumbered Interests and the Property.

C. Pledgor holds the following rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) 1% of the membership interest in Parc 1010 Investors, LLC, a Delaware limited liability company and all of the voting interest in such entity, (2) all of the membership interest in Parc 1010 Holdco., LLC, a Delaware limited liability company and (3) all of the membership interest in Parc 1010 GP, LLC, a Delaware limited liability company.

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

E. Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F. In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

G. Further, in connection with the Loan, Marc Kulick (the "**Guarantor**"), has executed a membership interest pledge and assignment agreement executed of even date herewith (the "**MIPAA**") in which the Guarantor has assigned all of its membership interest in Pledger until such time as the Borrower has repaid all interest in and principal due on the Loan.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. PLEDGE.

1.1 SECURITY INTEREST.

(a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor,

as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Borrower Collateral**". Further, Collateral also include all membership interest assigned to Lender pursuant to the MIPAA.

(b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal residence.

1.2 <u>ATTACHMENT</u>. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 <u>COLLATERAL</u>. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against any Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. <u>OBLIGATIONS</u>.

2.1 <u>SECURITY</u>. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement

and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 <u>DIRECT</u>. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. <u>REPRESENTATIONS AND WARRANTIES</u>. Borrower and Pledgor represent and warrant as follows:

3.1 <u>FINANCING STATEMENTS</u>. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 <u>OWNERSHIP</u>. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 <u>POWER AND AUTHORITY</u>. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 <u>MEMBERSHIP INTERESTS</u>. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 <u>LITIGATION</u>. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 <u>CURRENT DEFAULT</u>. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any

Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 DUE DILIGENCE MATERIALS. The items provided by Guarantor to Lender via a dropbox hyperlink[1] delivered on or about April 7, 2025, including five "zip files" - file names "Org Docs and Tax Returns"; "Leases and Leasing"; "Operations"; "Construction"; and "Reports and Similar Info"; a .xlsx file titled "Feb 25 Proforma Cash Flow Comparison Figures"; a .xlsx file titled "Parc 1010 - Model"; a pdf file titled "Org Chart (v.2)" and a pdf file entitled "Parc 1010 – OM", which have an aggregate file size of approximately [79.58 Megabytes], and include but are not limited to certain organizational documents, tax returns, lease agreements, operational documents and renovation documents related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Collateral in favor of Lender and shall not further encumber the Encumbered Interests or the Property with any additional liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

4.2 COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4 OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers

---

[1] Accessible as of April 8, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/vpna8wmxzwqkx2cs1sffh/AD6LnWrLC9VgxedrAwkGr7E/Parc%201010%20Due%20Diligence?rlkey=0g860nhogoxn22xqgg4avzlt2&e=1&subfolder_nav_tracking=1&dl=0)

405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver, or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, assert control over the Pledger and management authority over all Entities or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below. Alternatively, in lieu if sale, Lender may take control over the Entities, amend the operating and/or limited partnership agreements as necessary and operate the Entities in accordance with Lender's individual directives.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity,

Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. LIMITATION AS TO BORROWER.

6.1 OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) a security interest in favor of the First Lien Holder is expected to exist on the Encumbered Interests as of the date hereof or shortly thereafter that will have priority to Lender's security interest in the Encumbered Interests (the "**Other Interest**") and (ii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to the Other Interest, (ii) the existence or creation of the Other Interest shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence

of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 ADDITIONAL WAIVERS. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT,

ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in

Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

**PARC 1010 HOLDCO., LLC**, a Delaware limited liability company

By: Its Manager
Parc 1010 GP, LLC

By: Its Manager
Kulick Manager, LLC

By:________________
Name: Marc Kulick
Title: Manager

**PARC 1010 GP, LLC**, a Delaware limited liability company

By: Its Manager
Kulick Manager, LLC

By:________________
Name: Marc Kulick
Title: Manager

**PARC 1010 INVESTORS, LLC**, a Delaware limited liability company

By: Its Manager
Kulick Manager, LLC

By:________________
Name: Marc Kulick
Title: Manager

**PLEDGOR**

**KULICK MANAGER, LLC**, an Oklahoma limited liability company

By: ________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on April 9th, 2025 by Marc Kulick, as the Manager of Kulick Manager, LLC, an Oklahoma limited liability company and on behalf of PARC 1010 HOLDCO., LLC, a Delaware limited liability company, PARC 1010 GP, LLC, a Delaware limited liability company and PARC 1010 Investors, LLC, a Delaware limited liability company..

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

(STAMP SEAL ABOVE)

[signature]
(Signature of notarial officer)

My Commission Expires: 02/21/2029

Commission No.: #25002105

[signature pages continue]

**LENDER**

**YSA INVESTMENTS 1, LLC**, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated April 9, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: ______________________________
Name: Marc Kulick
Date:

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on April 9th, 2025 by Marc Kulick, as an individual.

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

______________________________
(Signature of notarial officer)

My Commission Expires: 02/21/2029

Commission No.: # 25002105

(STAMP SEAL ABOVE)

# GUARANTY AND ROFO

April 9, 2025

**MARC KULICK**, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Parc 1010 Holdco., LLC, a Delaware limited liability company, Parc 1010 GP, LLC, a Delaware limited liability company and Parc 1010 Investors, LLC a Delaware limited liability company (collectively, the "**Company**") and Lender.

1. GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company and Kulick Manager, LLC, an Oklahoma limited liability company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2. CERTAIN WAIVERS AND REQUIREMENTS.

   a. The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

   b. Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

   c. If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

   d. Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

   e. Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

f. Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and effect until the Obligations are satisfied.

g. Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3. RIGHT OF FIRST OFFER.

a. CERTAIN DEFINITIONS.

i. **"Loan"** shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii. **"Opportunity Notice"** shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b. ROFO.

i. Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the **"ROFO"**). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii. Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c. RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more

favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed with respect thereto.

d. TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4. REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a. This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b. Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a **"Guarantor Entity")**, in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e. The items provided by Guarantor to Lender via a dropbox hyperlink[1] delivered on or about April 7, 2025, including five "zip files" - file names "Org Docs and Tax Returns"; "Leases and Leasing"; "Operations"; "Construction"; and "Reports and Similar Info"; a .xlsx file titled "Feb 25 Proforma Cash Flow Comparison Figures"; a .xlsx file titled "Parc 1010 - Model"; a pdf file titled "Org Chart (v.2)" and a pdf file entitled "Parc 1010 – OM", which have an aggregate file size of approximately [79.58 Megabytes], and include but are not limited to certain organizational documents, tax returns, lease agreements, operational documents and renovation documents related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a

[1] Accessible as of April 8, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/vpna8wmxzwqkx2cs1sfth/AD6LnWrLC9VgxedrAwkGr7E/Parc%201010%20Due%20Diligence?rlkey=0g860nhogoxn22xqgg4avzlt2&e=1&subfolder_nav_tracking=1&dl=0)

material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

5. COVENANTS.

a. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of [Date] remains true, correct, and complete as of February 14, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default.**" Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. MISCELLANY.

a. All notices, requests, consents, approvals, demands and other communications required or

allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the other party that pertains to or arises from this Guaranty. Notwithstanding anything in this

Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

______________________________

**MARC KULICK**, an individual

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on April 9th, 2025 by Marc Kulick, an individual.

______________________________
(Signature of notarial officer)

My Commission Expires: 02/21/2029

Commission No.: # 25002105

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

(STAMP SEAL ABOVE)

[signature pages continue]

**JOINDER**

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

**YSA Investments 1, LLC**, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of July 16, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**") and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company (both "**Borrower**" and "**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

E. Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F. In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will also benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. PLEDGE.

1.1 SECURITY INTEREST.

(a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

(b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. All of the items provided by Guarantor to Lender via email and access to one or more cloud storage environments prior to the Effective Date related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

3.8 Minimum Reserves. As of the date hereof, Borrower and Pledgor directly and indirectly possess debt service reserves in an aggregate amount of at least $20,000,000 ("**Reserves**") as required by loan agreements with various third parties. Until repayment of the Loan, neither Borrower nor Pledgor nor any entity directly or indirectly owned or controlled by Borrower or Pledgor shall withdraw any Reserves without Lender's prior written consent.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

4.2 COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the

Guaranty).

4.4 OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

YSA Investments I, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before July 18, 2025, Borrower and Pledgor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before July 18, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Borrower and Pledgor provide additional information and data related to the same, and Borrower and Pledgor shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver, or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by

acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to

Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. <u>LIMITATION AS TO PLEDGOR.</u>

6.1 <u>OTHER INTERESTS</u>. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 <u>LIMITATION</u>. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has

under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to

have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 ADDITIONAL WAIVERS. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for

convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER AND PLEDGOR**

**VESTA HOLDINGS LLC**, an Oklahoma limited liability company

By: Its Manager
Louis Investments LLC

By:________________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on July 18, 2025 by Marc Kulick, as the Manager of Louis Investments LLC, the manager of Vesta Holdings LLC.

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

________________________
(Signature of notarial officer)

My Commission Expires: 02-21-2029

Commission No.: 25002105

(STAMP SEAL ABOVE)

[signature pages continue]

**LENDER**

YSA INVESTMENTS 1, LLC, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated July 16, 2025 (the **"Collateral Pledge and Security Agreement"**), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: ______________________
Name: Marc Kulick
Date:

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on July 16th, 2025 by Marc Kulick, as an individual.

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

______________________
(Signature of notarial officer)

My Commission Expires: 02-21-2029

Commission No.: 25002105

(STAMP SEAL ABOVE)

**GUARANTY AND ROFO**

July 16, 2025

**MARC KULICK**, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Vesta Holdings LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1. GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2. CERTAIN WAIVERS AND REQUIREMENTS.

   a. The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

   b. Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

   c. If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

   d. Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

   e. Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

   f. Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

effect until the Obligations are satisfied.

g. Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3. RIGHT OF FIRST OFFER.

a. CERTAIN DEFINITIONS.

i. "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii. "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b. ROFO.

i. Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii. Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c. RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d. TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4. REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a. This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b. Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a **"Guarantor Entity")**, in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, **"Material Action"** means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an **"Other Loan Default"**).

e. All of the items provided by Guarantor to Lender via email and access to one or more cloud storage environments prior to the Effective Date related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a **"Material Change"**), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

5. COVENANTS.

a. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By July 18, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of July 18, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of the date it was last provided to Lender remains true, correct, and complete as of July 18, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d. TRAILING REPORTS. By or before July 18, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

e. DOMO REPORTING ACCESS. By or before July 18, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an **"Event of Default."** Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. MISCELLANY.

a. All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the

other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

__________________________________
MARC KULICK, an individual

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on July 16th, 2025 by Marc Kulick, an individual.

ETHAN WYATT AUTRY
Notary Public, State of Oklahoma
Commission # 25002105
My Commission Expires 02-21-2029

__________________________________
(Signature of notarial officer)

My Commission Expires: 02-21-2029

Commission No.: 25002105

(STAMP SEAL ABOVE)

[signature pages continue]

**JOINDER**

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

**YSA Investments 1, LLC**, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

# GUARANTY AND ROFO

July 31, 2025

**MARC KULICK**, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Vesta Holdings LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1. GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2. CERTAIN WAIVERS AND REQUIREMENTS.

   a. The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

   b. Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

   c. If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

   d. Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

   e. Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

   f. Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

effect until the Obligations are satisfied.

g. Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3. RIGHT OF FIRST OFFER.

a. CERTAIN DEFINITIONS.

i. "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii. "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b. ROFO.

i. Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii. Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c. RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d. TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4. REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a. This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b. Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e. All of the items provided by Guarantor to Lender via email and access to one or more cloud storage environments prior to the Effective Date related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

5. COVENANTS.

a. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By August 4, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of August 4, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of the date it was last provided to Lender remains true, correct, and complete as of August 4, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d. TRAILING REPORTS. By or before August 4, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

e. DOMO REPORTING ACCESS. By or before August 4, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default**." Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. MISCELLANY.

a. All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the

other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

MARC KULICK, an individual

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on July 31, 2025 by Marc Kulick, an individual.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

**JOINDER**

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

**YSA Investments 1, LLC**, a Delaware limited liability company

By: *Robert Miley*
Name: Robert Miley
Title: Authorized Representative

# PROMISSORY NOTE

February 18, 2025 (the "**Effective Date**")

| | |
|---|---|
| "**Borrower**": | ASSET HOLDER, LLC, an Oklahoma limited liability company, having an address for notices of % Vesta Realty, LLC, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, Attention: Marc Kulick and A.J. Jindal. Email: legalnotices@vestarealproperty.com |
| "**Lender**": | **YSA INVESTMENTS I, LLC**, a Delaware limited liability company, having an address for notices of 8325 NE 2nd Ave. Miami, FL 33138. Email: robert@vdacquisitions.com |
| "**Pledgor**": | VESTA HOLDINGS, LLC, an Oklahoma limited liability company, having an address for notices of % Vesta Realty, LLC, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, Attention: Marc Kulick and A.J. Jindal. Email: legalnotices@vestarealproperty.com |
| "**Principal Amount**": | One Million Five Hundred Thousand Dollars ($1,500,000). |
| "**Funding Date**": | The date on which Lender funds the Principal Amount (subject to reductions set forth under §§ 2.2, 3 and 4 below) to Borrower, which Lender shall cause to occur within the same business day as the Effective Date |
| "**Original Maturity Date**": | May 19, 2025 |
| "**Maturity Date**": | The first to occur of (i) the Original Maturity Date and (ii) the date on which an Event of Default (defined below) occurs |
| "**Interest Rate**": | One Hundred Thirty-Three and One-Third Percent (133.333%) per annum, based on a three-hundred-sixty (360)-day year and compounded monthly |
| "**Note**": | This Promissory Note, as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time |
| "**Loan Documents**": | Collectively, (1) this Note, (2) the Collateral Pledge and Security Agreement of even date herewith between Lender and Borrower (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**CPSA**"), (3) the Guaranty and ROFO of even date herewith made by Marc Kulick, an individual ("**Guarantor**"), for the benefit of Lender, (4) the Affidavit of Confession of Judgment made by Borrower for the benefit of Lender, and (5) and any other document that is executed in connection with the Loan from time to time |
| "**Loan**": | The Loan from Lender to Borrower, as evidenced by this Note and the other Loan Documents |
| "**O.P.B.**": | At any given time, the sum of (i) the outstanding Principal Amount, (ii) any and all capitalized interest on the Loan, and (iii) any other amounts that are due or have accrued under the Loan and have not been paid (excluding interest that has not been capitalized) |
| "**Payoff Amount**": | At any given time, the sum of (i) the O.P.B., (ii) all interest on the Loan that has accrued, not been paid, and not been capitalized, and (iii) any amounts that would become due under the Loan (including under this Note) if the O.P.B. were prepaid, including the Minimum Interest (defined below), if due |

"Event of Default": Each of the following: (i) Borrower fails to pay any amount that becomes due under this Note, (ii) Borrower defaults in the performance or observance of any other term or condition in this Note (including §8.5 below), and Borrower does not cure such default within ten (10) days after Lender notifies Borrower thereof; (iii) Borrower breaches any warranty or representation under this Note and does not cure such breach within ten (10) days after Lender notifies Borrower thereof; and (iv) the occurrence of an "Event of Default" under any other Loan Document. Notwithstanding anything to the contrary in clauses (ii) and (ii) above, if the cause of the default thereunder is fraud in the inducement, then Borrower shall not be entitled to the cure period therein.

1. PROMISE TO PAY. For value received, Borrower promises to pay to the order of Lender the Loan, together with any other amounts due under this Note and any other Loan Document, on or before the Maturity Date.

2. PRINCIPAL AND INTEREST.

2.1 ACCRUAL. Interest shall accrue on the O.P.B. at the Interest Rate, subject to §4.

2.2. PAYMENTS.

2.2.1. Notwithstanding anything in this Agreement to the contrary, payments shall be made in accordance with the following schedule and in the following minimum amounts except as otherwise increased by accrued interest or any other applicable costs or fees:

| | |
|---|---|
| February 18, 2025 | $166,666.67 (which shall be deducted from Lender's funding of the Principal Amount funded to Borrower) |
| March 18, 2025 | $166,666.67 |
| April 18, 2025 | $166,666.66 |
| May 19, 2025 | $1,500,000 |

2.2.2. On the Maturity Date, the entire Payoff Amount shall be due.

2.2.3. All payments under the Loan must be made in immediately available U.S. funds.

2.3. DUE DATE. Whenever any payment is stated to be due or a computation is to be made on a day that is not a business day, such payment or computation will be made on the immediately following business day.

2.4. APPLICATION. Each payment under the Loan shall be applied when received as follows: first, to any fees, penalties, expenses, and other costs (including reasonable attorneys' fees and costs incurred hereunder or under any other Loan Document) that Borrower is obligated to pay hereunder or under any other Loan Document; second, to interest on the Loan that has accrued, not been paid, and not been capitalized; and the remainder to reduce the O.P.B.

2.5. MINIMUM INTEREST. Borrower shall be obligated to pay Lender at least three (3) months of interest on the Principal Amount at the Interest Rate (the "Minimum Interest"). I.e., if when Borrower pays the Payoff Amount, the amount of interest that has become due under the Loan (the "Total Interest Due") is less than the Minimum Interest, then the Payoff Amount shall be increased by the difference between the Minimum Interest and the Total Interest Due.

Alternatively, if when Borrower pays the Payoff Amount, the Total Interest Due equals or exceeds the Minimum Interest, then the Payoff Amount shall not be increased or otherwise affected by the Minimum Interest.

2.6. LENDER PAYMENT INSTRUCTIONS. All payments by Borrower to Lender shall be made payable by ACH in accordance with the following ACH payment instructions except as otherwise provided by Lender to Borrower in writing:

YSA Investments I LLC
6899 Collins Ave
Unit #808
Miami Beach, FL 33141

**ACH & Domestic wires**

| | |
|---|---|
| Receiving Bank ABA: | 064008637 |
| Receiving Bank Name: | Pinnacle Bank<br>150 3rd Ave S, Nashville, TN 37201 |
| For Credit to (Beneficiary) | YSA Investments I LLC |
| Account number: | 600109606954 |

2.7. PREPAYMENTS. Subject to the Minimum Interest, Borrower may prepay the Loan in whole or in part from time to time without penalty, fee, or premium.

2.8 LATE FEE. If any payment that is due under the Loan is not timely paid, then a late charge equal to two percent (2%) of the amount of such payment shall immediately and automatically accrue. Borrower (i) acknowledges that a late payment would result in losses and expenses to Lender such as lost opportunity costs and increased costs of collection, (ii) agrees that the actual losses and expenses in connection with a late payment are unpredictable and uncertain (and may be less or more than the late charge), and (iii) agrees that such charge is a fair, *ex ante* agreement on such losses and expenses.

2.9. MATURITY DATE EXTENSION. Notwithstanding anything in the Loan Documents to the contrary, Borrower may receive a 10-day extension of the Maturity Date by (i) providing Lender with written notice requesting the extension via email by or before May 14, 2025 and (ii) paying Lender the amount of seventy-five thousand dollars ($75,000) by or before the original Maturity Date, which amount shall be received by Lender by or before the original Maturity Date for such extension to be effective.

3. ORIGINATION FEE. On the date hereof, Borrower shall pay Lender an origination fee equal to two percent (2%) of the Principal Amount (the "**Origination Fee**"). The Origination Fee shall be deemed fully earned, payable, and non-refundable upon the execution of this Note and the other Loan Documents. On the Funding Date, Lender shall deduct the Origination Fee from Lender's funding of the Principal Amount, and Borrower shall be deemed to have paid same.

4. LEGAL FEES. The Parties acknowledge that Lender has incurred legal fees in connection with the negotiation, revision, and execution of the Loan Documents. On the Funding Date, Lender shall deduct the amount of $15,000 from Lender's funding of the Principal Amount.

5. EVENT OF DEFAULT.

5.1. If an Event of Default occurs, then Lender may exercise any lawful rights and remedies that may be available to Lender, whether at law, in equity, or otherwise. In addition thereto and without limiting the foregoing: (i) the commitment and obligation of Lender to extend credit or to make disbursements under this Note or any other Loan Document shall immediately and automatically terminate; (ii) Borrower shall indemnify, defend, and hold Lender harmless from and against any actual loss, damage, harm, injury, claim, liability, cost, or expense

(including reasonable attorneys' fees) that is caused by such Event of Default or arises therefrom; (iii) while an Event of Default exists, the O.P.B. shall accrue interest at a rate equal to the Interest Rate plus five percent (5%) per annum; (iv) pursuant to Section 4.6 of the CPSA, Lender as Borrower's attorney-in-fact may take any steps it deems necessary in its sole discretion to protect its interests; and (v) Lender may pursue any remedy provided in the CPSA. Lender shall further be entitled to any attorney's fees, costs, or other damages that may be available to it as a result of an Event of Default.

5.2. In connection with any Event of Default (and in addition to any other remedies Lender may possess), Borrower knowingly, voluntarily, and intentionally authorizes any attorney who represents Lender to appear on Borrower's behalf, from time to time, in any court of record possessing jurisdiction over this Note for the purposes of (i) waiving issuance and service of process and (ii) confessing judgment in favor of Lender against Borrower in the Payoff Amount. In connection therewith, presenting this Note or a copy hereof verified by an affidavit shall be a sufficient warrant.

6. WAIVER. Borrower—for itself and any and all endorsers, guarantors and sureties of this Note, and each of them, and their successors and assignees, respectively—hereby (i) waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the Note and CPSA, including but not limited to the payment of this Note (excepting only notices expressly provided for herein), and agrees that its liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Lender; (ii) waives all defenses to the enforcement of this Note other than the defense of full performance; (iii) consents to every extension of time, renewal, waiver or modification that may be granted by Lender with respect to the payment or other provisions of this Note, and to the release of any borrowers, makers, endorsers, guarantors or sureties, or of the collateral pledged under the CPSA (the "**Collateral**"), or any part hereof, with or without substitution, and agrees that additional borrowers, makers, guarantors or endorsers may become parties hereto without notice to Borrower and without affecting the liability of Borrower hereunder; and (iv) waives the right to assert a setoff, counterclaim, or deduction in any action or arising out of or in any way connected with this Note or any other Loan Document (except for compulsory counterclaims and the defense of full performance). No right of rescission, setoff, abatement, diminution, counterclaim, or defense has been or will be asserted with respect to this Note or any other Loan Document.

7. SECURITY. This Note is secured by—and on the terms in the CPSA, Lender is and shall be entitled to the benefits of—the liens, encumbrances, and obligations on the Collateral that are created by this Note and the other Loan Documents. In connection therewith, the applicable terms and provisions of the other Loan Documents are hereby incorporated herein.

8. BUSINESS LOAN; USURY.

8.1. Borrower represents and warrants that (i) the entire proceeds of the Loan will be used to further the business purposes and objectives of it and its affiliates, and (ii) none of the proceeds of the Loan will be used for personal, family, or household purposes. Borrower shall not, whether directly or indirectly, use any proceeds of the Loan (a) for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, (b) to extend credit to any person for the purpose of purchasing or carrying any such margin stock, or (c) for any purpose which violates, or is inconsistent with, Regulation X of such Board of Governors.

8.2. If the interest rate under this Note exceeds the maximum lawful interest rate at any time, then the interest rate under this Note, for such period of time which it exceeds the maximum lawful rate, will be reduced to (and will equal) the maximum lawful rate at such time. If Lender

receives any interest payments in excess of the maximum amount permitted by law, then (i) such excess will be applied to reduce the O.P.B., whether then due and payable or not, and any other amounts owing under this Note, and (ii) the balance remaining (if any) will be returned to Borrower upon Borrower's request.

9. REPRESENTATIONS AND WARRANTIES OF BORROWER. Borrower represents and warrants as follows:

9.1. FORMATION. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation, and is duly qualified or licensed and in good standing to do business as a foreign entity in all jurisdictions in which Borrower does business and such qualification is required.

9.2. AUTHORIZATION. Borrower has full power and authority to enter into this Note and to perform all obligations required to be performed by it hereunder. The execution, delivery and performance by Borrower of this Note and any Loan Documents to which Borrower is a party are within Borrower's powers, have been authorized by all necessary company action and do not and will not contravene Borrower's formation or constitutional documents, violate any provision of law or result in a breach of or default under any other agreement to which Borrower is a party.

9.3. OBLIGATION. This Note, when executed and delivered by Borrower, will constitute Borrower's valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

9.4. LITIGATION. As of the Effective Date, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Borrower under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

9.5. CURRENT DEFAULT. As of the Effective Date, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Borrower's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

10. RELATED COVENANTS.

10.1. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower covenants that if an Other Loan Default occurs or if Borrower receives notice of a Material Action, then Borrower shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, LLP

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

10.2. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

11. MISCELLANY.

11.1. JOINT AND SEVERAL LIABILITY. If more than one person or entity constitutes "Borrower," then all obligations of any kind under this Note (including all liabilities) shall be joint and several to each person or entity that constitutes "Borrower" from time to time.

11.2. NOTICES, DISBURSEMENTS, AND PAYMENTS.

11.2.1. Each notice, request, demand, approval, consent, and other communication that pertains to this Note (each, a "**notice**") must be in writing, be delivered to the address(es) set forth on the first page of this Note, and be delivered (a) personally, (b) by a national overnight courier, or (c) by electronic mail (provided, however, that any notice delivered personally or by a national overnight courier must also be sent on the same day by electronic mail). Each notice shall be deemed to have been given when it is received or refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

11.2.2. Each disbursement or payment under this Note (as applicable) shall be made using wire, A.C.H., or other such instructions that Borrower or Lender (as applicable) provides to the other party from time to time. Each such disbursement or payment shall be deemed to have been made when it is received.

11.2.3. From time to time, each of Borrower and Lender may (i) change its address for receiving notices and/or instructions for receiving disbursements or payments (as applicable), and (ii) specify up to two (2) additional addresses for receiving a copy of any notice, in each case by delivering a notice thereof to the other party in accordance with §9.2.1 above at least five (5) days in advance.

11.3. TRANSFER OF LOAN. Without the other party's prior approval, neither party hereto shall assign, delegate, or otherwise transfer or convey any of its rights or obligations pertaining to the Loan. Subject to the foregoing, this Note shall bind and inure to the benefit of each party hereto and its successors and assignees.

11.4. GOVERNING LAW; VENUE. This Note shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower and pertaining to or arising from this Note, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in

Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Note, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each party hereto (i) waives any right it may have to domesticate any judgment obtained in connection with this Note, and (ii) waives trial by jury in any action, proceeding, or claim pertaining to this Note. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Note (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Note to the contrary, the parties agree that any Event of Default will result in irreparable harm to the injured party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching party and without the injured party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default by Borrower, Borrower further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower, in each case excluding the defense of full performance.

11.5. CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

11.6. TIME OF ESSENCE. Time is of the essence in this Note.

11.7. SEVERABLE PROVISIONS. Every provision of this Note is intended to be severable. If any term or provision hereof is declared by a court of competent jurisdiction to be illegal, invalid, or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the balance of the terms and provisions hereof, which shall remain binding and enforceable.

11.8. INTERPRETATION. Unless specifically written to the contrary, (i) all instances of "including" and other derivations of "include" in this Note shall mean "including, without limitation," and (ii) all instances of "any" shall mean "any and all." Section headings shall be for convenience and reference only—not interpretation.

11.9. NO ORAL MODIFICATION: INTEGRATION. This Note and any other Loan Document may be amended or revised only by a written instrument that is signed by Borrower and Lender. This Note, together with any other Loan Documents, (i) supersedes any prior commitments, agreements, representations, and understandings (whether oral or written) between Borrower and Lender regarding the subject matter hereof and thereof, and (ii) may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions between Borrower and Lender. Each of Borrower and Lender acknowledges and agrees that there are no oral agreements between Borrower and Lender.

11.10. EXECUTION AND STORAGE.

11.10.1. This Note may be executed in counterpart signature pages. Electronic and other non-original signatures on this Note shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Note may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform

Electronic Transaction Act, and any applicable state law. Any Note that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Note had been physically executed using so-called "wet ink" signatures.

11.10.2. A copy of this Note may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Note so stored. All parties hereto agree and stipulate that any reproduction of this Note that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

IN WITNESS WHEREOF, Borrower has executed this Note as of the Effective Date.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of Asset Holder, LLC, an Oklahoma limited liability company.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

______________________
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **VSA INVESTMENTS I LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

E. Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F. In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. PLEDGE.

1.1 SECURITY INTEREST.

(a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

(b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

---

[1] Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBO?rlkey=ge5mto1sbrmefbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

4.2 <u>COSTS</u>. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 <u>DEBT OBLIGATIONS</u>. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4 <u>OTHER LOAN DEFAULT AND MATERIAL ACTIONS</u>. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

YSA Investments I, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 <u>RIGHT OF LENDER TO NOTIFY OTHERS</u>. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 <u>POWER OF ATTORNEY</u>. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 <u>NO WAIVER BY LENDER</u>. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("SEC") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. <u>LIMITATION AS TO PLEDGOR.</u>

6.1 OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 ADDITIONAL WAIVERS. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

ASSET HOLDER, LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

**PLEDGOR**

VESTA HOLDINGS LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

______________________
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

LENDER

YSA INVESTMENTS 1, LLC, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: ______________________
Name: Marc Kulick
Date:

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th 2025 by Marc Kulick, as and individual.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

# GUARANTY AND ROFO

February 18, 2025

MARC KULICK, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS I, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Asset Holder, LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1. GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company and Vesta Holdings LLC, an Oklahoma limited liability company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2. CERTAIN WAIVERS AND REQUIREMENTS.

a. The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

b. Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

c. If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

d. Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

e. Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

f. Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

effect until the Obligations are satisfied.

g. Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3. <u>RIGHT OF FIRST OFFER</u>.

a. <u>CERTAIN DEFINITIONS</u>.

i. "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii. "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b. <u>ROFO</u>.

i. <u>Offer</u>. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii. <u>Response</u>. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c. <u>RENEWED RIGHT</u>. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d. TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4. REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a. This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b. Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e. The items provided by Guarantor to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "Material Change"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

[1] Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvoze8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1shrmefbwtimwmhc0qg&e=1&st=j01p1kik&dl=0)

COVENANTS.

a. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments I, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of [Date] remains true, correct, and complete as of February 14, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d. TRAILING REPORTS. By or before February 28, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

e. DOMO REPORTING ACCESS. By or before February 20, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three month annualized, and twelve month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof

(provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default**." Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. <u>MISCELLANY</u>.

a. All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or

borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

MARC KULICK, an individual

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, an individual.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

**JOINDER**

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

**YSA Investments I, LLC**, a Delaware limited liability company

By: Robert Miley
Name: Robert Miley
Title: Authorized Representative

# EXHIBIT 5

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC<br><br>Plaintiffs,<br><br>v.<br><br>YSA INVESTMENTS 1, LLC,<br><br>Defendant. | C.A. No. 2025-1319-KSJM |
| YSA INVESTMENTS 1, LLC,<br><br>Counterclaim-Plaintiff and Third-Party Plaintiff,<br><br>v.<br><br>MARC KULICK, VESTA HOLDINGS, LLC, et al.,<br><br>Counterclaim-Defendants and Third-Party Defendants. | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: April 9, 2026
Date Decided: June 9, 2026

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; Benjamin H. Brodsky, Michael Fisher, BRODSKY FOTIU-WOJTOWICZ, PLLC, Miami, Florida; *Counsel for Plaintiffs and Counterclaim-Defendants, Marc Kulick, Vesta Holdings, LLC, and Asset Holder, LLC.*

Sarah R. Martin, Samuel L. Moultrie, GREENBERG TRAURIG LLP, Wilmington, Delaware; Joel Tasca, Kerry Kleinman, GREENBERG TRAURIG LLP, Las Vegas, Nevada; *Counsel for Defendant and Counterclaim and Third-Party Plaintiff YSA Investments 1, LLC.*

**McCORMICK, C.**

Plaintiff Marc Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas. Beginning in October 2024, Defendant YSA Investments 1, LLC loaned the Kulick-led plaintiff entities millions of dollars. In February 2025, Kulick asked YSA for another loan. Because the amount requested was twice as large as any previous loan, YSA demanded better terms and additional security. In response, cash-strapped Kulick proposed an extremely favorable interest rate and agreed to pledge his entire real estate portfolio. YSA accepted the terms. And Kulick signed a joinder committing all entities that he owned, in whole or part, or managed or controlled directly or indirectly, to the obligations in the loan agreements. Kulick later defaulted on four loans, including the February loan, and YSA placed second mortgages on properties in Kulick's portfolio. Kulick filed this litigation to require that YSA remove the second mortgages and to enjoin YSA from recording additional second mortgages. The case proceeded to trial.

The key issue is whether YSA had the right to record mortgages on the properties. Kulick argues that the loan agreements identified as collateral interests in the holding companies, and not the properties at issue. But this argument does not matter, because the loan documents granted YSA expansive rights to take actions against real property owned by the collateral, including the properties. YSA exercised that right by recording the second mortgages. Kulick also argues that the loans cannot be enforced because their terms were predatory, usurious, and against public policy. Setting aside the fact that Kulick proposed the loan terms about which

he now complains, this defense fails for a more basic reason—Delaware law does not extend usury defenses to limited liability companies like the plaintiff entities. This decision therefore enters judgment for YSA.

## I. FACTUAL BACKGROUND

The facts are drawn from the 222 joint trial exhibits, live testimony from four witnesses, deposition testimony from two fact witnesses, and 22 stipulations of fact. These are the facts as the court finds them after trial.[1]

### A. Marc Kulick And The Vesta Entities

Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas (the "Properties").[2] The Properties are owned by

---

[1] This decision cites to: C.A. No. 2025-1319-KSJM docket entries (by "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkt. 98 (by "Trial Tr. at"); stipulated facts set forth in the parties' Joint Pre-Trial Order, Dkt. 88 ("PTO"); and the Transcript of the November 25, 2025 hearing on Plaintiffs' Motion for Expedited Proceedings and Motion for Expedited Preliminary and Permanent Injunction, Dkt. 25 ("11/25/25 Hr'g Tr."). The parties called the following fact witnesses: Marc Kulick (owner and controller of Plaintiffs Vesta and Asset Holder); Efraim Diveroli (YSA's principal); Robert Miley (YSA's Rule 30(b)(6) representative); John Hall (Defendant's expert). The parties submitted the deposition transcripts of the live witnesses, except for John Hall, and called the following witnesses by deposition only: Kara Thomas (Controller at Vesta Realty) and Courtney Merritt (Controller at Vesta Realty). The transcripts of the witnesses' respective depositions are cited using the witnesses' last name and "Dep. Tr." The decision notes in citation form where a witness was designated to testify under Rule 30(b)(6). This decision cites the following declaration by the declarant's last name: Christopher Rogers (Partner at Capital Fund Law Group), Dkt. 86 ("Rogers Decl.").

[2] JX-185; Trial Tr. at 6:23–7:4 (Kulick). Some of Kulick's 34 assets have a tenancy in common ("TIC") ownership structure that results in two or more entities serving as the ultimate owners of the TIC assets. Trial Tr. at 7:5–8:1 (Kulick).

34 separate, single-purpose limited liability companies (the "Title Owners").[3] Each Title Owner is owned by one or more holding company (the "Intermediate Holding Companies").[4] The Title Owners are capitalized by investments at the Intermediate Holding Company level.[5]

Plaintiffs Vesta Holdings, LLC and Asset Holder, LLC (with Kulick, the "Plaintiffs")[6] are Kulick's personal investment vehicles.[7] Kulick is the sole owner and manager of Vesta and Asset Holder.[8] Vesta and Asset Holder hold membership interests in several Intermediate Holding Companies.[9] Kulick also holds an interest in all the Title Owners.[10]

### B. Plaintiffs Seek Short-Term Loans From Defendant.

In 2024, Kulick was in search of short-term financing for one of the Properties.[11] An acquaintance introduced Kulick to Efraim Diveroli. Diveroli is the

[3] Trial Tr. at 7:5–8:1, 115:22–116:17 (Kulick); JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A; *compare* PTO ¶ 6 *with* JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803.

[4] Trial Tr. at 7:5–8:1 (Kulick); *see* JX-198.

[5] Trial Tr. at 7:5–8:1 (Kulick).

[6] *Id.* at 8:7–18 (Kulick).

[7] *Id.* at 8:7–24 (Kulick).

[8] *Id.* at 8:7–8:18 (Kulick).

[9] *Id.* at 9:2–9:14 (Kulick).

[10] *Id.* at 49:17–51:1 (Kulick).

[11] JX-3 at 1; Trial Tr. at 9:18–10:8 (Kulick); Trial Tr. at 146:21–147:22 (Diveroli).

principal of Defendant YSA Investments 1, LLC ("Defendant" or "YSA"),[12] a special purpose vehicle for Diveroli's commercial lending.[13] Kulick connected with Diveroli in September 2024. Kulick urged Diveroli to finance some of his loans, claiming "[i]t's the easiest money you'll ever make" and that Diveroli has no reason to worry about losing his investment.[14]

On September 7, 2024, Kulick provided YSA a form agreement for the proposed loan.[15] On September 29, Kulick and his counsel provided YSA's counsel and Diveroli the material loan terms.[16] The terms included: a loan of $775,000, an interest rate of 7% per month (84% annualized), a 2% closing fee for YSA, and a right of first refusal in favor of YSA.[17] Kulick, Diveroli, and YSA's counsel discussed the proposed loan.[18] After, YSA's counsel proposed more detailed descriptions of the material terms, and

---

[12] Dkt. 81 ¶ 12.

[13] Trial Tr. at 146:10–20 (Diveroli); *see* Dkt. 81 ¶ 12.

[14] JX-3 at 4; JX-4 (attaching a draft loan agreement). The initial draft of the loan document contemplated an interest rate of 20% per annum, compounding annually. JX-4 at 2. Kulick explained his goal for the interest rate was to provide Diveroli "10% over the 3-month term." JX-3 at 10.

[15] JX-4 (providing Diveroli initial versions of a promissory note and a collateral pledge and security agreement); JX-3 at 2–12; *see* JX-6 at 4. The "form agreement" Kulick provided the borrower would have "[n]o right of rescission, setoff, abatement, diminution, counterclaim, or defense . . . with respect to this Note or any other Loan Documents." JX-4 at 4.

[16] JX-6; Trial Tr. at 10:11–13 (Kulick).

[17] JX-5 at 1–2 ("Efraim and I have basically finished our deal for Parc 1010 EM."); JX-3 at 2–12.

[18] *See* JX-46.

the parties deferred to Kulick's counsel to revise the documents consistent with that proposal.[19]

Kulick agreed to the revised terms on October 2 and his attorney agreed to update the drafts.[20]

The parties closed the transaction on October 8, 2024 (the "October 8 Loan").[21] The October 8 Loan included a Promissory Note ("Note"), a Collateral Pledge and Security Agreement ("CPSA"), and a Personal Guaranty and Right of First Offer (the "Guaranty" and collectively, the "Loan Documents").[22]

The October 8 Loan made Asset Holder the Borrower, Vesta the Pledgor, and YSA as the Lender.[23] YSA loaned Asset Holder $775,000, maturing ninety days after closing.[24] Asset Holder and Pledgor secured the October 8 Loan with "Collateral" defined as "Unencumbered Interests" and "Encumbered Interests" in the form of membership interests that Kulick held in the Intermediate Holding Companies.[25]

---

[19] JX-5 at 1–2 (noting that Kulick's counsel "prefer[ed] to make the initial edits" to the documents Kulick previously provided); JX-46 at 7–8.

[20] JX-6.

[21] PTO ¶ 7; JX-10.

[22] Kulick Day 1 Dep. Tr. at 28:19–23.

[23] JX-10 at 1.

[24] *Id.*

[25] *Id.* at 9. For the October 8 Loan, the Unencumbered Interests were Kulick's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC, Remington Ranch Investors, LLC, Copperfield Investors, LLC, and Putnam Investors, LLC. *Id.* Kulick represented that Asset Holder, as borrower, "owns the Unencumbered Collateral absolutely and free of any . . . encumbrance" and Asset Holder "has the unencumbered and unrestricted right to pledge the Unencumbered Collateral." *Id.* at 11.

The CPSA included a Power of Attorney provision applicable in the event of a borrower breach proposed by YSA on October 3. That day, YSA's counsel asked Kulick to provide a list of suits filed against "Vesta and its affiliated entities" and to identify any UCC liens.[26] A UCC search precipitated YSA's request.[27] Kulick then identified nine civil actions and stated that "none of the entities that are a party to this loan have any UCCs filed against them[.]"[28] YSA proposed additional terms, including the Power of Attorney provision. The Power of Attorney provision, quoted more fully in the below legal analysis, gave YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests . . . includ[ing] but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral."[29] Kulick agreed to most of the proposed terms but noted that he would need a few hours to consider the Power of Attorney,[30] which Kulick later agreed to.[31]

---

[26] JX-7 at 4.

[27] *Id.*

[28] *Id.* at 3.

[29] JX-9 at 2–3.

[30] *Id.* at 2; JX-3 at 15; JX-46 (discussing representations and warranties of the loan). For instance, Kulick agreed to "waive any defense or asset protection mechanism that may be available in the event of a default." JX-9 at 2.

[31] Trial Tr. at 54:2–56:5 (Kulick); JX-46.

The October 8 Loan was due with interest on January 8, 2025,[32] when Kulick was obligated to remit payment of $829,250.[33] But Kulick requested a one-week extension on January 8,[34] when he informed Diveroli he was short over $500,000.[35] Diveroli agreed to a short extension on the condition that Kulick pay an additional $25,000.[36] Kulick paid the $829,250 and additional $25,000 on January 21.[37] And YSA continued loaning Kulick money.

### C. Defendants Provide Additional Loans Subject To A Joinder.

By February 2025, YSA had loaned Kulick $4,775,000 over six loans.[38] That month, Kulick approached YSA requesting a $1,500,000 loan, nearly twice the amount of any previous Loan.[39] Diveroli wanted to loan the money to Kulick. Diveroli considered Kulick "a fantastic salesman" and "very persist[ent]," noting that Kulick "presents as trustworthy."[40]

---

[32] *Id.* at 2; JX-3 at 22–23 ("If money doesn't come in as expected would you be open to a week extension for an additional 25k of interest paid today.").

[33] JX-10 at 2.

[34] JX-3 at 22–24.

[35] JX-3 at 23.

[36] *Id.* at 22–24.

[37] JX-58; JX-22.

[38] JX-10 at 1 (October 8 Loan for $775,000); JX-60 at 2 (loaning Plaintiffs $750,000 on January 21, 2025); JX-63 at 2 (loaning Plaintiffs $750,000 on January 24, 2025); JX-65 at 2 (loaning Plaintiffs $800,000 on January 30, 2025); JX-67 at 2 (loaning Plaintiffs $850,000 on February 4, 2025); JX-71 at 2 (loaning Plaintiffs $850,000 on February 10, 2025).

[39] Trial Tr. at 149:3–22 (Diveroli); Rogers Decl. ¶ 4; *compare* JX-16 at 1 *with* JX-71 at 2.

[40] Trial Tr. at 151:19–152:5 (Diveroli).

But given that Kulick repaid the October 8 Loan late, and the amount requested, YSA "made it crystal clear" it would need "significantly more collateral" before agreeing to Kulick's request.[41] Diveroli directed his office to "cease almost all other activities" to review Kulick's portfolio of assets prior to extending additional capital.[42] And YSA searched for a consultant "familiar with multi-family residential real estate" who could assist in "making sure [YSA] [is] as protected by the collateral" as it was made to believe.[43]

On February 13, YSA requested that Kulick provide preliminary diligence materials.[44] Kulick resisted YSA's requests initially,[45] expressing his desire to end the parties' relationship, and even requested that YSA "release all liens . . . from the [October 8 Loan]."[46]

Kulick then changed his tune. The next morning, Kulick offered to move forward if YSA would accept a subset of the requested materials.[47] YSA agreed based on Kulick's offer to provide: "[a]ll tax returns"; "[a]ll mortgage statements"; "a

[41] *Id.* at 149:23–152:5 (Diveroli).

[42] *Id.* at 149:23–151:10 (Diveroli); JX-73; *see* JX-222.

[43] JX-222; *see* JX-73.

[44] JX-76 at 2 (Defendant requested the following materials: (i) bank statements for the preceding six months for all entities; (ii) financial statements from the last three years; (iii) tax returns from the last three years; (iv) internal analytics for the properties Kulick developed; (v) "all Loan Documents related to loans currently encumbering one or multiple properties that will be securing the loan"; and (vi) "[a]ny and all active UCC filings related to any of the entities/properties.").

[45] JX-73.

[46] JX-76 at 1.

[47] *Id.*

portfolio p&l" statement; and "[c]onstant live access to data curated between [Kulick's] team and [YSA]."[48]

YSA's counsel reviewed the materials. Because the materials did not clearly identify the entity associated with each property, YSA's counsel requested additional information.[49] YSA also asked whether any encumbrances on the properties would be senior to the contemplated loan.[50] Kulick provided additional documentation, including a broker's valuation opinion for one property and operating agreements for five of the entities.[51]

The following morning, Kulick texted Diveroli and Robert Miley, YSA's counsel, to check on the status of the Loan.[52] Miley responded by sharing an image of the CPSA provision that defined "Unencumbered Interests" and "Encumbered Interests."[53] Miley asked Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, could you please send me a paragraph that I can copy into it with the other entities?"[54]

Kulick immediately responded stating: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole[.]"[55]

---

[48] *Id.*

[49] JX-77 at 2–3.

[50] *Id.*

[51] JX-77 at 1.

[52] JX-12.

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.*

Miley then asked the group for "consensus on the entity language for the collateral agreement."[56] He noted that, given certain covenants in the CPSA, it was critical to keep the unencumbered and encumbered interests separate.[57] Kulick responded stating: "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?"[58]

Miley said that the joinder "may" work.[59] Miley then emailed Kulick updated drafts of the Confession of Judgment and Guaranty.[60] In the same email, Miley again flagged for the group Kulick's suggestion of adding a joinder to the CPSA. He noted that the CPSA does not clearly state which entities are intended to be "unencumbered vs encumbered."[61] Kulick responded: "No change to this document at all except to add a joinder that joins *any asset controlled by any affiliate of mine*."[62] YSA's counsel circulated a revised CPSA that included a one-paragraph joinder consistent with Kulick's proposal (the "February Joinder").[63]

On February 18, 2025, the parties entered the new loan agreement (the "February 2025 Loan").[64] The February 2025 Loan comprises: a promissory note (the

---

[56] *Id.* at 3.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] JX-13 at 1.

[61] *Id.*

[62] *Id.* (emphasis added).

[63] JX-15 at 1, 18, 32.

[64] PTO ¶ 7; *see generally* JX-16.

"February Note"); a collateral pledge and security agreement (the "February CPSA"), a Personal Guaranty and Right of First Offer (the "February Guaranty"); and a Joinder.[65] The February 2025 Loan is governed by Delaware law.[66]

Section 5(c) of the February Guaranty requires Kulick, as Guarantor, to "deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor. . . ."[67] Kulick delivered the required schedule of real estate owned, which identified the Title Owners.[68] Again, requiring a schedule of real estate owned by Kulick, the Guarantor, reinforces the terms and purpose of the February Joinder.

The February Guaranty, like the February CPSA, granted YSA a broad power of attorney (the "February Guaranty POA").[69] The February POA, in relevant part, provided: "Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests. . . ."[70]

---

[65] JX-16

[66] *Id.* at 6–7.

[67] *Id.* at 26.

[68] JX-27 at 39–40; JX-169 §§ 1–3, Ex. A (providing Louis Investments, LLC an entity solely owned and managed by Kulick "directly or indirectly, owns or controls" the entities listed on Exhibit A, which includes the Title Owners).

[69] JX-16 at 28.

[70] *Id.*

### D. Plaintiffs Default On Four Loans.

Plaintiffs ultimately defaulted on four loans (the "Defaulted Loans"): (1) the February 2025 Loan; (2) the "April 2025 Loan"; (3) the "July 16, 2025 Loan"; and (4) the "July 31, 2025 Loan."[71] Each Defaulted Loan followed the format of the February 2025 Loan,[72] in that each involved a Note, a CPSA, a Guaranty, and a Joinder.[73]

The principal amount of the February 2025 Loan is $1,500,000. Plaintiffs defaulted on May 19, 2025.[74] The interest rate is 133.333% per annum, compounded monthly.[75] Plaintiffs owe approximately $3.3 million under the February 2025 Loan.[76]

The principal amount of the April 2025 Loan is $300,000.[77] The purpose of the April 2025 Loan was to finance Kulick's closing costs related to the acquisition of Parc

---

[71] JX-16; JX-17; JX-20; JX-21; *see* JX-28.

[72] Trial Tr. at 14:2–8, 51:6–54:12 (Kulick).

[73] *See generally* JX-16; JX-17; JX-20; JX-21.The identity of the Borrower Entity providing the "Encumbered Interests" and the Pledgor Entity providing the "Unencumbered Interests" differ. JX-16 at 9 (identifying Vesta as Pledgor and Asset Holder as Borrower); JX-17 at 11 (identifying Kulick Manager, LLC as Pledgor and Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC as Borrowers); JX-20 at 9 (identifying Vesta as Pledgor and Borrower); JX-21 at 9 (identifying Vesta as Pledgor and Borrower). The April 2025 Loan included one bespoke feature, a membership interest pledge and assignment agreement ("MIPAA"). JX-17 at 34–42. The April 2025 Loan stands apart from the other Defaulted Loans in that regard. The MIPAA is not relevant to the resolution of this action.

[74] JX-94; JX-201; JX-28 at 2–4; *see* JX-104.

[75] JX-16 at 1.

[76] JX-28 at 2–4.

[77] PTO ¶ 17. The loan went to three entities owned by Kulick Manager, LLC—Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. PTO ¶ 17.

1010, an apartment complex in Tulsa, Oklahoma.[78] It was a short-term loan, due to be repaid ten days after closing.[79] But the transaction never closed.[80] The interest rate of the April 2025 Loan was 1,500% per annum, compounded monthly.[81] Plaintiffs owe approximately $3 million on the loan.[82]

---

Kulick manages each of the entities. JX-17 at 8–9. Under the April 2025 Loan, Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC are each a "Borrower" and the "Pledgor" is Kulick Manager, LLC. *Id.* at 1.

[78] PTO ¶ 17.

[79] *Id.* at 1–2.

[80] Trial Tr. at 117:20–118:1 (Kulick).

[81] JX-17 at 1. Kulick proposed repaying YSA $425,000, inclusive of principal and interest, in exchange for April 2025 Loan with a face value of $300,000. JX-3 at 53.

[82] Diveroli consistently messaged Kulick seeking payment once Kulick defaulted on the April 2025 Loan. JX-3 at 56–82; *see* JX-99 at 1. On June 16, Diveroli contacted Kulick to work out a plan for the two defaulted Loans, Kulick responded asking for a new loan and stating that: "you already have way more secure loan docs than anything else I've ever used." JX-3 at 83; *see* JX-104 at 1. On June 15, Kulick requested a new loan of $315,000 from Diveroli (the "June 2025 Loan"). JX-104. Kulick proposed satisfying the June 2025 Loan by repaying Diveroli $515,000 by July 1. *Id.* Kulick acknowledged he was in default under the April 2025 Loan and that failure to satisfy that Loan "would be a default on this loan." *Id.* Kulick also proposed including a $1,000,000 penalty if the June 2025 Loan negatively impact either the February 2025 Loan or the April 2025 Loan. *Id.* On June 19, Kulick and YSA closed on the June 2025 Loan. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan included a Note, an Affidavit of Confession of Judgment, a CPSA, and a Guaranty. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan reflected the terms proposed by Kulick. *Compare* JX-104 *with* JX-108. The principal amount of the June 2025 Loan was $315,000 and Kulick was obligated to repay $515,000 by July 1. JX-108 at 1–2. The interest rate of the June 2025 Loan is for 1565% per annum, compounded daily. JX-108 at 1. Also on June 19, Kulick executed a Confidential Side Letter Related to the February 2025 Loan, April 2025 Loan, and June 2025 Loan granting YSA the right to seek repayment from reserves held by entities identified on Schedule 3. JX-112; Trial Tr. at 114:4–116:22 (Kulick). The properties on Schedule 3 appear to overlap significantly with properties owned by the Title Owners. *Compare* JX-112 at Schedule 3 *with* PTO ¶ 6. Exhibit C to the Confidential Side Letter does not provide the full names of the listed entities and, since the names of the Title Owner

The principal amount of the July 15, 2025 Loan is $365,000.[83] Plaintiffs defaulted on July 30, 2025.[84] The interest rate is 960% per year, compounded daily.[85] Plaintiffs owe approximately $5 million on the loan.[86]

The principal amount of the July 31, 2025 Loan is $317,000. Plaintiffs defaulted on August 5, 2025.[87] The interest rate is 7,000% per year, compounded daily.[88] Plaintiffs owe a staggering $921 million on the loan.[89]

Kulick testified that he proposed the interest rates on each loan by reverse engineering whatever payment he thought appropriate on the loan amount.[90] He calculated that payment amount assuming timely payment.[91] But he knew that YSA implied the interest rate that appeared in the Loan Documents from those amounts.[92]

When asked at trial about the interest rates of the Defaulted Loans, Kulick testified that "I'm not playing the victim on paying high interest rates on my loans. I

---

and Intermediate Holding Companies share some names, it is difficult to discern the exact identity of each entity provided on Exhibit C. Also around this time, Diveroli offered Kulick a $5 to $10 million payoff option, which Kulick declined. Trial Tr. at 188:17–189:13 (Diveroli).

[83] JX-20 at 1

[84] *Id.*

[85] *Id.*

[86] JX-28 at 2.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 3.

[90] Trial Tr. at 91:9–19 (Kulick).

[91] *Id.* at 29:9–18 (Kulick).

[92] *Id.* at 91:9–93:3 (Kulick).

understand that, you know, my cash position was bad, it was stressed. I was having trouble getting investors to fund pro rata capital calls."[93] He also acknowledged that he kept returning to YSA because he was "desperate" for funding.[94]

**E. Defendant Records Second Mortgages.**

By August 2025, Plaintiffs had defaulted on four loans and owed approximately $900 million under the Defaulted Loans.[95] (By trial, Plaintiffs owed $932,149,606.85 under the Defaulted Loans.)[96]

In October 2025, Diveroli and two YSA representatives visited Kulick in Tulsa, Oklahoma, to diligence the Properties in connection with a contemplated loan where YSA would provide Plaintiffs tranche financing.[97] Diveroli asked to see "the worst units at the worst properties" to evaluate whether it made sense to move forward

[93] *Id.* at 94:20–24 (Kulick).

[94] *Id.* at 29:11–17, 84:16–18, 122:24–123:1 (Kulick).

[95] JX-28 at 4; *see* JX-24 (informing Kulick he owed $897,744,576 under the Defaulted Loans on December 2, 2025). Kulick complained throughout this litigation about Defendant's delays in providing a payoff summary. He testified that he made multiple requests for a payoff summary as early as November 2025. Dkt. 22 ¶ 28 ("On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars. . . ."). At trial Kulick testified he did not receive a payoff from YSA until February 6, 2026. Trial Tr. at 45:15–46:5 (Kulick); Dkt. 103 at 11. But in the Amended Complaint Plaintiffs plead having received a payoff summary on December 2, 2025, which is supported by contemporaneous evidence. JX-24.

[96] JX-28 at 2.

[97] Trial Tr. at 29:22–35:7 (Kulick).

with the requested tranche financing.[98] After the tour, they asked Kulick to join for a meeting at their hotel conference room.[99]

During the meeting, Diveroli informed Kulick that he owed them "well over a billion dollars" due to the compounding interest rates.[100] Diveroli told Kulick that he could "either do this *the easy way or the hard way*[.]"[101] As Kulick recalled, "[t]hey told me that basically they *now own my entire portfolio*[.]"[102] Kulick understood the "easy way" would entail handing over to YSA the deeds to the Properties in lieu of YSA seeking to foreclose on the Properties.[103] Kulick claims YSA offered cash if he were to hand over the deeds.[104] Kulick understood the "hard way" as involving litigation, as YSA had brought a draft complaint to the meeting.[105] YSA also threatened to alert persons in Kulick's professional network, including his Rabi and wife.[106]

---

[98] *Id.* at 32:2–24 (Kulick).

[99] *Id.* at 33:1–20 (Kulick).

[100] *Id.* at 33:1–19 (Kulick).

[101] *Id.* at 33:13–33:19 (Kulick) (emphasis added).

[102] *Id.* (Kulick) (emphasis added).

[103] *Id.* at 34:6–35:6 (Kulick).

[104] *Id.* (Kulick).

[105] *Id.* at 34:6–37:14 (Kulick).

[106] *Id.* at 34:19–35:6 (Kulick); *see* JX-23 (providing Plaintiffs and Plaintiffs' counsel the Complaint YSA filed in Superior Court noting "YSA also intends to submit litigation preservation letters to various third parties, including but not limited to Vesta employees, investors, and lenders that are believed to have either benefited from or borne witness to Defendants' misconduct"). In addition to attaching the Superior Court Complaint, YSA shared with Plaintiffs and Plaintiffs' counsel drafts of an amended complaint and motion for a temporary restraining order and noted

Diveroli pursued the hard way.[107] On October 31, 2025, YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas.[108] The Properties are owned by the Title Owners.[109] Kulick identified the Properties in compliance with Section 5(c)'s requirement under the February Guaranty to provide YSA the "complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly)" by Kulick, in connection with the February

---

"YSA is willing to forego further litigation, including the filing of the amended complaint, in exchange for Mr. Kulick executing deeds-in-lieu of foreclosure voluntarily turning over ownership of each of the subject properties. . . ." *Id.*

[107] Diveroli testified that it was only because YSA "discovered the fraud and deceit" coupled with the poor conditions of the Properties that YSA decided to record the second mortgages. Trial Tr. at 188:21–189:13 (Diveroli). Kulick acknowledged at trial that he repeatedly recorded second mortgages on properties owned by Title Owners. *Id.* at 110:24–113:7 (Kulick). Kulick admitted that two weeks before commencing this action he granted a second mortgage on another property owned by a Title Owner. *Id.* at 112:1–20 (Kulick); JX-170 (granting second mortgage on Jenk's Best Living on October 30, 2025); JX-168 (granting second mortgage on Eaton Place Best Living, LLC on October 24, 2025); JX-155 (granting second mortgage on Bartlesville Best Living, LLC on September 24, 2025). Kulick explained that 32 of Vesta's 34 properties routinely need cash, and his solution was to have Vesta make a loan to the cash-strapped property, to allow the property to get their reserve funded, and then subsequently pay back to the loan to Vesta. Trial Tr. at 115:7–116:18 (Kulick). Kulick acknowledged comingling his personal funds with Vesta's to create a "lending pool" to move cash around to pay the debts of one property with proceeds from another. Trial Tr. at 128:15–18, 129:9–13, 131:6–22 (Kulick). YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts. JX-198; JX-194 ("In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the net operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.").

[108] Dkt. 81 ¶ 21; JX-27; PTO ¶ 6.

[109] JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A.

2025 Loan.[110] Kulick testified that he personally owns interests in each Title Owner.[111]

### F. Plaintiffs File This Litigation.

Plaintiffs were first to file litigation. On November 13, 2025, Plaintiffs filed their Complaint against YSA, seeking an order from this Court requiring Defendant to remove the second mortgages.[112] At the same time, Plaintiffs moved for expedition and separately moved for expedited preliminary and permanent injunctive relief.[113]

On November 25, 2025, the court heard argument on Plaintiffs' motions to expedite and for injunctive relief.[114] In seeking preliminary injunctive relief, Plaintiffs claimed "many of these properties are under contract or actively being marketed for sale" including one property set to close the next day.[115] At the

---

[110] JX-16 at 26 ("By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of provided as of [Date] remains true, correct and complete as of February 14, 2025, in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof."); JX-27 at 39–40.

[111] Trial Tr. at 8:2–9:11 (Kulick).

[112] Dkt. 1 ¶¶ 37–44.

[113] Dkt. 1 at Plaintiffs' Motion to Expedite; Dkt. 1 at Plaintiffs' Motion for Expedited Preliminary and Permanent Injunction.

[114] Dkt. 14.

[115] 11/25/25 Hr'g Tr. at 4:6–5:10.

preliminary stage, Plaintiffs also claimed Kulick lacked authority to record second mortgages directly on the Title Owners' properties.[116]

The court denied Plaintiffs' request for preliminary injunctive relief because the relief requested—ordering Defendant to lift the second mortgages—was mandatory in nature and thus foreclosed, absent discovery to resolve factual disputes.[117] But the court granted expedition. The court directed the parties to "take some targeted discovery" to allow the court to determine "whether the defendant has the authority to impose these mortgages on a full discovery record that reflects the parties' intent."[118] The court did enjoin YSA from imposing additional second mortgages.[119]

On December 5, Plaintiffs filed their Amended Complaint.[120] The Amended Complaint asserts one claim.[121] Plaintiffs claim that Defendant unlawfully recorded the second mortgages and seek a declaratory judgment that the second mortgages are void, coupled with an order from this court directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[122]

---

[116] *Id.* at 15:24–17:5.

[117] *Id.* at 42:17–43:8.

[118] *Id.* at 44:1–8.

[119] *Id.* at 43:9–24.

[120] Dkt. 22.

[121] *Id.* ¶¶ 39–48 (alleging the second mortgages "are invalid" and seeking a "permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage[s].").

[122] *Id.* ¶¶ 42–48.

Plaintiffs again moved for Expedited Preliminary and Permanent Injunctive relief (the "Motion").[123] Defendant opposed the Motion.[124]

After the court preliminarily enjoined additional second mortgages, Defendants moved to set an injunction bond under Court of Chancery Rule 65 (the "Bond Motion").[125] On December 30, the court granted the Bond Motion, requiring Plaintiffs to post a bond in the amount of $22,368,257.93.[126] On January 7, 2026, Defendant informed the court that Plaintiffs were unable to post the bond.[127] Plaintiffs' failure to post bond caused the ordered injunction to dissolve by operation of law.[128]

On February 11, Defendant filed an Amended Answer and brought counterclaims and third-party claims.[129] Defendant asserted counterclaims against Kulick and Vesta and brought third-party claims against 46 named third-party defendants and Does 1-100 and Roe Entities 1-100.[130] On March 6, Plaintiffs

[123] Dkt. 23.

[124] Dkt. 32.

[125] Dkt. 29; Ct. Ch. R. 65(c).

[126] Dkt. 60 ("In connection with this Court's entry of a temporary restraining order [] in connection with the above-captioned action, within five (5) calendar days of the entry of this Order, Plaintiffs shall post with this Court a secured bond. . . .").

[127] Dkt. 64.

[128] Ct. Ch. R. 65(c).

[129] Dkt. 81.

[130] *Id.* ¶¶ 4–49.

answered the Counterclaims.[131] In May, Defendant began to effectuate service on the counterclaim/third-party defendants.[132]

The court held trial on March 5, 2026.[133] The parties completed post-trial briefing on March 26, 2026.[134]

## II. LEGAL ANALYSIS

Plaintiffs seek permanent injunctive relief, asking the court to order Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[135] To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction."[136] A party need not show imminent irreparable harm to obtain a permanent injunction.[137] There are other ways to demonstrate no adequate remedy at law.[138]

Permanent injunctive relief comes in one of two forms: prohibitive or mandatory. "A permanent injunction is a form of final relief that prohibits a party

---

[131] Dkt. 93.

[132] Dkt. 107; Dkt. 108; Dkt. 109; Dkt. 110; Dkt. 111; Dkt. 112; Dkt. 113.

[133] Dkt. 92.

[134] Dkt. 103.

[135] Dkt. 22 ¶ 48.

[136] *In re COVID-Related Restrictions on Religious Svcs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).

[137] *Id.* at 1228–31; 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d ed.) ("[I]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.").

[138] *Id.* at 1230.

from taking action or compels a party to take action."[139] Its negative version serves as a prohibitive injunction, "whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[140] Its affirmative or mandatory version compels a party to take specific action.[141]

An order directing YSA to undertake specific affirmative actions to remove the second mortgages is mandatory in nature.[142] Kulick bears the burden of proving that the second mortgages are "invalid" as a matter of law and that he has "clearly established" the legal right to have the court order YSA to cancel the second mortgages.[143] To show success on the merits, therefore, Plaintiffs must "clearly establish" the legal right they seek to enforce.[144] "The showing on the merits required

---

139 *Glob. Cap. P'rs LLC v. Green Sapphire Hldgs., Inc.*, 2026 WL 709819, at *45 (Del. Ch. Mar. 13, 2026), *judgment entered*, (Del. Ch. 2026).

140 *Id.* (quoting James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879)); *see In re COVID*, 285 A.3d at 1228; *NEC Fund VI HE Lender, LLC v. Hecate Hldgs. LLC*, 2026 WL 527007, at *7 (Del. Ch. Feb. 25, 2026).

141 *In re COVID*, 285 A.3d at 1226 n.4; 43A C.J.S. Injunctions § 19 ("A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury."); *Hughes Tool Co. v. Fawcett Publications, Inc.*, 315 A.2d 577, 579 (Del. 1974); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02[c] (2025) ("[A] mandatory injunction requires an individual to perform a specific act.").

142 Dkt. 22 ¶ 48.

143 *DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 434 (Del. Ch. 2021).

144 *DeMarco*, 263 A.3d at 434; *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *3 (Del. Ch. Aug. 7, 1989); *see Pomilio v. Caserta*, 215 A.2d 924, 925 (Del. 1965) ("There is no right to an injunction as a matter of course; and this is especially

by the 'clearly established' standard is 'more than a reasonable probability of success.'"[145] Satisfying the 'clearly established' standard requires "a showing that the petitioner is entitled as a matter of law to the relief" sought.[146]

Plaintiffs' claim flounders on the first element—Plaintiffs have not clearly established the right at issue. Plaintiffs' primary argument is that neither the CPSAs, nor the Joinders, nor the POAs, define Collateral to include properties held by the Title Owners. In the alternative, Plaintiffs argue that the CPSAs are usurious and cannot be enforced even if the CPSAs support Defendant's right to record the second mortgages.[147]

### A. Contractual Entitlement

Plaintiffs argue that Defendant must remove the second mortgages because the definition of "Collateral" in the Loan Documents did not create a security interest

---

so as to the mandatory writ which is issuable only in the exercise of extraordinary judicial caution.").

[145] *DeMarco*, 263 A.3d at 423 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 14.03[b][6], at 14-03.44 (2021)); *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990) ("Upon an application for mandatory preliminary relief, however, plaintiff must show more than a reasonable probability of success on the merits; he must clearly establish the legal right he seeks to protect or the duty he seeks to enforce.").

[146] *Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008); *Bertucci's Rest. Corp. v. New Castle Cnty.*, 836 A.2d 515, 519 (Del. Ch. 2003) ("[T]he Court of Chancery has consistently applied an exacting standard, requiring that an applicant seeking mandatory preliminary injunctive relief clearly establish the legal right he seeks to protect or the duty he seeks to enforce." (internal quotation omitted)).

[147] Dkt. 95 at 33.

in the Properties.[148] Defendant disputes Plaintiffs' interpretation of Collateral but says that it does not matter, because Defendant had the right to record the second mortgages even assuming Plaintiffs' interpretation.[149] This decision rules in Defendant's favor, concluding that Defendant had the right to record the mortgages even under Plaintiffs' interpretation.

The court's task is to interpret the Loan Documents in a way that carries out the parties' intent.[150] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[151] The contract terms will be given their "plain, ordinary meaning."[152] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[153] The court must "reconcile all the provisions of the instrument" if possible.[154] When a

---

[148] *Id.* at 19–21.

[149] Dkt. 100 at 23–24; Dkt. 106 at 45.

[150] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[151] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[152] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[153] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[154] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

transaction consists of multiple documents, Delaware courts will interpret the documents as one singular contract.[155]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[156] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[157] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[158] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[159] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[160] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[161]

---

[155] *See, e.g., E.I. du Pont de Nemours & Co.*, 498 A.2d at 1115 ("The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction . . . Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (internal citations omitted)); *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002).

[156] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[157] *Id.* (citing *Osborn*, 991 A.2d at 1160).

[158] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[159] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[160] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

[161] *Salamone*, 106 A.3d at 374 (citation omitted).

Plaintiffs rest their contract claim on the definition of "Collateral" in the CPSAs. Under the CPSAs, Borrower[162] and Pledgor[163] agreed to "pledge, grant, and assign to Lender a security interest in and lien upon the Collateral . . . to secure the payment and the performance of the Obligations . . . ."[164] The CPSA defines "Collateral" to include "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, . . ."[165] The CPSAs define "Interests" with reference to two other defined terms—"Unencumbered Interests" and "Encumbered Interests."[166] Those terms are defined as Borrower's and Pledgor's "membership interest[s]" in the Intermediate Holding Companies listed in the recitals of the CPSAs.[167] In Plaintiffs' view, the

---

[162] Asset Holder, Vesta, and Parc 1010 HoldCo., LLC are each a "Borrower" under one of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[163] Vesta and Kulick Manager, LLC are each a "Pledgor" under one or more of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[164] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[165] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[166] JX-16 at 9; JX-17 at 11; JX-20 at 9; JX-21 at 9.

[167] *See, e.g.*, JX-16 at 9 (defining the Unencumbered Interests as the Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); *id.* (defining the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living

definition of "Collateral" does not extend to the assets held by these entities, which include the Properties.[168] Rather, the CPSAs gave Defendant a security interest in Plaintiffs' *membership interests* in the entities, full stop.

Plaintiffs' argument is a red herring. Defendant concedes that the Loan Documents did not create a secured interest in the Properties.[169] Rather, they created a secured interest in the entities that own the Properties. The Loan Documents also gave Defendant the right to take action against real property owned by those entities, including the Properties.

Defendant's interpretation begins with the Joinder. The Joinder states that:

> [Marc Kulick], as a manager, member or other authorized person *of any and all Guarantor Entities* and *any other entities in which the undersigned does now own or control or may herein after own or control* during the term of that certain [February CPSA, April CPSA, and July CPSAs] hereby agrees *to jointly and severally assume all obligations of Pledgor* under the [February CPSA, April CPSA, and July CPSAs] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [February CPSA, April CPSA, and July CPSAs] as fully as if [Marc Kulick] had personally and individually executed

---

Investors, LLC; Muntage Vesta Investors, LLC); JX-20 at 9 (identifying the Unencumbered Interests as Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); JX-21 at 9 (identifying the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; Muntage Vesta Investors, LLC); *see* PTO ¶ 10.

[168] Dkt. 95 at 15–21.

[169] *See* Dkt. 100 at 18–24.

> and delivered the [February CPSA, April CPSA, and July CPSAs] as of the date thereof.[170]

Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ."[171]

Under the CPSA, "Guarantor Entities" includes the Title Owners.[172] The CPSA defined "Guarantor Entities" as "any entity directly or indirectly controlled or managed by [Kulick]," or "directly or indirectly owned by [Kulick] in whole or in part with respect to which Guarantor receives notices in the ordinary course of business[.]"[173]

This definition of Guarantor Entities sweeps in the Title Owners in multiple ways. First, the definition includes entities that Kulick owns in part. At trial, Kulick admitted that he had an investment in each of the Title Owners and Properties.[174]

---

[170] Trial Tr. at 20:2–21:6, 61:12–65:15 (Kulick); JX-16 at 22; JX-17 at 25; JX-20 at 22; JX-21 at 22. The Joinders are substantively identical. The only difference among the Joinders is the identity of the Kulick-affiliated entities named as Pledgor under the respective CPSA. *See* JX-16 at 1 (identifying Vesta as Pledgor); JX-17 at 1 (identifying Kulick Manager, LLC as Pledgor); JX-20 at 1 (identifying Vesta as Pledgor); JX-21 at 1 (identifying Vesta as Pledgor).

[171] Trial Tr. at 61:12–62:7 (Kulick).

[172] JX-169 ¶¶ 1–3, Ex. A (providing Kulick is the "sole Member" and "100%" owner of Louis Investments, LLC, and identifying the Title Owners as "directly or indirectly" owned by Louis Investments, LLC).

[173] JX-16 at 12; JX-20 at 12; JX-21 at 12.

[174] Trial Tr. at 69:1–2 (Kulick) ("I have an investment in each property."); JX-169 ¶¶ 1–3, Ex. A.

And Kulick identified every one of the Title Owners in response to a provision in his Guaranty requiring him to provide a "complete schedule of . . . entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor."[175] Thus, at a minimum, Kulick "indirectly own[s] . . . in part" each Title Owner. Second, Kulick controls or manages the Title Owners, as he testified at trial.[176] That too brings them within the scope of the Guarantor Entities.

Because each Title Owner is a Guarantor Entity, each Title Owner assumed "all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [CPSA]" by operation of the Joinder.[177] Thus, the Joinder renders each Title Owner an additional Pledgor under the CPSA, subject to the Pledgor's obligations under the CPSA.

Each Pledgor has obligations under the Power of Attorney provision of the CPSA. The Power of Attorney states that:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.[178]

---

[175] JX-16 at 26; JX-27 at 39–40.

[176] Trial Tr. at 63:24–67:21 (Kulick); *see* JX-168 at Ex. A.

[177] JX-16 at 22; JX-20 at 22; JX-21 at 22.

[178] JX-16 at 13; JX-20 at 13; JX-21 at 13.

The first sentence of this provision gives YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests."[179] This expressly includes "doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."[180] This power is not tied to or limited by the definition of Collateral. The second sentence does reference "taking action against the Collateral" but as a non-exclusive right. It reads: "This shall include *but not be limited to* taking any action against any of the Collateral. . . ."[181] By defining "action against the Collateral" as a non-exclusive right encompassed by the preceding sentence, the language and structure of the Power of Attorney indicate that the parties intended for YSA's rights to extend beyond the right to take "action against the Collateral."

Eliminating all doubt, the Power of Attorney provision uses the word "secure."[182] It gives YSA the right to take "whatever steps that it deems necessary in its sole discretion to *secure* and protect its interests[.]," including "whatever . . . is necessary to . . . collect all amounts due" to YSA.[183] The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against those entities bound by the Joinder, including the Title Owners, to facilitate payment of

---

[179] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[180] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[181] JX-16 at 13; JX-20 at 13; JX-21 at 13 (emphasis added).

[182] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[183] JX-16 at 13; JX-20 at 13; JX-21 at 13. (emphasis added).

amounts due to YSA. YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it.[184] Plaintiffs do not argue otherwise.

Plaintiffs instead argue that Defendant's interpretation runs afoul of Article Nine of the UCC.[185] According to Plaintiffs, the CPSAs had to describe the Collateral consistent with Article Nine of the UCC.[186] Under Article Nine, and a recent case interpreting it, that description must "reasonably identif[y] what is described."[187] The Loan Documents provided the full name and state of incorporation of each Intermediate Holding Companies entity comprising the Collateral.[188] But it did not list the details of the Properties. It does not so much as list: the Title Owners, the Properties, or the Properties' addresses.[189] Plaintiffs say that neither the CPSAs nor

---

[184] Trial Tr. at 190:15–191:13 (Diveroli); *id.* at 196:17–200:6 (Miley).

[185] Dkt. 95 at 20–21; Dkt. 103 at 3–6.

[186] Dkt. 103 at 3–6; *see Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995) ("Article 9 generally governs the creation, perfection, and enforcement of security interests in property and applies to 'any transaction (regardless of its form) which is intended to create a security interest in personal property.'" (quoting 6 *Del. C.* § 9-102(1)(a))).

[187] 6 *Del. C.* § 9-108(a) ("[A] description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."); *Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069, at *22 (Del. Ch. Oct. 7, 2025) ("[T]he description must objectively identify the collateral so that, at a minimum, it 'puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved.'" (quoting *Bishop v. All. Banking Co.*, 412 S.W.3d 217, 220 (Ct. App. KY, 2013))); *see* 6 *Del. C.* § 9-108, cmt. 2. ("The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).").

[188] JX-16 at 9; JX-20 at 9; JX-21 at 9.

[189] *See generally* JX-16; *see also* Trial Tr. at 205:24–206:6 (Miley).

any of the Loan Documents reasonably identify the Properties consistent with Article Nine.[190] Plaintiffs, therefore, contend that Article Nine prevents a security interest from attaching to the Properties because the Properties are not mentioned, let alone described in the CPSAs.[191]

But again, Plaintiffs' argument is of no moment. Defendant admits that the Loan Documents standing alone did not create a secured interest in the Properties. Defendant argues that they did not have to, because the Loan Documents gave Defendant the right in its "sole discretion to secure and protect its interests" by "taking any action against . . . . any real or personal property owned by the Collateral," including the Properties. And the Loan Documents reasonably describe the Collateral by providing the full name and state of incorporation of each entity comprising the Collateral.

Contrary to Plaintiffs' contentions, the Loan Documents granted YSA expansive rights to take actions against real property owned by Collateral. YSA exercised that right by recording the second mortgages on real property owned by the Collateral, in this case Properties owned by the Intermediate Holding Companies.

Parol evidence confirms what the plain language of the Loan Documents requires. When Kulick requested a substantially larger loan from YSA, he had only

---

[190] Dkt. 95 at 20–21.

[191] *Id.* at 3, 20–21, 29–30.

just repaid the October 8 Loan three weeks late.[192] YSA required more protection than it had on previous loans.[193] In a February 10, 2025 email to his colleague, Miley explained that YSA needed to hire a lawyer or other professional to advise on "a loan whereby we would be providing funding to a multi-family real estate firm which would be secured by the firm's real estate portfolio."[194]

On February 18, 2025, Miley texted Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities?"[195] Kulick was in a rush to get funded,[196] and so Kulick told Miley to leave

---

[192] JX-10 at 2 (identifying January 8, 2025 as the maturity date of the October 8 Loan); JX-58 (informing Diveroli on January 13, 2025 the October 8 Loan would be repaid on January 20); JX-22 (providing the October 8 Loan was repaid on January 21, 2025); JX-3 at 35 (requesting a "longer term" Loan on January 31); JX-222 (searching for a real estate consultant on February 10 regarding a "loan to Vesta" and seeking expertise to ensure YSA is "as protected by the collateral as we think we are").

[193] Trial Tr. at 149:23–151:24 (Diveroli); JX-77 at 2 (requesting Kulick identify the owner of each Property); JX-76 (requesting Kulick submit to "due diligence" in connection with the February 2025 Loan); JX-73 at 2.

[194] JX-222 at 1.

[195] JX-12 at 2.

[196] JX-73 at 2. Shortly after Miley asked Kulick if he had a paragraph to use for the Joinder Kulick exclaimed, "[M]y biggest concern is as usual (lol) funding. Do we have enough time to get this done?" JX-12 at 2. Less than 15 minutes later, Kulick asked: "Efraim can we please get sign off so we can push ahead[.]" *Id.* at 3. Two hours later, Kulick again pled for the Loan to be funded that day. *Id.* at 3 ("Can we find a way to fund today still[?]").

it the same.[197] Kulick texted back: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole."[198]

Putting a fine point on it, in the preceding text message, Miley asked two questions: (1) "are we expanding to rest of portfolio"; and (2) "can you please send me a paragraph?" Kulick responded to each in turn: (1) "yes"; and (2) "no."[199] Yes, they were expanding to the rest of the portfolio. No, no language was necessary. Instead, Kulick suggested "a joinder to the portfolio as a whole."[200] Vesta's website refers to the word "portfolio" as individual real properties owned or controlled by Vesta,[201] supporting that Kulick intended "portfolio" to refer to real properties.[202]

Kulick also referred in the exchanges that day to "a joinder with any asset controlled by any affiliate of mine," and "a joinder that joins any asset controlled by any affiliate of mine."[203] If Kulick intended the Joinder to be limited to adding entities to stand behind the same Collateral in the CPSA, there would have been no reason to refer to joining "any asset of any affiliate."

---

[197] JX-12; *see* JX-13 ("No change to [CPSA] at all except to add a joinder *that joins any asset controlled by any affiliate of mine*." (emphasis added)).

[198] JX-12 at 2.

[199] *Id.*

[200] *Id.*

[201] JX-185.

[202] Trial Tr. at 149:23–151:9 (Diveroli); *id.* at 82:2–23 (Kulick).

[203] JX-13.

Consistent with this contemporaneous evidence, both Diveroli and Miley testified that, prior to the February 2025 Loan, Kulick agreed to pledge his entire portfolio to support the next loan.[204]

Plaintiffs also argue that it does not make sense that Kulick would pledge $900 million worth of additional property to support a $1.5–2 million loan. But Kulick wanted the loans, YSA wanted greater protection, this is the compromise that Kulick proposed and ultimately the deal the parties struck.[205]

### B. Usury Defense

Plaintiffs separately raise a usury defense, contending that the interest rates of the Loans are "facially unreasonable[.]"[206] But Section 2306 forecloses any defense based on the interest rate charged because here the borrower of each Loan was a limited liability company.[207] Section 2306 provides: "No corporation, limited partnership, statutory trust, business trust or *limited liability company, . . . shall interpose the defense of usury in any action*."[208] Delaware courts have consistently declined invitations to deviate from Section 2306's mandate, even where the

---

[204] Trial Tr. at 185:5–9 (Diveroli); *id.* at 196:17–197:7 (Miley).

[205] Trial Tr. at 29:9–17 (Kulick) (testifying that "[t]hroughout 2025 I was desperate for access to money to come into my business"); *id.* at 84:13–18 (Kulick) ("I was not of the opinion that they needed additional collateral. . . . But this was meant to solve an issue that was stopping us from getting the loan done that I desperately needed.").

[206] Dkt. 95 at 32–34.

[207] 6 *Del. C.* § 2306.

[208] *Id.* (emphasis added).

individual indorser or guarantor is a natural person.[209] Because the defense of usury would not be available to the entity Borrowers under the Loan Documents, the defense is not available to Kulick.[210]

## III. CONCLUSION

Because Plaintiffs have not demonstrated clear legal entitlement to the mandatory injunctive relief they seek, this decision need not reach the other elements of the claim or the other arguments raised by Defendant.[211] Plaintiffs' failure to prove an essential element of their claim warrants judgment for Defendant.

---

[209] *Bank of Delaware v. NMD Realty Co.*, 325 A.2d 108, 111 (Del. Super. 1974) (holding that "individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes"); *MacNeil v. Cusato*, 1998 WL 1029267, at *4 (Del. Super. Nov. 30, 1998) ("Whether Defendant's position is termed privy, guarantor, or accommodation party, the result consistently is estoppel from asserting usury where such defense was not available to the original debtor. . . . Defendant, as guarantor, was no stranger to the corporation's preclusion from the defense of usury. Upon the Corporation's expiration, the Defendant-guarantor was not transformed into an individual-debtor who could then assert the defense of usury."); *River Bank Am. v. Tally-Ho Assocs., L.P.*, 1991 WL 35719, at *6 (Del. Super. Feb. 22, 1991) ("Under Delaware law, an individual who is surety or guarantor of the corporate obligation is under the same disability to assert the defense of usury as the corporation.").

[210] *NMD Realty Co.*, 325 A.2d at 111.

[211] YSA raised other arguments including that Kulick, Vesta, and Asset Holder lacked standing because none hold title to the Properties subject to the second mortgages. Dkt. 100 at 12. Having found that Plaintiffs failed to establish a right to have the second mortgages removed, the court need not reach any other argument.