**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re:<br>YSA INVESTMENTS 1, LLC,<br>Debtor.[1] | Chapter 11<br>Case No. 26-12806 (SAH) |

**DECLARATION OF MATTHEW K. HANSEN IN SUPPORT OF LSREF7 BADLANDS LOAN TRUST 2026'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY COMBINED WITH NOTICE OF OPPORTUNITY FOR HEARING AND BRIEF IN SUPPORT**

I, Matthew K. Hansen, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner of Troutman Pepper Locke LLP. Upon my personal knowledge and review, the facts stated herein are true and correct to the best of my knowledge, information, and belief.

2. A true and correct copy of the Verified Petition, filed on February 18, 2026, in the District Court of Oklahoma County in the State of Oklahoma, Case No. CJ-2026-1275, is attached hereto as **Exhibit A**.

3. A true and correct copy of the Borrowers' Petition in Error filed on June 3, 2026, in the Supreme Court of Oklahoma, Case No. IN-124122, is attached hereto as **Exhibit B**.

4. A true and correct copy of the Plaintiff's Motion for Summary Judgment, filed on June 17, 2026, in the District Court of Oklahoma County in the State of Oklahoma, Case No. CJ-2026-1275, is attached hereto as **Exhibit C**.

5. A true and correct copy of the Affidavit of Jim Casey in Support of Plaintiff's Motion for Summary Judgment, filed on June 17, 2026, in the District Court of Oklahoma County

[1] The address of the Debtor is 848 Brickell Avenue, Suite PH5, Miami, Florida 33131. The last four digits of the Debtor's federal tax identification number is 3352.



EXHIBIT 1

in the State of Oklahoma, Case No. CJ-2026-1275, is attached hereto as Exhibit 1 to the Motion for Summary Judgment.

6. A true and correct copy of the Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021, by the Borrowers in favor of Lender, pertaining to the property located at 8800 Drexel Avenue, Oklahoma City, Oklahoma 73159 is attached hereto as Exhibit A to the Verified Petition.

7. A true and correct copy of the Payoff Letter, demonstrating the amounts owed to Lender by the Borrowers as of July 30, 2026, is attached hereto as Exhibit B to Exhibit 1 to the Motion for Summary Judgment.

8. I reviewed a true and correct copy of a recent Broker Opinion of Value (the "BOV") executed by Colliers with regard to 8800 South Drexel Avenue, Oklahoma City, Oklahoma (the "Property"). The BOV estimated the market value of the Property to be between $27.5 million and $29.5 million.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 10, 2026.

/s/ *Matthew K. Hansen*
Matthew K. Hansen, Partner
TROUTMAN PEPPER LOCKE LLP

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC<br>Plaintiff,<br>v.<br>DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company; DREXEL FLATS ACQUISITION TIC LLC, a Delaware limited liability company; NIX LUMBER, INC., an Oklahoma corporation; TRES PALM SUPPLY, LLC D/B/A MAINTENANCE SUPPLY SOLUTIONS, a Texas limited liability company; RASA FLOORS & CARPET CLEANING, LLC, a Texas limited liability company; IPLUMB CO. LLC, an Oklahoma limited liability company; MARC KULICK, an individual; YSA INVESTMENTS 1, LLC, a Delaware limited liability company; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; and THE OKLAHOMA COUNTY TREASURER<br>Defendants. | Case No.: CJ - 2026 - 1275<br><br>FILED IN DISTRICT COURT OKLAHOMA COUNTY<br>FEB 18 2026<br>RICK WARREN COURT CLERK<br>114 |

**VERIFIED PETITION**

Plaintiff Ready Capital Mortgage Financing 2023-FL12, LLC ("**Lender**"), for its Petition ("**Petition**") against Defendants Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC (collectively, the "**Borrowers**"), Nix Lumber, Inc. ("**Nix Lumber**"), Tres Palm Supply, LLC d/b/a Maintenance Supply Solutions ("**MSS**"), Rasa Floors & Carpet Cleaning, LLC ("**Rasa**"), IPlumb Co. LLC ("**IPlumb**"), Marc Kulick ("**Guarantor**"), YSA Investments 1, LLC ("**YSA**"), the Board of County Commissioners of Oklahoma County ("**Board**"), and the Oklahoma County Treasurer ("**Treasurer**"), states and alleges:

## THE PARTIES

1. Lender is a Delaware limited liability company, which is the current owner and holder of that certain commercial loan described herein. With respect to the Loan transaction that is the subject matter of this action, KeyBank National Association acts as servicer and authorized agent for Lender.

2. Drexel Flats Acquisition LLC is a Delaware limited liability company registered to do business in the State of Oklahoma, which can be served at c/o Vesta Realty, LLC 6911 S. 66th E Ave., Suite 100, Tulsa, Oklahoma 74133.

3. Drexel Flats Acquisition TIC LLC is a Delaware limited liability company registered to do business in the State of Oklahoma, which can be served c/o its Registered Agent, Vesta Realty, LLC, at 6911 S. 66th E Ave., Suite 100, Tulsa, Oklahoma 74133.

4. Nix Lumber is an Oklahoma corporation, which may claim some right, title, or interest in or to the Property (as defined below) pursuant to that certain Mechanics' and Materialmen's Lien Statement recorded with the Oklahoma County Clerk (the "**County Clerk**") on June 30, 2025, as Document No. 2025063001093711 and that certain Notice of Pendency of Action recorded with the County Clerk on July 7, 2025, as Document No. 2025070701096966, and which can be served c/o its Registered Agent, David N. Nix, at 5117 NW 10th Street, Oklahoma City, Oklahoma 73127.

5. MSS is a Texas limited liability company registered to do business in the State of Oklahoma, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's or Materialman's Lien Statement recorded with the County Clerk on August 27, 2025, as Document No. 2025082701123376, and which can be served c/o its Registered Agent, Registered Agents, Inc., 9905 S. Pennsylvania Avenue, Suite A, Oklahoma City, Oklahoma 73159.

6. Rasa is a Texas limited liability company registered to do business in the State of Oklahoma, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's or Materialman's Lien Statement recorded with the County Clerk on September 24, 2025, as Document No. 2025092401136568, and which can be served c/o its Registered Agent, CT Corporation System, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

7. IPlumb is an Oklahoma limited liability company, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's Lien Statement of Claim recorded with the County Clerk on October 21, 2025, as Document No. 2025102101151756, and which can be served at 9944 S. Sooner Road, Oklahoma City, Oklahoma 73165.

8. Guarantor is an individual, who guaranteed the Loan, who may claim some right, title, or interest in or to the Property (defined below) pursuant to those certain Guaranties and ROFO agreements (collectively, the "**ROFOs**") recorded with the County Clerk on October 31, 2025, as Document Nos. 2025103101156526, 2025103101156569, 2025103101156572, 2025103101156575, 2025103101156578, 2025103101156581, and 2025103101156584, and who can be served at 6400 W. 110th Street, Suite 201, Overland Park, Kansas 66211.

9. YSA is a Delaware limited liability company, which may claim some right, title, or interest in or to the Property (defined below) pursuant to the ROFOs, and which can be served c/o its Registered Agent, Northwest Registered Agent Service, Inc. at 8 The Green, Suite B, Dover, Delaware 19901.

10. The Board may claim some right, title or interest in the Property (as defined below) by virtue of unpaid real estate taxes and assessments or otherwise.

11. The Treasurer may claim some right, title or interest in the Property (as defined below) by virtue of unpaid real estate taxes and assessments or otherwise.

## JURISDICTION AND VENUE

12. This Court has *in rem* jurisdiction over the Property (as defined below) that is the subject matter of this action as said Property is located in the State of Oklahoma. This Court has subject matter jurisdiction in this action pursuant to 12 Okla. Stat. § 1551 because Lender seeks foreclosure and appointment of a receiver over property located in the State of Oklahoma.

13. The Court has personal jurisdiction over Borrowers because they hold title to the subject Property (as defined below), which is located Oklahoma County, Oklahoma and have transacted business in Oklahoma County, Oklahoma and thus have contacts with this forum directly related to the subject matter of this action.

14. This Court has personal jurisdiction over Nix Lumber because Nix Lumber has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

15. This Court has personal jurisdiction over MSS because MSS has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

16. This Court has personal jurisdiction over Rasa because Rasa has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

17. This Court has personal jurisdiction over IPlumb because IPlumb has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

18. This Court has personal jurisdiction over Guarantor because Guarantor has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

19. This Court has personal jurisdiction over YSA because YSA has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

20. Pursuant to 12 Okla. Stat. §132, Oklahoma County is a proper venue for this case because part of the real property over which Lender seeks appointment of a receiver (and foreclosure) through this Petition and owned and operated by Borrowers is located in Oklahoma County, Oklahoma.

21. Pursuant to 12 Okla. Stat. § 137, Oklahoma County is a proper venue for this case also because certain Defendants are nonresidents of Oklahoma, and others may properly be sued in Oklahoma County by virtue of their ownership of property located in Oklahoma County and/or because Oklahoma County is that in which there may be debts owing to such Defendants.

## FACTUAL BACKGROUND

***The Loan Transaction***

22. On or about December 21, 2021, Borrowers entered into that certain Loan Agreement, dated as of December 21, 2021, (as any time amended, the "**Loan Agreement**") with ReadyCap Commercial, LLC ("**Original Lender**"). The Loan Agreement evidences, in part, a commercial real estate loan made by Original Lender to Borrowers in the amount of $28,300,000.00 (the "**Loan**"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

23. The Loan is evidenced by that certain Promissory Note, dated as of December 21, 2021 by and between Borrowers and Original Lender in the original principal amount of

$28,300,000.00 (as at any time amended, the "**Note**"). A true and correct copy of the Note is attached hereto as **Exhibit B** and is incorporated herein by reference.

24. The Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226739, (as at any time amended, the "**Mortgage**") pursuant to which Borrower granted to Lender, the assignee of Original Lender, a first-priority security interest in that certain real and personal property, consisting of a multifamily apartment complex, located at 8800 Drexel Avenue, Oklahoma, City, Oklahoma 73159 and further described in the Mortgage (the "**Property**"). A true and correct copy of the Mortgage is attached hereto as **Exhibit C** and is incorporated herein by reference.

25. The Loan is secured further by that certain Assignment of Leases and Rents, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226740, (at any time amended, the "**ALR**") pursuant to which Borrower granted to Lender, as assignee of Original Lender, a first-priority security interest in all leases and rents with respect to the Property. A true and correct copy of the ALR is attached hereto as **Exhibit D** and is incorporated herein by reference.

26. The Loan is secured further by that certain Deposit Account Control Agreement, dated as of December 21, 2021, by and among, Lender, Borrowers and Signature Bank (as at any time amended, the "**DACA**"), establishing and governing the Deposit Account and Lockbox Agreement, defined therein. A true and correct copy of the DACA is attached hereto as **Exhibit E** and is incorporated herein by reference.

27. The Loan Agreement, Note, the Mortgage, the ALR, the DACA, and all other documents executed in connection with, evidencing or securing the Loan are collectively referred to herein as the "**Loan Documents**."

***Assignment of the Loan***

28. Effective as of December 21, 2021, Original Lender assigned all of its right, title and interest in and to the Loan and Loan Documents to ReadyCap Warehouse Financing LLC ("**RCWF**") as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); and (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of December 21, 2021 and recorded with the County Clerk on August 30, 2022 as Document No. 2022083001132674; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of December 21, 2021 and recorded with the County Clerk on August 29, 2022 as Document No. 2022082901131732 (collectively, the "**RCWF Assignments**"). A true and correct copy of each of the RCWF Assignments is attached hereto as **Group Exhibit F** and is incorporated herein by reference.

29. Effective as of June 22, 2023, RCWF assigned all of its right, title and interest in and to the Loan and Loan Documents to Ready Capital Subsidiary Reit II, LLC ("**Reit II**") as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001092946; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001092942 (the "**Reit II Assignments**"). A true and correct copy of each

of the Reit II Assignments is attached hereto as **Group Exhibit G** and is incorporated herein by reference.

30. Effective as of June 22, 2023, Reit II assigned all of its right, title and interest in and to the Loan and Loan Documents to Ready Capital Mortgage Depositor FL12, LLC ("**Depositor FL12**") as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 202307201093016; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001093019 (the "**Depositor FL12 Assignments**"). A true and correct copy of each of the Depositor FL12 Assignments is attached hereto as **Group Exhibit H** and is incorporated herein by reference.

31. Effective as of June 22, 2023, Ready Capital Mortgage Depositor FL 12, LLC assigned all of its right, title and interest in and to the Loan and Loan Documents to Lender as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001093191; and (c) that certain Assignment of Assignment of Leases and Rents, effective June 22, 2023 and recorded with the County Clerk on July 30, 2023 as Document No. 2023072001093158 (the "**Lender Assignments**"). A true and correct copy of each of the Lender Assignments is attached hereto as **Group Exhibit I** and is incorporated herein by reference.

32. Thus, Lender is the current owner and holder of the Loan Documents.

33. As the current holder of the Loan Documents, Lender is entitled to enforce the Note, the lien created by the Mortgage and security interests as to the Property.

***Default under the Loan***

34. Under the terms of the Loan Documents, Borrowers are required to make monthly payments as provided therein and is required to pay the Loan in full upon maturity.

35. The Note matured by its terms on the January 2025 Payment Date (as defined therein). Upon such maturity, Borrowers failed to pay the full indebtedness due under the Note and other Loan Documents, and Borrowers have not turned over rents and other proceeds from the Property to which Lender is entitled under the Mortgage and ALR, which failures constitute Events of Default under the Loan Documents.

36. As of January 30, 2026, the balance due and owing to Lender under the Loan Documents, not including attorneys' fees and costs, is $30,647,053.79, consisting of Participation A-1 ("**A-1**") principal balance of $21,754,468.26; A-1 accrued interest of $500,365.15; A-1 default interest (January 10, 2025 – January 30, 2026) of $1,163,259.76; A-1 late fees of $96,464.99; Participation A-2 ("**A-2**") principal balance of $6,220,321.13; A-2 accrued interest of $143,070.93; A-2 default interest (January 10, 2025 – January 30, 2026) of $332,614.39; A-2 late fees of $20,289.31; exit fees of $70,750.00; lien release/assignment fees of $2,000.00; processing fees of $300.00; advances of $12,523.00; miscellaneous fees/IOA of $193.15; liquidation fee of $303,436.18; and special servicing fees of $26,997.54. Interest continues to accrue from and after January 30, 2026 as provided in the Loan Documents. Additionally, Borrowers owe any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue.

37. Additionally, under the Loan Documents, Borrower agreed not to allow any Transfer (as defined in the Loan Agreement) to occur, including imposition of a Lien affecting the Property. Despite Borrower's agreement, Borrower has allowed multiple Liens on the Property, including those filed by Nix Lumber (including a suit to enforce), MSS, Rasa, and IPlumb (as well as the filing of the ROFRs) (collectively, the "**Liens**"). This constitutes a further Event of Default under the Loan Documents.

38. On December 12, 2025, Lender notified Borrower in writing of the Events of Default under the Loan Documents and informed Borrower that its license under the Loan Documents to receive, collect and make use of rents, profits and income of any other type derived from the Property (the "**Rents**") was revoked pursuant to Article 3 of the Mortgage and Section 3 of the ALR (the "**Notice of Default**"). A true and correct copy of the Notice of Maturity Default is attached hereto as **Exhibit J** and incorporated herein by reference.

39. The Events of Default authorize Lender to exercise all rights and remedies available to Lender under the Loan Documents or at law or in equity, including the right to seek the appointment of a receiver for the Property (to which Borrowers agreed), foreclose the Mortgage, and collect rents and other income generated from the Property, among other things.

40. Specifically, Article 3 of the Mortgage provides, in part:

> …If an Event of Default exists…, the license granted to Mortgagor herein may, at Mortgagee's election, be revoked by Mortgagee, and Mortgagee shall immediately be entitled to possession of all Rents then or thereafter payable during the continuance of any such Event of Default (including Rents past due and unpaid) whether or not Mortgagee enters upon or takes control of the Property. Any Rents collected by Mortgagor from and after the date on which an Event of Default occurred and is continuing shall be held by Mortgagor in trust for Mortgagee. Mortgagor hereby grants and assigns to Mortgagee the right, at Mortgagee's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent ***or by a receiver appointed***…to collect Rents with or without taking

> the actual possession of the Property or any equivalent action. During the existence of any Event of Default, Mortgagee may apply any Rents collected after the license granted herein is revoked in Mortgagee's sole and absolute discretion to pay the Loan Obligations in such order and in such manner as Mortgagee shall elect.

(Emphasis added.)

41. Section 6.2 of the Mortgage provides, in part:

> (a) If an Event of Default shall have occurred, this Mortgage may, to the maximum extent permitted by law, be enforced, and Mortgagee may exercise any right, power or remedy permitted to it hereunder, under the Loan Agreement or under any of the other Loan Documents or at law or in equity, and, without limiting the generality of the foregoing, Mortgagee may, personally or by their agents, to the maximum extent permitted by law:
>
> > (i) enter into and take possession of the Property or any part thereof, exclude Mortgagor and all Persons claiming under Mortgagor whose claims are junior to this Mortgage, wholly or partly therefrom, and use, operate, manage and control the Property or any part thereof either in the name of Mortgagor or otherwise as Mortgagee shall deem best, and upon such entry, from time to time at the expense of Mortgagor and the Property, make all such repairs, replacements, …, collect and receive all Rents and apply the same to the payment of all expenses that Mortgagee may be authorized to make under this Mortgage, the remainder to be applied to the payment of the Loan Obligations until the same shall have been repaid in full, take possession of all security deposits held by or on behalf of Mortgagor with respect to the Property, whether or not Mortgagee enters upon or takes control of the Property and regardless of where any such security deposits are deposited or located; if Mortgagee demands or attempts to take possession of the Property or any part thereof in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;
> >
> > (iii) personally or by agents, with or without entry:
> >
> > > (x) invoke the power of sale and pursuant to the procedures prescribed by law as a result

thereof, sell the Property or any part thereof, or cause the Property or any part thereof to be sold at a sale or sales…;

(y) proceed to protect and enforce Mortgagee's rights under this Mortgage, by suit for specific performance of any covenant contained herein or in the Loan Documents or in aid of the execution of any power granted herein or in the Loan Documents, or for the foreclosure of this Mortgage (as a mortgage or otherwise) and the sale of the Property or any part thereof under the judgment or decree of a court of competent jurisdiction, or for the enforcement of any other right as Mortgagee shall elect…; or

(z) exercise any or all of the remedies available to a secured party under the UCC, including, without limitation:

(1) either personally or ***by means of a court appointed receiver***, take possession of all or any of the Property and exclude therefrom Mortgagor and all Persons claiming under Mortgagor, and thereafter hold, store, use, operate, manage, maintain and control… and exercise all rights and powers of Mortgagor in respect of the Property, or any part thereof; if Mortgagee demands or attempts to take possession of the Property in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;

. . .

(b) If an Event of Default shall have occurred and be continuing after any applicable notice and cure periods under the Loan Documents or applicable law, ***Mortgagee, to the maximum extent permitted by law, shall be entitled, as a matter of strict right, to the appointment of a receiver of the Property by a court of competent jurisdiction in connection with any action to foreclose this Mortgage*** (whether by judicial proceedings or by non-judicial proceedings by exercise of the power of sale), without notice or

> demand, and without regard to the adequacy of the security for the Loan Obligations or the solvency of Mortgagor. ***Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor.*** Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Mortgagee in case of entry and shall continue as such and exercise all such powers until the date of confirmation of sale of the Property, unless such receivership is sooner terminated.

(Emphasis added.)

42. Further, Section 3 of the ALR provides, in part:

> At any time after the occurrence and during the continuance of an Event of Default, Assignee, without waiving such Event of Default, at its option, upon notice and without regard to the adequacy of the security for the Loan Obligations, either in person or by agent, upon bringing any action or proceeding, ***by a receiver appointed by a court***, or otherwise, may take possession of the Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper. During the existence of an Event of Default, Assignee shall immediately be entitled to possession of all security deposits held by or on behalf of Assignor with respect to the Property…. During the existence of an Event of Default, Assignee, either with or without taking possession of the Property in its own name, may demand, sue for or otherwise collect and receive all Rents, including Rents past due and unpaid, and apply such Rents to pay any one or more of the following in such order and amounts as Assignee may elect in its sole and absolute discretion: (a) all costs and expenses incurred, and advances made, by Assignee to enforce this Assignment or the other Loan Documents, protect the Lien and security afforded thereby, or preserve the Property, including, without limitation, all expenses of managing the Property, including, without limitation, the salaries, fees and wages of any managing agent and such other employees as Assignee may deem reasonably necessary and all expenses of operating and maintaining the Property, including, without limitation, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for insurance and the cost of alterations, renovations, repairs or replacements, and all costs and expenses incident to taking and retaining possession of the Property or enforcing any of Assignee's rights and remedies hereunder; and (b) the Loan Obligations, together with all costs, expenses and attorneys' fees in connection with any of the foregoing… Assignor agrees that the exercise by Assignee of one or more of its rights and

> remedies under this Assignment shall in no way be deemed or construed to make Assignee a mortgagee-in-possession.

(Emphasis added.)

43. Lender is enforcing its rights under the Mortgage and intends to foreclose its security interest in the Property or otherwise sell the Property through a receiver sale at the earliest opportunity.

44. Borrowers have no legal right to occupy the Property nor do they have any further right to collect rents and other income generated therefrom.

45. Upon information and belief, tenants of the Property have made numerous complaints with respect to the condition of the Property (noting increased deterioration over the last couple years), including, among other things, lack of repairs and maintenance, neglected landscaping, roof damage, and pest infestation, all of which indicates that Borrowers have abdicated their responsibility and abandoned their duty to administer and operate the Property, further endangering its income-producing potential.

46. The Liens, which Borrowers have allowed to attach to the Property, further indicate Borrowers are either unable or unwilling to pay vendors and further evidence Borrowers' inability to adequately maintain the Property.

**COUNT I**
**(Suit for Breach of Loan Documents)**

47. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

48. Borrowers are in default under the Note and other Loan Documents.

49. Lender provided notice to Borrowers of Borrowers' defaults by way of the Notice of Default, but Borrowers failed to cure the defaults and pay the matured balance due under the Loan Documents, among other things.

50. Lender has retained counsel for the purpose of assisting Lender's efforts to collect the amounts owed under the Note and to assist Lender in protecting and disposing of the Property.

51. Lender has been charged fees and costs thereof, and will continue to incur such fees and costs, including, but not limited to, attorneys' fees, and court costs. Lender is entitled to include in any judgment entered against Borrowers the reasonable costs of collection accrued and hereafter accruing.

**WHEREFORE**, Lender requests a Judgment, *in rem*, on Count I of this Petition against Borrowers as follows:

(a) For a judgment, *in rem*, against Borrowers, jointly and severally, in the amount of $30,647,053.79, not including attorneys' fees and costs, as of January 30, 2026, together with accrued interest from and after January 30, 2026, and together with any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue; and

(b) Awarding Lender such other and further relief to which Lender might be entitled under Count I of this Petition and which may be just and equitable under the facts and circumstances presented by this action.

**COUNT II**
**(Foreclosure)**

52. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

53. As a result of Borrowers' Events of Default under the Loan Documents, Lender is entitled to a judgment directing that the Mortgage be foreclosed and finding that Lender has a first-priority lien on the Property.

54. Lender's liens are prior and superior to the interests of Borrowers, all Defendants, and all others who may make some claim in and to the Property.

55. Under the terms of the Mortgage, because of Borrowers' defaults, Lender is entitled to immediate possession of the Property and to an order directing foreclosure of Lender's interest therein.

56. Lender specifically reserves the right to pursue a temporary injunction or other relief with respect to its rights under the Loan Documents.

**WHEREFORE**, Lender requests entry of a judgment, *in rem*, on Count II of this Petition ordering and declaring:

(a) That Lender's lien on the Property is a valid first-priority mortgage lien on the Property and that Lender's lien is prior and superior to all other interests in the Property;

(b) That any interest of any party, including Borrowers, and all Defendants, in and to the Property, and any persons claiming by, through or under Defendants, is junior and inferior to Lender's lien on the Property;

(c) That Lender has the legal right and is authorized to foreclose its security interest in the Property and that the Property shall be sold, with or without appraisement, either in separate lots or together, as Lender may elect at the time a sale confirmation order is entered;

(d) That such foreclosure will vest in the purchaser at the foreclosure sale free and clear title to the Property, free of any and all interests that are or might be asserted by Borrowers or any

alleged interest-holder who has failed to make his/her/its alleged interest apparent in the real property records of Oklahoma County, Oklahoma, prior to the filing of this Petition;

(e) That Lender has the right to credit bid at such foreclosure sale all amounts owed to Lender under the Note and other Loan Documents executed by Borrowers in connection with the loan evidenced by the Note and Loan Documents;

(f) That the Sheriff sell the Property, either separately or together as directed, and deliver title to the Property to the successful bidder at the foreclosure sale via sheriff's deed or bill of sale, as appropriate;

(g) That the proceeds of the sale be applied as follows: (i) first, to payment of any real estate taxes due and owing on the Property at the time of sale; (ii) second, to the payment of foreclosure and advertising costs incurred by Lender in connection with the foreclosure of the Property; (iii) third, to the payment of the amounts owed to Lender under the Note and other Loan Documents executed by Borrowers in connection with the Loan; and (iv) fourth, the surplus, if any, to be disbursed in accordance with further order of the Court;

(h) Granting Lender immediate possession of the Property; and

(i) All further relief as the Court deems just, proper, and equitable.

**COUNT III**
**(Appointment of Receiver)**

57. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

58. An Event of Default occurred with respect to the Loan and under the Loan Documents.

59. Under the Loan Agreement, as a result of the Existing Default, Lender is entitled to take immediate possession of the Property and of the income and rents generated therefrom.

60. The superior alternative however is for the Court to order delivery of such possession to a receiver who can administer and manage the Property, address and resolve issues with the Property, collect the rents and pay the expenses of the Property, pay any net cash flow to Lender for application to the debt owed under the Note, and report to the Court on a periodic basis regarding the receiver's administration and management of the Property.

61. The immediate appointment of a receiver to manage and operate the Property is just and necessary for the following reasons:

a. Borrowers are in default having failed to perform as agreed under the Loan Documents, including failure to perform conditions of the Mortgage.

b. At a time when Borrowers cannot meet their obligations owed to Lender, Lender has a vested interest in protecting the value of the Property, the income therefrom and the personal property, and to prevent a risk of loss, removal or material injury thereto;

c. Lender has a vested interest in ensuring that the income and profits generated by the Property are being properly used for the benefit of the Property and for payment of debt service and other obligations;

d. At a time when Borrowers have failed to properly manage and supervise the Property (allowing the imposition of Liens thereon, among other things), Lender has a vested interest in protecting the Property which, together with the personalty, represents its only source of collateral and security for the amounts due and owing under the Note, from further loss and diminution in value;

e. Upon information and belief, the value of the Property is insufficient to satisfy Borrowers' debt obligation under the Note and other Loan Documents;

f. Upon information and belief, tenants of the Property have made numerous complaints with respect to the condition of the Property (noting increased deterioration over the last couple years), as set forth above, indicating that Borrowers have abdicated their responsibility and abandoned their duty to administer and operate the Property, further endangering its income-producing potential;

g. Borrowers continue to allow unauthorized liens to attach to the Property, indicating Borrowers are unable or unwilling to pay vendors and further evidencing Borrower's inability to adequately maintain the Property; and

h. Borrowers agreed in Section 6.2(b) of the Mortgage, that, upon an Event of Default under the Loan Documents, Lender is entitled "***as a matter of strict right, to the appointment of a receiver for the Property***" and Mortgagor (Borrowers) "***irrevocably consents to such appointment and waives notice of any application therefor***." (Emphasis added.) Such agreements should be enforced under Oklahoma law. *See Davon Drilling Co. v. Ginder,* 467 P.2d 470, 473 (Okla. 1970) (holding unambiguous contract should be enforced according to their express terms even if such terms are harsh);

i. 12 Okla. Stat. §1551(2) specifically provides for the appointment of a receiver "in an action by a mortgagee for the foreclosure of his mortgage and sale of the mortgaged property…where it appears that the mortgaged property is in danger of being lost, removed or materially injured, or …that a condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt, or …that a condition of the mortgage has not been performed and the mortgage instrument provides for the appointment of a receiver. Each of these conditions is met in this case; and

j. 12 Okla. Stat. §1551(6) specifically provides for the appointment of a receiver "[i]n all other cases where receivers have heretofore been appointed by the usages of the courts of equity."

**WHEREFORE**, Lender requests a Judgment on Count III of this Petition against Borrowers as follows:

(a) for immediate appointment of a receiver to take possession of and administer the Property in accordance with the proposed Order Appointing Receiver attached as Exhibit B to the Motion for Appointment of Receiver filed concurrently herewith;

(b) for all additional fees and costs incurred by Lender in connection with the enforcement of its rights under the Loan Documents and the protection, preservation and realization of the Property, including, without limitation, attorneys' fees, and costs incurred in connection with this action seeking appointment of a receiver; and

(c) Awarding Lender such other and further relief to which Lender might be entitled under Count III of this Petition and which may be just and equitable under the facts and circumstances presented by this action.

Dated: February 18, 2026

Respectfully submitted,

Kiran A. Phansalkar, OBA #11470
Preston Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
Conner & Winters, LLP
1700 One Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com

***Counsel for Plaintiff***

## VERIFICATION

STATE OF Kansas )
)
COUNTY OF Johnson )

Before me, the undersigned authority, on this day personally appeared Ethan J. Meyer who, being by me duly sworn, upon his oath, deposed and stated that he is an authorized representative KeyBank National Association, the special servicer and authorized agent of the Plaintiff in connection with the foregoing Verified Petition, is duly authorized to execute the forgoing document on behalf of the same, and certifies that the statements set forth in said complaint are true and correct, except as to matters therein stated to be on information and belief and to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

Ethan J. Meyer

Notary Public

My Commission Expires:
8/12/2029

CHASE THOMPSON
Notary Public - State of Kansas
My Appointment Expires 8.12.29

**LOAN AGREEMENT**

dated as of December 21, 2021

by and among

**DREXEL FLATS ACQUISITION LLC,**
a Delaware limited liability company

and

**DREXEL FLATS ACQUISITION TIC LLC,**
a Delaware limited liability company

(individually and collectively, jointly and severally, as Borrower)

and

**READYCAP COMMERCIAL, LLC,**
a Delaware limited liability company

(as Lender)

Premises:

8800 Drexel Avenue, Oklahoma City, Oklahoma 73159

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..... 1

Section 1.1. Definitions ..... 1
Section 1.2. Location of Additional Defined Terms ..... 11
Section 1.3. Principles of Construction ..... 13

ARTICLE 2 THE LOAN ..... 13

Section 2.1. The Loan ..... 13
Section 2.2. Interest Rate; Payments; Prepayment ..... 13
Section 2.3. Extension Option ..... 13
Section 2.4. Origination Fee; Exit Fee ..... 14

ARTICLE 3 RESERVE ACCOUNTS; DEPOSIT ACCOUNT; EXCESS CASH FLOW ACCOUNT ..... 14

Section 3.1. Reserve Accounts Generally ..... 14
Section 3.2. Intentionally Omitted ..... 14
Section 3.3. Tax and Insurance Monthly Installment. ..... 15
Section 3.4. Capital Expenditures Reserve Funds; Working Capital Funds ..... 15
Section 3.5. Intentionally Omitted ..... 16
Section 3.6. Replacement Costs Reserve Account ..... 16
Section 3.7. Deposit Account; Excess Cash Flow Account ..... 17
Section 3.8. Minimum Disbursement Amount; Waiver of Minor Non-Compliance; Reallocations Among Reserves ..... 18
Section 3.9. Interest on Reserve Accounts; Use of Remaining Reserve Funds; Refund of Remaining Funds ..... 19
Section 3.10. Sole Dominion and Control ..... 20
Section 3.11. Security Interest ..... 20
Section 3.12. Rights on Default ..... 20
Section 3.13. Financing Statement; Further Assurances ..... 20
Section 3.14. Borrower's Obligation Not Affected ..... 21
Section 3.15. Property Inspections; Draw Requests ..... 21
Section 3.16. Interest Rate Protection Agreement ..... 21

ARTICLE 4 REPRESENTATIONS AND WARRANTIES ..... 22

Section 4.1. Organization ..... 22
Section 4.2. Authorization ..... 22
Section 4.3. Enforceability ..... 22
Section 4.4. Litigation ..... 22
Section 4.5. Full and Accurate Disclosure ..... 22
Section 4.6. Compliance ..... 23
Section 4.7. ERISA ..... 23

Exhibit A

EXHIBIT A TO EXHIBIT 1

Section 4.8. Not Foreign Person ..... 23
Section 4.9. Investment Company Act; Public Utility Holding Company Act ..... 23
Section 4.10. Title to the Property; Liens ..... 24
Section 4.11. Condemnation ..... 24
Section 4.12. Utilities and Public Access ..... 24
Section 4.13. Separate Lots ..... 24
Section 4.14. Assessments; Use Fees ..... 24
Section 4.15. Flood Zone ..... 24
Section 4.16. Physical Condition ..... 24
Section 4.17. Title Insurance ..... 24
Section 4.18. Leases and Rents ..... 24
Section 4.19. Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws ..... 25
Section 4.20. Organizational Chart ..... 25
Section 4.21. Property ..... 25
Section 4.22. Management Agreement ..... 25
Section 4.23. Insurance ..... 26
Section 4.24. Federal Reserve Regulations ..... 26
Section 4.25. Taxes ..... 26
Section 4.26. Employer Identification Number ..... 26
Section 4.27. Solvency ..... 26
Section 4.28. Business Purposes ..... 27
Section 4.29. Forfeiture ..... 27
Section 4.30. No Defaults ..... 27
Section 4.31. Reverse Exchange ..... 27
Section 4.32. Survival of Representations ..... 27

ARTICLE 5 COVENANTS ..... 27

Section 5.1. Compliance with Legal Requirements; Impositions and Other Claims; Contests ..... 27
Section 5.2. Maintenance; Waste; Alterations ..... 28
Section 5.3. Access to Property and Records ..... 28
Section 5.4. Management of Property ..... 28
Section 5.5. Financial and Other Reporting ..... 29
Section 5.6. Leases ..... 31
Section 5.7. Place of Business; State of Organization; Operations ..... 32
Section 5.8. Zoning; Joint Assessment ..... 32
Section 5.9. Equity Requirements ..... 32
Section 5.10. Notice of Default ..... 32
Section 5.11. Litigation ..... 32
Section 5.12. Performance by Borrower ..... 32
Section 5.13. Guarantor Financial Covenants ..... 32
Section 5.14. Illegal Activity/Forfeiture. ..... 33
Section 5.15. Intentionally Omitted ..... 33
Section 5.16. TIC Agreement. ..... 33

Section 5.17. Bringdown of Certain Representations and Warranties ..................... 34

ARTICLE 6 TRANSFERS AND CHANGE OF BUSINESS ..................... 34

Section 6.1. Transfers ..................... 34
Section 6.2. Other Indebtedness ..................... 35
Section 6.3. Single-Purpose Entity; Change In Business ..................... 35

ARTICLE 7 INSURANCE, CASUALTY, CONDEMNATION AND RESTORATION ..................... 35

Section 7.1. Types of Insurance ..................... 35
Section 7.2. Insurer Ratings ..................... 38
Section 7.3. General Insurance Requirements ..................... 38
Section 7.4. Certificates of Insurance and Delivery of Policies ..................... 39
Section 7.5. Restoration Proceeds ..................... 39
Section 7.6. Restoration ..................... 40
Section 7.7. Disbursement ..................... 42
Section 7.8. Qualified Amount ..................... 42

ARTICLE 8 DEFAULTS ..................... 43

Section 8.1. Event of Default ..................... 43
Section 8.2. Remedies ..................... 44
Section 8.3. Remedies Cumulative ..................... 44
Section 8.4. Lender Appointed Attorney-In-Fact ..................... 45
Section 8.5. Lender's Right to Perform ..................... 45

ARTICLE 9 ENVIRONMENTAL PROVISIONS ..................... 45

Section 9.1. Environmental Representations and Warranties ..................... 45
Section 9.2. Environmental Covenants ..................... 46
Section 9.3. Environmental Cooperation and Access ..................... 46
Section 9.4. Environmental Indemnity ..................... 46
Section 9.5. Duty to Defend ..................... 47

ARTICLE 10 SPECIAL PROVISIONS ..................... 47

Section 10.1. Transfer of Loan ..................... 47
Section 10.2. Cooperation ..................... 47
Section 10.3. Servicer ..................... 48
Section 10.4. Restructuring of Loan. ..................... 49
Section 10.5. Intentionally Deleted ..................... 49
Section 10.6. Participant Register ..................... 49

ARTICLE 11 MISCELLANEOUS ..................... 50

Section 11.1. Survival ..................... 50
Section 11.2. Lender's Discretion ..................... 50



Exhibit A

EXHIBIT A TO EXHIBIT 1

Section 11.3. Governing Law; Submission to Jurisdiction ... 51
Section 11.4. Modification; Waiver in Writing ... 51
Section 11.5. Delay Not a Waiver. ... 51
Section 11.6. Notices ... 51
Section 11.7. Trial By Jury ... 52
Section 11.8. Headings ... 52
Section 11.9. Severability ... 52
Section 11.10. Preferences ... 53
Section 11.11. Waiver of Notice ... 53
Section 11.12. Remedies of Borrower ... 53
Section 11.13. Exhibits Incorporated ... 53
Section 11.14. Offsets, Counterclaims and Defenses ... 53
Section 11.15. No Joint Venture or Partnership ... 53
Section 11.16. Waiver of Marshalling of Assets Defense ... 54
Section 11.17. Waiver of Counterclaim ... 54
Section 11.18. Construction of Documents ... 54
Section 11.19. Brokers and Financial Advisors ... 54
Section 11.20. Counterparts ... 54
Section 11.21. Estoppel Certificates ... 54
Section 11.22. Bankruptcy Waiver ... 55
Section 11.23. Entire Agreement ... 55
Section 11.24. Liability and Indemnification ... 55
Section 11.25. Publicity ... 56
Section 11.26. Time of the Essence ... 56
Section 11.27. Taxes ... 56
Section 11.28. Further Assurances; Loan Servicing ... 57
Section 11.29. Permanent Financing ... 57
Section 11.30. Joint and Several ... 57
Section 11.31. Designation of Lead Borrower ... 58
Section 11.32. Co-Borrower Provisions. ... 59
Section 11.33. Reverse 1031 Exchange. ... 59




Exhibit A

EXHIBIT A TO EXHIBIT 1

<u>SCHEDULES AND EXHIBITS</u>

Schedule 1 – Leasing Guidelines
Schedule 2 – Loan Documents
Schedule 3 – Approved Annual Budget
Schedule 4 – Approved Capital Expenditures Budget
Schedule 5 – Rent Roll
Schedule 6 – List of Environmental Reports

Exhibit A – Compliance Certificate
Exhibit B – Deposit Account Information
Exhibit C – Disbursement Conditions
Exhibit D – Excess Cash Flow Account Information
Exhibit E – Definition of Single-Purpose Entity
Exhibit F – Disbursement Certification
Exhibit G – Organizational Chart of Borrower
Exhibit H – Intentionally Omitted
Exhibit H – Request for Waiver of Missing Items

# LOAN AGREEMENT

THIS LOAN AGREEMENT (as the same may from time to time hereafter be modified, supplemented or amended, this "Agreement"), dated as of December 21, 2021 (the "Closing Date"), is made by and among READYCAP COMMERCIAL, LLC, a Delaware limited liability company (together with its successors and assigns, "Lender"), having an address of 1320 Greenway Drive, Suite 560, Irving, Texas 75038, and DREXEL FLATS ACQUISITION LLC ("Borrower 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Borrower 2", and together with Borrower 1, individually and collectively, jointly and severally, "Borrower"), each a Delaware limited liability company, each having an address at 187 S. Old Woodward, Suite 200, Birmingham, Michigan 48009.

With respect to the definition of "Borrower", except where the context otherwise provides, (i) any representations contained herein or in any other Loan Document of Borrower shall be applicable to each Borrower, (ii) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower and shall require performance by all Borrowers, (iii) any negative covenants contained herein or in any other Loan Document shall be deemed to be covenants of each Borrower, and shall be breached if any Borrower fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Borrower shall be deemed to be an Event of Default hereunder, and (v) any Indebtedness of Borrower shall be deemed to include any Indebtedness of Borrowers, or any Indebtedness of any one of them.

## RECITALS

Borrower desires to obtain a loan (the "Loan") from Lender in the maximum principal amount of TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00) (the "Loan Amount"), and Lender is willing to make the Loan on the terms and conditions set forth in this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the making of the Loan by Lender, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1. Definitions.** For all purposes of this Agreement and the other Loan Documents, the following terms shall have the following respective meanings. The location of additional defined terms is set forth in Section 1.2 below:

"Affiliate" of any specified Person means any other Person Controlling, Controlled by or under common Control with such specified Person.

"Approved Accounting Method" means GAAP, an income tax basis of accounting, or such other method of accounting approved by Lender from time to time, consistently applied.

"Approved Lease" means any Lease or proposed Lease that complies with the Leasing Guidelines (i.e., is not a Material Lease) or that is otherwise approved by Lender.

"Approved Lease Form" means the form of tenant lease agreement used by Borrower to lease all or any part of the Property, which Lender has approved in writing.

"Bank" means Signature Bank, or any such other bank selected by Borrower (to execute and deliver the Deposit Account Control Agreement) and acceptable to Lender.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which any of the following institutions is not open for business: (a) banks and savings and loan institutions in New York, New York, (b) the trustee under a Securitization (or, if no Securitization has occurred, Lender), (c) any Servicer, (d) the financial institution that maintains any collection account for or on behalf of any Servicer or any Reserve Account, (e) the New York Stock Exchange, or (f) the Federal Reserve Bank of New York.

"Capital Expenditures" means costs incurred by Borrower in connection with capital improvements (including, but not limited to, costs of demolition, as well as the "hard" and "soft" costs associated with such capital improvements) to the Property as set forth in the Approved Capital Expenditures Budget.

"Capital Expenditures Reserve Account" means the Reserve Account into which any of the Capital Expenditures Reserve Funds are deposited.

"Capital Expenditures Reserve Funds" means a portion of the Loan Amount equal to the sum of Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00), which shall be made available to Borrower only for the payment of Capital Expenditures pursuant to Section 3.4 hereof.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statutes thereto.

"Compliance Certificate" means a compliance certificate substantially in the form of Exhibit A annexed hereto, signed by a Responsible Officer of a Borrower.

"Control" (and terms correlative thereto) when used with respect to any specified Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise.

"Debt Service" means, with respect to any particular period of time, Interest (at the time of any determination thereof as calculated under the Note) and, if applicable, principal payments, due and payable under the Note and this Agreement.

"Debt Yield Ratio" means, as of any date of calculation, a ratio conveyed as a percentage in which: (a) the numerator is the Net Operating Income, which shall be calculated on the basis of the Operating Income for a trailing period of three (3) months (annualized and normalized) and the Operating Expenses for a trailing period of six (6) months (annualized and normalized); and (b) the denominator is the Loan Amount. Lender's calculation of the Debt Yield Ratio, and all component calculations, shall be conclusive and binding on Borrower absent manifest error.

"Deemed Approval Requirements" means, with respect to a request by Borrower for Lender's approval or consent, that: (a) no Event of Default shall have occurred and be continuing (either at the date of any notices specified below or as of the effective date of any deemed approval), (b) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof, together with such supporting information and documentation as Lender may reasonably require, (c) Lender shall have failed to request additional information or otherwise approve or deny such request, within five (5) Business Days of receipt of the foregoing initial notice, (d) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof, together with such supporting information and documentation as Lender may reasonably require, which second notice shall have been marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF THE LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER. LENDER'S FAILURE TO RESPOND TO THIS NOTICE WITHIN SUCH FIVE (5) BUSINESS DAY PERIOD MAY RESULT IN LENDER'S APPROVAL OF THE MATTERS DISCUSSED HEREIN BEING DEEMED GRANTED PURSUANT TO THE LOAN AGREEMENT", and (e) Lender shall have failed to respond to such second notice within such five (5) Business Day period.

"Deposit Account" shall mean the account established or to be established with the Bank pursuant to the terms of the Deposit Account Control Agreement, including all replacements or substitutions therefor, for the deposit of the Operating Income pursuant to and in accordance with Section 3.7 hereof, as identified on Exhibit B annexed hereto.

"Deposit Account Control Agreement" means that certain Deposit Account Control Agreement by and among Borrower, Lender and Bank to be entered into on or before the Closing Date, in form, scope and substance acceptable to Lender, as the same may thereafter be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Disbursement Conditions" means the specific conditions to be satisfied with respect to the disbursement of any Reserve Funds pursuant to a Draw Request, which conditions are specified on Exhibit C annexed hereto.

"Disclosure Document" means, individually or collectively and as applicable, any offering circular, prospectus, prospectus supplement, private placement memorandum or other offering document, in each case, in connection with a Securitization.

"Draw Request" means the written request to be furnished by Borrower to Lender in connection with the disbursement of any of the Reserve Funds, which written request shall be in form, scope and substance acceptable to Lender, acting reasonably.

"Eligible Account" means (a) an account maintained with a federal or state chartered depository institution or trust company whose (x) commercial paper, short-term debt obligations or other short-term deposits are rated at least "A-1" by S&P and the equivalent rating by each other Rating Agency if the deposits in such account are to be held in such account for thirty (30) days or less or (y) long-term unsecured debt obligations are rated at least "A" by S&P and the equivalent rating by each other Rating Agency if the deposits in such account are to be held in such account

for more than thirty (30) days; or (b) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations regarding fiduciary funds on deposit substantially similar to 12 C.F.R. § 9.10(b); or (c) an account otherwise acceptable to each Rating Agency, as evidenced by a Rating Agency Confirmation relating to such account.

"Environmental Law" means any present and future applicable federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to Hazardous Substances or related to liability for or costs of violations of any of the foregoing, including the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

"Equity Requirements" means an amount, as of the Closing Date, equal to not less than Seven Million Four Hundred Seventy-Five Thousand and 00/100 Dollars ($7,475,000.00).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended or re-codified from time to time, and the regulations promulgated thereunder.

"Excess Cash Flow Account" means the custodial account established with Lender for the deposit of the Net Operating Income pursuant to and in accordance with Section 3.7(d) hereof, as identified on Exhibit D annexed hereto.

"Exchange Act" means the Securities Exchange Act of 1934, as the same may be amended, modified or replaced from time to time.

"Exit Fee" means an amount equal to Seventy Thousand Seven Hundred Fifty and 00/100 Dollars ($70,750.00) (i.e., one quarter of one percent (0.25%) of the Loan Amount).

"Extension Fee" means an amount equal to Seventy Thousand Seven Hundred Fifty and 00/100 Dollars ($70,750.00) (i.e., one quarter of one percent (0.25%) of the Loan Amount).

"Fiscal Year" means the 12-month period ending on December 31 of each year or such other fiscal year of Borrower as Borrower may select from time to time with the prior written consent of Lender, such consent not to be unreasonably withheld or delayed.

"Fitch" means Fitch, Inc.

"GAAP" means generally accepted accounting principles, applied on a consistent basis, as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified

Public Accountants or in statements of the Financial Accounting Standards Board or their respective successors and which are applicable in the circumstances as of the date in question.

"Governmental Authority" means any national, federal, state, regional or local government, or any other political subdivision of any of the foregoing, in each case with jurisdiction over Borrower, the Property, or any Person with jurisdiction over Borrower or the Property exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" means, individually and collectively, jointly and severally, IRA MONDRY, an individual, MITCHELL MONDRY, an individual, JOHN ALEXANDER UPPERMAN, an individual, and MARC KULICK, an individual.

"Hazardous Substance" means, without limitation, any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, toxic or hazardous wastes, toxic or hazardous substances, toxic or hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that have a documented negative impact on human health or the environment, including petroleum and petroleum products, mold or fungus, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives.

"Impositions" means all ground rents, if any, all taxes (including, without limitation, ad valorem or value added, sales (including those imposed on lease rentals), use, single business, gross receipts, intangible transaction privilege, privilege, license or similar taxes), and all assessments water rates or sewer rents, if any, (including, without limitation, to the extent not discharged prior to the Closing Date, all assessments for public improvements or benefits, whether or not commenced or completed within the term of the Loan), now or hereafter levied or assessed or imposed against any and all of the Property or any part thereof.

"Indebtedness" means, at any given time, the Principal Indebtedness, together with all accrued and unpaid interest thereon (including the Minimum Interest Fee and the Exit Fee, if and as applicable) and all other obligations and liabilities due or to become due to Lender pursuant hereto or any of the other Loan Documents.

"Indemnified Parties" means Lender, its Affiliates and their respective successors and assigns, any Person who is or will have been involved with the servicing of the Loan, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including Investors, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) (including any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the collateral therefor) and any Affiliate or designee of Lender that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, any other co-underwriters, co-placement agents or co initial purchasers of Securities issued in the Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates and each Person or entity who Controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act,

any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, and the respective officers, directors, and employees, agents, Affiliates, successors and assigns of any and all of the foregoing.

"Initial Advance" means a portion of the Loan Amount equal to the sum of Twenty-Six Million Fifty Thousand and 00/100 Dollars ($26,050,000.00), the net proceeds of which will be used to fund: (a) certain acquisition, refinancing and closing costs incurred by Borrower in connection with the acquisition of the Property and the closing of the Loan; and (b) the Working Capital Funds.

"Interest" means any and all scheduled interest payments due and payable under the Note and this Agreement.

"Interest Rate Protection Agreement" means that certain interest rate cap agreement, dated on or before the Closing Date, between Borrower and a counterparty acceptable to Lender, in form, scope and substance acceptable to Lender, and with a "strike price" of two and one half percent (2.50%) or less, covering the Loan Amount and the period from and including the Closing Date through and including the Initial Maturity Date.

"Leases" means all leases, assignments, sub-leases and other agreements or arrangements affecting the use or occupancy of all or any portion of the Property now in effect or hereafter entered into (including all lettings, subleases, licenses, concessions, tenancies and other occupancy agreements covering or encumbering all or any portion of the Property), together with any guarantees, supplements, amendments, modifications, extensions and renewals of the same.

"Leasing Guidelines" means the leasing guidelines applicable to the Property attached hereto as Schedule 1.

"Legal Requirements" means (a) all statutes, laws, rules, orders, regulations, ordinances, judgments, orders, decrees and injunctions of Governmental Authorities affecting Borrower, the Loan Documents, the Property or any part thereof, and all Permits and regulations relating thereto, (b) all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, (c) terms of any insurance policy maintained by or on behalf of Borrower, and (d) the organizational documents of Borrower.

"Lien" means any mortgage, deed of trust, deed to secure debt, lien pledge, easement (excluding Permitted Encumbrances), restrictive covenant, hypothecation, assignment, security interest, conditional sale or other title retention agreement, financing lease having substantially the same economic effect as any of the foregoing, or financing statement or similar instrument.

"Loan Documents" means, collectively, this Agreement and all other documents, agreements, instruments and certificates now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the documents listed on Schedule 2 attached hereto, as each may be (and each of the defined terms shall refer to such documents as they may be) amended, restated, or otherwise modified from time to time.

"Loan to Value Ratio" means the percentage, calculated by taking a fraction, the numerator of which is the outstanding Principal Indebtedness and the denominator of which is the "as is" fair market value of the Property, as determined by Lender (which, if required by Lender, shall be determined on the basis of an updated and current appraisal of the Property obtained at the sole cost and expense of Borrower, which appraisal shall be acceptable to Lender, in its sole and absolute discretion). Lender's calculation of the Loan to Value Ratio, and all component calculations, shall be conclusive and binding on Borrower absent manifest error.

"Losses" means any actual losses, actual damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including strict liabilities), obligations, debts, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, litigation costs, reasonable attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards (but specifically excluding consequential and punitive damages, except to the extent actually paid to a third party).

"Management Agreement" means any agreement entered into between Manager and Borrower pertaining to the management of the Property, as the same may be amended or otherwise modified from time to time in accordance with Section 5.4.

"Manager" means the Person designated as manager of the Property in the Management Agreement (if applicable), or any successor or assignee appointed in accordance with this Agreement.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Property, the Borrower and/or the Guarantor, (b) a material impairment of the rights and remedies of the Lender under any of the Loan Documents, or of the ability of the Borrower or the Guarantor to perform their respective obligations under any of the Loan Documents to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower or the Guarantor of any of the Loan Documents to which it is a party.

"Material Lease" means any Lease not complying with the Leasing Guidelines, excluding immaterial deviations from the Leasing Guidelines (i.e., that is not an Approved Lease).

"Maturity Date" means the Initial Maturity Date, as the same may be extended pursuant to and in accordance with Section 2.3 hereof.

"Minimum Disbursement Amount" means, for the disbursement of Capital Expenditures Reserve Funds only (except for the final disbursement thereof), an amount equal to Ten Thousand and 00/100 Dollars ($10,000.00).

"Moody's" means Moody's Investors Service, Inc.



Exhibit A

EXHIBIT A TO EXHIBIT 1

"Morningstar" means Morningstar Credit Ratings, LLC, a Pennsylvania limited liability company.

"Net Effective Rent" means, for any particular Lease, the total amount of rent payable during the term thereof, less the costs incurred by Borrower in connection with the entering into of such Lease (including, but not limited to, free rent, tenant improvements and leasing commissions), discounted to a "net present value" based upon a market discount rate, with each component of such calculation as determined by Lender, in its sole and absolute discretion.

"Net Operating Income" means the difference between Operating Income and Operating Expenses, provided, however, that only for purposes of calculating Net Operating Income in connection with Lender's calculation of the Debt Yield Ratio: (a) Operating Income shall exclude any income or revenues from: (i) a sale or refinancing of all or any portion of the Property, (ii) a Casualty or a Taking, (iii) payment of Rents for more than one (1) month in advance, (iv) lease termination payments, (v) Rents from any tenants who are in default under their Lease, who have vacated the demised premises and/or who are involved in a bankruptcy or insolvency proceeding, and (vi) payments from any other events not related to the ordinary course of operations of the Property; and (b) Operating Expenses shall: (i) exclude the payment of any "asset management" fees; and (ii) include Impositions on the basis of actual Impositions.

"Operating Expenses" means all cash expenses actually incurred by or charged to Borrower (appropriately pro-rated for any expenses that, although actually incurred in a particular period, also relate to other periods), with respect to the ownership, operation, leasing and management of the Property in the ordinary course of business, determined in accordance with the Approved Accounting Method, including, without limitation: (a) Impositions and Premiums (including the Tax and Insurance Monthly Installment); (b) Replacement Costs Reserve Funds; (c) personal property taxes and other real estate taxes; (d) sales taxes or any tax on rents; (e) wages, salaries, payroll taxes and employee benefits; (f) costs of utility services; (g) maintenance, repair and custodial costs; (h) office supplies, other administrative expenses and professional fees; (i) costs of advertising and marketing for the Property; (j) costs of telephone service; (k) costs of garbage removal; (l) an allowance for income items that are determined to be uncollectible; and (m) any compensation, fees or reimbursements paid to the property or asset manager of the Property (in either case up to three and one half percent (3.5%) of gross income per annum). Notwithstanding the foregoing, Operating Expenses specifically exclude (1) costs of tenant improvements and leasing commissions, (2) capital expenditures, (3) construction management fees, (4) depreciation, (5) income taxes, (6) legal fees incurred in connection with the acquisition of the Property and the closing of the Loan, (7) payments made towards Debt Service, (8) costs of Restoration following a Casualty or a Taking, (9) funds disbursed from any Reserve Account, and (10) any other non-cash items.

"Operating Income" means all gross cash income, revenues and consideration received or paid to or for the account or benefit of Borrower resulting from or attributable to the operation or leasing of the Property determined in accordance with the Approved Accounting Method, including, without limitation: (a) the Rents (from tenants, assignees, subtenants, or parties to termination or walkaway agreements); (b) amounts (to the extent included in Operating Expenses) payable by tenants to Borrower on account of maintenance or service charges, taxes, assessments, utilities and maintenance of the Property; (c) rents and receipts from health clubs, restaurants,

licenses, concessions, vending machines, laundry machines and similar items located at or operated from the Property (d) interest income; (e) proceeds of business interruption insurance; and (f) security deposits applied to the payment of rent.

"Origination Fee" means an amount equal to Two Hundred Twelve Thousand Two Hundred Fifty and 00/100 Dollars ($212,250.00) (i.e., three quarters of one percent (0.75%) of the Loan Amount).

"Permitted Encumbrances" means, with respect to the Property, collectively, (a) the Lien created by the Loan Documents, (b) all Liens and other matters disclosed in the title insurance policy insuring the Security Instrument, or any part thereof which have been approved by Lender, (c) Liens, if any, for Impositions imposed by any Governmental Authority not yet due or delinquent, and (d) such governmental, public utility and private restrictions, covenants, reservations, easements, licenses or other agreements of an immaterial nature that are of public record and that may be granted by Borrower after the Closing Date and which do not have a Material Adverse Effect.

"Permitted Trade Payables" means unsecured trade payables in the ordinary course of business relating to the ownership and operation of the Property which (a) do not exceed, at any time, a maximum amount of two percent (2%) of the Loan Amount and (b) are paid within 60-days of the date incurred.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, or any other entity, any Governmental Authority, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Premiums" means insurance premiums payable for insurance carried on or with respect to the Property.

"Principal Indebtedness" means the principal amount of the entire Loan outstanding as the same may be increased or decreased, as a result of prepayment or otherwise, from time to time.

"Rating Agencies" means each of S&P, Moody's, Fitch and Morningstar or any other nationally recognized statistical rating agency which has assigned a rating to the Securities.

"Release" with respect to any Hazardous Substance includes but is not limited to any presence, release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"Remaining Loan Amount" means the difference between: (a) the Loan Amount; and (b) the amount of the Initial Advance.

"Remaining Reserve Funds" means all or any portion of the Remaining Loan Amount not yet deposited in any Reserve Account.

"REMIC" means a "real estate mortgage investment conduit", within the meaning of Section 860D of the Code (or any successor statute) or any substantially similar vehicle for the holding of real estate indebtedness without the incurrence of taxation.

"Remediation" includes, but is not limited to, any activity to (a) clean up, detoxify, decontaminate, disinfect, contain, treat, remove, respond to, correct, dispose of, transport, or otherwise remediate, prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; or (b) inspect, investigate, study, monitor, assess, audit, sample, test, or evaluate any actual, potential or threatened Release of Hazardous Substances.

"Replacement Costs" means the costs for any and all replacement building components at the Property (including, but not limited to, the costs and expenses incurred in connection with the repair and replacement of items that are repaired or replaced due to normal wear and tear at the Property) or other capital expenditures at the Property not included in the Approved Capital Expenditures Budget.

"Replacement Costs Reserve Account" means the account held by Lender into which the Replacements Costs Reserve Funds shall be deposited pursuant to this Agreement.

"Replacement Costs Reserve Funds" means an amount equal to the sum of $250.00 per unit annually, but prorated monthly, or such other amount as may hereafter be determined by Lender, which Borrower shall deposit in the Replacement Costs Reserve Account on a monthly basis commencing upon (and each Payment Date subsequent to) the first Payment Date occurring subsequent to the first occurrence of the Stabilization Threshold, which shall be applied toward payment of Replacement Costs in accordance with the provisions of Section 3.6 hereof.

"Reserve Account Funds" means any or all of the funds deposited in the Reserve Accounts.

"Reserve Funds" means, collectively, the Capital Expenditures Reserve Funds and the Replacement Costs Reserve Funds.

"Responsible Officer" means with respect to any Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer, vice president-finance, member or manager of such Person.

"S&P" means Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

"Securities Act" means the Securities Act of 1933, as the same shall be amended from time to time.

"Stabilization Threshold" means (a) the Property achieving a Debt Yield Ratio of not less than seven and three quarters percent (7.75%) for a trailing period of two (2) consecutive calendar quarters, and (b) not less than ninety-three percent (93%) of the Property being leased on the basis of the most recent rent roll for the Property and executed Leases (approved by Lender if and as required hereunder) with the tenants in possession and having commenced paying rent, in each case as determined by Lender in its sole but reasonable discretion, upon the written request of

Borrower or as and when otherwise required to be determined pursuant to and in accordance with the terms, provisions, covenants and conditions of this Agreement.

"State" shall mean the state where the Property is located.

"TIC Agreement" means Tenants In Common Agreement, dated on or about the date hereof, by and among the Borrowers.

"Title Company" means Old Republic National Title Insurance Company.

"Title Policy" means the title insurance policy issued on the Closing Date by the Title Company in favor of Lender insuring the Lien of the Security Instrument.

"Transfer" means (a) any conveyance, transfer, sale, assignment, equity pledge or Lien, whether by operation of law or otherwise, of, on or affecting (i) all or any portion of the Property, or (ii) any direct or indirect legal ownership interest in Borrower, and (b) any change in Control of Borrower (including, but not limited to, any transfer of any direct or indirect legal ownership interest in Borrower that results in Guarantor, in the aggregate, owning less than the direct or indirect ownership interest in Borrower owned by Guarantor, in the aggregate, as of the date hereof, and/or not having effective legal and management control of, Borrower and the Property).

"Trust" means the REMIC (or other transferee pursuant to a Securitization, as to which interests are conveyed to one or more Investors) that holds the Loan.

"Working Capital Funds" means a portion of the Loan Amount (and the Initial Advance) equal to Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), which shall be disbursed to Borrower on the Closing Date and thereafter (including any replenishments thereof) used by Borrower only for the payment of future Capital Expenditures pursuant to and in accordance with the same general protocols relating thereto as set forth in Section 3.4(b) hereof.

**Section 1.2. Location of Additional Defined Terms.**

| Defined Term | Location |
|---|---|
| **"Agreement"** | **First Paragraph** |
| **"Approved Annual Budget"** | **Section 5.5(a)(iv)** |
| **"Approved Capital Expenditures Budget"** | **Section 5.5(a)(iv)** |
| **"Assignment of Leases"** | **Schedule 2** |
| **"Borrower"** | **First Paragraph** |
| **"Cash Management Protocols"** | **Section 3.7(d)** |
| **"Casualty"** | **Section 7.5(a)** |
| **"Casualty Retainage"** | **Section 7.7(b)** |
| **"Closing Date"** | **First Paragraph** |
| **"Condemnation Proceeds"** | **Section 7.5(a)** |
| **"Contracts"** | **The Security Instrument** |
| **"Default Rate"** | **The Note** |
| **"Disbursement Certification"** | **Section 3.8(b)** |
| **"Environmental Lien"** | **Section 9.2** |



Exhibit A

EXHIBIT A TO EXHIBIT 1

“Equipment” .................... The Security Instrument
“ERISA Affiliate” .................... Section 4.7
“Event of Default”.................... Section 8.1
“First Extended Maturity Date”.................... The Note
“Funding Losses” .................... The Note
“Improvements”.................... The Security Instrument
“In-Balance” .................... Section 3.8(c)
“Initial Maturity Date”.................... The Note
“Insolvency Action” .................... Section 8.1(h)
“Insurance Proceeds” .................... Section 7.5(a)
“Interest Rate” .................... The Note
“Inventory”.................... The Security Instrument
“Investor” .................... Section 10.1
“Land” .................... The Security Instrument
“Lender” .................... First Paragraph
“Liabilities” .................... Section 10.2
“Loan”.................... Recitals
“Loan Amount”.................... Recitals
“Material Alterations”.................... Section 5.2
“Maximum Amount”.................... The Note
“Minimum Interest Fee” .................... The Note
“Net Restoration Proceeds” .................... Section 7.5(a)
“Net Worth and Liquidity Requirements”.................... Section 5.13
“Note”.................... Schedule 2
“Operating Account”.................... Section 3.7(d)
“Participant Register” .................... Section 10.6
“Payment Date” .................... The Note
“Permits” .................... The Security Instrument
“Permitted Transfer” .................... Section 6.1
“Property” .................... The Security Instrument
“Reconciliation Statement”.................... Section 3.7(d)
“Rents”.................... The Security Instrument
“Reserve Account” and “Reserve Accounts” .................... Section 3.1(a)
“Restoration”.................... Section 7.6
“Restoration Proceeds” .................... Section 7.5(a)
“Restoration Proceeds Threshold”.................... Section 7.5(a)
“Securities”.................... Section 10.1
“Securitization”.................... Section 10.1
“Security Instrument” .................... Schedule 2
“Servicer” .................... Section 10.3
“Servicing Agreement”.................... Section 10.3
“Single-Purpose Entity” .................... Exhibit E
“Taking” .................... Section 7.5(a)
“Tax and Insurance Monthly Installment” .................... Section 3.3
“Tax and Insurance Reserve Account”.................... Section 3.3
“Tenant Direction Letter”.................... Section 3.7(c)



Exhibit A

EXHIBIT A TO EXHIBIT 1

"UCC" ............................................................................ The Security Instrument

**Section 1.3. Principles of Construction.** All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2
## THE LOAN

**Section 2.1. The Loan.**

(a) **Initial Advance.** On the Closing Date, Borrower shall receive an initial advance of the Loan Amount in an amount equal to the Initial Advance. The remaining (unfunded) portion of the Loan Amount shall be made available to Borrower pursuant to the terms, provisions, covenants and conditions of Section 2.1(b) and/or Article 3, as applicable. No amounts borrowed under this Section 2.1(a), Section 2.1(b) and/or Article 3 and repaid may be re-borrowed.

(b) **Mandatory Advance.** On or after March 1, 2024, provided an Event of Default does not then exist (unless waived by Lender, in its sole and absolute discretion), the then unfunded portion of the Capital Expenditures Reserve Funds may, at the option of Lender (in its sole and absolute discretion), be deposited in the Capital Expenditures Reserve Account and thereafter applied and disbursed toward the payment of Capital Expenditures pursuant to and in accordance with the terms, provisions, covenants and conditions of Section 3.4(b) hereof. All amounts so advanced under this Section 2.1(b) shall earn interest from and after the date so advanced and deposited into the applicable Reserve Account.

(c) **Evidence of Indebtedness.** Borrower's obligation to pay the Indebtedness is evidenced by this Agreement and by the Note and is secured by the Security Instrument and the other Loan Documents to the extent provided therein.

**Section 2.2. Interest Rate; Payments; Prepayment.**

(a) Interest Rate; Payments. The Indebtedness shall accrue interest at the rates and in the manner set forth in the Note. Borrower shall make payments of principal and interest at the times and in the manner set forth in the Note.

(b) Prepayment. Borrower shall not be permitted at any time to prepay all or any part of the Loan except as expressly provided in the Note.

**Section 2.3. Extension Option.** The Borrower may request that Lender extend the Initial Maturity Date and the First Extended Maturity Date, if applicable, pursuant to and in accordance with the terms, provisions covenants and conditions of (and in the manner set forth in) Section 2(c) and Section 2(d) of the Note.



Exhibit A

EXHIBIT A TO EXHIBIT 1

**Section 2.4. Origination Fee; Exit Fee.**

(a) On the Closing Date, Borrower shall pay the Origination Fee to Lender.

(b) Subject to Section 11.29 hereof, on the Maturity Date (or sooner repayment or acceleration of the Loan), Borrower shall pay the Exit Fee to Lender.

## ARTICLE 3
## RESERVE ACCOUNTS;
## DEPOSIT ACCOUNT; EXCESS CASH FLOW ACCOUNT

**Section 3.1. Reserve Accounts Generally.**

(a) Establishment. Each of the reserve accounts referred to in this Article 3 (including the Tax and Insurance Reserve Account, the Capital Expenditures Reserve Account, the Replacement Costs Reserve Account and the Excess Cash Flow Account referred to below) is established with or for the benefit of Lender for the purpose of holding the funds deposited therein pursuant to the terms, provisions, covenants and conditions of this Agreement and is individually referred to herein as a "Reserve Account" and collectively as the "Reserve Accounts." Each Reserve Account shall be a custodial account established by and with Lender and shall not constitute a trust fund. At Lender's option, funds deposited into a Reserve Account may be commingled with other money held by Lender or its servicer. Borrower acknowledges and agrees that funds in the Reserve Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof and that the funds therein shall not earn interest. Borrower shall not have the right to make any withdrawals from any Reserve Account.

(b) Disbursements of Reserve Account Funds. The Reserve Account Funds then on deposit and funded from time to time into the Reserve Accounts shall be disbursed to Borrower for the respective purposes set forth in (and otherwise pursuant to and in accordance with the terms, provisions, covenants and conditions of) this Article 3 prior to the disbursement and utilization of any of the as yet unfunded respective portions of the Remaining Reserve Funds, as the case may be (i.e., the Reserve Account Funds shall be disbursed prior to utilizing any of the unfunded Remaining Reserve Funds).

(c) Processing Fee. Lender shall be entitled to a processing fee not to exceed: (i) Five Hundred and 00/100 Dollars ($500.00) per request for each disbursement of Capital Expenditures Reserve Funds; and (ii) Two Hundred Fifty and 00/100 Dollars ($250.00) per request for each disbursement of Replacement Costs Reserve Funds, which Lender may deduct from the applicable Reserve Accounts and/or the applicable Remaining Reserve Funds, as the case may be, at the time of the applicable disbursement.

(d) Application upon Event of Default. Notwithstanding anything to the contrary contained herein, upon the occurrence and during the continuance of an Event of Default, (i) any amounts deposited into and/or remaining in any Reserve Account may be withdrawn by Lender and thereafter applied by Lender in any manner towards the Indebtedness (and/or the Operating Expenses) as Lender may elect in Lender's discretion, and (ii) Borrower shall thereafter have no further right in respect of the Reserve Accounts.

**Section 3.2. Intentionally Omitted.**

**Section 3.3. Tax and Insurance Monthly Installment.**

On each Payment Date, one-twelfth (1/12th) of the annual amount of (A) Impositions, and (B) Premiums (collectively, the "Tax and Insurance Monthly Installment") shall be deposited by Borrower into a custodial account established with Lender (the "Tax and Insurance Reserve Account"), provided, however, that the Tax and Insurance Monthly Installment shall not include any "supplemental real estate taxes" relating to the Property subsequent to the Closing Date (which Borrower shall instead be required to pay directly). The initial amount of the Tax and Insurance Monthly Installment as of the Closing Date is equal to Thirty-Two Thousand Eight Hundred Twenty-Eight and 96/100 Dollars ($32,828.96), and the initial amount of the total funds on deposit in the Tax and Insurance Reserve Account as of the Closing Date is equal to One Hundred Twenty-Nine Thousand One Hundred Seventy-Four and 16/100 Dollars ($129,174.16). Lender may re-calculate the foregoing initial amount of the Tax and Insurance Monthly Installment from time to time in order to assure that funds are reserved in sufficient amounts to enable the payment of Impositions and Premiums thirty (30) days prior to their respective due dates, and if such amounts for the then current Fiscal Year or payment period are not ascertainable by Lender at the time a Tax and Insurance Monthly Installment is required to be made, the amount of the Tax and Insurance Monthly Installment shall be Lender's reasonable estimate based on one-twelfth (1/12th) of the aggregate Impositions and Premiums for the prior Fiscal Year or payment period, with adjustments reasonably determined by Lender. Provided an Event of Default does not then exist, Lender shall make payments of Impositions and Premiums out of the Tax and Insurance Reserve Account before the same shall be due and payable or otherwise delinquent to the extent that there are funds then available in the Tax and Insurance Reserve Account and Lender has received appropriate documentation from Borrower in order to establish the amount(s) due and the due date(s) for the payment of the same at least thirty (30) days prior to the respective due date(s).

**Section 3.4. Capital Expenditures Reserve Funds; Working Capital Funds.**

(a) The Capital Expenditures Reserve Funds shall be used for the payment, pursuant to Section 3.4(b) below, of Capital Expenditures.

(b) Borrower shall be entitled to receive disbursement of the Capital Expenditures Reserve Funds from Lender from time to time during the term of the Loan to pay for Capital Expenditures, provided that at such time the applicable Disbursement Conditions have been satisfied, and provided, further, that in each case, Borrower's Draw Request for such disbursement must be received by Lender at least fifteen (15) Business Days prior to the requested disbursement date for the payment of any such Capital Expenditures.

(c) In furtherance of the foregoing, it is the intention of Borrower and Lender that: (i) disbursements for Capital Expenditures then due and payable shall be made either to Borrower for the payment of the same, or if requested by Borrower (or required by Lender, acting reasonably) as a direct payment to the contractor performing the Capital Expenditures for which such disbursements are being made; (ii) neither the Capital Expenditures Reserve Funds (nor any funds in any other Reserve Account) shall be made available or otherwise disbursed hereunder for payment of any construction management or similar fees payable to the Manager under the



Exhibit A

EXHIBIT A TO EXHIBIT 1

Management Agreement unless previously approved by Lender; and (iii) Borrower shall submit no more than one (1) request for disbursement of Capital Expenditures Reserve Funds every thirty (30) calendar days (it being the intention of the parties that at no point shall such requests occur more than once during each calendar month).

(d) Borrower shall complete any and all of the Capital Expenditures in a timely manner and free and clear of any mechanic's liens, materialmen's liens and equitable liens or any other Liens, and otherwise in accordance with applicable Legal Requirements. In connection therewith, if required by Lender at the time of any disbursement (but also on no less than a semi-annual basis until the Capital Expenditures contemplated by the Approved Capital Expenditures Budget have been completed), Lender shall have received, at the cost and expense of Borrower, a "date-down" endorsement to Lender's title insurance policy showing no new exceptions and reciting the increased policy coverage amount based upon the latest disbursement of the Capital Expenditures Reserve Funds.

(e) The Working Capital Funds shall be: (i) disbursed to Borrower on the Closing Date and shall (including any replenishments thereof) thereafter be used by Borrower only for the payment (pursuant to and in accordance with the protocols set forth in Section 3.4(b) hereof) of future Capital Expenditures; and (ii) replenished and disbursed once again to Borrower subsequent to the Closing Date, but only provided that: (x) the initial disbursement of the Working Capital Funds to Borrower on the Closing Date (and any subsequent replenishments thereof) have previously been utilized by Borrower for the payment of Capital Expenditures (and proof of such payment is furnished to Lender); (y) no Event of Default exists; and (z) such replenishment and disbursement is made from and only to the extent of the Capital Expenditures Reserve Funds then available and at the same time that a disbursement of Capital Expenditures Reserve Funds is made hereunder to Borrower pursuant to and in accordance with terms, provisions, covenants and conditions hereof.

**Section 3.5. Intentionally Omitted.**

**Section 3.6. Replacement Costs Reserve Account.**

(a) On or before the first Payment Date occurring subsequent to the first occurrence of the Stabilization Threshold, Borrower shall establish the Replacement Costs Reserve Account with Lender into which Borrower shall thereafter deposit the Replacement Costs Reserve Funds on a monthly basis commencing upon (and each Payment Date subsequent to) the first Payment Date occurring subsequent to the first occurrence of the Stabilization Threshold, which Replacement Costs Reserve Funds shall be used for the payment, pursuant to Section 3.6(b) below, of future Replacement Costs at the Property.

(b) Borrower shall be entitled to receive disbursement of the Replacement Costs Reserve Funds from Lender from time to time during the term of the Loan to pay for Replacement Costs at the Property, provided that at such time the applicable Disbursement Conditions have been satisfied, and provided, further, that in each case, Borrower's Draw Request for such disbursement must be received by Lender at least fifteen (15) Business Days prior to the requested disbursement date for the payment of any such Replacement Costs.



Exhibit A

EXHIBIT A TO EXHIBIT 1

(c) In furtherance of the foregoing, it is the intention of Borrower and Lender that Borrower shall submit no more than one (1) request for disbursement of funds from the Replacement Costs Reserve Account every thirty (30) calendar days (it being the intention of the parties that at no point shall such requests occur more than once during each calendar month).

**Section 3.7. Deposit Account; Excess Cash Flow Account.**

(a) On or before the Closing Date, Borrower shall establish the Deposit Account with the Bank pursuant to the Deposit Account Control Agreement, whereby Borrower agrees to cause the Operating Income to be paid to and deposited into the Deposit Account.

(b) The Deposit Account shall be in the name of Borrower for the sole and exclusive benefit of Lender. Borrower acknowledges and agrees that: (i) the Deposit Account is subject to the sole and absolute dominion, control and discretion of Lender; (ii) Borrower shall not have any right of withdrawal or control with respect to the Deposit Account or disbursements therefrom; and (iii) any Rents or other Operating Income from the Property received by Borrower or Manager prior to deposit in the Deposit Account shall: (1) be deemed to be Property and shall be held in trust for the benefit, and as the property, of Lender, (2) not be commingled with any other funds or property of Borrower or Manager, and (3) be deposited in the Deposit Account within three (3) Business Days of receipt (with the Borrower having the option for using a "check-scanning" device at the Property for the collection of Rents from the tenants).

(c) [reserved].

(d) On each Business Day of each calendar month following the establishment of the Deposit Account as aforesaid, the Bank shall (as long as no Event of Default has occurred and is continuing), from and to the extent of the Operating Income deposited in the Deposit Account, transfer all amounts then on deposit in the Deposit Account (in excess of the minimum balance) to an account designated by Borrower (the "Operating Account") as set forth in the Deposit Account Control Agreement. Borrower shall use such funds deposited by the Bank into the Operating Account, as aforesaid, to: (i) pay the Debt Service then due and payable; and (ii) pay the Operating Expenses (including any Tax and Insurance Monthly Installment required to be deposited into the Tax and Insurance Reserve Account, as well as Replacement Costs Reserve Funds required to be deposited into the Replacement Costs Reserve Account, if applicable) then due and payable, and thereafter at Borrower's discretion subject to the terms and conditions of the Loan Documents; provided, that, if the Property is not achieving a Debt Yield Ratio of at least six and three quarters percent (6.75%) on January 10, 2024 or at any time thereafter, then Borrower shall (i) remit the remaining Net Operating Income for the immediately preceding calendar month to Lender by wire transfer of immediately available Federal funds, which shall be held by Lender in the Excess Cash Flow Account as additional collateral for the Indebtedness, following payment of the Debt Service then due and payable and Operating Expenses (including any Tax and Insurance Monthly Installment required to be deposited into the Tax and Insurance Reserve Account, as well as Replacement Costs Reserve Funds required to be deposited into the Replacement Costs Reserve Account, if applicable) then due and payable, as aforesaid; and (ii) furnish Lender, if and as required by Lender, a quarterly reconciliation statement (the "Reconciliation Statement"), in form, scope and substance acceptable to Lender, acting reasonably, showing the Operating Income, the Operating Expenses (including any Tax and

Insurance Monthly Installment required to be deposited into the Tax and Insurance Reserve Account, as well as Replacement Costs Reserve Funds required to be deposited into the Replacement Costs Reserve Account, if applicable) and the Debt Service paid, as well as the Net Operating Income, for such immediately preceding calendar quarter (the aforementioned obligations of Borrower as set forth in the immediately preceding sub-paragraphs (i) and (ii), inclusive, collectively, the "Cash Management Protocols")

(e) If the Cash Management Protocols shall be implemented in accordance with Section 3.7(d) due to the failure of the Property to achieve a Debt Yield Ratio of at least six and three quarters percent (6.75%), upon the occurrence of the Stabilization Threshold, the Cash Management Protocols shall be suspended until such time as the Property may again fail to achieve a Debt Yield Ratio of at least six and three quarters percent (6.75%), and any and all funds in the Excess Cash Flow Account at such time shall (provided an Event of Default has not previously occurred, and subject to filling any deficiency in the Tax and Insurance Reserve Account and/or the Replacement Costs Reserve Account, as determined by Lender) be refunded to Borrower.

(f) In furtherance of the foregoing provisions of Section 3.7(e) hereof, in the event that, at any time subsequent to the initial (or any subsequent) occurrence of the Stabilization Threshold, the Property fails to achieve a Debt Yield Ratio of at least six and three quarters percent (6.75%), the Cash Management Protocols shall be re-implemented and continue thereafter until the next occurrence of the Stabilization Threshold.

(g) Upon the occurrence and during the continuance of an Event of Default (i) the Bank shall no longer transfer all amounts then on deposit in the Deposit Account (in excess of the minimum balance) to the Operating Account; (ii) any and all funds then or thereafter on deposit in the Deposit Account shall be disbursed by the Bank to a separate Lender-controlled Reserve Account in accordance with Lender's instructions; and (iii) such funds may be thereafter applied by Lender to amounts owing in connection with the Loan and for the payment of Operating Expenses, in such order of priority as Lender shall determine in Lender's sole and absolute discretion.

(h) Borrower hereby grants to the Lender (and shall at all times maintain in favor of Lender) a continuing, perfected, first-priority Lien and security interest in and to the Deposit Account, the Excess Cash Flow Account, the separate Lender-controlled Reserve Account referred to in Section 3.7(g) hereof and any and all funds now or hereafter deposited therein at any time, the proceeds thereof and any interest and/or accruals thereon, to further secure the Indebtedness and all obligations now or hereafter owing by Borrower to Lender under the Loan Documents.

**Section 3.8. Minimum Disbursement Amount; Waiver of Minor Non-Compliance; Reallocations Among Reserves.**

(a) Each disbursement request by Borrower of any of the Capital Expenditures Reserve Funds (except for the final disbursement thereof), shall, if required by Lender, be in amounts of not less than the Minimum Disbursement Amount.



Exhibit A

EXHIBIT A TO EXHIBIT 1

(b) In connection with the funding of a particular Draw Request by Borrower from time-to-time of any of the of the Capital Expenditure Reserve Funds and/or the Replacement Costs Reserve Funds: (i) Borrower shall submit, for Capital Expenditures and/or Replacement Costs, a completed disbursement certification (the "Disbursement Certification") in the form attached hereto as Exhibit F (which shall also include the normal and customary "Reserve Withdrawal Request Summary" and "Full Draw Package"), and (x) Lender shall disburse (unless a manifest error exists) the amount requested in the Disbursement Certification, provided that: (1) the amount requested in the Disbursement Certification is also otherwise in accordance with terms, provisions, covenants and conditions of this Agreement; (2) Lender has not advised Borrower in writing that a previously submitted Disbursement Certification was in error or incomplete; it being the intention of Borrower and Lender that in such case, Borrower shall first furnish Lender with such additional information as is reasonably necessary in order to correct such error or supply such missing information or materials before any further disbursements are made by Lender in connection with the submission by Borrower of any pending, new or additional Disbursement Certifications; and (3) Guarantor shall be liable under the Guaranty of Recourse Obligations for any Losses incurred by Lender as a result of or in connection with a failure of Borrower to use the Reserve Funds disbursed pursuant to a Disbursement Certification for their intended purposes; (ii) Lender may, at Lender's option, waive non-compliance by Borrower with one or more of the terms, provisions, covenants and conditions in this Article 3 applicable thereto, or non-compliance of other non-monetary terms, provisions, covenants and conditions in this Agreement, in each case for a period of up to ninety (90) days; and (iii) the existence of a non-monetary Event of Default (including, but not limited to, the failure of Borrower or Guarantor to comply with any of the reporting requirements set forth in Section 5.5 hereof), beyond any applicable notice and cure periods and for which Lender has not previously furnished Borrower with written notice, shall not prohibit the funding of such Draw Request (it being the intention of the Parties that a Draw Request shall be funded in such case as long as all of the other applicable disbursement conditions with respect thereto have been satisfied).

(c) If, at any time, Borrower shall request that the Reserve Funds for any category of cost or expense shown in the Approved Capital Expenditures Budget be reallocated to another category of cost or expense, Lender shall consider such request on a case-by-case basis for such reallocation in its sole, but reasonable discretion, provided, however, that under no circumstances shall Lender be obligated to consider such a request unless Borrower has first demonstrated to Lender's satisfaction, in Lender's sole, but reasonable discretion, that the Loan continues to remain In Balance (as defined below) following any such reallocation. For purposes hereof, the term "In Balance" means that the total of the available funds (as determined by Lender, in its sole, but reasonable discretion) for the Capital Expenditures equals or exceeds the costs therefor, as set forth on the Approved Capital Expenditures Budget, including any contingency reserves shown thereon.

(d) In connection with the funding of a particular Draw Request by Borrower from time-to-time of any of the Reserve Funds, Lender may, at Lender's option, make such disbursement directly to either the particular vendor/contractor or to Borrower (with proof of payment to thereafter be submitted to Lender prior to the funding of the next subsequent Draw Request to Borrower).

**Section 3.9. Interest on Reserve Accounts; Use of Remaining Reserve Funds; Refund of Remaining Funds.**

(a) Borrower shall not be entitled to any earnings or interest on funds deposited into the Reserve Accounts (nor shall any of the Remaining Reserve Funds or any funds in any of the Reserve Accounts be made available or disbursed to Borrower under any circumstances for any legal expenses incurred in connection with the closing of the Loan).

(b) At such time as the Capital Expenditures contemplated by the Approved Capital Expenditures Budget have been completed, or if subsequent to the occurrence of the Stabilization Threshold, the Reserve Account Funds then remaining in the Reserve Accounts will no longer need to be utilized by Borrower for their intended purposes, upon the prior written request of Borrower, Lender shall, in either case, at Lender's sole option, either (i) apply such Reserve Account Funds towards the reduction of the Principal Indebtedness; or (ii) disburse such Reserve Account Funds to Borrower as a reimbursement for additional capital expenditures.

(c) Upon full repayment of the Indebtedness, Lender shall also promptly thereafter refund to Borrower the Reserve Account Funds (if any) remaining in the Reserve Accounts or credit the same to Borrower on the payoff letter.

**Section 3.10. Sole Dominion and Control.** Borrower acknowledges and agrees that the Reserve Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and, except as set forth otherwise in the Loan Documents, Borrower shall have no right of withdrawal or distributions with respect to the funds in any of the Reserve Accounts.

**Section 3.11. Security Interest.** Borrower hereby grants to Lender a first priority security interest in each of the Reserve Accounts and the funds deposited therein as additional security for the Indebtedness.

**Section 3.12. Rights on Default.** Notwithstanding anything to the contrary in this Article 3, upon the occurrence of an Event of Default, and for so long as such Event of Default continues: (a) Lender shall have the right to liquidate and transfer any amounts then invested in any of the Reserve Accounts (and utilize any ACH form or forms provided by Borrower to Lender in connection therewith and also apply any and all such amounts towards the payment of the Indebtedness in such order and priority as Lender shall determine, in its sole discretion), or reinvest such amounts in other investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any of the Reserve Accounts or any funds deposited therein, and (b) Lender shall have all rights and remedies with respect to the Reserve Accounts, and the funds on deposit therein, as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, Lender may apply the amounts in any or all of such Reserve Accounts, as Lender determines in its sole discretion including, but not limited to, payment of the Indebtedness.

**Section 3.13. Financing Statement; Further Assurances.** Borrower hereby authorizes Lender to file, and upon Lender's request shall execute and deliver to Lender for filing a financing statement or statements under the UCC in connection with any of the Reserve Accounts, and the

funds on deposit with respect thereto in the form required to properly perfect Lender's security interest therein, if and to the extent that under applicable law a security interest in any and all of such Reserve Accounts, and any and all such funds on deposit therein, may be properly perfected by the filing of one or more financing statements. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted or purported to be granted hereby, if and to the extent that under applicable law a security interest in any and all of such Reserve Accounts, and any such funds on deposit therein, may be properly perfected by the filing of one or more financing statements, or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any and all of the Reserve Accounts, or any funds on deposit therein.

**Section 3.14. Borrower's Obligation Not Affected.** The insufficiency of funds on deposit in the Reserve Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**Section 3.15. Property Inspections; Draw Requests.**

(a) Lender shall also have the right to inspect the Property up to two (2) times each Fiscal Year, at reasonable times and upon reasonable prior notice to Borrower, in order to, among other things, evaluate the condition of the Property and the progress of any construction or other work being performed at the Property pursuant to and in accordance with the Approved Annual Budget or otherwise (and Borrower will pay all of Lender's actual, out-of-pocket costs, fees and expenses associated with such inspections, which may include fees and costs of an independent, third-party inspector).

(b) For avoidance of doubt with respect the submission of a Draw Request or other requests for the disbursement of Reserve Funds, Borrower acknowledges and agrees that: (i) each such request shall also include a certificate (along with a summary page), email or letter, in form, scope and substance acceptable to Lender, from the Borrower specifically outlining, among other things, the amount(s) requested; (ii) site inspections for such requests shall occur for all disbursements of One Hundred Thousand and 00/100 Dollars ($100,000.00) or more, but in all cases not less frequently than for every other such request (regardless of the amount of the disbursements); and (iii) the submission of invoices with such requests are not required for amounts of less than Five Thousand and 00/100 Dollars ($5,000.00).

**Section 3.16. Interest Rate Protection Agreement.**

(a) Borrower shall enter into an Interest Rate Protection Agreement on or before the Closing Date. Borrower shall also collaterally assign to Lender all of Borrower's right, title and interest in any and all payments under the Interest Rate Protection Agreement and shall deliver to Lender an executed counterpart of the same and obtain the consent of the counterparty thereto (as evidenced by such counterparty's execution of a separate acknowledgment), all on forms acceptable to Lender.

(b) Upon the occurrence and during the continuance of an Event of Default, the counterparty shall make all payments under the Interest Rate Protection Agreement to such address as Lender shall at such time notify the counterparty, to be applied by Lender towards the Indebtedness, in such order of priority as Lender shall determine.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Borrower represents, warrants and covenants to Lender as of the Closing Date as follows:

**Section 4.1. Organization**. Borrower (a) is duly organized and validly existing in good standing under the laws of the State of its formation, (b) is duly qualified to do business in each jurisdiction in which the nature of its business or any of the Property makes such qualification necessary, (c) has the requisite power and authority to carry on its business as now being conducted, and (d) has the requisite power to execute and deliver, and perform its obligations under, the Loan Documents.

**Section 4.2. Authorization.** The execution and delivery by Borrower of the Loan Documents, Borrower's performance of its obligations thereunder and the creation of the Liens provided for in the Loan Documents (a) have been duly authorized by all requisite action on the part of Borrower, (b) will not violate any provision of any applicable Legal Requirements, and (c) will not be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any Lien of any nature whatsoever upon any of the property or assets of Borrower pursuant to, any indenture or agreement or instrument. Except for those obtained or filed on or prior to the Closing Date, Borrower is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any Governmental Authority in connection with or as a condition to the execution, delivery or performance of the Loan Documents. The Loan Documents to which Borrower and/or Manager is a party have been duly executed and delivered by such parties.

**Section 4.3. Enforceability**. The Loan Documents executed by Borrower and Guarantor in connection with the Loan are the legal, valid and binding obligations of Borrower and Guarantor, as the case may be, enforceable against Borrower and Guarantor, as the case may be, in accordance with their terms, subject only to bankruptcy, insolvency and other limitations on creditors' rights generally and to equitable principles. Such Loan Documents are, as of the Closing Date, not subject to any right of rescission, set-off, counterclaim or defense by Borrower and/or Guarantor, as the case may be, including the defense of usury.

**Section 4.4. Litigation**. There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending and served or, to Borrower's knowledge, threatened, involving or concerning Borrower, Guarantor, or the Property, which would have a Material Adverse Effect on the Loan if adjudicated adversely to such party.

**Section 4.5. Full and Accurate Disclosure**. No statement of fact made by or on behalf of Borrower in the Loan Documents or in any other document or certificate delivered to Lender by Borrower contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no event or

circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect. Except as otherwise disclosed in writing to Lender, there has been no material adverse change in the financial position of Borrower or the Property, or in the results of operations of Borrower. Borrower has not incurred any obligation or liability, contingent or otherwise, not reflected in such financial data which might materially adversely affect its business operations or the Property.

**Section 4.6. Compliance.** To Borrower's knowledge, Borrower, the Property and Borrower's use thereof and operations thereat comply in all material respects with all applicable Legal Requirements. Borrower has obtained (in its own name) all Permits necessary to use and operate the Property, and all such Permits are in full force and effect.

**Section 4.7. ERISA.** Neither Borrower nor any ERISA Affiliate (as defined below) maintains, contributes to, has any obligation to contribute to, or has any direct or indirect liability with respect to any "employee benefit plan," "multiemployer plan," or any other "plan" (each as defined in ERISA). Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, a "plan," as defined in Section 4975(e)(1) of the Code, subject to Code Section 4975, or a "governmental plan" within the meaning of Section 3(32) of ERISA. None of the assets of Borrower constitutes "plan assets" of one or more of any such plans under 29 C.F.R. Section 2510.3-101 or otherwise. Transactions by or with Borrower do not violate state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans and such state statutes do not in any manner affect the ability of the Borrower to perform its obligations under the Loan Documents or the ability of Lender to enforce any and all of its rights under this Agreement. If an investor or direct or indirect equity owner in Borrower is a plan that is not subject to Title I of ERISA or Section 4975 of the Code, but is subject to the provisions of any federal, state, local, non-U.S. or other laws or regulations that are similar to those portions of ERISA or the Code, the assets of the Borrower do not constitute the assets of such plan under such other laws. "ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code, of which Borrower is a member, and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code, of which Borrower is a member. Borrower shall take or refrain from taking, as the case may be, such actions as may be necessary to cause the representations and warranties in this Section 4.7 to remain true and accurate throughout the term of the Loan.

**Section 4.8. Not Foreign Person.** Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

**Section 4.9. Investment Company Act; Public Utility Holding Company Act.** Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 4.10. Title to the Property; Liens.** Borrower owns good, indefeasible, marketable and insurable title to the Property, free and clear of all Liens, other than the Permitted Encumbrances. The Permitted Encumbrances do not and will not materially and adversely affect (a) the ability of Borrower to pay in full all sums due under the Note or any of its other obligations under the Loan Documents in a timely manner, or (b) the use of the Property for the use currently being made thereof, the operation of the Property as currently being operated or the value of the Property. The Security Instrument creates a valid and enforceable first Lien on the Property and a valid and enforceable first priority security interest in the personal property constituting part of the Property, subject to no Liens other than the Permitted Encumbrances. The Assignment of Leases creates a valid and enforceable first Lien on and a valid and enforceable first priority security interest in all of Borrower's interest in all Leases, subject to no Liens other than the Permitted Encumbrances.

**Section 4.11. Condemnation.** No Taking has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**Section 4.12. Utilities and Public Access.** The Property has adequate rights of access to public ways and is served by all utilities required for the current use thereof.

**Section 4.13. Separate Lots.** The Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot.

**Section 4.14. Assessments; Use Fees.** Except as disclosed in the Lender's title insurance policy (or in the title commitment provided to Lender and forming the basis thereof), there are no pending or, to the knowledge of Borrower, proposed special assessments, use fees or any other special or other assessments for public improvements or otherwise affecting the Property, nor, to the knowledge of Borrower, are there any contemplated improvements to the Property that may result in any such special assessments, use fees or any other special or other assessments.

**Section 4.15. Flood Zone** The Property is not located in a flood hazard area as designated by the Federal Emergency Management Agency.

**Section 4.16. Physical Condition.** Except as disclosed in the engineering report(s) delivered to Lender in connection with the Loan, to Borrower's knowledge, the Property is free of material structural defects and all building systems contained therein are in good working order in all material respects subject to ordinary wear and tear.

**Section 4.17. Title Insurance.** The Property is covered by an American Land Title Association mortgagee's title insurance policy insuring a valid first lien on the Property, which (a) is in full force and effect, (b) is freely assignable to and will inure to the benefit of Lender and any successor or assignee of Lender, (c) has been paid in full, (d) is issued by a title company licensed in the State where the Property is located, (e) has had no claims made against it, (f) except for the Permitted Encumbrances, contains no exclusions for (i) access or (ii) survey, and (g) lists only the Permitted Encumbrances as exceptions.

**Section 4.18. Leases and Rents.** (a) Borrower is the sole owner of the entire lessor's interest in the Leases, and neither the Leases nor any Rents have been Transferred by Borrower

except to Lender pursuant to the Loan Documents; (b) no Person has any possessory interest in, or right to occupy, the Property, (c) there are no pending contracts of sale in-place with respect to a sale of all or any portion of the Property, (d) Leases entered into subsequent to the Closing Date either comply with the Leasing Guidelines or have been otherwise approved by Lender, and (e) the rent roll for the Property annexed hereto as Schedule 5 is, as of the Closing Date, true, accurate and correct.

**Section 4.19. Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.** Borrower, Guarantor, and to the best of Borrower's knowledge, after having made reasonable inquiry, each Person owning a direct or indirect interest in Borrower and Guarantor: (a) is not currently identified on the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control (currently is accessible through the internet website at www.treas.gov/ofac/t11sdn.pdf.) or any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Legal Requirements (or if such list does not exist, the similar list then being maintained by the United States), including trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States; (b) is not a Person subject to any trade restriction, trade embargo, economic sanction, or other prohibition under federal law, including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any executive orders or regulations promulgated thereunder; and (c) is not in violation of Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism and the Uniting and Strengthening America by Providing Appropriate Tools Required in Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), with the result that (A) the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law, or (B) the Loan is in violation of law.

**Section 4.20. Organizational Chart.** The organizational chart annexed hereto as Exhibit H identifies subsidiaries and equity interests of Borrower and is true, complete and correct on and as of the date hereof. The Guarantor owns a direct or indirect ownership interest in, and has effective legal and management control of, Borrower and the Property, and no Person other than those Persons shown on Exhibit G has any ownership interest in, or right of control, directly or indirectly, in Borrower.

**Section 4.21. Property.**

(a) The Property is comprised of an approximately 249,600 square foot, 400-unit property located at 8800 Drexel Avenue, Oklahoma City, Oklahoma.

(b) Borrower represents and warrants that it owns (and shall own) the Property as tenants-in-common in accordance with the terms and conditions of the TIC Agreement and all applicable law where the Property is located.

**Section 4.22. Management Agreement.** The Management Agreement is in full force and effect, and constitutes the entire agreement with respect to the management of the Property between Manager and Borrower and has not been assigned or encumbered (other than pursuant to



Exhibit A

EXHIBIT A TO EXHIBIT 1

the Security Instrument), or modified, amended, or supplemented. Neither Manager nor Borrower is in default in the performance of the terms and provisions of the Management Agreement.

**Section 4.23. Insurance.** Borrower has obtained and has delivered to Lender certificates evidencing all insurance policies described in Article 7, which certificates reflect the insurance coverages, amounts and other requirements set forth in this Agreement. No insurance claims have been made that are currently pending, outstanding or otherwise remain unsatisfied under any such insurance policies and would have a Material Adverse Effect with respect to the Property. No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the insurance policies.

**Section 4.24. Federal Reserve Regulations.** No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**Section 4.25. Taxes.** Borrower has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower does not have knowledge of any basis for any material additional assessment in respect of any such taxes and related liabilities for prior years.

**Section 4.26. Employer Identification Number.** Borrower 1's United States employer identification number is 87-2977919. Borrower 2's United States employer identification number is 87-4035096.

**Section 4.27. Solvency.** Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute an insufficient amount of capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). Except as expressly disclosed to Lender in writing, no petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower, Guarantor, or any of their respective partners or members, if any, in the last seven (7) years, and neither Borrower, Guarantor, nor any of their respective partners or members in the last seven (7) years has ever made an assignment for the benefit of creditors or

taken advantage of any insolvency act for the benefit of debtors. Neither Borrower, Guarantor, nor any of their respective partners or members is contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower, Guarantor, or any of their respective partners or members.

**Section 4.28. Business Purposes.** The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

**Section 4.29. Forfeiture.** Neither Borrower nor any Affiliate of Borrower in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Property or any material part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

**Section 4.30. No Defaults.** Borrower is not in default under this Agreement or any of the other Loan Documents.

**Section 4.31. Survival of Representations.** Borrower agrees that all of the representations and warranties of Borrower set forth in Article 4 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 5
## COVENANTS

Borrower covenants and agrees that, from the Closing Date and until payment in full of the Indebtedness:

**Section 5.1. Compliance with Legal Requirements; Impositions and Other Claims; Contests.**

(a) Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, Permits and franchises necessary for the conduct of its business and shall comply in all respects with all applicable Legal Requirements, Contracts, Permits, and private covenants, conditions and restrictions that at any time apply to Borrower or the Property. Borrower shall notify Lender promptly of any written notice or order that Borrower receives from any Governmental Authority relating to Borrower's failure to comply with such applicable Legal Requirements.

(b) Except to the extent Lender is obligated to pay Impositions and Premiums from the Tax and Insurance Reserve Account pursuant to the terms of Section 3.3 hereof, Borrower

shall pay all Impositions and Premiums with respect to itself and the Property in accordance with the terms hereof. Borrower may, at its expense, after prior notice to Lender, contest by appropriate proceedings conducted in good faith and with due diligence, the validity or application of any Legal Requirements, Imposition, or any claims of mechanics, materialmen, suppliers or vendors, and may withhold payment of the same pending such proceedings if permitted by law, as long as (i) in the case of any Impositions or claims of mechanics, materialmen, suppliers or vendors, such proceedings shall suspend the collection thereof from the Property and neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower pays the amount or satisfies the condition being contested, and Borrower would have the opportunity to do so, in the event of Borrower's failure to prevail in such contest, (ii) Lender would not, by virtue of such permitted contest, be exposed to any risk of civil or criminal liability, (iii) neither the Property nor any part thereof or any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (iv) below, as a result of the failure to comply with any Legal Requirement of such proceeding which would not be released if Borrower pays the amount or satisfies the condition being contested, and Borrower would have the opportunity to do so, in the event of Borrower's failure to prevail in the contest, and (iv) Borrower shall have furnished to Lender reasonable additional security in respect of the claim being contested or the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be requested by Lender, but in no event less than 125% of the amount of such claim.

**Section 5.2. Maintenance; Waste; Alterations.** Borrower shall at all times keep the Property in good repair, working order and condition, except for reasonable wear and use. Borrower shall not permit the Improvements, Equipment or Inventory to be removed or demolished (provided, however, that Borrower may remove, demolish or alter worn out or obsolete Improvements, Equipment and Inventory that are promptly replaced with Improvements, Equipment or Inventory, as applicable, of equivalent value and functionality, unless Borrower reasonably determines that such replacement is not necessary for the operation of the Property and would not have a Material Adverse Effect). In addition, Borrower may not, without Lender's approval, perform alterations to the Improvements and Equipment which (a) exceed $250,000 per each separate alteration (not including alterations performed in connection with a Restoration), or (b) are not in the ordinary course of Borrower's business (such alterations, "Material Alterations"). Borrower shall not perform any Material Alteration unless approved in writing by Lender in Lender's reasonable discretion. Borrower shall reimburse Lender for all actual costs and expenses incurred by Lender, including the fees charged by any professional engaged by Lender in connection with any such Material Alteration. For the sake of clarity it is agreed that the performance of the Capital Expenditures as set forth in the Approved Capital Expenditures Budget are not Material Alterations requiring Lender's consent.

**Section 5.3. Access to Property and Records.** Borrower shall permit agents, representatives and employees of Lender (at Lender's cost and expense if no Event of Default has occurred), to inspect (a) the Property or any part thereof, and (b) such books, records and accounts of Borrower and to make such copies or extracts thereof as Lender shall desire, in each case at such reasonable times as may be requested by Lender upon reasonable advance notice, subject to the rights of tenants under Leases.

**Section 5.4. Management of Property.**

(a) The Property will be managed at all times by the Manager pursuant to the Management Agreement unless terminated as provided in the Loan Documents. Borrower shall diligently perform all terms and covenants of the Management Agreement. Borrower shall not (i) surrender, terminate, cancel, or materially modify the Management Agreement, (ii) enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, or (iv) waive or release any of its rights and remedies under the Management Agreement, in each case, without the consent of Lender, which consent shall not be unreasonably withheld or delayed. If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition to Lender's consent, execute a subordination of management agreement in form and substance reasonably satisfactory to Lender.

(b) If at any time and for any reason, the Manager is removed as the Manager of the Property: (i) Borrower shall promptly enter into a new property management agreement relating to the management and operation of the Property with a new property manager acceptable to Lender, and (ii) if required by Lender, acting reasonably, Borrower shall also appoint a third-party consultant acceptable to Lender to also act as the asset manager for the Property.

**Section 5.5. Financial and Other Reporting.**

(a) Delivery of Financial Statements. Borrower shall keep adequate books and records of account with respect to its financial condition and the operation of the Property on a cash basis, consistently applied in a manner reasonably acceptable to Lender, and shall furnish the following to Lender within the time periods specified (unless any of such items are waived or any of such time periods are extended by Lender), each prepared in such detail as reasonably required by Lender and certified by a Responsible Officer to be true, complete and correct:

(i) as soon as available, but in any event within thirty (30) days after the end of each calendar quarter, (A) a rent roll for the Property (but only if the Property is occupied); (B) a tracker of work completed to date per unit (which shall include the unit number, unit type, renovation status and estimated date of completion); (C) a pre-leasing and leasing status report for the Property, (D) a Reconciliation Statement for the Property detailing, among other things, the Operating Income received, the Operating Expenses incurred and the Interest paid, as of the end of such calendar quarter, as compared to the Approved Annual Budget, and (E) a Compliance Certificate;

(ii) as soon as available, but in any event within ninety (90) days after the close of each Fiscal Year, (A) an unaudited annual operating statement for the Property presented on an annual and/or twelve (12) month basis consistent with the quarterly operating statements described above, certified by Borrower to be complete and accurate; (B) an unaudited annual balance sheet and profit and loss statement for Borrower, certified by Borrower to be complete and accurate; and (C) a statement of change of financial position of Borrower, setting forth in comparative form the figures for the previous Fiscal Year;

(iii) on or before the Closing Date, and thereafter as soon as available, but in any event at least thirty (30) days prior to the close of each Fiscal Year, an annual operating budget, capital expenditures budget and forecast for the Property for the up-coming Fiscal Year

presented on a monthly basis (consistent with the information required in the quarterly operating statements described above and which shall also contain detailed information for the anticipated Operating Expenses and Capital Expenditures for such up-coming Fiscal Year), which budgets shall be subject to Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed (the annual operating budget, including revisions thereto, once each so approved by Lender, as aforesaid, the "Approved Annual Budget," and the capital expenditures budget, including periodic revisions that may be made thereto, once so approved by Lender, as aforesaid, the "Approved Capital Expenditures Budget ). The Approved Annual Budget for the period from January, 2022 through December, 2022 (showing anticipated Operating Expenses for the Property) is attached hereto as Schedule 3 and the Approved Capital Expenditures Budget (showing anticipated Capital Expenditures as of the Closing Date for the Property) is attached hereto as Schedule 4;

(iv) such other financial information or property management or leasing information (including, without limitation, copies of Borrowers' state and federal tax returns, information on tenants under Leases to the extent such information is available to Borrower, and an accounting of security deposits) as may reasonably be required by Lender from time to time.

(b) Lender Audit Rights. Lender and its agents have the right, upon prior written notice to Borrower (notice to be given unless an Event of Default exists) and at reasonable times, to examine the records, books and other papers which reflect upon Borrower's financial condition or pertain to the income, expense and management of the Property and to make copies and abstracts from such materials. Lender also shall have the right, from time to time (but, in the absence of an Event of Default existing, not more than annually) and upon reasonable prior notice to Borrower (notice to be given unless an Event of Default exists), to have an independent audit conducted of any of Borrower's financial information. Lender shall pay the cost of such audit unless Lender performed the audit following the occurrence and during the continuance of an Event of Default or if the results of Lender's audit disclose an error by more than ten percent (10%), in which case (and in addition to Lender's other remedies) Borrower shall pay the cost incurred by Lender with respect to such audit upon Lender's demand. Upon Borrower's failure to pay such amounts, and in addition to Lender's remedies for Borrower's failure to perform, the unpaid amounts shall be added to principal, the unpaid amounts shall bear interest at the Default Rate until paid in full, and payment of such amounts shall be secured by the Security Instrument and other collateral given to secure the Loan.

(c) Financial Reports from Guarantor. Borrower shall cause Guarantor to provide the following to Lender within the time periods specified (unless any of such items are waived or any of such time periods are extended by Lender): (i) an annual unaudited personal financial statement to be delivered within ninety (90) days after the end of each annual period during each calendar year or such party's fiscal year, as applicable; provided, however, that Lender during the continuance of an Event of Default may request delivery of the foregoing on a semi-annual basis; (ii) copies of state and Federal income tax returns for each Fiscal Year of Guarantor to be delivered as soon as available, but in any event on or before the later of: (x) July 15th of each Fiscal Year, or (y) within ninety (90) days of any extended period of time for the filing of the same, provided a copy of such extension is furnished to Lender on or before July 15th; (iii) such additional financial information (including, without limitation, (1) unaudited financial statements supporting the Guarantor's net worth and liquidity in accordance with Section 5.13 hereof, (2) a

detailed REO schedule, and (3) a list of contingent liabilities) as Lender may reasonably require from time to time (but no more frequently than annually unless an Event of Default exists). Each financial report provided by Guarantor shall be certified by such Guarantor to be complete and accurate.

(d) Failure to Provide Financial Reports. Borrower's failure to comply with any or all of the terms of this Section 5.5 relating to the furnishing of financial and other reporting information shall (a) not be deemed an Event of Default unless and until Lender provides Borrower with written notice of the same and Borrower does not provide such information within ten (10) Business Days of such notice; and (b) result, at the sole option of Lender upon Borrower's failure to provide such information within such ten (10) Business Day period, in an administrative charge of One Thousand and 00/100 Dollars ($1,000.00) being paid by Borrower for each reporting period for which Borrower has failed to comply with any or all of the terms of this Section 5.5 relating to the furnishing of such financial and other reporting information.

**Section 5.6. Leases.**

(a) Borrower shall (i) observe and perform all of the obligations imposed upon the lessor under the Leases; (ii) promptly send copies to Lender of all notices of material default that Borrower shall receive under any Lease; (iii) [reserved]; and (iv) enforce the terms, covenants and conditions in the Leases to be observed by tenants in accordance with commercially reasonable practices for properties similar to the Property.

(b) Borrower may not enter into any Material Lease after the date hereof without the written consent of Lender.

(c) Borrower may enter into an Approved Lease after the date hereof without the written consent of Lender provided such Approved Lease satisfies the Leasing Guidelines and an Event of Default does not exist, provided, however, that if a Lease does not satisfy the Leasing Guidelines, Lender shall nonetheless consider approval of such Lease, in its sole and absolute discretion, based upon an analysis by Lender of the Net Effective Rent for such Lease.

(d) Borrower shall not (i) make any assignment or pledge of any Lease or Rents to anyone other than Lender until the Indebtedness is paid in full, (ii) collect any Rents under the Leases more than one (1) month in advance (except that Borrower may collect in advance such security deposits as are permitted pursuant to applicable Legal Requirements and are commercially reasonable in the prevailing market); (iii) [reserved]; or (iv) grant any modification of any Lease which in the aggregate might have a Material Adverse Effect.

(e) Borrower shall, in connection with the review of any Material Lease by Lender subsequent to the Closing Date (and the preparation and/or negotiation of any subordination and non-disturbance agreements relating thereto), reimburse Lender for any reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection therewith.

(f) Notwithstanding the foregoing to the contrary, if the Deemed Approval Requirements are fully satisfied in connection with Borrower's request for Lender's approval with

respect to a matter pursuant to this Section 5.6, Lender's approval shall be deemed given with respect to such matter.

**Section 5.7. Place of Business; State of Organization; Operations**. Borrower shall not change its (a) chief executive office or its principal place of business or place where its books and records are kept, or (b) the jurisdiction in which it is organized, in each case without giving Lender at least sixty (60) days' prior written notice thereof and promptly providing Lender such information as Lender may reasonably request in connection therewith. Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Borrower will remain in good standing under the laws of the State to the extent required for the ownership, maintenance, management and operation of the Property. Borrower shall also not enter into any line of business, or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

**Section 5.8. Zoning; Joint Assessment**. Borrower shall not materially change the Property's use or initiate, join in or consent to any (a) change in any private restrictive covenant, zoning ordinance or other public or private restrictions limiting or defining the Property's uses or any part thereof (including filing a declaration of condominium, map or any other document having the effect of subjecting the Property to the condominium or cooperative form of ownership), except those necessary in connection with the uses permitted pursuant to this Agreement, or (b) joint assessment of the Property with any other real or personal property.

**Section 5.9. Equity Requirements**. Borrower shall furnish equity in the Property as represented by the Equity Requirements, and evidence of the Equity Requirements, as aforesaid, shall be furnished by Borrower to the satisfaction of Lender prior to the Closing Date. Lender acknowledges such evidence has been provided as of the date hereof.

**Section 5.10. Notice of Default**. Borrower shall promptly advise Lender of any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Event of Default or any event, which with the passage of time or the giving of notice, would constitute an Event of Default.

**Section 5.11. Litigation**. Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which would, if determined adversely to Borrower, be reasonably likely to have a Material Adverse Effect.

**Section 5.12. Performance by Borrower**. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

**Section 5.13. Guarantor Financial Covenants**. Guarantor shall, at all times while the Indebtedness remains unsatisfied, maintain a net worth, in the aggregate, of not less Twenty-Eight Million Three Hundred Thousand and 00/100 Dollars ($28,300,000.00) and liquidity, in the

aggregate, of not less than Two Million Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00) (collectively, the "Net Worth and Liquidity Requirements"). For the purposes hereof: (a) Guarantor's net worth shall exclude any equity attributable to the Property; and (b) the Net Worth and Liquidity Requirements may be tested by Lender on no less than an annual basis.

**Section 5.14. Illegal Activity/Forfeiture.** No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity, and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances (which shall include, without limitation, the growing, distributing and/or selling or dispensing of marijuana, whether for medical use or otherwise) currently ongoing at the Property. Borrower has not, will not, and will not permit the operation or use of the Property in any manner that would afford any Governmental Authority a right of forfeiture against the Property or any part thereof and, irrespective of the legality of such activity, no portion of the Property shall be operated or used for growing, distributing, selling and/or dispensing of marijuana, whether for medical use or otherwise.

**Section 5.15. Intentionally Omitted.**

**Section 5.16. TIC Agreement.**

(a) Borrower shall comply fully with the provisions of the TIC Agreement (provided, however, that in the event that the provisions of the TIC Agreement conflict with this Agreement or the other Loan Documents, then the terms and provisions of this Agreement and the other Loan Documents shall control, and each Borrower agrees to comply with, discharge and satisfy every term, provision, obligation and requirement of the Note, this Agreement, the Security Instrument and the other Loan Documents) and shall not materially modify or amend or terminate the TIC Agreement, or waive or limit any provision thereof, without the express prior written consent of Lender. Each Borrower covenants and agrees as follows: (a) that the TIC Agreement shall at all times be subject and subordinate to the Security Instrument and the terms and conditions of this Agreement; (b) the Borrower shall waive any rights it may have under applicable law to a partition of and/or the placement of a lien on the Property, for so long as the Loan is outstanding; (c) that no Borrower shall commence or prosecute any action for the partition of the Property until such time as the Indebtedness has been indefeasibly satisfied in full; and (d) the commencement or prosecution of any such action for a partition of and/or the placement of a lien on the Property shall constitute an immediate Event of Default hereunder and under the Guaranty of Recourse Obligations. Without limiting the foregoing, in the event that any Borrower commences or prosecutes an action for partition of the Property (in contravention of the provisions hereof or otherwise), the other Borrower shall purchase all of such Borrower's ownership and other tenant-in-common interests respecting the Property at fair market value pursuant to buy-sell provisions acceptable to Lender in all respects.

(b) Borrower hereby agrees that the TIC Agreement and all rights, remedies of, and indemnities benefiting Borrower thereunder as to one another, the Property or the ownership or operation thereof are hereby expressly made fully JUNIOR, SECONDARY, SUBJECT and SUBORDINATE to the rights and remedies of Lender under the Loan Documents, including any future advances made by Lender. Each Borrower further SUBORDINATES and hereby makes JUNIOR, SECONDARY and SUBJECT any and all purchase options, rights of first refusal and

rights to purchase the Property or any interest therein, whether now owned or hereafter acquired (including, without limitation, any rights arising under Section 363(i) of the Bankruptcy Code) to the terms and provisions of the Loan Documents. To the extent that any Borrower has or in the future obtains any lien or similar interest whatsoever in or to the Property, or any right or interest therein, whether now owned or hereafter acquired, such lien or other interest shall be and hereby is WAIVED, RELEASED and DISCHARGED in its entirety until such time as the Loan is paid in full and the obligations of Borrower and the Guarantor have been indefeasibly paid and performed in full. Borrower further agrees and covenants that it will not pursue any other remedies against one another to which it may be entitled pursuant to the TIC Agreement during the term of the Loan.

**Section 5.17. Bringdown of Certain Representations and Warranties.** Borrower shall cause the representations and warranties contained in Sections 4.7 (ERISA), 4.8 (Not Foreign Person), 4.9 (Investment Company Act, Public Company Act), 4.10 (Title to Property; Liens), 4.12 (Utilities and Public Access), 4.13 (Separate Lots), 4.17 (Title Insurance), 4.18 (Leases and Rents), 4.19 (Compliance with Anti-Terrorism) and 4.25 (Taxes) to be continuously accurate, true and correct at all times until payment in full of the Indebtedness, as if made with respect to current facts presently and continuously throughout the term of the Loan.

## ARTICLE 6
## TRANSFERS AND CHANGE OF BUSINESS

Borrower covenants and agrees that, from the Closing Date and until payment in full of the Indebtedness:

**Section 6.1. Transfers.** Borrower will not allow any Transfer to occur without the Lender's prior express written approval (which approval may be given or withheld in the Lender's sole and absolute discretion). Notwithstanding anything to the contrary contained herein, a Transfer (each a "Permitted Transfer") of: (a) a direct or indirect legal or beneficial ownership interest in Borrower that occurs by devise or bequest or by operation of law upon the death of a natural person that was the holder of such interest to a member of the immediate family of such interest holder or a trust or family conservatorship established for estate-planning purposes for the benefit of such immediate family member; (b) transfers to Affiliates of Borrower (subject to the satisfaction of minimum capitalization requirements); and (c) transfers of up to forty-nine percent (49%) of the membership interests in Borrower; shall each be permitted hereunder, provided, however, in each case that (i) Guarantor (and any trusts established by Guarantor for bona fide estate planning purposes), in the aggregate, continues to hold not less than the direct or indirect ownership in Borrower held by Guarantor, in the aggregate, on the date hereof, and also retains effective legal and management control of the Borrower and the Property (and such Transfer shall not result in a change of the day-to-day operations of the Property); (ii) with respect to any Transfer of more than ten percent (10%) of the direct or indirect interests in Borrower, Borrower shall give Lender notice of such transfer together with copies of all instruments effecting such transfer not less than five (5) Business Days after the date of such Transfer; and (iii) Lender has completed its KYC searches against any person or entity which, as a result of the Permitted Transfer, owns at least 20% direct or indirect interest in Borrower and such KYC searches do not reveal any negative information about such person or entity.

**Section 6.2. Other Indebtedness.** Borrower shall not incur, create, assume, allow to exist, become or be liable in any manner with respect to any other indebtedness or monetary obligations, except for the Indebtedness and Permitted Trade Payables.

**Section 6.3. Single-Purpose Entity; Change In Business.** Borrower shall not cease to be a Single-Purpose Entity (as such as such term is defined in Exhibit E annexed hereto). Until the Indebtedness is repaid in full, Borrower shall not modify, amend, restate or replace its organizational documents in any material respect, including with respect to the matters set forth in this Section 6.3, without Lender's prior written consent, such consent not to be unreasonably withheld.

## ARTICLE 7
## INSURANCE, CASUALTY, CONDEMNATION AND RESTORATION

**Section 7.1. Types of Insurance.** At all times during the term of the Loan, Borrower shall maintain, at its sole cost and expense, for the mutual benefit of Borrower and Lender, the following policies of insurance:

(a) Insurance against Casualty to the Property under a policy or policies covering such risks as are presently included in "special form" (also known as "all risk") coverage, including such risks as are ordinarily insured against by similar businesses, but in any event including fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, smoke, vandalism, malicious mischief and acts of terrorism, both foreign and domestic. Unless otherwise agreed in writing by Lender, such insurance shall be for the full insurable value of the Property, with a deductible amount, no greater than One Hundred Thousand and 00/100 Dollars ($100,000.00) per occurrence (5% for wind/hail and Fifty Thousand and 00/100 Dollars ($50,000.00) for named storm). No policy of insurance shall be written such that the proceeds thereof will produce less than the minimum coverage required by this subsection by reason of co-insurance provisions or otherwise (i.e., all such policies shall have either no coinsurance or, if coinsurance, then such policy shall have an "Agreed Amount" endorsement acceptable to Lender). The term "full insurable value" as used herein shall mean one hundred percent (100%) of the actual replacement cost of the Property (including a "Replacement Cost" endorsement, excluding foundation and excavation costs and costs of underground flues, pipes, drains and other uninsurable items) without any deduction for physical depreciation.

(b) Public liability insurance, to be written on an occurrence basis, including (i) "Commercial General Liability Insurance", with no deductible amount or self-insured retention greater than Five Hundred and 00/100 Dollars ($500.00); (ii) "Owned", "Hired" and "Non Owned Auto Liability" if applicable; and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance providing no less than Ten Million and 00/100 Dollars ($10,000,000.00) per occurrence, unless otherwise approved in writing by Lender. Coverage shall include acts of Terrorism, both Foreign and Domestic. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligations to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage. Liquor Liability, Automotive

Liability and Garage Keepers Liability, or any other liability coverage deemed appropriate given the Property type and exposure, may be required at the discretion of the Lender.

(c) Workers' compensation insurance for all employees of Borrower in such amount as is required by law and including employer's liability insurance, if required by Lender.

(d) During any period of any Restoration or any other construction upon the Property, Borrower shall maintain, or cause others to maintain, builder's risk insurance on a completed value basis (non-reporting form) of the type customarily carried in the case of similar construction for one hundred percent (100%) of the full, completed replacement cost of work in place and materials stored at or upon the Property, and such insurance shall cover against such risks (including the risks set forth in Section 7.1(a) hereof, and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance acceptable to Lender, with deductibles acceptable to Lender, and with such additional coverages to include, without limitation: (i) soft costs, including delayed opening coverage, (ii) coverage insuring all materials (installed and uninstalled, whether stored on or off-site); (iii) coverage naming Borrower as a named insured if the policy is provided by a general contractor; and (iv) professional engineers and architects liability (including errors and omissions) coverage at minimum limits of One Million and 00/100 Dollars ($1,000,000.00) per occurrence and of Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate.

(e) If at any time any portion of any structure on the Property is insurable against Casualty by flood and is located in a Special Flood Hazard Area under the Flood Disaster Protection Act of 1973, as amended, a flood insurance policy in form and amount, with deductibles acceptable to Lender, but in no event less than the amount sufficient to meet applicable Legal Requirements, as such Legal Requirements may from time to time be in effect.

(f) Rental loss and/or business interruption insurance (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to one hundred percent (100%) of the projected Rents from such Property during the period of restoration; and (iii) containing an extended period of indemnity endorsement which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that such Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. Coverage shall include acts of Terrorism, both Foreign and Domestic. Lender shall be named Lenders Loss Payee on a Standard Mortgagee Endorsement. Borrower shall maintain Business Interruption coverage in an amount equal to eighteen (18) months continuing expenses with at least a twelve (12) month period of indemnity and a six (6) month extended period of indemnity.

(g) [reserved].

(h) Comprehensive boiler and machinery insurance is required if the property contains centralized equipment, steam boilers or other pressure-fired vessels are in operation at the Property. Minimum liability amount per accident must equal the replacement (insurable) value of Improvements housing such equipment, boiler or pressure-fired machinery or such lesser amount

as approved by Lender in its sole and absolute discretion. The deductible with respect to such insurance shall not exceed One Hundred Thousand and 00/100 Dollars ($100,000.00) per claim.

(i) In the event the Land or the Improvements constitute a legal non-conforming use under applicable building, zoning, or land use laws or ordinances, coverage shall include Ordinance or Law coverage for loss of value of the undamaged portion of the Improvements up to the full limits of the policy, demolition and increased cost of construction (insurance for demolition and increased cost of construction may contain a sub limit satisfactory to Lender but no less than ten percent (10%) of total insurable value).

(j) Such other and further insurance and such higher limits as may be required from time to time by Lender in order to comply with regular requirements and practices of Lender in similar transactions including, if required by Lender, environmental liability insurance and earthquake insurance (A) with minimum coverage equivalent to the greater of 1.0x SUL (scenario upper loss) and 1.5x SEL (scenario expected loss) multiplied by the full replacement cost of the Improvements plus business income, (B) having a deductible approved by Lender (but in any event not in excess of 5% of the total insurable value of the Property), and (C) if the Property is legally nonconforming under applicable zoning ordinances and codes, containing ordinance of law coverage in amounts as required by Lender.

(k) All insurance provided for in this Section 7.1 shall be obtained under valid and enforceable policies, and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds, and all such policies provided for or contemplated by this Section 7.1, except for the insurance policy referenced in Section 7.1(c) hereof, shall name Borrower as the insured and Lender and its successors and/or assigns as their interests may appear as mortgagee and Lender's Loss Payee (in the case of property insurance and business interruption/loss of rents coverage) and the additional insured (in the case of liability insurance), and in the case of any and all property damage, boiler and machinery, flood and earthquake insurance, shall also contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender as Mortgagee/Lender's Loss Payee.

(l) Unless Lender is obligated to pay the Premiums from the Tax and Insurance Account pursuant to the terms of Section 3.3 hereof, Borrower shall promptly pay all Premiums when due on such insurance and, in all events, not less than thirty (30) days prior to the expiration dates of each such policy, Borrower will deliver to Lender acceptable evidence of insurance, such as a renewal policy or policies marked "premium paid" or other evidence satisfactory to Lender reflecting that such Premiums have been paid current and that all required insurance is current and in force. Borrower will immediately give Notice to Lender of any cancellation of, or modification or reduction in, any insurance policy. Lender shall not, because of accepting, rejecting, approving or obtaining insurance, incur any liability for (A) the existence, nonexistence, form or legal sufficiency thereof, (B) the solvency of any insurer, or (C) the payment of losses.

(m) Borrower may provide any required insurance under a blanket policy or policies covering the Property and Improvements and other property and assets not part of the Property, provided that Lender is provided a full schedule of locations and values for all properties on such blanket policy and such blanket policy otherwise complies with the requirements set forth

above. Any allocated coverage shall equal or exceed the coverage amounts required and must properly identify and fully protect the Property as if a separate policy were issued for one hundred percent (100%) of the replacement cost, with sub limits as permitted herein, at the time of loss.

(n) Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any of the insurance policies required by this Section 7.1. Borrower may, however, carry insurance for the Improvements, in addition to such policies, but only if such additional insurance: (a) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any of such policies; (b) mutually benefits Borrower and Lender, as their interests may appear; and (c) otherwise complies with the terms of this Agreement.

**Section 7.2. Insurer Ratings**. Unless otherwise approved by Lender in writing in advance of placement, Borrower will maintain the insurance coverage described in Section 7.1 with companies acceptable to Lender and with a claims paying ability rating of not less than "A-" by S&P or a financial and performance rating of "A-VIII" or its equivalent by A.M. Best. All insurers providing insurance required by this Agreement shall be authorized to issue insurance in the State.

**Section 7.3. General Insurance Requirements.**

(a) Borrower agrees that all insurance policies shall:

(i) be in such form and with such endorsements and in such amounts as required by this Agreement and as are satisfactory to Lender;

(ii) name Lender as an additional insured/loss payee/mortgagee and provide that all Insurance Proceeds be payable to Lender;

(iii) contain, where applicable, a "Non-Contributory Standard Lender Clause" and a Lender's Loss Payable Endorsement or their equivalents naming Lender as the person to whom all payments shall be paid and a provision that payment of Insurance Proceeds in excess of the Restoration Proceeds Threshold shall be made by a check payable only to Lender;

(iv) contain a waiver of subrogation endorsement as to Lender and its successors and assigns, providing that no policy shall be impaired or invalidated by virtue of any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such policy by Borrower, Lender or any other named insured, additional insured or loss payee (which might, absent such agreement, result in a forfeiture of all or a part of such insurance payment);

(v) contain an endorsement indicating that neither Lender nor Borrower shall be or be deemed to be a co-insurer with respect to any risk insured by such policies and shall provide for an aggregate deductible per loss for all policies not in excess of $100,000.00 for Property policies (5% for wind/hail and $50,000.00 for named storm) and no deductible or retention greater than $500.00 for General Liability policies, unless otherwise approved by Lender in advance and in writing;

(vi) contain a provision that any such Property policies shall not be canceled without at least thirty (30) days' prior written notice to Lender in each instance (at least ten (10) days' prior written notice to Lender due to nonpayment of premium). Such notice shall also be provided for Liability policies (except, when not available, Borrower shall provide required notice to Lender); and

(vii) with respect to commercial general liability and Excess/Umbrella Liability, provide for claims to be made on an occurrence basis.

(b) In the event of foreclosure of the lien of the Security Instrument or other transfer of title or assignment of the Property in extinguishment, in whole or in part, of the Indebtedness, all right, title and interest of Borrower in and to all policies of casualty insurance covering all or any part of the Property shall inure to the benefit of and pass to the successors in interest to Lender or the purchaser or grantee of the Property or any part thereof.

**Section 7.4. Certificates of Insurance and Delivery of Policies.** Upon Lender's request, certified copies of all insurance policies required pursuant to this Article 7 shall be promptly delivered to Lender. Certificates of insurance with respect to all renewal and replacement policies shall be delivered to Lender not less than ten (10) days prior to the expiration date of any of the insurance policies required to be maintained hereunder which certificates shall bear notations evidencing payment of applicable premiums and copies of such insurance policies shall be delivered to Lender promptly after Borrower's receipt thereof. If Borrower fails to maintain and deliver to Lender the certificates of insurance required by this Agreement, Lender may, at its option, after notice to Borrower, procure such insurance, and Borrower shall reimburse Lender for the amount of all premiums paid by Lender thereon promptly, after demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment, and such sum shall be a part of the Indebtedness secured by the Loan Documents. Lender shall not by the fact of approving, disapproving, accepting, preventing, obtaining or failing to obtain any insurance, incur any liability for or with respect to the amount of insurance carried, the form or legal sufficiency of insurance contracts, solvency of insurance companies, or the carriers' or Borrower's payment or defense of lawsuits, and Borrower hereby expressly assumes full responsibility therefor and all liability, if any, with respect thereto. Borrower represents that no claims have been made under any of such insurance policies, and no party, including Borrower, has done, by act or omission, anything which would impair the coverage of any of such insurance policies.

**Section 7.5. Restoration Proceeds.**

(a) Any and all awards, compensation, reimbursement, damages, proceeds, settlements, and other payments or relief paid or to be paid, together with all rights and causes of action relating to or arising from, (i) any insurance policy maintained by or on behalf of Borrower following any damage, destruction, casualty or loss to all or any portion of the Property (a "Casualty", and such proceeds, "Insurance Proceeds") or (ii) any temporary or permanent taking or voluntary conveyance of all or part of the Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority whether or not the same shall have actually been commenced (a "Taking", and such proceeds, "Condemnation Proceeds", and together with

Insurance Proceeds, collectively, "Restoration Proceeds") are hereby assigned to Lender as additional collateral security hereunder subject to the Lien of the Security Instrument, to be applied in accordance with this Article 7. Lender shall be entitled to receive and collect all Restoration Proceeds, and Borrower shall instruct and cause the issuer of each policy of insurance described herein and any applicable Governmental Authority to deliver to Lender all Restoration Proceeds. Borrower shall execute such further assignments of the Restoration Proceeds as Lender may from time to time reasonably require. Notwithstanding the foregoing, if the Restoration Proceeds, less the amount of Lender's actual out-of-pocket costs and expenses (including reasonable attorneys' fees and costs) incurred in collecting the same (the "Net Restoration Proceeds"), are Five Hundred Thousand and 00/100 Dollars ($500,000.00) or less (the "Restoration Proceeds Threshold"), provided no Event of Default then exists, Lender shall make such Net Restoration Proceeds available to Borrower. All Insurance Proceeds received by Borrower or Lender in respect of business interruption coverage, and all Condemnation Proceeds received with respect to a temporary Taking available to Borrower, shall be deposited in a segregated escrow account with Lender or its servicer, as applicable, and Lender shall estimate the number of months required for Borrower to restore the damage caused by such Casualty or replace cash flow interrupted by such temporary Taking, as applicable, and shall divide the aggregate proceeds by such number of months, and, provided no Event of Default then exists, shall disburse a monthly installment thereof to Borrower each such month. Subject to Lender's rights under Section 7.6, provided no Event of Default has occurred and is continuing and the Restoration has been completed in accordance with this Agreement, any Net Restoration Proceeds available to Borrower for Restoration, to the extent not used by Borrower in connection with, or to the extent they exceed the cost of such Restoration and any costs incurred by Lender, shall be paid to Borrower.

(b) Lender shall be entitled at its option to participate in any compromise, adjustment or settlement in connection with (i) any insurance policy claims relating to any Casualty, and (ii) any Taking in an amount in controversy, in either case, in excess of the Restoration Proceeds Threshold, and Borrower shall within ten (10) Business Days after request therefor reimburse Lender for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with such participation. Borrower shall not make any compromise, adjustment or settlement in connection with any such claim in excess of the Restoration Proceeds Threshold or if an Event of Default then exists without the prior written approval of Lender. Borrower shall not make any compromise, adjustment or settlement in connection with any claim unless same is commercially reasonable.

(c) If and to the extent Restoration Proceeds are not required to be made available to Borrower to be used for the Restoration of the Improvements, Equipment and Inventory affected by the Casualty or Taking, as applicable, pursuant to this Agreement, Lender shall be entitled, without Borrower's consent, to apply such Restoration Proceeds or the balance thereof, at Lender's option either (i) to the full or partial payment or prepayment of the Indebtedness in accordance with the Note; or (ii) to the Restoration of all or any part of such Improvements, Equipment and Inventory affected by the Casualty or Taking, as applicable.

**Section 7.6. Restoration.** Borrower shall apply all Insurance Proceeds first, to complete restoration or repair of the Improvements and Equipment before applying, disbursing or distributing any such Insurance Proceeds for any other purpose. Borrower shall restore and repair the Improvements and Equipment or any part thereof now or hereafter damaged or destroyed by

any Casualty or affected by any Taking; provided, however, that if the Casualty is not insured against or insurable, Borrower shall so restore and repair even though no Insurance Proceeds are received, or even if the available Insurance Proceeds are less than the cost of restoration and repair. Notwithstanding anything to the contrary set forth in Section 7.5, Lender agrees that Lender shall make the Net Restoration Proceeds (other than business interruption insurance proceeds, which shall be held and disbursed as provided in Section 7.5) available to Borrower for Borrower's restoration and repair of the Improvements, Equipment and Inventory affected by the Casualty or Taking (a "Restoration"), as applicable, on the following terms and subject to Borrower's satisfaction of the following conditions; provided, that Lender shall have the right to waive any of the following conditions in its discretion:

(a) At the time of such Casualty or Taking, as applicable, and at all times thereafter there shall exist no Event of Default;

(b) The Improvements, Equipment and Inventory affected by the Casualty or Taking, as applicable, shall be capable of being restored (including replacements) to substantially the same condition, utility, quality and character, as existed immediately prior to such Casualty or Taking, as applicable, in all material respects with a fair market value and projected cash flow of the Property equal to or greater than prior to such Casualty or Taking, as applicable;

(c) Borrower shall demonstrate to Lender's reasonable satisfaction Borrower's ability to pay the Indebtedness coming due during such repair or restoration period (after taking into account proceeds from business interruption insurance carried by Borrower);

(d) (i) in the event of a Casualty, the Casualty resulted in an actual or constructive loss of less than fifty percent (50%) of the fair market value of the Property, or (ii) in the event of a Taking, the Taking resulted in an actual or constructive loss of less than fifteen percent (15%) of the fair market value of the Property, less than fifteen percent (15%) of the land constituting the Property is taken, such land is located along the perimeter or periphery of the Property, and no portion of the Improvements on the Property is the subject of such Taking;

(e) Borrower shall have provided to Lender all of the following, and collaterally assigned the same to Lender pursuant to assignment documents acceptable to Lender: (i) an architect's contract with an architect reasonably acceptable to Lender and complete plans and specifications for the Restoration of the Improvements, Equipment and Inventory lost or damaged to the condition, utility and value required by Section 7.6(b); (ii) fixed-price or guaranteed maximum cost construction contracts with contractors reasonably acceptable to Lender for completion of the Restoration work in accordance with the aforementioned plans and specifications; (iii) such additional funds (if any) as are necessary from time to time, in Lender's reasonable opinion, to complete the Restoration (which funds shall be held by Lender as additional collateral securing the Indebtedness and shall be disbursed, if at all, pursuant to this Article 7); and (iv) copies of all Permits and licenses necessary to complete the Restoration in accordance with the plans and specifications and all Legal Requirements;

(f) Borrower shall use commercially reasonable efforts to commence such work within one hundred twenty (120) days after such Casualty or Taking, as applicable, and shall diligently pursue such work to completion;

(g) Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) the date six (6) months prior to the Maturity Date, (B) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or such Taking, as applicable, or (C) the expiration of the business interruption insurance coverage referred to in Section 7.1(f); and

(h) the Property and the use thereof after the Restoration will be in compliance with all applicable Legal Requirements.

**Section 7.7. Disbursement.**

(a) Each disbursement by Lender of such Restoration Proceeds shall be funded subject to conditions and in accordance with disbursement procedures which a commercial construction lender would typically establish in the exercise of sound banking practices, including requiring lien waivers and any other documents, instruments or items which may be reasonably required by Lender.

(b) In no event shall Lender be obligated to make disbursements of Restoration Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as determined by Lender, less, as to each contractor, subcontractor or materialman engaged in a Restoration, an amount equal to the greater of (i) ten percent (10%) of the costs actually incurred for work in place as part of such Restoration, as reasonably determined by Lender, and (ii) the amount actually withheld by Borrower (the "Casualty Retainage"). The Casualty Retainage shall not be released until Lender reasonably determines that the Restoration has been completed in accordance with the provisions of this Agreement and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage.

**Section 7.8. Qualified Amount.** Notwithstanding anything herein to the contrary, in the event of a taking of any portion of the Property by a state or any political subdivision or authority thereof, whether by legal proceeding or by agreement, or Casualty or Taking, if the ratio of the unpaid principal balance of the Loan to the value of the remaining Property (as determined by the Lender in its sole discretion using any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of any personal property or going concern value, if any) exceeds or would exceed 125% immediately after giving effect to the condemnation/casualty, then an amount that is a "qualified amount" as that term is defined in IRS Revenue Procedure 2010-30, as the same may be amended, replaced, supplemented or modified from time to time, must be applied to the principal amount of the Loan (rather than to any other portion of the Loan), unless Lender receives an opinion of counsel that, if this clause is applicable but not followed or is no longer applicable at the time of such taking, condemnation, eminent domain or similar proceeding, Casualty or Taking, the Loan (i) will not be subject to a "significant modification" within the meaning of Treasury Regulations Section 1.860G-2(b)(2) and (ii) will not fail to be a "qualified mortgage" within the meaning of Section 860G(a)(3)(A) of the Code.

## ARTICLE 8
## DEFAULTS

**Section 8.1. Event of Default.** The occurrence of one or more of the following events shall be an "Event of Default" hereunder:

(a) if Borrower fails to make any scheduled payment of principal, interest, or amounts due under Article 3 on any Payment Date, or fails to pay any other amount due and payable pursuant to the Loan Documents within five (5) days of the due date;

(b) if Borrower fails to pay the outstanding Indebtedness on the Maturity Date;

(c) the occurrence of the events identified elsewhere in this Agreement or the other Loan Documents as constituting an "Event of Default" hereunder or thereunder;

(d) the occurrence of a Transfer, other than a Permitted Transfer;

(e) [reserved];

(f) the entry of a judgment against the Borrower or Guarantor, which is reasonably likely not to be covered by insurance (as determined by Lender at Lender's sole but reasonable discretion), and is reasonably likely to have a Material Adverse Effect, and is not stayed, dismissed, satisfied or reversed on appeal within ninety (90) days after its entry;

(g) if any representation or warranty made herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower in connection with this Agreement or any other Loan Document shall be false in any material respect as of the date such representation or warranty was made or remade, provided, however, that Borrower shall have, with respect to unintentional misrepresentations that can be cured by the payment of money, a cure period of twenty (20) days after written notice from Lender within which to effectuate such a cure of the same;

(h) if Borrower or Guarantor (i) makes an assignment for the benefit of creditors, (ii) has a receiver, liquidator or trustee appointed for it, (iii) is adjudicated as bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law or any similar federal or state law shall be filed by or against, consented to, solicited by, or acquiesced in by it, or (iv) has any proceeding for its insolvency, dissolution or liquidation instituted against it (any of the foregoing in clauses (i) through (iv), an "Insolvency Action"); provided, however, that if such Insolvency Action was involuntary and not consented to by Borrower or Guarantor, as applicable, such Insolvency Action shall not be an Event of Default unless the same is not discharged, stayed or dismissed within ninety (90) days after the filing or commencement thereof;

(i) the failure of Borrower to maintain the insurance required pursuant to Article 7;

(j) if any guaranty given in connection with the Loan shall cease to be in full force and effect or any guarantor shall deny or disaffirm its obligations thereunder, or the death or



Exhibit A

EXHIBIT A TO EXHIBIT 1

legal incapacity of any such guarantor (provided, however, the death or legal incapacity of a guarantor shall not constitute an Event of Default or change in Control of Borrower provided that Lender shall have received a guaranty from a replacement guarantor satisfactory to Lender in its sole discretion within sixty (90) days following the death or legal incapacity of such guarantor and further provided that the death or incapacity of one (1) individual comprising Guarantor shall not be a default hereunder and shall not require a replacement if the remaining individuals comprising Guarantor continue to satisfy the Net Worth and Liquidity Requirements);

(k) any Borrower partitions or seeks to partition the Property, by legal action or otherwise, or consents to or otherwise acquiesces in any partition of the Property, by legal action or otherwise, without Lender's prior written consent; or

(l) a default shall be continuing under any of the other obligations, agreements, undertakings, terms, covenants, provisions or conditions of this Agreement not otherwise referred to in this Section 8.1, or under any other Loan Document, for fifteen (15) days after written notice to Borrower (and Guarantor, if applicable) that a default has occurred under this Section 8.1(l) in the case of any default which can be cured by the payment of a sum of money, or for forty-five (45) days after formal written notice in the case of any other default (unless otherwise provided herein or in such other Loan Document); provided, however, that if such non-monetary default under this clause (l) is susceptible of cure but cannot reasonably be cured within such forty-five (45) day period and provided further that Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such forty-five (45) day period and thereafter diligently and expeditiously proceeds to cure the same, such forty-five (45) day period shall be extended, at the sole option of Lender, for such time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, but in no event shall such period exceed one hundred twenty (120) days after the original formal written notice.

**Section 8.2. Remedies.** Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers and other remedies available to Lender against Borrower under any Loan Document, or at law or in equity may be exercised by Lender at any time and from time to time (including the right to accelerate and declare the outstanding Indebtedness to be immediately due and payable), without notice or demand, whether or not all or any portion of the Indebtedness shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any portion of the Property. Notwithstanding anything contained to the contrary herein, the outstanding Indebtedness shall be accelerated and immediately due and payable, without any election by Lender upon the occurrence of an Insolvency Action.

**Section 8.3. Remedies Cumulative.** The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents executed by or with respect to Borrower, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be

exercised from time to time and as often as may be deemed expedient. A waiver of any Event of Default shall not be construed to be a waiver of any subsequent Event of Default or to impair any remedy, right or power consequent thereon. Any and all of Lender's rights with respect to the Property shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding (i) the release or substitution of Property at any time, or of any rights or interest therein or (ii) any delay, extension of time, renewal, compromise or other indulgence granted by Lender in the event of any Event of Default with respect to the Property or otherwise hereunder. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim, in connection with the foreclosure of the Security Instrument on the Property, to the extent necessary to foreclose on other parts of the Property.

**Section 8.4. Lender Appointed Attorney-In-Fact.** Borrower hereby irrevocably and unconditionally constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, at any time after the occurrence and during the continuance of an Event of Default to execute, acknowledge and deliver any documents, agreements or instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower under all Loan Documents, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower under any Loan Document, which Borrower could or might do or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for under the Loan Documents and to accomplish the purposes thereof. The foregoing powers of attorney are irrevocable and coupled with an interest.

**Section 8.5. Lender's Right to Perform.** If Borrower fails to perform any covenant or obligation contained herein for a period of five (5) Business Days after Borrower's receipt of notice thereof from Lender, without in any way limiting Section 8.1, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and the expenses of Lender incurred in connection therewith shall be payable by Borrower to Lender upon demand, together with interest thereon at the Default Rate. Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

## ARTICLE 9
## ENVIRONMENTAL PROVISIONS

**Section 9.1. Environmental Representations and Warranties.** Borrower represents, warrants and covenants, as to itself and the Property, other than as disclosed to Lender in the environmental report(s) delivered to Lender in connection with the Loan (and listed on the attached Schedule 6): (a) to Borrower's knowledge, there are no Hazardous Substances or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto and (ii) which do not require Remediation; (b) to Borrower's knowledge, there are no past, present or threatened Releases of Hazardous Substances in, on, under, from or affecting the Property which have not been fully Remediated in accordance with Environmental Law; (c) to Borrower's knowledge, there is no Release or threat of any Release of Hazardous Substances in violation of Environmental Laws which has migrated or is migrating to the Property; (d) to Borrower's knowledge, there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully Remediated in accordance with

Environmental Law; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including a Governmental Authority) relating to Hazardous Substances or the Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Borrower and that is contained in files and records of Borrower, including any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

**Section 9.2. Environmental Covenants**. Borrower covenants and agrees that: (a) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Hazardous Substances used, present or Released in, on, under or from the Property, except those that are (i) in compliance with all Environmental Laws and with permits issued pursuant thereto; and (ii) which do not require Remediation; (c) Borrower shall, at its sole cost and expense, (i) fully and expeditiously cooperate in all activities pursuant to Section 9.3, including providing all relevant information and making knowledgeable Persons available for interviews, and (ii) effectuate Remediation of any condition (including a Release of a Hazardous Substance or violation of Environmental Laws) in, on, under or from the Property for which Remediation is legally required; and (d) Borrower shall immediately upon Borrower becoming aware notify Lender in writing of (A) any unlawful Releases or threatened Releases of Hazardous Substances in, on, under, from or migrating towards the Property in violation of Environmental Laws; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Lien imposed on Borrower or the Property pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person (an "Environmental Lien"); (D) any required Remediation of environmental conditions relating to the Property; and (E) any written notice or other communication of which any Borrower becomes aware from any source whatsoever relating in any way to an actual or threatened Release of Hazardous Substances in violation of Environmental Laws or the Remediation thereof.

**Section 9.3. Environmental Cooperation and Access**. In the event any Indemnified Party has a reasonable basis for believing that an environmental condition exists on the Property in violation of Environmental Laws, upon reasonable notice from Lender, Borrower shall, at Borrower's sole cost and expense, promptly cause an engineer or consultant reasonably satisfactory to Lender to conduct any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of Lender) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing reasonably requested by Lender and promptly deliver the results of any such assessment, audit, sampling or other testing; and provided, further, that the Indemnified Parties and any other Person designated by the Indemnified Parties, may at its option, enter upon the Property at all reasonable times upon reasonable prior notice to assess any and all aspects of the environmental condition of the Property and its use.

**Section 9.4. Environmental Indemnity**. Borrower covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Losses actually imposed upon or incurred by or asserted against any

Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any past, present or threatened Release of Hazardous Substances in, on, above, under, from or affecting the Property, or any Remediation thereof; (b) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (c) any misrepresentation or inaccuracy in any representation or warranty concerning Hazardous Substances; and (d) any breach of Section 9.1 or Section 9.2 of this Agreement.

**Section 9.5. Duty to Defend.** Upon request by any Indemnified Party, Borrower shall defend same (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties.

## ARTICLE 10
## SPECIAL PROVISIONS

**Section 10.1. Transfer of Loan.** At no cost to Borrower or Guarantor (provided Lender shall not be obligated to reimburse Borrower and/or Guarantor for costs incurred in excess of $5,000.00) Lender may, at any time, sell, transfer or assign, in whole or in part, this Agreement, the Note, and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities (the "Securities") evidencing a beneficial interest in a rated or unrated public offering or private placement (such sales, participation, offering and/or placement, collectively, a "Securitization"). Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in such participations or Securities (collectively, the "Investor") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, any Guarantor or the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable, including, without limitation, financial statements relating to Borrower, Guarantor, the Property and any tenant at the Property. Borrower irrevocably waives any and all rights it may have under law or in equity to prohibit such disclosure, including but not limited to any right of privacy.

**Section 10.2. Cooperation.** Borrower and Guarantor agree to cooperate with Lender (and agree to cause their respective officers and representatives to cooperate) in connection with any transfer made or any Securities created pursuant to this Article 10, including, without limitation, the taking, or refraining from taking, of such action as may be necessary to satisfy all of the conditions of any Investor, the delivery any documents as may be reasonably requested by Lender, and the execution of amendments to this Agreement, the Note and the other Loan Documents and Borrower's organizational documents as reasonably requested by Lender; provided that the reasonable costs incurred for such cooperation shall be paid by Lender and no changes to the Loan Documents shall be required which will have a material adverse economic impact on Borrower or Guarantor. Borrower shall also furnish and Borrower and Guarantor consent to Lender furnishing to such Investors or prospective Investors or any Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower and Guarantor as may be requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale, transfer or participations or Securities and shall indemnify

the Indemnified Parties against, and hold the Indemnified Parties harmless from, any losses, claims, damages or liabilities (collectively, the "Liabilities") to which any such Indemnified Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in a Disclosure Document or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in the Disclosure Document or necessary in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and agreeing to reimburse the Indemnified Parties for any legal or other expenses reasonably incurred by each of them in connection with investigating or defending the Liabilities; *provided, however,* that Borrower will be liable in any such case under this Section 10.2 only to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have and shall survive the termination of the Loan Documents.

**Section 10.3. Servicer.** At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer, and trustee, together with its agents, nominees or designees, are collectively referred to as "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement or other agreement providing for the servicing of one or more mortgage loans (collectively, the "Servicing Agreement") between Lender and Servicer. Borrower shall be responsible for any reasonable set up fees or any other initial costs relating to or arising under the Servicing Agreement (but in any event no more than $1,000), but Borrower shall not be responsible for payment of the regular monthly master servicing fee or trustee fee due to Servicer under the Servicing Agreement or any fees or expenses required to be borne by, and not reimbursable to, Servicer. Notwithstanding the foregoing, Borrower shall promptly reimburse Lender on demand for (a) interest payable on advances made by Servicer with respect to delinquent debt service payments (to the extent interest at the Default Rate actually paid by Borrower in respect of such payments are insufficient to pay the same) or expenses paid by Servicer or trustee in respect of the protection and preservation of the Property after an Event of Default, (b) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees payable by Lender to Servicer which may be due and payable under the Servicing Agreement (whether on a periodic or a continuing basis) as a result of an Event of Default under the Loan, the Loan becoming specially serviced, the commencement or continuance of any enforcement action of any kind with respect to the Loan or any of the Loan Documents, a refinancing or a restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" of the Loan Documents, or any bankruptcy, insolvency or liquidation action involving Borrower, Guarantor or any of their respective principals or Affiliates, (c) all costs and expenses of any Property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer or the trustee may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement) after an Event of Default, and (d) all costs and expenses relating to or arising from any special requests made by Borrower or Guarantor

during the term of the Loan including, without limitation, in connection with a prepayment, assumption or modification of the Loan.

**Section 10.4. Restructuring of Loan.**

(a) Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into additional multiple notes (which may include component notes and/or senior and junior notes), to re-allocate principal among component notes and/or senior and junior notes and/or to create participation interests in the Loan.

(b) Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Note and/or the Loan, if applicable, and shall, upon ten (10) Business Days written notice from Lender, which notice shall include the forms of documents for which Lender is requesting execution and delivery, (i) execute and deliver such documents, and (ii) cause Borrower's counsel to deliver such legal opinions, in each of the cases of clauses (i) and (ii) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender, including, without limitation, the severance of this Agreement and the other Loan Documents if requested; *provided, however,* that any such amendments required by Lender shall not result in any economic or other material adverse change in the transaction contemplated by this Agreement or the other Loan Documents.

(c) Borrower shall not be obligated to pay any costs or expenses incurred in connection with any such restructuring as set forth in this Section 10.4.

(d) In the event Borrower fails to execute and deliver such documents described in this Section 10.4 to Lender within ten (10) Business Days following such written notice by Lender, and Lender sends a second notice to Borrower with respect to the delivery of such documents containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "POWER OF ATTORNEY IN FAVOR OF LENDER DEEMED EFFECTIVE FOR EXECUTION AND DELIVERY OF DOCUMENTS IF NO RESPONSE WITHIN 10 BUSINESS DAYS", Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof, if Borrower fails to execute and deliver such documents within ten (10) Business Days of receipt of such second notice. It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 10.4 after the expiration of ten (10) Business Days after the second notice thereof.

**Section 10.5. Intentionally Deleted.**

**Section 10.6. Participant Register.** If Lender sells a participation, Lender may (in its sole and absolute discretion), maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that Lender shall have no obligation to disclose all or any portion of the Participant Register (including the

identity of any participant or any information relating to a participant's interest in any commitments, loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations. The entries in the Participant Register, if so prepared by Lender, as aforesaid, shall be conclusive absent manifest error, and each Person whose name is recorded in the Participant Register shall be treated as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

## ARTICLE 11
## MISCELLANEOUS

**Section 11.1. Survival.** This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the execution and delivery of this Agreement and the execution and delivery by Borrower to Lender of the Note, and shall continue in full force and effect so long as any portion of the Indebtedness is outstanding and unpaid; provided, however, that the representations, warranties and covenants set forth in Sections 4.19 and 9.1 shall survive in perpetuity. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of the respective successors and assigns of Lender. Nothing in this Agreement or in any other Loan Document, express or implied, shall give to any Person other than the parties and the holder(s) of the Note, the Security Instrument and the other Loan Documents, and their legal representatives, successors and assigns, any benefit or any legal or equitable right, remedy or claim hereunder.

**Section 11.2. Lender's Discretion.**

(a) Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right, option or election given or available to Lender to approve or disapprove, or consent or withhold consent, or modify or waive any requirements or covenants imposed upon Borrower herein or therein, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion or subject to Lender's approval or consent, the decision of Lender to approve or disapprove, consent or withhold consent, modify or waive any such requirement, or to decide whether arrangements or terms are satisfactory or not satisfactory or acceptable or not acceptable to Lender in Lender's discretion, shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender.

(b) Whenever pursuant to this Agreement or any other Loan Document, Lender is determining Operating Income for any particular period, Lender shall be allowed to make appropriate adjustments to the actual Operating Income for such period in order to exclude and/or lower the actual Operating Income derived from tenants who have been or will be affected by unexpected market circumstances having a Material Adverse Effect such as COVID-19 or other similar situations.



Exhibit A

EXHIBIT A TO EXHIBIT 1

**Section 11.3. Governing Law; Submission to Jurisdiction.**

(a) This Agreement shall be interpreted and enforced according to the laws of the State where the Property is located (without giving effect to rules regarding conflict of laws).

(b) Borrower hereby consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and state where the Property is located with respect to any legal action or proceeding arising with respect to this Agreement and waives all objections which it may have to such jurisdiction and venue.

**Section 11.4. Modification; Waiver in Writing.** No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note or any other Loan Document, or consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given, provided, however, that from time-to-time only with respect to: (a) any such waivers and/or approvals of proposed re-allocations of the Reserve Funds as set forth in Section 3.8(c) hereof, or (b) notices of the existence of an Event of Default in connection with any of the disbursement conditions for the disbursement of any of the Reserve Funds pursuant to Article 3 hereof, can be provided by Lender via e-mail (i.e., no modifications, amendments, extensions, discharges or terminations of any provision of this Agreement, the Note or any other Loan Document shall be provided by Lender via e-mail). Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. In addition, Lender shall be entitled (but not be obligated) to extend the time periods within which any immediate repairs, or any other post-closing obligations set forth in any side-letters executed and delivered by Borrower in favor of Lender on the Closing Date, are required to be completed for such additional period or periods of times as Lender may reasonably determine.

**Section 11.5. Delay Not a Waiver.** Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under any Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under any Loan Document, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 11.6. Notices.** All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if sent by (a) hand delivery, with proof of attempted delivery, (b) certified or registered United States mail, postage prepaid, or (c) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed to the parties as follows:



Exhibit A

EXHIBIT A TO EXHIBIT 1

| | |
|---|---|
| If to Lender: | READYCAP COMMERCIAL, LLC<br>1320 Greenway Drive, Suite 560<br>Irving, Texas 75038<br>Attention: Melissa Perez |
| with a copy to: | King & Spalding LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, New York 10036<br>Attention: Erik F. Andersen, Esq. |
| If to Borrower: | c/o M Group LLC<br>187 S. Old Woodward, Suite 200<br>Birmingham, Michigan 48009<br>Attention: Ira Mondry |
| with a copy to: | Vesta Realty, LLC<br>6400 W. 110th Street, Suite 201<br>Overland Park, Kansas 66211<br>Attention: Marc Kulick |
| and to: | O'Halloran Ryan PLLC<br>275 Madison Avenue, 36th Floor<br>New York, New York 10016<br>Attention: Neil O'Halloran |

A party receiving a notice which does not comply with the technical requirements for notice under this Section 11.6 may elect to waive any deficiencies and treat the notice as having been properly given. A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (c) in the case of expedited prepaid delivery upon the first attempted delivery on a Business Day.

**Section 11.7. Trial By Jury**. BORROWER AND LENDER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING, INCLUDING, WITHOUT LIMITATION, ANY TORT ACTION, BROUGHT BY ANY PARTY HERETO WITH RESPECT TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS.

**Section 11.8. Headings**. The Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9. Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10. Preferences.** Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender for Borrower's benefit, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11. Waiver of Notice.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12. Remedies of Borrower .** In the event that a claim or adjudication is made that Lender or its agents, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13. Exhibits Incorporated.** The information set forth on the cover, heading and recitals hereof, and the Exhibits attached hereto, are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.14. Offsets, Counterclaims and Defenses.** Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan, and the Loan Documents which Borrower may otherwise have against any assignor, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon, the Loan Documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 11.15. No Joint Venture or Partnership.** Borrower and Lender intend that the relationship created hereunder be solely that of borrower and lender. Nothing herein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between any of Borrower, Manager, any contractor or Governmental Authority and Lender nor to grant Lender any interest in the Property other than that of mortgagee or lender.

**Section 11.16. Waiver of Marshalling of Assets Defense.** To the fullest extent that Borrower may legally do so, Borrower waives all rights to a marshalling of the assets of Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Indebtedness without any prior or different resort for collection, or the right of Lender or any trustee under the Security Instrument to the payment of the Indebtedness in preference to every other claimant whatsoever.

**Section 11.17. Waiver of Counterclaim.** To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or Lender's agents.

**Section 11.18. Construction of Documents.** The parties hereto acknowledge that they were represented by counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

**Section 11.19. Brokers and Financial Advisors.** Borrower and Lender hereby represent that they have dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement except as disclosed to Lender. Borrower hereby agrees to indemnify and hold Lender harmless from and against any and all Losses relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein. If Borrower has dealt with one or more of foregoing described Persons, Borrower acknowledges and agrees that such Persons may receive additional compensation and/or fees from Lender. The provisions of this Section 11.19 shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**Section 11.20. Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**Section 11.21. Estoppel Certificates.** Borrower and Lender each hereby agree at any time and from time to time, but in no event more than one time per calendar quarter, upon not less than fifteen (15) days prior written notice by Borrower or Lender to execute, acknowledge and deliver to the party specified in such notice, a statement, in writing, certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications hereto), and stating whether or not, to the knowledge of such certifying party, any Event of Default has occurred, and, if so, specifying each such Event of Default; provided, however, that it shall be a condition precedent to Lender's obligation to deliver the statement pursuant to this Section 11.21, that Lender shall have received, together with Borrower's request for such statement, a certificate of Borrower stating that no Event of Default exists as of the date of such certificate (or specifying such Event of Default).

**Section 11.22. Bankruptcy Waiver.** Borrower hereby agrees that, in consideration of the recitals and mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, if Borrower (a) files with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended, (b) is the subject of any order for relief issued under Title 11 of the U.S. Code, as amended, (c) files or is the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or law relating to bankruptcy, insolvency or other relief of debtors, (d) has sought or consents to or acquiesces in the appointment of any trustee, receiver, conservator or liquidator, or (e) is the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency or other relief for debtors, the automatic stay provided by the U.S. Bankruptcy Code shall be modified and annulled as to Lender, so as to permit Lender to exercise any and all of its rights and remedies, upon request of Lender made on notice to Borrower and any other party in interest but without the need of further proof or hearing. Neither Borrower nor any Affiliate of Borrower shall contest the enforceability of this Section 11.22.

**Section 11.23. Entire Agreement.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS EVIDENCING, SECURING OR PERTAINING TO ALL OR ANY PORTION OF THE LOAN REPRESENT THE FINAL AGREEMENT BETWEEN BORROWER AND LENDER AS TO THE SUBJECT MATTER THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF SUCH PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN SUCH PARTIES.

**Section 11.24. Liability and Indemnification.**

(a) Lender shall not be liable for any loss sustained by Borrower resulting from any act or omission of any Indemnified Party unless it is finally judicially determined that such loss was solely caused by the fraud, gross negligence or willful misconduct of Lender or any Indemnified Party. Lender shall not be obligated to perform or discharge any obligation, duty or liability with respect to the ownership, operation and/or maintenance of the Property (including under any Lease, Contract or Permit) or under or by reason of any Loan Document. Unless and until Lender becomes the fee owner of the Property following an Event of Default, the Loan Documents shall not place responsibility for the control, care, management or repair of the Property upon Lender, nor for complying with any Lease, Contract or Permit; nor shall it make Lender responsible or liable for any waste committed on the Property, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, guest, employee or stranger.

(b) Borrower shall indemnify and hold the Indemnified Parties harmless against any and all Losses, and reimburse them for any costs and expenses actually incurred, in connection with, arising out of or as a result of (i) the negotiation, preparation, execution and delivery of the Loan Documents and the documents and instruments referred to therein, (ii) the creation, perfection or protection of Lender's Liens in the Property (including fees and expenses for title

and lien searches and filing and recording fees, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of the appraisal, environmental report(s) (and an environmental consultant), surveys and the engineering report(s) obtained by or delivered to Lender in connection with the Loan, (iii) the negotiation, preparation, execution and delivery of any amendment, waiver or consent relating to any of the Loan Documents, (iv) the exercise of any of Lender's or the Indemnified Parties' remedies under any Loan Document, or (v) any alleged obligations or undertakings to perform or discharge any obligation, duty or liability with respect to the ownership, operation and/or maintenance of the Property (including under any Lease, Contract or Permit), except to the extent that it is finally judicially determined that any such Loss resulted directly and solely from the fraud, gross negligence or willful misconduct of such Indemnified Party. If any Indemnified Party becomes involved in any action, proceeding or investigation in connection with any matter described in clauses (i) through (v) above, Borrower shall periodically reimburse any Indemnified Party upon demand therefor in an amount equal to its reasonable legal and other expenses (including the costs of any investigation and preparation) incurred in connection therewith to the extent such legal or other expenses are the subject of indemnification hereunder.

**Section 11.25. Publicity**. Lender shall have the right to issue press releases, advertisements and other promotional materials describing the Loan (including the amount and purpose of the Loan) and Lender's participation in the origination of the Loan. All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or any of its Affiliates shall be subject to the prior approval of Lender, except for disclosures required by law which shall not require Lender approval but which shall require prior notice to Lender.

**Section 11.26. Time of the Essence**. Time shall be of the essence in the performance of all obligations of Borrower hereunder and under each of the other Loan Documents.

**Section 11.27. Taxes**. All payments made under the Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, and all liabilities with respect thereto, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority. If Borrower is required by law to deduct any of the foregoing from any sum payable under the Loan Documents, such sum shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 11.27), Lender receives an amount equal to the sum Lender would have received had no such deductions been made. In the event of the passage of any Legal Requirement subsequent to the date hereof in any manner changing or modifying Legal Requirements now in force governing the taxation of mortgages or security agreements or debts secured thereby or the manner of collecting such taxes so as to adversely affect Lender or the Lien of the Loan Documents, Borrower will pay any such tax on or before the due date thereof. In the event Borrower is prohibited by Legal Requirements from assuming liability for payment of any such taxes (or if any Legal Requirement would penalize Lender if Borrower makes such payment or if, in the reasonable opinion of Lender, the making of such payment might result in the imposition of interest beyond the Maximum Amount) or from paying any other Imposition, the outstanding Indebtedness shall, at the option of Lender, become due and payable on the date that

is one hundred twenty (120) days after Lender provides notice to Borrower of such change in law and its election to accelerate the Maturity Date; and failure to pay such amounts on the date due shall be an Event of Default.

**Section 11.28. Further Assurances; Loan Servicing.**

(a) At no cost to Borrower (provided Lender shall not be obligated to reimburse Borrower for costs incurred), Borrower shall execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary, to (i) evidence, preserve and/or protect the Property at any time securing or intended to secure the Indebtedness, and/or (ii) enable Lender to perfect, exercise and enforce Lender's rights and remedies under any Loan Document, as Lender shall require from time to time in its discretion.

(b) Borrower shall also, in connection with any loan servicing matters arising hereunder subsequent to the Closing Date, reimburse Lender for any reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection therewith.

**Section 11.29. Permanent Financing.** In the event that Lender (or an Affiliate of Lender) in its sole and absolute discretion provides permanent mortgage financing for the Loan on or before the Maturity Date, a portion of the Exit Fee in an amount equal to Thirty-Five Thousand Three Hundred Seventy-Five and 00/100 Dollars ($35,375.00) (i.e., one eighth of one percent (0.125%) of the Loan Amount) shall be waived by Lender.

**Section 11.30. Joint and Several**

(a) Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each Borrower hereby accepts (or shall accept) joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Loan and the other Indebtedness hereunder. Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts (or shall accept), not merely as a surety but also as a co-debtor, joint and several liability with each other Borrower, with respect to the payment and performance of all of the Indebtedness (including, without limitation, any Indebtedness arising under this Section 11.30), it being the intention of the parties hereto that all the Indebtedness shall be the joint and several Indebtedness of each Borrower without preferences or distinction among them. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Indebtedness as and when due or to perform any of the Indebtedness in accordance with the terms thereof, then in each such event each other Borrower will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof and Section 16 of the Note, the Indebtedness of each Borrower under the provisions of this Section 11.30 constitute the absolute and unconditional, full recourse Indebtedness of each Borrower enforceable against each such person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b) The provisions of this Section 11.30 are made for the benefit of Lender and its successors and assigns, and may be enforced by them from time to time against any Borrower as often as occasion therefor may arise and without requirement on the part of Lender or its successors or assigns first to marshall any of its or their claims or to exercise any of its or their rights against any other Borrower or to exhaust any remedies available to it or them against any other Borrower or to resort to any other source or means of obtaining payment of any of the Indebtedness hereunder or to elect any other remedy. The provisions of this Section 11.30 shall remain in effect until all of the Indebtedness shall have been paid in full or otherwise fully satisfied.

(c) Each Borrower acknowledges that it has received, or will receive, significant financial and other benefits, either directly or indirectly, from the proceeds of the Loan made by Lender to Borrower pursuant to this Agreement; that the benefits received by such Borrower are reasonably equivalent consideration for such Borrower's execution of this Agreement. Each Borrower is executing this Agreement and the other Loan Documents in consideration of those benefits received by it.

(d) Each Borrower hereby agrees as among themselves that, in connection with payments made hereunder, each Borrower shall have a right of contribution from each other Borrower in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the Indebtedness until such time as the Indebtedness have been paid in full, and none of Borrowers shall exercise any such contribution rights until the Indebtedness have been paid in full.

(e) To the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Indebtedness constituting a portion of the Loan made to another Borrower hereunder or other Indebtedness incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount (as hereinafter defined) and the denominator of which is the sum of the Allocable Amounts of all of Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**Section 11.31. Designation of Lead Borrower.**

(a) Each Borrower hereby irrevocably designates and appoints Borrower 1 ("Lead Borrower") as such Borrower's agent to obtain loans and advances under the Loan, the proceeds of which shall be available to each Borrower as set forth herein. As the disclosed principal for its agent, each Borrower shall be obligated to Lender on account of loans and

advances so made under the Loan as if made directly by Lender to such Borrower, notwithstanding the manner by which such loans and advances are recorded on the books and records of Lead Borrower and/or of any Borrower (including, without limitation, on account of any such treatment of said loan or advance as an equity investment in a Borrower by Lead Borrower).

(b) The proceeds of the Loan and each advance provided under the Loan which is requested by Lead Borrower shall be advanced as and when otherwise provided herein or as otherwise indicated by Lead Borrower. Lead Borrower shall cause the transfer of the proceeds thereof to Borrower(s) on whose behalf such loan and advance was obtained. Lender not shall have any obligation to see to the application of such proceeds.

(c) Each Borrower hereby irrevocably designates and appoints Lead Borrower as such Borrower's attorney-in-fact to act in such Borrower's name and stead and to do and perform all matters, to grant to Lender a security interest in the Property, transact all business, and make, execute and acknowledge all Loan Documents and other instruments relating to this Agreement including but not limited to, this Agreement, the Note, and the Security Instrument. Borrowers hereby acknowledge and agree that the power of attorney created hereby is coupled with an interest.

**Section 11.32. Co-Borrower Provisions.**

(a) Any notice required to be given to any Borrower shall be deemed to have been given to such Borrower if such notice is sent to any other Borrower. Any such notice sent to one Borrower shall be deemed to have been given to all Borrowers.

(b) Any document executed by any one Borrower and delivered to Lender in connection with the Loan shall be deemed to be on behalf of all Borrowers, to the extent applicable, and each Borrower shall be obligated by, and subject to, the terms and conditions thereof.

(c) Each Borrower waives any right to assert against Lender any defense, setoff, counterclaim or claim that such Borrower may have against any other Borrower or any other party liable to Lender for the obligations of Borrowers under this Agreement or any of the other Loan Documents.

(d) Each Borrower agrees that it is solely responsible for keeping itself informed as to the financial condition of all other Borrowers and of all circumstances which bear upon the risk of nonpayment. Each Borrower waives any right it may have to require Lender to disclose to such Borrower any information that Lender may now or hereafter acquire concerning the financial condition of the other Borrowers.

(e) Each Borrower waives all rights to notices of default or nonperformance by any other Borrower under this Agreement and the other Loan Documents. Each Borrower further waives all rights to notices of the existence or the creation of new indebtedness by any other Borrower.

(f) Until all obligations under this Agreement and the other Loan Documents have been paid or otherwise performed in full, each Borrower waives any right of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including

any claim or right of subrogation under the Bankruptcy Code or any successor statute, that such Borrower may now or hereafter have against any other Borrower with respect to such obligations. Until all obligations under this Agreement and the other Loan Documents have been paid or otherwise performed in full, each Borrower waives any right to enforce any remedy which Lender now has or may hereafter have against any other Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

(g) Each Borrower hereby waives any election of remedies by Lender that impairs any subrogation or other right of such Borrower to proceed against any other Borrower or other Person, including any loss of rights resulting from any applicable anti-deficiency laws relating to nonjudicial foreclosures of real property or other laws limiting, qualifying or discharging obligations or remedies.

**[SIGNATURES ON THE FOLLOWING PAGES]**

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

READYCAP COMMERCIAL, LLC,
a Delaware limited liability company

By: ______________________
Name: Melissa Perez
Title: Authorized Signatory

[Signatures continued on following page]

**BORROWER:**

DREXEL FLATS ACQUISITION LLC, a
Delaware limited liability company

By: ______________________
Name: Ira Mondry
Title: Authorized Signatory

DREXEL FLATS ACQUISITION TIC LLC, a
Delaware limited liability company

By: ______________________
Name: Ira Mondry
Title: Authorized Signatory

Schedule 1

Leasing Guidelines

For purposes of Section 5.6 of the Loan Agreement and the defined term "Approved Lease", any Lease that complies with all of the following conditions shall be deemed to be an "Approved Lease":

(i) the Lease is on the Approved Lease Form, without material modification;

(ii) the Lease term is not less than six (6) months, excluding options to extend or renew;

(iii) for newly renovated units and/or newly signed Leases, the rent payable under the Lease must be at not less than prevailing market rents in the market where the Property is located;

(iv) the initial Lease term is no more than twenty-four (24) months;

(v) the other terms of the Lease (including any other concessions) are consistent with market conditions and with the Approved Annual Budget and the Rent Roll; and

(vi) the Lease is a bona fide, arm's-length transaction with a person or entity not affiliated with the Borrower.

Schedule 2

Loan Documents

(a) Promissory Note made by Borrower in favor of Lender in the maximum principal amount of the Loan Amount (the "Note");

(b) Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing by Borrower, as mortgagor, in favor of Lender, as mortgagee (the "Security Instrument");

(c) Assignment of Leases and Rents from Borrower to Lender (the "Assignment of Leases");

(d) Environmental Indemnity Agreement made by Borrower and Guarantor in favor of Lender (the "Environmental Indemnity");

(e) Guaranty of Recourse Obligations made by Guarantor in favor of Lender;

(f) Guaranty of Completion made by Guarantor in favor of Lender;

(g) Deposit Account Control Agreement among Borrower, the Bank and Lender;

(h) Assignment and Subordination of Management Agreement from Borrower and Manager in favor of Lender;

(i) Collateral Assignment of Interest Rate Cap Agreement made by Borrower in favor of Lender, together with that certain Acknowledgement of Pledge of Interest Rate Cap Agreement executed by the counterparty and Borrower;

(j) Compliance Agreement executed by Borrower;

(k) Authorization to Modify Documents and/or Substitute Pages executed by Borrower and Guarantor;

(l) Borrower's Certification with respect to Borrower made by Borrower to Lender;

(m) Disbursement Letter executed by Borrower; and

(n) Guarantor's Certification with respect to Guarantor made by Guarantor to Lender.

Schedule 3

Approved Annual Budget

[attached]

## Annual Operating Budget
Drexel Flats

| Year | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total Budget |
| Period Ending | 1/31/22 | 2/28/22 | 3/31/22 | 4/30/22 | 5/31/22 | 6/30/22 | 7/31/22 | 8/31/22 | 9/30/22 | 10/31/22 | 11/30/22 | 12/31/22 | 1/31/22 |
| ***Physical Occupancy*** | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* | *94%* |
| ***Economic Occupancy*** | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* | *91%* |
| **Rental Revenue** | | | | | | | | | | | | | |
| Gross Potential Rent | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 280,270 | 3,363,240 |
| *Weighted Average Rent Per Unit* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* | *1.12* |
| Absorption & Turnover Vacancy | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (19,472) | (233,663) |
| Loss to Lease | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (95,000) |
| Non-Revenue Units | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Concessions | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Scheduled Base Rent** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **252,881** | **3,034,577** |
| **Other Income** | | | | | | | | | | | | | |
| RUBS | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 140,000 |
| *RUBS %* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* | *9.2%* |
| General Other Income | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 200,000 |
| **Potential Gross Income** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **281,215** | **3,374,577** |
| Bad Debt | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (1,391) | (16,690) |
| *Bad Debt %* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* | *0.5%* |
| General Vacancy | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Vacancy %* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| **Effective Gross Income** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **279,824** | **3,357,887** |
| **Operating Expenses** | | | | | | | | | | | | | |
| Utilities | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 15,833 | 190,000 |
| Repairs & Maintenance | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| Payroll & Benefits | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 390,000 |
| Insurance | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 125,000 |
| Real Estate Taxes | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 31,027 | 372,324 |
| General & Admin. | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 70,000 |
| Management Fees | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 8,395 | 100,737 |
| Advertising & Marketing | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 35,000 |
| **Total Operating Expenses** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **126,922** | **1,523,061** |
| ***OpEx PSF*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***0.51*** | ***6.10*** |
| *OpEx Ratio* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* | *45.4%* |
| **Net Operating Income (NOI)** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **1,834,826** |
| **Capital & Leasing Costs** | | | | | | | | | | | | | |
| Replacement Reserves | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tenant Buyouts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TI/LC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Improvements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Capital & Leasing Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **NCF After Cap/Lease Costs** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **152,902** | **1,834,826** |



Exhibit A

EXHIBIT A TO EXHIBIT 1

Schedule 4

Approved Capital Expenditures Budget

[attached]

## Appendix B: Capital Expenditure Budget
Drexel Flats

| | | | |
|---|---|---|---|
| **Budget As of Date** | **12/21/21** | | **Project Month** |
| **Construction Start Month of Loan Term** | Month 1 | | **Loan Month** |
| **Months to Complete Contruction** | 24 Months | | **Period Ending** |
| **Completion Month in Loan Term** | Month 24 | | **Total % Complete** |
| **Hard Costs** | | | |
| **Base Building** | | | |
| Hard cost plug | - | 0.00 | |
| | | 0.00 | |
| | | 0.00 | |
| **Total Base Building** | **-** | **0.00** | |
| **Interior Improvements** | | | |
| Kitchen | 400,000 | 1,000.00 | |
| Bathroom | 200,000 | 500.00 | |
| Hardwood | 300,000 | 750.00 | |
| Walls | 100,000 | 250.00 | |
| Fixtures | 150,000 | 375.00 | |
| W/D Connections Added | 200,000 | 500.00 | |
| Painting | 150,000 | 375.00 | |
| **Total Interior Improvements** | **1,500,000** | **3,750.00** | |
| **Exterior Improvements** | | | |
| Landscaping | 75,000 | 187.50 | |
| Concrete | 100,000 | 250.00 | |
| Asphalt | 50,000 | 125.00 | |
| Roofs | 25,000 | 62.50 | |
| HVAC | 50,000 | 125.00 | |
| Siding | 25,000 | 62.50 | |
| Windows | 50,000 | 125.00 | |
| Amenities | 250,000 | 625.00 | |
| **Total Exterior Improvements** | **625,000** | **1,562.50** | |
| **Deferred Maintenance** | | | |
| | | 0.00 | |
| | | 0.00 | |
| | | 0.00 | |
| **Total Deferred Maintenance** | **-** | **0.00** | |
| **Total Hard Costs (excl. GC & cont.)** | **2,125,000** | **5,312.50** | |
| **Contingency & GC Profit** | | | |
| | - | 0.0% | |
| | - | 0.0% | |
| | - | 0.0% | |
| CM Fee | 159,375 | 7.5% | |
| GC Profit & Overhead | - | 0.0% | |
| Hard Cost Contingency | 215,625 | 10.0% | |
| **Total Hard Costs** | **2,500,000** | **6,250.00** | |
| **Soft Costs** | | | |
| Soft cost plug | - | 0.00 | |
| | | 0.00 | |
| Soft Cost Contingency | - | 5.0% | |
| **Total CapEx Soft Costs** | **-** | **0.00** | |
| **Total CapEx Hard & Soft Costs** | **2,500,000** | **6,250.00** | |

**FUNDING SCHEDULE**
*Minimum draw amount is $10,000 per draw*



Exhibit A

EXHIBIT A TO EXHIBIT 1

Schedule 5

Rent Roll

[attached]

# Drexel Flats Apartments

First Choice Management Group
Rent Roll
*10/6/2021*

Printed 10/6/2021 9:48:05 AM



## Current

| Unit | Type | Sq. Feet | Residents | Status | Market Rent | Description | Amount | Move In | Lease Start | Lease End | Move Out | Surety Bonds | Deposits | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0101 | 2-1 | 824 | Timothy Kuchera | C | 819.00 | Rent | 769.00 | 06/12/21 | 06/12/21 | 12/30/21 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Emp - Courtesy Offc | -769.00 | | | | | | | |
| | | | | | | **Total** | **49.00** | | | | | | | |
| 0102 | 2-1 | 824 | Mika Turner | C | 759.00 | Rent | 740.00 | 06/16/21 | 06/16/21 | 06/15/22 | | 0.00 | 200.00 | 887.36 |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **814.00** | | | | | | | |
| 0103 | Studio | 424 | Marco Rubio | C | 610.00 | Rent | 658.00 | 06/19/21 | 06/19/21 | 09/19/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **667.00** | | | | | | | |
| 0104 | StudioW | 424 | Quincy McCoy | C | 550.00 | Rent 5% Wal-Mart $ | 523.00 | 12/05/20 | 12/04/20 | 12/03/21 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **532.00** | | | | | | | |
| 0105 | 1-1 | 624 | Charlene Farmer | C | 660.00 | rent | 587.00 | 04/17/15 | 08/17/21 | 08/16/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | washer | 40.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | **Total** | **646.00** | | | | | | | |
| 0106 | 1-1 | 624 | Dustin Keich | C | 650.00 | Rent | 610.00 | 03/29/21 | 03/29/21 | 03/28/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Pest Fee | 4.00 | | | | | | | |
| | | | | | | **Total** | **659.00** | | | | | | | |
| 0107 | 1-1 | 624 | Joseph Hinson | C | 670.00 | Rent w/ 5% Amazon | 623.00 | 02/20/21 | 02/20/21 | 02/19/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | | |
| 0108 | 1-1 | 624 | Davion Nelson | C | 660.00 | Rent | 645.00 | 03/27/21 | 03/27/21 | 03/26/22 | | 0.00 | 150.00 | 600.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **679.00** | | | | | | |
| 0109 | 1-1 | 624 | Brian Beck | C | 620.00 | rent | 670.00 | 11/13/17 | 05/01/21 | 10/31/21 | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | |
| | | | | | | **Total** | **689.00** | | | | | | |
| 0110 | 1-1 | 624 | Ronald Logan | C | 650.00 | rent | 546.00 | 11/14/10 | 06/01/21 | 05/31/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | washer | 40.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **595.00** | | | | | | |
| 0111 | 1-1 | 624 | David Ratliff | C | 620.00 | Rent | 663.00 | 09/17/21 | 09/17/21 | 09/16/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **682.00** | | | | | | |
| 0112 | 1-1 | 624 | Gracelyn Love | C | 610.00 | Rent w 5% Amazon ! | 583.00 | 09/09/20 | 09/09/21 | 07/08/22 | 0.00 | 300.00 | 663.02 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | $299 Off! | 0.00 | | | | | | |
| | | | | | | **Total** | **592.00** | | | | | | |
| 0113 | Studio | 424 | Sofia Barcenas Sald | C | 610.00 | Rent | 708.00 | 10/01/21 | 10/01/21 | 12/30/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **727.00** | | | | | | |
| 0114 | Studio | 424 | Britni Meeks | C | 550.00 | Rent | 550.00 | 11/10/20 | 11/10/20 | 11/09/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **569.00** | | | | | | |
| 0115 | 2-1 | 824 | Hannah Gasaway, I | C | 819.00 | Rent | 779.00 | 04/24/21 | 04/24/21 | 04/23/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | **Total** | **848.00** | | | | | | |
| 0116 | 2-1 | 824 | Vacant Unit | | 759.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | |
| 0201 | Studio | 424 | Larry Williams | C | 560.00 | Rent w/ 5% Hobby L | 524.00 | 05/07/11 | 08/01/21 | 07/31/22 | 0.00 | 50.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **533.00** | | | | | | |
| 0202 | StudioW | 424 | Matthew Kerbo, Ga | C | 600.00 | Rent | 638.00 | 07/10/21 | 07/10/21 | 07/09/22 | 0.00 | 200.00 | 704.06 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 647.00 | | | | | | | |
| 0203 | 2-1 | 824 | Shaina McReynolds | C | 819.00 | Rent | 751.00 | 06/20/20 | 06/20/21 | 06/20/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Total | 800.00 | | | | | | | |
| 0204 | 2-1 | 824 | Ashley Perez | C | 809.00 | Rent | 809.00 | 03/25/21 | 03/25/21 | 03/24/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Total | 868.00 | | | | | | | |
| 0205 | 1-1 | 624 | Trieu Pham | C | 670.00 | Rent | 653.00 | 02/27/19 | 02/27/21 | 02/26/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 662.00 | | | | | | | |
| 0206 | 1-1 | 624 | Michelle Brazil | C | 610.00 | Rent w/ 5% Student | 583.00 | 05/24/19 | 08/01/21 | 08/01/22 | | 0.00 | 150.00 | -295.39 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 592.00 | | | | | | | |
| 0207 | 1-1 | 624 | Nathan Corley | C | 620.00 | Rent | 740.00 | 05/29/21 | 05/29/21 | 12/28/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 749.00 | | | | | | | |
| 0208 | 1-1 | 624 | Logan Marshall | C | 610.00 | Rent w 5% Educatio | 583.00 | 06/30/20 | 06/30/21 | 06/29/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 592.00 | | | | | | | |
| 0209 | 1-1 | 624 | Adam Harrington | C | 670.00 | Rent w/ 5% Amazon | 679.00 | 07/28/21 | 07/28/21 | 07/27/22 | | 0.00 | 150.00 | -442.70 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 688.00 | | | | | | | |
| 0210 | 1-1 | 624 | Wilfrid Sainval | C | 610.00 | Rent | 655.00 | 06/08/21 | 06/08/21 | 06/07/22 | | 0.00 | 300.00 | -571.79 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 664.00 | | | | | | | |
| 0211 | 1-1 | 624 | Kathleen Shirk | C | 670.00 | Rent w/ 5% Walmar | 637.00 | 04/27/20 | 04/29/21 | 04/28/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 646.00 | | | | | | | |
| 0212 | 1-1 | 624 | Bryson Mercer | C | 610.00 | Rent w 5% Crest Dis | 596.00 | 02/11/19 | 03/19/21 | 03/18/22 | | 0.00 | 150.00 | -13.01 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 615.00 | | | | | | | |
| 0213 | 2-1 | 824 | Israel Perez , Vane | C | 819.00 | Rent w/ 5% Amazon | 722.00 | 11/12/20 | 11/12/20 | 10/11/21 | 10/13/21 | 0.00 | 200.00 | 447.68 |
| | | | | | | Pest | 4.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | **Total** | **771.00** | | | | | | | |
| 0214 | 2-1 | 824 | Jennifer Kosyan, Ky | C | 809.00 | Rent w/ 5% Amazon | 835.00 | 08/10/21 | 08/10/21 | 08/09/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **894.00** | | | | | | | |
| 0215 | StudioW | 424 | Anthony Moniz | C | 560.00 | Rent | 505.00 | 11/28/09 | 06/02/21 | 06/01/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **514.00** | | | | | | | |
| 0216 | StudioW | 424 | Lewis Bowers | C | 550.00 | Rent | 623.00 | 09/08/21 | 09/08/21 | 12/07/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | | |
| 0301 | StudioW | 424 | Angelica Ceballos | C | 610.00 | Rent | 610.00 | 07/26/21 | 07/26/21 | 10/25/22 | | 0.00 | 100.00 | 679.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **629.00** | | | | | | | |
| 0302 | Studio | 424 | Amy Fenrick | C | 600.00 | Rent | 592.00 | 10/12/19 | 10/11/20 | 10/11/21 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **601.00** | | | | | | | |
| 0303 | 2-1 | 824 | Gustavo Monreal, E | C | 729.00 | Expired Lease Rent | 729.00 | 08/17/18 | 08/19/20 | 08/18/21 | 10/17/21 | 0.00 | 200.00 | 389.75 |
| | | | | | | Month to Month Fee | 125.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **863.00** | | | | | | | |
| 0304 | 2-1 | 824 | Jalliyah Morgan | C | 769.00 | Rent | 953.00 | 08/14/21 | 08/14/21 | 02/14/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **972.00** | | | | | | | |
| 0305 | 1-1 | 624 | Colwin Williams | C | 620.00 | Rent | 605.00 | 10/24/20 | 10/24/20 | 10/23/21 | 10/23/21 | 0.00 | 300.00 | 158.45 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **614.00** | | | | | | | |
| 0306 | 1-1 | 624 | Cynthia Chavoya | C | 660.00 | Rent | 655.00 | 01/08/20 | 01/08/21 | 01/07/22 | | 0.00 | 300.00 | -53.01 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **674.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0307 | 1-1 | 624 | Cathy Jackson | C | 670.00 | Rent | 675.00 | 08/09/19 | 06/09/21 | 06/08/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **684.00** | | | | | | | |
| 0308 | 1-1 | 624 | Rolland Olson | C | 610.00 | Rent | 595.00 | 10/12/20 | 10/10/20 | 10/09/21 | 10/09/21 | 0.00 | 300.00 | 536.48 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **604.00** | | | | | | | |
| 0309 | 1-1 | 624 | Joseph Porter | C | 620.00 | Rent | 665.00 | 08/23/19 | 08/24/21 | 03/23/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **674.00** | | | | | | | |
| 0310 | 1-1 | 624 | Christian Szabo | C | 610.00 | rent | 626.00 | 08/23/14 | 08/01/21 | 08/01/22 | | 0.00 | 100.00 | -836.61 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **635.00** | | | | | | | |
| 0311 | 1-1 | 624 | Donna Dunsmore | C | 620.00 | rent | 537.00 | 03/18/10 | 06/01/21 | 05/31/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **546.00** | | | | | | | |
| 0312 | 1-1 | 624 | TPI Construction | C | 660.00 | Rent | 0.00 | 05/10/21 | 05/10/21 | 04/25/22 | | 0.00 | 0.00 | 46.02 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **25.00** | | | | | | | |
| 0313 | 2-1 | 824 | Florine Burgess, Le | C | 769.00 | rent | 699.00 | 11/01/18 | 11/03/20 | 11/02/21 | 12/03/21 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **773.00** | | | | | | | |
| 0314 | 2-1 | 824 | Faith Swindall , Ke | C | 759.00 | Rent w/ 5% Amazon | 762.00 | 08/04/21 | 08/04/21 | 11/03/22 | | 0.00 | 400.00 | 861.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **811.00** | | | | | | | |
| 0315 | Studio | 424 | Tan Nguyen | C | 610.00 | Rent w 5% Amazon ! | 627.00 | 12/19/20 | 12/19/20 | 12/18/21 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **636.00** | | | | | | | |
| 0316 | StudioW | 424 | Sarah Mcnea | C | 600.00 | Rent | 680.00 | 07/01/21 | 07/01/21 | 06/30/22 | | 0.00 | 150.00 | -50.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **699.00** | | | | | | | |
| 0401 | StudioW | 424 | Kaylie Luna, Marys | C | 610.00 | Rent w 5% Amazon ( | 580.00 | 04/27/21 | 04/27/21 | 02/28/22 | | 0.00 | 100.00 | 2,000.53 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 589.00 | | | | | | | |
| 0402 | StudioW | 424 | Joseph Stevenson | C | 600.00 | Rent | 592.00 | 03/25/20 | 03/25/21 | 03/24/22 | | 0.00 | 100.00 | 679.58 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Total | 626.00 | | | | | | | |
| 0403 | 2-1 | 824 | Buddy Cooper | C | 819.00 | Rent | 749.00 | 09/05/20 | 09/05/20 | 12/30/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Emp - Courtesy Offc | -749.00 | | | | | | | |
| | | | | | | Total | 59.00 | | | | | | | |
| 0404 | 2-1 | 824 | Ian Gordon, Lennie | C | 769.00 | Rent w/ 5% Walmar | 704.00 | 09/17/18 | 11/01/20 | 11/01/21 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 713.00 | | | | | | | |
| 0405 | 1-1 | 624 | Rukayat Abdulrash | C | 620.00 | Rent | 641.00 | 08/19/21 | 08/19/21 | 08/18/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 650.00 | | | | | | | |
| 0406 | 1-1 | 624 | Eric Winston | C | 660.00 | Rent w 5% Amazon ! | 641.00 | 11/07/20 | 10/06/21 | 10/05/22 | | 0.00 | 300.00 | -1,431.89 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Move In Special | 0.00 | | | | | | | |
| | | | | | | Total | 650.00 | | | | | | | |
| 0407 | 1-1 | 624 | Julian Sandoval | C | 620.00 | Rent | 723.00 | 03/05/21 | 07/02/21 | 10/01/21 | 10/19/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 732.00 | | | | | | | |
| 0408 | 1-1 | 624 | Nathan Moss | C | 660.00 | Rent | 639.00 | 07/19/21 | 07/17/21 | 07/16/22 | | 0.00 | 500.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 668.00 | | | | | | | |
| 0409 | 1-1 | 624 | Sandra Sanchez | C | 710.00 | Rent | 655.00 | 11/30/20 | 11/30/20 | 12/01/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Total | 704.00 | | | | | | | |
| 0410 | 1-1 | 624 | Ann Cooper | C | 660.00 | Rent | 660.00 | 05/03/21 | 04/30/21 | 04/29/22 | | 0.00 | 150.00 | 740.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 669.00 | | | | | | | |
| 0411 | 1-1 | 624 | James Levalley | C | 660.00 | Rent | 620.00 | 04/03/20 | 04/04/21 | 04/04/22 | | 0.00 | 150.00 | -21.02 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | |
| 0412 | 1-1 | 624 | Linda Pinon | C | 610.00 | Rent w/ 5% Educatc | 583.00 | 06/14/19 | 06/15/21 | 06/14/22 | 0.00 | 150.00 | 23.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **592.00** | | | | | | |
| 0413 | 2-1 | 824 | Kevin Durham, Am) | C | 819.00 | Rent w/ 5% Airport | 754.00 | 07/27/21 | 07/26/21 | 10/25/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **823.00** | | | | | | |
| 0414 | 2-1 | 824 | Skyla Haywood, Co | C | 759.00 | rent w 5% Amazon $ | 655.00 | 03/08/19 | 03/08/21 | 03/07/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | washer | 40.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **714.00** | | | | | | |
| 0415 | Studio | 424 | Jeremy Joseph | C | 560.00 | Rent | 560.00 | 11/02/20 | 10/31/20 | 10/30/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **579.00** | | | | | | |
| 0416 | StudioW | 424 | Deon Hughes | C | 600.00 | Rent | 585.00 | 02/29/20 | 02/28/21 | 02/28/22 | 0.00 | 200.00 | 687.13 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | |
| 0501 | Studio | 424 | Anthony Gault | C | 610.00 | Rent w 5% Amazon ( | 579.00 | 03/17/21 | 03/17/21 | 03/02/22 | 0.00 | 200.00 | 266.13 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **598.00** | | | | | | |
| 0502 | StudioW | 424 | James Mann | C | 600.00 | Rent w/ 5% Military | 583.00 | 07/31/20 | 07/31/21 | 07/30/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest fee | 4.00 | | | | | | |
| | | | | | | **Total** | **592.00** | | | | | | |
| 0503 | 2-1 | 824 | Desiree Ivey* | C | 779.00 | Rent - Tenant Portic | 5.00 | 06/09/21 | 06/09/21 | 06/08/22 | 0.00 | 200.00 | 713.79 |
| | | | | | | Housing | 778.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | **Total** | **792.00** | | | | | | |
| 0504 | 2-1 | 824 | Ryan Matheson | C | 719.00 | Rent | 786.00 | 08/02/21 | 08/02/21 | 09/01/22 | 0.00 | 400.00 | -10.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **795.00** | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0505 | 1-1 | 624 | Kenneth Hirt | C | 620.00 | Rent | 605.00 | 01/14/21 | 01/14/21 | 01/13/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **624.00** | | | | | | |
| 0506 | 1-1 | 624 | Sherry Williams | C | 660.00 | Rent | 664.00 | 06/19/20 | 06/19/21 | 04/18/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **683.00** | | | | | | |
| 0507 | 1-1 | 624 | Daileen Tirado cas | C | 620.00 | Rent | 623.00 | 09/19/20 | 09/19/21 | 09/19/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | $299 Off! | 0.00 | | | | | | |
| | | | | | | **Total** | **657.00** | | | | | | |
| 0508 | 1-1 | 624 | Kyle Kelsoe | C | 610.00 | Rent w 5% Amazon ! | 566.00 | 10/24/20 | 10/24/20 | 10/23/21 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **585.00** | | | | | | |
| 0509 | 1-1 | 624 | Deheavelyn Farmer | C | 670.00 | Rent w 5% Amazon ! | 641.00 | 09/26/20 | 09/26/21 | 07/25/22 | 0.00 | 150.00 | 1,458.73 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **675.00** | | | | | | |
| 0510 | 1-1 | 624 | Antonio Perry | C | 610.00 | Rent w/ 5% Walmar | 604.00 | 03/22/19 | 03/21/21 | 03/21/22 | 0.00 | 300.00 | 498.97 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **638.00** | | | | | | |
| 0511 | 1-1 | 624 | Brian Smith | C | 670.00 | Rent w/ 5% Hobby L | 635.00 | 08/29/20 | 08/29/21 | 08/29/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **644.00** | | | | | | |
| 0512 | 1-1 | 624 | Antoinette Cubit | C | 610.00 | Rent | 613.00 | 07/31/20 | 07/31/21 | 07/30/22 | 0.00 | 150.00 | -512.52 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | |
| 0513 | 2-1 | 824 | Daniela Contreras, | C | 769.00 | Rent w/ 5% Hobby L | 692.00 | 05/24/17 | 05/01/21 | 04/30/22 | 0.00 | 87.50 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | washer | 40.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **766.00** | | | | | | |
| 0514 | 2-1 | 824 | Mikeal Mallory | C | 809.00 | Rent | 707.00 | 03/01/18 | 02/17/21 | 02/16/22 | 0.00 | 400.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Washer/Dryer Rent‹ | 40.00 | | | | | | |
| | | | | | | **Total** | **756.00** | | | | | | |
| 0515 | Studio | 424 | Helen Richards | C | 560.00 | rent | 524.00 | 06/08/12 | 08/01/21 | 08/01/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **533.00** | | | | | | |
| 0516 | StudioW | 424 | Madison Willis, Brit | C | 550.00 | Rent | 568.00 | 07/31/21 | 07/31/21 | 07/30/22 | 0.00 | 200.00 | -400.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **587.00** | | | | | | |
| 0601 | Studio | 424 | Joshua Wheeless | C | 610.00 | Rent | 610.00 | 04/21/21 | 04/21/21 | 02/21/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **629.00** | | | | | | |
| 0602 | Studio | 424 | Isreal Pauley | C | 550.00 | Rent | 647.00 | 09/20/21 | 09/20/21 | 12/19/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **656.00** | | | | | | |
| 0603 | 2-1 | 824 | Adrian Gebman | C | 819.00 | Rent | 809.00 | 10/01/21 | 10/01/21 | 05/31/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Rent‹ | 40.00 | | | | | | |
| | | | | | | **Total** | **858.00** | | | | | | |
| 0604 | 2-1 | 824 | Keith Dooley | C | 719.00 | Rent | 699.00 | 12/30/20 | 12/30/20 | 12/29/21 | 0.00 | 200.00 | 25.00 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **733.00** | | | | | | |
| 0605 | 1-1 | 624 | Amanda Hubbard | C | 620.00 | Rent | 605.00 | 12/19/20 | 12/19/20 | 12/18/21 | 0.00 | 150.00 | 685.02 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **614.00** | | | | | | |
| 0606 | 1-1 | 624 | Annisa Hill | C | 610.00 | Rent | 612.00 | 09/01/20 | 09/02/21 | 09/01/22 | 0.00 | 300.00 | 517.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **646.00** | | | | | | |
| 0607 | 1-1 | 624 | Jazmine Gammon, | C | 620.00 | Rent | 605.00 | 06/20/19 | 06/20/19 | 06/19/20 | 0.00 | 150.00 | 830.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Month to Month Fee | 125.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | **Total** | **759.00** | | | | | | |
| 0608 | 1-1 | 624 | Andrew Elix, Arian‹ | C | 610.00 | Rent | 654.00 | 09/15/21 | 09/15/21 | 06/14/22 | 0.00 | 300.00 | 0.00 |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **663.00** | | | | | | | |
| 0609 | 1-1 | 624 | James Perkins | C | 670.00 | Rent | 769.00 | 09/28/21 | 09/28/21 | 02/28/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **778.00** | | | | | | | |
| 0610 | 1-1 | 624 | Mark Mayfield | C | 660.00 | Rent | 664.00 | 05/16/20 | 05/16/21 | 05/15/22 | | 0.00 | 150.00 | 769.02 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **698.00** | | | | | | | |
| 0611 | 1-1 | 624 | Elijah Tehee | C | 620.00 | Rent | 691.00 | 09/27/21 | 09/27/21 | 04/26/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **700.00** | | | | | | | |
| 0612 | 1-1 | 624 | Amanda Sanders, V | C | 610.00 | Rent w/ 5% Educatc | 552.00 | 08/17/11 | 01/26/21 | 01/25/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **571.00** | | | | | | | |
| 0613 | 2-1 | 824 | Daiji Cherry | C | 819.00 | Rent w/ 5% Amazon | 703.00 | 03/06/21 | 03/06/21 | 03/05/22 | | 0.00 | 200.00 | -696.35 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | **Total** | **752.00** | | | | | | | |
| 0614 | 2-1 | 824 | Luis Florez, Freddy | C | 809.00 | Rent w/ 5% Amazon | 752.00 | 06/19/21 | 06/19/21 | 07/18/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | **Total** | **801.00** | | | | | | | |
| 0615 | StudioW | 424 | Kirsta Martin | C | 610.00 | Rent | 643.00 | 07/23/21 | 07/23/21 | 07/22/22 | | 0.00 | 100.00 | -3,203.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **662.00** | | | | | | | |
| 0616 | StudioW | 424 | DeAndre Stephens | C | 550.00 | Rent w/ 5% Amazon | 514.00 | 05/09/20 | 05/09/21 | 05/09/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **548.00** | | | | | | | |
| 0701 | Studio | 424 | Steven Baker | C | 560.00 | Rent | 569.00 | 08/07/21 | 08/07/21 | 09/06/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **578.00** | | | | | | | |
| 0702 | 2-1 | 824 | Tanner Abney, Ama | C | 759.00 | Rent | 608.00 | 05/07/21 | 05/07/21 | 12/30/21 | | 0.00 | 0.00 | 0.00 |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **617.00** | | | | | | | |
| 0703 | 2-1 | 824 | Juliee Brooks | C | 819.00 | Rent | 785.00 | 08/25/21 | 08/25/21 | 08/24/22 | | 0.00 | 400.00 | 883.32 |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **834.00** | | | | | | | |
| 0704 | StudioW | 424 | Elisha Thornton | C | 550.00 | Rent | 566.00 | 09/10/20 | 09/10/21 | 09/09/22 | | 0.00 | 100.00 | 43.13 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **610.00** | | | | | | | |
| 0705 | 1-1 | 624 | Matthew Salley | C | 620.00 | Rent | 693.00 | 07/28/21 | 07/28/21 | 07/27/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **702.00** | | | | | | | |
| 0706 | 1-1 | 624 | Austin Taber | C | 650.00 | Rent w/ 5% Hobby L | 595.00 | 04/29/17 | 05/01/21 | 04/30/22 | | 0.00 | 131.25 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | washer | 40.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 0707 | 1-1 | 624 | Mary Floyd | C | 620.00 | rent | 579.00 | 04/06/04 | 09/01/21 | 08/31/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **588.00** | | | | | | | |
| 0708 | 1-1 | 624 | Danny Laffoon | C | 610.00 | Rent | 610.00 | 09/14/18 | 09/10/21 | 09/09/22 | | 0.00 | 150.00 | 15.86 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | | |
| 0709 | 1-1 | 624 | Enny Kriswari | C | 620.00 | rent | 577.00 | 08/24/13 | 08/01/21 | 07/31/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **586.00** | | | | | | | |
| 0710 | 1-1 | 624 | Davel Dewberry | C | 650.00 | Rent w/ 5% Walmar | 620.00 | 02/08/18 | 05/08/21 | 03/07/22 | | 0.00 | 150.00 | 802.73 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **679.00** | | | | | | | |
| 0711 | 1-1 | 624 | Vacant Unit | | 620.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 0712 | 1-1 | 624 | Keara Moreno-Higg | C | 610.00 | Rent w/ 5% Hobby L | 581.00 | 11/08/19 | 11/08/20 | 11/08/21 | 11/08/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 590.00 | | | | | | | |
| 0713 | 2-1 | 824 | Asia Hawkins, Briar | C | 769.00 | Rent | 744.00 | 01/17/20 | 01/17/21 | 01/17/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 793.00 | | | | | | | |
| 0714 | 2-1 | 824 | Michael Lujan | C | 809.00 | Rent | 739.00 | 09/19/20 | 09/19/20 | 09/18/21 | 10/11/21 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 748.00 | | | | | | | |
| 0715 | Studio | 424 | Susie Garcia | C | 560.00 | Rent | 647.00 | 09/05/20 | 09/05/21 | 03/04/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 656.00 | | | | | | | |
| 0716 | StudioW | 424 | Benjamin Soto | C | 550.00 | Rent | 550.00 | 08/17/19 | 02/17/21 | 02/16/22 | 11/27/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 559.00 | | | | | | | |
| 0801 | StudioW | 424 | MODEL Model | C | 560.00 | Rent | 0.00 | 01/29/16 | 01/29/16 | 12/30/21 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Total | 0.00 | | | | | | | |
| 0802 | StudioW | 424 | Cecil Annan | C | 550.00 | Rent w/ 5% Amazon | 541.00 | 05/19/20 | 05/19/21 | 03/18/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 550.00 | | | | | | | |
| 0803 | 2-1 | 824 | Ivan Fierro | C | 819.00 | Rent w 5% Amazon ! | 722.00 | 11/16/20 | 11/16/20 | 11/15/21 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 781.00 | | | | | | | |
| 0804 | 2-1 | 824 | Chadrick Walker, D | C | 769.00 | Rent | 739.00 | 11/21/20 | 11/21/20 | 11/20/21 | | 0.00 | 150.00 | 829.88 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | Total | 748.00 | | | | | | | |
| 0805 | 1-1 | 624 | MODEL Model | C | 660.00 | Rent | 0.00 | 01/29/16 | 01/29/16 | 12/30/21 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Total | 0.00 | | | | | | | |
| 0806 | 1-1 | 624 | Thomas Jones IV | C | 610.00 | Rent | 684.00 | 08/26/21 | 08/26/21 | 08/25/22 | | 0.00 | 300.00 | 743.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 693.00 | | | | | | | |
| 0807 | 1-1 | 624 | Mariela Escobedo, | C | 670.00 | Rent w 5% Hobby lo | 622.00 | 03/20/21 | 03/20/21 | 01/19/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Total | 641.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0808 | 1-1 | 624 | Johnny Higginbotha | C | 610.00 | rent | 565.00 | 10/03/12 | 09/01/21 | 08/31/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **574.00** | | | | | | | |
| 0809 | 1-1 | 624 | Elenor Alvarez | C | 670.00 | Rent | 665.00 | 04/24/20 | 04/24/21 | 04/23/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **674.00** | | | | | | | |
| 0810 | 1-1 | 624 | Ethan Matthews | C | 610.00 | Rent | 666.00 | 08/21/21 | 08/21/21 | 08/20/22 | | 0.00 | 150.00 | 725.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **675.00** | | | | | | | |
| 0811 | 1-1 | 624 | Michael Raymond | C | 620.00 | rent | 492.00 | 12/19/01 | 11/01/20 | 11/01/21 | | 0.00 | 125.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **501.00** | | | | | | | |
| 0812 | 1-1 | 624 | Samantha Smith | C | 660.00 | Rent w/ 5% Amazon | 660.00 | 01/06/21 | 08/06/21 | 06/06/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | | |
| 0813 | 2-1 | 824 | Michelle Boyer | C | 819.00 | Rent | 751.00 | 08/10/19 | 08/01/21 | 08/01/22 | | 0.00 | 200.00 | 851.88 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **770.00** | | | | | | | |
| 0814 | 2-1 | 824 | Eric Howell | C | 759.00 | Rent | 689.00 | 09/03/20 | 09/03/20 | 09/02/21 | 10/26/21 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **698.00** | | | | | | | |
| 0815 | StudioW | 424 | Richard Sackett | C | 560.00 | Rent | 545.00 | 02/14/20 | 02/14/21 | 02/14/22 | | 0.00 | 100.00 | -2,032.15 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **564.00** | | | | | | | |
| 0816 | StudioW | 424 | Quinterius Foster | C | 550.00 | Rent w / 5% Amazoı | 523.00 | 02/05/21 | 02/05/21 | 02/04/22 | | 0.00 | 200.00 | 635.13 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **567.00** | | | | | | | |
| 0901 | Studio | 424 | Edith Vann | C | 560.00 | Rent w/ 5% Amazon | 611.00 | 10/02/21 | 10/02/21 | 01/02/23 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **620.00** | | | | | | | |
| 0902 | StudioW | 424 | Jerry Nguyen, Minh | C | 550.00 | Rent | 632.00 | 08/11/21 | 08/11/21 | 08/10/22 | | 0.00 | 100.00 | 0.00 |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **641.00** | | | | | | | |
| 0903 | 2-1 | 824 | Cecil Arismendez, . | C | 819.00 | Rent | 767.00 | 08/31/21 | 08/31/21 | 08/30/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent; | 40.00 | | | | | | | |
| | | | | | | **Total** | **836.00** | | | | | | | |
| 0904 | 2-1 | 824 | Donishea Jones | C | 809.00 | Rent | 814.00 | 10/05/20 | 10/03/21 | 04/02/22 | | 0.00 | 200.00 | -1,575.08 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent; | 40.00 | | | | | | | |
| | | | | | | **Total** | **863.00** | | | | | | | |
| 0905 | 1-1 | 624 | Vacant Unit | | 710.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 0906 | 1-1 | 624 | Eleaha Haynes | C | 610.00 | Rent | 595.00 | 11/16/20 | 11/16/20 | 11/15/21 | | 0.00 | 300.00 | 556.73 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **604.00** | | | | | | | |
| 0907 | 1-1 | 624 | Christian Brown | C | 710.00 | Rent | 735.00 | 09/01/21 | 09/01/21 | 03/31/22 | | 0.00 | 300.00 | -3,161.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent; | 40.00 | | | | | | | |
| | | | | | | **Total** | **784.00** | | | | | | | |
| 0908 | 1-1 | 624 | Vacant Unit | | 700.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 0909 | 1-1 | 624 | Darius Young | C | 620.00 | Rent | 603.00 | 06/28/17 | 06/01/21 | 05/31/22 | | 0.00 | 131.25 | 0.00 |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **622.00** | | | | | | | |
| 0910 | 1-1 | 624 | Liyah Davis | C | 650.00 | Rent w/ 7% Amazon | 632.00 | 01/10/20 | 07/01/21 | 06/30/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent; | 40.00 | | | | | | | |
| | | | | | | **Total** | **731.00** | | | | | | | |
| 0911 | 1-1 | 624 | Paola Espinoza, Sie | C | 660.00 | Rent w/ 5% Military | 793.00 | 07/15/20 | 05/15/21 | 10/14/21 | 10/22/21 | 0.00 | 300.00 | 261.84 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **802.00** | | | | | | | |
| 0912 | 1-1 | 624 | Stormie Smith | C | 650.00 | Rent | 729.00 | 09/30/21 | 09/30/21 | 03/29/22 | | 0.00 | 150.00 | 795.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **748.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0913 | 2-1 | 824 | Patricia Wright, Br | C | 769.00 | Rent | 769.00 | 07/14/15 | 10/01/20 | 09/30/21 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Month to Month Fee | 125.00 | | | | | | | |
| | | | | | | **Total** | **914.00** | | | | | | | |
| 0914 | 2-1 | 824 | Kevin Rowe | C | 809.00 | Rent | 749.00 | 01/23/21 | 01/23/21 | 01/22/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **823.00** | | | | | | | |
| 0915 | Studio | 424 | Fermin Estrada | C | 560.00 | Rent | 560.00 | 05/21/21 | 05/21/21 | 05/20/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **569.00** | | | | | | | |
| 0916 | StudioW | 424 | Isaiah Clayton | C | 550.00 | Rent | 524.00 | 03/02/19 | 03/02/21 | 01/03/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **558.00** | | | | | | | |
| 1001 | StudioW | 424 | Ashley Dobbs | C | 560.00 | rent | 551.00 | 01/05/14 | 07/01/21 | 06/30/22 | | 0.00 | 50.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **560.00** | | | | | | | |
| 1002 | StudioW | 424 | James Lum | C | 550.00 | Rent | 550.00 | 05/28/21 | 05/28/21 | 05/27/22 | | 0.00 | 100.00 | 627.13 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **559.00** | | | | | | | |
| 1003 | 2-1 | 824 | Vacant Unit | | 729.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1004 | 2-1 | 824 | Deveyon Brewer, L | C | 809.00 | Rent | 741.00 | 07/19/19 | 07/20/21 | 07/19/22 | | 0.00 | 200.00 | -1,829.77 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **790.00** | | | | | | | |
| 1005 | 1-1 | 624 | Lexis Fry, Timothy | C | 670.00 | Rent | 670.00 | 03/08/21 | 03/08/21 | 01/07/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **689.00** | | | | | | | |
| 1006 | 1-1 | 624 | Anthony Tolle | C | 660.00 | Rent | 705.00 | 06/26/21 | 06/26/21 | 06/25/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **714.00** | | | | | | | |
| 1007 | 1-1 | 624 | Garian Sykes | C | 620.00 | Rent 5% Amazon $3( | 575.00 | 11/12/20 | 11/12/20 | 11/11/21 | 11/11/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **584.00** | | | | | | | |
| 1008 | 1-1 | 624 | Madelyn Williamso | C | 660.00 | Rent 5% Wal-Mart $: | 645.00 | 11/14/20 | 11/14/20 | 11/13/21 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **664.00** | | | | | | | |
| 1009 | 1-1 | 624 | Chrystal McCormicl | C | 620.00 | Rent | 535.00 | 06/10/15 | 02/02/21 | 02/01/22 | | 0.00 | 600.00 | 0.00 |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **554.00** | | | | | | | |
| 1010 | 1-1 | 624 | Stephanie Mccarthy | C | 610.00 | rent | 611.00 | 03/17/17 | 04/01/21 | 03/31/22 | | 0.00 | 250.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **630.00** | | | | | | | |
| 1011 | 1-1 | 624 | Yancey Luna | C | 710.00 | Rent | 675.00 | 08/07/20 | 08/07/21 | 08/06/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **749.00** | | | | | | | |
| 1012 | 1-1 | 624 | Olivia Scott | C | 660.00 | Rent | 645.00 | 10/14/20 | 10/14/20 | 10/15/21 | | 0.00 | 150.00 | 704.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 1013 | 2-1 | 824 | Brooklynn Bennett | C | 769.00 | Rent | 709.00 | 11/20/20 | 11/20/20 | 11/19/21 | 11/19/21 | 0.00 | 200.00 | 25.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **783.00** | | | | | | | |
| 1014 | 2-1 | 824 | Shalonda Manuel | C | 809.00 | Rent 5% Amazon $3( | 703.00 | 11/02/20 | 11/02/20 | 11/01/21 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **752.00** | | | | | | | |
| 1015 | Studio | 424 | Ana Quijana De Ac( | C | 560.00 | Expired Lease Rent | 560.00 | 09/18/19 | 09/18/20 | 09/17/21 | | 0.00 | 88.90 | 179.68 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Month to Month Fee | 125.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **694.00** | | | | | | | |
| 1016 | StudioW | 424 | Lillian Goodrich | C | 550.00 | Rent | 550.00 | 02/24/21 | 02/24/21 | 02/23/22 | | 0.00 | 300.00 | 627.13 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **559.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1101 | StudioW | 424 | Kayla Phinney | C | 610.00 | Rent | 649.00 | 08/28/21 | 08/28/21 | 11/28/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **668.00** | | | | | | | |
| 1102 | StudioW | 424 | Daniel Downing | C | 550.00 | Rent | 502.00 | 01/10/20 | 01/10/21 | 01/10/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **511.00** | | | | | | | |
| 1103 | 2-1 | 824 | Angela Taylor, Cha | C | 769.00 | Rent | 750.00 | 09/01/17 | 09/01/21 | 08/31/22 | | 0.00 | 87.50 | 70.88 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | washer | 40.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **824.00** | | | | | | | |
| 1104 | 2-1 | 824 | Donovan Koleman, | C | 809.00 | Rent w/ 5% Amazon | 712.00 | 02/13/21 | 02/13/21 | 02/12/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | **Total** | **761.00** | | | | | | | |
| 1105 | 1-1 | 624 | Robert Owusu | C | 670.00 | Rent w 5% Hobby Lc | 592.00 | 07/01/20 | 07/01/21 | 04/30/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **626.00** | | | | | | | |
| 1106 | 1-1 | 624 | D'angelo Alexander | C | 660.00 | Rent | 660.00 | 03/12/21 | 03/12/21 | 01/11/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **689.00** | | | | | | | |
| 1107 | 1-1 | 624 | Ali Quilitzsch | C | 670.00 | Rent w 5% Medical I | 641.00 | 09/12/20 | 09/12/21 | 09/12/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **650.00** | | | | | | | |
| 1108 | 1-1 | 624 | Ana Martinez | C | 610.00 | Rent | 635.00 | 09/05/21 | 09/04/21 | 08/03/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **644.00** | | | | | | | |
| 1109 | 1-1 | 624 | Anallely Avalos | C | 710.00 | Rent | 641.00 | 12/01/18 | 12/01/20 | 11/30/21 | 11/30/21 | 0.00 | 250.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **650.00** | | | | | | | |
| 1110 | 1-1 | 624 | Micah Oliver | C | 660.00 | Rent | 660.00 | 05/14/21 | 05/14/21 | 05/13/22 | | 0.00 | 300.00 | 740.02 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1111 | 1-1 | 624 | Matthew Slaughter | C | 670.00 | Rent w/ 5% Amazon | 642.00 | 05/22/20 | 05/22/21 | 05/21/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **651.00** | | | | | | | |
| 1112 | 1-1 | 624 | Cherelle Embry | C | 660.00 | Rent w/ $32 PEP Di: | 636.00 | 02/28/20 | 02/28/21 | 02/28/22 | 10/11/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **645.00** | | | | | | | |
| 1113 | 2-1 | 824 | Davona Newton, Da | C | 819.00 | Rent w/ 5% Amazon | 719.00 | 06/01/19 | 06/01/21 | 05/31/22 | | 0.00 | 200.00 | -1.47 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | **Total** | **778.00** | | | | | | | |
| 1114 | 2-1 | 824 | Pearl Fredette | C | 759.00 | Rent w/ 5% Amazon | 655.00 | 04/01/20 | 04/01/21 | 03/31/22 | | 0.00 | 400.00 | 400.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **714.00** | | | | | | | |
| 1115 | StudioW | 424 | Vacant Unit | | 610.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1116 | Studio | 424 | Clinton Reese | C | 600.00 | Rent | 609.00 | 08/14/21 | 08/14/21 | 09/13/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **618.00** | | | | | | | |
| 1201 | StudioW | 424 | Colleen Valliere | C | 560.00 | Rent w 5% Hobby Lc | 544.00 | 08/22/20 | 08/22/21 | 06/21/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **553.00** | | | | | | | |
| 1202 | StudioW | 424 | Luke Larson | C | 550.00 | Rent w/ 5% Medical | 523.00 | 12/15/20 | 12/15/20 | 12/14/21 | | 0.00 | 100.00 | 0.00 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **557.00** | | | | | | | |
| 1203 | 2-1 | 824 | Kimberly Kennedy | C | 769.00 | Rent | 699.00 | 07/19/19 | 07/20/21 | 07/19/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | **Total** | **773.00** | | | | | | | |
| 1204 | 2-1 | 824 | Dominic Terrell | C | 719.00 | Rent w/ 7% Amazon | 638.00 | 03/06/20 | 11/15/20 | 11/15/21 | | 0.00 | 400.00 | 753.46 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **672.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1205 | 1-1 | 624 | James Parsons | C | 670.00 | Rent | 740.00 | 08/24/21 | 08/24/21 | 09/23/22 | 0.00 | 150.00 | 1.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **750.00** | | | | | | |
| 1206 | 1-1 | 624 | Essence Freeman | C | 660.00 | Rent | 660.00 | 03/06/21 | 03/06/21 | 03/05/22 | 0.00 | 300.00 | 2,228.48 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | |
| 1207 | 1-1 | 624 | Christopher Stewar | C | 620.00 | Rent | 620.00 | 04/19/19 | 04/18/21 | 04/18/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | |
| 1208 | 1-1 | 624 | Itzel Gonzalez | C | 610.00 | Rent | 722.00 | 06/26/21 | 06/26/21 | 06/25/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **731.00** | | | | | | |
| 1209 | 1-1 | 624 | Kayla Furney | C | 620.00 | Rent | 605.00 | 03/01/21 | 02/27/21 | 02/26/22 | 0.00 | 300.00 | 720.02 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **649.00** | | | | | | |
| 1210 | 1-1 | 624 | Stacy Salazar | C | 610.00 | Rent w 5% Amazon ! | 566.00 | 11/16/20 | 11/14/20 | 11/13/21 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **575.00** | | | | | | |
| 1211 | 1-1 | 624 | Fatima Hernandez | C | 670.00 | Rent | 700.00 | 10/02/21 | 10/02/21 | 11/01/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **709.00** | | | | | | |
| 1212 | 1-1 | 624 | Adriane Young | C | 610.00 | rent | 609.00 | 10/10/14 | 10/01/21 | 09/30/22 | 0.00 | 250.00 | -0.57 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **618.00** | | | | | | |
| 1213 | 2-1 | 824 | Jennifer Shelton | C | 769.00 | Rent w/ 5% Amazon | 693.00 | 04/18/20 | 10/18/20 | 10/18/21 | 0.00 | 400.00 | 857.27 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | |
| | | | | | | **Total** | **767.00** | | | | | | |
| 1214 | 2-1 | 824 | Shandalyn Nash | C | 809.00 | Rent w/ 5% Amazon | 777.00 | 07/17/21 | 07/17/21 | 08/16/22 | 0.00 | 200.00 | -822.71 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **826.00** | | | | | | |
| 1215 | StudioW | 424 | Tristian Massey | C | 560.00 | Rent | 560.00 | 02/09/21 | 02/09/21 | 02/08/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **569.00** | | | | | | | |
| 1216 | StudioW | 424 | Lance Sadongei, Jil | C | 600.00 | Rent | 600.00 | 12/08/20 | 12/08/20 | 12/07/21 | 12/07/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest Reimbursemen | 50.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **659.00** | | | | | | | |
| 1301 | Studio | 424 | Vacant Unit | | 560.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1302 | StudioW | 424 | Vacant Unit | | 550.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1303 | 2-1 | 824 | Vacant Unit | | 729.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1304 | 2-1 | 824 | Vacant Unit | | 759.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1305 | 1-1 | 624 | Vacant Unit | | 620.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1306 | 1-1 | 624 | Vacant Unit | | 610.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1307 | 1-1 | 624 | Vacant Unit | | 620.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1308 | 1-1 | 624 | Vacant Unit | | 610.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1309 | 1-1 | 624 | Vacant Unit | | 660.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1310 | 1-1 | 624 | Vacant Unit | | 610.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1311 | 1-1 | 624 | Vacant Unit | | 620.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1312 | 1-1 | 624 | Vacant Unit | | 660.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1313 | 2-1 | 824 | Vacant Unit | | 729.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1314 | 2-1 | 824 | Vacant Unit | | 809.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1315 | Studio | 424 | Vacant Unit | | 560.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1316 | Studio | 424 | Vacant Unit | | 600.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1401 | StudioW | 424 | Sheila Dutton | C | 560.00 | Rent | 551.00 | 07/18/20 | 07/18/21 | 07/18/22 | | 0.00 | 100.00 | -541.64 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **595.00** | | | | | | |
| 1402 | Studio | 424 | Charles McClure | C | 600.00 | Rent | 683.00 | 09/08/21 | 09/08/21 | 09/07/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **692.00** | | | | | | |
| 1403 | 2-1 | 824 | Caroline Brown | C | 819.00 | Rent | 751.00 | 08/02/19 | 08/03/21 | 08/02/22 | 0.00 | 200.00 | 653.90 |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **800.00** | | | | | | |
| 1404 | 2-1 | 824 | Keeno Saldua, Ken | C | 809.00 | Rent w/ 5% Hobby L | 705.00 | 06/14/19 | 06/15/21 | 06/14/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | |
| | | | | | | **Total** | **754.00** | | | | | | |
| 1405 | 1-1 | 624 | Ayjee Turner | C | 670.00 | Rent w/ 5% Amazon | 642.00 | 07/24/20 | 07/24/21 | 07/23/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | **Total** | **671.00** | | | | | | |
| 1406 | 1-1 | 624 | Austin Trolinger | C | 660.00 | Rent | 664.00 | 07/14/20 | 07/15/21 | 07/14/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **683.00** | | | | | | |
| 1407 | 1-1 | 624 | John Girard | C | 710.00 | Rent w/ 5% Amazon | 713.00 | 05/17/21 | 05/17/21 | 05/16/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **762.00** | | | | | | |
| 1408 | 1-1 | 624 | Maison Wixom | C | 610.00 | Rent | 651.00 | 09/20/21 | 09/20/21 | 12/19/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **660.00** | | | | | | |
| 1409 | 1-1 | 624 | James Watts | C | 620.00 | rent | 579.00 | 07/04/06 | 08/31/21 | 08/30/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | **Total** | **588.00** | | | | | | |
| 1410 | 1-1 | 624 | Ronald Merritt | C | 610.00 | Rent w/ 5% Educatc | 576.00 | 11/18/20 | 01/31/21 | 01/31/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | **Total** | **610.00** | | | | | | |
| 1411 | 1-1 | 624 | Jeffrey Williams | C | 670.00 | Rent | 655.00 | 01/18/21 | 01/16/21 | 01/15/22 | 0.00 | 300.00 | 735.02 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **664.00** | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1412 | 1-1 | 624 | Tiyona Thompson | C | 660.00 | Rent | 681.00 | 08/28/21 | 08/28/21 | 08/27/22 | 0.00 | 300.00 | 740.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **690.00** | | | | | | |
| 1413 | 2-1 | 824 | Willella Hammons, | C | 819.00 | Rent | 771.00 | 08/11/20 | 08/11/21 | 08/10/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **840.00** | | | | | | |
| 1414 | 2-1 | 824 | Jazlyn Ardizzone, k | C | 809.00 | Rent | 874.00 | 08/14/21 | 08/14/21 | 06/13/22 | 0.00 | 400.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | **Total** | **933.00** | | | | | | |
| 1415 | Studio | 424 | Winfred Davis | C | 560.00 | Rent w/ 5% Amazon | 532.00 | 02/06/21 | 02/06/21 | 02/05/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **541.00** | | | | | | |
| 1416 | Studio | 424 | Kaleb Abel | C | 600.00 | Rent | 689.00 | 09/25/21 | 09/25/21 | 12/23/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **698.00** | | | | | | |
| 1501 | Studio | 424 | Anthony Vann | C | 610.00 | Rent w 5% (Hobby L | 579.00 | 05/04/21 | 05/03/21 | 05/02/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **588.00** | | | | | | |
| 1502 | StudioW | 424 | Paul Harbour | C | 550.00 | Rent | 546.00 | 06/09/18 | 06/09/21 | 06/08/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **565.00** | | | | | | |
| 1503 | 2-1 | 824 | Nadiah Howell, Car | C | 769.00 | Rent w/ 5% Amazon | 711.00 | 07/14/20 | 01/14/21 | 12/13/21 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **760.00** | | | | | | |
| 1504 | 2-1 | 824 | Wandy Vasquez | C | 759.00 | Rent | 780.00 | 05/21/21 | 05/20/21 | 03/19/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **829.00** | | | | | | |
| 1505 | 1-1 | 624 | Christina Ice, Raye | C | 620.00 | Rent | 699.00 | 09/03/21 | 09/03/21 | 12/02/22 | 0.00 | 150.00 | 150.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 718.00 | | | | | | | |
| 1506 | 1-1 | 624 | Felicia Castillo San | C | 610.00 | Rent | 560.00 | 02/28/20 | 02/28/21 | 02/28/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 589.00 | | | | | | | |
| 1507 | 1-1 | 624 | Denise Gibeaut | C | 620.00 | Rent | 585.00 | 10/14/19 | 10/14/20 | 10/12/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 604.00 | | | | | | | |
| 1508 | 1-1 | 624 | James Carpenter | C | 610.00 | Rent w/ %5 Senior D | 511.00 | 03/18/13 | 08/27/21 | 08/26/22 | | 0.00 | 100.00 | -44.02 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | Total | 520.00 | | | | | | | |
| 1509 | 1-1 | 624 | Ash Ashuoruh Oruh | C | 670.00 | Rent | 633.00 | 10/12/19 | 10/12/20 | 10/11/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 642.00 | | | | | | | |
| 1510 | 1-1 | 624 | Mariah Willis | C | 660.00 | Rent w/ 7% Amazon | 618.00 | 03/09/20 | 03/09/21 | 03/08/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 627.00 | | | | | | | |
| 1511 | 1-1 | 624 | Rejon Brown, Cade | C | 670.00 | Rent | 740.00 | 09/06/21 | 09/06/21 | 12/05/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 749.00 | | | | | | | |
| 1512 | 1-1 | 624 | Betti Autaubo | C | 610.00 | Rent | 590.00 | 10/26/15 | 09/01/21 | 06/30/22 | | 0.00 | 203.23 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | Total | 599.00 | | | | | | | |
| 1513 | 2-1 | 824 | Jennifer Morales, J | C | 819.00 | Rent | 769.00 | 04/13/21 | 04/13/21 | 04/12/22 | | 0.00 | 200.00 | 907.86 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 818.00 | | | | | | | |
| 1514 | 2-1 | 824 | Timothy Thomas | C | 759.00 | Rent | 809.00 | 06/26/21 | 06/26/21 | 07/25/22 | 11/16/21 | 0.00 | 400.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Total | 858.00 | | | | | | | |
| 1515 | Studio | 424 | Patricia Jimboy | C | 610.00 | Rent | 590.00 | 12/01/18 | 12/01/20 | 11/30/21 | | 0.00 | 100.00 | 1,159.81 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Total | 609.00 | | | | | | | |
| 1516 | StudioW | 424 | Darnell Gafford | C | 550.00 | Rent | 591.00 | 06/27/20 | 06/27/21 | 01/26/22 | | 0.00 | 100.00 | -6.87 |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **600.00** | | | | | | | |
| 1601 | StudioW | 424 | Joanna Lawrence | C | 560.00 | Rent | 486.00 | 05/29/09 | 08/01/21 | 05/31/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **520.00** | | | | | | | |
| 1602 | Studio | 424 | Jeff Cohlmia | C | 550.00 | rent | 502.00 | 04/08/95 | 12/01/20 | 11/30/21 | | 0.00 | 100.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **511.00** | | | | | | | |
| 1603 | 2-1 | 824 | Gracine Tiger | C | 769.00 | Rent | 672.00 | 01/29/16 | 03/30/21 | 03/29/22 | | 0.00 | 0.00 | 310.86 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | washer | 40.00 | | | | | | | |
| | | | | | | **Total** | **721.00** | | | | | | | |
| 1604 | 2-1 | 824 | Jorge Ramirez | C | 809.00 | Rent w/ %5 Amazon | 705.00 | 07/02/20 | 07/02/21 | 07/01/22 | | 0.00 | 200.00 | 918.87 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **779.00** | | | | | | | |
| 1605 | 1-1 | 624 | Dustin Charleswort | C | 670.00 | Rent | 675.00 | 06/01/20 | 06/01/21 | 05/31/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **684.00** | | | | | | | |
| 1606 | 1-1 | 624 | Alex Olishkevych | C | 610.00 | Rent | 623.00 | 06/02/18 | 06/02/21 | 06/01/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | | |
| 1607 | 1-1 | 624 | Courtney Parmer | C | 670.00 | Rent | 655.00 | 10/12/20 | 10/10/20 | 10/09/21 | 10/09/21 | 0.00 | 150.00 | 572.23 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **684.00** | | | | | | | |
| 1608 | 1-1 | 624 | Elizabeth Baxter | C | 610.00 | Rent | 610.00 | 04/29/20 | 04/29/21 | 04/28/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **629.00** | | | | | | | |
| 1609 | 1-1 | 624 | Susan Bowen | C | 620.00 | Rent | 561.00 | 09/15/12 | 09/01/21 | 08/31/22 | | 0.00 | 250.00 | -7.95 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **570.00** | | | | | | | |
| 1610 | 1-1 | 624 | Stephen Mansur | C | 660.00 | Rent | 714.00 | 09/05/21 | 09/04/21 | 06/03/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **723.00** | | | | | | | |
| 1611 | 1-1 | 624 | Thi Le Quyen Bui, T | C | 620.00 | Rent | 620.00 | 04/02/20 | 04/02/21 | 04/01/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **629.00** | | | | | | | |
| 1612 | 1-1 | 624 | Michelle Messner, S | C | 700.00 | Rent | 758.00 | 08/07/21 | 08/07/21 | 03/07/22 | | 0.00 | 150.00 | -867.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **817.00** | | | | | | | |
| 1613 | 2-1 | 824 | Branden Meier | C | 819.00 | Rent w/ 5% Hobby L | 740.00 | 05/15/21 | 05/15/21 | 03/14/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **789.00** | | | | | | | |
| 1614 | 2-1 | 824 | Brock Williams | C | 809.00 | Expired Lease Rent | 809.00 | 12/05/20 | 12/05/20 | 06/04/21 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Month to Month Fee | 125.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **993.00** | | | | | | | |
| 1615 | StudioW | 424 | Tyrael Scarborough | C | 610.00 | Rent | 600.00 | 02/22/19 | 02/23/21 | 02/22/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **609.00** | | | | | | | |
| 1616 | Studio | 424 | Jerry Irwinsky | C | 550.00 | Rent | 536.00 | 01/05/93 | 09/04/21 | 09/03/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **545.00** | | | | | | | |
| 1701 | 2-1 | 824 | Susana Rodriguez | C | 819.00 | Rent w 5% Student S | 733.00 | 09/22/20 | 09/23/21 | 09/22/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **742.00** | | | | | | | |
| 1702 | 2-1 | 824 | Amanda Wasik | C | 809.00 | Rent | 761.00 | 10/03/20 | 10/03/21 | 10/03/22 | | 0.00 | 200.00 | 930.90 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **810.00** | | | | | | | |
| 1703 | Studio | 424 | Robert Digiovanni | C | 610.00 | Rent | 610.00 | 01/23/21 | 01/23/21 | 01/22/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | | |
| 1704 | StudioW | 424 | Anita Garcia, Ferna | C | 600.00 | Expired Lease Rent | 600.00 | 04/18/20 | 04/17/21 | 08/17/21 | 11/09/21 | 0.00 | 100.00 | 0.00 |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Month to Month Fee | 125.00 | | | | | | |
| | | | | | | **Total** | **734.00** | | | | | | |
| 1705 | 1-1 | 624 | Celeste Simmons | C | 620.00 | Rent | 605.00 | 12/31/20 | 12/31/20 | 12/30/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Rent | 20.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **634.00** | | | | | | |
| 1706 | 1-1 | 624 | Brian Lopez | C | 610.00 | Rent | 605.00 | 07/08/17 | 08/01/21 | 08/01/22 | 0.00 | 337.50 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **614.00** | | | | | | |
| 1707 | 1-1 | 624 | Susan Tate-McCollu | C | 620.00 | Rent | 614.00 | 08/13/21 | 08/13/21 | 11/12/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **623.00** | | | | | | |
| 1708 | 1-1 | 624 | Shidavius Jeffers | C | 610.00 | Rent | 595.00 | 03/13/21 | 03/13/21 | 03/12/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **604.00** | | | | | | |
| 1709 | 1-1 | 624 | Geoffrey Casella | C | 620.00 | Rent | 623.00 | 07/30/20 | 07/29/21 | 05/28/22 | 0.00 | 87.50 | -666.00 |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | |
| 1710 | 1-1 | 624 | Larry Thompson | C | 660.00 | Rent | 623.00 | 05/24/19 | 05/25/21 | 05/24/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **657.00** | | | | | | |
| 1711 | 1-1 | 624 | Velvet Seymour | C | 620.00 | rent | 533.00 | 03/15/13 | 06/02/21 | 06/01/22 | 0.00 | 250.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | **Total** | **542.00** | | | | | | |
| 1712 | 1-1 | 624 | Alma Hernandez, I | C | 660.00 | Rent | 664.00 | 07/03/21 | 07/03/21 | 07/02/22 | 0.00 | 300.00 | 755.95 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **683.00** | | | | | | |
| 1713 | Studio | 424 | Vacant Unit | | 560.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | |
| 1714 | StudioW | 424 | Jazmin Rodriguez | C | 550.00 | Rent | 550.00 | 05/08/21 | 05/08/21 | 05/07/22 | 0.00 | 100.00 | 637.13 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | **Total** | **569.00** | | | | | | |
| 1715 | 2-1 | 824 | Lindsay Miller* | C | 769.00 | Rent | 719.00 | 08/26/19 | 08/26/21 | 08/25/22 | 0.00 | 87.50 | 718.88 |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | washer | 40.00 | | | | | | |
| | | | | | | **Total** | **768.00** | | | | | | |
| 1716 | 2-1 | 824 | Sharon Nunez | C | 759.00 | Rent | 710.00 | 08/08/20 | 08/08/21 | 08/08/22 | 0.00 | 400.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **759.00** | | | | | | |
| 1801 | StudioW | 424 | Cameron Fleming | C | 610.00 | Rent | 667.00 | 09/18/21 | 09/18/21 | 12/17/22 | 0.00 | 100.00 | 726.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **676.00** | | | | | | |
| 1802 | StudioW | 424 | Ryli Bradford, Nar | C | 600.00 | Rent w/ 5% Amazon | 656.00 | 07/16/21 | 07/16/21 | 07/15/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **665.00** | | | | | | |
| 1803 | 2-1 | 824 | Tiffany Price | C | 769.00 | rent | 706.00 | 04/12/13 | 07/01/21 | 06/30/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | washer | 40.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **755.00** | | | | | | |
| 1804 | 2-1 | 824 | Vanessa Herrera, E | C | 719.00 | Rent | 759.00 | 07/27/21 | 07/27/21 | 07/26/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **768.00** | | | | | | |
| 1805 | 1-1 | 624 | Dylan Hight | C | 620.00 | Rent | 623.00 | 05/03/19 | 05/04/21 | 05/03/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | |
| 1806 | 1-1 | 624 | Seung Hoon Lee | C | 610.00 | Rent | 610.00 | 12/23/19 | 12/23/20 | 12/22/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | |
| 1807 | 1-1 | 624 | Laurie Hatch | C | 620.00 | Rent | 623.00 | 07/01/19 | 07/03/21 | 07/02/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **652.00** | | | | | | |
| 1808 | 1-1 | 624 | Antonio Ortiz | C | 610.00 | rent | 621.00 | 12/07/13 | 08/01/21 | 05/31/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **630.00** | | | | | | |
| 1809 | 1-1 | 624 | Nafissetou Ouedra | C | 670.00 | Rent w/ 5% amazon | 670.00 | 07/03/21 | 07/03/21 | 07/02/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Total** | **679.00** | | | | | | | |
| 1810 | 1-1 | 624 | Benjamin Woolley | C | 660.00 | Rent | 645.00 | 10/24/20 | 10/24/20 | 10/23/21 | 10/23/21 | 0.00 | 150.00 | 724.77 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 1811 | 1-1 | 624 | Halle Moseley, Cay | C | 620.00 | Rent | 736.00 | 08/14/21 | 08/14/21 | 08/13/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **755.00** | | | | | | | |
| 1812 | 1-1 | 624 | Rebeca Franco | C | 610.00 | Rent | 613.00 | 07/31/20 | 07/31/21 | 07/30/22 | | 0.00 | 300.00 | 701.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **622.00** | | | | | | | |
| 1813 | 2-1 | 824 | Andrea Morales | C | 779.00 | Rent | 759.00 | 01/08/21 | 01/08/21 | 01/07/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **768.00** | | | | | | | |
| 1814 | 2-1 | 824 | Rachel Anderson | C | 759.00 | Rent | 757.00 | 05/20/21 | 05/20/21 | 07/19/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **806.00** | | | | | | | |
| 1815 | StudioW | 424 | Winifred Mobley | C | 610.00 | Rent | 631.00 | 06/30/21 | 06/30/21 | 06/29/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **640.00** | | | | | | | |
| 1816 | StudioW | 424 | Timothy Little | C | 600.00 | Rent w 5% Hobby Lc | 570.00 | 11/20/20 | 11/20/20 | 10/19/21 | | 0.00 | 200.00 | 1,948.36 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **579.00** | | | | | | | |
| 1901 | StudioW | 424 | Rochelle Lee | C | 560.00 | Rent w/ Senior Disc | 496.00 | 11/12/14 | 02/02/21 | 02/01/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **505.00** | | | | | | | |
| 1902 | Studio | 424 | William Downs | C | 550.00 | rent | 490.00 | 04/29/16 | 09/01/21 | 08/31/22 | | 0.00 | 200.00 | 602.13 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | **Total** | **534.00** | | | | | | | |
| 1903 | 2-1 | 824 | Nicole Haury, Robe | C | 779.00 | Rent | 794.00 | 07/24/21 | 07/24/21 | 08/23/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **803.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1904 | 2-1 | 824 | Kelley Taylor | C | 809.00 | Rent w 5% Amazon ! | 731.00 | 03/31/21 | 03/31/21 | 01/31/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **780.00** | | | | | | | |
| 1905 | 1-1 | 624 | Aaron Key, Hannah | C | 710.00 | Rent | 655.00 | 12/18/20 | 12/18/20 | 12/17/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | **Total** | **704.00** | | | | | | | |
| 1906 | 1-1 | 624 | Ethan McCollum | C | 610.00 | Rent | 595.00 | 03/06/21 | 03/06/21 | 03/05/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | **Total** | **624.00** | | | | | | | |
| 1907 | 1-1 | 624 | Emileigh Ruth | C | 670.00 | Rent | 705.00 | 07/17/21 | 07/17/21 | 07/16/22 | | 0.00 | 150.00 | 2.89 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **714.00** | | | | | | | |
| 1908 | 1-1 | 624 | Rickayla Grant | C | 660.00 | Rent | 660.00 | 03/26/21 | 03/26/21 | 03/25/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | | |
| 1909 | 1-1 | 624 | Vacant Unit | | 620.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | **Total** | **0.00** | | | | | | | |
| 1910 | 1-1 | 624 | Cherry Bowen | C | 660.00 | Rent | 705.00 | 09/27/21 | 09/27/21 | 12/26/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **734.00** | | | | | | | |
| 1911 | 1-1 | 624 | Gabriel Cross | C | 620.00 | Rent w 5% Amazon ! | 589.00 | 04/08/21 | 04/08/21 | 04/07/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **608.00** | | | | | | | |
| 1912 | 1-1 | 624 | Matthew Millsap | C | 610.00 | Rent | 610.00 | 05/08/21 | 05/08/21 | 05/07/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | | |
| 1913 | 2-1 | 824 | Mercedes Neely | C | 819.00 | Rent | 694.00 | 11/27/19 | 11/27/20 | 11/27/21 | 11/29/21 | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Rent | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **743.00** | | | | | | | |
| 1914 | 2-1 | 824 | Deryl Cosby | C | 759.00 | rent | 684.00 | 12/30/16 | 12/01/20 | 11/30/21 | | 0.00 | 300.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | washer | 40.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 733.00 | | | | | | | |
| 1915 | Studio | 424 | Charles Noble | C | 560.00 | Rent w 5% educator | 532.00 | 04/09/21 | 04/09/21 | 04/08/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 541.00 | | | | | | |
| 1916 | Studio | 424 | Maurice Spann Jr. | C | 550.00 | Rent | 535.00 | 12/22/17 | 12/01/20 | 11/30/21 | 0.00 | 250.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 544.00 | | | | | | |
| 2001 | 2-1 | 824 | Elizabeth Fitzhugh, | C | 779.00 | Rent | 771.00 | 08/01/20 | 08/01/21 | 07/31/22 | 0.00 | 200.00 | 871.88 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 790.00 | | | | | | |
| 2002 | 2-1 | 824 | Jayden Alarcon, Si | C | 769.00 | Rent w 5% Hobby Lc | 781.00 | 05/24/21 | 05/24/21 | 07/23/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 790.00 | | | | | | |
| 2003 | StudioW | 424 | Sue Ann Odom | C | 560.00 | Rent w/ 5% Senior E | 540.00 | 06/01/19 | 12/01/20 | 11/30/21 | 0.00 | 100.00 | -33.48 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 549.00 | | | | | | |
| 2004 | Studio | 424 | Ron Hill | C | 550.00 | Rent | 541.00 | 06/21/19 | 06/22/21 | 06/21/22 | 0.00 | 100.00 | -7.88 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 550.00 | | | | | | |
| 2005 | 1-1 | 624 | Lamar Howard | C | 670.00 | Rent | 745.00 | 05/05/21 | 05/05/21 | 08/04/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 754.00 | | | | | | |
| 2006 | 1-1 | 624 | Vacant Unit | | 660.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | Total | 0.00 | | | | | | |
| 2007 | 1-1 | 624 | Rae'ven Vaughn | C | 670.00 | Rentw/ 5% Medical | 627.00 | 05/22/21 | 05/22/21 | 05/21/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 636.00 | | | | | | |
| 2008 | 1-1 | 624 | Marana Nish | C | 660.00 | Rent w/ 5% Amazon | 676.00 | 09/25/21 | 09/25/21 | 09/24/22 | 0.00 | 150.00 | 735.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 685.00 | | | | | | |
| 2009 | 1-1 | 624 | Juanita Mustain, D | C | 620.00 | Rent | 720.00 | 06/11/21 | 09/11/21 | 12/10/21 | 0.00 | 150.00 | -300.47 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 749.00 | | | | | | |
| 2010 | 1-1 | 624 | Keiona Evans | C | 700.00 | Rent | 645.00 | 11/02/20 | 10/31/20 | 10/30/21 | 0.00 | 300.00 | -579.66 |

Exhibit A

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **694.00** | | | | | |
| 2011 | 1-1 | 624 | Jurrelle Johnson | C | 670.00 | Rent w/ 5% Hobby L | 642.00 | 07/29/19 | 08/03/21 | 06/02/22 | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **651.00** | | | | | |
| 2012 | 1-1 | 624 | Emile Sine | C | 700.00 | Rent/ amazon 5% di | 687.00 | 07/24/21 | 07/24/21 | 07/23/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | **Total** | **736.00** | | | | | |
| 2013 | StudioW | 424 | George Cornish | C | 610.00 | Rent w/ 20% Emplo | 488.00 | 12/18/20 | 12/18/20 | 12/30/21 | 0.00 | 0.00 | 585.88 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | **Total** | **522.00** | | | | | |
| 2014 | StudioW | 424 | Gregory White | C | 600.00 | Rent w/ 5% Crest Di | 563.00 | 08/23/19 | 08/24/21 | 08/23/22 | 0.00 | 200.00 | 40.48 |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **597.00** | | | | | |
| 2015 | 2-1 | 824 | Synthia Collins, Rol | C | 769.00 | Rent | 721.00 | 09/06/19 | 09/05/21 | 09/03/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **730.00** | | | | | |
| 2016 | 2-1 | 824 | Reina Contreras, N | C | 759.00 | Rent | 759.00 | 04/02/21 | 04/02/21 | 04/01/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **808.00** | | | | | |
| 2101 | StudioW | 424 | Barbara Moore | C | 610.00 | Rent | 573.00 | 07/01/19 | 07/01/21 | 06/30/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **582.00** | | | | | |
| 2102 | Studio | 424 | Mike Hale | C | 600.00 | Rent | 600.00 | 11/23/20 | 11/21/20 | 11/20/21 | 0.00 | 200.00 | 677.13 |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | **Total** | **609.00** | | | | | |
| 2103 | 2-1 | 824 | Colby Williams, Jul | C | 769.00 | Rent | 699.00 | 05/20/20 | 05/21/21 | 05/20/22 | 0.00 | 669.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | |
| | | | | | | **Total** | **748.00** | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2104 | 2-1 | 824 | Miranda Hassler, R( | C | 759.00 | Rent | 699.00 | 12/07/18 | 12/07/20 | 10/06/21 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **783.00** | | | | | | | |
| 2105 | 1-1 | 624 | Eustace Paige | C | 620.00 | Rent | 623.00 | 04/28/16 | 07/02/21 | 07/01/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **632.00** | | | | | | | |
| 2106 | 1-1 | 624 | James Robinson | C | 660.00 | Rent | 741.00 | 06/12/21 | 06/12/21 | 07/11/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **750.00** | | | | | | | |
| 2107 | 1-1 | 624 | Alyssa Smith, Jerar | C | 620.00 | Rent w (5% Amazon | 589.00 | 04/16/21 | 04/16/21 | 02/15/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **608.00** | | | | | | | |
| 2108 | 1-1 | 624 | Nicholas Hollock | C | 660.00 | Rent | 745.00 | 07/19/21 | 07/16/21 | 01/15/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **774.00** | | | | | | | |
| 2109 | 1-1 | 624 | Liza Carter, Frede | C | 670.00 | Rent | 774.00 | 05/01/21 | 04/30/21 | 04/29/22 | | 0.00 | 150.00 | 437.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **793.00** | | | | | | | |
| 2110 | 1-1 | 624 | Franklyn Arviso | C | 660.00 | Rent w/ 5% amazon | 694.00 | 06/21/21 | 06/21/21 | 07/20/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **703.00** | | | | | | | |
| 2111 | 1-1 | 624 | Chaonette Rowles, | C | 670.00 | Rent | 655.00 | 03/02/21 | 03/01/21 | 12/27/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **664.00** | | | | | | | |
| 2112 | 1-1 | 624 | Danny Terrazas | C | 660.00 | Rent | 660.00 | 03/13/21 | 03/13/21 | 03/12/22 | | 0.00 | 300.00 | -23.16 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | | |
| 2113 | 2-1 | 824 | Jason Rodriguez | C | 779.00 | Rent | 833.00 | 05/26/21 | 05/26/21 | 05/25/22 | | 0.00 | 300.00 | 515.90 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **842.00** | | | | | | | |
| 2114 | 2-1 | 824 | Joshua Oglesby, Ka | C | 759.00 | Rent w/ 5% Hobby L | 721.00 | 06/01/21 | 06/01/21 | 05/31/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **770.00** | | | | | | |
| 2115 | StudioW | 424 | Yvette Cano | C | 610.00 | Rent | 610.00 | 04/01/21 | 04/01/21 | 03/31/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **629.00** | | | | | | |
| 2116 | Studio | 424 | Salvador Martinez | C | 600.00 | Rent | 550.00 | 04/02/21 | 04/02/21 | 03/31/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **559.00** | | | | | | |
| 2201 | StudioW | 424 | James Reinhardt | C | 560.00 | Rent | 560.00 | 10/19/20 | 10/19/20 | 10/18/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **569.00** | | | | | | |
| 2202 | StudioW | 424 | Tyler Allen | C | 600.00 | Rent w/ 5% Crest Di | 545.00 | 12/26/18 | 12/27/20 | 12/27/21 | 0.00 | 100.00 | 657.13 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **589.00** | | | | | | |
| 2203 | 2-1 | 824 | Keasha Martin | C | 819.00 | Rent | 744.00 | 02/12/20 | 02/12/21 | 02/11/22 | 0.00 | 400.00 | 866.90 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | **Total** | **793.00** | | | | | | |
| 2204 | 2-1 | 824 | Candace Husmann | C | 759.00 | Rent | 684.00 | 12/17/18 | 12/17/20 | 12/16/21 | 0.00 | 200.00 | 50.83 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **753.00** | | | | | | |
| 2205 | 1-1 | 624 | Zaley Baldwin | C | 620.00 | Rent | 605.00 | 04/17/21 | 04/17/21 | 02/16/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **634.00** | | | | | | |
| 2206 | 1-1 | 624 | Bryce Parkerson | C | 610.00 | Rent | 655.00 | 07/14/21 | 07/14/21 | 07/13/22 | 0.00 | 300.00 | -658.93 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **664.00** | | | | | | |
| 2207 | 1-1 | 624 | Melynna Iturrino | C | 660.00 | Rent w/ 5% OCCC $: | 575.00 | 12/23/20 | 12/23/20 | 12/23/21 | 0.00 | 300.00 | 722.73 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | 624.00 | | | | | | |
| 2208 | 1-1 | 624 | Amy Lemaster | C | 610.00 | Rent w/ 5% Walmar | 509.00 | 02/28/20 | 02/28/21 | 02/28/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 528.00 | | | | | | |
| 2209 | 1-1 | 624 | Ever Jaquez, Aliyal | C | 620.00 | Rent | 658.00 | 09/18/21 | 09/18/21 | 09/17/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 667.00 | | | | | | |
| 2210 | 1-1 | 624 | Carlos Contreras, D | C | 660.00 | Rent | 709.00 | 09/18/21 | 09/18/21 | 09/17/22 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 718.00 | | | | | | |
| 2211 | 1-1 | 624 | TPI Construction | C | 620.00 | Rent | 0.00 | 05/10/21 | 05/10/21 | 05/09/22 | 0.00 | 0.00 | 46.02 |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Total | 25.00 | | | | | | |
| 2212 | 1-1 | 624 | Jewel Harris, Ruth | C | 660.00 | Rent w/ 5% Amazon | 631.00 | 09/25/20 | 09/25/21 | 09/24/22 | 0.00 | 300.00 | 394.19 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 665.00 | | | | | | |
| 2213 | 2-1 | 824 | Maria Oyarce | C | 769.00 | Rent w/ 5% Hobby L | 693.00 | 06/09/21 | 06/09/21 | 06/08/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Total | 752.00 | | | | | | |
| 2214 | 2-1 | 824 | Johnny Stone, Victi | C | 809.00 | Rent | 734.00 | 12/13/19 | 12/13/20 | 12/13/21 | 0.00 | 200.00 | -23.31 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 783.00 | | | | | | |
| 2215 | Studio | 424 | Chyna Coons | C | 560.00 | Rent w/ 5% 7-11 Dis | 524.00 | 03/13/20 | 03/13/21 | 01/12/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | Total | 543.00 | | | | | | |
| 2216 | StudioW | 424 | Michael McCormick | C | 600.00 | Rent | 618.00 | 09/23/20 | 09/23/21 | 09/22/22 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 627.00 | | | | | | |
| 2301 | StudioW | 424 | Cameron Tull | C | 610.00 | Rent/(-$35 amazon | 664.00 | 09/29/21 | 09/29/21 | 12/28/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Total | 673.00 | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2302 | StudioW | 424 | Mitchell Kirby | C | 600.00 | Rent | 565.00 | 06/07/21 | 06/05/21 | 09/03/22 | | 0.00 | 1,130.00 | 642.13 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **574.00** | | | | | | | |
| 2303 | 2-1 | 824 | Melissa Valdez Mira | C | 779.00 | Rent w/ 5% Hobby L | 708.00 | 01/11/20 | 01/10/21 | 01/10/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **717.00** | | | | | | | |
| 2304 | 2-1 | 824 | Daniel Foshee | C | 759.00 | Rent | 699.00 | 02/06/21 | 02/06/21 | 02/05/22 | | 0.00 | 200.00 | 396.90 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **748.00** | | | | | | | |
| 2305 | 1-1 | 624 | Erik Smith | C | 620.00 | Rent w/ 5% Hobby L | 592.00 | 03/25/20 | 03/26/21 | 03/25/22 | | 0.00 | 150.00 | 682.02 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **611.00** | | | | | | | |
| 2306 | 1-1 | 624 | Dante Elliott, Josur | C | 660.00 | Rent w/ 5% Oncue D | 631.00 | 03/11/20 | 03/12/21 | 03/11/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **660.00** | | | | | | | |
| 2307 | 1-1 | 624 | Corey Hicks | C | 620.00 | Rent w/ 5% Amazon | 575.00 | 10/23/20 | 10/22/20 | 10/21/21 | 10/22/21 | 0.00 | 150.00 | -535.27 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **584.00** | | | | | | | |
| 2308 | 1-1 | 624 | Breydon Velasco | C | 660.00 | Rent | 645.00 | 12/01/20 | 12/01/20 | 12/01/21 | 12/01/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 2309 | 1-1 | 624 | Jerry Latham | C | 620.00 | rent | 524.00 | 01/02/95 | 06/02/21 | 06/01/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **533.00** | | | | | | | |
| 2310 | 1-1 | 624 | Roberto Barcenas | C | 660.00 | Rent | 645.00 | 11/05/20 | 11/05/20 | 11/03/21 | 11/08/21 | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 2311 | 1-1 | 624 | Chris Hamilton | C | 670.00 | Rent w/ 5% Amazon | 637.00 | 03/12/21 | 03/12/21 | 03/11/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **646.00** | | | | | | | |
| 2312 | 1-1 | 624 | Joy Rhodes | C | 660.00 | Rent | 719.00 | 08/07/21 | 08/07/21 | 09/06/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **728.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2313 | 2-1 | 824 | Mishelle Speight | C | 819.00 | Rent | 749.00 | 02/27/21 | 02/27/21 | 02/26/22 | | 0.00 | 400.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **808.00** | | | | | | | |
| 2314 | 2-1 | 824 | Estefany Bottenha | C | 809.00 | Rent | 769.00 | 03/27/21 | 03/27/21 | 03/26/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | **Total** | **818.00** | | | | | | | |
| 2315 | StudioW | 424 | Deanna Maddox | C | 610.00 | Rent w 5% discount | 596.00 | 07/09/21 | 07/09/21 | 07/08/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **605.00** | | | | | | | |
| 2316 | Studio | 424 | Sherryl White | C | 600.00 | Rent | 687.00 | 09/01/21 | 09/01/21 | 03/31/22 | 11/28/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **696.00** | | | | | | | |
| 2401 | Studio | 424 | Nathan Fraley | C | 560.00 | Rent w/ 5% Amazon | 524.00 | 06/08/20 | 06/09/21 | 06/08/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **533.00** | | | | | | | |
| 2402 | StudioW | 424 | Hayley Jones | C | 600.00 | Rent | 592.00 | 04/07/20 | 04/07/21 | 04/06/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **611.00** | | | | | | | |
| 2403 | 2-1 | 824 | Maria Goicochea | C | 729.00 | Rent | 699.00 | 08/10/19 | 08/10/21 | 08/09/22 | | 0.00 | 200.00 | -25.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **708.00** | | | | | | | |
| 2404 | 2-1 | 824 | Felipe Diaz | C | 809.00 | Rent | 749.00 | 01/23/21 | 01/23/21 | 12/01/21 | | 0.00 | 400.00 | -190.66 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | **Total** | **798.00** | | | | | | | |
| 2405 | 1-1 | 624 | Dryden Groat | C | 620.00 | Rent w/ 20% employ | 496.00 | 08/30/19 | 08/31/21 | 08/30/22 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **505.00** | | | | | | | |
| 2406 | 1-1 | 624 | Santiago Lopez | C | 610.00 | Rent | 610.00 | 04/17/21 | 04/17/21 | 04/16/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | | |
| 2407 | 1-1 | 624 | Kathy Denson | C | 670.00 | Rent | 655.00 | 10/01/20 | 10/01/20 | 09/30/21 | 11/28/21 | 0.00 | 150.00 | 0.00 |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **664.00** | | | | | | | |
| 2408 | 1-1 | 624 | Tevin Pittman | C | 660.00 | Rent | 613.00 | 06/23/20 | 06/22/21 | 06/21/22 | | 0.00 | 150.00 | 681.51 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **647.00** | | | | | | | |
| 2409 | 1-1 | 624 | Virginia Lopez | C | 710.00 | Rent | 715.00 | 09/10/21 | 09/10/21 | 12/09/22 | | 0.00 | 300.00 | 864.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **764.00** | | | | | | | |
| 2410 | 1-1 | 624 | Alyssa Vann | C | 660.00 | Rent | 660.00 | 05/15/21 | 05/15/21 | 05/14/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **669.00** | | | | | | | |
| 2411 | 1-1 | 624 | Derrick Taylor | C | 620.00 | Rent w 5% Educator | 592.00 | 06/05/20 | 06/05/21 | 06/04/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | **Total** | **626.00** | | | | | | | |
| 2412 | 1-1 | 624 | Dengqi Huang | C | 660.00 | Rent | 645.00 | 12/04/20 | 12/04/20 | 12/03/21 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **654.00** | | | | | | | |
| 2413 | 2-1 | 824 | Amber Cotner | C | 769.00 | Rent | 665.00 | 05/04/20 | 05/04/21 | 05/03/22 | | 0.00 | 200.00 | 586.10 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **724.00** | | | | | | | |
| 2414 | 2-1 | 824 | Lacy St. Denis | C | 809.00 | Rent | 740.57 | 10/11/19 | 10/11/20 | 10/10/21 | 10/10/21 | 0.00 | 400.00 | 898.47 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Washer/Dryer Rent: | 40.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | **Total** | **824.57** | | | | | | | |
| 2415 | StudioW | 424 | Lori Dennis | C | 610.00 | Rent | 603.00 | 04/17/20 | 04/17/21 | 04/16/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **612.00** | | | | | | | |
| 2416 | StudioW | 424 | Jordayne Smith | C | 600.00 | Rent | 600.00 | 04/23/21 | 04/23/21 | 04/22/22 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **619.00** | | | | | | | |
| 2501 | Studio | 424 | Tommy Moore | C | 560.00 | Rent | 470.00 | 03/19/04 | 07/02/21 | 07/01/22 | | 0.00 | 125.00 | -35.35 |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | **Total** | **479.00** | | | | | | | |
| 2502 | Studio | 424 | Travis Welcher | C | 550.00 | Rent | 550.00 | 09/10/20 | 12/10/20 | 12/09/21 | | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **559.00** | | | | | | | |
| 2503 | 2-1 | 824 | Sydney Williams , [ | C | 819.00 | Rent | 749.00 | 10/20/20 | 10/20/20 | 10/19/21 | 10/30/21 | 0.00 | 200.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **758.00** | | | | | | | |
| 2504 | 2-1 | 824 | Alexa Dunn | C | 809.00 | Rent | 790.00 | 09/03/21 | 09/03/21 | 09/02/22 | | 0.00 | 200.00 | 0.00 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **839.00** | | | | | | | |
| 2505 | 1-1 | 624 | Rhonda Gray | C | 620.00 | Rent | 623.00 | 05/10/19 | 05/11/21 | 05/10/22 | | 0.00 | 150.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **642.00** | | | | | | | |
| 2506 | 1-1 | 624 | Kianah Deer | C | 660.00 | Rent | 660.00 | 02/28/20 | 09/02/21 | 03/01/22 | | 0.00 | 300.00 | 760.02 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **714.00** | | | | | | | |
| 2507 | 1-1 | 624 | Pamela Horn | C | 710.00 | rent | 569.00 | 11/01/18 | 11/01/20 | 11/01/21 | | 0.00 | 0.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | | |
| | | | | | | trash | 5.00 | | | | | | | |
| | | | | | | petrent | 10.00 | | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | | |
| | | | | | | **Total** | **628.00** | | | | | | | |
| 2508 | 1-1 | 624 | Kory Rowe | C | 660.00 | Rent/ Amazon discc | 627.00 | 07/01/21 | 07/01/21 | 06/30/22 | | 0.00 | 150.00 | 390.49 |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | **Total** | **636.00** | | | | | | | |
| 2509 | 1-1 | 624 | Nahari Johnson | C | 620.00 | Rent w/ 5% Amazon | 589.00 | 05/22/21 | 05/22/21 | 05/21/22 | | 0.00 | 300.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **598.00** | | | | | | | |
| 2510 | 1-1 | 624 | Evan Heath | C | 610.00 | Rent | 605.00 | 12/30/19 | 01/03/21 | 01/03/22 | | 0.00 | 150.00 | 664.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | | |
| | | | | | | **Total** | **614.00** | | | | | | | |

Exhibit A

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2511 | 1-1 | 624 | Deanna Ramirez | C | 660.00 | Rent w/ 5% Hobby L | 585.00 | 01/31/20 | 01/30/21 | 01/29/22 | 0.00 | 150.00 | -113.81 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **634.00** | | | | | | |
| 2512 | 1-1 | 624 | Hailey Branagh | C | 700.00 | Rent | 660.00 | 12/20/19 | 12/20/20 | 12/20/21 | 0.00 | 300.00 | 0.00 |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **734.00** | | | | | | |
| 2513 | 2-1 | 824 | Frances Reeder | C | 819.00 | rent | 729.00 | 10/01/18 | 10/01/21 | 09/30/22 | 0.00 | 0.00 | 1,017.65 |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | Pet Fee Monthly | 10.00 | | | | | | |
| | | | | | | INS - ePremium Cha | 25.00 | | | | | | |
| | | | | | | Washer/Dryer Renta | 40.00 | | | | | | |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | **Total** | **813.00** | | | | | | |
| 2514 | 2-1 | 824 | Zachary Perez | C | 809.00 | Rent | 761.00 | 07/02/20 | 07/02/21 | 07/01/22 | 0.00 | 200.00 | 0.00 |
| | | | | | | Pet Fee Monthly | 20.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | **Total** | **790.00** | | | | | | |
| 2515 | StudioW | 424 | Debra Guinn | C | 560.00 | rent | 524.00 | 06/26/15 | 11/01/20 | 11/01/21 | 0.00 | 0.00 | 0.00 |
| | | | | | | pestctrl | 4.00 | | | | | | |
| | | | | | | trash | 5.00 | | | | | | |
| | | | | | | **Total** | **533.00** | | | | | | |
| 2516 | Studio | 424 | Marco Gallegos | C | 550.00 | Rent | 550.00 | 10/17/20 | 10/17/20 | 10/16/21 | 0.00 | 100.00 | 0.00 |
| | | | | | | Trash Fee | 5.00 | | | | | | |
| | | | | | | Pest | 4.00 | | | | | | |
| | | | | | | **Total** | **559.00** | | | | | | |
| | | | | | **264720** | | | | | | **0** | **74291.13** | **36404.81** |

## Total Charges

| Description | Total |
|---|---|
| Housing | 778.00 |
| INS - ePremium Charge - 4260 | 1,200.00 |
| Month to Month Fee | 750.00 |
| Pest | 1,476.00 |
| Pest Reimbursement - 5820 | 50.00 |
| Pet Fee Monthly | 1,200.00 |
| Rent | 239,366.57 |
| Trash Fee | 1,845.00 |
| Washer/Dryer Rental | 3,560.00 |
| | **250,225.57** |

## Total Credits

| Description | Total |
|---|---|
| Concession | 0.00 |
| Emp - Courtesy Offcr | 1,518.00 |
| | **1,518.00** |

Exhibit A

## Property Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| Total | Occupied | 248,446.00 | 93.9% | 375 | 93.8% | 234,000.00 | 93.8% |
| Total | Vacant | 16,274.00 | 6.1% | 25 | 6.3% | 15,600.00 | 6.3% |
| | | 264,720.00 | | 400 | | 249,600.00 | |

## Unit Type Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| 1-1 | Occupied | 120,160.00 | 93.5% | 187 | 93.5% | 116,688.00 | 93.5% |
| 1-1 | Vacant | 8,320.00 | 6.5% | 13 | 6.5% | 8,112.00 | 6.5% |
| 2-1 | Occupied | 73,976.00 | 94.2% | 94 | 94.0% | 77,456.00 | 94.0% |
| 2-1 | Vacant | 4,514.00 | 5.8% | 6 | 6.0% | 4,944.00 | 6.0% |
| Studio | Occupied | 21,310.00 | 90.3% | 37 | 90.2% | 15,688.00 | 90.2% |
| Studio | Vacant | 2,280.00 | 9.7% | 4 | 9.8% | 1,696.00 | 9.8% |
| StudioW | Occupied | 33,000.00 | 96.6% | 57 | 96.6% | 24,168.00 | 96.6% |
| StudioW | Vacant | 1,160.00 | 3.4% | 2 | 3.4% | 848.00 | 3.4% |
| | | 264,720.00 | | 400 | | 249,600.00 | |

## Collections

| Account | Collections Total | Previously Billed | Amount Paid | Agreement Amount |
|---|---|---|---|---|
| 0107 - Anh Le | 1,486.00 | 400.00 | 400.00 | 50.00 |
| 0113 - Dylon Marcom | 4,098.35 | 200.00 | 100.00 | 100.00 |
| 0305 - Craig Bielamowicz | 812.23 | 715.00 | 660.00 | 55.00 |
| 0714 - Bernard Addo | 3,606.30 | 650.00 | 600.00 | 50.00 |
| 1801 - Sterling Dowlearn | 823.17 | 750.00 | 600.00 | 73.17 |
| 1814 - Amanda Delong | 1,286.67 | 1,000.00 | 800.00 | 200.00 |
| 1904 - Kenrich Little | 2,347.87 | 350.00 | 300.00 | 50.00 |
| 2310 - Ryan McGee | 2,815.96 | 1,800.00 | 1,650.00 | 150.00 |
| Totals | 17,276.55 | 5,865.00 | 5,110.00 | 728.17 |

* denotes unit is excluded from occupancy calculations

© ResMan, LLC

Exhibit A

Schedule 6

List of Environmental Reports

1. Phase I Environmental Site Assessment, dated November 23, 2021, prepared by Nova Group, GBC as Project HP21-10427.

EXHIBIT A

Compliance Certificate

This Compliance Certificate is prepared pursuant to that certain Loan Agreement (the "Agreement"), dated as of December 21, 2021, by DREXEL FLATS ACQUISITION LLC ("Borrower 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Borrower 2", and together with Borrower 1, individually and collectively, jointly and severally, "Borrower"), each a Delaware limited liability company, in favor of READYCAP COMMERCIAL, LLC, for the month ended ____________________ (the "Period").

The undersigned, [the chief financial officer] of Borrower, pursuant to the Agreement, does hereby certify to Lender as follows: (All capitalized terms used herein shall, unless otherwise specified, have the meanings ascribed in the Agreement.)

1. **NO DEFAULTS.** No Event of Default has occurred and is continuing under the Agreement. The financial statements delivered in connection with this Certificate for the Period, a copy of which are annexed hereto, are accurate and complete and fairly represent the financial conditions of Borrower as of the above date (if not, explain).

2. **COMPLIANCE.**

(a) Borrower has complied, and is in compliance, with all of the terms, covenants and provisions of the Agreement (if not, explain).

(b) The Debt Yield Ratio of the Property is ___ percent (__%), and Borrower's calculation of the Debt Yield Ratio is attached hereto as Schedule 1.

(c) Guarantor has complied, and is in compliance, with the Net Worth and Liquidity Requirements (if not, explain).

________________________________ ________________________________

SIGNATURE: DATE:
TITLE:

EXHIBIT B

Deposit Account Information

| | |
|---|---|
| Bank: | Signature Bank |
| Location: | 201 Mission Street, 26th Floor, San Francisco, CA 94105 |
| Account No.: | 1504649535 |

EXHIBIT C

Disbursement Conditions

The following are the applicable disbursement conditions that must be satisfied in connection with the disbursements of each of the Reserve Funds specified below:

**For Capital Expenditures Reserve Funds**

1. No Event of Default exists (unless waived by Lender), other than a non-monetary Event of Default (including, but not limited to, the failure of Borrower or Guarantor to comply with any of the reporting requirements set forth in Section 5.5 hereof) beyond any applicable notice and cure periods and for which Lender has not previously furnished Borrower with written notice (it being the intention of the Parties that such a non-monetary Event of Default, as aforesaid, shall not prohibit the funding of a Draw Request as long as all of the other applicable Disbursement Conditions have been satisfied).

2. The disbursement shall be in accordance with the Approved Capital Expenditures Budget, or otherwise approved by Lender.

3. For the initial disbursement of Capital Expenditures Reserve Funds (but only if and as required by Lender) for Capital Expenditures not involving "soft costs" and/or "demolition costs," Borrower shall have also provided Lender with a copy of the executed general construction contract and other construction contracts (and W-9's for such general contractor and each such other construction contractor), as and if applicable, for such Capital Expenditures, which general construction contract (and the general contractor thereunder) and such other construction contracts (and the other contractors thereunder) shall be acceptable to Lender.

4. For the initial disbursement of Capital Expenditures Reserve Funds (but only if and as required by Lender) for Capital Expenditures involving "demolition costs," Borrower shall have also provided Lender with a copy of the executed demolition contract (and W-9's for the demolition contractor) for such Capital Expenditures, which demolition contract (and the demolition contractor thereunder) shall be acceptable to Lender.

5. Borrower shall have delivered copies of the applicable bills, invoices (for amount in excess of $5,000.00 and other documentation reasonably required by Lender (including with respect to any cost for labor or materials furnished to the Property in excess of $50,000, sworn conditional or unconditional lien waivers from any Person providing such labor or materials, as well as proof of payment for prior Draw Requests or prior reimbursements, budget trackers and change orders, and, with respect to completion of the work covered by a particular contract, an unconditional lien waiver from the Person providing such labor or materials) in order to establish that the costs are reasonable and are substantially in accordance with market rates, that the work relating thereto has been completed, and that such amounts are then due.

6. Borrower shall have delivered copies of receipts, or cancelled checks or wire confirmations or bank statements identifying payment, for the Capital Expenditures covered by the Capital Expenditures Reserve Funds disbursed to Borrower pursuant to the immediately

preceding Draw Request therefor (and proof of such payment shall be provided to Lender in one complete package with each item presented in the same order as previously submitted invoices),

7. Lender shall have, as more particularly described in, and subject to, Section 3.15 hereof, inspected the Property in order to confirm that the Capital Expenditures have been completed and installed (and Borrower will pay all of Lender's actual, out-of-pocket costs, fees and expenses associated with such inspections, which may include fees and costs of an independent, third-party inspector).

8. If Capital Expenditure Reserve Funds have not been disbursed within ten (10) Business Days of the submission of a Draw Request, and in order to not delay funding of such Draw Request for missing items, Borrower, at Borrower's option, may submit a supplemental request in the form attached hereto as Exhibit I after such ten (10) Business Day period, for a waiver of such missing items, which waiver may be granted or denied in Lender's sole, but reasonable discretion.

**For Replacement Costs Reserve Funds**

1. No Event of Default exists, other than a non-monetary Event of Default (including, but not limited to, the failure of Borrower or Guarantor to comply with any of the reporting requirements set forth in Section 5.5 hereof) beyond any applicable notice and cure periods and for which Lender has not previously furnished Borrower with written notice (it being the intention of the Parties that such a non-monetary Event of Default, as aforesaid, shall not prohibit the funding of a Draw Request as long as all of the other applicable Disbursement Conditions have been satisfied).

2. Lender shall have reviewed and approved of the Draw Request (which shall set forth the details concerning the Replacement Costs).

3. Lender shall have, as more particularly described in, and subject to, Section 3.15 hereof, inspected the Property in order to confirm that the Replacements Costs at the Property have been completed and installed (and Borrower will pay all of Lender's actual, out-of-pocket costs, fees and expenses associated with such inspections, which may include fees and costs of an independent, third-party inspector).

EXHIBIT D

Excess Cash Flow Account Information

| | |
|---|---|
| Bank: | KeyBank N.A. |
| Location: | 127 Public Square, Cleveland, OH. 44114 |
| ABA: | 041001039 |
| Account Name: | KCM Payment Clearings |
| Account No.: | 359951013036 |
| Contact: | Account Manager/913-317-4327 |
| Reference: | Loan Number 202024384 |

# EXHIBIT E

## Definition of Single Purpose Entity

A "Single Purpose Entity" is an entity that:

(a) has not and will not and has organizational documents that provide that it has not and will not:

(1) engage in any business or activity other than the ownership, leasing, sale, refinancing, operation and maintenance of the Property, and activities incidental thereto;

(2) acquire or own any assets other than (i) the Property, and (ii) such incidental personal property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(3) merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, except as otherwise permitted under the Loan Documents, transfer, or otherwise dispose of all or substantially all of its assets or change its legal structure;

(4) fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under applicable Legal Requirements of the jurisdiction of its organization or formation, or except as permitted under the Loan Documents, amend, modify, terminate or fail to comply with the provisions of its organizational documents without Lender's prior written consent;

(5) own any subsidiary or make any investment in, any Person (other than cash and investment-grade securities, issued by an entity that is not an affiliate of or subject to common ownership with such entity);

(6) except as contemplated by the Loan Documents, commingle its funds or assets with the funds or assets of any other Person;

(7) incur any indebtedness (including guaranteeing any obligation) other than (i) the Indebtedness and, with respect to Borrower 2 only, the Exchange Loan, (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than thirty (30) days past the date incurred and paid on or prior to such date unless being contested in good faith by Borrower, and/or (iii) permitted equipment leases; provided however, the aggregate amount of the indebtedness described in (ii) and (iii) shall not exceed at any time two percent (2%) of the aggregate outstanding principal amount of the Indebtedness and the indebtedness evidenced and secured by the Loan Documents. No indebtedness other than the Indebtedness and the indebtedness evidenced and secured by the Loan Documents may be secured by the Property;

(8) fail to maintain all of its books, records, financial statements and bank accounts

separate from those of any other Person. Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet;

(9) enter into any contract or agreement with any partner, member, shareholder, principal or affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(10) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(11) assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(12) make any loans or advances to any Person;

(13) fail to file its own tax returns (unless prohibited by applicable Legal Requirements from doing so);

(14) fail to (i) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (ii) conduct its business solely in its own name, (iii) hold its assets in its own name or (iv) correct any known misunderstanding regarding its separate identity;

(15) fail to endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, provided, however, that the foregoing shall not be interpreted so as to require any capital contributions from any Person to such Person);

(16) without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, the prior unanimous written consent of its board of directors or managers, as applicable, (i) file or consent to the filing of any bankruptcy petition, either voluntary or involuntary, (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, (iv) make an assignment for the benefit of creditors or (v) take any action to consolidate or merge Borrower with or into any Person, or sell all or substantially all of the assets of Borrower, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Borrower or a substantial part of its property, or admit in writing Borrower's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate Borrower;

(17) fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(18) fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds or fail to maintain a sufficient number of employees in light of its contemplated business operations (in each case to the extent there exists sufficient cash flow from the Property to do so provided, however, that the foregoing shall not be interpreted so as to require any capital contributions from any Person to such Person);

(19) acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable; or

(20) identify its partners, members, shareholders or other affiliates, as applicable, as a division or part of it.

(b) if such entity is a Single Member LLC (as defined below), its organizational documents shall provide that, as long as any portion of the Indebtedness remains outstanding, upon the occurrence of any event that causes the sole member of such Single Member LLC to cease to be a member of such Single Member LLC (other than (y) upon an assignment by such member of all of its limited liability company interest in such Single Member LLC and the admission of the transferee, if permitted pursuant to the organizational documents of such Single Member LLC and the Loan Documents, or (z) the resignation of such member and the admission of an additional member of such Single Member LLC, if permitted pursuant to the organizational documents of such Single Member LLC and the Loan Documents), **NEIL O'HALLORAN** shall, without any action of any Person and simultaneously with the last remaining member of the Single Member LLC ceasing to be a member of the Single Member LLC, automatically be admitted as a member of the Single Member LLC (the "Special Member") and shall preserve and continue the existence of the Single Member LLC without dissolution thereof; and

(c) if such entity is a Single Member LLC, its organizational documents shall also provide that for so long as any portion of the Indebtedness is outstanding, (i) no Special Member may resign or transfer its rights as Special Member unless a successor Special Member has been admitted to such Single Member LLC as a Special Member; and (ii) such entity has not and will not have any obligation to indemnify or indemnify the Special Member or any other equity owner, as the case may be, unless such an obligation was and is fully subordinated to the Indebtedness and, to the fullest extent permitted by law, will not constitute a claim against such entity in the event that cash flow in excess of the amount required to pay the Indebtedness is insufficient to pay such indemnity obligation.

For purposes hereof, the term "Single Member LLC" means a limited liability company that is a single member limited liability company.

# EXHIBIT F

## Disbursement Certification

**FORM OF DISBURSEMENT CERTIFICATION AND SCHEDULE**

Loan No. [____________________]

The undersigned ("**Affiant**") does hereby certify and affirm the following to [______________________] ("**Lender**") to induce Lender to disburse (the "**Disbursement**") the aggregate sum of $[______________________] from the [________________________________________] pursuant to the terms of that certain Loan Agreement ("**Loan Agreement**") originally entered into between [__________________________] ("**Borrower**") and ReadyCap Commercial, LLC, a Delaware limited liability company, dated ___________________. Any capitalized terms used herein and not otherwise defined herein shall have the meaning set forth in the Loan Agreement.

1. Affiant is the _____________ of Borrower, has actual knowledge as to the matters herein set forth and makes this Certification pursuant to Section _____ of the Loan Agreement.

2. No Default or Event of Default exists under any of the Loan Documents.

3. All of the statements, information, costs and amounts set forth herein or on Exhibit A attached hereto are true and correct in every material respect as of the date hereof. All of the Disbursement funds shall be used solely for the purposes of paying the costs of the [___________________________________] specified herein, or for reimbursing Borrower for such costs previously paid by Borrower.

4. All [________________________________________] to be funded by the requested Disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, have not been the subject of a previous Disbursement, and that all outstanding payables with respect thereto (other than those to be paid from the requested Disbursement) have been paid in full.

5. Attached hereto as Exhibit A is a schedule of each contractor, subcontractor, materialman and/or person (each, a "**Payee**") to be paid (or for which Borrower is to be reimbursed for amounts previously paid by it to such Payee) from the proceeds of the Disbursement, the aggregate amount then payable to each such Payee, a description of the goods, work or services provided by each such Payee and related invoice numbers to be paid from the Disbursement.

6. Each Payee has been paid, or will be paid with the proceeds of the Disbursement, the amounts then due and payable to such Payee in connection with the goods, work or services specified on Exhibit A provided by each such Payee, and Borrower has obtained lien waivers from each such Payee with respect to such specified goods, work or services.

7. Each previous disbursement of [______________________________] was used to pay the costs of the [________________________________] identified in the Disbursement Certification and Schedule provided in connection with such previous disbursement.

Date: ________________________

[TO BE EXECUTED BY AN AUTHORIZED OFFICER, GENERAL PARTNER, MANAGING MEMBER OR SOLE MEMBER OF BORROWER, AS APPLICABLE]

EXHIBIT G

Organizational Chart

[attached]

## Drexel Flats - Organizational Chart




Exhibit A

EXHIBIT H

<u>Intentionally Omitted</u>

# EXHIBIT I

## Request For Waiver of Missing Items

### Request for Waiver of Missing Items

Loan # :________________________ Draw #:____________________

Property Name: ____________________ Draw Submission Date:__________

RWRS = Reserve Withdrawal Request Summary

| Borrower | | | Lender | | |
|---|---|---|---|---|---|
| Missing Item | Amount $ | Reason Missing | Temp Waiver | Perm Waiver | Lender Comments |
| **G702/Pay App Architect Signature** | $______ | __________ | o | o | __________ |
| Invoices | | | | | |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| Proof of Payment for Prior Draw | | | | | |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| Conditional Lien Waivers | | | | | |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| Change Orders | | | | | |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| RWRS Item # ________ | $______ | __________ | o | o | __________ |
| Financial and Guarantor Reporting | | | | | |
| ____________ | $______ | __________ | o | o | __________ |
| ____________ | $______ | __________ | o | o | __________ |
| ____________ | $______ | __________ | o | o | __________ |
| Post-Closing Requirements | | | | | |
| ____________ | $______ | __________ | o | o | __________ |
| ____________ | $______ | __________ | o | o | __________ |
| ____________ | $______ | __________ | o | o | __________ |



Exhibit A

EXHIBIT A TO EXHIBIT 1

# PROMISSORY NOTE

Up to $28,300,000.00 December 21, 2021

FOR VALUE RECEIVED, DREXEL FLATS ACQUISITION LLC ("Maker 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Maker 2", and together with Maker 1, individually and collectively, jointly and severally, "Maker"), each a Delaware limited liability company, promise to pay to the order of READYCAP COMMERCIAL, LLC, a Delaware limited liability company (together with any subsequent holder of this Note, and their respective successors and assigns, "Holder"), at such address as Holder may from time to time designate in writing, the maximum principal sum of up to TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00), together with interest thereon and all other sums due and/or payable under any Loan Document; such principal and other sums to be calculated and payable as provided in this Promissory Note (this "Note"). This Note is being executed and delivered in connection with, and is entitled to the rights and benefits of, that certain Loan Agreement of even date herewith between Maker and Holder (as amended, modified and supplemented and in effect from time to time, the "Loan Agreement"). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement.

With respect to the definition of "Maker", except where the context otherwise provides, (i) any representations contained herein or in any other Loan Document of Maker shall be applicable to each Maker, (ii) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Maker and shall require performance by all Makers, (iii) any negative covenants contained herein or in any other Loan Document shall be deemed to be covenants of each Maker, and shall be breached if any Maker fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Maker shall be deemed to be an Event of Default hereunder, and (v) any Indebtedness of Maker shall be deemed to include any Indebtedness of Makers, or any Indebtedness of any one of them.

Maker agrees to pay the principal sum of this Note together with interest thereon and all other sums due and/or payable under any Loan Document in accordance with the following terms and conditions:

1. **Interest Rate**. Interest shall accrue on the Principal Indebtedness at the Interest Rate (as defined below) commencing on the date of this Note. Interest shall be computed on the actual number of days elapsed based on a 360-day year. For purposes hereof, the following terms shall have the following respective meanings:

(a) "Alternate Index" shall mean a published floating rate index that Holder determines in its sole discretion (and in connection therewith, may take into consideration the recommendations of the Alternative Reference Rates Committee convened by the Federal Reserve Board and the Federal Reserve Bank of New York) that is: (i) then generally used by Holder in its floating rate commercial real estate loans similar to the Loan as an alternative to LIBOR; and (ii) administratively and commercially reasonable for Holder to implement, in each case, as determined by Holder in its sole discretion.

(b) "Alternate Index Rate" shall mean, with respect to each Interest Accrual Period, the per annum rate of interest of the Alternate Index, determined in accordance with the Interest Rate Conversion Conforming Changes (as defined below), plus the Spread Adjustment; provided, however, that in no event will the Alternate Index Rate be less than the zero.

(c) "Alternate Rate" shall mean, with respect to each applicable Interest Accrual Period, the per annum rate of interest equal to the sum of Alternate Index Rate plus the Spread; provided, however, that, for avoidance of doubt, the Alternate Rate shall never be less than the Spread.

(d) "Alternate Rate Loan" shall mean the Loan at such time as interest thereon accrues at a per annum rate of interest based on the Alternate Index Rate.

(e) "Early Opt-in Election" shall mean the occurrence of:

(i) a determination by Holder that at least five currently outstanding U.S. dollar-denominated commercial real estate loans originated and/or held by Holder at such time contain (as a result of amendment or as originally executed) as a benchmark interest rate, in lieu of LIBOR, an alternative index rate plus a spread adjustment; and

(ii) the election by Holder to declare that an Early Opt-in Election has occurred and the provision by the Holder of the Rate Election Notice.

(f) "Initial Interest Accrual Period" means the period commencing on the Closing Date and continuing to and including January 9, 2022.

(g) "Interest Accrual Period" means the Initial Interest Accrual Period and thereafter each period running from and including a Payment Date (as defined below) to and including the calendar day preceding the next Payment Date during the term of the Loan.

(h) "Interest Determination Date" shall mean: (i) with respect to the Initial Interest Accrual Period, the date that is two (2) Business Days before the Closing Date; and (ii) with respect to any other Interest Accrual Period, the Reference Time.

(i) "Interest Rate" shall mean, with respect to each Interest Accrual Period: (a) an interest rate per annum equal to: (i) for a LIBOR Loan, the LIBOR Rate, determined as of the Interest Determination Date immediately preceding the commencement of such Interest Accrual Period; (ii) for a Prime Rate Loan, the Prime Rate, determined as of the Interest Determination Date immediately preceding the commencement of such Interest Accrual Period; and (iii) for an Alternate Rate Loan, the Alternate Rate, determined in accordance with the Interest Rate Conversion Conforming Changes; or (b) when applicable pursuant to this Note or any other Loan Document, the Default Rate (as defined below).

(j) "Interest Rate Conversion" shall mean any conversion of the Loan to or from a LIBOR Loan to or from an Alternate Rate Loan or to or from a Prime Rate Loan in accordance with the terms and conditions of this Note.



Exhibit B

EXHIBIT A TO EXHIBIT 1

(k) "Interest Rate Conversion Conforming Changes" shall mean, with respect to any conversion hereunder of the Loan from a LIBOR Loan to an Alternate Rate Loan, any technical, administrative or operational changes (including changes to the definition of "Prime Index Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that Holder decides may be appropriate to reflect the adoption and implementation of such conversion and to permit the administration thereof by Holder in a manner substantially consistent with market practice (or, if Holder decides that adoption of any portion of such market practice is not administratively feasible or if Holder determines that no market practice for the administration of such conversion exists, in such other manner of administration as Holder decides is reasonably necessary in connection with the administration of the Loan).

(l) "LIBOR" means, with respect to any Interest Accrual Period, the rate per annum (rounded upwards, if necessary, to the nearest one-sixteenth (1/16th) of one percent (1%)) reported on the Interest Determination Date by the Intercontinental Exchange Benchmark Administration Limited (as published by Bloomberg or other firm selected by Holder) as the non-reserve adjusted London Interbank Offered Rate for U.S. dollar deposits having a one (1) month term and in an amount of $1,000,000.00 or more (all as determined by Holder in its sole but good faith discretion). In the event that (i) more than one such rate is provided, the average of such rates shall apply, or (ii) no such rate is published, then LIBOR shall be determined from such comparable financial reporting company as Holder in its sole but good faith discretion shall determine. LIBOR for any Interest Accrual Period shall be adjusted from time to time by increasing the rate thereof to compensate Holder for any aggregate reserve requirements (including, without limitation, all basic, supplemental, marginal and other reserve requirements and taking into account any transitional adjustments or other scheduled changes in reserve requirements during any Interest Accrual Period) which are required to be maintained by Holder with respect to "Eurocurrency Liabilities" (as presently defined in Regulation D of the Board of Governors of the Federal Reserve System) of the same term under Regulation D, or any other regulations of a Governmental Authority having jurisdiction over Holder of similar effect. The establishment of LIBOR by Holder and Holder's calculation of the rate of interest applicable to this Note shall, in the absence of manifest error, be final and binding.

(m) "LIBOR Business Day" means any day on which banks are open for dealing in foreign currency and exchange in London, England.

(n) "LIBOR Floor" means ten and four tenths basis points (i.e., 0.104%).

(o) "LIBOR Loan" means the Loan at such time as interest thereon accrues at a per annum rate of interest based on the LIBOR Rate.

(p) "LIBOR Rate" shall mean the sum of (i) the greater of (A) LIBOR; and (B) the LIBOR Floor; and (ii) the Spread.

(q) "LIBOR Unavailability Conditions" shall mean the occurrence of one or more of the following: (i) Dollar deposits in an amount approximately equal to the then unpaid Principal Indebtedness are not generally available at such time in the London interbank Eurodollar market for deposits in Eurodollars, (ii) Holder shall have determined that by reason of

circumstances affecting the interbank Eurodollar market or otherwise, adequate and reasonable means do not exist for ascertaining LIBOR in accordance with the definition thereof (including if fewer than two (2) LIBOR quotations are available), (iii) the Interest Rate for a LIBOR Loan would be in excess of the maximum interest rate that Maker may by law pay, (iv) LIBOR does not fairly and accurately reflect the costs to Holder of making or maintaining the Loan, (v) the adoption of any requirement of law or any change therein or in the interpretation or application thereof shall thereafter make it unlawful for Holder to maintain a LIBOR Loan as contemplated hereunder, (vi) LIBOR is no longer a widely recognizable benchmark rate for newly originated credit facilities in the United States loan market, (vii) the regulatory supervisor for the administrator of LIBOR or any Governmental Authority having jurisdiction over Holder has made a public statement or published information announcing that LIBOR is no longer representative or may no longer be used, (viii) a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR, (ix) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the central bank for the currency of LIBOR, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR, or (x) in connection with the exercise of any extension option hereunder, Holder anticipates the occurrence of any of the events described in clauses (i) through (x) above prior to the Initial Maturity Date (as extended pursuant to the exercise of such extension option).

(r) "Minimum Interest Amount" means an amount equal to One Million Six Hundred Nineteen Thousand and 00/100 Dollars ($1,619,000.00), which is an amount equal to twenty-one (21) months of Interest on the Initial Advance (determined using the forward-looking LIBOR curve, while also taking into account the LIBOR Floor, plus the Spread), as determined by Holder in its sole but reasonable discretion, which determination shall be conclusive and binding on Maker absent manifest error.

(s) "Minimum Interest Fee" means as of the date of determination, an amount equal to the difference (but only if positive) between (a) the Minimum Interest Amount; and (b) the aggregate amount of Interest previously paid by Maker to Holder with respect to the Loan (as determined by Holder in its sole but reasonable discretion, which determination shall be conclusive and binding on Maker absent manifest error).

(t) "Prime Index" shall mean the rate of interest per annum published in The Wall Street Journal from time to time as the "Prime Rate". If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" will be used, and such average will be rounded up to the nearest 1/1000th of one percent (0.001%). If The Wall Street Journal ceases to publish the "Prime Rate," Holder will select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Holder will select a comparable interest rate index.

(u) "Prime Index Rate" shall mean, with respect to each Interest Accrual Period, the per annum rate of interest of the Prime Index, determined as of the Interest Determination Date immediately preceding the commencement of such Interest Accrual Period; provided that in no event will the Prime Index Rate be less than zero.

(v) "Prime Rate" shall mean, with respect to each Interest Accrual Period, the per annum rate of interest equal to the sum of the Prime Index Rate plus the Prime Rate Spread; provided, however, that such rate shall not be less than the Spread.

(w) "Prime Rate Loan" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Index Rate.

(x) "Prime Rate Spread" shall mean, in connection with any conversion of the Loan in accordance with the terms hereof to a Prime Rate Loan, the sum (expressed as the number of basis points and determined at the time of such conversion) of (i) the Spread, and (ii) the Spread Adjustment; provided that the Prime Rate Spread shall not be less than a spread resulting in the Interest Rate immediately after giving effect to the conversion to a Prime Rate Loan being at least equal to the Interest Rate immediately prior to conversion to a Prime Rate Loan, and in no event will the Prime Rate Spread be less than zero.

(y) "Rate Election Notice" shall mean written notice from Holder to Maker of (i) Holder's decision to implement an Interest Rate Conversion; or (ii) Holder's declaration of an Early Opt-in Election, which, in each case, shall set forth the new Interest Rate with respect to the Loan.

(z) "Reference Time" shall mean, with respect to any determination of the Interest Rate, (i) if the Interest Rate is based on the LIBOR Rate, 11:00 a.m. (London time) on the day that is two (2) London banking days preceding the first day of the related Interest Accrual Period, and (ii) if the Interest Rate is not based on the LIBOR Rate, the time determined by Holder in accordance with the Interest Rate Conversion Conforming Changes.

(aa) "Relevant Governmental Body" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

(bb) "Spread" means three hundred forty basis points (i.e., 3.40%).

(cc) "Spread Adjustment" shall mean, for any Interest Accrual Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Holder giving due consideration, if applicable, to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Alternate Index Rate by the Relevant Governmental Body at such time or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Alternate Index Rate for U.S. dollar-denominated commercial real estate loans at such time.

(dd) "Unadjusted Alternate Index Rate" shall mean the Alternate Index Rate excluding the Spread Adjustment.

2. **Payments; Maturity; Extension Option; Additional LIBOR Provisions.**

(a) Maker shall make the following payments to Holder:

(i) On the Closing Date, a payment of interest-only for the Initial Interest Accrual Period.

(ii) On February 10, 2022, and on the same calendar day of each calendar month thereafter (each, a "Payment Date") during the term of the Loan, Maker shall pay to Holder a monthly payment of interest-only in an amount equal to interest on the unpaid Principal Indebtedness calculated at the Interest Rate which has accrued through the last day of the Interest Accrual Period immediately preceding such Payment Date.

(iii) Commencing on the first Payment Date occurring subsequent to the First Extended Maturity Date (if the First Extended Maturity Date is extended pursuant to and in accordance with the terms, provisions, covenants and conditions of Section 2(d) hereof), Maker shall pay to Holder a monthly payment of principal and interest in an amount equal to interest on the unpaid Principal Indebtedness calculated at the Interest Rate which has accrued through the last day of the Interest Accrual Period immediately preceding such Payment Date, together with a principal payment based upon an amortization period of thirty (30) years, as determined by Holder.

(iv) The entire outstanding Indebtedness shall be due and payable on the Payment Date occurring in January, 2025 (the "Initial Maturity Date"), or on the First Extended Maturity Date or Second Extended Maturity Date (as defined below) if the Initial Maturity Date and, if applicable, the First Extended Maturity Date is extended pursuant to and in accordance with the terms, provisions, covenants and conditions of Section 2(c) and, if applicable, Section 2(d) hereof, as applicable, or on such earlier date resulting from acceleration of the Indebtedness by Holder.

(b) For purposes of making payments hereunder, but not for purposes of calculating Interest Accrual Periods, if the Payment Date of a given month shall not be a Business Day, then the Payment Date for such month shall be the preceding Business Day.

(c) The Maker may extend the Initial Maturity Date for a period of twelve (12) months (the "First Extended Maturity Date") upon the satisfaction of the following conditions:

(i) The Maker shall have delivered to Holder a written request to extend the term of the Loan, as aforesaid, not earlier than ninety (90) days, and not later than thirty (30) days, prior to the Initial Maturity Date;

(ii) The Maker shall have paid to Holder the Extension Fee on or before the Initial Maturity Date;



Exhibit B

EXHIBIT A TO EXHIBIT 1

(iii) No Event of Default and/or fact or condition having a Material Adverse Effect shall have previously occurred and be continuing at the time Holder receives the Maker's written request for the extension, nor on the Initial Maturity Date;

(iv) All representations and warranties under the Loan Agreement and the other Loan Documents shall be true and correct in all material respects as of the Initial Maturity Date, except to the extent that Holder accepted exceptions to such representations and warranties on the Closing Date;

(v) As of the Initial Maturity Date, the Loan to Value Ratio shall be not more than seventy-two and one half percent (72.5%), as determined by Holder in its sole and absolute discretion;

(vi) As of the Initial Maturity Date, not less than ninety-three percent (93%) of the Property shall be leased on the basis of the most recent rent roll for the Property and executed Leases (approved or deemed approved by Holder if and as required pursuant to the Loan Agreement) with the tenants in possession and having commenced paying rent, as determined by Holder in its sole and absolute discretion;

(vii) As of the Initial Maturity Date, the Debt Yield Ratio shall be not less than seven and three quarters percent (7.75%), as determined by Holder in its sole and absolute discretion;

(viii) [reserved];

(ix) The Interest Rate Protection Agreement shall be extended, or a new Interest Rate Protection Agreement shall be provided, at Maker's sole cost and expense, and with a "strike price" selected by Holder (in the same manner and on the same basis as the "strike price" for the initial Interest Rate Protection Agreement was selected), covering the period through and including the First Extended Maturity Date;

(x) [reserved];

(xi) Maker shall execute any agreements, documents or amendments to the Loan Documents reasonably requested by Holder to document such extension (which amendments shall not change the terms of this Note other than to extend the term hereof); and

(xii) Maker shall pay all actual costs and expenses incurred by Holder in connection with such extension of the Initial Maturity Date, including Holder's reasonable attorneys' fees.

For purposes of determining whether the Loan to Value Ratio and/or the Debt Yield Ratio conditions set forth above have been satisfied, Maker shall be permitted to pay to Holder an amount, as determined by Holder in its sole but reasonable discretion, by which it is necessary to reduce the principal amount of the Indebtedness so that the Loan to Value Ratio and/or the Debt Yield Ratio conditions set forth above are satisfied.

(d) The Maker may extend the First Extended Maturity Date for a period of twelve (12) months (the "Second Extended Maturity Date," and together with the First Extended Maturity Date and the Initial Maturity Date, the "Maturity Date") upon the satisfaction of the following conditions:

(i) The Maker shall have delivered to Holder a written request to extend the term of the Loan, as aforesaid, not earlier than ninety (90) days, and not later than thirty (30) days, prior to the First Extended Maturity Date;

(ii) The Maker shall have paid to Holder the Extension Fee on or before the First Extended Maturity Date;

(iii) No Event of Default and/or fact or condition having a Material Adverse Effect shall have previously occurred and be continuing at the time Holder receives the Maker's written request for the extension, nor on the First Extended Maturity Date;

(iv) All representations and warranties under the Loan Agreement and the other Loan Documents shall be true and correct in all material respects as of the First Extended Maturity Date, except to the extent that Holder accepted exceptions to such representations and warranties on the Closing Date;

(v) As of the First Extended Maturity Date, the Loan to Value Ratio shall be not more than seventy percent (70%), as determined by Holder in its sole and absolute discretion;

(vi) As of the First Extended Maturity Date, not less than ninety-three percent (93%) of the Property shall be leased on the basis of the most recent rent roll for the Property and executed Leases (approved or deemed approved by Holder if and as required pursuant to the Loan Agreement) with the tenants in possession and having commenced paying rent, as determined by Holder in its sole and absolute discretion;

(vii) As of the First Extended Maturity Date, the Debt Yield Ratio shall be not less than seven and three quarters percent (7.75%), as determined by Holder in its sole and absolute discretion;

(viii) Commencing on the First Extended Maturity Date, the monthly accrual for payments of interest at the Interest Rate payable by the Maker under the Loan shall be amended to include principal payments based upon an amortization period of thirty (30) years, as determined by Holder (with the first payment of principal and interest being due and payable on an accrual basis on the first Payment Date occurring after the First Extended Maturity Date);

(ix) The Interest Rate Protection Agreement shall be extended, or a new Interest Rate Protection Agreement shall be provided, at Maker's sole cost and expense, and with a "strike price" selected by Holder (in the same manner and on the same basis as the "strike price" for the initial Interest Rate Protection Agreement was selected), covering the period through and including the Second Extended Maturity Date;



Exhibit B

EXHIBIT A TO EXHIBIT 1

(x) Maker shall execute any agreements, documents or amendments to the Loan Documents reasonably requested by Holder to document such extension (which amendments shall not change the terms of this Note other than to extend the term hereof); and

(xi) Maker shall pay all actual costs and expenses incurred by Holder in connection with such extension of the First Extended Maturity Date, including Holder's reasonable attorneys' fees.

For purposes of determining whether the Loan to Value Ratio and/or the Debt Yield Ratio conditions set forth above have been satisfied, Maker shall be permitted to pay to Holder an amount, as determined by Holder in its sole but reasonable discretion, by which it is necessary to reduce the principal amount of the Indebtedness so that the Loan to Value Ratio and/or the Debt Yield Ratio conditions set forth above are satisfied.

(e) The Maker may also request a short-term administrative extension of the Initial Maturity Date, First Extended Maturity Date or Second Extended Maturity Date for a period of thirty (30) days in order to have additional time within which to refinance the Loan, upon the satisfaction of the following conditions:

(i) The Maker shall have delivered to Holder a written request for such short-term administrative extension, as aforesaid, not earlier than forty-five (45) days, and not later than ten (10) Business Days, prior to the Maturity Date;

(ii) The Maker shall have paid to Holder an administrative extension fee in an amount equal to Five Thousand and 00/100 Dollars ($5,000.00) at the same time that the written request for such short-term administrative extension, as aforesaid, is delivered to Holder;

(iii) No Event of Default and/or fact or condition having a Material Adverse Effect shall have previously occurred and be continuing at the time Holder receives the Maker's written request for the short-term administrative extension;

(iv) All representations and warranties under the Loan Agreement and the other Loan Documents shall be true and correct in all material respects as of the Maturity Date, except to the extent that Holder accepted exceptions to such representations and warranties on the Closing Date;

(v) Maker shall execute any agreements, documents or amendments to the Loan Documents reasonably requested by Holder to document such short-term administrative extension; and

(vi) Maker shall pay all costs and expenses incurred by Holder in connection with such short-term administrative extension of the Maturity Date, including Holder's reasonable attorneys' fees.

(f) Maker shall pay to Holder all losses, costs and expenses incurred or sustained by Holder (or expected to be incurred or sustained) in liquidating or re-employing funds from third parties to effect or maintain the Loan or any part thereof as a consequence of (i) the Loan, or any portion thereof, being repaid for any reason whatsoever on any date other than a



Exhibit B

EXHIBIT A TO EXHIBIT 1

Payment Date (including, without limitation, from Insurance Proceeds or Condemnation Proceeds); (ii) any default in the payment or prepayment of the Principal Indebtedness or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise); (iii) the conversion of the Loan from a LIBOR Loan to an Alternate Rate Loan or a Prime Rate Loan in accordance with Section 2(g) or (h) below, including, without limitation, such loss or expenses arising from interest or fees payable by Holder to lenders of funds obtained by it in order to maintain the LIBOR Rate hereunder; (iv) any increased costs that Holder may sustain in maintaining the Loan; (v) the reduction of any amounts received or receivable from Maker, in either case, due to the introduction of, or any change in, law or applicable regulation or treaty (including the administration or interpretation thereof), whether or not having the force of law, or due to the compliance by Holder with any directive, whether or not having the force of law, or request from any central bank or domestic or foreign governmental authority, agency or instrumentality have jurisdiction; and/or (vi) any other set of circumstances not attributable to Holder's acts (collectively, "Funding Losses") in each case incurred from time to time by Holder upon demand. Holder shall deliver to Maker a statement for any such sums to which Holder is entitled to receive pursuant to this Section 2(f), which statement shall be binding and conclusive absent manifest error. Payment of Funding Losses hereunder shall be in addition to any obligations of Maker to pay the Exit Fee, the Minimum Interest Fee and the other amounts required under Section 4(a) hereof.

(g) Subject to the terms and conditions of this Section 2(g), the Loan shall be a LIBOR Loan and bear interest at the LIBOR Rate. In the event that Holder shall have determined in its sole and absolute discretion (which determination shall be conclusive and binding upon Maker absent manifest error) that one or more LIBOR Unavailability Conditions exists, or upon the occurrence of an Early Opt-in Election, as applicable, then Holder shall have the sole and exclusive right at its election, to be exercised in its sole discretion, to convert the Loan from a LIBOR Loan to an Alternate Rate Loan based on the applicable Alternate Index Rate selected by Holder as provided in the definition thereof for all purposes hereunder or under any Loan Document. Such Alternate Rate shall become effective at the time set forth in the related Rate Election Notice provided to Maker without any amendment to this Note or further action or consent of Maker.

(h) In the event that Holder shall have determined in its sole and absolute discretion (which determination shall be conclusive and binding upon Maker absent manifest error) that one or more LIBOR Unavailability Conditions exists (or is reasonably expected by Holder to occur) and Holder has determined in its sole discretion that it is unable to convert the Loan to an Alternate Rate Loan in accordance with Section 2(g) hereof, Holder may, in its sole and absolute discretion elect to send a Rate Election Notice to Maker and convert the Loan to a Prime Rate Loan bearing interest at the Prime Rate effective at the time set forth in the related Rate Election Notice provided to Maker without any amendment to this Note or further action or consent of Maker. Notwithstanding any provision of this Note to the contrary, in no event shall Maker have the right to convert a LIBOR Loan to a Prime Rate Loan or an Alternate Rate Loan.

(i) If, pursuant to Section 2(h) hereof, the Loan has been converted to Prime Rate Loan and Holder shall determine (which determination shall be conclusive and binding upon Maker absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable (i.e., a LIBOR Unavailability Condition does not exist)

and LIBOR can be determined as provided in the definition of LIBOR as set forth herein, Holder shall send a Rate Election Notice to Maker and convert the Loan to a LIBOR Loan effective at the time set forth in the related Rate Election Notice provided to Maker without any amendment to this Note or further action or consent of Maker. Notwithstanding any provision of this Note to the contrary, in no event shall Maker have the right to convert a Prime Rate Loan to a LIBOR Loan or a LIBOR Loan to a Prime Rate Loan.

(j) If, pursuant to the terms of Section 2(g) hereof, the Loan has been converted to an Alternate Rate Loan but thereafter Holder shall determine (which determination shall be conclusive and binding upon Maker absent manifest error) that the Alternate Index Rate cannot be ascertained, or that the adoption of any requirement of law or any change therein or in the interpretation or application thereof, shall make it unlawful for Holder to maintain an Alternate Rate Loan as contemplated hereunder, or the Alternate Rate would be in excess of the maximum interest rate that Maker may by law pay, Holder shall send a Rate Election Notice to Maker. The Alternate Rate Loan shall be converted to a Prime Rate Loan effective at the time set forth in the related Rate Election Notice provided to Maker without any amendment to this Note or further action or consent of Maker.

(k) If, pursuant to the terms of this Section 2(k), the Loan has been converted to a Prime Rate Loan and thereafter Holder has determined in its sole discretion that LIBOR has been succeeded by an Alternate Index and such Alternate Index can be determined, then Holder shall have the sole and exclusive right, to be exercised in its sole discretion, to convert the Loan from a Prime Rate Loan to an Alternate Rate Loan in accordance with, and subject to satisfaction of the conditions set forth in, the provisions of Section 2(g) hereof, Holder shall send a Rate Election Notice to Maker, and the Loan shall be converted to an Alternate Rate Loan effective at the time set forth in the related Rate Election Notice provided to Maker without any amendment to this Note or further action or consent of Maker. Notwithstanding any provision of this Note to the contrary, in no event shall Maker have the right to elect to convert an Alternate Rate Loan to a Prime Rate Loan or a Prime Rate Loan to an Alternate Rate Loan.

(l) Holder shall promptly notify Maker of (i) any occurrence of a LIBOR Unavailability Condition or an Early Opt-in Election, as applicable; (ii) the implementation of any Alternate Rate; and (iii) the effectiveness of any Interest Rate Conversion Conforming Changes. Any determination, decision or election that may be made by Holder pursuant to this Section 2(l), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Maker.

(m) In connection with an Interest Rate Conversion, Holder shall have the right to make Interest Rate Conversion Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Interest Rate Conversion Conforming Changes shall become effective without any further action or consent of Maker. Maker hereby agrees to promptly pay to Holder, upon demand, any additional amounts necessary to compensate Holder for any reasonable costs incurred by Holder in making any Interest Rate Conversion, including, without limitation, any Funding Losses. Holder's notice of such costs, as certified to Maker, shall be conclusive absent manifest error



Exhibit B

EXHIBIT A TO EXHIBIT 1

(n) For the avoidance of doubt, and notwithstanding anything to the contrary herein, if a Securitization has occurred, the Maker hereby acknowledges and agrees that a party to such Securitization may have the right to process any modification, waiver or amendment with respect to this Note or the other Loan Documents that relates to: (i) any Alternate Index, Alternate Index Rate and Spread Adjustment that such party determines is desirable to reduce or eliminate a mismatch between any benchmark replacement and the benchmark replacement adjustment (if any) that is paid on the notes, securities or certificates, as applicable, in connection with such Securitization and the Interest Rate payable hereunder; and (ii) any corresponding changes to the Loan Documents to match any applicable benchmark conforming changes in such Securitization and/or to make any desirable Interest Rate Conversion Conforming Changes.

(o) If the introduction of, or any change in, any law, regulation or treaty, or in the interpretation thereof by any governmental authority charged with the administration or interpretation thereof, shall make it unlawful for Holder to maintain the Loan as a LIBOR Loan, or any portion thereof, or to fund the Loan, or any portion thereof, in Eurodollars in the London Interbank Market, then, (i) the Loan (or such portion of the Loan) shall thereafter bear interest at the Alternate Rate or the Prime Rate, as determined by Holder hereunder; and (ii) Maker shall pay to Holder the amount of Funding Losses (if any) incurred in connection with such conversion. The accrual of interest at the applicable Alternate Rate or the Prime Rate, as aforesaid, shall continue until such Payment Date, if any, as the situation described in this Section 2(o) is no longer in effect.

3. **Event of Default; Default Interest; Late Charge**. Upon the occurrence and during the continuance of an Event of Default, the Indebtedness shall (a) at Holder's option, become due and payable as provided in Article 8 of the Loan Agreement, and (b) bear interest at a per annum interest rate equal to the lesser of (i) the Maximum Amount (as defined below), and (ii) the Interest Rate plus five percent (5%) (the "Default Rate"). If Maker fails to pay any sums due under the Loan Documents on the date when the same is due (other than payment in full of the Indebtedness on the Maturity Date or earlier acceleration thereof in accordance with the Loan Documents), Maker shall pay to Holder upon demand a late charge on such sum in an amount equal to the lesser of (i) five percent (5%) of such unpaid amount, and (ii) the maximum late charge permitted to be charged under the laws of the State of where the Property is located (a "Late Charge"). The imposition of the Default Rate and/or the Late Charge can be waived by Holder from time-to-time, in its sole and absolute discretion (provided, however, that any such waiver by Holder shall not be construed to be a waiver of the right of Holder to impose the Default Rate and/or Late Charge upon the occurrence of any other or subsequent Event of Default). Maker will also pay to Holder, after an Event of Default occurs, in addition to the amount due and any Late Charges, all actual out-of-pocket costs of collecting, securing, or attempting to collect or secure this Note or any other Loan Document, including, without limitation, court costs and reasonable attorneys' fees (including reasonable attorneys' fees on any appeal by either Maker or Holder and in any bankruptcy proceedings).

4. **Prepayment**.

(a) Maker may prepay the Loan in whole, but not in part (except in connection with: (i) a principal reduction payment pursuant to and in accordance with Section 2(c) and, if applicable, Section 2(d) hereof, provided that all other conditions to the extension are otherwise satisfied to Holder's reasonable satisfaction; and (ii) the application of the Reserve Account Funds

pursuant to and in accordance with Section 3.9(b) of the Loan Agreement), at any time upon not less than thirty (30) days prior written notice to Holder, subject to payment of the Exit Fee and the Minimum Interest Fee (and any applicable Funding Losses).

(b) If any such prepayment is not made on the last day of an Interest Accrual Period, Maker shall also pay to Holder interest calculated at the Interest Rate that would have accrued on such prepaid Principal Indebtedness through the end of the Interest Accrual Period in which such prepayment occurs. No prepayment shall be permitted after 3:00 p.m., New York City time.

(c) Maker acknowledges that the provisions of this Section 4 were independently bargained for and constitute a specific material part of the consideration given by Maker to Holder for the making of the Loan.

(d) Notwithstanding any provision of this Note to the contrary, Maker's notice of prepayment in accordance with this Section 4 shall be revocable; provided Maker shall pay all costs and expense of Holder incurred as a result of, or in connection with, any such revocation.

5. **Method and Place of Payments; Application of Payments; Maker Obligations Absolute**.

(a) Except as otherwise specifically provided herein, all payments under this Note and the other Loan Documents shall be made to Holder not later than 3:00 p.m., New York City time, on the date when due, and shall be made in lawful money of the United States of America in federal or other immediately available funds to an address specified to Maker by Holder in writing, and any funds received by Holder after such time, for all purposes hereof, shall be deemed to have been paid on the next succeeding Business Day.

(b) All proceeds of payment, including any payment or recovery on the Property, shall be applied to the Indebtedness in such order and in such manner as Holder shall elect in Holder's discretion.

(c) Except as specifically set forth in any Loan Document, all sums payable by Maker under any Loan Document shall be paid without notice, demand, counterclaim (other than mandatory counterclaims), setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction.

6. **Security**. The obligations of Maker under this Note are secured by, among other things, the Security Instrument and Liens of the other Loan Documents granted in favor of Holder by Maker and/or encumbering or affecting the Property.

7. **Waivers**. To the extent permitted by applicable law, with respect to the amounts due pursuant to this Note or any other Loan Document, Maker waives the following: (a) all rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any State thereof; (b) demand, presentment, protest, notice of dishonor, notice of nonpayment, notice of protest, notice of intent to accelerate, notice of acceleration, suit against any party, diligence in collection of this Note and in the handling of securities at any time existing in connection herewith, and all other requirements

necessary to enforce this Note except for notices required by Governmental Authorities and notices required by the Loan Agreement; and (c) any further receipt by Holder or acknowledgment by Holder of any collateral now or hereafter deposited as security for the Loan. In addition, Maker agrees and acknowledges that no release of any security for the Loan or Indebtedness, or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Holder or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other Person who may become liable for the payment of all or any part of the Loan or Indebtedness, under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Maker shall be deemed to be a waiver of the obligation of Maker or of the right of Holder to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.

8. **Usury Savings Clause**. This Note and the other Loan Documents are subject to the express condition that at no time shall Maker be obligated or required to pay interest on the Indebtedness at a rate which could subject Holder to either civil or criminal liability as a result of being in excess of the maximum rate of interest designated by applicable laws relating to payment of interest and usury (the "Maximum Amount"). If, by the terms of this Note or the other Loan Documents, Maker is at any time required or obligated to pay interest on the Indebtedness at a rate in excess of the Maximum Amount, the Interest Rate shall be deemed to be immediately reduced to the Maximum Amount and all previous payments in excess of the Maximum Amount shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Holder for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Amount from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

9. **Modifications; Remedies Cumulative; Setoffs**. Holder shall not by any act, delay, omission or otherwise be deemed to have modified, amended, waived, extended, discharged or terminated any of its rights or remedies, and no modification, amendment, waiver, extension, discharge or termination of any kind shall be valid unless in writing and signed by Holder and Maker. All rights and remedies of Holder under the terms of this Note and applicable statutes or rules of law shall be cumulative, and may be exercised successively or concurrently. Maker agrees that there are no defenses, equities or setoffs with respect to the obligations set forth herein as of the date hereof, and to the extent any such defenses, equities, or setoffs may exist, the same are hereby expressly released, forgiven, waived and forever discharged. If Maker is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Maker," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Maker is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Maker" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing



Exhibit B

EXHIBIT A TO EXHIBIT 1

in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

10. **Severability**. Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Note shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

11. **Release**. Holder may, at its option, release any Property given to secure the Indebtedness, and no such release shall impair the obligations of Maker to Holder.

12. **Governing Law; Submission to Jurisdiction**.

(a) This Note shall be interpreted and enforced according to the laws of the State where the Property is located (without giving effect to rules regarding conflict of laws).

(b) Maker hereby consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and state where the Property is located with respect to any legal action or proceeding arising with respect to this Note and waives all objections which it may have to such jurisdiction and venue.

13. **Waiver of Jury Trial**. MAKER AND HOLDER TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING, INCLUDING, WITHOUT LIMITATION, ANY TORT ACTION, BROUGHT BY ANY PARTY HERETO WITH RESPECT TO THIS NOTE OR THE OTHER LOAN DOCUMENTS. EACH OF MAKER AND HOLDER AGREES THAT THE OTHER MAY FILE A COPY OF THIS WAIVER WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF THE OTHER IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY, AND THAT, TO THE FULLEST EXTENT THAT IT MAY LAWFULLY DO SO, ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN MAKER AND HOLDER SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

14. **Sales and Assignments**. Holder may assign, sell, securitize, participate, pledge and/or otherwise transfer all or any portion of Holder's right, title and interest in, to and under this Note and/or the other Loan Documents in one or more transactions as set forth in the Loan Agreement. Upon the transfer of this Note, Maker hereby waiving notice of any such transfer, Holder may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under legal requirements given to Holder with respect thereto, and Holder shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Holder shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.



Exhibit B

EXHIBIT A TO EXHIBIT 1

15. **Due on Sale; Due on Encumbrance**. Maker understands that in making the Loan, Holder is relying to a material extent upon the business expertise and/or net worth of Maker and, if Maker is also an entity, its partners, members, officers or principals and upon the continuing interest which Maker or its partners, members, officers or principals will have in the Property and in Maker, respectively, and that a violation of Section 6.1 of the Loan Agreement may significantly and materially alter or reduce Holder's security for this Note. Accordingly, in the event that a violation of Section 6.1 of the Loan Agreement occurs, then the same shall be deemed to increase the risk of Holder and Holder may then, or at any time thereafter, declare the entire Indebtedness immediately due and payable.

16. **Exculpation**. Subject to the qualifications below, Holder shall not enforce the liability and obligation of Maker to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Maker or its Affiliates, principals or shareholders, except that Holder may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Holder to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents, the Insurance Proceeds, the Condemnation Proceeds or any other collateral given to Holder pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Maker only to the extent of Maker's interest in the Property, the Rents, the Insurance Proceeds, the Condemnation Proceeds and any other collateral given to Holder, and Holder agrees that it shall not sue for, seek or demand any deficiency judgment against Maker in any such action or proceeding under or by reason of or under or in connection with any Loan Document. The provisions of this Section 16 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (b) impair the right of Holder to name Maker as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (c) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Holder thereunder; (d) impair the right of Holder to obtain the appointment of a receiver; (e) impair the enforcement of the Security Instrument; (f) constitute a prohibition against Holder to seek a deficiency judgment against Maker in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Holder to exercise its remedies against all of the Property; or (g) constitute a waiver of the right of Holder to enforce the liability and obligation of Maker by money judgment or otherwise, in each case to the extent of any Losses incurred by Holder arising out of or in connection with the following (each, a "Recourse Liability" and collectively, the "Recourse Liabilities"):

(i) fraud, intentional misrepresentation, or willful misconduct by Maker or Guarantor in connection with the Loan;

(ii) the breach of any representation, warranty, covenant or indemnification provision in any Loan Document concerning Environmental Laws or Hazardous Substances, and any indemnification of Holder with respect thereto contained in any Loan Document;

(iii) any act of material physical waste of the Property or any portion thereof, or, during the continuance of any Event of Default, the removal or disposal of any portion



Exhibit B

EXHIBIT A TO EXHIBIT 1

of the Property, provided, however, that no liability under this clause (iii) shall arise to the extent Operating Income from the Property is insufficient to prevent such material physical waste, and it being agreed that no member or principal of Borrower shall be required to make additional capital contributions to Borrower to prevent any such material physical waste;

(iv) the misapplication, misappropriation, or conversion by Maker, Guarantor, or any Affiliate of either of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Condemnation Proceeds received in connection with any Taking or (C) any Rents or security deposits;

(v) failure to pay any real estate taxes, assessments or other impositions, or any part thereof, heretofore or hereafter imposed upon or in respect of the Property which become a Lien or charge upon Maker or the Property in the event there was sufficient Operating Income available to pay the same, it being agreed that no member or principal of Borrower shall be required to make additional capital contributions to Borrower to pay any real estate taxes, assessments or other impositions, or any part thereof;

(vi) failure to maintain or cause to be maintained any insurance policies with respect to the Property as required under the Loan Documents in the event there was sufficient Operating Income available to pay the same, it being agreed that no member or principal of Borrower shall be required to make additional capital contributions to Borrower to maintain or cause to be maintained any insurance policies;

(vii) failure of Maker to use the Reserve Funds disbursed pursuant to a Disbursement Certification for their intended purposes;

(viii) failure of Maker to follow and comply with the Cash Management Protocols;

(ix) failure of Maker to use the Working Capital Funds for the purposes set forth in Section 3.4(e) of the Loan Agreement;

(x) failure to pay to Holder all actual costs and expenses, including reasonable attorneys' fees and expenses, incurred in collecting any amount due and owing under the Loan Documents and/or in exercising any rights or remedies against the Property, but only in the event Maker and/or Guarantor (or any other person acting at the direction of Maker and/or Guarantor) is contesting any such collection efforts and/or the exercise of any such rights or remedies in bad faith (as determined by a court of competent jurisdiction);

(xi) any violation by Maker of the covenant to remain a Single-Purpose Entity contained in Section 6.3 of the Loan Agreement, unless the same shall constitute as Full Recourse Event hereunder; or

(xii) criminal acts of the Maker or Guarantor which result in the seizure or forfeiture of all or any portion of the Property.

Notwithstanding anything to the contrary in this Note or any of the Loan Documents, (A) Holder shall not be deemed to have waived any right which Holder may have under Section 506(a), 506(b),

1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Indebtedness or to require that all collateral shall continue to secure all of the Indebtedness in accordance with the Loan Documents, and (B) Holder's agreement not to pursue personal liability of Maker as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Indebtedness shall be fully recourse to Maker in the event that one or more of the following occurs (each, a "Full Recourse Event"): (1) any voluntary Transfer of title to all or any portion of the real property comprising the Property by Maker or any voluntary Transfer of direct or indirect equity interests in Maker, in each of the foregoing cases, in violation of the Loan Documents; (2) Maker fails to obtain Holder's prior written consent to any mezzanine financing or financing secured, in whole or in part, by the Property; (3) any violation by Maker of the covenant to remain a Single-Purpose Entity contained in Section 6.3 of the Loan Agreement that is cited as a material factor in the substantive consolidation of Maker with any Affiliate of Maker; (4) Maker or Guarantor files a voluntary petition under the U.S. Bankruptcy Code or any other federal or state bankruptcy or insolvency law, (5) Guarantor, or any Affiliate, officer, director, or representative of Maker or Guarantor, files or acquiesces in the filing of, or Maker acquiesces in the filing of, an involuntary petition under the U.S. Bankruptcy Code or any other federal or state bankruptcy or insolvency law against Maker, or (6) any Maker partitions the Property, by legal action or otherwise, or consents to or otherwise acquiesces in any partition of the Property, by legal action or otherwise, without Holder's prior written consent.

17. **Notice**. All notices or other written communications hereunder shall be delivered in accordance with Section 11.6 of the Loan Agreement.

[Signature on the following page]



Exhibit B

EXHIBIT A TO EXHIBIT 1

IN WITNESS WHEREOF, Maker has caused this Promissory Note to be properly executed as of the date first above written and has authorized this Promissory Note to be dated as of the day and year first above written.

**MAKER:**

DREXEL FLATS ACQUISITION LLC, a
Delaware limited liability company

By: ____________________
Name: Ira Mondry
Title: Authorized Signatory

DREXEL FLATS ACQUISITION TIC LLC, a
Delaware limited liability company

By: ____________________
Name: Ira Mondry
Title: Authorized Signatory

**ALLONGE TO PROMISSORY NOTE**

This Allonge is attached to and forms a part of that certain Promissory Note dated December 21, 2021, in the original principal amount of up to TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00), made by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, ("***Borrower 1***"), and **DREXEL FLATS ACQUISITION TIC LLC** a Delaware limited liability company, ("***Borrower 2***", and together with Borrower 1, individually and collectively, jointly and severally, "***Borrower***"), payable to the order of **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Lender***").

Pay to the order of **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company, having an address at 1320 Greenway Drive, Suite 560, Irving, Texas 75038, its successors, participants and assigns.

Dated: As of December 21, 2021.

[SIGNATURE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed by its duly authorized officer to be effective as of the day and year written above.

**LENDER:**

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company

By: M. Perez

Name: Melissa Perez

Title: Authorized Person

## ALLONGE TO PROMISSORY NOTE

This Allonge is attached to and forms a part of that certain Promissory Note dated December 21, 2021, in the original principal amount of up to TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00), made by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, ("***Borrower 1***"), and **DREXEL FLATS ACQUISITION TIC LLC** a Delaware limited liability company, ("***Borrower 2***", and together with Borrower 1, individually and collectively, jointly and severally, "***Borrower***"), payable to the order of **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), as assigned by Original Lender to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Lender***"), and its successors, participants and assigns, pursuant to that certain Allonge to Promissory Note dated December 21, 2021.

Pay to the order of ______________________________, its successors, participants and assigns without recourse, representation or warranty, expressed or implied, except as set forth in that certain Uncommitted Master Repurchase Agreement dated as of December 10, 2015, between **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company and **SUTHERLAND WAREHOUSE TRUST**, a Delaware statutory trust, collectively as Sellers, and **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, as Buyer (as amended, restated, supplemented, assigned, or otherwise modified and in effect from time to time), as joined by **READY CAPITAL MORTGAGE DEPOSITOR II, LLC**, a Delaware limited liability company, pursuant to that certain Omnibus Joinder Agreement dated as of October 25, 2019, and that certain Omnibus Assignment of even date herewith.

Dated: As of ______________________.

**[SIGNATURE ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed by its duly authorized officer to be effective as of the day and year written above.

**LENDER:**

**READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company

By: ______________________
Name: Melissa Perez
Title: Authorized Person

2021122901226739 B: 15013 P: 1071
12/29/2021 09:11:50 AM Pgs: 20
Fee: $56.00
David B. Hooten, County Clerk
Oklahoma County - State of Oklahoma

**PREPARED BY, RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:**
ReadyCap Commercial LLC
Post Closing / Melissa Perez
1320 Greenway Drive, Suite 560
Irving, Texas 75038

Received: $28,300.00 MTG TAX
Rcpt# T21801864
Dated this 29th day of December, 2021.
Forrest "Butch" Freeman
Oklahoma Co. Treasurer
By KSTEVENS, Deputy

**Space Above This Line For Recorder's Use**

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

by

DREXEL FLATS ACQUISITION LLC,
a Delaware limited liability company

and

DREXEL FLATS ACQUISITION TIC LLC,
a Delaware limited liability company

(individually and collectively, jointly and severally, as Mortgagor)

in favor of

READYCAP COMMERCIAL, LLC,
a Delaware limited liability company

(as Mortgagee)

SECURE TITLE & ESCROW, LLC
4200 E. Skelly Drive, Suite 420
Tulsa, OK 74135

Dated: December 21, 2021

Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE MORTGAGOR UNDER THIS MORTGAGE.**



Exhibit C

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "Mortgage") is made as of December 21, 2021, by DREXEL FLATS ACQUISITION LLC ("Mortgagor 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Mortgagor 2", and together with Mortgagor 1, individually and collectively, jointly and severally, "Mortgagor"), each a Delaware limited liability company, each having an address at 187 S. Old Woodward, Suite 200, Birmingham, Michigan 48009, in favor of READYCAP COMMERCIAL, LLC, a Delaware limited liability company, whose address is 1320 Greenway Drive, Suite 560, Irving, Texas 75038 (together with its successors and assigns, "Mortgagee").

With respect to the definition of "Mortgagor", except where the context otherwise provides, (i) any representations contained herein or in any other Loan Document of Mortgagor shall be applicable to each Mortgagor, (ii) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Mortgagor and shall require performance by all Mortgagors, (iii) any negative covenants contained herein or in any other Loan Document shall be deemed to be covenants of each Mortgagor, and shall be breached if any Mortgagor fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Mortgagor shall be deemed to be an Event of Default hereunder, and (v) any Indebtedness of Mortgagor shall be deemed to include any Indebtedness of Mortgagors, or any Indebtedness of any one of them.

## RECITALS

WHEREAS, Mortgagor has requested that Mortgagee make the Loan (as hereinafter defined) to Mortgagor. As a condition precedent to making the Loan, Mortgagee has required that Mortgagor execute and deliver this Mortgage to Mortgagee;

WHEREAS, Mortgagor and Mortgagee have entered into that certain Loan Agreement dated as of the date hereof (said Loan Agreement, as modified and supplemented and in effect from time to time, the "Loan Agreement"), which Loan Agreement provides, among other things, for Mortgagee to advance to Mortgagor the maximum principal amount of TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00) (the "Loan"); and

WHEREAS, it is a condition to the obligation of Mortgagee to extend credit to Mortgagor pursuant to the Loan Agreement that Mortgagor execute and deliver this Mortgage.

## GRANT

NOW, THEREFORE, in consideration of the making of the Loan by Mortgagee to Mortgagor and the covenants, agreements, representations and warranties set forth in the Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and for the purpose of securing the payment and performance of the following (collectively, the "Loan Obligations"): (a) all principal (including, without limitation,



Exhibit C

EXHIBIT A TO EXHIBIT 1

any advance to Mortgagor now or hereafter made), interest thereon and all other sums due and/or payable, and all obligations owing by Mortgagor, under any Loan Document and amendments, modifications, extensions, substitutions, exchanges and renewals thereof (each of which shall enjoy the same priority as the advance made on the Closing Date as evidenced by the Note); and (b) all covenants, agreements and other obligations of Mortgagor under the Loan Documents;

Mortgagor hereby irrevocably grants, bargains, sells, releases, conveys, warrants, assigns, transfers, mortgages, pledges, sets over, confers and confirms unto Mortgagee, its successors and assigns, with power of sale, to have and to hold forever for the security and benefit of Mortgagee and its successors and assigns, all of Mortgagor's right, title and interest in and to the following property, rights, interests and estates, now existing or hereafter coming into existence (the property, rights, interests and estates hereinafter described are collectively referred to herein as the "Property"): (i) all the land located in the County and State identified on Exhibit A attached hereto, as more particularly described on such Exhibit A (the "Land"), (ii) the Accounts, (iii) the Account Collateral, (iv) the Appurtenant Rights, (v) the Contracts, (vi) the Equipment, (vii) the Improvements, (viii) the Instruments, (ix) the Inventory, (x) the General Intangibles, (xi) the Leases, (xii) the Permits (to the fullest extent assignable), (xiii) the Rents, (xiv) the Proceeds, (xv) the Chattel Paper (including Electronic Chattel Paper and Tangible Chattel Paper), Commercial Tort Claims, Deposit Accounts, Documents, Goods, Investment Property, Letter of Credit Rights, Payment Intangibles and Supporting Obligations (as all such terms in this clause (xv) are defined in the UCC), and (xvi) any and all other rights of Mortgagor in and to the items set forth in clauses (i) through (xv) above, all whether now owned or hereafter acquired, and all other property which is or hereafter may become subject to a Lien in favor of Mortgagee pursuant to any Loan Document.

TO HAVE AND TO HOLD the Property and all parts thereof unto Mortgagee, its successors and assigns, for the benefit of Mortgagee, their successors and assigns forever;

PROVIDED, HOWEVER, that these presents are upon the express condition that, if Mortgagor shall pay or cause to be paid to Mortgagee all sums due Mortgagee with respect to the Loan under the Loan Documents and keep, perform and observe all the covenants and promises in each of the Loan Documents, all without fraud and delay, then this Mortgage, and all the properties, interests, and rights hereby granted, bargained, and sold shall cease, terminate and be void and Mortgagor shall instruct Mortgagee to effect a full and proper termination and release; otherwise the same shall remain in full force and effect.

TO PROTECT THE SECURITY OF THIS MORTGAGE, MORTGAGOR HEREBY COVENANTS AND AGREES AS FOLLOWS:

## ARTICLE 1
## DEFINITIONS

Section 1.1. Certain Defined Terms. For all purposes of this Mortgage, all capitalized terms shall have the meaning ascribed thereto in the Loan Agreement or the Note, as applicable, unless defined herein, and:



Exhibit C

EXHIBIT A TO EXHIBIT 1

"Account Collateral" means the Reserve Accounts (as defined in the Loan Agreement), together with all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Reserve Accounts, all interest, dividends, cash, instruments, investment property and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing.

"Accounts" means all of Mortgagor's "accounts," as such term is defined in the UCC.

"Appurtenant Rights" means all easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights, air rights, development rights and powers, and, to the extent now or hereafter owned by Mortgagor, all minerals, flowers, shrubs, crops, trees, timber and other emblements now or hereafter appurtenant to, or used in connection with, or located on, under or above the Land or any part or parcel thereof, and all "as extracted collateral" (as defined in the UCC), and all ground leases, subleases, estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversions, and remainders whatsoever, in any way belonging, relating or appertaining to the Land or any part thereof.

"Contracts" means, collectively, (a) all contracts between Mortgagor and third parties in connection with the management, construction (including, but not limited to, plans and specifications and architect agreement(s)), repair, renovation, use, operation or maintenance of the Property, in each case as the same may thereafter from time to time be amended or modified; and (b) all warranties, guarantees, and other rights of Mortgagor or Manager, direct and indirect, against manufacturers, dealers, suppliers, and others in connection with the above contracts and agreement or the work done or to be done and the materials supplied or to be supplied to or for the Property.

"Equipment" means all of Mortgagor's "equipment," as such term is defined in the UCC, and, to the extent not included in such definition, all fixtures, appliances, machinery, "software" (as defined in the UCC), furniture, furnishings, decorations, tools and supplies, now owned or hereafter acquired by Mortgagor, including without limitation, all beds, linens, radios, televisions, carpeting, telephones, cash registers, computers, electronic data-processing or other office equipment, lamps, glassware, restaurant and kitchen equipment, and building equipment, including, without limitation, all heating, lighting, incinerating, waste removal and power equipment, engines, pipes, tanks, motors, conduits, switchboards, security and alarm systems, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigeration, washing machines, dryers, stoves, refrigerators, ventilating, and communications apparatus, air cooling and air conditioning apparatus, escalators, elevators, ducts, and compressors, materials and supplies, and all other machinery, apparatus, equipment, fixtures and fittings now owned or hereafter acquired by Mortgagor wherever located, any portion thereof or any appurtenances thereto, together with all additions, replacements, parts, fittings, accessions, attachments, accessories, modifications and alterations of any of the foregoing.

"General Intangibles" means all of Mortgagor's "general intangibles," as such term is defined in the UCC, and, to the extent not included in such definition, all intangible personal property of Mortgagor (other than Accounts, Rents, Instruments, Inventory, money and Permits), including,





Exhibit C

EXHIBIT A TO EXHIBIT 1

without limitation, choses in action, settlements, judgments, contract rights, rights to performance (including, without limitation, rights under warranties) refunds of real estate taxes and assessments and other rights to payment of money, copyrights, trademarks, trade names, service marks, trade secrets, and patents, the goodwill associated with any of the foregoing, and all applications for any of the foregoing, in each case whether now existing or hereafter in existence.

"Improvements" means all buildings, structures and improvements of every nature whatsoever situated on the Land on the Closing Date or thereafter, including, without limitation, to the extent of Mortgagor's right, title or interest therein or thereto, all gas and electric fixtures, radiators, heaters, washing machines, dryers, refrigerators, ovens, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, antennas, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Land or said buildings, structures or improvements.

"Instruments" means all of Mortgagor's "instruments," as such term is defined in the UCC, and, to the extent not included in such definition, all instruments, chattel paper, documents or other writings obtained by Mortgagor from or in connection with the ownership or operation of the Property evidencing a right to the payment of money, including, without limitation, all notes, drafts, acceptances, documents of title, and policies and certificates of insurance, including but not limited to, liability, hazard, rental and credit insurance, guarantees and securities, now or hereafter received by Mortgagor or in which Mortgagor has or acquires an interest pertaining to the foregoing.

"Inventory" means all of Mortgagor's "inventory," as such term is defined in the UCC.

"Permits" means all licenses, registrations, permits, allocations, filings, authorizations, approvals and certificates used in connection with the ownership, operation, construction, renovation, use or occupancy of the Property, including, without limitation, building permits, business licenses, state health department licenses, food service licenses, liquor licenses, licenses to conduct business and all such other permits, licenses and rights, obtained from any Governmental Authority or private Person concerning the ownership, construction, operation, renovation, use or occupancy of the Property.

"Proceeds" means all of Mortgagor's "proceeds" as such term is defined in the UCC and, to the extent not included in such definition, all proceeds, whether cash or non-cash, movable or immovable, tangible or intangible (including Insurance Proceeds, Condemnation Proceeds, and proceeds of proceeds), from the Property, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of the Property (or any portion thereof) and all income, gain, credit, distributions and similar items from or with respect to the Property.

"Rents" means, with respect to the Property, all rents (whether denoted as advance rent, minimum rent, percentage rent, additional rent or otherwise), receipts, issues, income, royalties, profits, revenues, proceeds, bonuses, deposits (whether denoted as security deposits or otherwise), lease termination fees or payments, rejection damages, buy-out fees and any other fees made or to be made in lieu of rent, any award made hereafter to Mortgagor in any court

proceeding involving any tenant, lessee, licensee or concessionaire under any of the Leases in any bankruptcy, insolvency or reorganization proceedings in any state or federal court, and all other payments, rights and benefits of whatever nature from time to time due under the Leases.

"UCC" means the Uniform Commercial Code in effect in the jurisdiction in which the Property is located, as applicable.

Section 1.2. Interpretation of Defined Terms.

Singular terms shall include the plural forms and vice versa, as applicable, of the terms defined.

All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified or amended, and all replacements and substitutions therefor.

## ARTICLE 2
## COVENANTS AND AGREEMENTS OF MORTGAGOR

Section 2.1. Payment of Secured Loan Obligations; Incorporation by Reference. Mortgagor shall pay when due the principal, interest thereon and all other sums, charges, fees and other Loan Obligations due and/or payable under any Loan Document all as in accordance with the Loan Documents. All of the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

Section 2.2. Duty to Defend; Filing; Re-Filing; Etc.

(a) Mortgagor will forever defend the title to the Property and the validity and priority of the lien or estate hereof against the claims and demands of all Persons whomsoever.

(b) Mortgagor shall execute, acknowledge and deliver, from time to time, such further instruments as Mortgagee may reasonably require to accomplish the purposes of this Mortgage, and in the event Mortgagor shall fail to execute, acknowledge and/or deliver any such further instruments, Mortgagor hereby irrevocably authorizes and appoints Mortgagee as its attorney-in-fact, coupled with an interest, for such purpose.

(c) Mortgagor shall pay all intangible taxes, recording taxes, filing, registration, certification and recording fees, all refiling, re-registration and re-recording fees, and all expenses incident to the execution, filing, recording and acknowledgment of this Mortgage, any security agreement, mortgage, modification or amendment supplemental hereto and any document, instrument and agreement of further assurance, and all federal, state, county and municipal stamp and mortgage taxes and other taxes, duties, imposts, assessments and charges arising out of the execution, delivery, filing, registration and recording of the Note, this Mortgage or any of the other Loan Documents, any security agreement or mortgage or deed of trust modification or amendment supplemental hereto or any document instrument or agreement of further assurance (but excluding taxes imposed on or measured by the net income or receipts of Mortgagee or any franchise tax or similar tax imposed on Mortgagee).

(d) Mortgagor hereby indemnifies and holds Mortgagee harmless from any sales or use tax that may be imposed on Mortgagee by virtue of the Loan other than taxes imposed on the income, stock or assets of Mortgagee or any franchise tax or similar tax imposed on Mortgagee.

Section 2.3. No Transfer. Mortgagor shall not and shall not cause, allow, or permit, and shall prevent from occurring, a Transfer, other than a Permitted Transfer, a Permitted Encumbrance or as otherwise expressly permitted pursuant to the Loan Agreement or approved by Mortgagee in writing. In the event of any violation of this Section 2.3, Mortgagee may, at its option, accelerate and declare the outstanding Indebtedness immediately due and payable, without notice or demand, and whether or not Mortgagee shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any Loan Document with respect to any Property or all or any portion of the Property.

Section 2.4. Future Advances. In addition to securing the full, prompt and complete payment when due of the Indebtedness, this Mortgage shall also secure any and all other, further or future loans, advances and borrowings (if applicable under the Loan Agreement) made to or at the request of Mortgagor from or by Mortgagee and all other debts, obligations and liabilities of every kind and character of Mortgagor now or hereafter existing in favor of Mortgagee (including, without limitation, all indebtedness incurred or arising pursuant to any Loan Document) whether such debts, obligations or liabilities be direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether originally payable to any of such parties or to a third party, and subsequently acquired by any of such parties, and whether such debts, obligations and liabilities are evidenced by note, open account, overdraft, endorsement, surety agreement or otherwise, it being presently contemplated by Mortgagor and such other parties that Mortgagor may and will hereafter become indebted to Mortgagee in other, further and future sum or sums.

## ARTICLE 3
## ASSIGNMENT OF RENTS, ISSUES AND PROFITS

Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended that this Mortgage constitute a present, absolute assignment and not an assignment for additional security only. This Article 3 presently gives Mortgagee the right to collect Rents and to apply Rents in partial payment of the Loan Obligations and otherwise in accordance with the Loan Agreement. Mortgagor intends that the Rents and Leases be absolutely assigned and no longer be, during the term of this Mortgage, property of Mortgagor or Mortgagor's estate, as defined by 11 U.S.C. §541. If any law exists requiring Mortgagee to take actual possession of the Property (or some action equivalent to taking possession of the Property, such as securing the appointment of a receiver) for Mortgagee to "perfect" or "activate" the rights and remedies of Mortgagee as provided herein, Mortgagor waives the benefit of such law to the extent permitted by applicable law. Such assignment to Mortgagee shall not be construed to bind Mortgagee to perform any covenants, conditions or provisions contained in any Lease or otherwise impose any obligation upon Mortgagee, and notwithstanding this Mortgage, Mortgagor shall remain liable for any obligations undertaken by Mortgagor pursuant to any Lease. Notwithstanding the foregoing, subject to the terms of this Article 3 and the Loan Agreement, Mortgagee grants to Mortgagor a



Exhibit C

EXHIBIT A TO EXHIBIT 1

license, revocable as hereinafter provided, to operate and manage the Property and to collect, receive and use the Rents. If an Event of Default exists (except, for any Event of Default described in Section 8.1(h) of the Loan Agreement, for which the revocation hereinafter described shall be automatic and simultaneous with the occurrence of any such Event of Default), the license granted to Mortgagor herein may, at Mortgagee's election, be revoked by Mortgagee, and Mortgagee shall immediately be entitled to possession of all Rents then or thereafter payable during the continuance of any such Event of Default (including Rents past due and unpaid) whether or not Mortgagee enters upon or takes control of the Property. Any Rents collected by Mortgagor from and after the date on which an Event of Default occurred and is continuing shall be held by Mortgagor in trust for Mortgagee. Mortgagor hereby grants and assigns to Mortgagee the right, at Mortgagee's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by a receiver appointed pursuant to Section 6.3(b) to collect Rents with or without taking the actual possession of the Property or any equivalent action. During the existence of any Event of Default, Mortgagee may apply any Rents collected after the license granted herein is revoked in Mortgagee's sole and absolute discretion to pay the Loan Obligations in such order and in such manner as Mortgagee shall elect.

## ARTICLE 4
## ASSIGNMENT OF CONTRACTS

Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to the Contracts to the maximum extent allowable under all Legal Requirements and to the maximum extent allowable under the terms of each individual Contract, it being intended that this assignment be an absolute assignment from Mortgagor to Mortgagee and not merely the granting of a security interest. Notwithstanding the foregoing, if no Event of Default then exists, Mortgagor may retain, use and enjoy the benefits of the Contracts. Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 8.1(h) of the Loan Agreement for which the revocation hereinafter described shall be automatic and simultaneous with the occurrence of any such Event of Default), the license described in the preceding sentence shall, upon Mortgagee's election, be automatically revoked, and Mortgagee may elect to exercise any and all of Mortgagee's rights and remedies hereunder.

## ARTICLE 5
## SECURITY AGREEMENT AND FIXTURE FILING

As additional security, Mortgagor, as debtor, hereby grants to Mortgagee, as secured party, a continuing security interest in all of Mortgagor's right, title and interest in and to the portion of the Property which is or may be subject to the provisions of the UCC which are applicable to secured transactions, and in any property as to which a security interest can be created or perfected, now existing or hereafter coming into existence, and all substitutions replacements, renewals and additions to and all products and Proceeds of the foregoing. This Mortgage is intended to be and shall be effective as a security agreement and "fixture filing" under the UCC or other law applicable to the creation of liens on and security interests in personal property and fixtures. As further security for the payment and performance of the Loan Obligations, this

Mortgage shall constitute a financing statement under the UCC with Mortgagor, as debtor, and Mortgagee, as secured party. To the extent permitted by law, Mortgagor hereby authorizes Mortgagee to file financing and continuation statements necessary to continue the lien of and security interest evidenced by this Mortgage with respect to the personal property and fixtures (and confirms that Mortgagee is a person entitled to file a record, and that Mortgagor has authorized all such filings, within the meaning of Section 9-509 of the UCC). The principal places of business and mailing addresses of Mortgagor, as debtor, and Mortgagee, as secured party, respectively, are as set forth on page one hereof. Mortgagor's location, for purposes of Section 9-307 of the UCC, is Mortgagor's state of formation/incorporation/organization as set forth on page 1 hereof. Information relative to the security interest created hereby may be obtained by application to Mortgagee.

## ARTICLE 6
## REMEDIES

Section 6.1. Acceleration of Maturity. If an Event of Default shall have occurred, then the entire Indebtedness and all other Loan Obligations shall, at the option of Mortgagee, become due and payable without notice or demand, time being of the essence; and any omission on the part of Mortgagee to exercise such option when entitled to do so shall not be considered as a waiver of such right. Mortgagor hereby expressly waives presentment, demand for payment (except as may be expressly required under the Loan Documents), notice of protest, notice of dishonor, notice of intent to accelerate the maturity of the Indebtedness and notice of acceleration of the maturity of the indebtedness secured hereby. Notwithstanding anything contained to the contrary herein, the Indebtedness shall be accelerated and immediately due and payable, without any election by Mortgagee, upon the occurrence of an Event of Default described in Section 8.1(h) of the Loan Agreement.

Section 6.2. Default Remedies.

(a) If an Event of Default shall have occurred, this Mortgage may, to the maximum extent permitted by law, be enforced, and Mortgagee may exercise any right, power or remedy permitted to it hereunder, under the Loan Agreement or under any of the other Loan Documents or at law or in equity, and, without limiting the generality of the foregoing, Mortgagee may, personally or by their agents, to the maximum extent permitted by law:

(i) enter into and take possession of the Property or any part thereof, exclude Mortgagor and all Persons claiming under Mortgagor whose claims are junior to this Mortgage, wholly or partly therefrom, and use, operate, manage and control the Property or any part thereof either in the name of Mortgagor or otherwise as Mortgagee shall deem best, and upon such entry, from time to time at the expense of Mortgagor and the Property, make all such repairs, replacements, alterations, additions or improvements to the Property or any part thereof as Mortgagee may reasonably deem proper and, whether or not Mortgagee has so entered and taken possession of the Property or any part thereof, collect and receive all Rents and apply the same to the payment of all expenses that Mortgagee may be authorized to make under this Mortgage, the remainder to be applied to the payment of the Loan Obligations until the same shall have been repaid in full, take

possession of all security deposits held by or on behalf of Mortgagor with respect to the Property, whether or not Mortgagee enters upon or takes control of the Property and regardless of where any such security deposits are deposited or located; if Mortgagee demands or attempts to take possession of the Property or any part thereof in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;

(ii) effect new Permits and Contracts; amend, alter, renew, cancel or surrender existing Permits and Contracts; and make concessions to the Governmental Authorities, the Contractors, warrantors and others; and

(iii) personally or by agents, with or without entry:

(x) invoke the power of sale and pursuant to the procedures prescribed by law as a result thereof, sell the Property or any part thereof, or cause the Property or any part thereof to be sold at a sale or sales held at such place or places and time or times and upon such notice and otherwise in such manner and in such order as may be required by law, or, in the absence of any such requirements, as Mortgagee may deem appropriate and from time to time adjourn any such sale by announcement at the time and place specified for such sale or for such adjourned sale without further notice, except such as may be required by law;

(y) proceed to protect and enforce Mortgagee's rights under this Mortgage, by suit for specific performance of any covenant contained herein or in the Loan Documents or in aid of the execution of any power granted herein or in the Loan Documents, or for the foreclosure of this Mortgage (as a mortgage or otherwise) and the sale of the Property or any part thereof under the judgment or decree of a court of competent jurisdiction, or for the enforcement of any other right as Mortgagee shall elect, provided, that in the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Mortgage shall continue as a lien on, and security interest in, the remaining portion of the Property; or

(z) exercise any or all of the remedies available to a secured party under the UCC, including, without limitation:

(1) either personally or by means of a court appointed receiver, take possession of all or any of the Property and exclude therefrom Mortgagor and all Persons claiming under Mortgagor, and thereafter hold, store, use, operate, manage, maintain and control, make repairs, replacements, alterations, additions and improvements to and exercise all rights and powers of Mortgagor in respect of the

Property, or any part thereof; if Mortgagee demands or attempts to take possession of the Property in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;

(2) without further notice to or demand upon Mortgagor (except those otherwise required hereby or by the Loan Agreement), make such payments and do such acts as Mortgagee may deem necessary to protect its security interest in the Property, including, without limitation, paying, purchasing, contesting or compromising any encumbrance that is prior to or superior to the security interest granted hereunder, and in exercising any such powers or authority paying all expenses incurred in connection therewith, which expenses shall thereafter become part of the Loan Obligations secured by the lien of this Mortgage;

(3) require Mortgagor to assemble the Property or any portion thereof, at a place designated by Mortgagee and reasonably convenient to both parties, and promptly to deliver the Property to Mortgagee, or an agent or representative designated by Mortgagee, and its agents and representatives, shall have the right to enter upon the premises and property of Mortgagor to exercise Mortgagee's rights hereunder;

(4) sell, lease or otherwise dispose of the Property, with or without having the Property at the place of sale, and upon such terms and in such manner as Mortgagee may determine (and Mortgagee may be a purchaser at any such sale, provided, however, that Mortgagee, may dispose of the Property in accordance with Mortgagee's rights and remedies in respect of the Property pursuant to the provisions of this Mortgage in lieu of proceeding under the UCC); and

(5) unless the Property is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Mortgagee shall give Mortgagor at least ten (10) days prior notice of the time and place of any sale of the Property or other intended disposition thereof, which notice Mortgagor agrees is commercially reasonable.

(b) If an Event of Default shall have occurred and be continuing after any applicable notice and cure periods under the Loan Documents or applicable law, Mortgagee, to the maximum extent permitted by law, shall be entitled, as a matter of strict right, to the appointment of a receiver of the Property by a court of competent jurisdiction in connection with any action to foreclose this Mortgage (whether by judicial proceedings or by non-judicial proceedings by exercise of the power of sale), without notice or demand, and without regard to the adequacy of the security for the Loan Obligations or the solvency of Mortgagor. Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor. Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Mortgagee in case of entry and shall continue as such and exercise all such powers until the date of confirmation of sale of the Property, unless such receivership is sooner terminated.

(c) In any sale under any provision of this Mortgage or pursuant to any judgment or decree of court, the Property, to the maximum extent permitted by law, may be sold in one or more parcels or as an entirety and in such order as Mortgagee may elect, without regard to the right of Mortgagor or any Person claiming under Mortgagor to the marshalling of assets.

(d) All rights of action under any Loan Document may be enforced by Mortgagee without the possession of the original Loan Documents and without the production thereof at any trial or other proceeding relative thereto.

Section 6.3. Application of Proceeds.

(a) All proceeds of any repayment of or recoveries on the Loan shall be applied to repay the Indebtedness in such order and in such manner as Mortgagee shall elect in Mortgagee's discretion.

(b) No sale or other disposition of all or any part of the Property pursuant to this Section 6.3 shall be deemed to relieve Mortgagor of its obligations under any Loan Document except to the extent the proceeds thereof are applied to the payment of such obligations. If the proceeds of sale, collection or other realization of or upon the Property are insufficient to cover the costs and expenses of such realization and the payment in full of the Loan Obligations, Mortgagor shall remain liable for any deficiency.

(c) Upon any sale made under the power of sale herein granted and conferred, the receipt given by Mortgagee will be sufficient discharge to the purchaser or purchasers at any sale for the purchase money, and such purchaser or purchasers and their heirs, devisees, personal representatives, successors and assigns thereof will not, after paying such purchase money and receiving such receipt of Mortgagee, be obligated to see to the application thereof or be in any way answerable for any loss, misapplication or non-application thereof.

Section 6.4. Right to Sue. Mortgagee shall have the right from time to time to sue for any sums required to be paid by Mortgagor under the terms of this Mortgage as the same become due, without regard to whether or not the entire Loan Obligations shall be, or have become, due and without prejudice to the right of Mortgagee thereafter to bring any action or proceeding of foreclosure or any other action upon the occurrence of any Event of Default existing at the time such earlier action was commenced.

Section 6.5. Powers of Mortgagee. Mortgagee may at any time or from time to time renew or extend this Mortgage or (with the written agreement of Mortgagor) alter or modify the same in any way, or waive any of the terms, covenants or conditions hereof or thereof, in whole or in part, and may release or reconvey, or cause Mortgagee to release or reconvey, any portion of the Property or any other security, and grant such extensions and indulgences in relation to the Loan Obligations, or release any Person liable therefor as Mortgagee may determine without the consent of any junior lienor or encumbrancer, without any obligation to give notice of any kind thereto, without in any manner affecting the priority of the lien and estate of this Mortgage on or in any part of the Property, and without affecting the liability of any other Person liable for any of the Loan Obligations.



Exhibit C

EXHIBIT A TO EXHIBIT 1

Section 6.6. Remedies Cumulative.

(a) No right or remedy herein conferred upon or reserved to Mortgagee is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy under this Mortgage, or under applicable law, whether now or hereafter existing; the failure of Mortgagee to insist at any time upon the strict observance or performance of any of the provisions of this Mortgage or to exercise any right or remedy provided for herein or under applicable law, shall not impair any such right or remedy nor be construed as a waiver or relinquishment thereof.

(b) To the maximum extent permitted by law, Mortgagee shall be entitled to enforce payment and performance of any of the obligations of Mortgagor in accordance with the Loan Documents and to exercise all rights and powers under this Mortgage or under any Loan Document or any laws now or hereafter in force, notwithstanding that some or all of the Loan Obligations may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, lien, assignment or otherwise; neither the acceptance of this Mortgage nor its enforcement, whether by court action or pursuant to the power of sale or other powers herein contained, shall prejudice or in any manner affect the right of Mortgagee to realize upon or enforce any other security now or hereafter held by Mortgagee, it being stipulated that Mortgagee shall be entitled to enforce this Mortgage and any other security now or hereafter held by Mortgagee in such order and manner as Mortgagee, in its discretion, may determine; every power or remedy given by any Loan Documents to Mortgagee, or to which Mortgagee is otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Mortgagee, and Mortgagee may pursue inconsistent remedies.

Section 6.7. Waiver of Stay, Extension, Moratorium Laws; Equity of Redemption. To the maximum extent permitted by law, Mortgagor shall not at any time insist upon, or plead, or in any manner whatsoever claim or take any benefit or advantage of any applicable present or future stay, extension or moratorium law, that may affect observance or performance of the provisions of this Mortgage; nor claim, take or insist upon any benefit or advantage of any present or future law providing for the valuation or appraisal of the Property or any portion thereof prior to any sale or sales thereof that may be made under or by virtue of Section 6.2; and Mortgagor, to the maximum extent permitted by law, hereby waives all benefit or advantage of any such law or laws. Mortgagor, for itself and all who may claim under it, hereby waives, to the maximum extent permitted by law, any and all rights and equities of redemption from sale under the power of sale created hereunder or from sale under any foreclosure of this Mortgage and (if an Event of Default exists) all notice or notices of seizure, and all right to have the Property marshalled upon any foreclosure hereof. Mortgagee shall not be obligated to pursue or exhaust its rights or remedies as against any other part of the Property, and Mortgagor hereby waives any right or claim of right to have Mortgagee proceed in any particular order.

Section 6.8. No Assumption by Mortgagee. Except as otherwise expressly set forth in any Loan Document, Mortgagee will not be deemed in any manner to have assumed any liabilities or obligations relating to the Property or any portion thereof unless and until Mortgagee takes possession of the Property following an Event of Default. Mortgagor agrees





Exhibit C

EXHIBIT A TO EXHIBIT 1

that the exercise by Mortgagee of one or more of its rights and remedies under this Mortgage shall in no way be deemed or construed to make Mortgagee a mortgagee-in-possession.

Section 6.9. Waiver of Homestead. Mortgagor hereby waives and renounces all homestead and exemption rights provided for by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Loan Obligations, or any part thereof.

Section 6.10. Discontinuance of Proceedings. If Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by judicial foreclosure, non-judicial foreclosure by power of sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Mortgagee, then in every such case, Mortgagor and Mortgagee shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of Mortgagee shall continue as if no such proceedings had occurred.

ARTICLE 7
MISCELLANEOUS

Section 7.1. Reconveyance by Mortgagee. Upon payment in full of the Loan Obligations or a complete defeasance with respect to the Property which complies with the Loan Agreement (if the Loan Agreement provides for defeasance), Mortgagee, to the extent required by law to effect a full and proper termination, release and reconveyance, shall release the lien of this Mortgage, or upon the request of Mortgagor, and at Mortgagor's expense, assign this Mortgage without recourse to Mortgagor's designee, or to the Person or Persons legally entitled thereto, by an instrument duly acknowledged in proper form for recording.

Section 7.2. Notices. All notices, demands, consents, requests or other communications that are permitted or required to be given by any party to the other hereunder shall be in writing and given in the manner specified in Section 11.6 of the Loan Agreement.

Section 7.3. Amendments; Waivers; Etc. This Mortgage cannot be modified, changed or discharged except by an agreement in writing, duly acknowledged in proper form for recording, signed by Mortgagor and Mortgagee.

Section 7.4. Successors and Assigns. This Mortgage applies to, inures to the benefit of and binds Mortgagor and Mortgagee and each of their respective successors and assigns, and shall run with the Land.

Section 7.5. Captions. The captions or headings at the beginning of each Article and Section hereof are for the convenience of the parties hereto and are not a part of this Mortgage.

Section 7.6. Severability. If any term or provision of this Mortgage or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Mortgage, or the application of such term or provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Mortgage shall be valid and enforceable to the





Exhibit C

EXHIBIT A TO EXHIBIT 1

maximum extent permitted by law. If any portion of the Loan Obligations shall for any reason not be secured by a valid and enforceable lien upon any part of the Property, then any payments made in respect of the Loan Obligations (whether voluntary or under foreclosure or other enforcement action or procedure or otherwise) shall, for purposes of this Mortgage (except to the extent otherwise required by applicable law) be deemed to be made (a) first, in respect of the portion of the Loan Obligations not secured by the lien of this Mortgage, (b) second, in respect of the portion of the Loan Obligations secured by the lien of this Mortgage, but which lien is on less than all of the Property, and (c) last, to the portion of the Loan Obligations secured by the lien of this Mortgage, and which lien is on all of the Property.

Section 7.7. Applicable Law; Submission to Jurisdiction.

(a) This Mortgage shall be governed by and construed in accordance with the laws of the State in which the Property is located.

(b) Mortgagor hereby consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and State in which the Property is located with respect to any legal action or proceeding arising with respect to this Mortgage and waives all objections which it may have to such jurisdiction and venue.

Section 7.8. Limitation of Interest. This Mortgage is subject to the limitations on the payment of interest set forth in Section 8 of the Note.

Section 7.9. Time of the Essence. Time is of the essence with respect to each and every covenant, agreement and obligation of Mortgagor under all Loan Documents.

Section 7.10. WAIVER OF JURY TRIAL. MORTGAGOR AND MORTGAGEE HEREBY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS MORTGAGE OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF MORTGAGOR AND/OR MORTGAGEE WITH RESPECT TO ANY LOAN DOCUMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS MORTGAGE OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF MORTGAGOR AND MORTGAGEE AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS MORTGAGE WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF MORTGAGOR AND MORTGAGEE IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT TO MORTGAGEE TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) BETWEEN MORTGAGOR AND/OR MORTGAGEE SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 7.11. Exculpation. This Mortgage and the obligations of Mortgagor and rights of Mortgagee hereunder are and shall be subject to and limited by the exculpation provisions of Section 16 of the Note.

Section 7.12. Exhibits. The information set forth on the cover, heading and recitals hereof, and the Exhibits attached hereto, are hereby incorporated herein as a part of this Mortgage with the same effect as if set forth in the body hereof.

ARTICLE 8
STATE-SPECIFIC PROVISIONS

Section 8.1. Principles of Construction. In the event of any inconsistencies between the terms and conditions of this Article 8 and the other terms and conditions of this Mortgage, the terms and conditions of this Article 8 shall control and be binding.

Section 8.2. Foreclosure Remedies. Without in any way limiting the other provisions of this Mortgage, but in addition thereto, and in amplification thereof, Mortgagor hereby confers on and grants to Mortgagee the power to sell the Mortgaged Property, and the interests of persons therein, upon the occurrence and during the continuation of any Event of Default, in the manner and pursuant to the procedures set forth in the Oklahoma Power of Sale Mortgage Foreclosure Act, 46 Okla. Stat. §§40 et seq. (the "Act"), as the Act may be amended from time to time, or pursuant to other applicable statutory or judicial authority. If no cure of such Event of Default is effected within the time period set forth in the Act, Mortgagee may accelerate the indebtedness secured hereby without further notice (the aforementioned statutory cure period to run concurrently with any contractual provision for notice before acceleration of debt) and may then proceed in the manner and subject to the conditions of the Act to publish and send to Mortgagor and other necessary parties a notice of sale and may sell and convey the Mortgaged Property in accordance with the Act. Mortgagee may enforce this Mortgage by exercising said power of sale or, at the option of Mortgagee, by judicial foreclosure proceedings as provided by law. No action of Mortgagee based upon the provisions contained in this Mortgage or in the Act, including, without limitation, the giving of the notice of intent to foreclose by power of sale or the notice of sale, shall constitute an election of remedies which would preclude Mortgagee from accelerating the indebtedness secured hereby and pursuing judicial foreclosure before or at any time after commencement of the power of sale foreclosure procedure. As often as any proceedings may be taken to foreclose this Mortgage, whether pursuant to the power of sale or by judicial proceedings, or to foreclose the security interest which has been granted to Mortgagee, or otherwise to enforce any of the provisions of this Mortgage, Mortgagor agrees to pay to Mortgagee, in addition to all other sums due, all reasonable costs and expenses, including reasonable attorneys' fees, incurred by Mortgagee.

Section 8.3. Appraisement. If Mortgagee institutes judicial proceedings to enforce this Mortgage, Mortgagor, to the fullest extent permitted by law, hereby waives or does not waive, at the sole option of Mortgagee, appraisement of the Mortgaged Property, said option to be exercised by Mortgagee at the time judgment is rendered or at any time prior thereto.

Section 8.4. Maximum Principal Amount Secured. For purposes of calculation of mortgage tax only, the maximum principal amount secured by this Mortgage is $28,300,000.00,

plus all interest, additional interest, late payment and prepayment charges in respect thereof, plus all amounts expended by Mortgagee before or after an Event of Default to enforce, defend and/or maintain the lien of this Mortgage, including without limitation, (a) taxes, charges or assessments which may be imposed by law upon the Property; (b) premiums on insurance policies covering the Property; (c) expenses incurred in upholding the lien of this Mortgage, including, but not limited to, the costs and expenses of any litigation to collect the indebtedness secured by this Mortgage or to prosecute or defend the rights and lien created by this Mortgage; (d) any amount, cost or charges to which Mortgagee becomes subrogated upon payment, whether under recognized principles of law or equity or under express statutory authority and (e) interest at the Default Rate (or regular interest rate). Mortgagor covenants, warrants and agrees in favor of Mortgagee that the foregoing limitation on the maximum amount of principal indebtedness secured hereby shall not, in any manner, limit or waive any of Mortgagee's rights and remedies under the other Loan Documents nor limit the amount of any of the indebtedness or other obligations or liabilities secured by any of the other Loan Documents or other collateral granted thereunder, nor affect the priority thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



Exhibit C

EXHIBIT A TO EXHIBIT 1

IN WITNESS WHEREOF, this Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing has been duly executed by Mortgagor as of the day and year first above written.

**MORTGAGOR:**

DREXEL FLATS ACQUISITION LLC,
a Delaware limited liability company

By: [signature]
Name: Ira Mondry
Title: Authorized Signatory

ACKNOWLEDGMENT

State of Michigan }
County of Oakland } ss.

On the 14th day of December, in the year 2021, before me the undersigned, personally appeared Ira Mondry, personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

[signature]
[Notary Public]

TRACY SPANO PHILLIPS
Notary Public – State of Michigan
County of Oakland
My Commission Expires Apr 28, 2023
Acting in the County of Oakland



Exhibit C

EXHIBIT A TO EXHIBIT 1

DREXEL FLATS ACQUISITION TIC LLC,
a Delaware limited liability company

By: [signature]
Name: Ira Mondry
Title: Authorized Signatory

ACKNOWLEDGMENT

State of Michigan }
County of Oakland } ss.

On the 14th day of December, in the year 2021, before me the undersigned, personally appeared Ira Mondry, personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

[signature]
[Notary Public]

TRACY SPANO PHILLIPS
Notary Public – State of Michigan
County of Oakland
My Commission Expires Apr 28, 2023
Acting in the County of Oakland



Exhibit C

EXHIBIT A TO EXHIBIT 1

**Exhibit A**

**DESCRIPTION OF PROPERTY**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

Exhibit C

EXHIBIT A TO EXHIBIT 1

2021122901226740 B: 15013 P: 1091
12/29/2021 09:11:50 AM Pgs: 11
Fee: $38.00
David B. Hooten, County Clerk
Oklahoma County - State of Oklahoma

**PREPARED BY, RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:**

ReadyCap Commercial LLC
Post Closing / Melissa Perez
1320 Greenway Drive, Suite 560
Irving, Texas 75038

---

Space Above This Line For Recorder's Use

**ASSIGNMENT OF LEASES AND RENTS**

From

**DREXEL FLATS ACQUISITION LLC,**
a Delaware limited liability company

and

**DREXEL FLATS ACQUISITION TIC LLC,**
a Delaware limited liability company

(individually and collectively, jointly and severally, as Assignor)

To

**READYCAP COMMERCIAL, LLC,**
a Delaware limited liability company

(as Assignee)

Dated: As of December 21, 2021

Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159

SECURE TITLE & ESCROW, LLC
4200 E. Skelly Drive, Suite 420
Tulsa, OK 74135



Exhibit D

EXHIBIT A TO EXHIBIT 1

## ASSIGNMENT OF LEASES AND RENTS

THIS ASSIGNMENT OF LEASES AND RENTS (as amended, modified and in effect from time to time, this "Assignment") is made as of October 29, 2018, by DREXEL FLATS ACQUISITION LLC ("Assignor 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Assignor 2", and together with Assignor 1, individually and collectively, jointly and severally, "Assignor"), each a Delaware limited liability company, each having an address at 187 S. Old Woodward, Suite 200, Birmingham, Michigan 48009, in favor of READYCAP COMMERCIAL, LLC, a Delaware limited liability company, whose address is 1320 Greenway Drive, Suite 560, Irving, Texas 75038 (together with its successors and assigns, "Assignee").

With respect to the definition of "Assignor", except where the context otherwise provides, (i) any representations contained herein or in any other Loan Document of Assignor shall be applicable to each Assignor, (ii) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Assignor and shall require performance by all Assignors, (iii) any negative covenants contained herein or in any other Loan Document shall be deemed to be covenants of each Assignor, and shall be breached if any Assignor fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Assignor shall be deemed to be an Event of Default hereunder, and (v) any Indebtedness of Assignor shall be deemed to include any Indebtedness of Assignors, or any Indebtedness of any one of them.

### RECITALS

A. Pursuant to that certain Loan Agreement dated as of the date hereof by and between Assignor, certain affiliates of Assignor and Assignee (as amended, modified and supplemented and in effect from time to time, the "Loan Agreement"), Assignee is making the Loan to Assignor which is evidenced by that certain Promissory Note, dated of even date herewith, made by Assignor and payable to the order of Assignee in the original stated principal amount of TWENTY-EIGHT MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,300,000.00) (together with all renewals, modifications, increases and extensions thereof, the "Note") secured by, inter alia, that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated of even date herewith and recorded herewith, granted by Assignor in favor of Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Security Instrument") covering Assignor's interest in the real property described on Exhibit A attached hereto and the Property.

B. Assignor intends by the execution and delivery of this Assignment to further secure the payment and performance of the Loan Obligations (as such term is defined in the Security Instrument).

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. Certain Defined Terms. For all purposes of this Assignment, all capitalized terms shall have the meaning ascribed thereto in the Loan Agreement unless defined herein, and:

"Leases" means all leases and other agreements or arrangements affecting the use or occupancy of all or any portion of the Property now in effect or hereafter entered into (including, without limitation, all lettings, subleases, licenses, concessions, tenancies and other occupancy agreements covering or encumbering all or any portion of the Property), together with any guarantees, supplements, amendments, modifications, extensions and renewals of the same, and all additional remainders, reversions, and other rights and estates appurtenant thereto.

"Rents" means, with respect to the Property, all rents (whether denoted as advance rent, minimum rent, percentage rent, additional rent or otherwise), receipts, issues, income, royalties, profits, revenues, proceeds, bonuses, deposits (whether denoted as security deposits or otherwise), lease termination fees or payments, rejection damages, buy-out fees and any other fees made or to be made in lieu of rent, any award made hereafter to Assignor in any court proceeding involving any tenant, lessee, licensee or concessionaire under any of the Leases in any bankruptcy, insolvency or reorganization proceedings in any state or federal court, all rights, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support given by any guarantor in connection with any of the Leases or leasing commissions, and all other payments, rights and benefits of whatever nature from time to time due under any of the Leases.

2. Assignment of Leases and Rents. Assignor hereby absolutely and unconditionally assigns to Assignee all of Assignor's right, title and interest in all current and future Leases and Rents, it being intended that this Assignment constitute a present, absolute assignment and not an assignment for additional security only. This Section 2 presently gives Assignee the right to collect Rents and to apply Rents in partial payment of the Loan Obligations in accordance with the Loan Agreement. Assignor intends that the Rents and Leases be absolutely assigned and no longer be, during the term of this Assignment, property of Assignor or Assignor's estate, as defined by 11 U.S.C. §541. If any law exists requiring Assignee to take actual possession of the Property (or some action equivalent to taking possession of the Property, such as securing the appointment of a receiver) for Assignee to "perfect" or "activate" the rights and remedies of Assignee as provided in this Section 2, Assignor waives the benefit of such law to the extent permitted by applicable law. Such assignment to Assignee shall not be construed to bind Assignee to perform of any covenants, conditions or provisions contained in any Lease or otherwise impose any obligation upon Assignee, and notwithstanding this Assignment, Assignor shall remain liable for any obligations undertaken by Assignor pursuant to any Lease. Notwithstanding the foregoing, subject to the terms of this Section 2 and the Loan Agreement, Assignee grants to Assignor a license, revocable as hereinafter provided, to operate and manage the Property and to collect, receive and use the Rents. If an Event of Default exists, the license granted to Assignor herein shall be automatically and immediately, without any further action on the part of Assignee, revoked by Assignee, and Assignee shall immediately be entitled to possession of all Rents collected thereafter during the continuance of any such Event of Default (including Rents past due and unpaid) whether or not Assignee enters upon or takes control of the Property. Any Rents collected by Assignor from and after the date on which an Event of Default occurred and is continuing shall be held by Assignor in trust for Assignee. Assignor hereby grants and assigns to Assignee the right, at Assignee's option, upon revocation of the



Exhibit D

EXHIBIT A TO EXHIBIT 1

license granted herein, to enter upon the Property in person, by agent or by a receiver (appointed upon application to a court of competent jurisdiction in any action to foreclose the Security Instrument, whether by judicial proceedings or by non-judicial proceedings in connection with exercise of the power of sale conferred in the Security Instrument, to which appointment Assignee shall be entitled as a matter of strict right) to collect Rents with or without taking the actual possession of the Property or any equivalent action. During the existence of an Event of Default, Assignee may apply any Rents collected after the license granted herein is revoked in Assignee's sole and absolute discretion to pay the Loan Obligations in such order and in such manner as Assignee shall elect in Assignee's discretion.

3. Remedies. At any time after the occurrence and during the continuance of an Event of Default, Assignee, without waiving such Event of Default, at its option, upon notice and without regard to the adequacy of the security for the Loan Obligations, either in person or by agent, upon bringing any action or proceeding, by a receiver appointed by a court, or otherwise, may take possession of the Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper. During the existence of an Event of Default, Assignee shall immediately be entitled to possession of all security deposits held by or on behalf of Assignor with respect to the Property, whether or not Assignee enters upon or takes control of the Property and regardless of where any such security deposits are deposited or located. During the existence of an Event of Default, Assignee, either with or without taking possession of the Property in its own name, may demand, sue for or otherwise collect and receive all Rents, including Rents past due and unpaid, and apply such Rents to pay any one or more of the following in such order and amounts as Assignee may elect in its sole and absolute discretion: (a) all costs and expenses incurred, and advances made, by Assignee to enforce this Assignment or the other Loan Documents, protect the Lien and security afforded thereby, or preserve the Property, including, without limitation, all expenses of managing the Property, including, without limitation, the salaries, fees and wages of any managing agent and such other employees as Assignee may deem reasonably necessary and all expenses of operating and maintaining the Property, including, without limitation, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for insurance and the cost of alterations, renovations, repairs or replacements, and all costs and expenses incident to taking and retaining possession of the Property or enforcing any of Assignee's rights and remedies hereunder; and (b) the Loan Obligations, together with all costs, expenses and attorneys' fees in connection with any of the foregoing. Neither Assignee's exercise of the option granted to Assignee in this Section 3 nor the collection or application of Rents as herein provided shall be considered a waiver of any Event of Default. Assignor agrees that the exercise by Assignee of one or more of its rights and remedies under this Assignment shall in no way be deemed or construed to make Assignee a mortgagee-in-possession.

During the existence of an Event of Default, Assignee shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under Title 11 of the United State Code, as amended from time to time, and all rules and regulations promulgated thereunder (the "Bankruptcy Code"). If there shall be filed by or against Assignor a petition under the Bankruptcy Code, and Assignor, as lessor under any Lease, shall determine to reject such Lease





Exhibit D

EXHIBIT A TO EXHIBIT 1

pursuant to Section 365(a) of the Bankruptcy Code, then Assignor shall give Assignee not less than ten (10) days' prior notice of the date on which Assignor shall apply to the bankruptcy court for authority to reject such Lease. Assignee shall have the right, but not the obligation, to serve upon Assignor within such ten (10) day period a notice stating that (i) Assignee demands that Assignor assume and assign the Lease to Assignee pursuant to Section 365 of the Bankruptcy Code, and (ii) Assignee covenants to cure or provide adequate assurance of future performance under the Lease. If Assignee serves upon Assignor the notice described in the preceding sentence, Assignor shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after Assignee's notice shall have been given, subject to the performance by Assignee of the covenant provided for in clause (ii) of the preceding sentence.

4. No Lender Liability. This Assignment shall not be construed to bind Assignee to the performance of any of the covenants, conditions or provisions contained in any Lease or lease guaranty, or otherwise impose any obligation upon Assignee. Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property after an Event of Default or from any other act or omission of Assignee in managing the Property after an Event of Default, unless such loss is caused by the willful misconduct or bad faith of Assignee. Assignee shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any lease guaranties or under or by reason of this Assignment, and Assignor shall, and hereby agrees to, indemnify Indemnified Parties (as hereinafter defined) for, and to hold Indemnified Parties harmless from (a) any and all liability, loss or damage which may or might be incurred under the Leases, any lease guaranties or under or by reason of this Assignment, and (b) from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against any Indemnified Parties by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any lease guaranties. Should Indemnified Parties incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents, and Assignor shall reimburse such Indemnified Parties therefor immediately upon demand, and upon the failure of Assignor to do so Assignee may, at its option, declare all sums secured by this Assignment and by the Security Instrument and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Assignee, nor for the carrying out of any of the terms and conditions of the Leases or any lease guaranties; nor shall it operate to make Assignee responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property including, without limitation, the presence of any Hazardous Substances, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. For purposes of this Section 4, the term "Indemnified Parties" means Assignee and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by this Assignment is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in securities related to the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the

Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Assignee's assets and business). The provisions of this Section 4 shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.

5. Notices. All notices, demands, consents, requests or other communications that are permitted or required to be given by Assignor or Assignee to the other shall be in writing and given in the manner specified in Section 11.6 of the Loan Agreement.

6. Binding Obligations, Successors and Assigns. The provisions and covenants of this Assignment shall run with the Property, shall be binding upon Assignor, its successors and assigns, and shall inure to the benefit of Assignee, its successors and assigns. Assignee shall have the right to assign, sell, pledge, participate, delegate, or transfer, as applicable, to one or more Persons, all or any portion of its rights and obligations under this Assignment in connection with any assignment of the Loan and the Loan Documents to any Person in accordance with the Loan Agreement. Any assignee or transferee of Assignee in accordance with the Loan Agreement shall be entitled to all the benefits afforded to Assignee under this Assignment. Assignor shall not have the right to assign, delegate or transfer its rights or obligations under this Assignment without the prior written consent of Assignee, as provided in the Loan Agreement, and any attempted assignment, delegation or transfer without such consent shall be null and void.

7. Captions. The captions or headings at the beginning of each Section hereof are for the convenience of the parties hereto and are not a part of this Assignment.

8. Severability. If any term or provision of this Assignment or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Assignment, or the application of such term or provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforceable to the maximum extent permitted by law.

9. Assignor's Obligations Absolute. Except as set forth to the contrary herein or in the other Loan Documents, all sums payable by Assignor hereunder shall be paid without notice, demand, counterclaim (other than mandatory counterclaims), setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction. Except as expressly provided herein or in the other Loan Documents, Assignor waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any sum secured hereby and payable by Assignor.

10. Amendments. This Assignment cannot be modified, changed or discharged except by an agreement in writing, duly acknowledged in form for recording, executed by Assignor and Assignee.

11. Exhibits. The information set forth on the cover, heading and recitals hereof, and the Exhibit attached hereto, are hereby incorporated herein as a part of this Assignment with the same effect as if set forth in the body hereof.

12. Time of the Essence. Time is of the essence with respect to each and every covenant, agreement and obligation of Assignor under this Assignment.

13. Termination. When the Security Instrument has been fully released by Assignee, that release shall operate as a release and discharge of this Assignment and as a reassignment of all future Leases and all Rents with respect to the Property to the Person or Persons legally entitled thereto, unless such release expressly provides to the contrary.

14. Applicable Law; Submission to Jurisdiction.

(a) This Assignment shall be governed by and construed in accordance with the laws of the State in which the Property is located (without giving effect to rules regarding conflict of laws).

(b) Assignor hereby consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and state where the Property is located with respect to any legal action or proceeding arising with respect to this Assignment and waives all objections which it may have to such jurisdiction and venue.

15. WAIVER OF JURY TRIAL. ASSIGNOR AND ASSIGNEE HEREBY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS ASSIGNMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF ASSIGNOR AND/OR ASSIGNEE WITH RESPECT TO ANY LOAN DOCUMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS ASSIGNMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF ASSIGNOR AND ASSIGNEE AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS ASSIGNMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF ASSIGNOR AND ASSIGNEE IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT TO ASSIGNEE TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) BETWEEN ASSIGNOR AND/OR ASSIGNEE SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

16. Exculpation. This Assignment is and shall be subject to the exculpation provisions of Section 16 of the Note.

17. Further Assurances. Assignor agrees that to further evidence and reflect the assignment granted herein, Assignor shall execute, acknowledge and deliver to Assignee such



Exhibit D

EXHIBIT A TO EXHIBIT 1

additional documents, instruments and agreements, in form and substance satisfactory to Assignee, as may hereafter be reasonably requested by Assignee, and Assignor shall record such thereof, all at Assignor's expense.

[Signature on the following page]

IN WITNESS WHEREOF, this Assignment of Leases and Rents has been duly executed and delivered as of the day and year first above written.

**ASSIGNOR:**

**DREXEL FLATS ACQUISITION LLC,**
a Delaware limited liability company

By: ______________
Name: Ira Mondry
Title: Authorized Signatory

**ACKNOWLEDGMENT**

State of Michigan }
County of Oakland } ss.

On the 14th day of December, in the year 2021, before me the undersigned, personally appeared Ira Mondry, personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

______________
[Notary Public]

TRACY SPANO PHILLIPS
Notary Public - State of Michigan
County of Oakland
My Commission Expires Apr 28, 2023
Acting in the County of Oakland



Exhibit D

EXHIBIT A TO EXHIBIT 1

**DREXEL FLATS ACQUISITION TIC LLC,**
a Delaware limited liability company

By: ______________________
Name: Ira Mondry
Title: Authorized Signatory

**ACKNOWLEDGMENT**

State of Michigan }
ss.
County of Oakland }

On the 14th day of December, in the year 2021, before me the undersigned, personally appeared Ira Mondry, personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

______________________
[Notary Public]

TRACY SPANO PHILLIPS
Notary Public – State of Michigan
County of Oakland
My Commission Expires Apr 28, 2023
Acting in the County of Oakland

Exhibit D

# Exhibit A

## DESCRIPTION OF PROPERTY

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

Exhibit D

# DEPOSIT ACCOUNT CONTROL AGREEMENT
(Soft Lockbox)

THIS DEPOSIT ACCOUNT CONTROL AGREEMENT (the "Agreement") is made as of December 21, 2021, by and among DREXEL FLATS ACQUISITION LLC ("Borrower 1"), and DREXEL FLATS ACQUISITION TIC LLC ("Borrower 2", and together with Borrower 1, individually and collectively, jointly and severally, "Borrower"), each a Delaware limited liability company, READYCAP COMMERCIAL, LLC, a Delaware ("Lender"), and SIGNATURE BANK ("Bank"), a New York state chartered bank, and sets forth the rights and obligations of the parties with respect to the Account (as defined below).

1. Defined Terms. The following terms have the respective meanings set forth below.

(a) "Account" means the non-interest bearing demand deposit account that Borrower has opened with Bank in the name of Borrower for the benefit of Lender, designated as Account Number 1504649535, together with all replacements, substitutions, and successors thereto.

(b) "Account Agreement" means Bank's applicable deposit account agreement and other related service documentation governing the Account and services related thereto.

(c) "Account Funds" shall have the meaning set forth in Section 3 hereof.

(d) "Bank Fees" shall have the meaning set forth in Section 10 hereof.

(e) "Business Day" means any day other than a Saturday, Sunday, or a Bank holiday.

(f) "Disposition Instructions" shall have the meaning set forth in Section 4 hereof.

(g) "Funds Transfer Agreement" means Bank's applicable funds transfer agreement governing funds transfers into and out of the Account.

(h) "Indemnified Parties" shall have the meaning set forth in Section 14 hereof.

(i) "Lockbox" shall have the meaning set forth in Section 8(a) hereof.

(j) "Lockbox Agreement" means Bank's applicable lockbox service agreement.

(k) "Losses and Liabilities" shall the meaning set forth in Section 14 hereof.

(l) "Minimum Balance" shall mean $5,000.00.

(m) "Remittances" shall have the meaning set forth in Section 8(a) hereof.

2. Establishment of Account.

(a) Borrower and Bank acknowledge and confirm that Borrower has established the Account, and to the extent applicable, that the Account is subject to lockbox services provided by Bank in accordance with Section 8 of this Agreement and Bank's standard lockbox policies and procedures.





Exhibit E

EXHIBIT A TO EXHIBIT 1

(b) The Account shall at all times have the Minimum Balance.

3. Lender's Interest in Account. Borrower represents that it has granted, or intends to grant, a security interest in the Account to Lender. Borrower hereby confirms the security interest granted, or to be granted, by Borrower to Lender in all of Borrower's right, title and interest in the Account and all sums now or hereafter on deposit in or payable to or withdrawable from the Account (the "Account Funds").

4. Lender Control. Except as otherwise provided in this Agreement, Borrower agrees that the Account and the Account Funds are subject to the sole dominion, control, and discretion of Lender. Bank, Lender and Borrower each agrees that Bank will comply with written instructions given to Bank by Lender directing disposition of funds in the Account (collectively "Disposition Instructions") without further consent by Borrower or any other person, provided that Lender attaches a copy of this Agreement to any such Disposition Instructions. Except as otherwise required by law, Bank will not agree to comply with instructions from any third party for disposition of funds in the Account. Notwithstanding the foregoing, Lender shall have the right from time to time to delegate all or some of its rights and obligations hereunder to a loan servicer; provided that (i) such delegation shall not relieve Lender of its obligations hereunder and (ii) Lender will provide written notice of such designation to Bank, in a form and substance satisfactory to Bank. As of the date hereof, Lender has appointed Keybank, National Association as its loan servicer.

5. No Access to Account. Borrower acknowledges and agrees that subject to the terms hereof, neither Borrower nor any other person claiming on behalf of, or through, Borrower shall have any right, title or interest, whether express or implied, in the Account or to withdraw or make use of any amounts from the Account. Notwithstanding the foregoing, Lender shall be permitted to designate to Bank in writing, in a format acceptable to Bank, one or more third party merchant or payment processing service providers permitted to debit the Account from time to time, for amounts related to services being provided. Any such designation permitted by the preceding sentence shall remain in effect until Bank receives written notice from Lender directing otherwise, and Bank has had a reasonable opportunity to act on such notice.

6. Disbursements from Account.

(a) Until Bank receives Disposition Instructions from Lender in accordance with Section 4 above, Bank will transfer the full amount of the collected and available balance in the Account (excluding the Minimum Balance and other amounts permitted under Section 7 hereof), each Business Day, by wire transfer (or other means in Bank's sole but reasonable discretion) of immediately available funds to the following account of Borrower or such other account specified by Borrower in writing:

| | |
|---|---|
| Bank Name: | Bank of Blue Valley |
| Bank Address: | 6400 W 110th St., Suite 201 Overland Park, KS 66211 |
| ABA Number: | 101101950 |
| Account Number: | 9968189901 |
| Account Name: | Drexel Flats Acquisition LLC |

(b) In the event that Lender provides Disposition Instructions to Bank in accordance with Section 4 above and instructs Bank to cease transferring funds in accordance with Section 6(a) above, and provided that Bank has had a reasonable amount of time to act upon such instructions, Bank will

transfer the full amount of the collected and available balance in the Account (excluding the Minimum Balance and other amounts permitted under Section 7 hereof), each Business Day, by wire transfer (or other means in Bank's sole but reasonable discretion) of immediately available funds to an account specified by Lender in writing.

(c) Unless Bank separately agrees in writing to the contrary, Bank will have no obligation to disburse funds or assets under this Agreement other than by automatic standing wire. Any disposition of funds or assets which Bank makes pursuant to this Agreement is subject to Bank's standard policies, procedures, and documentation governing the type of disposition made, including, but not limited to, Bank's Funds Transfer Agreement; provided, however, that in no circumstances will any such disposition require Borrower's consent. Furthermore, Bank will have a reasonable opportunity to act upon any instructions (including Disposition Instructions) provided pursuant to this Agreement.

7. Partial Subordination of Bank's Rights. Bank hereby subordinates to the security interest of Lender in the Account (i) any security interest which Bank may have or acquire in the Account, and (ii) any right which Bank may have or acquire to set off or otherwise apply any funds in the Account against the payment of any indebtedness from time to time owing to Bank from Borrower; provided, however, that Bank retains the right to set off against and to charge the Account for (A) any Bank Fees (as defined in Section 10), (B) all items deposited in and credited to the Account and subsequently returned unpaid or with respect to which Bank fails to receive final settlement, and (C) all items deposited in and credited to the Account in error. If amounts in the Account are insufficient to fully reimburse Bank for such amounts, Borrower agrees to pay such deficiency to Bank in immediately available funds, without setoff or counterclaim, within five (5) Business Days after demand of Bank.

8. Bank Obligations with Respect to Account.

(a) To the extent items deposited in the Account have been received in one or more post office lockboxes maintained for Borrower by Bank (each a "Lockbox") and processed by Bank for deposit, Borrower acknowledges that Borrower has granted Lender a security interest in all such items (the "Remittances"). Lender alone will have the right and ability to so instruct Bank regarding the receipt, processing, or deposit of Remittances. Borrower and Lender acknowledge and agree that Bank's operation of each Lockbox, and the receipt, retrieval, processing, and deposit of Remittances, will at all times be governed by Bank's Lockbox Agreement and the standard procedures governing such services, as each may be updated from time to time.

(b) The parties agree that items deposited in the Account shall be deemed to bear the valid and legally binding endorsement of the payee and to comply with all of Bank's requirements for the supplying of missing endorsements, now or hereafter in effect. As between Borrower and Lender, any deposit made by or on behalf of Borrower into the Account shall be deemed deposited into the Account when the funds with respect to such deposit shall become collected funds.

9. Account Statements and Reports. Borrower agrees that it shall, at its sole cost and expense, make available to Lender information directly related to the Account, including granting Lender online, view-only access to Borrower's internet banking platform with Bank (if any). Bank will, at the written request of Lender, provide Lender such information by a transmission method determined by Bank, in Bank's sole discretion, which may include granting Lender online access to Borrower's internet banking platform (if any) or transmitting data files summarizing Account activity, and Borrower consents to the provision of such information to Lender. Borrower and Lender shall complete any Bank documentation

required by Bank to transmit such information. Any failure to comply with this section by Bank shall not be deemed a material breach of Bank's obligations under this Agreement, and Bank's liability for failure to comply with this section shall not exceed the cost of providing such information.

10. Bank Fees. Borrower agrees to pay all Bank's standard and customary fees and charges, for the maintenance and administration of the Account and for the cash management and other account services provided with respect to the Account and any Lockboxes (collectively, the "Bank Fees"), including, but not limited to, the fees for (a) information reporting (including online access thereto) provided on the Account, including the services referenced in Section 9 hereof, (b) funds transfer services received with respect to the Account, (c) lockbox processing services, (d) funds advanced to cover overdrafts in the Account (but without Bank being in any way obligated to make any such advances), (e) duplicate bank statements, (f) any cash management service(s) that Bank may be required to provide the Account and related services thereto as contemplated hereunder, and (g) the fees and expenses described in Exhibit A attached hereto, in each case, to the extent applicable. Bank Fees will be paid by Bank debiting the Account on the Business Day that Bank Fees are due, without notice to Lender or Borrower. If there are not sufficient funds in the Account to cover fully Bank Fees on the Business Day Bank attempts to debit them from the Account, such shortfall or the amount of such Bank Fees will be paid by Borrower to Bank, without setoff or counterclaim, within five (5) Business Days after demand from Bank.

11. Account Agreement. Except as specifically provided in this Agreement, Lender and Borrower agree that the Account will be subject to, and Bank's operation of the Account will be in accordance with, the terms of Bank's Account Agreement. Borrower agrees, upon Bank's request, to promptly execute and deliver the Account Agreement to Bank. The parties agree that, in the event of a conflict between this Agreement and the Account Agreement with respect to the Account, this Agreement shall control.

12. Legal Compliance.

(a) If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Borrower, Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency.

(b) Bank will comply with any legal process, legal notice, or court order it receives in relation to the Account if Bank determines in its sole discretion that the legal process, legal notice, or court order is legally binding on it.

(c) If at any time Bank, in good faith, is in doubt as to the action it should take under this Agreement, Bank shall have the right (i) to commence an interpleader in the United States District Court in the State of New York, and/or (ii) to take no further action, except, in each case, in accordance with joint instructions from Lender and Borrower or in accordance with the final order of the court in such action.

13. Certain Matters Affecting Bank.

(a) Bank has no fiduciary duties under this Agreement to any other party, whether as trustee, agent, bailee, or otherwise. In performing its duties under this Agreement, or upon the claimed



Exhibit E

EXHIBIT A TO EXHIBIT 1

failure to perform its duties, Bank shall have no liability except for Bank's willful misconduct or gross negligence. Bank shall have no liability with respect to the transfer of any funds effected by Bank pursuant to Lender's Disposition Instructions or otherwise in accordance with the provisions of this Agreement. Bank shall not be obligated to take any legal action or to commence any proceedings in connection with this Agreement or any property held hereunder or to appear in, prosecute, or defend in any such legal action or proceedings.

(b) Bank may rely and shall be protected in acting or refraining from acting upon any notice, request, consent, order, certificate, report, opinion, or other document (including, but not limited to, electronically conformed facsimiles thereof) believed by it to be genuine and to have been signed or presented by the proper party or parties. Bank shall have no duty to make inquiry as to the genuineness, accuracy, or validity of any statements or instructions or any signatures on statements or instructions, including but not limited to those contained on any Disposition Instructions. Bank shall have no obligation to review or confirm that actions taken pursuant to the foregoing in accordance with this Agreement comply with any other agreement or document to which it is not a party.

(c) The duties and obligations of Bank set forth in this Agreement shall be determined solely by the express provisions of this Agreement. Bank shall not be liable except for the performance of its duties and obligations as are specifically set forth herein. No implied covenants or obligations shall be read into this Agreement against Bank. Bank makes no express or implied representations or warranties with respect to its obligations under this Agreement, except for those expressly set forth herein.

(d) Bank will not be liable to Borrower, Lender, or any other person for any Losses and Liabilities (as defined below in Section 14) caused by (i) circumstances beyond Bank's reasonable control (including, without limitation, computer malfunctions, interruptions of communication facilities, labor difficulties, acts of God, wars, or terrorist attacks) or (ii) any other circumstances, except, in each case, to the extent that such Losses and Liabilities are directly caused by Bank's gross negligence or willful misconduct.

(e) IN NO EVENT WILL BANK BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO BANK, AND REGARDLESS OF THE FORM OF THE CLAIM OR ACTION, OR THE LEGAL THEORY ON WHICH IT IS BASED.

(f) Any action against Bank by Borrower or Lender under or related to this Agreement must be brought within twenty-four (24) months after the cause of action accrues.

14. Indemnification. Borrower agrees to fully indemnify, release, and hold Bank, its officers, directors, attorneys, representatives, employees, and agents (collectively, the "Indemnified Parties") harmless from and against any claims, demands, liabilities, losses, costs, damages, and expenses (including reasonable attorneys' fees and expenses) incident thereto (collectively "Losses and Liabilities"), which may be asserted against or incurred by the Indemnified Parties, whether with or without basis in fact or in law, arising out of, or with respect to any act or omission to act on Bank's part in connection with this Agreement, but excluding any Losses and Liabilities arising from Bank's gross negligence or willful misconduct. The provisions of this Section 14 shall survive termination of this Agreement.

15. Termination. This Agreement may be terminated by Lender or Bank at any time by either of such parties providing thirty (30) calendar days prior written notice of such termination to the other

parties to this Agreement at their contact addresses specified after their signatures to this Agreement; provided, however, that this Agreement may be terminated (i) immediately upon prior written notice from Bank to Borrower and Lender (x) should Borrower or Lender fail to make any payment when due to Bank from Borrower or Lender under the terms of this Agreement or (y) should Bank close the Account pursuant to applicable law, regulation, policy, or in the event of suspected fraud or other illegal activity in connection with the Account or this Agreement, or (ii) immediately upon prior written notice from Lender to Bank on termination or release of Lender's security interest in the Account; provided that any notice from Lender under clause (ii) of this sentence must contain Lender's acknowledgement of the termination or release of its security interest in the Account. Borrower's payment obligations hereunder, as well as the indemnifications made, and the limitations on the liability of Bank accepted by Borrower and Lender under this Agreement will continue after the termination of this Agreement with respect to all the circumstances to which they are applicable, existing or occurring before such termination, and any liability of any party to this Agreement, as determined under the provisions of this Agreement, with respect to acts or omissions of such party prior to such termination will also survive such termination. Upon any termination of this Agreement, Bank will transfer all collected and available balances (less any deductions permitted under Section 7 hereof) in the Account on the date of such termination in accordance with Lender's written instructions.

16. Modifications, Amendments, and Waivers. This Agreement may not be modified or amended, or any provision thereof waived, except in writing signed by all the parties to this Agreement.

17. Notices. Notwithstanding anything herein to the contrary, all notices, consents, approvals and requests required or permitted hereunder shall be given in writing by facsimile or e-mail (followed by delivery in one of the following manners), expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as follows (or at such other address and person as shall be designated from time to time by any party to this Agreement, as the case may be, in a written notice to the other parties to this Agreement in the manner provided for in this Section). A notice shall be deemed to have been given when delivered or upon refusal to accept delivery. Bank is authorized by Borrower and Lender to act on any instructions or notices received by Bank if (a) such instructions or notices purport to be made in the name of Lender, (b) Bank reasonably believes that they are so made, and (c) they do not conflict with the terms of this Agreement as such terms may be amended from time to time, unless such conflicting instructions or notices are supported by a court order.

18. Successors and Assigns. Borrower may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank and Lender. Lender may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank; provided, however, that no such consent will be required if Lender transfers its rights and obligations under this Agreement to (i) a transferee to which, by contract or operation of law, Lender transfers substantially all of its rights and duties under the financing or other arrangements between Lender and Borrower, or (ii) if Lender is acting as a representative in whose favor a security interest is created or provided for, a transferee that is a successor representative. In the event of a permitted assignment or transfer by Lender of its rights or obligations under this Agreement, Lender will not be released from its obligations under this Agreement unless and until Bank receives transferee's binding written agreement to assume all of Lender's obligations hereunder. Bank may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Lender, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required if such assignment or transfer takes place as part of a merger, acquisition, or corporate reorganization affecting Bank.

19. Governing Law and Venue. This Agreement will be governed by and be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles. This state will also be deemed to be Bank's jurisdiction for purposes of Article 9 of the Uniform Commercial Code as it applies to this Agreement. For any disputes arising out of this Agreement, the parties hereto agree that the New York State Supreme Court, New York County, will be the exclusive forum. Each party hereto irrevocably waives any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consents to service of process by mail or in any manner permitted by applicable law and consents to the jurisdiction of said court.

20. Waiver of Jury Trial. TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THE ACCOUNT OR THIS AGREEMENT.

21. Severability. To the extent that the terms of this Agreement are inconsistent with, or prohibited or unenforceable under, any applicable law or regulation, they will be deemed ineffective only to the extent of such prohibition or unenforceability, and will be deemed modified and applied in a manner consistent with such law or regulation. Any provision of this Agreement which is deemed unenforceable or invalid in any jurisdiction will not affect the enforceability or validity of the remaining provisions of this Agreement or the same provision in any other jurisdiction.

22. Counterparts. This Agreement may be executed in any number of counterparts each of which will be an original with the same effect as if the signatures were on the same instrument. Delivery of a manually executed counterpart of a signature page of this Agreement by facsimile or electronic image scan transmission (such as a ".pdf" file via electronic mail) will be effective as delivery of a manually executed counterpart of the Agreement.

23. Entire Agreement. This Agreement, together with the Account Agreement, contains the entire and only agreement among all the parties to this Agreement and between Bank and Borrower, on the one hand, and Bank and Lender, on the other hand, with respect to (a) the interest of Lender in the Account and Account Funds, and (b) Bank's obligations to Lender in connection with the Account and Account Funds.

[Remainder of page is intentionally left blank; signatures appear on next page.]

This Agreement has been signed by the duly authorized officers or representatives of Borrower, Lender and Bank on the date first written above.

**BORROWER:**

DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company

By: ____________________
Name: Ira Mondry
Title: Authorized Signatory

DREXEL FLATS ACQUISITION TIC LLC, a Delaware limited liability company

By: ____________________
Name: Ira Mondry
Title: Authorized Signatory

**Addresses for Notices:**
c/o M Group LLC
187 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Attention: Ira Mondry

and

Vesta Realty, LLC
6400 W 110th Street, Suite 201
Overland Park, Kansas 66211
Attention: Marc Kulick

and

O'Halloran Ryan PLLC
275 Madison Avenue, 36th Floor
New York, New York 10016
Attention: Neil O'Halloran

**LENDER:**

READYCAP COMMERCIAL, LLC,
a Delaware limited liability company

By: ______________________________
Name: Melissa Perez
Title: Authorized Signatory

**Address for Notices:**

READYCAP COMMERCIAL, LLC
1320 Greenway Drive, Suite 560
Irving, Texas 75038
Attention: Melissa Perez

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Attention: Erik F. Andersen, Esq.

Exhibit E

**BANK:**

**SIGNATURE BANK**

By: ______________________
Name: Jake Shedden
Title: Senior Vice President

By: ______________________
Name: Grant Schnese
Title: Vice President

**Address for Notices:**

Signature Bank
201 Mission Street, 26th Floor
San Francisco, CA 94105
Attention: Specialized Mortgage Banking Solutions - DACA Notices PCG 837
Facsimile No.: 332-204-6708
Email: SMBSDACANotices@SignatureNY.com

with a copy to:

Signature Bank
Attention: DACA Notices
Facsimile No.: 332-204-6704
Email: DACANotices@SignatureNY.com

Exhibit E

# EXHIBIT A

## FEES

| | |
|---|---|
| Upfront Fee | $1,000, payable upon execution of the Agreement |
| Restricted Account Maintenance Fee | $225 per month base fee |
| Account/Cash Management Services Fees | Varies based on additional services and products, to include but not limited to, lockbox or remote deposit |
| Out of Pocket Expenses | As incurred |

2217-0169000

20220830001132674 B: 15256 P: 1113
08/30/2022 02:19:38 PM Pgs: 4
Fee: $24.00
Danny Lambert, Deputy County Clerk
Oklahoma County - State of Oklahoma

Return to:
Document Recording Services
P.O. Box 3008
Tallahassee, FL 32315-3008

REF238206432A

# ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company
(Assignor)
to

**READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company
(Assignee)

Dated: As of December 21, 2021

Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159

County: Oklahoma

DOCUMENT PREPARED BY ~~AND WHEN RECORDED, RETURN TO:~~

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company, whose address is 1320 Greenway Drive, Suite 560, Irving, Texas 75038 ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company, having an address at 1320 Greenway Drive, Suite 560, Irving, Texas 75038, their successors, participants and assigns ("***Assignee***"), all right, title and interest of Assignor in and to that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing from **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, ("***Borrower 1***"), and **DREXEL FLATS ACQUISITION TIC LLC** a Delaware limited liability company, ("***Borrower 2***", and together with Borrower 1, individually and collectively, jointly and severally, "***Borrower***"), for the benefit of Assignor dated December 21, 2021, and recorded in the official real estate records of Oklahoma County, Oklahoma, as Document Number 2021122901226739 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended, the "***Mortgage***"), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and Assignor hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD the Mortgage unto Assignee and to the successors and assigns of Assignee forever.

[SIGNATURE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company

By: ____________________
Name: Melissa Perez
Title: Authorized Person

ACKNOWLEDGMENT

State of Texas
ss.
County of Dallas

On December 8, 2021, before me, Jillian Tosh, a Notary Public in and for said County and State, personally appeared Melissa Perez, personally known to me or proved on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

____________________
[Notary Public]

Jillian Tosh
My Commission Expires
02/21/2024
ID No. 125638194

**Exhibit A**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

20220829011[illegible]732 B: 15254 P: 1285
08/29/2022 01:21:57 PM Pgs: 4
Fee: $24.00
Danny Lambert, Deputy County Clerk
Oklahoma County - State of Oklahoma

# ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

REF238206425A

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company
(Assignor)
to

**READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company
(Assignee)

Dated: As of December 21, 2021

Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159

County: Oklahoma

DOCUMENT PREPARED BY ~~AND WHEN RECORDED, RETURN TO~~:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

Return to:
Document Recording Services
P.O. Box 3008
Tallahassee, FL 32315-3008

ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company, whose address is 1320 Greenway Drive, Suite 560, Irving, Texas 75038 ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company, having an address at 1320 Greenway Drive, Suite 560, Irving, Texas 75038, their successors, participants and assigns ("***Assignee***"), all right, title and interest of Assignor in and to that certain Assignment of Leases and Rents from **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, ("***Borrower 1***"), and **DREXEL FLATS ACQUISITION TIC LLC** a Delaware limited liability company, ("***Borrower 2***", and together with Borrower 1, individually and collectively, jointly and severally, "***Borrower***"), for the benefit of Assignor dated December 21, 2021, and recorded in the official real estate records of Oklahoma County, Oklahoma, as Document Number 2021122901226740 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended, the "***Assignment of Leases and Rents***"), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and Assignor hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD the Assignment of Leases and Rents unto Assignee and to the successors and assigns of Assignee forever.

[SIGNATURE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READYCAP COMMERCIAL, LLC**, a Delaware limited liability company

By: M. Perez
Name: Melissa Perez
Title: Authorized Person

ACKNOWLEDGMENT

State of Texas

ss.

County of Dallas

On December 8, 2021, before me, Jillian Tosh, a Notary Public in and for said County and State, personally appeared Melissa Perez, personally known to me or proved on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[Notary Public]

NOTARY PUBLIC STATE OF TEXAS
Jillian Tosh
My Commission Expires
02/21/2024
ID No. 125638194

**Exhibit A**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

**CSC**
www.cscglobal.com

CSC- New York
Suite 200
19 West 44th Street
New York, NY 10036
212-299-5600
212-299-5656 (Fax)

**Matter#** READYCAP 2023-FL12
**Project Id :**
**Additional Reference :** DREXEL FLATS

**Order#** 887532-1
**Order Date** 07/20/2023

| | |
|---|---|
| **Entity Name:** | **DREXEL FLATS ACQUISITION LLC, READYCAP WAREHOUSE FINANCING LLC, READY CAPITAL SUBSIDIARY REIT II, LLC ET AL** |
| **Jurisdiction:** | **OK - Oklahoma County** |
| **Request for:** | **UCC Filing** |
| **File Type:** | MORTGAGE ASSIGNMENT |
| **Result:** | **Filed** |
| **File Number:** | 2023072001092946 |
| **Filing Date:** | 07/20/2023 |
| **Book Number:** | 15512 |
| **Page Number:** | 1233 |

Ordered by SHANNON MAROUTIAN at HOLLAND & KNIGHT LLP - READYCAP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Tremane Nicholson
tnichols@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

EXHIBIT G

2023072001092946 B: 15512 P: 1233
07/20/2023 12:59:26 PM Pgs: 4
Fee: $24.00
Maressa Treat, County Clerk
Oklahoma County - State of Oklahoma

# ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company
(Assignor)

to

**READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company
(Assignee)

Dated: As of June 22, 2023

Property Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159
County: Oklahoma County

DOCUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038



EXHIBIT G

EXHIBIT A TO EXHIBIT 1

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020, their successors, participants and assigns (collectively "***Assignee***"), all right, title and interest of Assignor in and to that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, and **DREXEL FLATS ACQUISITION TIC LLC**, a Delaware limited liability company (collectively, "***Borrower***"), to **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), dated as of December 21, 2021, and recorded in the Official Records of Oklahoma County, Oklahoma ("***Official Records***") on December 29, 2021, in Book 15013 at Page 1071, as document number 2021122901226739; as the same was assigned by Original Lender to Assignor, pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021 and recorded in the Official Records on August 30, 2022, in Book 15256 at Page 1113 as document number 2022083001132674 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD this Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing unto Assignee and to the successors and assigns of Assignee forever.

**SIGNATURE ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READYCAP WAREHOUSE FINANCING LLC,**
a Delaware limited liability company

By: [signature]
Name: Melissa Perez
Title: Authorized Person

**ACKNOWLEDGMENT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Texas )
)ss.:
County of Dallas )

Before me, Jillian Tosh, on this day personally appeared Melissa Perez, known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Given under my hand and seal of office this 9 day of June, 2023.

Signature [signature]

NOTARY PUBLIC STATE OF TEXAS
Jillian Tosh
My Commission Expires
02/21/2024
ID No 125638194
(Seal)

**EXHIBIT A**

**Description of the Property**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

**CSC**

www.cscglobal.com

CSC- New York
Suite 200
19 West 44th Street
New York, NY 10036
212-299-5600
212-299-5656 (Fax)

**Matter#** READYCAP 2023-FL12
**Project Id :**
**Additional Reference :** DREXEL FLATS

**Order#** 887532-2
**Order Date** 07/20/2023

| | |
|---|---|
| **Entity Name:** | **DREXEL FLATS ACQUISITION LLC, READY CAPITAL SUBSIDIARY REIT II, LLC, READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC ET AL** |
| **Jurisdiction:** | **OK - Oklahoma County** |
| **Request for:** | **UCC Filing** |
| **File Type:** | MORTGAGE ASSIGNMENT |
| **Result:** | **Filed** |
| **File Number:** | 2023072001093016 |
| **Filing Date:** | 07/20/2023 |
| **Book Number:** | 15512 |
| **Page Number:** | 1443 |

Ordered by SHANNON MAROUTIAN at HOLLAND & KNIGHT LLP - READYCAP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Tremane Nicholson
tnichols@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

EXHIBIT H

2023072001093016 B: 15512 P: 1443
07/20/2023 02:43:28 PM Pgs: 4
Fee: $24.00
Maressa Treat, County Clerk
Oklahoma County - State of Oklahoma

# ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company
(Assignor)

to

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company
(Assignee)

Dated: As of June 22, 2023

| | |
|---|---|
| Property Location: | 8800 Drexel Avenue<br>Oklahoma City, Oklahoma 73159 |
| County: | Oklahoma County |

DOCUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

EXHIBIT H

## ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020, their successors, participants and assigns (collectively "***Assignee***"), all right, title and interest of Assignor in and to that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, and **DREXEL FLATS ACQUISITION TIC LLC**, a Delaware limited liability company (collectively, "***Borrower***"), to **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), dated as of December 21, 2021, and recorded in the Official Records of Oklahoma County, Oklahoma ("***Official Records***") on December 29, 2021, in Book 15013 at Page 1071, as document number 2021122901226739; as the same was assigned by Original Lender to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Initial Assignee***"), pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021 and recorded in the Official Records on August 30, 2022, in Book 15256 at Page 1113 as document number 2022083001132674; as the same was assigned by Initial Assignee to Assignor pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 11512 at Page 1233, as document number 2023072001092946 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD this Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing unto Assignee and to the successors and assigns of Assignee forever.

**SIGNATURE ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READY CAPITAL SUBSIDIARY REIT II, LLC,**
a Delaware limited liability company

By: [signature]
Name: Melissa Perez
Title: Authorized Person

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF TEXAS )
)SS.:
COUNTY OF DALLAS )

Before me, Jillian Tosh, on this day personally appeared Melissa Perez, known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Given under my hand and seal of office this 9 day of June, 2023.

Signature [signature]

NOTARY PUBLIC STATE OF TEXAS
Jillian Tosh
My Commission Expires
02/21/2024
ID No 125638194
(Seal)

# EXHIBIT A

## Description of the Property

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

**CSC**
www.cscglobal.com

CSC- New York
Suite 200
19 West 44th Street
New York, NY 10036
212-299-5600
212-299-5656 (Fax)

**Matter#** READYCAP 2023-FL12
**Project Id :**
**Additional Reference :** DREXEL FLATS

**Order#** 887532-2
**Order Date** 07/20/2023

| | |
|---|---|
| **Entity Name:** | **DREXEL FLATS ACQUISITION LLC, READY CAPITAL SUBSIDIARY REIT II, LLC, READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC ET AL** |
| **Jurisdiction:** | **OK - Oklahoma County** |
| **Request for:** | **UCC Filing** |
| **File Type:** | MORTGAGE ASSIGNMENT |
| **Result:** | **Filed** |
| **File Number:** | 2023072001093019 |
| **Filing Date:** | 07/20/2023 |
| **Book Number:** | 15512 |
| **Page Number:** | 1451 |

Ordered by SHANNON MAROUTIAN at HOLLAND & KNIGHT LLP - READYCAP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Tremane Nicholson
tnichols@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

EXHIBIT H

2023072001093019 B: 15512 P: 1451
07/20/2023 02:44:14 PM Pgs: 4
Fee: $24.00
Maressa Treat, County Clerk
Oklahoma County - State of Oklahoma

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

**READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company
(Assignor)

to

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company
(Assignee)

Dated: As of June 22, 2023

| | |
|---|---|
| Property Location: | 8800 Drexel Avenue<br>Oklahoma City, Oklahoma 73159 |
| County: | Oklahoma County |

DOCUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

EXHIBIT H

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

**READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020, their successors, participants and assigns (collectively "***Assignee***"), all right, title and interest of Assignor in and to that certain Assignment of Leases and Rents, by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, and **DREXEL FLATS ACQUISITION TIC LLC**, a Delaware limited liability company (collectively, "***Borrower***"), to **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), dated as of December 21, 2021, and recorded in the Official Records of Oklahoma County, Oklahoma ("***Official Records***") on December 29, 2021, in Book 15013 at Page 1091, as document number 2021122901226740; as the same was assigned by Original Lender to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Initial Assignee***"), pursuant to that certain Assignment of Assignment of Leases and Rents, dated as of December 21, 2021 and recorded in the Official Records on August 30, 2022, in Book 15254 at Page 1285 as document number 2022082901131732; as the same was assigned by Initial Assignee to Assignor pursuant to that certain Assignment of Assignment of Leases and Rents, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 11512 at Page 1212, as document number 2023072001092942 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD this Assignment of Assignment of Leases and Rents unto Assignee and to the successors and assigns of Assignee forever.

**SIGNATURE ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READY CAPITAL SUBSIDIARY REIT II, LLC,**
a Delaware limited liability company

By: [signature]
Name: Melissa Perez
Title: Authorized Person

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Texas )
)ss.:
County of Dallas )

Before me, Jillian Tosh, on this day personally appeared Melissa Perez, known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Given under my hand and seal of office this 9 day of June, 2023.

Signature [signature]

NOTARY PUBLIC STATE OF TEXAS
Jillian Tosh
My Commission Expires 02/21/2024
ID No 125638104
(Seal)

# EXHIBIT A

## Description of the Property

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

2023072001093191 B: 15513 P: 121
07/20/2023 03:42:25 PM Pgs: 4
Fee: $24.00
Maressa Treat, County Clerk
Oklahoma County - State of Oklahoma

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company
(Assignor)

to

**READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC**, a Delaware limited liability company
(Assignee)

Dated: As of June 22, 2023

| | |
|---|---|
| Property Location: | 8800 Drexel Avenue<br>Oklahoma City, Oklahoma 73159 |
| County: | Oklahoma County |

DOCUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020, their successors, participants and assigns (collectively "***Assignee***"), all right, title and interest of Assignor in and to that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, and **DREXEL FLATS ACQUISITION TIC LLC**, a Delaware limited liability company (collectively, "***Borrower***"), to **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), dated as of December 21, 2021, and recorded in the Official Records of Oklahoma County, Oklahoma ("***Official Records***") on December 29, 2021, in Book 15013 at Page 1071, as document number 2021122901226739; as the same was assigned by Original Lender to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Initial Assignee***"), pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021 and recorded in the Official Records on August 30, 2022, in Book 15256 at Page 1113 as document number 2022083001132674; as the same was assigned by Initial Assignee to **READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company ("***Second Assignee***"), pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 11512 at Page 1233, as document number 2023072001092946; as the same was assigned by Second Assignee to Assignor pursuant to that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 15512 at Page 1443, as document number 2023072001093016 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD this Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing unto Assignee and to the successors and assigns of Assignee forever.

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC,**
a Delaware limited liability company

By: ______________________
Name: Gary Taylor
Title: Authorized Person

**ACKNOWLEDGMENT**

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF NEW JERSEY )
) ss.:
COUNTY OF UNION )

On the 13th day in June, the year 2023 before me personally appeared Gary Taylor, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________
Notary Public

RONALD BERTRAND
COMMISSION # 50049797
NOTARY PUBLIC-NEW JERSEY
Comm Expires Nov. 16, 2026

**EXHIBIT A**

**Description of the Property**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

2023072001093158 B: 15513 P: 13
07/20/2023 03:23:05 PM Pgs: 4
Fee: $24.00
Maressa Treat, County Clerk
Oklahoma County - State of Oklahoma

# ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC,** a Delaware limited liability company
(Assignor)

to

**READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC,** a Delaware limited liability company
(Assignee)

Dated: As of June 22, 2023

Property Location: 8800 Drexel Avenue
Oklahoma City, Oklahoma 73159
County: Oklahoma County

DOCUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

ReadyCap Commercial, LLC
Attn: Melissa Perez
1320 Greenway Drive, Suite 560
Irving, TX 75038

ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company ("***Assignor***"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to **READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 50th Floor, New York, New York 10020, their successors, participants and assigns (collectively "***Assignee***"), all right, title and interest of Assignor in and to that certain Assignment of Leases and Rents, by **DREXEL FLATS ACQUISITION LLC**, a Delaware limited liability company, and **DREXEL FLATS ACQUISITION TIC LLC**, a Delaware limited liability company (collectively, "***Borrower***"), to **READYCAP COMMERCIAL, LLC**, a Delaware limited liability company ("***Original Lender***"), dated as of December 21, 2021, and recorded in the Official Records of Oklahoma County, Oklahoma ("***Official Records***") on December 29, 2021, in Book 15013 at Page 1091, as document number 2021122901226740; as the same was assigned by Original Lender to **READYCAP WAREHOUSE FINANCING LLC**, a Delaware limited liability company ("***Initial Assignee***"), pursuant to that certain Assignment of Assignment of Leases and Rents, dated as of December 21, 2021 and recorded in the Official Records on August 30, 2022, in Book 15254 at Page 1285 as document number 2022082901131732; as the same was assigned by Initial Assignee to **READY CAPITAL SUBSIDIARY REIT II, LLC**, a Delaware limited liability company ("***Second Assignee***"), pursuant to that certain Assignment of Assignment of Leases and Rents, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 15512 at Page 1212, as document number 2023072001092942; as the same was assigned by Second Assignee to Assignor pursuant to that certain Assignment of Assignment of Leases and Rents, dated as of June 22, 2023 and recorded in the Official Records on 7/20/2023, in Book 15512 at Page 1451, as document number 2023072001093019 (as the same have heretofore been amended, modified, restated, supplemented, assigned, renewed or extended), and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all notes and obligations therein described, the debt and claims secured thereby and all sums of money due and to become due thereon, with interest provided for therein, and hereby irrevocably appoints Assignee hereunder its attorney to collect and receive such debt, and to foreclose, enforce and satisfy the foregoing the same as it might or could have done were these presents not executed, but at the cost and expense of Assignee.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

TO HAVE AND TO HOLD this Assignment of Assignment of Leases and Rents unto Assignee and to the successors and assigns of Assignee forever.

**SIGNATURE ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed by its duly authorized officer on the day and year first above written.

**ASSIGNOR:**

**READY CAPITAL MORTGAGE DEPOSITOR FL12, LLC**, a Delaware limited liability company

By: ______________________
Name: Gary Taylor
Title: Authorized Person

## ACKNOWLEDGMENT

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF NEW JERSEY )
) ss.:
COUNTY OF UNION )

On the 13th day in June, the year 2023 before me personally appeared Gary Taylor, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________
Notary Public

RONALD BERTRAND
COMMISSION # 50049797
NOTARY PUBLIC-NEW JERSEY
Comm Expires Nov. 16, 2026

**EXHIBIT A**

**Description of the Property**

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

POLSINELLI.

7676 Forsyth Boulevard, Suite 800, St. Louis, MO 63105 • (314) 889-8000

Llynn K. White
(314) 552-6804
(314) 622-6704 Fax
lwhite@polsinelli.com

December 12, 2025

**VIA FEDERAL EXPRESS**

Drexel Flats Acquisition LLC
c/o M Group LLC
187 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Attn: Ira Mondry

Drexel Flats Acquisition TIC LLC
c/o M Group LLC
187 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Attn: Ira Mondry

**Re: NOTICE OF MATURITY DEFAULT**
**Borrower: Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC**
**Loan Agreement dated as of December 21, 2021**
**Original Principal Amount of $28,300,000.00**
**Property: 8800 Drexel Avenue, Oklahoma City, Oklahoma 73159**

Dear Mr. Mondry:

This Firm is counsel to KeyBank National Association (**"KeyBank"**), as servicer for Ready Capital Mortgage Financing 2023-FL12, LLC ("**Lender**"). Lender is the owner and holder of that certain Promissory Note, dated as of December 21, 2021, in the original principal amount of $28,300,000.00 (the "**Note**"), the makers of which are Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC (collectively, "**Borrower**"). The Note evidences the loan to Borrower (the "**Loan**") made pursuant to that certain Loan Agreement dated as of December 21, 2021.

The Loan is secured by, among other things, that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021 ("**Mortgage**") pursuant to which Borrower granted to Lender, the assignee of ReadyCap Commercial, LLC ("**Original Lender**"), a first-priority security interest in that certain real property located at 8800 Drexel Avenue, Oklahoma, City, Oklahoma 73159 and further described in the Mortgage (the

"**Property**"). Lender is also the holder of that certain Guaranty of Recourse Obligations, dated as of December 21, 2021, executed by Ira Mondry, Mitchell Mondry, Marc Kulick and John Alexander Upperman (the "**Guaranty**").

The Note, the Loan Agreement, the Mortgage, the Guaranty, and all other documents further evidencing, securing or executed in connection with the Loan, together with all modifications of any of the foregoing, are sometimes referred to herein collectively as the "**Loan Documents**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Documents.

Pursuant to the Loan Documents, Borrower was obligated to pay the entire outstanding Indebtedness under the Note on the January 2025 Payment Date (as defined therein). Despite Borrower's agreement, the Loan matured, and Borrower failed to pay the Loan in full upon such maturity in January 2025 (or to otherwise obtain an extension of the Initial Maturity Date.) Such failure constitutes an Event of Default under the Loan Documents.

Additionally, under the Loan Documents, Borrower agreed not to allow any Transfer (as defined in the Loan Agreement) to occur, including imposition of a Lien affecting the Property. Despite Borrower's agreement, Borrower has allowed multiple Liens on the Property, including those filed by Nix Lumber, Inc. (including a suit to enforce), Maintenance Supply Solutions, Rasa Floors & Carpet Cleaning, LLC and IPlumb Co., LLC. This constitutes a further Event of Default under the Loan Documents.

**Accordingly, the matured Indebtedness under the Note and other Loan Documents is due and payable to Lender in full, and demand is hereby made on Borrower for immediate payment, in full, of all amounts owned under the Loan Documents, including, without limitation, interest at the Default Rate, which is now accruing and will continue to accrue.** Additionally, as a result of Borrower's default and such acceleration, Borrower's license under the Loan Documents to receive, collect and make use of rents, profits and income of any other type (the "**Rents**") is automatically revoked, and all such Rents are now the property of Lender. Borrower shall hold the Rents in trust for the benefit of Lender. The revocation of Borrower's license to collect and make use of the Rents shall remain in full force and effect until such time as Lender and Borrower otherwise agree in a signed writing.

If the matured Indebtedness due under the Note and Other Loan Documents is not paid as demanded herein, Borrower will continue to be in default, and Lender may exercise any and all rights and remedies available to it under the Loan Documents, and under applicable law or in equity, without further notice or demand, and all as Lender may determine in its sole discretion. Such rights and remedies include, but are not limited to, collection of interest at the Default Rate (defined in the Note), which may already be accruing and due under the Loan Documents,

appointment of a receiver for the Property to take possession of and administer the Property, the direct collection of all rents, income and profits arising from operation of the Property, foreclosure of the Property, and enforcement against Borrower and Guarantor of any recourse liability that has arisen in connection with the Loan Documents.

Please note that Lender, or Lender's servicer or other agents, may, from time to time, generate automated billing statements or other statements that are forwarded to Borrower or to other persons or entities on a monthly or other periodic basis. The forwarding to Borrower of any billing statement from this time forward, including any billing statement that purports to state amounts due and owing by Borrower that are different from the indebtedness owed, may not be relied upon by Borrower, and does not result in any waiver of Lender's rights as set forth herein, all of which are reserved in their entirety.

Borrower's tender of any post-maturity payment, or acceptance of any post-maturity payment by Lender or any of its representatives or loan servicing agents, that is not sufficient to pay the matured Indebtedness in full is not intended, and shall not be deemed, to constitute a waiver of Lender's rights, remedies or recourse under the Loan Documents or at law or in equity. Any application of any such payment is not intended, and shall not be deemed, to be a modification, rearrangement, reinstatement or extension of the existing Loan Documents. Any such payment shall be applied in such order as Lender may elect in its sole discretion, all as and to the maximum extent permitted by the Loan Documents, without any waiver by Lender of its right to pursue any of its rights and remedies under the Loan Documents, at law or in equity.

Lender fully reserves all rights and remedies related to the Event of Default described herein (as well as any about which Borrower has been previously or will be advised), and all discussions to date, and the discussions to continue, in no manner are intended to be, or shall constitute, a waiver by Lender of any such rights or remedies. Any past or future negotiation between Borrower or its representatives or agents on the one hand and Lender and its representatives or agents on the other do not and shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents, at law or in equity. Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender. Borrower is not entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth herein is intended, and shall not be deemed, to modify, limit, release, reduce or waive any of Lender's rights, remedies or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of

POLSINELLI



any specific default herein is not intended, and shall not be deemed, to waive other defaults that may currently exist under the Loan Documents.

Please contact me or Ethan J. Meyer with KeyBank by telephone at (913) 913-317-4819 or by electronic mail at Ethan_J_Meyer@keybank.com to discuss further. Your immediate attention to this matter is appreciated. Thank you.

Very truly yours,

By: */s/ Llynn K. White*

Llynn K. White

cc: By Federal Express:

Vesta Realty, LLC
6400 W 110th Street, Suite 201
Overland Park, Kansas 66211
Attn: Marc Kulick

O'Halloran Ryan PLLC
275 Madison Avenue, 36th Floor
New York, New York 10016
Attn: Neil O'Halloran

c/o Vesta Realty
6400 W 110th Street, Suite 201
Overland Park, Kansas 66211
Attn: John Alexander Upperman

c/o Vesta Realty
6400 W 110th Street, Suite 201
Overland Park, Kansas 66211
Attn: Marc Kulick

c/o M Group
187 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Attn: Ira Mondry



Exhibit J

EXHIBIT A TO EXHIBIT 1

POLSINELLI



c/o M Group
187 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Attn: Mitchell Mondry

By Electronic Mail:

Ethan J. Meyer
Ethan_J_Meyer@keybank.com



Exhibit J

EXHIBIT A TO EXHIBIT 1

*1065412587*

ORIGINAL

($/oc)

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

FILED
SUPREME COURT
STATE OF OKLAHOMA
JUN - 3 2026
SELDEN JONES
CLERK

| | | |
|---|---|---|
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION,**<br><br>**Plaintiff/Appellee,**<br><br>**v.**<br><br>**DREXEL FLATS ACQUISITION, LLC; DREXEL FLATS ACQUISITION TIC, LLC,**<br><br>**Defendants/Appellants,**<br><br>**NIX LUMBER, INC.; TRES PALM SUPPLY, LLC d/b/a MAINTENANCE SUPPLY SOLUTIONS; RASA FLOORS & CARPET CLEANING, LLC; IPLUMB CO., LLC; MARC KULICK; YSA INVESTMENTS 1, LLC; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; THE OKLAHOMA COUNTY TREASURER,**<br><br>**Additional Defendants.** | ) | **No.** #124122 |

FILED IN DISTRICT COURT
OKLAHOMA COUNTY
JUN - 3 2026
RICK WARREN
COURT CLERK
129 __________

ORIGINAL
Receipted
Marshall
Reynolds
Cert mailed
Updated

## PETITION IN ERROR

_X_ PETITION IN ERROR
____ AMENDED OR SUPPLEMENTAL PETITION
____ CROSS PETITION
____ COUNTER-PETITION
____ DATE FIRST PETITION IN ERROR FILED: ________________

### I. TRIAL COURT HISTORY

COURT/TRIBUNAL: District Court
COUNTY: Oklahoma
CASE NO.: CJ-2026-1275
JUDGE: Honorable Amy Palumbo
NATURE OF CASE: Foreclosure
(e.g., Divorce, Personal Injury)

NAME OF PARTY OR PARTIES FILING THIS PETITION IN ERROR:
Drexel Flats Acquisition, LLC and Drexel Flats Acquisition TIC, LLC

THE APPEAL IS BROUGHT FROM: (Check one)

_____ Judgment, Decree or Final order of District Court.

_____ Appeal from order granting summary judgment or motion to dismiss (Accelerated procedure under Rule 1.36).

_____ Appeal from Revocation of Driver's License (Rule 1.21(b)).

_____ Final Order of Other Tribunal.

(Specify Corporation Commission, Insurance Department, Tax Commission, Court of Tax Review, Banking Board or Banking Commissioner, etc. ______________________)

__X__ Interlocutory Order Appealable by Right.

_____ Other ______________________________________________

## II. TIMELINESS OF APPEAL

1. Date judgment, decree or order appealed was filed: May 28, 2026.
2. Did the party appealing prepare the judgment, decree or order appealed? ____ Yes __X_ No.
3. Date the certificate of service was filed in the trial court: May 28, 2026.
4. Does the judgment or order on appeal dispose of all claims by and against all parties?

   ____ Yes __X__ No.

   If not, did district court direct entry of judgment in accordance with 12 O.S. § 994? _____Yes __X__ No.

   When was this done? _______________

5. If the judgment or order is not a final disposition, is it appealable because it is an Interlocutory Order Appealable by Right? __X__ Yes _____ No. Specific *statutory* basis for interlocutory order appealable by right:_12 O.S. § 993(A)(4); Rule 1.60(e).
6. If none of the above applies, what is the specific *statutory* basis for determining the judgment or order is appealable? _N/A_____________________________
7. Were any post-trial motions filed? No.

| Type | Date Filed | Date Disposed |
|---|---|---|
| | | |
| | | |
| | | |

8. This Petition is filed by: _X__ Delivery to Clerk, or

   _____ Mailing to Clerk by U.S. Certified Mail, Return Receipt Requested, on __________ (date)

## III. RELATED OR PRIOR APPEALS

List all prior appeals involving same parties or same trial court proceeding: None

List all related appeals involving same issues: None
(Identify by Style, Appeal Number, Status, and Citation, if any. If none, so state.)

## IV. SETTLEMENT CONFERENCE

Is appellant willing to participate in an attempted settlement of the appeal by predecisional conference under Rule 1.250? _X__ Yes _____ No

## V. RECORD ON APPEAL

_X__ A Transcript will be ordered.
_____ No Transcript will be ordered because no record was made and/or no transcript will be necessary for this appeal
_____ A Narrative Statement will be filed
_____ Record is concurrently filed as required by Rule 1.34 (Driver's License Appeals, etc.) or Rule 1.36 (Summary judgments and motions to dismiss granted).

## VI. JUDGMENT, DECREE OR ORDER APPEALED -- EXHIBIT "A"

(Attach as Exhibit "A" to the Petition in Error a certified copy of the judgment, decree or order from which the appeal is taken. If a post-trial motion extending appeal time under Rule 1.22 was filed, a certified copy of the order disposing of the motion must be attached also.)

## VII. SUMMARY OF CASE -- EXHIBIT "B"

Attach as Exhibit "B" a brief summary of the case *not to exceed one 8 ½"x 11" double spaced page.*

## VIII. ISSUES TO BE RAISED ON APPEAL -- EXHIBIT "C"

Attach as Exhibit "C" the issues proposed to be raised. Include each point of law alleged as error. Avoid general statements such as "Judgment not supported by law."

## IX. NAME OF COUNSEL OR PARTY, IF PRO SE

ATTORNEY FOR APPELLANTS
Name: Andrew A. Shank
OBA No.: 22298
Name: Lacy B. Williamson
OBA No.: 34004
Firm: Eller & Detrich
Designated Case-Specific Email Address: ashank@ellerdetrich.com

Secondary Email Address: lwilliamson@ellerdetrich.com
Address: 2727 East 21st Street, Suite 200
Tulsa, Oklahoma 74114
Telephone: 918-747-8900

ATTORNEY FOR APPELLEE
Name: Kiran A. Phansalkar
OBA No.: 11470
Name: Preston Sullivan
OBA No.: 33619
Firm: Conner & Winters, LLP
Designated Case-Specific Email Address: kphansalkar@cwlaw.com
Secondary Email Address: psullivan@cwlaw.com
Address: 1700 One Leadership Square
211 N. Robinson
Oklahoma City, Oklahoma 73120
Telephone: 405-272-5711

DATE: June 3, 2026

Verified by Andrew A. Shank, OBA #22298
Eller & Detrich, P.C.
Firm
ashank@ellerdetrich.com
Designated Case-Specific Email Address *[if applicable]*
lwilliamson@ellerdetrich.com
Secondary Email Address *[if applicable]*
2727 East 21st Street, Suite 200
Address
918-747-8900
Telephone

## X. CERTIFICATE OF MAILING TO ALL PARTIES AND COURT CLERK

I hereby certify that a true and correct copy of the Petition in Error was mailed this 3rd day of June, 2026 by depositing it in the U.S. Mail, postage prepaid.

Kiran A. Phansalkar, OBA #11470
Preston Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
CONNER & WINTERS, LLP
1700 One Leadership Square
211 N. Robinson Avenue
Oklahoma City OK 73102
kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com
ATTORNEYS FOR PLAINTIFF

Drew Campo, OBA #1455
5704 NW 161st Circle
Edmond OK 73013
drewcampo@cox.net
ATTORNEY FOR NIX LUMBER, INC.

James Vogt, OBA #9243
Reynolds, Ridings, Vogt & Robertson, PLLC
101 Park Avenue, Suite 1010
Oklahoma City OK 74102
jimvogt@rrvmlaw.com
ATTORNEY FOR TRES PALM SUPPLY, LLC

Hilary S. Allen, OBA #16979
Spence Fane LLP
9400 N. Broadway Ext., Suite 600
Oklahoma City, OK 73114
hallen@spencerfane.com
ATTORNEY FOR RECEIVER

I further certify that a copy of the Petition in Error was filed in the Office of the Oklahoma County District Court Clerk on the 3rd day of June, 2026.

(District Court Clerk or Other Tribunal)

Certified by Andrew A. Shank
Attorney for Appellants Drexel Flats Acquisition, LLC
and Drexel Flats Acquisition TIC, LLC
(Signature of Attorney or Pro Se Party)

# EXHIBIT A – JUDGMENT, DECREE OR ORDER APPEALED

*1065659397*

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| LSREF7 BADLANDS LOAN TRUST 2026, a Delaware Statutory Trust,<br>Plaintiff,<br>v.<br>DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company, et al.,<br>Defendants. | Case No.: CJ-2026-1275<br>Judge Amy Palumbo |

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 2 8 2026

RICK WARREN
COURT CLERK
115 ________

**ORDER APPOINTING RECEIVER**

On this 28th of May, 2026, comes before the Court, the Motion for Appointment of a Receiver ("**Motion**") filed by Plaintiff LSREF7 Badlands Loan Trust 2026[1] ("**Plaintiff**" or "**Lender**") seeking the appointment of a receiver for certain real and personal property identified in the Motion, owned by Defendants Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC (collectively, "**Borrowers**"), and consisting of a multifamily apartment complex, located at 8800 Drexel Avenue, Oklahoma, City, Oklahoma 73159, as more fully described in the Mortgage[2] (which Mortgage is attached as Exhibit C to the Verified Petition) and in the legal description attached hereto as **Exhibit A** (collectively, the "**Property**").

Having examined the pleadings and papers filed in this case, and having determined that jurisdiction and venue are proper in this Court and sufficient notice has been given, and being otherwise fully advised, and having fully considered the matter, the Court, for good cause shown, hereby finds and orders as follows:

NOW THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

---

[1] LSREF7 Badlands Loan Trust 2026 was substituted as the proper Plaintiff after the filing of the Motion for Appointment of a Receiver.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Verified Complaint, Motion and/or Loan Documents.

(a) The Court finds that the appointment of a receiver for the Property is proper for good cause shown. Accordingly, Jeremiah Foster with Resolute Commercial Services, LLC ("**Receiver**") is hereby appointed as the receiver for the Property. Receiver possesses the necessary qualifications and experience and is not an attorney or related to any party to this action;

(b) Upon entry of this Order, the Receiver's Oath, and the posting of a bond by the Receiver, as set forth in paragraph (mm) below, (referred to as the "**Effective Date**"), the Receiver is appointed to act and serve as receiver with respect to the Property and with respect to the income therefrom, whether now existing or hereafter collected, including the rents, profits and income from the Property;

(c) As of the Effective Date, the Receiver is authorized to take and have complete and exclusive control, possession and custody of the Property, together with any and all bank accounts, credit card receipts, demand deposits, reimbursement rights, bank deposits and security deposits related thereto, including accounts titled in the name of Borrowers, all without offset by Borrowers or by any property manager of the Property or third party, and all financial institutions are directed to deliver to the Receiver any such deposits and all records relating thereto, and, with this authority, the Receiver is allowed to transfer all deposit accounts to another financial institution insured by the federal government in the name of the Borrowers or Receiver and to write checks and make withdrawal on such accounts, provided that only the Receiver (and its designated management company or operator) shall have deposit, check-writing and other authority to conduct transactions in such accounts;

(d) As of the Effective Date, the Receiver is authorized to take any and all actions the Receiver deems reasonable and appropriate to prevent waste to and to preserve, secure, manage, maintain and safeguard the Property;

(e) As of the Effective Date, the Receiver is vested with (and Borrowers and their respective agents and any property manager shall without delay deliver to the Receiver) exclusive possession, custody and control of all books and records with respect to the operation of the Property and all documents, information and other items necessary for the Receiver to carry out his duties under this Order and otherwise, including: (1) all keys (including all master keys) and security and access codes and cards to the Property and a schedule (including full contact information) identifying each person or entity (including security companies, municipal/governmental agencies and utility companies), that currently has one or more keys or access cards to the Property or that has knowledge of any access codes thereto; (2) all leases and tenant files together with communication and correspondence files relating thereto; (3) all security deposits, rent, prepaid rent, other sums relating to the use, enjoyment, possession, improvement or occupancy of all or any part of the Property, and any accountings of any of the foregoing; (4) any and all accounts receivable and accounts payable reports and all open invoices for goods and services related to the Property; (5) operating statements and other financials for the Property; (6) any and all documents pertaining to any ongoing litigation; (7) any and all documents pertaining to any licenses maintained in connection with the Property together with all communications and correspondence pertinent thereto; (8) any and all contracts and agreements in effect with respect to any of the Property or to which the Property may be subject, including maintenance and service contracts, together with all communications and correspondence pertinent thereto; (9) any and all contracts, bids or other materials relating to any contractor work at the Property; (10) any and all payroll records, employee files, applications and other materials relevant to those persons employed by or at the Property; (11) a list of all bank accounts in the name of or relating to the Property, including the name of the institution where each account is located, the account number

for each such account and the monthly statements for each such account for the 12 month period preceding the date of this Order; (12) all third party reports, including environmental condition reports, audits and studies relating to the Property; (13) login information for any electronic tax account for the Property; (14) a current rent roll and occupancy report for the Property, including but not limited to schedules/information related to tenant security deposits, encumbrances, options, escalations, rents and term; (15) all written and electronic books, records, correspondence, and other information related to: (i) any amounts received from operations at the Property since January 1, 2025; (ii) all liens, encumbrances and other interests against or affecting the Property; (iii) property taxes, assessments and related appeals; (iv) insurance of all types for Borrowers, the Property and tenants (including but not limited to liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, burglary and theft, builders risk, construction related insurance and workmen's compensation) related to the Property, which Borrowers shall not act to terminate or modify; and (v) accounting including tenant escalations/reconciliations from the time Borrowers took ownership of the Property to the date of entry of this Order; (16) all marketing information (in hard copy and electronic format) including but not limited to brochures, photographs (including aerial), maps, and signage; (17) all quotes received for repairs, maintenance, capital expenditures, deferred maintenance, or fire and life safety issues at the Property; (18) a list of all outstanding tenant improvement and/or leasing commission obligations; ; (19) any warranties and maintenance manuals for the Property; (20) legal notices, alleged claims, defects, or malfunctions received in connection with the Property; (21) all plans and specifications for any construction at the Property; (22) all plot plans, specifications, surveys and drawings for the Property; (23) all licenses, permits, and certificates of occupancy for the Property; (24) all building and stacking plans for the Property; (25) all insurance

loss histories and claims on the Property since January 1, 2024; (26) all property and all other things of value associated with the use, operation and maintenance of the Property, specifically including all intellectual property and marketing websites and materials, including, without limitation possession and control over the website, Facebook and other social media pages, logo, and brochures used in connection with the Property; and (27) all other records for the Property that are or may be necessary or pertinent to the Receiver's management, maintenance, operation or leasing of the Property; provided, however, that neither Borrowers nor any other third party shall be required to provide any documents, communications, correspondence and other information that is subject to an attorney-client privilege or other confidentiality obligations that prohibits such disclosure;

(f) As of the Effective Date, all persons and entities, including Borrowers, and anyone associated therewith or acting under its/their authority or control, including any current or past manager of the Property, any owner of Borrowers, or any person or entity with an interest in any owner of Borrowers ("**Borrower Parties**"), are enjoined from in any manner disturbing the Receiver's possession of the Property or any other property of the receivership estate created by this Order, and are prohibited and restrained from disposing of, dissipating, mishandling or misappropriating any such property, and are prohibited and restrained from collecting any rents or other sums due to Borrowers, unless otherwise directed by the Court. Borrower Parties shall not (i) possess or manage the Property in any way; (ii) collect, withdraw or transfer, in any way, funds or revenue derived from the operation of the Property; (iii) remove or destroy any property from the Property; (iv) terminate, modify or cause to be terminated or modified any license, permit, lease, contract, insurance policy, utility service, or agreement relating to the Property; (v) enter into any leases, vendor contracts or other contracts with respect to the operation or management

of the Property; or (vi) otherwise interfere with the Receiver's custody, control, or operation of the Property;

(g) Borrowers shall, at all times after the entry of this Order, provide full cooperation to the Receiver for carrying out the Receiver's duties hereunder, and Borrowers shall timely respond to all reasonable requests made by the Receiver. Borrowers' obligation to use reasonably commercial efforts to provide or make available to the Receiver the items and things identified herein shall be continuing;

(h) As of the Effective Date, the Receiver is authorized to retain, hire or discharge employees of the Borrowers, if any. The Receiver is further authorized to retain agents, representatives, consultants, contractors, property managers, leasing or sales brokers, accountants and attorneys (collectively, "**Receiver Professionals**"), as necessary or appropriate to perform its duties under this Order or as otherwise directed by the Court, provided, however, that the Receiver shall have no obligation to employ or pay any current employees of Borrowers but shall not be limited from doing so if the Receiver elects to do so.

(i) As of the Effective Date, the Receiver shall have the right to continue to operate under all existing licenses and permits issued with respect to the Property whether or not in the name of Borrowers;

(j) As of the Effective Date, the Receiver is authorized to make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property. The Receiver has no obligation to pay pre-receivership expenses of any kind unless the Receiver determines that such payments may benefit the Property and then only upon approval of Plaintiff or the Court;

(k) As of the Effective Date, the Receiver is authorized to receive and collect (by causing the same to be deposited into the Deposit Account, defined herein) any and all sums held by and due and owing to Borrowers relating to the Property, whether the same are now due or hereafter become due and owing, and to deposit such sums into an account in the name Borrowers or otherwise using Borrowers' FEINs (which sums shall not be commingled with any other funds) established and maintained by the Receiver, and Borrowers shall provide to the Receiver their federal employer identification number(s);

(l) As of the Effective Date, the Receiver is authorized to continue any current insurance policies in place and pay any related invoices or policy premiums for such policies and is authorized to purchase further insurance as the Receiver deems appropriate to the extent such insurance is required under the relevant Loan Documents (as defined in the Petition) or is approved by Plaintiff or the Court. Borrowers shall cooperate in all reasonable respects with Receiver to obtain, renew or re-document all insurance required under the Loan Documents, and to modify any existing or new insurance policies if deemed appropriate by Receiver. All insurance policies shall name the Plaintiff and Receiver and any property manager retained by Receiver, as an additional named insured, as mortgagee, and as loss payee with respect to all casualty policies. The Receiver may cancel any existing insurance policy, and Borrowers and their employees and agents are prohibited from cancelling, reducing or modifying any and all insurance coverage in existence with respect to the Property until Receiver has notified Borrowers that the above-described coverage has been obtained by Receiver. Any refunds received by Borrowers arising from the cancellation of its insurance coverage on the Property shall be turned over to the Receiver. No insurance company shall be permitted to terminate coverage or refuse coverage for the Property

based upon prior unpaid premiums, claims history or because of the appointment of Receiver pursuant to this Order;

(m) As of the Effective Date, the Receiver is authorized to pay all current and past due real estate taxes, personal property taxes and any other taxes and assessments against any of the Property;

(n) As of the Effective Date, the Receiver is authorized to open and review mail, e-mail, and faxes received at the Property or elsewhere directed to Borrowers or their manager relating to the Property and may issue demand that the U.S. Postal service grant exclusive possession and control of all mail including postal boxes as may have been used by Borrowers and may direct that such mail relating to the Property be re-directed to the Receiver, except as to those postal boxes that may be in the control of Plaintiff;

(o) As of the Effective Date, the Receiver is not required to prepare and file tax returns with respect to the Property, and the Receiver is not responsible for the preparation of any tax returns for Borrowers, provided, however, that the Receiver shall furnish any information reasonably requested by Borrowers to allow Borrowers, or their agents, to prepare any tax returns of Borrowers;

(p) As of the Effective Date, the Receiver is authorized to: (1) negotiate and enter into new leases, occupancy agreements and other contracts in the ordinary course of the business of the Property; (2) modify existing leases, occupancy agreements and other contracts in the ordinary course of the business of the Property; (3) terminate existing agreements and contracts pertaining to the Property as Receiver determines is reasonably necessary with no further obligations or liability, including the liability to pay any termination fee under such terminated contract; (4) pay all utilities, expenses and other obligations secured by, or which may give rise to, liens, and all

other outstanding obligations to suppliers and servicers in the ordinary course of business, including obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership; (5) make repairs necessary to the maintenance of the Property, including but not limited to all repairs necessary to remediate any environmental conditions present at the Property, in order to preserve the Property in the ordinary course of business, provided, however, that the Receiver shall not make any improvements, repairs or remediation having a cost of $5,000.00 or more without first obtaining approval of either Plaintiff or the Court unless Receiver reasonably determines that such repairs must be made prior to obtaining approval to address any life safety issues arising at the Property; and (6) take all steps necessary to comply with all requirements, regulations and laws, including but not limited to environmental or health requirements, regulations and laws, applicable to the Property, and to deal with all regulatory authorities in connection with the same, and the Receiver shall have no liability for any environmental claims or other municipal code violations existing as of the date of this Order;

(q) As of the Effective Date, the Receiver is authorized, through itself or by an agent, upon request of Plaintiff, to lease, market for lease and/or sale and, upon further Court order, and with the consent of Plaintiff, negotiate and sell the Property (including free and clear of liens, encumbrances and other interests in the Property);

(r) As of the Effective Date, the Receiver is authorized to take possession of and receive from all depositories, banks, brokerages and otherwise (collectively, the "**Financial Institutions**") any money on deposit in all such Financial Institutions belonging to Borrowers or arising from the operation of the Property, whether such funds be in accounts titled in the name of

Borrowers or not (but excluding any monies paid to or held by Lender). All Financial Institutions are directed to deliver such deposits to Receiver and such records as Receiver may reasonably request with respect to such accounts. Receiver may, in its sole discretion, open any new accounts using a new EIN, or close any such accounts. Receiver shall deposit monies and funds collected and received in connection with the Property at a federally insured banking institution or savings association with offices in the State of Oklahoma. Borrowers shall assist and cooperate with Receiver to have all funds from the Financial Institutions turned over to Receiver as soon as possible. Borrowers understand that time is of the essence in effectuating the turn-over of these funds to Receiver;

(s) As of the Effective Date, the Receiver is authorized to, in its discretion, institute, prosecute, defend, compromise and/or intervene in or become a party to such actions or proceedings in state or federal courts which may in the Receiver's opinion be necessary for the protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of the Court affecting the Property, to collect rent and otherwise enforce the terms and provisions of any tenant leases with respect to the Property, to remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity, and the Receiver is authorized to retain counsel in connection with the foregoing and to seek reimbursement of any reasonable and customary fees or costs incurred by Receiver or its property manager in connection with the utilization of such counsel, provided, however, that Receiver must first obtain approval from Plaintiff or the Court with respect to any financial terms of such engagement. This Order shall act as notice to all tenants of the Property that the Property is now under the control of the Receiver;

(t) As of the Effective Date, the Receiver is authorized to enter into further lending transactions by which Plaintiff may in its sole discretion, but has no obligation to, lend monies to the Receiver (on a nonrecourse basis as to Receiver) to enable the Receiver to perform its duties hereunder, in which case any monies loaned shall be deemed protective advances for the benefit of the Property and shall be secured by a first and prior lien and security interest on the Property in favor of Plaintiff, to the extent permitted in the Loan Documents;

(u) As of the Effective Date, the collection and disbursement of cash, rents and other income by the Receiver shall continue during the term of the receivership as provided in Section 3.7 of the Loan Agreement and the Deposit Account Control Agreement (Soft Lockbox) ("**DACA**"), (which DACA is attached as Exhibit D to the Verified Petition), in Plaintiff's sole discretion, with funds continuing to be deposited in the Deposit Account thereunder. Any funds in the Deposit Account that are subject to disbursement to Borrowers under Section 3.7 of the Loan Agreement and the DACA shall instead be disbursed to the Receiver and utilized for Property operations and payment of receivership expenses and costs, all in accordance with this Order. The Receiver will use an account established by the Receiver to sweep cash through funding requests from the Deposit Account. Disbursements received by Receiver from the Deposit Account shall be applied on a monthly basis in the following order of priority, subject to the lien rights of Plaintiff, without further order of the Court as follows: (1) to the Allowed Fees and Expenses; (2) to current operating expenses of the receivership incurred by the Receiver in the ordinary course of business; and (3) to the monetary obligations owed to Plaintiff under the Loan Documents or otherwise;

(v) As of the Effective Date, the Receiver is authorized to maintain sufficient cash on hand to enable the Receiver to meet expenses, in an amount to be agreed to between the Receiver and Plaintiff;

(w) As of the Effective Date, the Receiver shall allow Plaintiff and its agents access to the Property at all reasonable times;

(x) As of the Effective Date, the Receiver is directed to file with the Court and serve on parties of record, within 60 calendar days of entry of the order of the Court, and not less than monthly thereafter, and within 45 calendar days after termination of the receivership, full and complete reports, under oath, detailing all receipts, disbursements and transactions, including a budget for all future expenses, if required by Plaintiff, affecting the Property (**"Monthly Reports"**) and that, at the option of Plaintiff, may be submitted to the Clerk of the Court under seal and shall not be available for public inspection without further order of the Court.

(y) The Monthly Reports shall detail the Receiver's and Receiver's Professionals' fees and expenses incurred during the reporting period. If no objection is filed within 14 calendar days after the filing of a Monthly Report, the Monthly Report, along with the Receiver's and Receiver's Professionals' fees and expenses compensation or reimbursement (including legal fees and expenses) shall be deemed approved without further order of the Court. Failure to object to a Monthly Report constitutes a waiver of any objection to matters addressed in the Monthly Report. Any objection must identify with reasonable specificity all items in the Monthly Report to which objection is made, the grounds for the objection, the facts supporting the objection, and any legal authority therefore. With respect to fees and expenses, an objecting party must file a specific objection to an entry or specific objections to multiple entries contained within such fee statements. All fees and expenses to which no specific objection is made shall be deemed allowed at the

conclusion of such 14 day period ("**Allowed Fees and Expenses**"). Any objection must identify with specificity all items in the fees and expenses to which objection is made, the grounds for the objection, the facts supporting the objection, and any legal authority therefore. Objections, if any, that fail to identify a specific objection to an entry, or which are not timely made or heard in accordance with the foregoing, shall be deemed forever waived. Upon the Court's approval of any fees and expenses subject to a proper objection, such fees and expenses shall be deemed Allowed Fees and Expenses. The Receiver shall have 14 calendar days from the filing of any objection to a Monthly Report to respond to such objection and may request that the Court set a hearing or that the Court rule on the written submissions. No person or entity may file suit against the Receiver, in its capacity as Receiver, unless otherwise authorized in advance by this Court;

(z) The Receiver, and those agents acting under Receiver's control, including without limitation the Receiver's Professionals, shall have no personal liability in connection with any obligations owed by Borrowers to their creditors. No person or entity, including any creditor of the Borrowers, other than Plaintiff, shall have the right to seize or attempt to seize any property delivered to the Receiver hereunder, and no person, entity or creditor, including any utility company, shall act to terminate any existing service, either as a means of attempting to collect an obligation of Borrowers or on account of an obligation of Borrowers, and the Receiver shall have no obligation to pay for services incurred prior to its appointment;

(aa) The Receiver, and those agents acting under Receiver's control, including without limitation the Receiver's Professionals, shall have no personal liability in connection with their conduct in the course of this receivership, except for claims due to their gross negligence, gross or willful misconduct, or malicious acts. The Receiver is entitled to rely on all outstanding rules of law and Court orders and shall not be liable to anyone for his own good faith compliance with any

order, rule, law, judgment, or decree. No party, person or entity shall file suit against the Receiver, or any agents acting under Receiver's control, including without limitation the Receiver's Professionals, or take other action against them without an order of this Court after notice and a hearing permitting the action; provided, however, that no prior Court order is required to file a motion in this action to enforce or interpret the provisions of this Order or any other order of this Court in this action;

(bb) As of the Effective Date, the Receiver is authorized to undertake all actions specifically set forth in this Order, as well as to exercise the usual and customary powers accorded to a receiver under Oklahoma law;

(cc) The Receiver may be removed upon 15 days written notice by Plaintiff that Plaintiff desires such removal. The Receiver may elect to be removed upon 15 days written notice to Plaintiff and the Court. In either event, the Receiver and Receiver's Professionals shall be entitled to any compensation or reimbursements owed under the terms of this Order as of the date of such removal, with a copy of such notice lodged with the Court, or upon an order of the Court, in which event the Court shall appoint a substitute receiver to be recommended by Plaintiff;

(dd) Upon the transfer of title of the Property to Plaintiff or its assignee by judicial foreclosure or by means of a deed in lieu of foreclosure, the Property shall cease to be part of the receivership estate created by this Order, the Receiver's rights, duties and responsibilities with respect to the Property pursuant to this Order shall automatically terminate without further Order of this Court, and Plaintiff or the Receiver may move the Court for the immediate discharge of the Receiver;

(ee) Nothing contained in this Order shall be construed as obligating the Receiver or the Receiver's Professionals to advance their own funds in order to pay the costs and expenses of the receivership that have been approved by the Plaintiff and the Court;

(ff) The Receiver may apply at any time to the Court, with notice to all other parties in this case, for further instruction and for further power necessary to enable the Receiver to properly fulfill its duties;

(gg) The Receiver shall be paid in accordance with the Fee Structure set forth in **Exhibit B** attached hereto and is hereby authorized to retain a property management company, which property management company shall be paid in an amount consistent with current management rates and subject to approval by Plaintiff or the Court;

(hh) Any action of the Receiver authorized in this Order shall require the consent of Plaintiff if and when such action, if undertaken by Borrowers, would require Plaintiff's consent or authorization under any Loan Document. If the Plaintiff's written consent is required under any of the Loan Documents or under this Order, consent via e-mail is sufficient and approved;

(ii) Plaintiff shall not become a mortgagee in possession as a result of this Order, and neither Plaintiff nor the Receiver shall become responsible for any debts or obligations relating to the Property incurred prior to the date of this Order, including assessments, real estate taxes, environmental obligations or any other obligations and neither the Plaintiff nor the Receiver is required to advance monies to cover operating deficiencies;

(jj) Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to Receiver or the Property based upon the non-payment of such taxes, assessments, goods or services, and/or utilities provided prior to the date of this Order and from attempting to collect taxes, assessments, invoices and utility charges from Receiver for

any payment obligations whatsoever that arose prior to the date of this Order. Each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds to the exclusive control of Receiver and any utility company providing services to the Property, including gas, electricity, water, sewer, trash collection, telephone, communications, or similar services, is prohibited from discontinuing service to the Property based upon unpaid bills incurred by Borrowers. Further, such utilities are prohibited from demanding that the Receiver deposit funds in advance to secure such services.

(kk) The entry of this Order shall not in any manner prejudice any of the other rights and remedies of Plaintiff under its Loan Documents and/or under applicable law nor shall it preclude Plaintiff from exercising such other rights and remedies, including the judicial foreclosure of the Property, and the Receiver shall cooperate with Plaintiff in any such proceedings;

(ll) The entry of this Order shall not in any manner preclude any consensual resolution that may be reached between Plaintiff and Borrowers, and the Receiver shall abide by the terms of any such consensual resolution;

(mm) The Receiver shall post a surety bond in the amount of $200,000.00, and the cost of securing and maintaining such bond shall be an expense of the receivership. This Order is made conditional on the posting of this bond, if any, which may also be made in cash or check payable to the Clerk of Court;

(nn) The Receiver shall file with the clerk of this Court the oath to the effect that the Receiver will faithfully discharge its duties and obey the orders of this Court;

(oo) Upon receipt of a copy of this Order, and upon Receiver's request, any law enforcement officials shall take any and all actions necessary to preserve the peace, protect the Property and enforce and effectuate the terms and provisions of this Order; and

(pp) Notwithstanding anything to the contrary contained in this Order, the Receiver shall not take any action with regard to ownership, operation, control, storage, generation, or disposal of (a) any substance deemed a "hazardous substance", "pollutant", "contaminant", or similar substance under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675, the Conservation and Recovery Act of 1976, the Solid Waste Amendments of 1984, the Superfund Amendments and Reauthorization Act of 1986, and any other amendments; or (b) any other chemical, toxin, pollutant or substance defined as hazardous or dangerous to human health under any other federal, state or local law, regulation, rule or ordinance, including, without limitation thereto, petroleum, crude oil, or any fraction thereof (all collectively referred to herein as "Hazardous Substances"), without first applying for an obtaining an Order of this Court specifically setting forth the action or actions proposed to be taken by Receiver. Without first applying for and obtaining such an Order of this Court, the Receiver shall have no ownership, control, authority, custody, or power (neither shall receiver have any obligation to exercise ownership, control, authority, custody, or power) over the operation, storage, generation or disposal of any Hazardous Substance. All decisions relating to the ownership, operation, control, storage, generation and disposal of any Hazardous Substances shall be resolved by this Court.

Judge of the District Court of Oklahoma County, Oklahoma

CERTIFIED COPY
AS FILED OF RECORD
IN DISTRICT COURT
JUN 0 3 2026
RICK WARREN COURT CLERK Oklahoma County



EXHIBIT B TO EXHIBIT 1

Prepared By:

Kiran A. Phansalkar, OBA #11470
Preston Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
Conner & Winters, LLP
1700 One Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com

and

Matthew Hansen, OBA #35797
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8496
Email: matt.hansen@troutman.com
***Counsel for Plaintiff LSREF7 Badlands Loan Trust 2026***

Approved as to Form Only, Reserving all Rights:

Andrew A. Shank, OBA #22298
Lacy B. Williamson, OBA #34004
Eller & Detrich, P.C.
2727 East 21st Street, Suite 200
Tulsa, Oklahoma 74114
(918) 747-8900 – telephone
(918) 747-2665 – facsimile
ashank@ellerdetrich.com
lwilliamson@ellerdetrich.com
***Attorneys for Defendants Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC***

# EXHIBIT A

## (Property Legal Description)

TRACT 1

A tract of land in the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of the SE/4 of said Section 36; THENCE North 89° 52' 56" West, along the South line of said SE/4, a distance of 876.88 feet; THENCE North 00° 04' 18" West a distance of 195.00 feet to the POINT OF BEGINNING; THENCE North 89° 52' 56" West, parallel with the South line of said SE/4, a distance of 509.71 feet; THENCE North 00° 04' 18" West a distance of 965.51 feet; THENCE North 89° 55' 42" East a distance of 1047.63 feet; THENCE South 00° 04' 18" East a distance of 584.00 feet; THENCE South 89° 55' 42" West a distance of 537.92 feet; THENCE South 00° 04' 18" East a distance of 383.19 feet to the POINT OF BEGINNING.

TRACT 2

A tract of land being a part of the Southeast Quarter (SE/4) of Section Thirty-six (36), Township Eleven (11) North, Range Four (4) West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

COMMENCING at the Southeast Corner of said Southeast Quarter (SE/4); THENCE North 89° 52' 56" West, along the south line of said Southeast Quarter (SE/4), a distance of 1317.82 feet; THENCE North 00° 07' 04" East a distance of 50.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 68.94 feet; THENCE North 00° 04' 18" West a distance of 10.00 feet to the POINT OF BEGINNING; THENCE continuing North 00° 04' 18" West a distance of 135.00 feet; THENCE South 89° 52' 56" East, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet; THENCE South 00° 04' 18" East a distance of 135.00 feet; THENCE North 89° 52' 56" West, parallel with the south line of said Southeast Quarter (SE/4), a distance of 120.00 feet to the POINT OF BEGINNING.

# EXHIBIT B

## (Fee Structure)

### Fee Structure:

| Asset Management Rates & Fees | Timing \| Fee Structure | One-Time | Ongoing |
|---|---|---|---|
| Disposition Fee | Disposition · 0.25% of Purchase Price | x | |
| Construction Management Fee | Project Completion · Greater of 5% of Gross Receipts or $2 500 | x | |

| [illegible] | Rate Per Hour | Administrative Rates & Fees | Per Item |
|---|---|---|---|
| Resolute Professional Team | $350 | Court Fees & Expenses | At Cost |
| | | Travel Time & Expenses | At Cost |



#10870574v1

## EXHIBIT B – ISSUES TO BE RAISED ON APPEAL

1. Whether Lender established that present conditions at the property necessitated the appointment of a Receiver?
2. Whether Lender established that there existed imminent danger to the property or threat to deteriorate in value absent a Receiver?
3. Whether Lender established that a less drastic equitable remedy existed?
4. Whether Borrowers established that Lender has an adequate remedy at law?
5. Whether Lender established that a Receiver could better manage the property than Borrowers during the pendency of the foreclosure?
6. Whether the district court's ruling before Lender finished putting on its evidence and before Borrowers put on any evidence was reversible error?

## EXHIBIT C – SUMMARY OF CASE

This case involves an action by Lender (1) to foreclose and sell the real property owned by Borrowers to satisfy the underlying debt obligation, and (2) to immediately dispossess Owners/Borrowers from their operational and managerial control over a multifamily apartment complex until the foreclosure is complete forcibly depriving Owners of their property right to hold, control, operate, and/or sell their own real property.

Borrowers contend that Lender has no basis in equity to employ a Receiver over the multifamily apartment complex; that Lender has failed to establish that present conditions necessitate the appointment of a Receiver; that there exists any imminent danger to the property or that it will deteriorate in value; that no less drastic equitable remedy exists; that the Receiver could better manage the property than Borrowers during the pendency of the foreclosure; and that Lender has an adequate remedy at law.

Lender filed its Motion for Appointment of a Receiver ("Motion") on an expedited basis the same day Lender filed its Petition. On May 20, 2026, the Court held a hearing on the Motion, granted the Motion, and appointed a Receiver prior to Lender finishing its evidentiary presentation and prior to Borrowers presenting any of their evidence. This appeal immediately followed the Court's appointment of a Receiver.

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| LSREF7 BADLANDS LOAN TRUST 2026, a Delaware Statutory Trust,<br>Plaintiff,<br>v.<br>DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company, et al.,<br>Defendants. | Case No.: CJ-2026-1275<br>Judge Amy Palumbo<br>FILED IN DISTRICT COURT<br>OKLAHOMA COUNTY<br>JUN 17 2026<br>RICK WARREN<br>COURT CLERK<br>42 |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff LSREF7 BADLANDS LOAN TRUST 2026, a Delaware Statutory Trust ("**Lender**"), respectfully moves this Court to grant summary judgment on Counts I for breach of the Loan Documents and Count II for foreclosure[1] against Defendants, Drexel Flats Acquisition LLC; Drexel Flats Acquisition TIC LLC (together, "**Borrowers**"); Nix Lumber, Inc. ("**Nix Lumber**"); Tres Palm Supply, LLC d/b/a Maintenance Supply Solutions ("**Tres Palm**"); Rasa Floors & Carpet Cleaning, LLC ("**Rasa**"); Marc Kulick; YSA Investments 1, LLC ("**YSA**"); The Board of County Commissioners of Oklahoma County ("**The Board**"); and The Oklahoma County Treasurer ("**The Treasurer**," together without Borrowers, the "**Non-Borrower Defendants**") (collectively, "**Defendants**"). In support of this Motion, Plaintiff states as follows:

On or about December 21, 2021, Borrowers executed a Promissory Note (the "**Note**"), payable to Lender, in the original stated principal amount of $28,300,000.00 (the "**Loan**"). In connection therewith, the Borrowers executed a Loan Agreement (together with all schedules, exhibits, and amendments thereto, the "**Loan Agreement**") and an Assignment of Leases and Rents ("**ALR**"), and Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture

[1] Plaintiff does not seek summary judgment of Count III as this Court's May 28, 2026, order granting Plaintiff's Motion to Appoint Receiver.



EXHIBIT C TO EXHIBIT 1

Filing ("**Mortgage**"). The Mortgage granted a mortgage against the real property with a physical address of 8800 Drexel Avenue, Oklahoma City, Oklahoma 73159 commonly known as Drexel Flats Apartments (the "**Property**"), and described more particularly in the Plaintiff's Verified Petition.[2] *See* Verified Pet. at Ex. A. The Note, Loan Agreement, Mortgage, and ALR and all other documents and instruments securing or evidencing the loan to the Borrowers are hereinafter collectively referred to as the "**Loan Documents**."

Lender is the current owner and holder of the Loan Documents, including the Note and the Mortgage. Borrowers breached their obligations under the Loan Documents by: (1) failing to repay the Note upon its maturity; (2) and allowing unauthorized liens to attach to the Property. Each of these failures by the Borrowers constitutes an event of default under the Loan Documents. As a result, Lender provided notice to the Borrowers on December 12, 2025, of the Borrowers' defaults and demanded immediate payment of the unpaid debt under the Loan (the "**Notice**"). *See* Verified Pet. at Ex. J, Notice.

Non-Borrower Defendants were included in this action as they may claim some right, title, or interest in and to the Property. Nix Lumber, YSA, The Board, The Treasurer, Tres Palm have entered their appearances and assert an interest in the Property. Rasa has failed to appear and their interests in the Property are still inferior to Lender. For the reasons set forth below, it is undisputed that Borrowers are in default under the Loan Agreement, that Lender is entitled to judgment against Borrowers for the amount owed under the Note and foreclosing the Mortgage, and that Lender is entitled to judgment on its claims as a matter of law and undisputed fact.

---

[2] All references to the Verified Petition refer specifically to Plaintiff Ready Capital Mortgage Financing 2023-FL12, LLC (later substituted for LSREF7 BADLANDS LOAN TRUST 2026, a Delaware Statutory Trust) verified and filed on February 18, 2026, and the documents attached as exhibits to, the Verified Petition. Similarly, all references to the Motion for Appointment of a Receiver ("**Receiver Motion**") refer specifically to the Receiver Motion filed on February 18, 2026, and the documents attached as exhibits to the Receiver Motion.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

No genuine issue exists with respect to the following undisputed material facts ("**UMF**"):

1. Plaintiff filed its Verified Petition on February 18, 2026. A true and correct copy of the Verified Petition is attached as **Exhibit A** to the Affidavit of Jim Casey, which is attached hereto as **Exhibit 1**.

***The Loan to Borrowers***

2. Lender is the owner and holder of that certain Promissory Note, dated as of December 21, 2021, in the original principal amount of $28,300,000.00 (as at any time amended, the "**Note**" and the loan transaction evidenced thereby being referred to as the "**Loan**"), the makers of which are the Borrowers. The terms and conditions of the Loan are set forth in that certain Loan Agreement, dated as of December 21, 2021, executed by Borrowers. *See* Verified Pet. at Ex. A, Loan Agreement; Ex. 1, Casey Aff. ¶ 7.

3. The Loan is secured by that certain Mortgage, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226739, (as at any time amended, the Mortgage is attached to the Verified Petition as Exhibit C) pursuant to which Borrowers granted to Lender a first-priority security interest in the Property. *See* Verified Pet. at Ex. C, Mortgage; Ex. 1, Casey Aff. ¶ 8.

4. The Loan is secured further by that certain ALR, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226740, (which ALR is attached to the Verified Petition as Exhibit D) pursuant to which Borrowers granted to Lender a first-priority security interest in all leases, rents, profits and income of any other type derived from the Property (collectively, the "**Rents**"). *See* Verified Pet. at Ex. D, ALR; Ex. 1, Casey Aff. ¶ 9.

5. The Loan is secured further by that certain Deposit Account Control Agreement, dated as of December 21, 2021, by and among, Lender, Borrowers and Signature Bank (as at any time amended, the "**DACA**"), establishing and governing the Deposit Account and Lockbox Agreement, defined therein. *See* Verified Pet. at Ex. E, DACA; Ex. 1, Casey Aff. ¶ 10.

6. Borrowers absolutely and unconditionally assigned to Lender all right, title, and interest in the Rents under both the Mortgage and ALR. *See* Verified Pet. at Exs. F-I, Assignments; Ex. 1, Casey Aff. ¶ 11.

7. Lender is the owner and holder of the Loan and Loan Documents. *See* Verified Pet. at Exs. F-I, Assignments; Ex. 1, Casey Aff. ¶ 12.

***Borrowers' Defaults***

8. Under Section 2.2(a) of the Loan Agreement and Section 2(a) of the Note, Borrowers are required to make monthly payments as provided therein and to pay the entire outstanding Indebtedness (as defined therein) on the Payment Date occurring in January 2025 (the "**Initial Maturity Date**"). *See* Verified Pet. at Ex. B, Note § 2(a)(ii); *id.* § 2(a)(iv); Verified Pet. at Ex. A, Loan Agreement § 2.2(a); Ex. 1, Casey Aff. ¶ 10.

9. The Note matured pursuant to its terms on the Initial Maturity Date and Borrowers failed to pay the full Indebtedness due under the Note and other Loan Documents, which failure constitutes an Event of Default under the Loan Documents (the "**Maturity Default**"). *See* Verified Pet. at Ex. B, Note § 2(a)(iv); Verified Pet. at Ex. A, Loan Agreement § 8.1(b); Ex. 1, Casey Aff. ¶ 11.

10. Upon an Event of Default, pursuant to Article 3 of the Mortgage and Section 3 of the ALR, and as further governed by Section 3.7 of the Loan Agreement, Lender is immediately entitled to possession of any and all Rents and proceeds from the Property. *See* Verified Pet. at

Ex. C, Mortgage, Art. 3; Verified Pet. at Ex. D, ALR § 3; *see also* Verified Pet. at Ex. A, Loan Agreement § 3.7(b); Ex. 1, Casey Aff. ¶ 12.

11. Under Section 6.1 of the Loan Agreement, Borrowers agreed not to allow the imposition of a liens affecting the Property. *See* Verified Pet. at Ex. A, Loan Agreement § 6.1; *Id.*, Art. 1; Ex. 1, Casey Aff. ¶ 13.

12. Despite Borrowers' agreement, Borrowers have allowed multiple liens on the Property, including those filed by Nix Lumber (including a suit to enforce), Tres Palm, Rasa, and iPlumb Co., LLC (as well as the filing of the ROFRs, as defined below) (collectively, the "**Liens**"). This constitutes a further Event of Default under the Loan Documents (the "**Lien Default**," together with the Maturity Default, the "**Events of Default**"). Verified Pet. at Ex. A, Loan Agreement § 6.1; *Id.* § 8.1(c) (incorporating events identified elsewhere in the Loan Documents as Events of Default); Ex. 1, Casey Aff. ¶ 14.

13. On December 12, 2025, Lender notified Borrowers in writing of the Events of Default under the Loan Documents and informed Borrowers that its license under the Loan Documents to collect Rents was revoked pursuant to Article 3 of the Mortgage and Section 3 of the ALR (the "**Notice of Default**"). *See* Verified Pet. at Ex. J, Notice; Ex. 1, Casey Aff. ¶ 15.

14. As of May 20, 2026, the balance due and owing to Lender under the Loan Documents, not including attorneys' fees and costs, is $31,170,801.84. Additionally, Borrowers owe any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, accrued interest from and after May 20, 2026, and any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue. See Payoff attached as **Exhibit B** to Ex. 1, Casey Aff. ¶ 16;

***Other Interests in the Property***

15. Nix Lumber filed a Mechanic's and Materialmen's Lien Statement recorded with the Oklahoma County Clerk on June 30, 2025, as Document No. 2025063001093711. In addition, Nix Lumber filed a Notice of Pendency of Action recorded on July 7, 2025, as Document No. 2025070701096966, reflecting a suit to enforce the lien. Nix Lumber's interest arises from unpaid amounts owed for materials or labor furnished to the Property. *See* Verified Pet. at ¶ 4; Ex. 1, Casey Aff. ¶ 18.

16. Nix Lumber's lien and lis pendens are junior and inferior to Lender's first-priority Mortgage (recorded December 29, 2021).

17. Tres Palm filed a Mechanic's or Materialman's Lien Statement recorded with the Oklahoma County Clerk on August 27, 2025, as Document No. 2025082701123376. Tres Palm's interest arises from unpaid amounts owed for materials or services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Pet. at ¶ 5; Ex. 1, Casey Aff. ¶ 19.

18. Rasa filed a Mechanic's or Materialman's Lien Statement recorded with the Oklahoma County Clerk on September 24, 2025, as Document No. 2025092401136568. Rasa's interest arises from unpaid amounts for flooring and carpet cleaning services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Pet. at ¶ 6; Ex. 1, Casey Aff. ¶ 20.

19. iPlumb Co., LLC filed a Mechanic's Lien Statement of Claim recorded with the Oklahoma County Clerk on October 21, 2025, as Document No. 2025102101151756. iPlumb's interest arises from unpaid amounts for plumbing services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Pet. at ¶ 7; Ex. 1, Casey Aff. ¶ 21.

20. Marc Kulick is an individual, who guaranteed the Loan, who may claim some right, title, or interest in or to the Property pursuant to those certain Guaranties and Right of First Offer agreements recorded with the Oklahoma County Clerk on October 31, 2025, as Document Nos. 2025103101156526, 2025103101156569, 2025103101156572, 2025103101156575, 2025103101156578, 2025103101156581, and 2025103101156584 (collectively, the "**ROFOs**". Any interest arising from the ROFOs is junior and inferior to Lender's first-priority Mortgage. *See* Verified Pet. at ¶ 8; Verified Pet. at Ex. A, Loan Agreement (Schedule 2); Ex. 1, Casey Aff. ¶ 22.

21. YSA may claim some right, title, or interest in or to the Property pursuant to those certain ROFOs. Any interest arising from the ROFOs is junior and inferior to Lender's first-priority Mortgage. *See* Verified Pet. at ¶ 9; Ex. 1, Casey Aff. ¶ 23.

22. The Board may claim some right, title, or interest in the Property by virtue of unpaid real estate taxes and assessments or otherwise, as provided under applicable Oklahoma law. Any such tax lien or assessment interest is governed by Oklahoma statutory priority rules and is subject to the claims of Lender under the Mortgage and Loan Documents. Ex. 1, Casey Aff. ¶ 24.

23. The Treasurer may claim some right, title, or interest in the Property by virtue of unpaid real estate taxes and assessments or otherwise, as provided under applicable Oklahoma law. Any such tax lien or assessment interest is governed by Oklahoma statutory priority rules and is subject to the claims of Lender under the Mortgage and Loan Documents. Ex. 1, Casey Aff. ¶ 2.

24. The following Non-Borrower Defendants have entered an appearance in this matter: Marc Kulick, Nix Lumber, Tres Palm, YSA, Oklahoma County Commissioners, Oklahoma County Treasurer, Maintenance Supply.

25. Lender served Rasa with the Summons and Verified Petition on February 20, 2026, via Certified Mail. Proof of service was filed with this Court on June 17, 2026, attached hereto as **Exhibit 2**.

***Lender's Remedies Under the Loan Documents***

26. Upon the occurrence and continuance of an Event of Default, Lender is entitled to various remedies under the Loan Documents, including, but not limited to selling the Property. Section 6.2 of the Mortgage provides:

> (a) If an Event of Default shall have occurred, this Mortgage may, to the maximum extent permitted by law, be enforced, and Mortgagee may exercise any right, power or remedy permitted to it hereunder, under the Loan Agreement or under any of the other Loan Documents or at law or in equity, and, without limiting the generality of the foregoing, Mortgagee, may personally or by their agents, to the maximum extent permitted by law:
>
> (iii) personally or by agents, with or without entry:
>
> (x) invoke the power of sale and pursuant to the procedures prescribed by law as a result thereof, sell the Property or any part thereof, or cause the Property or any part thereof to be sold at a sale or sales held at such place or places and time or times and upon such notice and otherwise in such manner and in such order as may be required by law, or, in the absence of any such requirements, as Mortgagee may deem appropriate and from time to time and place specified for such sale or for such adjourned sale without further notice, except such as may be required by law;
>
> (y) proceed to protect and enforce Mortgagee's rights under this Mortgage, by suit for specific performance of any covenant contained herein or in the Loan Documents or in aid of the execution of any power granted herein or in the Loan Documents, or for the foreclosure of this Mortgage (as a mortgage or otherwise) and the sale of the Property or any part thereof under the judgment or decree of a court of competent jurisdiction, or for the enforcement of any other right as Mortgagee shall elect, provided, that in the event of a sale, by foreclosure or otherwise, or less than all of the Property, this Mortgage shall continue as a lien on, and security interest in, the remaining portion of the Property; or
>
> (z) exercise any or all of the remedies available to a secured party under the UCC…

*See* Verified Pet. at Ex. C, Mortgage §§ 6.2(a)(x), (y); *Id.* § 8.2 (granting power of sale pursuant to the Oklahoma Power of Sale Mortgage Foreclosure Act, 46 Okla. Stat. §§ 40 et seq.); Ex. 1, Casey Aff. ¶ 17.

## ARGUMENT & AUTHORITIES

### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper as a matter of law when the moving party establishes that "there is no substantial controversy as to any material fact." 12 Okla. Stat. § 2056(C); Rule 13 of the Rules for the District Courts of Oklahoma; *Flanders v. Crane*, 1984 OK 88, 693 P.2d 602, 605; *see Weeks v. Wedgewood Village, Inc.*, 1976 OK 72, 554 P.2d 780, 784 ("Although the allegations of the pleadings standing alone may raise an issue of material fact, summary judgment is not to be denied if other documentation pertinent to the motions palpably show the absence of such an issue."). The focus of a summary judgment motion is whether the evidentiary material establishes undisputed facts that support a single inference in favor of the movant's quest for relief. *Gray v. Holman*, 1995 OK 118, 909 P.2d 776, 781. Once the movant has established that no genuine issue of material fact exists, the opposing party must come forward with evidence, based on specific facts, that justifies a trial of the issues. *First Nat'l Bank and Trust Co. v. Kissee*, 1993 OK 96, 859 P.2d 502, 505.

In this case, the UMFs establish that Plaintiff is entitled to summary judgment and that Defendants cannot present a material dispute for trial.

## II. IT IS UNDISPUTED THAT PLAINTIFF IS ENTITLED TO JUDGMENT FOR BORROWERS' DEFAULTS UNDER LOAN AGREEMENT, NOTE AND MORTGAGE.

### A. Borrowers have Breached the Loan Documents Entitling Plaintiff to Judgment on Count 1.

Summary judgment is warranted on Plaintiff's claim for breach of the Loan Documents by virtue of the various Events of Default. While Borrowers' Answer denies allegations related to the Events of Default in the Verified Petition (Answer ¶ 35-39), Borrowers have failed to present any contradicting facts sufficient to create a genuine issue of material fact because no such facts exist. Thus, the allegations in the UMF remain undisputed. *See Weeks v. Wedgewood Vill., Inc.*, 1976 OK 72, ¶ 12, 554 P.2d 780, 784 ("The mere denial in a pleading, repeated in an affidavit unsupported by any proof is not sufficient to require the credibility of the opposing party to be determined on trial.").

To prevail on a breach of contract claim, a party need only show "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Cates v. Integris Health, Inc.*, 2018 OK 9, ¶ 11, 412 P.3d 98, 103. A promissory note is a negotiable instrument, and a negotiable instrument is a contract. *Wells Fargo Bank, N.A. v. Heath*, 2012 OK 54, ¶ 12, 280 P.3d 328, 334 (footnote and citations omitted). When a promissory note provides that it shall become due in full upon default, such default renders it due immediately, and entitles the holder to maintain an action at once for the entire debt. *See Bollenbach v. Ludlum*, 1921 OK 384, 201 P. 982, 983. Further, "[w]here a promissory note is executed and a mortgage is given to secure the payment of the note, the two instruments being made at the same time, they should be read and construed together as one contract, and the resulting contract is to be determined by a construction of both in accordance with conventional rule." *Herrington v. Murphy*, 1968 OK 155, 446 P.2d 595, 597.

In this case, the UMFs establish that the Loan Agreement, Note, and Mortgage are all enforceable contracts that were made, executed, and delivered by Borrower. (UMF Nos. 2-3). It is undisputed that Lender is the owner and holder of the Loan Agreement, Note, Mortgage, and other Loan Documents. (UMF No. 7). It is undisputed that the Note required full payment of all Indebtedness by the Maturity Date, (UMF No. 10), and that Borrowers failed to pay the full amount of the Loan by the Maturity Date. (UMF No. 11). Due to such failure, Borrowers are in default on under the Loan Documents. (UMF No. 12).

Borrowers' defaults under the Loan Documents, however, are not limited to the Maturity Default. Borrowers further defaulted under the Loan Documents by allowing the Non-Borrower Defendants to place the Liens against the Property. (UMF No. 15). Accordingly, Lender delivered written notice of the Borrowers' Events of Default under the Loan Documents via the Notice of Default. (UMF No. 17). Any one of these Events of Default alone are sufficient for Lender to prevail on its claim for breach of the Loan Documents.

Lender has incurred damages as a result of Borrowers' Events of Default. Most notably, Lender has not been paid the full amount of the indebtedness owed under the Loan. (UMF Nos. 9 & 14). Further, as a result of each of the Events of Default, the value of Lender's collateral has been diminished. Additionally, Lender has attained counsel for the purpose of assisting Lender's efforts to collect the amounts owed under the Note and to assist Lender in protecting and disposing of the Property. As such, Lender has incurred fees and costs, and will continue to incur such fees and costs, including, but not limited to, attorneys' fees and court costs.

**B. Plaintiff Is Entitled to Summary Judgment on Count II - Foreclosure.**

To commence a mortgage foreclosure action, a plaintiff must demonstrate it has a right to enforce the underlying note. See *Deutsche Bank Nat. Tr. Co. v. Matthews*, 2012 OK 14, ¶ 7, 273 P.3d 43, 46. See also *Wells Fargo Bank, N.A. v. Taylor*, 2018 OK CIV APP 24, ¶ 7, 417 P.3d

1212, 1215. Additionally, the plaintiff must produce evidence of default by the borrower. *Taylor*, 2018 OK CIV APP 24, ¶ 8, 417 P.3d at 1215 (finding the summary judgment evidence sufficient to support foreclosure where the lender was in possession of the note when the foreclosure action was filed, was entitled to enforce the note, and the mortgagors were in default).

A plaintiff may establish its right to enforce the note by showing it is "the holder of the instrument," which can be done by proving "both possession of the note and an indorsement on the note or attached allonge." *Matthews*, 2012 OK 14, ¶ 7, 273 P.3d at 46. Lender is holder of the Loan Documents, including the Note and Mortgage, and is therefore entitled to foreclose upon the Mortgage due to Borrowers' various defaults. To secure the obligations of Borrowers to Lender under the Note, Borrowers executed and delivered the Mortgage. (UMF Nos. 2-3). Lender has the right to foreclose and sell the Property to recoup the amounts owed on the Note and any enforcement-related fees, costs and expenses. (UMF Nos. 16, 28). Borrowers are in default under the Note and Mortgage. (UMF Nos. 10-16). Borrowers were provided notice of such defaults. (UMF No. 17). Accordingly, Lender is entitled to judgment as a matter of law determining and declaring that Borrowers are in default under the Note and Mortgage, and for determination of its lien priority against Borrowers in the property subject to this foreclosure suit, and for foreclosure of Lender's Mortgage on the Property and sale of the Property. (UMF Nos. 2-3, 10-16, 28).

Oklahoma is a first to file state. *See RCB Bank v. Stitt*, 2022 OK CIV APP 3, ¶ 32, 517 P.3d 986, 996 ("The general rule in Oklahoma is that the first to file has priority."). Following this general rule, the Oklahoma Supreme Court has held that "[a] prior recorded mortgage has priority over liens subsequently filed." *First Mustang State Bank v. Garland Bloodworth, Inc.*, 1991 OK 65, ¶ 21, 825 P.2d 254 (citing 42 O.S. § 15). Here, the Mortgage was recorded prior to the Non-Borrower Defendants' interests were filed. (UMF Nos. 18-27). Consequently, Lender is

also entitled to a determination that its perfected interest in the Property is first, prior, and superior to any interest claimed by all of the named Defendants in the Property.

Furthermore, any proceeds realized from the sale or other disposition of the Property should be applied first to the payment of Lender's sale-related costs, then to the payment of the total Indebtedness owed to Lender under the Judgment, with any surplus paid into the Court for further direction as to the disposition of that surplus. Accordingly, the Court should grant summary judgment in favor of Lender and against Borrowers and Non-Borrower Defendants, and order foreclosure of Lender's Mortgage on the Property and sale of the Property.

## CONCLUSION

For the reasons stated above, LSREF7 BADLANDS LOAN TRUST 2026 respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in LSREF7 BADLANDS LOAN TRUST 2026's favor as follows:

i. Against Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC for: (a) the full amount owed under the Loan, as of May 20, 2026, of $31,170,801.84, consisting of unpaid principal balance, accrued interest, default interest, and late fees; (b) any interests and fees that continue to accrue after January 30, 2026; and (c) any additional amounts the Court deems just;

ii. Against Defendants declaring the Mortgage to be a valid lien on the Property, ordering the Mortgage to be foreclosed, and that the Property be sold, with appraisement, to satisfy the judgment herein, with the proceeds of such sale to be paid first to the costs of this action, second to the judgment amount owed to LSREF7 BADLANDS LOAN TRUST 2026, and any balance paid into the registry of the Court to abide further order, and such other and further relief as this Court may deem just and equitable;

iii. Against Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC and in favor of LSREF7 BADLANDS LOAN TRUST 2026, as damages all rents Borrowers have received at the Property since the date of the Notice, December 12, 2025; and

iv. Against Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC and in favor of LSREF7 BADLANDS LOAN TRUST 2026 on its request that Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC are ordered to immediately remit to LSREF7 BADLANDS LOAN TRUST 2026, upon receipt, all future Rents that are received in connection with the Property through the date of the Court's confirmation of any foreclosure sale.

Respectfully submitted,

Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
Conner & Winters, LLP
211 North Robinson, Suite 1700
Oklahoma City, OK 73102-7101
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com

and

Matthew Hansen, OBA #35797
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8496
Email: matt.hansen@troutman.com
***Attorneys for Plaintiff***
***LSREF7 Badlands Loan Trust 2026***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June 2026, a true and correct copy of the above and foregoing instrument was sent via U.S. First Class Mail, postage prepaid, to the following:

Drew Campo, OBA #1455
5704 NW 161st Circle
Edmond, OK 73013
Telephone: (405) 359-3026
Email: drewcampo@cox.net
***Attorneys for Defendant Nix Lumber, Inc.***

James Vogt, OBA #9243
Reynolds, Ridings,
Vogt & Robertson, P.L.L.C.
101 Park Avenue, Suite 1010
Oklahoma City, OK 73102
Telephone: (405) 232-8131
Facsimile: (405) 232-7911
Email: jimvogt@rrvmlaw.com
***Attorneys for Defendant, Tres Palm Supply, LLC d/b/a Maintenance Supply Solutions***

Katelynn J. Crain, OBA #36608
Assistant District Attorney
211 N. Robinson Ave., Suite N700
Oklahoma City, OK 73102
Telephone: (405) 713-1600
Email: Katelynn.crain@oklahomacounty.org
***Attorneys for Defendants Board of County Commissioners of Oklahoma County and Forrest "Butch" Freeman, in his official Capacity as Oklahoma County Treasurer***

John "Jake" M. Krattiger, OBA #30617
Cole McDaniel, OBA #35677
GABLEGOTWALS
BOK Park Plaza
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Telephone: (405) 235-5500
Facsimile: (405) 235-2875
Email: jkrattiger@gablelaw.com
cmcdaniel@gablelaw.com

Andrew A. Shank, OBA #22298
Lacy B. Williamson, OBA #34004
Eller & Detrich, P.C.
2727 East 21st Street, Suite 200
Tulsa, OK 74114
Telephone: (918) 747-8900
Facsimile: (918) 747-2665
Email: ashank@ellerdetrich.com
lwilliamson@ellerdetrich.com
***Attorneys for Defendants Drexel Flats Acquisition, LLC, Drexel Flats Acquisition TIC, LLC, and Mark L. Kulick***

and

David P. Limekiller, OBA #18173
GABLEGOTWALS
110 N. Elgin Ave., Suite 200
Tulsa, OK 74120
Telephone: (918) 595-4800
Email: dlimekiller@gablelaw.com
***Attorneys for Defendant YSA Investments 1, LLC***

Preston M. Sullivan

#10895328v1



EXHIBIT C TO EXHIBIT 1

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| LSREF7 BADLANDS LOAN TRUST 2026, a Delaware Statutory Trust<br>Plaintiff,<br><br>v.<br><br>DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company; DREXEL FLATS ACQUISITION TIC LLC, a Delaware limited liability company; NIX LUMBER, INC., an Oklahoma corporation; TRES PALM SUPPLY, LLC d/b/a MAINTENANCE SUPPLY SOLUTIONS, a Texas limited liability company; RASA FLOORS & CARPET CLEANING, LLC, a Texas limited liability company; IPLUMB CO. LLC, an Oklahoma limited liability company; MARC KULICK, an individual; YSA INVESTMENTS 1, LLC, a Delaware limited liability company; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; and THE OKLAHOMA COUNTY TREASURER,<br><br>Defendants. | Case No.: CJ-2026-1275 |

**AFFIDAVIT OF JIM CASEY IN SUPPORT OF PLAINTIFF'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Jim Casey, states and affirms the following facts:

1. My name is Jim Casey. I am over the age of 21 years and competent to give testimony.

2. The plaintiff in this lawsuit is LSREF7 BADLANDS LOAN TRUST 2026, ("**Plaintiff**" or "**Lender**"), acting by and through Torchlight Loan Services, LLC as Special Servicer ("**Special Servicer**" or "**Torchlight**") under the Commercial Loan Servicing Agreement dated as of March 17, 2026.

3. I currently serve as Senior Vice President with Special Servicer. In that capacity, I am responsible for, among other things, recovering the debt that Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC (together, the "**Borrowers**") owe Plaintiff at issue in this lawsuit. I am an authorized signatory for Special Servicer and I make this affidavit based upon my personal knowledge and personal review of the books and records of Plaintiff and Special Servicer in my possession or subject to my control. The information described herein and referenced below is found in the business records of Plaintiff and Special Servicer that are made and maintained by Plaintiff and Special Servicer in the regular course of their business.

4. I am familiar with and have personal knowledge of Special Servicer's record keeping practices. In connection with performing its duties as Special Servicer for Plaintiff, Special Servicer creates, receives, and maintains records in the regular course of Special Servicer's business pursuant to established procedures and practices for the routine, habitual, and systematic making of such records, including the documents attached to this affidavit. Based on my review of and my familiarity with Plaintiff's records, including those maintained by Special Servicer, all of the documents were received, created, or otherwise generated at or near the dates reflected on such documents.

5. I submit this Affidavit in support of Plaintiff's Motion for Summary Judgment ("**Motion**").

6. Lender filed its Verified Petition in the above-captioned case on February 18, 2026, asserting claims for: Count I, Suit for Breach of Loan Documents; Count II, Foreclosure; and Count III, Appointment of Receiver. A true and accurate copy of the Verified Petition is attached as **Exhibit A**.

### *The Loan to Borrowers*

7. Lender is the owner and holder of that certain Promissory Note, dated as of December 21, 2021, in the original principal amount of $28,300,000.00 (as at any time amended, the "Note" and the loan transaction evidenced thereby being referred to as the "**Loan**"), the makers of which are Borrowers. The terms and conditions of the Loan are set forth in that certain Loan Agreement, dated as of December 21, 2021 (the "**Loan Agreement**"), executed by Borrowers. *See* Exhibits A to the Verified Petition.

8. The Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226739, (as at any time amended, the "**Mortgage**", which Mortgage is attached to the Verified Petition as Exhibit C) pursuant to which Borrowers granted to Lender, a first-priority security interest in that certain real and personal property, consisting of a multifamily apartment complex, located at 8800 Drexel Avenue, Oklahoma City, Oklahoma 73159 and further described in the Mortgage (collectively, the "**Property**"). *See* Exhibit C to the Verified Petition.

9. The Loan is secured further by that certain Assignment of Leases and Rents, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226740, (at any time amended, the "**ALR**", which ALR is attached to the Verified Petition as Exhibit D) pursuant to which Borrowers granted to Lender, a first-priority security interest in all leases, rents, profits and income of any other type derived from the Property (collectively, the "Rents"). *See* Exhibit D to the Verified Petition.

10. The Loan is secured further by that certain Deposit Account Control Agreement, dated as of December 21, 2021, by and among, Lender, Borrowers and Signature Bank (as at any

time amended, the "**DACA**"), establishing and governing the Deposit Account and Lockbox Agreement, defined therein. *See* Exhibit E to the Verified Petition.

11. Borrowers absolutely and unconditionally assigned to Lender all right, title, and interest in the Rents under both the Mortgage and ALR. *See* Exhibits F-I.

12. Lender is the owner and holder of the Loan and Loan Documents. *See* Group Exhibits F-I to the Verified Petition.

***Borrowers' Defaults***

10. Under Section 2.2(a) of the Loan Agreement and Section 2(a) of the Note, Borrowers are required to make monthly payments as provided therein and are required to pay the entire outstanding Indebtedness (as defined therein) on the Payment Date occurring in January 2025 (the "**Initial Maturity Date**"). *See* Ex. B to Verified Petition, Note § 2(a)(ii); *id.* § 2(a)(iv); Exhibit A to Verified Petition, Loan Agreement § 2.2(a).

11. The Note matured pursuant to its terms on the Initial Maturity Date and Borrowers failed to pay the full Indebtedness due under the Note and other Loan Documents, which failure constitutes an Event of Default under the Loan Documents (the "**Maturity Default**"). *See* Exhibit B to Verified Petition, Note § 2(a)(iv); Exhibit A to Verified Petition, Loan Agreement § 8.1(b).

12. Upon an Event of Default, pursuant to Article 3 of the Mortgage and Section 3 of the ALR, and as further governed by Section 3.7 of the Loan Agreement, Lender is immediately entitled to possession of any and all Rents and proceeds from the Property. *See* Exhibit C to Verified Petition, Mortgage, Art. 3; Exhibit D to Verified Petition, ALR § 3; *see also* Exhibit A to Verified Petition, Loan Agreement § 3.7(b).

13. Under Section 6.1 of the Loan Agreement, Borrowers agreed not to allow any Transfer to occur without Lenders' consent, including imposition of a Lien affecting the Property. *See* Exhibit A to Verified Petition, Loan Agreement § 6.1; *Id.*, Art. 1.

14. Despite Borrowers' agreement, Borrowers have allowed multiple Liens on the Property, including those filed by Nix Lumber (including a suit to enforce), Tres Palm, Rasa, and iPlumb (as well as the filing of the ROFRs, as defined below) (collectively, the "**Liens**"). This constitutes a further Event of Default under the Loan Documents (the "**Lien Default**," together with the Maturity Default, the "**Events of Default**"). Exhibit A to Verified Petition, Loan Agreement § 6.1; *Id.* § 8.1(c) (incorporating events identified elsewhere in the Loan Documents as Events of Default).

15. On December 12, 2025, Lender notified Borrowers in writing of the Events of Default under the Loan Documents and informed Borrowers that its license under the Loan Documents to collect Rents was revoked pursuant to Article 3 of the Mortgage and Section 3 of the ALR (the "Notice of Default"). *See* Exhibit J to the Verified Petition.

16. As of May 20, 2026, the balance due and owing to Lender under the Loan Documents, not including attorneys' fees and costs, is $31,170,801.84,. Additionally, Borrowers owe any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, accrued interest from and after May 20, 2026 and any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue. *See* Exhibit B to the Verified Petition, Note § 3 (attorneys' fees and costs); See Exhibit A to the Verified Petition, Loan Agreement §§ 3.3, 5.1(b) (taxes, insurance); See Exhibit C to the Verified Petition, Mortgage § 8.4 (taxes, insurance, title fees, property advances, and attorneys' fees). *See* **Exhibit B**, Payoff Letter.

### *Lender's Remedies Under the Loan Documents*

17. Upon the occurrence and continuance of an Event of Default, Lender is entitled to various remedies under the Loan Documents, including, but not limited to selling the Property pursuant to Section 6.2 of the Mortgage. *See* Exhibit C of Verified Petition, Mortgage §§ 6.2(a)(x), (y); *Id.* § 8.2 (granting power of sale pursuant to the Oklahoma Power of Sale Mortgage Foreclosure Act, 46 Okla. Stat. §§ 40 et seq.).

### *Other Interests in the Property*

18. Nix Lumber filed a Mechanic's and Materialmen's Lien Statement recorded with the Oklahoma County Clerk on June 30, 2025, as Document No. 2025063001093711. In addition, Nix Lumber filed a Notice of Pendency of Action recorded on July 7, 2025, as Document No. 2025070701096966, reflecting a suit to enforce the lien. Nix Lumber's interest arises from unpaid amounts owed for materials or labor furnished to the Property. *See* Verified Petition ¶ 4.

19. Tres Palm filed a Mechanic's or Materialman's Lien Statement recorded with the Oklahoma County Clerk on August 27, 2025, as Document No. 2025082701123376. Tres Palm's interest arises from unpaid amounts owed for materials or services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Petition ¶ 5.

20. Rasa filed a Mechanic's or Materialman's Lien Statement recorded with the Oklahoma County Clerk on September 24, 2025, as Document No. 2025092401136568. Rasa's interest arises from unpaid amounts for flooring and carpet cleaning services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Petition ¶ 6.

21. iPlumb filed a Mechanic's Lien Statement of Claim recorded with the Oklahoma County Clerk on October 21, 2025, as Document No. 2025102101151756. iPlumb's interest arises

from unpaid amounts for plumbing services furnished to the Property. Its lien is junior and inferior to Lender's first-priority Mortgage. *See* Verified Petition ¶ 7.

22. Marc Kulick is an individual, who guaranteed the Loan, who may claim some right, title, or interest in or to the Property pursuant to those certain Guaranties and Right of First Offer agreements recorded with the Oklahoma County Clerk on October 31, 2025, as Document Nos. 2025103101156526, 2025103101156569, 2025103101156572, 2025103101156575, 2025103101156578, 2025103101156581, and 2025103101156584 (collectively, the "**ROFOs**"). Any interest arising from the ROFOs is junior and inferior to Lender's first-priority Mortgage. *See* Verified Petition ¶ 8; Exhibit A to the Verified Petition, Loan Agreement, Schedule 2.

23. YSA may claim some right, title, or interest in or to the Property pursuant to those certain ROFOs. Any interest arising from the ROFOs is junior and inferior to Lender's first-priority Mortgage. *See* Verified Petition ¶ 9.

24. The Board may claim some right, title, or interest in the Property by virtue of unpaid real estate taxes and assessments or otherwise, as provided under applicable Oklahoma law. Any such tax lien or assessment interest is governed by Oklahoma statutory priority rules and is subject to the claims of Lender under the Mortgage and Loan Documents.

25. The Treasurer may claim some right, title, or interest in the Property by virtue of unpaid real estate taxes and assessments or otherwise, as provided under applicable Oklahoma law. Any such tax lien or assessment interest is governed by Oklahoma statutory priority rules and is subject to the claims of Lender under the Mortgage and Loan Documents.

FURTHER AFFIANT SAYETH NAUGHT.

By: ______________________________
Jim Casey, Senior Vice President, Torchlight Loan Services, LLC
As special servicer for LSREF7 BADLANDS LOAN TRUST 2026

Subscribed and sworn to before me this 15th day of June 2026.

[SEAL]

NOTARY PUBLIC STATE OF FLORIDA
BARBARA TYLER
Commission # HH 500142
Expires March 12, 2028

______________________________
Notary Public
My Commission Number: HH 500142
My Commission Expires: 03/12/2028

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC

Plaintiff,

v.

DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company; DREXEL FLATS ACQUISITION TIC LLC, a Delaware limited liability company; NIX LUMBER, INC., an Oklahoma corporation; TRES PALM SUPPLY, LLC D/B/A MAINTENANCE SUPPLY SOLUTIONS, a Texas limited liability company; RASA FLOORS & CARPET CLEANING, LLC, a Texas limited liability company; IPLUMB CO. LLC, an Oklahoma limited liability company; MARC KULICK, an individual; YSA INVESTMENTS 1, LLC, a Delaware limited liability company; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; and THE OKLAHOMA COUNTY TREASURER

Defendants.

Case No.: CJ - 2026 - 1275

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

FEB 18 2026

RICK WARREN
COURT CLERK
114 ______

**VERIFIED PETITION**

Plaintiff Ready Capital Mortgage Financing 2023-FL12, LLC (**"Lender"**), for its Petition (**"Petition"**) against Defendants Drexel Flats Acquisition LLC and Drexel Flats Acquisition TIC LLC (collectively, the **"Borrowers"**), Nix Lumber, Inc. (**"Nix Lumber"**), Tres Palm Supply, LLC d/b/a Maintenance Supply Solutions (**"MSS"**), Rasa Floors & Carpet Cleaning, LLC (**"Rasa"**), IPlumb Co. LLC (**"IPlumb"**), Marc Kulick (**"Guarantor"**), YSA Investments 1, LLC (**"YSA"**), the Board of County Commissioners of Oklahoma County (**"Board"**), and the Oklahoma County Treasurer (**"Treasurer"**), states and alleges:

EXHIBIT A

**THE PARTIES**

1. Lender is a Delaware limited liability company, which is the current owner and holder of that certain commercial loan described herein. With respect to the Loan transaction that is the subject matter of this action, KeyBank National Association acts as servicer and authorized agent for Lender.

2. Drexel Flats Acquisition LLC is a Delaware limited liability company registered to do business in the State of Oklahoma, which can be served at c/o Vesta Realty, LLC 6911 S. 66th E Ave., Suite 100, Tulsa, Oklahoma 74133.

3. Drexel Flats Acquisition TIC LLC is a Delaware limited liability company registered to do business in the State of Oklahoma, which can be served c/o its Registered Agent, Vesta Realty, LLC, at 6911 S. 66th E Ave., Suite 100, Tulsa, Oklahoma 74133.

4. Nix Lumber is an Oklahoma corporation, which may claim some right, title, or interest in or to the Property (as defined below) pursuant to that certain Mechanics' and Materialmen's Lien Statement recorded with the Oklahoma County Clerk (the "**County Clerk**") on June 30, 2025, as Document No. 2025063001093711 and that certain Notice of Pendency of Action recorded with the County Clerk on July 7, 2025, as Document No. 2025070701096966, and which can be served c/o its Registered Agent, David N. Nix, at 5117 NW 10th Street, Oklahoma City, Oklahoma 73127.

5. MSS is a Texas limited liability company registered to do business in the State of Oklahoma, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's or Materialman's Lien Statement recorded with the County Clerk on August 27, 2025, as Document No. 2025082701123376, and which can be served c/o its Registered Agent, Registered Agents, Inc., 9905 S. Pennsylvania Avenue, Suite A, Oklahoma City, Oklahoma 73159.

6. Rasa is a Texas limited liability company registered to do business in the State of Oklahoma, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's or Materialman's Lien Statement recorded with the County Clerk on September 24, 2025, as Document No. 2025092401136568, and which can be served c/o its Registered Agent, CT Corporation System, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

7. IPlumb is an Oklahoma limited liability company, which may claim some right, title, or interest in or to the Property (defined below) pursuant to that certain Mechanic's Lien Statement of Claim recorded with the County Clerk on October 21, 2025, as Document No. 2025102101151756, and which can be served at 9944 S. Sooner Road, Oklahoma City, Oklahoma 73165.

8. Guarantor is an individual, who guaranteed the Loan, who may claim some right, title, or interest in or to the Property (defined below) pursuant to those certain Guaranties and ROFO agreements (collectively, the "**ROFOs**") recorded with the County Clerk on October 31, 2025, as Document Nos. 2025103101156526, 2025103101156569, 2025103101156572, 2025103101156575, 2025103101156578, 2025103101156581, and 2025103101156584, and who can be served at 6400 W. 110th Street, Suite 201, Overland Park, Kansas 66211.

9. YSA is a Delaware limited liability company, which may claim some right, title, or interest in or to the Property (defined below) pursuant to the ROFOs, and which can be served c/o its Registered Agent, Northwest Registered Agent Service, Inc. at 8 The Green, Suite B, Dover, Delaware 19901.

10. The Board may claim some right, title or interest in the Property (as defined below) by virtue of unpaid real estate taxes and assessments or otherwise.

11. The Treasurer may claim some right, title or interest in the Property (as defined below) by virtue of unpaid real estate taxes and assessments or otherwise.

**JURISDICTION AND VENUE**

12. This Court has *in rem* jurisdiction over the Property (as defined below) that is the subject matter of this action as said Property is located in the State of Oklahoma. This Court has subject matter jurisdiction in this action pursuant to 12 Okla. Stat. § 1551 because Lender seeks foreclosure and appointment of a receiver over property located in the State of Oklahoma.

13. The Court has personal jurisdiction over Borrowers because they hold title to the subject Property (as defined below), which is located Oklahoma County, Oklahoma and have transacted business in Oklahoma County, Oklahoma and thus have contacts with this forum directly related to the subject matter of this action.

14. This Court has personal jurisdiction over Nix Lumber because Nix Lumber has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

15. This Court has personal jurisdiction over MSS because MSS has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

16. This Court has personal jurisdiction over Rasa because Rasa has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

17. This Court has personal jurisdiction over IPlumb because IPlumb has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

18. This Court has personal jurisdiction over Guarantor because Guarantor has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

19. This Court has personal jurisdiction over YSA because YSA has transacted business involving the Property (as defined below) and thus has contacts with this forum directly related to the subject matter of this action.

20. Pursuant to 12 Okla. Stat. §132, Oklahoma County is a proper venue for this case because part of the real property over which Lender seeks appointment of a receiver (and foreclosure) through this Petition and owned and operated by Borrowers is located in Oklahoma County, Oklahoma.

21. Pursuant to 12 Okla. Stat. § 137, Oklahoma County is a proper venue for this case also because certain Defendants are nonresidents of Oklahoma, and others may properly be sued in Oklahoma County by virtue of their ownership of property located in Oklahoma County and/or because Oklahoma County is that in which there may be debts owing to such Defendants.

## FACTUAL BACKGROUND

***The Loan Transaction***

22. On or about December 21, 2021, Borrowers entered into that certain Loan Agreement, dated as of December 21, 2021, (as any time amended, the "**Loan Agreement**") with ReadyCap Commercial, LLC ("**Original Lender**"). The Loan Agreement evidences, in part, a commercial real estate loan made by Original Lender to Borrowers in the amount of $28,300,000.00 (the "**Loan**"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

23. The Loan is evidenced by that certain Promissory Note, dated as of December 21, 2021 by and between Borrowers and Original Lender in the original principal amount of

$28,300,000.00 (as at any time amended, the "**Note**"). A true and correct copy of the Note is attached hereto as **Exhibit B** and is incorporated herein by reference.

24. The Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226739, (as at any time amended, the "**Mortgage**") pursuant to which Borrower granted to Lender, the assignee of Original Lender, a first-priority security interest in that certain real and personal property, consisting of a multifamily apartment complex, located at 8800 Drexel Avenue, Oklahoma, City, Oklahoma 73159 and further described in the Mortgage (the "**Property**"). A true and correct copy of the Mortgage is attached hereto as **Exhibit C** and is incorporated herein by reference.

25. The Loan is secured further by that certain Assignment of Leases and Rents, dated as of December 21, 2021, and recorded with the County Clerk on December 29, 2021 as Document No. 2021122901226740, (at any time amended, the "**ALR**") pursuant to which Borrower granted to Lender, as assignee of Original Lender, a first-priority security interest in all leases and rents with respect to the Property. A true and correct copy of the ALR is attached hereto as **Exhibit D** and is incorporated herein by reference.

26. The Loan is secured further by that certain Deposit Account Control Agreement, dated as of December 21, 2021, by and among, Lender, Borrowers and Signature Bank (as at any time amended, the "**DACA**"), establishing and governing the Deposit Account and Lockbox Agreement, defined therein. A true and correct copy of the DACA is attached hereto as **Exhibit E** and is incorporated herein by reference.

27. The Loan Agreement, Note, the Mortgage, the ALR, the DACA, and all other documents executed in connection with, evidencing or securing the Loan are collectively referred to herein as the "**Loan Documents.**"

***Assignment of the Loan***

28. Effective as of December 21, 2021, Original Lender assigned all of its right, title and interest in and to the Loan and Loan Documents to ReadyCap Warehouse Financing LLC ("**RCWF**") as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); and (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of December 21, 2021 and recorded with the County Clerk on August 30, 2022 as Document No. 2022083001132674; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of December 21, 2021 and recorded with the County Clerk on August 29, 2022 as Document No. 2022082901131732 (collectively, the "**RCWF Assignments**"). A true and correct copy of each of the RCWF Assignments is attached hereto as **Group Exhibit F** and is incorporated herein by reference.

29. Effective as of June 22, 2023, RCWF assigned all of its right, title and interest in and to the Loan and Loan Documents to Ready Capital Subsidiary Reit II, LLC ("**Reit II**") as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001092946; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001092942 (the "**Reit II Assignments**"). A true and correct copy of each

of the Reit II Assignments is attached hereto as **Group Exhibit G** and is incorporated herein by reference.

30. Effective as of June 22, 2023, Reit II assigned all of its right, title and interest in and to the Loan and Loan Documents to Ready Capital Mortgage Depositor FL12, LLC (“**Depositor FL12**”) as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) that certain Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 202307201093016; and (c) that certain Assignment of Assignment of Leases and Rents, effective as of June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001093019 (the “**Depositor FL12 Assignments**”). A true and correct copy of each of the Depositor FL12 Assignments is attached hereto as **Group Exhibit H** and is incorporated herein by reference.

31. Effective as of June 22, 2023, Ready Capital Mortgage Depositor FL 12, LLC assigned all of its right, title and interest in and to the Loan and Loan Documents to Lender as evidenced by: (a) the Allonge to the Note (attached as part of Exhibit B hereto); (b) Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective June 22, 2023 and recorded with the County Clerk on July 20, 2023 as Document No. 2023072001093191; and (c) that certain Assignment of Assignment of Leases and Rents, effective June 22, 2023 and recorded with the County Clerk on July 30, 2023 as Document No. 2023072001093158 (the “**Lender Assignments**”). A true and correct copy of each of the Lender Assignments is attached hereto as **Group Exhibit I** and is incorporated herein by reference.

32. Thus, Lender is the current owner and holder of the Loan Documents.

33. As the current holder of the Loan Documents, Lender is entitled to enforce the Note, the lien created by the Mortgage and security interests as to the Property.

***Default under the Loan***

34. Under the terms of the Loan Documents, Borrowers are required to make monthly payments as provided therein and is required to pay the Loan in full upon maturity.

35. The Note matured by its terms on the January 2025 Payment Date (as defined therein). Upon such maturity, Borrowers failed to pay the full indebtedness due under the Note and other Loan Documents, and Borrowers have not turned over rents and other proceeds from the Property to which Lender is entitled under the Mortgage and ALR, which failures constitute Events of Default under the Loan Documents.

36. As of January 30, 2026, the balance due and owing to Lender under the Loan Documents, not including attorneys' fees and costs, is $30,647,053.79, consisting of Participation A-1 ("**A-1**") principal balance of $21,754,468.26; A-1 accrued interest of $500,365.15; A-1 default interest (January 10, 2025 – January 30, 2026) of $1,163,259.76; A-1 late fees of $96,464.99; Participation A-2 ("**A-2**") principal balance of $6,220,321.13; A-2 accrued interest of $143,070.93; A-2 default interest (January 10, 2025 – January 30, 2026) of $332,614.39; A-2 late fees of $20,289.31; exit fees of $70,750.00; lien release/assignment fees of $2,000.00; processing fees of $300.00; advances of $12,523.00; miscellaneous fees/IOA of $193.15; liquidation fee of $303,436.18; and special servicing fees of $26,997.54. Interest continues to accrue from and after January 30, 2026 as provided in the Loan Documents. Additionally, Borrowers owe any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue.

37. Additionally, under the Loan Documents, Borrower agreed not to allow any Transfer (as defined in the Loan Agreement) to occur, including imposition of a Lien affecting the Property. Despite Borrower's agreement, Borrower has allowed multiple Liens on the Property, including those filed by Nix Lumber (including a suit to enforce), MSS, Rasa, and IPlumb (as well as the filing of the ROFRs) (collectively, the "**Liens**"). This constitutes a further Event of Default under the Loan Documents.

38. On December 12, 2025, Lender notified Borrower in writing of the Events of Default under the Loan Documents and informed Borrower that its license under the Loan Documents to receive, collect and make use of rents, profits and income of any other type derived from the Property (the "**Rents**") was revoked pursuant to Article 3 of the Mortgage and Section 3 of the ALR (the "**Notice of Default**"). A true and correct copy of the Notice of Maturity Default is attached hereto as **Exhibit J** and incorporated herein by reference.

39. The Events of Default authorize Lender to exercise all rights and remedies available to Lender under the Loan Documents or at law or in equity, including the right to seek the appointment of a receiver for the Property (to which Borrowers agreed), foreclose the Mortgage, and collect rents and other income generated from the Property, among other things.

40. Specifically, Article 3 of the Mortgage provides, in part:

> ...If an Event of Default exists..., the license granted to Mortgagor herein may, at Mortgagee's election, be revoked by Mortgagee, and Mortgagee shall immediately be entitled to possession of all Rents then or thereafter payable during the continuance of any such Event of Default (including Rents past due and unpaid) whether or not Mortgagee enters upon or takes control of the Property. Any Rents collected by Mortgagor from and after the date on which an Event of Default occurred and is continuing shall be held by Mortgagor in trust for Mortgagee. Mortgagor hereby grants and assigns to Mortgagee the right, at Mortgagee's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent ***or by a receiver appointed***...to collect Rents with or without taking

> the actual possession of the Property or any equivalent action. During the existence of any Event of Default, Mortgagee may apply any Rents collected after the license granted herein is revoked in Mortgagee's sole and absolute discretion to pay the Loan Obligations in such order and in such manner as Mortgagee shall elect.

(Emphasis added.)

41. Section 6.2 of the Mortgage provides, in part:

> (a) If an Event of Default shall have occurred, this Mortgage may, to the maximum extent permitted by law, be enforced, and Mortgagee may exercise any right, power or remedy permitted to it hereunder, under the Loan Agreement or under any of the other Loan Documents or at law or in equity, and, without limiting the generality of the foregoing, Mortgagee may, personally or by their agents, to the maximum extent permitted by law:
>
> > (i) enter into and take possession of the Property or any part thereof, exclude Mortgagor and all Persons claiming under Mortgagor whose claims are junior to this Mortgage, wholly or partly therefrom, and use, operate, manage and control the Property or any part thereof either in the name of Mortgagor or otherwise as Mortgagee shall deem best, and upon such entry, from time to time at the expense of Mortgagor and the Property, make all such repairs, replacements, …, collect and receive all Rents and apply the same to the payment of all expenses that Mortgagee may be authorized to make under this Mortgage, the remainder to be applied to the payment of the Loan Obligations until the same shall have been repaid in full, take possession of all security deposits held by or on behalf of Mortgagor with respect to the Property, whether or not Mortgagee enters upon or takes control of the Property and regardless of where any such security deposits are deposited or located; if Mortgagee demands or attempts to take possession of the Property or any part thereof in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;
> >
> > (iii) personally or by agents, with or without entry:
> >
> > > (x) invoke the power of sale and pursuant to the procedures prescribed by law as a result

thereof, sell the Property or any part thereof, or cause the Property or any part thereof to be sold at a sale or sales…;

(y) proceed to protect and enforce Mortgagee's rights under this Mortgage, by suit for specific performance of any covenant contained herein or in the Loan Documents or in aid of the execution of any power granted herein or in the Loan Documents, or for the foreclosure of this Mortgage (as a mortgage or otherwise) and the sale of the Property or any part thereof under the judgment or decree of a court of competent jurisdiction, or for the enforcement of any other right as Mortgagee shall elect…; or

(z) exercise any or all of the remedies available to a secured party under the UCC, including, without limitation:

(1) either personally or ***by means of a court appointed receiver***, take possession of all or any of the Property and exclude therefrom Mortgagor and all Persons claiming under Mortgagor, and thereafter hold, store, use, operate, manage, maintain and control… and exercise all rights and powers of Mortgagor in respect of the Property, or any part thereof; if Mortgagee demands or attempts to take possession of the Property in the exercise of any rights hereunder during the existence of an Event of Default, Mortgagor shall promptly turn over and deliver complete possession thereof to Mortgagee;

. . .

(b) If an Event of Default shall have occurred and be continuing after any applicable notice and cure periods under the Loan Documents or applicable law, ***Mortgagee, to the maximum extent permitted by law, shall be entitled, as a matter of strict right, to the appointment of a receiver of the Property by a court of competent jurisdiction in connection with any action to foreclose this Mortgage*** (whether by judicial proceedings or by non-judicial proceedings by exercise of the power of sale), without notice or

> demand, and without regard to the adequacy of the security for the Loan Obligations or the solvency of Mortgagor. ***Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor.*** Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Mortgagee in case of entry and shall continue as such and exercise all such powers until the date of confirmation of sale of the Property, unless such receivership is sooner terminated.

(Emphasis added.)

42. Further, Section 3 of the ALR provides, in part:

> At any time after the occurrence and during the continuance of an Event of Default, Assignee, without waiving such Event of Default, at its option, upon notice and without regard to the adequacy of the security for the Loan Obligations, either in person or by agent, upon bringing any action or proceeding, ***by a receiver appointed by a court***, or otherwise, may take possession of the Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper. During the existence of an Event of Default, Assignee shall immediately be entitled to possession of all security deposits held by or on behalf of Assignor with respect to the Property.... During the existence of an Event of Default, Assignee, either with or without taking possession of the Property in its own name, may demand, sue for or otherwise collect and receive all Rents, including Rents past due and unpaid, and apply such Rents to pay any one or more of the following in such order and amounts as Assignee may elect in its sole and absolute discretion: (a) all costs and expenses incurred, and advances made, by Assignee to enforce this Assignment or the other Loan Documents, protect the Lien and security afforded thereby, or preserve the Property, including, without limitation, all expenses of managing the Property, including, without limitation, the salaries, fees and wages of any managing agent and such other employees as Assignee may deem reasonably necessary and all expenses of operating and maintaining the Property, including, without limitation, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for insurance and the cost of alterations, renovations, repairs or replacements, and all costs and expenses incident to taking and retaining possession of the Property or enforcing any of Assignee's rights and remedies hereunder; and (b) the Loan Obligations, together with all costs, expenses and attorneys' fees in connection with any of the foregoing... Assignor agrees that the exercise by Assignee of one or more of its rights and

> remedies under this Assignment shall in no way be deemed or construed to make Assignee a mortgagee-in-possession.

(Emphasis added.)

43. Lender is enforcing its rights under the Mortgage and intends to foreclose its security interest in the Property or otherwise sell the Property through a receiver sale at the earliest opportunity.

44. Borrowers have no legal right to occupy the Property nor do they have any further right to collect rents and other income generated therefrom.

45. Upon information and belief, tenants of the Property have made numerous complaints with respect to the condition of the Property (noting increased deterioration over the last couple years), including, among other things, lack of repairs and maintenance, neglected landscaping, roof damage, and pest infestation, all of which indicates that Borrowers have abdicated their responsibility and abandoned their duty to administer and operate the Property, further endangering its income-producing potential.

46. The Liens, which Borrowers have allowed to attach to the Property, further indicate Borrowers are either unable or unwilling to pay vendors and further evidence Borrowers' inability to adequately maintain the Property.

**COUNT I**
**(Suit for Breach of Loan Documents)**

47. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

48. Borrowers are in default under the Note and other Loan Documents.

49. Lender provided notice to Borrowers of Borrowers' defaults by way of the Notice of Default, but Borrowers failed to cure the defaults and pay the matured balance due under the Loan Documents, among other things.

50. Lender has retained counsel for the purpose of assisting Lender's efforts to collect the amounts owed under the Note and to assist Lender in protecting and disposing of the Property.

51. Lender has been charged fees and costs thereof, and will continue to incur such fees and costs, including, but not limited to, attorneys' fees, and court costs. Lender is entitled to include in any judgment entered against Borrowers the reasonable costs of collection accrued and hereafter accruing.

**WHEREFORE**, Lender requests a Judgment, *in rem*, on Count I of this Petition against Borrowers as follows:

(a) For a judgment, *in rem*, against Borrowers, jointly and severally, in the amount of $30,647,053.79, not including attorneys' fees and costs, as of January 30, 2026, together with accrued interest from and after January 30, 2026, and together with any other fees and costs incurred by Lender as provided in the Loan Documents, including, without limitation, any sums incurred by Lender for taxes, insurance, title fees, property advances, and attorneys' fees and costs, all of which continue to accrue; and

(b) Awarding Lender such other and further relief to which Lender might be entitled under Count I of this Petition and which may be just and equitable under the facts and circumstances presented by this action.

**<u>COUNT II</u>**
**(Foreclosure)**

52. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

53. As a result of Borrowers' Events of Default under the Loan Documents, Lender is entitled to a judgment directing that the Mortgage be foreclosed and finding that Lender has a first-priority lien on the Property.

54. Lender's liens are prior and superior to the interests of Borrowers, all Defendants, and all others who may make some claim in and to the Property.

55. Under the terms of the Mortgage, because of Borrowers' defaults, Lender is entitled to immediate possession of the Property and to an order directing foreclosure of Lender's interest therein.

56. Lender specifically reserves the right to pursue a temporary injunction or other relief with respect to its rights under the Loan Documents.

**WHEREFORE,** Lender requests entry of a judgment, *in rem*, on Count II of this Petition ordering and declaring:

(a) That Lender's lien on the Property is a valid first-priority mortgage lien on the Property and that Lender's lien is prior and superior to all other interests in the Property;

(b) That any interest of any party, including Borrowers, and all Defendants, in and to the Property, and any persons claiming by, through or under Defendants, is junior and inferior to Lender's lien on the Property;

(c) That Lender has the legal right and is authorized to foreclose its security interest in the Property and that the Property shall be sold, with or without appraisement, either in separate lots or together, as Lender may elect at the time a sale confirmation order is entered;

(d) That such foreclosure will vest in the purchaser at the foreclosure sale free and clear title to the Property, free of any and all interests that are or might be asserted by Borrowers or any

alleged interest-holder who has failed to make his/her/its alleged interest apparent in the real property records of Oklahoma County, Oklahoma, prior to the filing of this Petition;

(e) That Lender has the right to credit bid at such foreclosure sale all amounts owed to Lender under the Note and other Loan Documents executed by Borrowers in connection with the loan evidenced by the Note and Loan Documents;

(f) That the Sheriff sell the Property, either separately or together as directed, and deliver title to the Property to the successful bidder at the foreclosure sale via sheriff's deed or bill of sale, as appropriate;

(g) That the proceeds of the sale be applied as follows: (i) first, to payment of any real estate taxes due and owing on the Property at the time of sale; (ii) second, to the payment of foreclosure and advertising costs incurred by Lender in connection with the foreclosure of the Property; (iii) third, to the payment of the amounts owed to Lender under the Note and other Loan Documents executed by Borrowers in connection with the Loan; and (iv) fourth, the surplus, if any, to be disbursed in accordance with further order of the Court;

(h) Granting Lender immediate possession of the Property; and

(i) All further relief as the Court deems just, proper, and equitable.

**COUNT III**
**(Appointment of Receiver)**

57. Lender hereby realleges and restates each and every allegation in the preceding paragraphs and incorporates the same in this paragraph by reference as if fully stated herein.

58. An Event of Default occurred with respect to the Loan and under the Loan Documents.

59. Under the Loan Agreement, as a result of the Existing Default, Lender is entitled to take immediate possession of the Property and of the income and rents generated therefrom.

60. The superior alternative however is for the Court to order delivery of such possession to a receiver who can administer and manage the Property, address and resolve issues with the Property, collect the rents and pay the expenses of the Property, pay any net cash flow to Lender for application to the debt owed under the Note, and report to the Court on a periodic basis regarding the receiver's administration and management of the Property.

61. The immediate appointment of a receiver to manage and operate the Property is just and necessary for the following reasons:

a. Borrowers are in default having failed to perform as agreed under the Loan Documents, including failure to perform conditions of the Mortgage.

b. At a time when Borrowers cannot meet their obligations owed to Lender, Lender has a vested interest in protecting the value of the Property, the income therefrom and the personal property, and to prevent a risk of loss, removal or material injury thereto;

c. Lender has a vested interest in ensuring that the income and profits generated by the Property are being properly used for the benefit of the Property and for payment of debt service and other obligations;

d. At a time when Borrowers have failed to properly manage and supervise the Property (allowing the imposition of Liens thereon, among other things), Lender has a vested interest in protecting the Property which, together with the personalty, represents its only source of collateral and security for the amounts due and owing under the Note, from further loss and diminution in value;

e. Upon information and belief, the value of the Property is insufficient to satisfy Borrowers' debt obligation under the Note and other Loan Documents;

f. Upon information and belief, tenants of the Property have made numerous complaints with respect to the condition of the Property (noting increased deterioration over the last couple years), as set forth above, indicating that Borrowers have abdicated their responsibility and abandoned their duty to administer and operate the Property, further endangering its income-producing potential;

g. Borrowers continue to allow unauthorized liens to attach to the Property, indicating Borrowers are unable or unwilling to pay vendors and further evidencing Borrower's inability to adequately maintain the Property; and

h. Borrowers agreed in Section 6.2(b) of the Mortgage, that, upon an Event of Default under the Loan Documents, Lender is entitled "***as a matter of strict right, to the appointment of a receiver for the Property***" and Mortgagor (Borrowers) "***irrevocably consents to such appointment and waives notice of any application therefor***." (Emphasis added.) Such agreements should be enforced under Oklahoma law. *See Davon Drilling Co. v. Ginder*, 467 P.2d 470, 473 (Okla. 1970) (holding unambiguous contract should be enforced according to their express terms even if such terms are harsh);

i. 12 Okla. Stat. §1551(2) specifically provides for the appointment of a receiver "in an action by a mortgagee for the foreclosure of his mortgage and sale of the mortgaged property…where it appears that the mortgaged property is in danger of being lost, removed or materially injured, or …that a condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt, or …that a condition of the mortgage has not been performed and the mortgage instrument provides for the appointment of a receiver. Each of these conditions is met in this case; and

j. 12 Okla. Stat. §1551(6) specifically provides for the appointment of a receiver "[i]n all other cases where receivers have heretofore been appointed by the usages of the courts of equity."

**WHEREFORE,** Lender requests a Judgment on Count III of this Petition against Borrowers as follows:

(a) for immediate appointment of a receiver to take possession of and administer the Property in accordance with the proposed Order Appointing Receiver attached as Exhibit B to the Motion for Appointment of Receiver filed concurrently herewith;

(b) for all additional fees and costs incurred by Lender in connection with the enforcement of its rights under the Loan Documents and the protection, preservation and realization of the Property, including, without limitation, attorneys' fees, and costs incurred in connection with this action seeking appointment of a receiver; and

(c) Awarding Lender such other and further relief to which Lender might be entitled under Count III of this Petition and which may be just and equitable under the facts and circumstances presented by this action.

Dated: February 18, 2026

Respectfully submitted,

Kiran A. Phansalkar, OBA #11470
Preston Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
Conner & Winters, LLP
1700 One Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com

***Counsel for Plaintiff***

**VERIFICATION**

STATE OF Kansas )
)
COUNTY OF Johnson )

Before me, the undersigned authority, on this day personally appeared Ethan J. Meyer who, being by me duly sworn, upon his oath, deposed and stated that he is an authorized representative KeyBank National Association, the special servicer and authorized agent of the Plaintiff in connection with the foregoing Verified Petition, is duly authorized to execute the forgoing document on behalf of the same, and certifies that the statements set forth in said complaint are true and correct, except as to matters therein stated to be on information and belief and to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

Ethan J. Meyer

Notary Public

My Commission Expires:
8/12/2029

CHASE THOMPSON
Notary Public - State of Kansas
My Appointment Expires 8.12.29

# Payoff Letter

Bellwether

Drexel Flats Acquistion LLC
Drexel Flats Acquistion TIC LLC
187 S. Old Woodward, Suite 200
Birmingham, MI 48009

| | |
|---|---|
| Lender: | LSREF7 Badlands Loan Trust 2026 |
| Loan Number: | 132020243 |
| Payoff Date: | 5/20/2026 |
| Expiration Date: | 6/9/2026 |

| | | |
|---|---|---|
| Principal Balance: | $ | 27,974,789.39 |
| Past Due Interest through (5/20/2026): | $ | 904,449.65 |
| Default Interest: | $ | 2,064,798.95 |
| Exit Fee: | $ | 70,750.00 |
| Late Charges Due: | $ | 149,601.39 |
| Servicing Fees: | $ | 5,912.46 |
| Recording Fee: | $ | 500.00 |
| Reimbursable Lender Expenses: | | |
| ***Gross Payoff:*** | **$** | **31,170,801.84** |
| ***Less:*** | | |
| Escrow Funds: | $ | 31,471.31 |
| ***Sum:*** | **$** | **31,471.31** |
| **Net Payoff** | **$** | **31,139,330.53** |

WIRE payment for the full amount shown above must be RECEIVED by Bellwether no later than 4:00 p.m. ET on May 20th. This statement expires **June 9, 2026 at 4:00 p.m. ET. If payment is made after this date a per diem of $9,567.55 is due.**

This letter does NOT modify your loan documents nor negate your responsibility to pay installments timely.

**Please wire the total amount due as follows:**

| | |
|---|---|
| Account Name | Bellwether Asset Services LLC |
| ABA Routing Number | 021-000-021 |
| Account Number | 737016983 |
| Beneficiary Bank | JP Morgan Chase |
| Reference | LN: 132020243 |

IMPORTANT NOTICE: This statement does not modify, alter or amend the terms of the loan documents. The payoff quoted above is subject to final verification by the noteholder. Bellwether reserves the right to demand additional funds before or subsequent to the release of the noteholder's security interest in the property securing the loan, to correct any error or omission in these figures made in good faith, whether mathematical, clerical, typographical, or otherwise. The payoff figure is also subject to change to reflect any transactions that may occur on or after the date of this statement.

EXHIBIT B

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

READY CAPITAL MORTGAGE FINANCING 2023-FL12, LLC

Plaintiff,

v.

DREXEL FLATS ACQUISITION LLC, a Delaware limited liability company; DREXEL FLATS ACQUISITION TIC LLC, a Delaware limited liability company; NIX LUMBER, INC., an Oklahoma corporation; TRES PALM SUPPLY, LLC D/B/A MAINTENANCE SUPPLY SOLUTIONS, a Texas limited liability company; RASA FLOORS & CARPET CLEANING, LLC, a Texas limited liability company; IPLUMB CO. LLC, an Oklahoma limited liability company; MARC KULICK, an individual; YSA INVESTMENTS 1, LLC, a Delaware limited liability company; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; and THE OKLAHOMA COUNTY TREASURER

Defendants.

Case No. CJ - 2026 - 1275

**FILED**
DISTRICT COURT
OKLAHOMA COUNTY, OKLAHOMA
June 17, 2026 11:30 AM
RICK WARREN, COURT CLERK
Case Number CJ-2026-1275

**SUMMONS**

**TO: Rasa Floors & Carpet Cleaning, LLC**
**c/o CT Corporation System**
**1833 South Morgan Road**
**Oklahoma City, Oklahoma 73128**

You have been sued by the above-named Plaintiffs and are directed to file a written answer to the attached Petition in the Court of the above address within twenty (20) days after service of this Summons upon you exclusive of the day of service. Within the same time, a copy of the Answer must be delivered or mailed to the attorney for the Plaintiffs. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this 18 day of February 2026.

Attorneys for Plaintiffs:

Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
CONNER & WINTERS, LLP
One Leadership Square, Suite 1700
211 North Robinson
Oklahoma City, OK 73102-7101
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com

RICK WARREN, COURT CLERK

By: ______________________
Deputy Court Clerk

This Summons was served on ______________________
(Date of Service)

______________________
Signature of person serving Summons)

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

US POSTAGE
quadient
PRIORITY MAIL
IMI
$022.15⁰
02/19/2026 ZIP 73102
043M31247567

CONNER WINTERS
1700 One Leadership Square 211 N. Robinson | Oklahoma City, OK 73102

TO

Rasa Floors & Carpet Cleaning, LLC
c/o CT Corporation System
1833 South Morgan Road
Oklahoma City, Oklahoma 73128

CERTIFIED MAIL®

7019 2280 0001 7838 6987
7019 2280 0001 7838 6987

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

22320.0002 Summons-Rasa Floors Co.

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $
Postage

Postmark Here

Via Cert. Mail: RRR
Rasa Floors & Carpet Cleaning, LLC
c/o CT Corporation System
1833 South Morgan Road
Oklahoma City, Oklahoma 73128

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Via Cert. Mail; RRR
Rasa Floors & Carpet Cleaning, LLC
c/o CT Corporation System
1833 South Morgan Road
Oklahoma City, Oklahoma 73128

9590 9402 5378 9189 3903 30

2. Article Number (Transfer from service label)

7019 2280 0001 7838 6987

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☒ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type

- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☒ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ail
- all Restricted Delivery
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☒ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt