**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YSA Investments 1, LLC, | ) | |
| | ) | Case No. 26-12806 (SAH) |
| | ) | |
| Debtor. | ) | |

---

**LIMITED JOINDER OF AUERBACH OPPORTUNITY FUND I, LP, AUERBACH OPPORTUNITY FUND III, LP, AND AUERBACH OPPORTUNITY FUND IV, LP TO AMENDED EMERGENCY MOTION OF CREO QRS VC LLC AND CREO QRS NP LLC TO APPOINT A CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, TO DISMISS THE CHAPTER 11 CASE OF YSA INVESTMENTS 1, LLC AND BRIEF IN SUPPORT**

Auerbach Opportunity Fund I, LP, Auerbach Opportunity Fund III, LP, and Auerbach Opportunity Fund IV, LP (collectively, "Auerbach"), by and through their undersigned counsel, hereby join in and adopt on a limited basis the Amended Emergency Motion of CREO QRS VC LLC and CREO QRS NP LLC to Appoint a Chapter 11 Trustee, or Alternatively, to Dismiss the Chapter 11 Case of YSA Investments 1, LLC (the "Motion"), filed on August 21, 2026 [Docket No. 184]. Auerbach joins the request for primary relief in the appointment of a chapter 11 trustee and affirmatively opposes the alternatively requested relief of the dismissal of the chapter 11 filing. In limited support of this Joinder, Auerbach respectfully states as follows:

**TABLE OF CONTENTS**


| | Page |
|---|---|
| Preliminary Statement | 2 |
| Additional Facts Supporting the Motion | 4 |
| The Predatory Lending Scheme Underlying YSA's Claims | 4 |
| The Delaware Decision Adjudicated Neither Ownership nor the Validity of the Mortgages, Nor Authority | 7 |
| YSA's Collateral Was Membership Interests in Holding Companies Not the Real Estate | 8 |
| The Validity of the Recorded Mortgages is an Unanswered Question Of Oklahoma and Kansas Law | 11 |
| The Mortgages Breach the Senior Loan Documents and YSA Knew those Documents Existed | 12 |

| | |
|---|---|
| No Court Has Ever Adjudicated Whether YSA Acquired Authority Over the Portfolio Entities | 13 |
| Only an Independent Fiduciary Will Investigate and Prosecute the Estate's Claims | 15 |
| Legal Basis for Joinder | 17 |
| Appointment of a Trustee Serves Auerbach's Interests | 17 |
| Limitation of Joinder as to Dismissal of the Bankruptcy Filing | 18 |
| Conclusion | 19 |


**TABLE OF AUTHORITIES CITED**


| | |
|---|---|
| 11 U.S.C. § 1104 | 2 |
| 6 Del. C. § 18-703 | 8 |
| 6 Del. C. § 18-701 | 8 |
| Fed. R. Bankr. P. 2002; 11 U.S.C. § 1109(b) | 17 |
| 11 U.S.C. §§ 1104(a) and 1112(b) | 17 |


1. Auerbach hereby adopts and joins the Motion, and by filing this Joinder, incorporates by reference all facts, legal arguments, and authorities set forth in the Motion as if fully restated herein, excepting only those parts of the Motion that request dismissal of the Chapter 11 case. Auerbach hereby requests the same primary relief sought by CREO: the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104.

**PRELIMINARY STATEMENT**

2. Auerbach has substantial and direct interests in this chapter 11 case that are affected by the relief requested and that give Auerbach standing to join this Motion. Auerbach has invested approximately $75,000,000 across approximately thirty-four multifamily real estate properties in Oklahoma, Arkansas and Kansas comprising the "Vesta Portfolio". Auerbach holds direct equity ownership interests, unsecured creditor positions, preferred equity positions with forced-sale rights, and other significant financial interests in numerous Portfolio properties that are the subject of or related to chapter 11 cases pending in this Court.

3. As an institutional investor representing hundreds of its own underlying investors, Auerbach negotiated and secured specific contractual governance rights in a number of the subject properties in this bankruptcy within the Vesta Portfolio, including Major Decision consent rights over any encumbrance,

transfer, or change of control of the Portfolio entities and their assets. YSA has improperly obtained an alleged interest the Portfolio Properties taken the Portfolio in stages, and without court authorization. First, without authority it encumbered the Properties, recording second mortgages against them in the county land records of Oklahoma and Kansas. Second, upon information and belief, it rewrote the governance of the entities themselves—purporting to amend or replace operating agreements, to remove and substitute managers and authorized signatories, and to make corresponding filings with state authorities—without notice to, consent from, or in most instances any communication whatsoever with the members whose capital those entities hold. Third, under the guise of void deeds in lieu of foreclosure it took physical possession of a number of the Properties. Fourth, it scheduled assets in this case as owned outright by YSA, including assets legally owned by Auerbach or in which Auerbach holds a substantial economic interest. Auerbach's approximately $75 million is one part of hundreds of millions of dollars of third-party equity invested across the Portfolio by limited partners, co-investors, and institutional participants—none of whom was a party to YSA's loans, received any proceeds of them, was asked to consent to them, or was told they existed. Every dollar of that equity now sits beneath recorded void encumbrances, invalid rewritten governance documents, and fraudulently asserted ownership claims that no court has adjudicated.

4. YSA's recording of second mortgages against the Portfolio properties, its subsequent seizure and control of properties in which Auerbach holds substantial equity and credit interests and reserved governance rights, and its filing of this chapter 11 case have together created immense and irreparable disruption to Auerbach's financial interests and have violated Auerbach's contractually reserved rights. Most critically, on July 20, 2026—eight days before YSA filed this chapter 11 case—YSA, acting through agents and with the presence of law enforcement, physically seized possession of Portfolio properties, including Village Creek and other Auerbach Properties, by changing locks, removing the incumbent

property manager, and installing YSA's chosen manager, all without obtaining any judicial authorization. As referenced in Section 13 of the Motion, several of the Auerbach Properties, including Village Creek, had filed their own voluntary chapter 11 petitions prior to YSA's takeover, which entitled them to automatic stay protections that were flagrantly and intentionally violated by YSA and its principals. The chaos and confusion created by YSA and its principals has directly and adversely affected the operations, management, ownership status, and value of the properties in which Auerbach maintains significant credit and equity interests.

5. As an institutional investor with approximately $75 million at stake, standing alongside hundreds of millions of dollars of aggregate third-party investor equity across the Portfolio, with contractually reserved governance rights over critical asset decisions, and direct economic stakes in multiple Portfolio properties, Auerbach's interests are inextricably intertwined with remedying the chaos YSA has created across the Vesta Portfolio and with the stabilization of its operations and management. The appointment of an independent chapter 11 trustee is essential to protect Auerbach's equity and creditor interests, preserve the value of the properties in which Auerbach has substantial investments, and honor Auerbach's contractually reserved approval rights over the properties in which it invested. Thus, Auerbach joins in CREO's request to appoint a Chapter 11 Trustee over the YSA bankruptcy estate.

**ADDITIONAL FACTS SUPPORTING THE MOTION**

6. Auerbach incorporates by reference the detailed factual background set forth in the Motion, including but not limited to:

a. YSA's alleged improper seizure and control of properties in the Vesta Portfolio;
b. The chaos created by YSA's assertion of ownership and control over properties it neither purchased nor foreclosed upon;
c. YSA's filing of this chapter 11 case mere minutes before Mr. Diveroli was to testify at the TRO Hearing, demonstrating the tactical, litigation-driven purpose of this filing;
d. YSA's failure to secure adequate insurance coverage for the properties, which is still unresolved;

e. The characterization by Judge Jernigan of YSA's filing as creating an "aura of bad faith" and evidence of strategic motives to create additional chaos;
f. YSA's admission that it has no ongoing business or operations of its own; and
g. The indisputable bad faith nature of this filing, filed solely to obtain tactical litigation advantage and to shield YSA from accountability for the chaos it created and its potential violation of the automatic stay in the Texas bankruptcy cases.

**THE PREDATORY LENDING SCHEME UNDERLYING YSA'S CLAIMS**

7. The Motion identifies YSA's reliance on a scheme of predatory lending that directly impacts Auerbach's interests. Beginning in October 2024, YSA extended a series of short-term, high-interest loans to entities controlled by Mr. Kulick, with rates escalating across four defaulted loans to 133.333% per annum compounded monthly, 1,500% per annum compounded monthly, 960% per annum compounded daily, and finally a stated rate of 7,000% per annum compounded daily on a single $317,000 loan dated July 31, 2025. That loan advanced $317,000 on a five-day term and was in default five days later. Computed as YSA computes it on its own worksheet—on a 360-day year—a stated rate of 7,000% per annum is a daily rate of 19.4444%, compounded daily. That is an effective annual rate of 1,464,109,324,325,582,544,099,793,920,274%. At that rate the balance doubles approximately every four days, as YSA's own expert acknowledged at trial. YSA's own accounting calculates that this $317,000 advance accrued to $919,740,361.28 in forty-three days. Carried forward on YSA's own stated terms, it reaches approximately $470,920,497,145,708,204,735,481,040,422,167,404 by August 31, 2026—more than four hundred seventy decillion dollars. Measured against the combined annual gross domestic product of every nation on earth, roughly $115 trillion, that balance exceeds the entire annual output of the world economy by a factor of approximately 4,094,960,844,745,288,736,830—four sextillion ninety-four quintillion, or more than four billion trillion times over. Put another way, the whole of global economic production would have to be paid over to YSA every year for approximately 4,094,960,844,745,288,736,830 years, a span exceeding the current age of the universe roughly two hundred ninety-seven billion times over. It is this loan that matters most here. Auerbach does not contend

that it knows which advance the second mortgages were nominally taken in connection with. What can be derived from YSA's own numbers is that the interest YSA manufactured on this note is what produced the balance those mortgages purport to secure, and it is the size of that balance—not the size of any loan—that determined how large the recorded encumbrances could be made. A $317,000 advance, compounded in this manner, became the entire predicate for encumbering and then claiming a 34-property portfolio capitalized with hundreds of millions of dollars of third-party equity, including approximately $75 million from Auerbach and its investors.

8. YSA undertook no meaningful diligence into who owned the Portfolio or who was authorized to encumber it before it lent. The Chancery record reflects that YSA's own Rule 30(b)(6) representative could not recall requesting the operating agreements of the Title Owners, and that only five entities' operating agreements were produced in connection with the February 2025 loan. By the time of the July 2025 loan, YSA was, upon information and belief, in possession of every entity's organizational documents and senior loan agreements, which clearly enumerated the reserved rights and restrictions provided by each. YSA nonetheless accepted a one-paragraph joinder, proposed and drafted in a matter of hours while its borrower pressed for same-day funding, as the instrument by which an entire portfolio would be committed. By the time it recorded second mortgages against the Properties, it purported to amend those entities' operating agreements, took title by deeds in lieu of foreclosure, and seized possession, YSA had the documents in hand and knew what they said about who owned these entities, who was authorized to encumber their assets, and whose consent was required. It proceeded anyway, and it did so without notice to or consent from the institutional and individual investors who capitalized the Portfolio. In fact, according to the operating agreements, loans of the type made by YSA were not allowed without the consent of Auerbach. This was never done.

9. The damage to Auerbach began with the mortgages, and it was immediate. Long before YSA seized a single property and long before it filed this case, the recording of those instruments did the initial and decisive harm. Title across the Portfolio became uninsurable. Pending sales died. Refinancings could not be completed, because no incoming lender would fund into a nine-figure junior encumbrance and no senior lender will consent to one. Auerbach's equity was frozen in place: it could not be sold, could not be recapitalized, and could not be protected. Several Title Owners were driven into chapter 11 for that reason and no other; Village Creek, now before this Court, would have required no bankruptcy protection but for YSA's encumbrances. YSA's later conduct compounded that harm: the purported amendments to entity governance documents, the deeds in lieu of foreclosure taken without any foreclosure, the seizure of possession, and this bad faith filing have each deepened an impairment the mortgages had already inflicted. The same impairment runs through every other institutional and individual investor in the Portfolio.

## THE DELAWARE DECISION ADJUDICATED NEITHER OWNERSHIP, NOR THE VALIDITY OF THE MORTGAGES, NOR AUTHORITY

10. Auerbach notes, and does not ask this Court to revisit, the post-trial judgment entered against Mr. Kulick and in favor of YSA in Kulick v. YSA Investments 1, LLC, C.A. No. 2025-1319-KSJM (Del. Ch. June 9, 2026). Two points about that judgment matter here. First, YSA conceded in that action, and the court recorded the concession, that its loan documents did not create a security interest in the properties themselves. Second, the question presented was whether Mr. Kulick had clearly established an entitlement to a mandatory injunction compelling YSA to release recorded mortgages—a heightened burden he failed to carry. The court declined to reach the remaining elements of the claim or any of YSA's other arguments. A denial of mandatory relief to remove an instrument is not an adjudication that the instrument is valid, and no court has yet declared these mortgages valid, enforceable, or binding on anyone. Auerbach was

not a party to that action, was not in privity with any party to it, and was adverse in interest to the plaintiffs who prosecuted it.

11. The Delaware decision is not a money judgment, and it should not be treated as one. It awarded no damages, liquidated no debt, adjudicated no ownership, and transferred no property. YSA's counterclaims and third-party claims—filed February 11, 2026 against Mr. Kulick, Vesta Holdings, forty-six named third-party defendants, and up to one hundred additional unidentified individuals and one hundred additional unidentified entities named as placeholders—remains unadjudicated, with service still being effectuated as of May 2026. To the extent YSA has characterized that decision as a judgment for a sum in the hundreds of millions of dollars, or has represented that it is simply exercising the rights of a judgment creditor, the characterization is incorrect. And even if YSA did hold such a judgment against a member of a limited liability company, its remedy under the Delaware law it chose to govern its own loan documents would be a charging order against that member's distributions, which the Delaware Limited Liability Company Act makes the exclusive remedy of a judgment creditor of a member. 6 Del. C. § 18-703. A charging order is not a right of possession, not a right to manage, and not title to the entity's real property. What YSA has actually done—installing its own property manager, directing tenants to pay rent to it as the property owner, and scheduling the Properties in this case as owned outright by YSA—exceeds both what the Delaware decision conferred and what a money judgment would have conferred.

**YSA'S COLLATERAL WAS MEMBERSHIP INTERESTS IN HOLDING COMPANIES, NOT THE REAL ESTATE**

12. Whatever YSA was entitled to reach, it was not the real estate. The collateral was enumerated: Vesta Holdings and Asset Holder pledged membership interests in seventeen intermediate holding companies, identified by name and by stated capital contribution, and nothing else. A membership interest in a limited liability company is personal property, and the member holds no interest in the specific property of the company. 6 Del. C. § 18-701. The loan documents say the same thing about their own

collateral: the CPSA provides that the Collateral constitutes "general intangibles" under the Uniform Commercial Code and that the CPSA is a security agreement under the UCC. CPSA § 3.4. General intangibles are encumbered by a security agreement and perfected by a financing statement filed against the debtor. Real property is encumbered by a mortgage granted by the record owner and recorded in the county where the land lies. These are different assets, held by different persons, governed by different bodies of law, and perfected in different offices. A lien on a member's interest travels with that interest. It does not descend into the company and attach to the company's buildings. There is a further limit that YSA has ignored entirely. What was pledged was not an entity but a fractional membership interest in an entity. Vesta Holdings and Asset Holder held minority economic stakes in these holding companies alongside Auerbach and the other members, described in the pledge documents by reference to stated capital contributions of $400,000, $150,000, $100,000 and similar sums. Even a completed foreclosure could therefore have reached only that member's own fractional interest—the share of distributions attributable to a $400,000 or $150,000 contribution—and could not have reached the interests of the co-members who contributed the balance of the capital. YSA has treated the pledge of one member's minority interest as a conveyance of the entire company, and then of everything the company owns.

13. The gap here is two tiers wide, not one. The pledged interests were interests in the Intermediate Holding Companies. The mortgages were recorded against real property owned by the Title Owners, which sit below the Intermediate Holding Companies and are separate limited liability companies with their own members, their own governing agreements, and their own creditors. Auerbach invested at the Title Owner and Intermediate Holding Company levels, as did the other institutional investors and the hundreds of individuals whose capital those entities hold. Nothing Mr. Kulick pledged was an asset of a Title Owner, and no instrument he signed made a Title Owner the grantor of a mortgage. If YSA holds anything, it holds a security interest in a membership interest, and its remedy is the one its own documents

prescribe: a sale under CPSA § 5.2, followed by admission of the purchaser as a member of the applicable Entity. That route would have yielded YSA a minority membership interest and nothing more. YSA did not take it. It went to the land records instead.

14. YSA knew the difference, because it observed it the first time. On the October 8, 2024 loan—built on the same collateral structure, with the same seventeen entities and the same form of collateral pledge and security agreement—YSA perfected by filing UCC-1 financing statements against the pledged membership interests. It recorded no mortgages. Mr. Kulick so testified at trial, and the financing statements were admitted as an exhibit. Trial Tr. at 12:20–13:16 (Exhibit 1). YSA thus treated this collateral as what the documents say it is—general intangibles perfected by UCC filing—for as long as the balance was $829,250. It abandoned that path and turned to the county land records only after the compounding had produced a claimed balance of hundreds of millions of dollars, when a security interest in membership interests was no longer worth having and the real estate was.

15. Recording an instrument is not the same as creating a lien, and this is the difference on which the matter turns. A contract between YSA and its borrower may permit YSA to sign and record a document. It cannot make that document a mortgage. Recording does not create an interest in real property; it gives notice of a claimed interest, and it leaves the question of validity to the court with jurisdiction over the land. A mortgage purportedly granted on an entity's behalf by a party without authority to encumber that entity's property creates no lien, however faithfully it is recorded and however broad the contract that authorized its filing. The point is easily illustrated. Assume a lender advances money to the chief executive officer of a large company against minority shares the executive personally owns, under papers permitting the lender, on default, to take whatever steps it deems necessary to protect its position. On that language a court might well allow the lender to record a notice of its claim. It is a different matter altogether for the lender to sign the executive's name to instruments appointing the lender

as chief executive, seize the company's facilities, remove its employees, and inform the remaining shareholders—who signed nothing and received nothing—that the company is now the lender's because their chief executive borrowed against his own minority stock. A right to file is not a right to own. And at no point in any of it did YSA give notice to Auerbach. Auerbach was not told that mortgages would be recorded against the properties in which it had invested, was not asked to consent to them, and was not informed after they were recorded. The same is true of the purported amendments to the entities' governing documents, of the deeds in lieu of foreclosure, and of the seizure of possession. Each of those acts was taken without Auerbach's knowledge and without any communication to Auerbach at all, and none of these acts can be of any legal effect without Auerbach's express consent. YSA has confused permission to file with the power to encumber, and it has done so repeatedly: each time it recorded a mortgage against real property owned by an entity that had granted it nothing, again when it purported to amend those entities' governing documents and install its own managers, again when it took title by deeds in lieu of foreclosure without any foreclosure, and most visibly on July 20, 2026.

**THE VALIDITY OF THE RECORDED MORTGAGES IS AN UNANSWERED QUESTION OF OKLAHOMA AND KANSAS LAW**

16. The validity of these mortgages is a question of Oklahoma and Kansas law, and it has never been put to a court in either state. The Properties are located in Oklahoma, Arkansas, and Kansas. YSA recorded second mortgages against at least twenty-five of them in Oklahoma and Kansas county land records. The creation, validity, execution, and effect of an encumbrance on real property are governed by the law of the state where the property sits, and no court sitting in Delaware can adjudicate title to land in Oklahoma or Kansas. The Delaware action was an in personam contract dispute governed by a Delaware choice-of-law clause between YSA and Mr. Kulick's personal investment vehicles. It construed a contract. It did not, and could not, determine whether a valid mortgage lien attached to Oklahoma or Kansas real estate owned by entities that were not before it.

17. The defects are not technical. The Title Owners are the record owners of the Properties. They did not execute these mortgages. No officer, manager, or authorized signatory of any Title Owner signed them. They were signed by YSA, a lender with no adjudicated ownership interest in the Title Owners, acting under a power of attorney granted to it by a different party in a document to which the Title Owners were never signatories and of which their other members were never informed. No foreclosure sale was ever conducted under the procedures the loan documents themselves prescribe. No purchaser was ever admitted to membership in any entity. No successor manager or general partner was ever substituted under any operating or limited partnership agreement by the vote or consent of the members entitled to give it. YSA instead purported to rewrite the governing documents unilaterally, amending or replacing operating agreements and installing its own managers and signatories, and then treated its own paperwork as the source of the authority it was exercising. Whether an instrument executed in those circumstances satisfies the requirements of Oklahoma and Kansas law for the valid encumbrance of real property is an open question that must be answered before these mortgages can be treated as liens.

**THE MORTGAGES BREACHED THE SENIOR LOAN DOCUMENTS, AND YSA KNEW THOSE DOCUMENTS EXISTED**

18. The mortgages were sized to do damage and they did it as filed. These are not nominal or placeholder instruments. Auerbach has identified recorded face amounts exceeding $150 million to date and its review of the county records is not complete. At a number of the Properties the recorded amount approaches or exceeds the equity standing behind the senior debt, and in every instance the instrument purports to secure not its face amount but YSA’s entire claimed balance. An encumbrance that secures an obligation of that magnitude is not limited in its effect by the number written on it, and an unadjudicated and invalid lien of that magnitude is commercially indistinguishable from a valid one—which is precisely why these instruments were recorded rather than litigated. Mr. Kulick testified that at least three transactions failed because of them. Nothing about their size bears any relation to money actually

advanced. Advances totaling a small fraction of one percent of the balance claimed have been compounded into recorded encumbrances that reach the equity of a 34-property portfolio and the institutional and individual investors behind it.

19. The recorded second mortgages also breached the senior loan documents encumbering the Properties as CREO has noted, and in doing so YSA manufactured defaults across a portfolio it did not own. Substantially all of the Properties are financed by institutional senior mortgage debt, including agency-backed loans. Loan documents of that kind prohibit subordinate liens outright, or permit them only with the senior lender's prior written consent, and they treat the recording of an unpermitted junior encumbrance as an immediate event of default, frequently with cross-default consequences across related loans and with recourse triggers against guarantors. YSA obtained no senior lender consent before recording. The result is that a lender whose actual advances totaled a small fraction of one percent of the balance it claims placed dozens of separately financed properties into technical default, exposed their sponsors and guarantors to recourse, and jeopardized the reserves and the agency relationships on which the Portfolio's financing depends—harm borne not by YSA but by the senior lenders, the title owners, and the hundreds of millions of dollars of investor equity beneath them. This highlights the incompetence and gross mismanagement of the affairs of YSA.

20. YSA cannot claim ignorance of those senior loan documents, because it contracted for information about them and built its own covenants around them. The CPSA recites that all due diligence materials furnished to YSA by email and through cloud storage environments were true and correct. CPSA § 3.7. It defines an "Other Loan Default" as a breach or default "under any loan agreement" taken by the borrower, pledgor, guarantor, or any related entity, and requires notice to YSA within two business days of any such default. CPSA §§ 3.6, 4.4. It obligates the borrower to alert YSA to any debt in excess of $50,000 incurred by any entity directly or indirectly controlled by the guarantor. CPSA § 4.3. And it

recites that the borrower and pledgor held at least $20,000,000 in debt service reserves "as required by loan agreements with various third parties," prohibiting any withdrawal of those reserves without YSA's written consent. CPSA § 3.8. YSA therefore knew that the Properties were subject to third-party institutional loan agreements, knew those agreements imposed reserve and default obligations, negotiated for notice of defaults under them, and asserted control over reserves held pursuant to them. It then recorded encumbrances that breached them. A lender who drafts covenants around senior loan agreements cannot credibly say it did not know those agreements restricted what it proceeded to do.

**NO COURT HAS EVER ADJUDICATED WHETHER YSA ACQUIRED AUTHORITY OVER THE PORTFOLIO ENTITIES**

21. Whether YSA ever acquired authority to encumber, transfer, or take control of the entities in which Auerbach invested has never been adjudicated. That question was raised in the Delaware action, abandoned before trial, and never decided. At the November 25, 2025 hearing the court ordered targeted discovery directed precisely at it, framing the issue as whether the defendant had the authority to impose these mortgages. The plaintiffs then dropped the argument in a footnote to their opening brief. When the Chancellor raised it again at the close of trial, plaintiffs' counsel confirmed they were not proceeding on actual authority, explaining that they had elected not to press it because they wanted quick relief and that proving apparent authority or ratification might have taken several days. The Chancellor observed that they would have had to prove up the limits of the authority at issue. Trial Tr. at 222:16–224:14. (Exhibit 1). The question was therefore neither actually litigated nor necessary to the judgment. No court has held that YSA acquired the authority it exercised, and nothing in that record binds Auerbach or any of the other institutional and individual investors whose capital, totaling hundreds of millions of dollars, is the subject of the unanswered question. None of them was a party to that action.

22. What the Chancery record does contain is Mr. Kulick's own sworn testimony that he lacked the authority YSA claims he transferred. He testified that he had overstepped his authority and was

working to fix it; that it was during the litigation that he learned where his authority extends and where it does not; and that, having examined the governing documents, many of which govern manager-managed limited liability companies in which he had assumed greater latitude than he possessed, he does not believe he has the authority. Trial Tr. at 111:4–11, 143:5–18. (Exhibit 1). He further testified that he had been required to explain to his investors and their counsel that he did not pledge what YSA says he pledged. Trial Tr. at 145:8–12. (Exhibit 1). The party from whom YSA claims to have derived authority over Auerbach's investments has testified under oath that he never had it.

23. Auerbach does not ask this Court to construe the loan documents, and this Joinder is not an invitation to revisit the Delaware judgment. Auerbach's point is narrower and, for present purposes, sufficient: the validity of YSA's asserted ownership and management authority over entities whose members signed nothing, received nothing, and were bound by YSA's own confidentiality covenant from learning the loans existed remains a genuinely open question, and it is a question that will be adjudicated in future litigation. It will not be answered by YSA, whose asserted ownership is the thing in question. It will not be answered by a debtor whose principals are the subjects of the inquiry. It can be answered only by a fiduciary appointed by this Court.

**ONLY AN INDEPENDENT FIDUCIARY WILL INVESTIGATE AND PROSECUTE THE ESTATE'S CLAIMS**

24. YSA is a special purpose lending vehicle with no operations of its own. Its principal asset is a claimed portfolio it acquired by suspect extrajudicial self-help, and its principal liability exposure runs to the very parties from whom it took that portfolio. The estate's most valuable assets are therefore claims that current management has every incentive not to investigate: whether the transfers of title were avoidable; whether YSA's principals stripped value from Portfolio entities; whether YSA was used as a shell to cloak a transfer of a real estate enterprise; and whether YSA's conduct in taking possession of properties subject to the automatic stay warrants sanction. A debtor does not sue itself, and Mr. Diveroli

will not authorize an investigation of Mr. Diveroli. However, a Chapter 11 Trustee can objectively analyze the myriad of issues that plague this Debtor.

25. YSA has now compounded the problem by prosecuting counterclaims and third-party claims against forty-six named third-party defendants and one hundred unnamed persons and entities in the Delaware action, with service beginning in May 2026. Its litigation posture is expanding outward against the owners and investors in the Portfolio at the same time that it seeks the protections of this Court. Whatever the merit of those claims, they are estate assets in the hands of a party whose judgment about how to deploy them cannot be trusted, and they are being pressed against the very constituency whose properties YSA is simultaneously operating. That posture is difficult to reconcile with YSA's own sworn explanation for this filing. On September 8, 2026, YSA's manager testified that YSA sought chapter 11 relief because of litigation brought against it by Mr. Kulick and his affiliates. Whatever the merits of the proceedings he identified, a debtor genuinely seeking shelter from litigation does not simultaneously prosecute counterclaims and third-party claims against dozens of named parties and reserve the right to add up to two hundred more, and it does not conduct the campaign of self-help described above while doing so. YSA's manager also cited the burden of legal fees. YSA is the party that generated them. However, it is only those attorney fees which comprise YSA unsecured creditors, of which total only four. It recorded the mortgages that forced the title owners to seek relief in court. It filed and is prosecuting the counterclaims and third-party claims in Delaware. It seized possession of properties without judicial authorization, requiring emergency motions to undo. And it required every party in interest to litigate a full temporary restraining order hearing before filing this case minutes before Mr. Diveroli was to take the stand. A debtor cannot manufacture the cost of litigation it chose to wage, and then invoke that cost as its reason for seeking the protection of this Court. YSA has been the aggressor throughout—in the land

records, at the properties, in the Delaware action, and in this District—and its stated reasons for invoking this Court's protection do not match its conduct.

26. An independent trustee resolves what neither Delaware nor this record can resolve while YSA remains in control. A trustee can determine which entities YSA actually holds an interest in and which it merely claims; can evaluate and prosecute avoidance actions against YSA's insiders; can operate the properties with a fiduciary's regard for the life-safety and insurance failures described in the Motion; and can deal with the rightful title owners, including Auerbach, as counterparties rather than as adversaries to be dispossessed. That is cause under 11 U.S.C. § 1104(a), and it is the only outcome that protects the hundreds of individual investors whose savings capitalized these assets.

**LEGAL BASIS FOR JOINDER**

27. Auerbach's joinder is appropriate because, as a party in interest with substantial financial stakes in this case and the related Vesta Portfolio properties, Auerbach has the right to be heard on matters affecting its interests and to support such relief as Auerbach deems appropriate. Fed. R. Bankr. P. 2002; 11 U.S.C. § 1109(b).

28. The legal standards and analysis set forth in the Motion, including the statutory bases under 11 U.S.C. §§ 1104(a) and 1112(b), the case law cited regarding bad faith filings, and the discretionary factors for appointment of a trustee under § 1104(a)(2), apply with equal force to Auerbach's concerns as a substantial equity holder with contractually reserved governance rights.

**APPOINTMENT OF TRUSTEE SERVES AUERBACH'S INTERESTS**

29. The appointment of an independent chapter 11 trustee in this case would serve Auerbach's interests as a holder of substantial equity and credit positions in the Vesta Portfolio by:

a. Placing an independent fiduciary in a position to investigate, test, and where appropriate prosecute claims challenging the validity of the second mortgages YSA recorded against the Properties, and of the title and management authority YSA asserts over the Portfolio entities and their assets;

b. Placing an independent fiduciary in control of YSA's assets and operations would remove Mr. Efraim Diveroli (who exercises undocumented de facto control), his brother Mr. Aharon Diveroli, Parker

Detweiller, and Robert Miley from influence over properties in which Auerbach holds significant equity and governance rights and over which YSA's own asserted rights have never been adjudicated. Aharon Diveroli testified at the September 8, 2026, Meeting of Creditors that both Efraim Diveroli and Parker Detweiller were instrumental in seizing possession of the Portfolio Properties;

c. Enabling the independent trustee to investigate and pursue avoidance actions against YSA and its insiders, including claims for: (i) wrongful seizure and conversion of Auerbach's Properties through the July 20, 2026 self-help taking without judicial process; (ii) fraudulent transfer of Auerbach's Properties through unauthorized deeds in lieu of foreclosure recorded without Auerbach's Major Decision consent; (iii) tortious interference with Auerbach's contractually reserved governance rights; and (iv) violations of Oklahoma and Kansas lending and usury laws through the scheme described above;

d. Enabling investigation into whether YSA was used as a mere shell entity to cloak what amounts to illegal lending activity and asset seizure, with a nominal manager and member serving as cover for Mr. Diveroli's undocumented, unbounded de facto control; and investigation of the purported amendments to Portfolio entity governance documents and manager substitutions effected by YSA without member notice or consent;

e. Eliminating the tactical impediments to restructuring, property stabilization, and creditor recovery created by YSA's control of this case and Diveroli's undisclosed domination of YSA's affairs; and enabling a fiduciary to cure or negotiate the senior loan defaults that YSA's recorded encumbrances triggered;

f. Potentially allowing for orderly resolution of the ownership confusion YSA created, unwinding of fraudulent transfers and seizures, and preservation of going-concern value in the Portfolio properties in which Auerbach holds substantial interests.

**LIMITATION OF JOINDER AS TO DISMISSAL OF THE BANKRUPTCY FILING**

30. While Auerbach understands the senior secured creditors' position as it relates to dismissal of the YSA case, dismissal would not advance the interests of the equity owners or subordinate creditors in these cases, and would instead reward the party that created the conditions requiring chapter 11 relief in the first place. The appointment of a Chapter 11 Trustee serves the ends of protecting the integrity of the bankruptcy process and the interests of secured creditors, unsecured creditors and equity holders. Every consequential act YSA has taken in this matter, it took when no one was watching. It recorded invalid second mortgages against properties it did not own when no one was watching. It amended the governing documents of entities it did not control and installed its own managers when no one was watching. It executed deeds in lieu of foreclosure without any foreclosure when no one was watching. And on July 20, 2026, it changed locks, removed the property manager, and took possession of properties—some already debtors before this Court and protected by the automatic stay—when no one

was watching. Village Creek, now before this Court, would have required no chapter 11 protection but for that conduct. Dismissal would return YSA to precisely that posture, free of this Court's supervision and free of the scrutiny of an independent fiduciary, while the ownership and authority questions YSA created remain unadjudicated and the other estates' avoidance claims against YSA and its insiders remain unprosecuted. While YSA's bankruptcy may have been filed in bad faith, this Court now holds at least some jurisdictional interest over the Portfolio and the underlying title claims through that filing. As the Court has already observed, YSA has caused a great deal of the "chaos" that has reigned in all of these cases. The remedy for that chaos is a trustee, not a release. The Court should not release YSA from its supervisory jurisdiction until the title and authority questions YSA created, and the estate's claims against YSA and its insiders, have been fully adjudicated. If this case is dismissed, YSA will revert to what it has done at every stage: acting unilaterally, in silence, and when no one is watching.

## CONCLUSION

First, Auerbach's Major Decision consent rights are not incidental protections. They were negotiated as a condition of Auerbach's investment, reduced to writing in the governing operating and limited partnership agreements, and reserved precisely so that no single sponsor could encumber, transfer, or surrender control of these assets alone. Those rights were never waived, never sought, and never obtained. YSA held the governing documents that contain them and encumbered, retitled, and seized the Properties without ever asking. Second, the power of attorney cannot supply what YSA lacks. It is an agency, granted by one member for the limited purpose of effecting a transfer of pledged collateral, exercisable only while an event of default exists, and exercisable only in the name and on the behalf of the member who granted it. An agent cannot hold authority its principal never held. It cannot bind entities its principal could not bind. It cannot enlarge the collateral it exists to transfer. And it cannot override consent rights belonging to parties who never granted it anything. A power of attorney

signed by one minority member is not a substitute for the consents that member could not give. For all of the reasons set forth in the Motion, which Auerbach adopts on a limited basis, and for the additional reasons set forth herein regarding Auerbach's interests as a substantial institutional equity holder with approximately $75 million invested across the Vesta Portfolio and contractually reserved Major Decision governance rights that YSA has disregarded, Auerbach respectfully joins in and requests that this Court grant the Motion and enter an order: (a) Appointing an independent chapter 11 trustee in this case pursuant to 11 U.S.C. § 1104 and; (b) Granting such other and further relief as this Court deems just, proper, and equitable, including equitable relief necessary to unwind YSA's unauthorized seizure of Auerbach's Properties, unwinding of fraudulent transfers, and restoration of Auerbach's governance rights.

Dated: September 10, 2026

Respectfully submitted,
**LAMUN MOCK CUNNYNGHAM & DAVIS, P.C.**

By: __/s/Bret Davis______________________
Bret Davis, OBA No.15079
5621 N. CLASSEN BLVD.
OKLAHOMA CITY, OK 73118
405-840-5900
Email: Bdavis@lamunmock.com
Counsel for Auerbach Opportunity Fund I, LP;
Auerbach Opportunity III, LP; and
Auerbach Opportunity IV, LP

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, I electronically transmitted the attached document to the Clerk of the Court using the Court's ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to all registered participants.

I further certify that on this date, I caused the foregoing document to be served via email and/or U.S. Mail, postage prepaid, on all parties required to be served with notice of this motion.

__/s/Bret Davis_______________
Bret Davis