**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| YSA INVESTMENTS 1, LLC, | ) | Case No. 26-12806 (SAH) |
| | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | |

**OMNIBUS OBJECTION OF YAMATO OKC LENDER, LLC TO (A) DEBTOR'S APPLICATION TO EMPLOY PJD CONSULT LLC AS REAL ESTATE CONSULTANT AND (B) DEBTOR'S APPLICATION TO EMPLOY CAPITAL ASSETS, INC. AS PROPERTY MANAGER**

Yamato OKC Lender, LLC ("Yamato"), by and through its undersigned counsel, files this omnibus objection (this "Objection") to (a) the *Debtor's Application to Employ PJD Consult LLC as Real Estate Consultant, with Brief in Support and Notice of Opportunity for Hearing* [Docket No. 279] (the "PJD Application") and (b) the *Debtor's Application to Employ Capital Assets, Inc. as Property Manager, with Brief in Support and Notice of Opportunity for Hearing* [Docket No. 283] (the "Capital Assets Application" and, together with the PJD Application, the "Employment Applications"),[1] and in support thereof respectfully states as follows:

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Employment Applications, as applicable.

## PRELIMINARY STATEMENT

1. Following explicit instructions from the Court to file employment applications no later than August 31, 2026, the Debtor filed the Employment Applications, seeking to employ both PJD Consult LLC ("PJD") and Capital Assets, Inc. ("Capital Assets"). In the case of Capital Assets, the Debtor seeks an order authorizing employment effective as of August 1, 2026.

2. While the Debtor filed the Employment Applications in response to the Court's attempts to provide some clarity to the chaos the Debtor has sewn into these chapter 11 cases, as well as the other pending cases involving the properties owned and managed by Marc Kulick or affiliated entities, the Employment Applications offer little clarity into the Debtor's operations and proposed direction in the chapter 11 case. Rather, the Employment Applications seek to employ entities that cannot reasonably be considered disinterested, while offering insufficient information to discern the scope of the relationship between the Debtor and each proposed professional.

## OBJECTION

3. Section 327(a) of the Bankruptcy Code provides that the debtor in possession, with the court's approval, "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). Section 101(14) of the Bankruptcy Code defines "disinterested person" to mean a person that "(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." *Id.* § 101(14).

4. Here, significant concerns exist regarding whether PJD and Capital Assets can be considered disinterested. At best, the disclosures in the Employment Applications provide a murky analysis of the potential conflicts that each proposed professional faces.

**PJD is Not Disinterested**

5. As an initial matter, the *Declaration of Parker Detweiler in Support of Debtor's Application to Employ PJD Consult LLC as Real Estate Consultant* [Docket No. 279, Ex.1] (the "Detweiler Declaration") fails to assert plausibly that PJD is disinterested. Indeed, the Detweiler Declaration hedges this representation by providing "I represent that Consultant is a 'disinterested person' within the meaning of Bankruptcy Code section 101(14) *without regard to the Interchange relationship*." Detweiler Decl. ¶ 13 (emphasis added). The carve-out in the Detweiler Declaration is no mystery: PJD, if retained, will be saddled with the impossible task of balancing its purported purpose in the chapter 11 case with its responsibilities to Interchange Claims Group, LLC, the sole member of the Debtor. Interchange and PJD are party to a separate consulting agreement (the "Interchange Agreement") through which PJD provides advisory services for a contingent fee payable by Interchange. Notably, though the PJD Application discusses the Interchange Agreement, it is not attached thereto. Confusingly, while the PJD Application states that the Interchange Agreement can be provided, the Detweiler Declaration provides that it is a verbal agreement. *Id.* ¶ 7.

6. While the terms of PJD's retention provide that it will only be paid a flat $5,000 monthly fee, the Interchange Agreement contrarily provides for "a contingent fee payable solely by Interchange from amounts actually received by Interchange, after a $2,500,000 hurdle, at 5%, 10%, or 15% of Interchange's defined Net Recovery, as set forth in the Interchange Agreement." *Id*. The PJD Application does not provide the definition for Net Recovery, but it would appear that

PJD's recoveries under the Interchange Agreement are dependent upon its creation of residual value above the secured debt in the chapter 11 case. In a case where secured creditors are potentially underwater, this creates an incentive for PJD to assist the Debtor in creating undue delay and potentially seeking to retain control of the properties; indeed, this is PJD's best bet to receive any recoveries under the Interchange Agreement and undeniably influences its actions as a real estate consultant to the Debtor.

7. In addition to the conflict created by the Interchange Agreement, other factors cast doubt on PJD's disinterestedness:

a. The Debtor's retention of PJD appears to be designed to cover some of the contingent fees to be paid under the Interchange Agreement. Both the PJD Application and the proposed engagement letter attached thereto provide that "the Interchange Agreement is intended to reduce Interchange-side contingent fees dollar-for-dollar by estate compensation paid for the same work." While Yamato agrees that PJD (if retained) should not be double paid for its work, the estate should not pay for PJD's work for Interchange.

b. Interchange is essentially paying PJD for its testimony. PJD's recoveries from Interchange are contingent on residual value above a certain threshold, which unduly influences PJD's decisions in carrying out its responsibilities to the Debtor, which include "declarations, affidavits, deposition testimony, hearing testimony, and trial testimony on behalf of YSA." Accordingly, PJD could be providing testimony on behalf of the Debtor with the goal of influencing PJD's own payments under the Interchange Agreement.

c. Significant uncertainties exist regarding PJD's relationship with Interchange and YSA. The following questions, among others, remain unanswered:

    i. did PJD advise YSA regarding its "remedies" against the Kulick portfolio, including the purported second mortgages and deeds in lieu?

    ii. What amounts has PJD been paid prepetition and what previous business dealings has the Diveroli family had with PJD?

    iii. How has PJD been paid for its work relating to YSA to date?

    iv. If the Interchange Agreement is unfiled (and perhaps only verbal), how can parties determine the full extent of PJD's purported disinterestedness? Further, how can parties determine whether other "verbal agreements" exist?

d. Finally, there is insufficient information in the PJD Application and Detweiler Declaration to determine whether PJD is in fact qualified to serve as real estate advisor. Neither the PJD Application nor the Detweiler Declaration attach any resume, reference any license, list any prior similar engagements or provide a staffing plan. Quite simply, YSA is attempting to employ a single-member Florida LLC, with a Miami apartment address, as a real estate consultant to an estate purportedly holding title to 29 properties without so much as a description of qualifications.

8. In addition to failing to meet the disinterestedness standard under the Bankruptcy Code, additional questions surround the nature of PJD's involvement in the chapter 11 cases to date, including:

a. How is Mr. Detweiler an authorized representative of the Debtor? Despite representing to the court in the *Declaration of Parker Detweiler in Support of the Debtor's Chapter 11 Petition and First Day Relief* [Docket No. 55] (the "First Day Declaration") that he is an authorized representative of the Debtor, no document or instrument has been produced clarifying the nature of his relationship to the Debtor or how he is an authorized representative.

b. Is Mr. Detweiler a real estate consultant or de facto management? Given the Debtor has no officers or employees, it is unclear as to whether Mr. Detweiler is the only person managing the Debtor's estate. First Day Declaration ¶¶ 6-7.

**Capital Assets is Not Disinterested**

9. The Debtor's proposed retention of Capital Assets is equally concerning. In asserting that Capital Assets is disinterested in the *Declaration of Greg Wright in Support of Debtor's Application to Employ Capital Assets, Inc. as Property Manager* [Docket No. 283, Ex. 1] (the "Wright Declaration"), Mr. Wright misstates the disinterestedness standards of Section 101(14) of the Bankruptcy Code by providing that Capital Assets and its principals "(i) are not equity security holders, or insiders of the Debtor and its bankruptcy estate . . . ." Mr. Wright omits the requirement that Capital Assets not be a creditor of the estate. This is likely because significant uncertainties exist as to whether Capital Assets is a creditor of the estate. This Court has already pondered whether Capital Assets' out of pocket expenses with respect to the properties over which

the Debtor purportedly has possession render Capital Assets a creditor, if not a lender. This statement came on the heels of testimony from Mr. Wright that Capital Assets had invested significant funds into the properties with the understanding that it would be repaid following approval of the use of cash collateral.

10. The *Submission of Financials* filed by the Debtor [Docket No. 281] (the "Financials") are telling. The Financials for each property reference a "TFR CAPITAL ASSETS LOAN" totaling $49,700.07 between the seven properties described therein. This is potentially explained in the *Declaration of Greg Wright Pursuant to Interim Order Authorizing Debtor's Use of Cash Collateral* [Docket No. 282] (the "Wright Cash Collateral Declaration") as Capital Assets' correction of a clerical error. As alleged in the Wright Cash Collateral Declaration, Capital Assets mistakenly paid the second August payroll for the properties prior to the entry of any cash collateral order and, upon discovery, advanced its own funds and restored the cash collateral accounts in full.

11. In addition to the second payroll payments, the general ledger for the Villas at Midtown (included in the foregoing financials) provides that $27,210.72 was due to Capital Assets for the month of August 2026. These admissions establish that Capital Assets is a creditor of the Debtor. Accordingly, Capital Assets cannot be "disinterested" within the meaning of Section 101(14) of the Bankruptcy Code.

12. In addition to the above, certain other expenses suggest that Capital Assets is a creditor of the Debtor or that expenses were incurred prepetition (in contradiction to the representations contained in the Wright Declaration, including: (a) a line item in the Thrive Jenks general ledger entitled "CAPITAL ASSETS, INC.: 7/20-7/21 OVERNIGHT FIREWATCH" in the amount of $2,160; and (b) numerous expenses related to "YSA TAKE OVER DAY," which would necessarily be prepetition expenses.

13. Finally, it is unclear whether the Debtor is only seeking to retain Capital Assets or whether other potentially related entities are included in this request. The Financials include 34 line items for CAI Renovations LLC, which, according to the Oklahoma Secretary of State, lists Mr. Wright as a registered agent. This begs the question as to whether the Capital Assets Application also clandestinely seeks authority to employ affiliated vendors of Capital Assets.

14. Accordingly, neither PJD nor Capital Assets are disinterested. PJD's prior and continuing engagement with Interchange is fundamentally at odds with its description of services to be rendered in the instant chapter 11 case. Additionally, Capital Assets is a creditor and, as such, cannot be disinterested pursuant to the terms of Sections 101(14) and 327(a) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

15. This Objection is without prejudice to Yamato's right, which is expressly reserved, to raise additional arguments with respect to the Employment Applications and seek other appropriate relief.

## PRAYER

WHEREFORE, Yamato requests that this Court enter an order (a) denying the Employment Applications, and (b) granting such other relief as the Court deems just and proper.

Dated: September 14, 2026

Respectfully submitted,

/s/ Samuel S. Ory
Samuel S. Ory, OBA #30340
FREDERIC DORWART, LAWYERS PLLC
124 E. 4th St.
Tulsa, OK 74103
Tel: (918) 583-9922
Fax: (918) 583-8251
sory@fdlaw.com

-and-

Alex Dimock (*pro hac* forthcoming)
**BRACEWELL LLP**
1445 Ross Avenue, Suite 3800
Dallas, TX 75202
alex.dimock@bracewell.com

-and-

Stuart Glick (*pro hac* forthcoming)
**BRACEWELL LLP**
31 W. 52nd Street, Suite 1900
New York, NY 10019
stuart.glick@bracewell.com

-and-

Jonathan Lozano (*pro hac* pending)
**BRACEWELL LLP**
111 Congress Avenue, Suite 2300
Austin, TX 78701
jonathan.lozano@bracewell.com

***Attorneys for Creditor Yamato OKC Lender, LLC***

## CERTIFICATE OF SERVICE

I certify that on September 14, 2026, a true and correct copy of the foregoing was electronically filed with the Court using the CM/ECF system, which effected service upon all parties entitled to electronic service, including counsel for the Debtor.

/s/ Samuel S. Ory
Samuel S. Ory