**IN THE DISTRICT COURT IN AND FOR OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

FILED
DISTRICT COURT
OKLAHOMA COUNTY, OKLAHOMA
August 27, 2026 9:50 AM
RICK WARREN, COURT CLERK
Case Number CJ-2026-230

**CREO QRS NP LLC,**

**Plaintiff,**

**v.**

**MARC L. KULICK and**
**JOHN ALEXANDER UPPERMAN,**

**Defendants.**

**Case No. CJ-2026-230**
**Judge Natalie Mai**

**SUGGESTION OF BANKRUPTCY**

Defendant Marc Kulick ("Defendant Kulick") suggests to this Court and all interested parties of the bankruptcy filing by YSA Investments 1, LLC. Defendant Kulick further states as follows:

1. On January 9, 2026, Plaintiff filed its Petition.

2. The claims in this lawsuit relate to Plaintiff's loan to Lofts at North Penn Best Living, LLC ("Lofts"), which was the subject of the separately filed foreclosure lawsuit, Case No. CJ-2025-7426 in the District Court of Oklahoma County, Oklahoma. That lawsuit was dismissed by Plaintiff on March 10, 2026.[1]

3. On July 2, 2026, Lofts filed its Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Court for the Northern District of Texas, Bankruptcy Case No. 26-32920-11.

[1] Instead of pursuing a judicial foreclosure action, Plaintiff chose to pursue foreclosure by power of sale pursuant to the Oklahoma Power of Sale Mortgage Foreclosure Act. Plaintiff sent Lofts at North Penn Best Living, LLC a Notice of Intent to Foreclose by Power of Sale the same day it dismissed the judicial foreclosure action.

4. Also on July 2, 2026, undersigned counsel emailed Lofts' Notice of Bankruptcy Case Filing to Plaintiff's counsel.

5. On July 16, 2026, Plaintiff filed its Motion for Summary Judgment herein against Guarantor Defendants Marc Kulick and John Alexander Upperman ("Defendant Upperman") (collectively, the "Guarantor Defendants").

6. The Court set Plaintiff's Motion for Summary Judgment for hearing on September 8, 2026.

7. Previously, on October 31, 2025, YSA Investments 1, LLC ("YSA") recorded a second mortgage against Lofts. Exhibit 1, Lofts Second Mortgage.

8. On July 28, 2026, YSA filed its Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 26-11178. Exhibit 2, YSA Notice of Bankruptcy Case Filing.[2]

9. Under 11 U.S.C. § 362(a)(1), the commencement or continuation of any judicial action or proceeding (including discovery) against YSA is automatically stayed upon the filing of the Petition.

10. On July 31, 2026, Defendant Upperman filed a Motion for Extension of Time pursuant to 12 O.S. § 2056(F) and Oklahoma District Court Rule 13 (D).[3] Defendant Kulick adopted and incorporated the argument and authorities in Defendant Upperman's Motion when he filed his Response to Plaintiff's Motion for Summary Judgment. Discovery is particularly important as to Plaintiff's allegations involving YSA.

---

[2] On August 14, 2026, YSA's bankruptcy case was transferred to the Western District of Oklahoma, Case No. 26-12806. Exhibit 3, Letter of Transfer.

[3] On August 14, 2026, Defendant Upperman filed an Amended Motion for Extension of Time pursuant to 12 O.S. § 2056(F) and Oklahoma District Court Rule 13 (D).

11. On August 3, 2026, Defendant Kulick filed a Suggestion of Bankruptcy herein to inform the Court of Lofts' bankruptcy filing and automatic stay and its Response to Plaintiff's Motion for Summary Judgment.

12. Defendant Kulick's Response to Plaintiff's Motion for Summary Judgment argued that the Court does not have jurisdiction, due to Lofts' bankruptcy, to determine the amount of damages owed by Lofts to then potentially impose as a judgment against the Guarantor Defendants. Therefore, entering summary judgment at this time would be premature.

13. YSA claims to ***own all Kulick-owned entities***, including without limitation, the borrower of the loan at issue in this case – Lofts.[4]

14. While Defendant disputes the merits of YSA's claims, the merits are not relevant to the analysis of whether or not this matter is stayed by the YSA Bankruptcy. Because YSA claims to own all Kulick-owned entities and YSA has filed Bankruptcy, this matter is stayed entirely until the Bankruptcy Court determines otherwise.

**WHEREFORE,** Defendant Marc Kulick respectfully requests that this Court stay this matter entirely until the Bankruptcy Court provides further guidance, along with such other relief as the Court deems just and proper.

---

[4] *See* correspondence from counsel for YSA to counsel for First United Bank dated June 15, 2026 and January 29, 2026 attached hereto as <u>Exhibit 4</u>.

Respectfully submitted,

**ELLER & DETRICH**
**A Professional Corporation**

By: ______________________________
Andrew A. Shank, OBA #22298
Lacy B. Williamson, OBA #34004
ELLER & DETRICH, P.C.
2727 East 21st Street, Suite 200
Tulsa, Oklahoma 74114
(918) 747-8900 – telephone
(918) 747-2665 – facsimile
ashank@ellerdetrich.com
lwilliamson@ellerdetrich.com
ATTORNEYS FOR DEFENDANT
MARC L. KULICK

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of August, 2026, I caused a true and correct copy of the above and foregoing document to be mailed, postage prepaid, via the United States Postal Service, to the following:

Ross A. Plourde
McAFEE & TAFT
211 N. Robinson
Oklahoma City, OK 73102
ross.plourde@mcafeetaft.com

ATTORNEY FOR PLAINTIFF

Stephen Q. Peters
Jason A. McVicker
Thomas M. Askew
Sharon K. Parker
JPM LAW
401 S. Boston Avenue, Suite 2000
Tulsa OK 74103
speters@jpmlawgroup.com
jmcvicker@jpmlawgroup.com
taskew@jpmlawgroup.com
sparker@jpmlawgroup.com

ATTORNEYS FOR JOHN ALEXANDER UPPERMAN

ATTORNEY FOR DEFENDANT
MARC L. KULICK

2025110401158034 B: 16280 P: 723
11/04/2025 09:49:53 AM Pgs: 40
Fee: $96.00
Maressa Treat , County Clerk
Oklahoma County - State of Oklahoma

This instrument was prepared by and after recording should be returned to:

David P. Limekiller, Esq.
GableGotwals
110 N. Elgin, Suite 200
Tulsa, Oklahoma 74120
(918) 595-4800

Received: $1,353.60 MTG TAX
Rcpt# T2524441
Dated this 4th day of November, 2025.
Forrest "Butch" Freeman
Oklahoma Co. Treasurer
By AMARTIN, Deputy

Certified True Copy
MARESSA TREAT, COUNTY CLERK
Oklahoma County, Oklahoma
27th day of July 2026
Maressa Treat

**MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT, AND FIXTURE FILING**

(Oklahoma County, Oklahoma)

(This document serves as a fixture filing under § 1-9-502 of the Oklahoma Uniform Commercial Code.)

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE GRANTOR UNDER THIS MORTGAGE**

THIS MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT, AND FIXTURE FILING (this "**Mortgage**") is made as of October 29th, 2025, by Lofts at North Penn Best Living LLC, a Delaware limited liability company, (the "**Grantor**"), having a mailing address at 6911 S 66th East Ave Suite 100 Tulsa, OK 7413, in favor of YSA Investments 1, LLC, a Delaware limited liability company (together with its successors and/or assigns, the "**Mortgagee**"), having a mailing address at 8 The Green #23817 Dover, DE 19901.

**RECITALS**

A. Mortgagee as lender, extended credit to the Borrower Parties through multiple loans (the "Loans") and pursuant to the terms of the loan documents.

B. The Borrower Parties defaulted on the payment and performance of the Loans and loan documents.

C. The Borrower Parties own equity interests in Grantor or otherwise are affiliated with Grantor, and Grantor will derive substantial and material direct or indirect benefits from the execution and delivery of this Mortgage.



EXHIBIT 1

D. Borrower Parties and guarantor of the Loans have granted Lender a Power of Attorney authorizing the Mortgage.

NOW, THEREFORE, Grantor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, and for the purpose of securing the Secured Obligations (as subsequently defined), hereby agrees with Mortgagee as follows:

1. **Grant of Security**. Grantor hereby irrevocably GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, ASSIGNS, PLEDGES, MORTGAGES, and SETS OVER and has by these presents GRANTED, BARGAINED, SOLD, CONVEYED, TRANSFERRED AND ASSIGNED, to Mortgagee, with the power of sale and right of entry and possession, all of Grantor's right, title and interest, whether now owned or hereafter acquired, in the land described in the attached Exhibit A (the "**Land**"), together with: (i) all the buildings and other improvements now on or that may be placed hereafter on the Land during the existence of this lien; (ii) Grantor's rights and interests in all fixtures or other property now or hereafter attached to, installed in, or used in connection with the buildings and other improvements now erected or hereafter to be erected on the Land; (iii) Grantor's rights and interests in all leases, easements, rights-of-way, permits, licenses and all other interests which are appurtenant to, relate to or used in connection with the Land, whether or not such right, title and interest be correctly, fully or sufficiently described or referred to herein; (iv) Grantor's rights and interests in any streets, ways, alleys and strips of land adjoining the Land or any part thereof; and (v) all rights, estates, powers and privileges appurtenant or incident to the foregoing (the Land together with such other property, rights and/or interests described in (i) though (iv) above are hereafter collectively referred to as the ("**Mortgaged Property**").

TO HAVE AND TO HOLD the Mortgaged Property unto the Mortgagee and its successors or and assigns, upon the terms, provisions and conditions of this Mortgage.

In order to secure the payment and performance of the Secured Obligations, Grantor also grants to Mortgagee a security interest in each of the following now owned or acquired in the future by Grantor (the "**Collateral**") and all proceeds of the Collateral:

(i) all goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature now or hereafter attached or affixed to or used in and about the buildings or other improvements now erected or hereafter to be erected on the Land, or otherwise located on such land, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing;

(ii) all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein;

(iii) all security (including cash deposits, letters of credit, stock warrants, bonds or other forms of security) and all advance rentals under lease agreements now or at any time hereafter covering or affecting any of the Mortgaged Property or any of the Collateral and held by or for the benefit of Grantor;

(iv) all monetary deposits which Grantor has been required to give to any public or private utility with respect to utility services furnished to the Mortgaged Property;

(v) all issues and profits from any part of the Mortgaged Property or any of the Collateral;

(vi) all proceeds (including premium refunds) of each policy of insurance relating to the Mortgaged Property or any of the Collateral;

(vii) all proceeds from the taking of the Mortgaged Property, any of the Collateral, or any part of either of them, or any interest therein or right or estate appurtenant thereto, by eminent domain or by purchase in lieu thereof;

(viii) all contracts related to the Mortgaged Property or any Collateral;

(ix) all money, funds, cash, cash equivalents, securities, investment property, accounts, instruments, documents, general intangibles (including copyrights, trademarks, trade names, trade dress, domain names, symbols and licenses of the foregoing used in connection therewith), and notes or chattel paper (whether tangible or intangible chattel paper or electronic chattel paper) arising from or related to the Mortgaged Property or any Collateral, including any funds deposited or set aside for the payment of taxes or insurance premiums related to the Mortgaged Property or any Collateral;

(x) all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property or any Collateral;

(xi) all plans, specifications, maps, surveys, reports, architectural, engineering and construction contracts, books of account, insurance policies and other documents or records of whatever kind or character, relating to the use, construction upon, occupancy, leasing, sale or operation of the Mortgaged Property or any Collateral;

(xii) all proceeds and other amounts paid or owing to Grantor under or pursuant to any and all contracts and bonds or commercial tort claims relating to the construction, erection renovation, or otherwise of the Mortgaged Property or any Collateral; and

(xiii) all of Grantor's interest in oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other hydrocarbons and other minerals produced, saved from, attributable to or transported through any Mortgaged Property and all products processed or obtained therefrom, the proceeds thereof, and all accounts and general intangibles under which such proceeds may arise, together with any sums of money that may now or at any time hereafter become due and payable to Grantor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and future oil, gas and mining leases covering the Mortgaged Property or any part thereof.

The Mortgaged Property and the Collateral are sometimes collectively called the "**Property**".

1. **Secured Obligations**.

(a) This Mortgage is made to secure the full and timely payment and performance of the following (collectively, the "**Secured Obligations**"):

(i) The sum of $6,768,000.00 and all indebtedness, now existing or arising in the future, including any extensions, modifications, substitutions, amendments, replacements, rearrangements and renewals thereof, whether for principal, interest, fees, expenses, indemnification or otherwise, including all interest and all reasonable costs and out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any exercise of its rights or remedies hereunder; and

(ii) all future advances and re-advances made for Borrower Parties' or Grantor's benefit or to protect any of the Property or any of the rights of Mortgagee and out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any exercise of its rights or remedies hereunder, pursuant to the terms of this Mortgage; and

(iii) all other obligations, debts and liabilities, plus interest thereon, of Grantor or Borrower Parties to Mortgagee, as well as all claims by Mortgagee against Grantor or Borrower Parties, whether arising from a loan or a purchased obligation, whether incurred for a consumer or a business purpose, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Loans, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor or Borrower Parties may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

(b) The initial principal amount and initial maturity date of the Mortgage is $6,768,000.00 and November 7th 2025, respectively.

2. <u>**Title**</u>. Grantor has good, indefeasible, marketable and insurable fee simple title of record to the Property, free and clear of all liens, encumbrances and charges except for permitted encumbrances. Grantor shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Mortgage and shall forever warrant and defend the same to Mortgagee against the claims of all Persons whomsoever.

3. <u>**Covenants and Agreements**</u>. So long as any Secured Obligations remain unpaid or outstanding, Grantor covenants and agrees with Mortgagee as follows:

(a) <u>Operation of Property</u>. Grantor shall operate and keep the Property in accordance with all applicable restrictive covenants, zoning ordinances and building codes, flood disaster laws in all material respects, and all other applicable laws and shall pay all reasonable fees or charges necessary in connection therewith, in each case except where the failure to do so could not reasonably be expected to have a material adverse effect.

(b) <u>Taxes</u>. Grantor shall cause to be paid prior to delinquency all taxes and assessments heretofore or hereafter levied or assessed (i) against the Property or any part thereof or (ii) against the Mortgagee for or on account of the Secured Obligations or the interest created by this Mortgage. Notwithstanding the foregoing, Grantor may in good faith and with

adequate reserves to pay, contest, by any and all appropriate administrative, trial or appellate proceedings, or any combination thereof, the amount, validity, enforceability or application of any imposition that Grantor is required to pay or perform to any person other than Mortgagee.

(c) Repair and Maintenance. Grantor shall not, without the prior written consent of Mortgagee, make any significant alterations to the Mortgaged Property that would materially reduce the value of the Mortgaged Property at the time made. Grantor will keep the Property (or cause the Property to be kept) in first class order, repair, operating condition and appearance, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to deteriorate.

(d) Condemnation. Grantor shall notify Mortgagee immediately of any threatened or pending proceeding for condemnation affecting the Property or arising out of damage to the Property, and Grantor shall, at Grantor's expense, diligently prosecute any such proceedings. Mortgagee shall have the right (but not the obligation) to participate in any such proceeding and to be represented by counsel of its own choice. Mortgagee shall be entitled to receive all sums which may be awarded or become payable to Grantor for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Grantor for injury or damage to the Property. Grantor shall, promptly upon request of Mortgagee, execute such additional assignments and other documents as may be necessary from time to time to permit such participation and to enable Mortgagee to collect and receipt for any such sums. All such sums are hereby assigned to Mortgagee, and shall, after deduction therefrom of all reasonable expenses actually incurred by Grantor, including attorneys' fees, and at Mortgagee's sole option be (1) applied (upon compliance with such terms and conditions as may be required by Mortgagee) to repair or restore the Property, or (2) applied to the payment of the Secured Obligations in such order and manner as Mortgagee, in its sole discretion, may elect, whether or not due. After such payment, the unpaid portion of the Secured Obligations shall remain in full force and effect. Mortgagee shall not be, under any circumstances, liable or responsible for failure to collect or to exercise diligence in the collection of any such sum or for failure to see to the proper application of any amount paid over to Grantor. Mortgagee is hereby authorized, in the name of Grantor, to execute and deliver valid acquittances for, and to appeal from, any such award, judgment or decree. All costs and expenses (including but not limited to attorneys' fees) incurred by Mortgagee in connection with any condemnation shall be a demand obligation owing by Grantor and added to the Secured Obligations.

(e) Insurance. Grantor will maintain policies of insurance (including general liability and property insurance) with financially sound and reputable insurance companies, in such amounts, and with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties and acceptable to Lender. Lender shall be named as loss payee, as its interest may appear, and/or additional insured with respect to any such insurance, and each provider of any such insurance shall agree, by endorsement upon the policy that it will give Lender thirty (30) days' prior written notice before any such policy or policies shall be altered or canceled

(f) Environmental Compliance. The Property and the intended use thereof by Grantor will comply with all applicable Environmental Laws (as defined herein). "Environmental Laws" means, collectively, any local, state or federal law, rule or regulation,

order, decree, together will all amendments thereto, pertaining to the environment, natural resources, pollution, or public health including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*).

4. **Right of Mortgagee to Perform**. If Grantor fails to perform any act or to take any action which hereunder Grantor is required to perform or take, or to pay any money which hereunder Grantor is required to pay, or takes any action prohibited hereby, Mortgagee may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money or remedy any action so taken, and any expenses so incurred by Mortgagee, and any money paid by Mortgagee in connection therewith, shall be a demand obligation owing by Grantor to Mortgagee and Mortgagee, upon making such payment, shall be subrogated to all of the rights of the person receiving such payment. Any amounts due and owing by Grantor to Mortgagee pursuant to this Mortgage shall bear interest from the date such amount becomes due until paid at the default rate, (Lender and Grantor intend that the Mortgage strictly comply with applicable usury law) will be part of the Secured Obligations and shall be secured by this Mortgage and by any other instrument securing the Secured Obligations.

5. **Assignment of Rents, Income, Profits and Proceeds**.

(a) Assignment. Grantor absolutely and unconditionally assigns, transfers and sets over to Mortgagee any leases (the "**Leases**") now or hereafter covering the Mortgaged Property, or any part of the Mortgaged Property, and all of the rents, income, receipts, revenues, issues, profits and other sums of money (collectively, "**Rent**") that are now or at any time hereafter become due and payable to Grantor under the terms of, or arising or issuing from or out of, the Leases or from or out of the Mortgaged Property. Rents covered by this assignment will include but not be limited to minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following default, security deposits, advance rents, and all proceeds payable under any policy of insurance covering the loss of any such rents, income, receipts, revenues, issues or profits. Rents covered by this assignment shall also include any money Grantor is entitled to recover from any lessee in bankruptcy or other similar insolvency proceeding such as, without limitation, money recoverable for use and occupancy of any part of the Mortgaged Property and damage claims arising out of Lease defaults, including rejections, under any applicable bankruptcy law or other similar insolvency or debtor relief law. This assignment shall include, without limitation, the immediate and continuing right to collect and receive Rent.

(b) Collections Before and After Default. Until receipt from Mortgagee of notice of the occurrence and continuance of an Event of Default (a "**Notice of Default**"), each lessee under the Leases may pay Rent directly to Grantor and Grantor shall have the right to receive such Rent. Upon receipt from Mortgagee of a Notice of Default, each lessee under the Leases is hereby authorized and directed to pay directly to Mortgagee all Rent thereafter accruing and the receipt of Rent by Mortgagee shall be a release of such lessee to the extent of all amounts

so paid. The receipt by a lessee under the Leases of a Notice of Default shall be sufficient authorization for such lessee to make all future payments of Rent directly to Mortgagee and each such lessee shall be entitled to rely on such Notice of Default and shall have no liability to Grantor for any Rent paid to Mortgagee after receipt of the Notice of Default. After a Notice of Default, any Rent received by Grantor shall be held in trust for Mortgagee and Grantor shall immediately deliver such rent to Mortgagee. Rent received by Mortgagee for any period prior to foreclosure under this Mortgage or acceptance of a deed in lieu of foreclosure shall be applied by Mortgagee to the payment (in such order as Mortgagee shall determine) of: (i) all expenses of managing the Property reasonably incurred, including but not limited to the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem reasonably necessary or desirable; all expenses of operating and maintaining the Property, including but not limited to all taxes, assessments, charges, claims, utility costs and premiums for insurance, and the cost of all reasonable alterations, renovations, repairs or replacements; and all expenses incident to taking and retaining possession of the Property or collecting Rent due and payable under the Leases; and (ii) the indebtedness secured by this Mortgage, reasonable attorneys' and collection fees and other amounts, in such order as Mortgagee in its sole discretion may determine. In no event will the assignment under this Section 5(b) reduce the Secured Obligations except to the extent (dollar for dollar), if any, that Rent is actually received by Mortgagee and applied upon or after receipt to the Secured Obligations in accordance with the preceding sentence. Without impairing its rights hereunder, Mortgagee may, at its option, at any time and from time to time, release to Grantor any Rent received by Mortgagee. As between Grantor and Mortgagee, and any Person claiming through or under Grantor, other than any lessee under the Leases who has not received a Notice of Default under this Section 5, the assignment under this Section 5 is intended to be absolute, unconditional and presently effective and the provisions of this Section 5 for notification of lessees under the Leases upon the occurrence and continuance of a default are intended solely for the benefit of each such lessee and shall never inure to the benefit of Grantor or any Person claiming through or under Grantor, other than a lessee who has not received such notice. It shall never be necessary for Mortgagee to institute legal proceedings of any kind whatsoever to enforce the provisions of this Section 5. At any time during which Grantor is receiving Rent directly from lessees under the Leases, Grantor shall, upon receipt of written direction from Mortgagee, make demand and sue for all Rent due and payable under one or more Leases, as directed by Mortgagee, as it becomes due and payable, including Rent which is past due and unpaid. In the event Grantor fails to take such action, or at any time during which Grantor is not receiving Rent directly from lessees under the Leases, Mortgagee shall have the right (but shall be under no duty) to demand, collect and sue for in its own name all Rent due and payable under the Leases, as it becomes due and payable, including Rent which is past due and unpaid. Mortgagee shall not be deemed to have taken possession of the Mortgaged Property except on the exercise of any option Mortgagee may have to do so, evidenced by its demand and overt act for such purpose.

(c) Limitation of Mortgagee's Liability. Mortgagee shall not be liable for any loss sustained by Grantor resulting from Mortgagee's failure to let the Mortgaged Property, or any part thereof; or from any other act or omission of Mortgagee under or relating to any Lease unless such loss is due to Mortgagee's gross negligence or willful misconduct. Nor shall Mortgagee be obligated to perform or discharge any obligation, duty or liability under the Leases by reason of the assignment set forth in this Section 5 or the exercise of rights or remedies hereunder. Without limiting the foregoing, Mortgagee shall not be liable for its failure to collect, or its failure to exercise diligence in the collection of rent, but shall be

accountable only for rent that Mortgagee actually receives. This Section 5 shall not operate to place responsibility upon Mortgagee for the control, care, management or repair of the Mortgaged Property, nor for the carrying out of any of the terms and conditions of any Lease.

6. <u>**Events of Default and Remedies**</u>.

(a) <u>Events of Default</u>. Each of the following shall constitute an "<u>**Event of Default**</u>" under this Mortgage whether voluntary or involuntary and whether occurring by operation of law or otherwise: (i) the occurrence of a default under the Loans, or any loan document, (ii) Grantor's failure to perform any obligation or condition under this Mortgage, (iii) the bankruptcy or dissolution of the Grantor; or (v) the liens, mortgages or security interests of Mortgagee in any of the Property become unenforceable in whole or in part, or cease to be of the priority herein required, (or the validity or enforceability thereof, in whole or in part, shall be challenged or denied by Grantor or any person obligated to pay any part of the Secured Obligations).

(b) <u>Remedies</u>. If an Event of Default is continuing, Mortgagee may, at its option, and without prior notice or demand, exercise, and hereby is authorized and empowered by Grantor so to exercise, any or all of the remedies set forth in the Mortgage (including enforcement of the Assignment of Rents), or otherwise permitted by law or in equity.

(c) <u>Foreclosure</u>. During the continuance of an Event of Default, Mortgagee has the option and is authorized and empowered to enforce this Mortgage and to commence foreclosure proceedings against the Mortgaged Property through judicial proceedings or by advertisement, pursuant to the statutes in such case made and provided, and to sell the Mortgaged Property or to cause the same to be sold at public sale, and to convey the same to the purchaser, in accordance with said statutes in a single parcel or in several parcels. Any sale made by Mortgagee hereunder may be as an entirety or in parcels, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as is required by applicable law. To the extent permitted by applicable law, Grantor hereby waives its right, if any, to require that the Mortgaged Property be sold as separate tracts or units. The sale by Mortgagee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and Mortgagee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgage Property shall be sold; and, if the proceeds of such sale of less than the whole of the Mortgaged Property shall be less than the aggregate of the Secured Obligations and the expenses thereof, this Mortgage and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Mortgaged Property but Mortgagee shall have the right, at its sole election, to sell less than the whole of the Mortgaged Property. If any sale hereunder is not completed or is defective in the opinion of Mortgagee, such sale shall not exhaust the power of sale hereunder and Mortgagee shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by Mortgagee or any successor or substitute appointed hereunder as to nonpayment of the indebtedness secured hereby, or as to the continuance of any Event of Default, or as Mortgagee having declared all of such indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of Mortgagee, or as to any other act or thing having been duly done by Mortgagee, shall be taken

as prima facie evidence of the truth of the facts so stated and recited. Mortgagee may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by Mortgagee, including the posting of notices and the conduct of sale, but in the name and on behalf of Mortgagee. In any action to foreclose this Mortgage by judicial proceedings, appraisement of the Mortgaged Property is hereby waived or not waived at the option of the Mortgagee

(d) Proceeds of Sale. The proceeds of any sale held by the Mortgagee in foreclosure of the Mortgage granted herein shall be applied in accordance with applicable law.

(e) Receiver. Upon the occurrence of an Event of Default, Mortgagee, without regard to the value of the Property or the adequacy of the security for the Secured Obligations and other sums secured hereby, shall be entitled as a matter of right and without any additional showing or proof, at Mortgagee's election, to either (i) the appointment by the court of a receiver (without the necessity of Mortgagee posting a bond) to enter upon and take possession of the Property and to collect all Rents, income and other benefits thereof and apply the same as the court may direct or (ii) to be placed by the court into possession of the Property as mortgagee in possession with the same power herein granted to a receiver and with all other rights and privileges of a mortgagee in possession under law.

(f) Mortgagee as Purchaser. Mortgagee has the right to become the purchaser at any sale held by Mortgagee or by any receiver or public officer, and if Mortgagee purchases at any such sale, it has the right to credit bid the Secured Obligations.

(g) Uniform Commercial Code Rights and Remedies. During the continuance of an Event of Default, Mortgagee may exercise its rights of enforcement with respect to the Collateral under the Uniform Commercial Code as in effect in the State of Oklahoma, as amended from time to time.

(h) Remedies Cumulative. All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity under applicable law and may be exercised independently, concurrently or successively in Mortgagee's sole discretion and as often as occasion therefor shall arise. Mortgagee's delay or failure to exercise any other remedy upon the occurrence of an Event of Default shall not be deemed a waiver of such right or remedy. No partial exercise by Mortgagee of any right or remedy will preclude further exercise thereof. Mortgagee will not be deemed as a consequence of its delay or failure to act, or any forbearance granted, to have waived or be estopped from exercising any of its rights or remedies.

(i) Power of Sale. In addition to all other remedies available to Mortgagee under this Mortgage and the other Loan Documents, Grantor confers on Mortgagee the power to sell the Mortgaged Property, upon the occurrence and during the continuation of an Event of Default, in the manner and pursuant to the procedures set forth in the "Oklahoma Power of Sale Mortgage Foreclosure Act" (46 O.S. §§ 40-49), as amended from time to time (the "**Power of Sale Act**"), or pursuant to other applicable statutory or judicial authority. If an Event of Default is not cured in the time period provided in the Power of Sale Act, Mortgagee may accelerate the Secured Obligations without further notice and may then proceed in the manner and subject to the conditions of the Power of Sale Act to send Grantor and other necessary parties a notice of sale and may sell and convey the Mortgaged Property in accordance with

the Power of Sale Act. Mortgagee may enforce this Mortgage by exercising its power of sale or, at Mortgagee's sole option, by judicial foreclosure proceedings as provided by applicable law. No action of Mortgagee based upon the provisions contained in this Mortgage or in the Power of Sale Act, including, without limitation, the giving of the notice of intent to foreclose by power of sale or the notice of sale, will constitute an election of remedies that would preclude Mortgagee from accelerating the Secured Obligations and pursuing judicial foreclosure before or at any time after commencements of the power of sale foreclosure procedure. Grantor fully understands the consequences of conferring on Mortgagee the above-described power of sale, and if Mortgagee elects to foreclose this Mortgage by exercising this power of sale, Grantor expressly waives, to the fullest extent permitted by applicable law, any right to a judicial hearing before the sale of the Mortgaged Property.

(j) Costs and Expenses. As often as any proceedings are taken to foreclose this Mortgage, whether pursuant to the power of sale or by judicial proceedings or to foreclose the security interest granted to Mortgagee, Grantor agrees to pay to Mortgagee, in addition to all other sums due, all reasonable costs and out-of-pocket expenses, including reasonable attorney fees, incurred by Mortgagee.

(k) Waiver of Marshalling; Additional Rights of Mortgagee. Grantor waives any and all right to have the Property (and/or any other property that secures any of the Secured Obligations) marshaled. In exercising its rights and remedies, Mortgagee may sell all or any part of the Property together or separately, in one sale or by separate sales. If an Event of Default occurs and is continuing, Mortgagee may pursue any of its remedies and rights under this Mortgage with respect to the Property and Grantor to collect payment in full of the Secured Obligations, regardless of whether Mortgagee first proceeds against any other collateral for the Secured Obligations. Additionally, Grantor acknowledges and agrees that, upon the occurrence of an Event of Default, Mortgagee, in its sole discretion, (i) may proceed against the Property pursuant to this Mortgage, or against any other party obligated under, or collateral for, the Secured Obligations, as Mortgagee deems appropriate, and (ii) may exercise any right, power, or remedy to which it is entitled under applicable law simultaneously or separately, and in such order, as Mortgagee deems appropriate.

7. **Miscellaneous**.

(a) Release. Upon the payment and satisfaction in full of the Secured Obligations and termination of all obligations (if any) on the part of Mortgagee to extend credit to the Borrower Parties, all rights under this Mortgage will automatically terminate and the Property will become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Mortgagee in due form at Grantor's cost. Without limitation, all provisions herein for indemnity of Mortgagee shall survive discharge of the Secured Obligations and any foreclosure, release or termination of this Mortgage.

(b) Waiver by Mortgagee. Mortgagee may at any time and from time to time (i) waive or not enforce compliance by Grantor with any covenant herein made by Grantor; (ii) consent to Grantor doing any act which hereunder Grantor is prohibited from doing, or consent to Grantor failing to do any act which hereunder Grantor is required to do; (iii) release any part of the Property, or any interest therein, from the lien and security interest of this Mortgage, or (iv) release any party liable, either directly or indirectly, for the Secured Obligations or for any covenant herein or in any other instrument now or hereafter securing the

payment of the Secured Obligations, without impairing or releasing the liability of any other party. No such act shall in any way impair the rights of Mortgagee hereunder except to the extent specifically agreed to by Mortgagee in a signed writing.

(c) Actions by Mortgagee. The lien, security interest and other rights of Mortgagee hereunder shall not be impaired by any indulgence, moratorium or release granted by Mortgagee, including but not limited to (i) any renewal, extension, increase or modification which Mortgagee may grant with respect to any of the Secured Obligations, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant in respect of the Property, or any part thereof or any interest therein, or (iii) any release or indulgence granted to any endorser, guarantor or surety of any of the Secured Obligations or any security for the Secured Obligations.

(d) Entire Agreement. The Mortgage constitutes the entire understanding and agreement between Grantor and Mortgagee with respect to the Mortgage and supersede all prior written or oral understandings and agreements between Grantor and Mortgage with respect to the matters addressed in the Mortgage.

(e) Authority. If Grantor, or any signatory who signs on behalf of Grantor, is a corporation, partnership, limited liability company or other legal entity, Mortgagor and any such signatory, and the person or persons signing for it, represent and warrant to Lender that this instrument is executed, acknowledged and delivered by Grantor's duly authorized representatives

(f) Rights of Mortgagee. Mortgagee may waive any Event of Default without waiving any other prior or subsequent Event of Default. Mortgagee may remedy any Event of Default without waiving the Event of Default remedied. Neither the failure by Mortgagee to exercise, nor the delay by Mortgagee in exercising, any right, power or remedy upon any Event of Default shall be construed as a waiver of such Event of Default, nor shall it be construed as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by Mortgagee of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Grantor therefrom shall in any event be effective unless the same shall be in writing and signed by Mortgagee and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Grantor in any case shall of itself entitle Grantor to any other or further notice or demand in similar or other circumstances. Acceptance by Mortgagee of any payment in an amount less than the amount then due on any of the Secured Obligations shall be deemed an acceptance on account only and shall not in any way affect the existence of any Event of Default hereunder.

(g) Notification of Account Debtors. Mortgagee may at any time during the continuance of an Event of Default notify the account debtors or obligors of any accounts, chattel paper, negotiable instruments or other evidence of indebtedness included in the Collateral to pay Mortgagee directly.

(h) Fixture Filing. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for

record in the real estate records in the Office of the County Clerk where the Property (including such fixtures) is situated. The mailing address of Grantor is set forth above. The address of Mortgagee from which information concerning the security interest may be obtained is as follows: 8 The Green #23817 Dover, DE 19901, Attention: Northwest Registered Agent.

(i) Dealing with Successors. If ownership of the Property or any part thereof becomes vested in a Person other than Grantor, Mortgagee may, without notice to Grantor, deal with such successor or successors in interest with reference to this Mortgage in the same manner as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or for the payment and performance of the Secured Obligations. No sale of the Property, no forbearance on the part of Mortgagee and no extension of the time for the payment or performance of any of the Secured Obligations given by Mortgagee shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Grantor hereunder or for the payment or performance of the Secured Obligations or the liability of any other Person hereunder or for the payment or performance of the Secured Obligations, except as agreed to in writing by Mortgagee.

(j) Further Acts. Grantor, at Grantor's expense, agrees to take such further actions and execute such further documents as Mortgagee reasonably may request to carry out the intent of this Mortgage or to establish and protect the rights and remedies created or intended to be created in favor of Mortgagee hereunder or to protect the value of the Mortgaged Property and the liens and security hereby created in favor of Mortgagee. Grantor agrees to pay all filing, registration or recording fees or taxes, and all expenses incident to the preparation, execution, acknowledgment or filing/recording of this Mortgage or any such instrument of further assurance, except where prohibited by law so to do.

(k) Notice. Any notice or communication required or permitted hereunder shall be given to the parties' addresses set forth in this Mortgage.

(l) Successors and Assigns. The terms, provisions, covenants and conditions hereof shall be binding upon Grantor, and the successors and permitted assigns of Grantor including all successors in interest of Grantor in and to all or any part of the Property, and shall inure to the benefit of the Mortgagee and its successors, substitutes and permitted assigns and shall constitute covenants running with the land. All references in this Mortgage to Grantor or Mortgagee shall be deemed to include all such successors, substitutes and assigns.

(m) Severability. A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Mortgage to any Person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other Persons or circumstances.

(n) Gender and Number. Within this Mortgage, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context otherwise requires.

(o) Counterparts. This Mortgage may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of

which when taken together shall constitute a single contract.

(p) Modification or Termination. This Mortgage may only be modified or terminated by a written instrument or instruments executed by the party against which enforcement of the modification or termination is asserted. Any alleged modification or termination which is not so documented shall not be effective as to any party.

(q) Negation of Partnership. Mortgagee has no fiduciary or other special relationship with Grantor. Nothing contained herein or in other Loan Documents is intended to create any partnership, joint venture or association between Grantor and Mortgagee, or in any way make Mortgagee a co-principal with Grantor with reference to the Property, and any inferences to the contrary are hereby expressly negated.

(r) Modification by Subsequent Owners. Grantor agrees that it shall be bound by any modification of this Mortgage made by Mortgagee and any subsequent owner of the Mortgaged Property, with or without notice to Grantor, and no such modification shall impair the obligations of Grantor under this Mortgage. Nothing in this Section permits any transfer of the Property that constitutes an Event of Default.

(s) Governing Law. THIS MORTGAGE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OKLAHOMA WITHOUT REGARD TO CHOICE OF LAW RULES.

(t) Jurisdiction and Venue. GRANTOR HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITTING IN THE COUNTY AND STATE WHERE THE MORTGAGED PROPERTY IS LOCATED WITH RESPECT TO ANY LEGAL ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING FROM OR RELATED TO THIS MORTGAGE AND WAIVES ALL OBJECTIONS WHICH IT MAY HAVE TO SUCH JURISDICTION AND VENUE. NOTHING HEREIN SHALL PRECLUDE OR PREVENT MORTGAGEE FROM BRINGING ACTIONS AGAINST GRANTOR IN ANY OTHER JURISDICTION AS MAY BE NECESSARY TO ENFORCE OR REALIZE UPON THE SECURITY HEREIN PROVIDED.

(u) WAIVER OF JURY TRIAL. GRANTOR AND MORTGAGEE IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(v) Future Advances. This Mortgage secures future principal advances by Mortgagee to Borrower Parties.

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[*SIGNATURE PAGE ATTACHED*]

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FINANCING STATEMENT is executed and delivered by the undersigned as of the date indicated at the top of the first page.

**GRANTOR:**
**Lofts at North Penn Best Living LLC,**
a Delaware limited liability company

By: Lofts at North Penn Holdings LLC
A Delaware limited liability company, its sole member

By: Louis Investments LLC
A Kansas limited liability company, its manager

By: ______________________
Aharon Diveroli, Authorized Representative of Lender, Attorney in Fact, on behalf of sole member and manger Marc Kulick

STATE OF Florida )
) ss.
COUNTY OF Miami Dade )

The foregoing instrument was acknowledged before me on October , 2025, by Aharon Diveroli as authorized representative of YSA Investments 1, LLC as Attorney in Fact on behalf of sole member and manager Marc Kulick.

______________________
Notary Public

Notary Commission No. 460369

My Commission Expires: Nov 1 2027

[S E A L]

ANAYANSI ROBLES
MY COMMISSION # HH 460369
EXPIRES: November 1, 2027

**Exhibit A**

**Legal Description**

Lot One (1), in Block Four (4), of NORTH PENN ADDITION, SECTION II, an addition to the City of Oklahoma City, Oklahoma County, Oklahoma, according to the recorded plat thereof

**TAX MAP ID:** 215371000

# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS I LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of [redacted] (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted]; (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of [redacted] and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of [redacted]

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

I Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

I In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. PLEDGE.

1.1 SECURITY INTEREST.

(a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

(b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender, which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

[redacted]

4.2 COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4 OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, P.C.
Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: [redacted]

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. LIMITATION AS TO PLEDGOR.

6.1 Other Interests. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 Limitation. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. Miscellany.

7.1 Confidentiality. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 Parties Bound. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 Waiver. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 Termination of Security Interest. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 Choice of Law; Venue. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 ADDITIONAL WAIVERS. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

ASSET HOLDER, LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

**PLEDGOR**

VESTA HOLDINGS LLC, an Oklahoma limited liability company

By: ______________________
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

LENDER

YSA INVESTMENTS I, LLC, a Delaware limited liability company

By: *Robert Miley*
Name: Robert Miley
Title: Authorized Representative

## JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: [signature]
Name: Marc Kulick
Date:

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as and individual.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

[signature]
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

# GUARANTY AND ROFO

July 31, 2025

MARC KULICK, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: [redacted] ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Vesta Holdings LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1. GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2. CERTAIN WAIVERS AND REQUIREMENTS.

   a. The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

   b. Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

   c. If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

   d. Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

   e. Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

   f. Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

effect until the Obligations are satisfied.

g. Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3. RIGHT OF FIRST OFFER.

a. CERTAIN DEFINITIONS.

i. "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii. "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b. ROFO.

i. Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii. Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c. RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d. TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4. REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a. This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b. Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e. All of the items provided by Guarantor to Lender via email and access to one or more cloud storage environments prior to the Effective Date related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

5. COVENANTS.

a. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments I, LLC
C/O Capital Fund Law Group, P.C.

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: [redacted]

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By August 4, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of August 4, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of the date it was last provided to Lender remains true, correct, and complete as of August 4, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d. TRAILING REPORTS. By or before August 4, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

e. DOMO REPORTING ACCESS. By or before August 4, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default.**" Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. MISCELLANY.

a. All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the

other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

_______________________ _______________
MARC KULICK, an individual

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

This instrument was acknowledged before me on July 21, 2025 by Marc Kulick, an individual

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

_______________________
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

[signature pages continue]

**JOINDER**

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

**YSA Investments 1, LLC**, a Delaware limited liability company

By: *Robert Miley*
Name: Robert Miley
Title: Authorized Representative

Schedule

[illegible]

[redacted]

[redacted]

United States Bankruptcy Court
District of Delaware

## Notice of Bankruptcy Case Filing

FILED
07/28/2026
5:49 PM

A bankruptcy case concerning the debtor(s) listed below was filed under Chapter 11 of the United States Bankruptcy Code, entered on 07/28/2026 at 5:49 PM and filed on 07/28/2026.

**YSA Investments 1, LLC**
848 Brickell Avenue
Suite PH5
Miami, FL 33131
Tax ID / EIN: 33-1343352

The case was filed by the debtor's attorney:

**Ericka Fredricks Johnson**
Bayard P.A.
600 N. King St.
Suite 400
Wilmington, DE 19801
302-429-4275

The case was assigned case number 26-11178-BLS to Judge Brendan Linehan Shannon.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our *Internet* home page www.deb.uscourts.gov or at the Clerk's Office, 824 Market Street, 3rd Floor, Wilmington, DE 19801.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth important deadlines.

**Stephen L Grant**
**Clerk, U.S. Bankruptcy Court**

| PACER Service Center |
|---|
| **Transaction Receipt** |

EXHIBIT
2

| 08/06/2026 11:26:34 | | | |
|---|---|---|---|
| **PACER Login:** | lacywilliamson | **Client Code:** | KULICK/FNMA |
| **Description:** | Notice of Filing | **Search Criteria:** | 26-11178-BLS |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Outlook

**Re: Case transferred from DEB to OKWB**

**From** OKWBdb_Helpdesk <helpdesk@okwb.uscourts.gov>
**Date** Fri 8/14/2026 4:57 PM
**To** Lori Waite <Lori_Waite@deb.uscourts.gov>
**Cc** OKWBdb_Helpdesk <helpdesk@okwb.uscourts.gov>

Hi Lori,

We have successfully opened this transferred case in our CM/ECF system. The new case number for YSA Investments 1, LLC is **26-12806-SAH**.

Thanks.

Sue Bellingham
Operations Supervisor
United States Bankruptcy Court
Western District of Oklahoma
(405) 609-5753

**From:** Lori Waite <Lori_Waite@deb.uscourts.gov>
**Sent:** Friday, August 14, 2026 1:53 PM
**To:** Sue Bellingham <Sue_Bellingham@okwb.uscourts.gov>
**Subject:** Case transferred from DEB

Hello Sue, just a heads up - I have initiated the interdistrict transfer of 26-11178 and you should have received the email. Please let me know if you need anything else.

LORI WAITE
IT MANAGER
DELAWARE BANKRUPTCY COURT
302.252.2936

EXHIBIT
3

GABLE GOTWALS
COUNSEL

John M. "Jake" Krattiger
Direct Line: (405) 568-3301
*jkrattiger@gablelaw.com*

BOK Park Plaza
499 W. Sheridan Avenue
Suite 2200
Oklahoma City, OK 73102-7101
Telephone (405) 235-5500
Fax (405) 235-2875
*www.gablelaw.com*

June 15, 2026

Joshua C. Greenhaw
MEE HAWKINS GREENHAW COTNER PLLP
50 Penn Place
1900 NW Expressway, Suite 1400
Oklahoma City, OK 73118

Re: YSA Investments 1 LLC's Demand for Immediate Control of First United Bank Deposit Accounts — Kulick-Owned Entities

Mr. Greenhaw,

As you know from our previous correspondence, we represent YSA Investments 1 LLC ("YSA") which, pursuant to applicable loan documents, has recorded mortgages (the "Mortgages") against properties owned by Marc Kulick, or entities owned by Mr. Kulick, as identified in our letter to First United Bank dated January 29, 2026 (the "Subject Properties"). In addition, YSA has recorded UCC-1 financing statements against the Kulick-owned entities to perfect its security interests in collateral pledged under the same loan documents. The Mortgages and UCC-1s evidence YSA's enforceable rights in the Subject Properties, collateral, accounts, proceeds, and other personal property of the Kulick-owned entities, and First United Bank is on notice that YSA asserts a perfected and enforceable interest in that collateral. For your convenience, attached is a copy of my letter to First United Bank dated January 29, 2026.

In that prior letter and related communications, First United Bank was notified that (i) Mr. Kulick and entities owned by Mr. Kulick had defaulted on their obligation to repay loans owed to YSA, and (ii) YSA made demand that First United Bank recognize and honor YSA's rights in the Subject Properties and related rents, accounts, and proceeds arising from the Mortgages and related loan documents. This included a demand that First United Bank take the steps necessary to prevent further dissipation of collateral and to recognize YSA's rights under the Mortgages, including the assignments of rents and related security interests.

Since that time, the Delaware Court of Chancery has entered its Post-Trial Memorandum Opinion and judgment in C.A. No. 2025-1319-KSJM, styled *Marc Kulick et al. v. YSA Investments*

EXHIBIT 4

*1 LLC* (the "Judgment"), confirming that YSA validly exercised its rights to record the Mortgages against the Subject Properties, and rejecting the challenges asserted by Mr. Kulick and the related entities regarding purported limitations on YSA's ability to enforce its rights through the Mortgages, UCC-1s, and any other method deemed necessary to YSA to protect its interests. A copy of the Judgment is enclosed with this letter. I encourage you to review the Judgment for yourself, but will summarize the key rulings below.

The Chancery Court's Judgment clearly affirms the validity and broad authority granted by Mr. Kulick to YSA in the loan documents that require compliance with YSA's demand for First United Bank to provide YSA with control of the identified collateral. First, the Court affirmed the enforceability of the Collateral Pledge and Security Agreement ("CSPA") that included a broad Power of Attorney ("POA") provision applicable in the event of a default. (Judgment at pp. 5-6, 29-30). In relevant part, the POA states:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.

(*Id.* at 29). The Court also held that Mr. Kulick signed a Joinder binding him personally, and any entity in which Mr. Kulick had an ownership or controlling interest, to the terms of the CPSA and POA. (*Id.* at 27).

The Court's Judgment clearly supports YSA's construction of the POA as providing YSA the right to control the collateral through any means YSA deems necessary. In the Court's own language:

> The first sentence of this provision gives YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests." This expressly includes "doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender." This power is not tied to or limited by the definition of Collateral. The second sentence does reference "taking action against the Collateral" but as a non-exclusive right. It reads: "This shall include *but not be limited to* taking any action against any of the Collateral. . . ." By defining "action against the Collateral" as a non-exclusive right encompassed by the preceding sentence, the language and structure of the Power of Attorney indicate that the parties intended for YSA's rights to extend beyond the right to take "action against the Collateral."
>
> Eliminating all doubt, the Power of Attorney provision uses the word "secure." It gives YSA the right to take "whatever steps that it deems necessary in its sole discretion to *secure* and protect its interests[.]," including "whatever . . . is necessary to . . . collect all amounts due" to YSA. The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against

> those entities bound by the Joinder, including the Title Owners, to facilitate payment of amounts due to YSA. YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it. Plaintiffs do not argue otherwise.

(*Id.* at pp. 30-31).

Given the Judgment, First United Bank's immediate compliance with this demand is necessary to protect YSA (and the bank) against ongoing transactions by Kulick that may be fraudulent in nature. The Court heard directly from Mr. Kulick and also expert witness testimony from American Fiduciary Services (AFS) that demonstrated Mr. Kulick had engaged in significant self-dealing and commingling of funds to cover expenses from other entities in the real estate portfolio. The Court accepted this testimony from Mr. Kulick and AFS in rendering its Judgment:

> Kulick explained that 32 of Vesta's 34 properties routinely need cash, and his solution was to have Vesta make a loan to the cash-strapped property, to allow the property to get their reserve funded, and then subsequently pay back to the loan to Vesta. Trial Tr. at 115:7–116:18 (Kulick). Kulick acknowledged comingling his personal funds with Vesta's to create a "lending pool" to move cash around to pay the debts of one property with proceeds from another. Trial Tr. at 128:15–18, 129:9–13, 131:6–22 (Kulick). YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts. JX-198; JX-194 ("In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the net operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.

*Id.* at 17, n. 107. As First United Bank is surely aware, given that it is a party to certain litigation and likely monitoring Mr. Kulick's ongoing affairs, Mr. Kulick and his companies have been subjected to dozens of lawsuits regarding mismanagement of the Subject Properties and failure to pay loans to other parties. Mr. Kulick's continued access to funds at First United Bank is not only contradicted by the Court's Judgment, but a risk to First United Bank if funds continue to be used improperly. As the Court found, the amount owed by Mr. Kulick on the loans to YSA exceeds $921 million (Judgment at p. 14).

Based on the Chancery Court's Judgment, YSA's prior demands made to First United Bank, including YSA's January 29, 2026, letter, and YSA's perfected security interests, YSA hereby renews its demand that First United Bank immediately:

(a) Identify all deposit accounts, rents, proceeds, and other funds held by or through First United Bank that relate to, or derive from, any of the Subject Properties or the Kulick-owned entities, and provide a current accounting of those funds to YSA.

(b) Provide to the undersigned copies of all account agreements, signature cards, deposit account control documentation, and other banking documents relating to accounts maintained for the Subject Properties or the Kulick-owned entities.

(c) Immediately cease permitting any withdrawals, transfers, disbursements, or other movement of funds from accounts related to the Subject Properties or the Kulick-owned entities to Marc Kulick, the Kulick-owned entities, and/or their current or prior managers, officers, employees, or agents, and cancel or place a stop on any pending transaction.

(d) Immediately cease providing account information, balances, statements, or other information regarding such accounts or funds to Marc Kulick, the Kulick-owned entities, and/or their current or prior managers, officers, employees, or agents, except as otherwise required by law.

(e) For all such accounts and collateral, immediately revoke all existing authorities, rights of access, signing authorities, and online credentials associated with Marc Kulick, the Kulick-owned entities, and/or their current or prior managers, officers, employees, or agents.

(f) Establish and confirm YSA's exclusive control over the identified accounts, proceeds, and related collateral by:

i. Recognizing the following as the sole authorized representative(s) regarding the identified accounts, proceeds, and collateral:

Authorized Representative: Aharon Diveroli, Manager.

ii. Providing new online access credentials and administrator rights to the Authorized Representative(s).

iii. Enabling full transactional control over the identified accounts, proceeds, and collateral exclusively for the Authorized Representative(s).

(g) Upon YSA's request, immediately remit funds subject to YSA's security interests to YSA.

YSA's prior correspondence provided more than sufficient information for First United Bank to identify the Subject Properties, the Kulick-owned entities, and the accounts, rents, and proceeds at issue. To the extent First United Bank contends that additional identifying information is necessary, please advise immediately and specifically what information is needed so that YSA may evaluate the request.

For all communications regarding the accounts, funds, rents, and proceeds subject to YSA's demands, please contact Aharon Diveroli, AD@ysainvestments.com. For all other questions regarding YSA's demands, please contact the undersigned.

Nothing in this correspondence waives any of YSA's rights or remedies. YSA expressly reserves all rights and remedies available at law or in equity, including any legal action should First United Bank fail or refuse to implement the actions requested and required by YSA's valid

mortgages, related loan documents, and perfected security interests. First United Bank is further reminded that YSA has sustained damages through the prior failure to recognize and honor YSA's rights, and such damages continue to increase.

Yours very truly,

John M. "Jake" Krattiger
For the Firm

JMK/kc
Enc.

GABLE GOTWALS
COUNSEL

David P. Limekiller
Direct Line: (918) 595-4854
*dlimekiller@gablelaw.com*

110 N. Elgin Ave., Ste. 200
Tulsa, Oklahoma 74120
Telephone (918) 595-4800
Fax (918) 595-4990
*www.gablelaw.com*

January 29, 2026

***VIA EMAIL dkeese@firstunitedbank.com***
First United Bank and Trust Company
Attn: Commercial Banking Department / William David Keese, General Counsel
1400 W. Main Street
Durant, OK 74701

Re: YSA Investments 1 LLC's Demand for Immediate Control of Deposit Accounts – Kulick-Owned Entities / UCC-1 Filings

Dear Mr. Keese and Commercial Banking Team:

We represent YSA Investments 1 LLC ("YSA") in connection with certain loans and collateral arrangements involving entities owned and/or controlled by Marc Kulick, including Vesta Holdings LLC (the "Kulick-Owned Entities"), which are in default. This letter serves as YSA's formal demand that First United Bank and Trust Company ("First United" or "FUB") immediately recognize YSA's rights and provide YSA with complete control over all bank accounts maintained at FUB in the name of, or for the benefit of, the Kulick-Owned Entities, as such entities are now controlled by YSA and such action is necessary to preserve the value of the Kulick-Owned Entities.

**1. Background and Basis for Demand.**

YSA is the secured party (and/or assignee of secured party rights) under the applicable loan documents and collateral pledge / security agreements executed by or on behalf of the Kulick-Owned Entities and/or Marc Kulick. YSA has perfected its security interests in the membership interests of the Kulick-Owned Entities by filing UCC-1 financing statements in the appropriate state identifying the applicable debtor(s) and collateral, including (as applicable) membership interests and associated governance/economic rights. Attached as Exhibit is a list of all Kulick-Owned Entities subject to YSA's security interest.

You are further advised, YSA has exercised its rights to protect and to preserve the value of the Kulick-Owned Entities' membership interests pursuant to the loan documents and the Uniform Commercial Code. YSA is now the sole member of each Kulick-Owned Entity and owns 100% of its membership interests. Attached for your review are copies of the Amended and Restated Limited Liability Company Agreement of each Kulick-Owned Entity (upon request an executed copy will be provided as well as copies of YSA's 100% membership interests in such Kulick-Owned Entities).

**2. <u>Demand: Immediate Transfer of Control Over All FUB Accounts.</u>**

Effective immediately, FUB must:

(a) Identify all accounts held at FUB in the name of, or controlled by, the Kulick-Owned Entities (including any operating accounts, rent deposit accounts, lockbox accounts, reserve accounts, escrow accounts, and any related subaccounts) and provide a current account list with account numbers (last four digits if preferred for email), current balances, and available balances.

(b) Revoke all existing account authorities, including any and all signing authorities, online banking credentials, ACH/wire origination permissions, and debit/credit card access associated with Marc Kulick and/or any prior managers, officers, employees, or agents of the Kulick-Owned Entities.

(c) Establish and confirm YSA's exclusive control and administration of the accounts by:

i. Adding the following as the sole authorized account representative(s) and signatory authority:

Authorized Representative: Aharon Diveroli, Manager.

ii. Providing new online banking access credentials and administrator rights to the Authorized Representative(s).

iii. Enabling full transactional control (including initiating wires, ACH, internal transfers, check issuance, stop payments, and account closures) exclusively for the Authorized Representative(s).

(d) Immediately implement stop-payment controls and fraud-prevention measures to prevent any disbursement or transfer initiated by Marc Kulick or any other unauthorized person after receipt of this letter. At a minimum, this must include (i) disabling wire/ACH templates associated with prior users, (ii) disabling cards issued under prior authority, and (iii) flagging the accounts for heightened verification.

**3. Requested Confirmation and Timing.**

Please provide written confirmation (email is acceptable) no later than January 29, 2026 by 4:00 p.m. that:

(a) FUB has identified all accounts for the Kulick-Owned Entities;

(b) all prior authorities have been revoked/disabled; and

(c) the Authorized Representative(s) above have been granted full and exclusive control, including administrator-level online banking access.

**4. Points of Contact.**

Please direct communications and implementation coordination to:

Aharon Diveroli, AD@ysainvestments.com

with courtesy copies to:

David Limekiller, dlimekiller@gablelaw.com, (918) 595-4854.

**5. Reservation of Rights.**

Nothing in this correspondence waives any of YSA's rights or remedies. YSA expressly reserves all rights and remedies available at law or in equity, including pursuing appropriate relief should FUB fail or refuse to implement the account-control changes required by YSA's control of the Kulick-Owned Entities in order to preserve their value.

Yours very truly,

David P. Limekiller
For the Firm

cc: Brady Bieber (brady.bieber@firstunitedbank.com)
Matt Winzeler (mwinzeler@firstunitedbank.com)

# EXHIBIT A

## KULICK-OWNED ENTITIES

BARTLESVILLE BEST LIVING, LLC a limited liability company formed and organized under the laws of Oklahoma.

SHORELINE'S BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

SPRINGDALE VILLAGE TIC 1, LLC a limited liability company formed and organized under the laws of Delaware.

SPRINGDALE VILLAGE TIC 2, LLC a limited liability company formed and organized under the laws of Delaware.

SPRINGDALE VILLAGE TIC 3, LLC a limited liability company formed and organized under the laws of Delaware.

SPRINGDALE VILLAGE'S BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

A-V 23 EAST OWNERS, LLC a limited liability company formed and organized under the laws of Delaware.

A-V CLASSEN OWNERS, LLC a limited liability company formed and organized under the laws of Delaware.

A-V VILLAGE CREEK OWNERS, LLC a limited liability company formed and organized under the laws of Delaware.

AUERBACH-VESTA, LLC a limited liability company formed and organized under the laws of Delaware.

BARCELONA BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

BRYAN HILLS BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

EATON PLACE TIC 1 LLC a limited liability company formed and organized under the laws of Delaware.

FAIRFAX HOLDING COMPANY LLC a limited liability company formed and organized under the laws of Delaware.

LAKESIDE BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

LOFTS AT NORTH PENN BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

MONTGOMERY APARTMENT HOLDINGS, LLC a limited liability company formed and organized under the laws of Delaware.

MONTGOMERY BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

MUNTAGE BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

NAE CANOPY APARTMENTS, LLC a limited liability company formed and organized under the laws of Delaware.

OKC3 INVESTORS LLC a limited liability company formed and organized under the laws of Delaware.

ONE ETON TIC 1 LLC a limited liability company formed and organized under the laws of Delaware.

REMINGTON RANCH BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

RIDGE BEST LIVING INVESTORS LLC a limited liability company formed and organized under the laws of Delaware.

RIDGE BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

RIVER WALK BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

RIVERPARK BEST LIVING, LLC a limited liability company formed and organized under the laws of Delaware.

SUMMER OAKS BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

TUSCAN VILLAGE BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

VESTA-SEMINOLE RIDGE LLC a limited liability company formed and organized under the laws of Delaware.

VILLAS AT MIDTOWN BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

W.M. BEST LIVING OWNER, LLC a limited liability company formed and organized under the laws of Delaware.

W.O. SOLE MEMBER LLC a limited liability company formed and organized under the laws of Delaware.

WOODLAND OAKS BEST LIVING LLC a limited liability company formed and organized under the laws of Delaware.

JENKS BEST LIVING LLC a limited liability company formed and organized under the laws of Kansas.

LOUIS INVESTMENTS LLC a limited liability company formed and organized under the laws of Kansas.

LS APARTMENT SPONSOR LLC a limited liability company formed and organized under the laws of Kansas.

RIVER WALK SPONSOR LLC a limited liability company formed and organized under the laws of Kansas.

RIVERPARK BEST LIVING SPONSOR LLC a limited liability company formed and organized under the laws of Kansas.

SEMINOLE RIDGE APARTMENTS HOLDINGS LLC a limited liability company formed and organized under the laws of Kansas.

SEMINOLE RIDGE SPONSOR LLC a limited liability company formed and organized under the laws of Kansas.

TUSCANY VILLAGE SPONSOR LLC a limited liability company formed and organized under the laws of Kansas.

B&J WOODSCAPE / OKLAHOMA CITY, LLC a limited liability company formed and organized under the laws of Oklahoma.

COPPERFIELD APARTMENTS, LP a limited partnership formed and organized under the laws of Oklahoma.

EFiled: Jun 09 2026 02:50PM EDT
Transaction ID 79699309
Case No. 2025-1319-KSJM

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC<br><br>Plaintiffs,<br><br>v.<br><br>YSA INVESTMENTS 1, LLC,<br><br>Defendant. | ) | C.A. No. 2025-1319-KSJM |
| YSA INVESTMENTS 1, LLC,<br><br>Counterclaim-Plaintiff and Third-Party Plaintiff,<br><br>v.<br><br>MARC KULICK, VESTA HOLDINGS, LLC, et al.,<br><br>Counterclaim-Defendants and Third-Party Defendants. | ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: April 9, 2026
Date Decided: June 9, 2026

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; Benjamin H. Brodsky, Michael Fisher, BRODSKY FOTIU-WOJTOWICZ, PLLC, Miami, Florida; *Counsel for Plaintiffs and Counterclaim-Defendants, Marc Kulick, Vesta Holdings, LLC, and Asset Holder, LLC.*

Sarah R. Martin, Samuel L. Moultrie, GREENBERG TRAURIG LLP, Wilmington, Delaware; Joel Tasca, Kerry Kleinman, GREENBERG TRAURIG LLP, Las Vegas, Nevada; *Counsel for Defendant and Counterclaim and Third-Party Plaintiff YSA Investments 1, LLC.*

**McCORMICK, C.**

Plaintiff Marc Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas. Beginning in October 2024, Defendant YSA Investments 1, LLC loaned the Kulick-led plaintiff entities millions of dollars. In February 2025, Kulick asked YSA for another loan. Because the amount requested was twice as large as any previous loan, YSA demanded better terms and additional security. In response, cash-strapped Kulick proposed an extremely favorable interest rate and agreed to pledge his entire real estate portfolio. YSA accepted the terms. And Kulick signed a joinder committing all entities that he owned, in whole or part, or managed or controlled directly or indirectly, to the obligations in the loan agreements. Kulick later defaulted on four loans, including the February loan, and YSA placed second mortgages on properties in Kulick's portfolio. Kulick filed this litigation to require that YSA remove the second mortgages and to enjoin YSA from recording additional second mortgages. The case proceeded to trial.

The key issue is whether YSA had the right to record mortgages on the properties. Kulick argues that the loan agreements identified as collateral interests in the holding companies, and not the properties at issue. But this argument does not matter, because the loan documents granted YSA expansive rights to take actions against real property owned by the collateral, including the properties. YSA exercised that right by recording the second mortgages. Kulick also argues that the loans cannot be enforced because their terms were predatory, usurious, and against public policy. Setting aside the fact that Kulick proposed the loan terms about which

he now complains, this defense fails for a more basic reason—Delaware law does not extend usury defenses to limited liability companies like the plaintiff entities. This decision therefore enters judgment for YSA.

## I. FACTUAL BACKGROUND

The facts are drawn from the 222 joint trial exhibits, live testimony from four witnesses, deposition testimony from two fact witnesses, and 22 stipulations of fact. These are the facts as the court finds them after trial.[1]

### A. Marc Kulick And The Vesta Entities

Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas (the "Properties").[2] The Properties are owned by

---

[1] This decision cites to: C.A. No. 2025-1319-KSJM docket entries (by "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkt. 98 (by "Trial Tr. at"); stipulated facts set forth in the parties' Joint Pre-Trial Order, Dkt. 88 ("PTO"); and the Transcript of the November 25, 2025 hearing on Plaintiffs' Motion for Expedited Proceedings and Motion for Expedited Preliminary and Permanent Injunction, Dkt. 25 ("11/25/25 Hr'g Tr."). The parties called the following fact witnesses: Marc Kulick (owner and controller of Plaintiffs Vesta and Asset Holder); Efraim Diveroli (YSA's principal); Robert Miley (YSA's Rule 30(b)(6) representative); John Hall (Defendant's expert). The parties submitted the deposition transcripts of the live witnesses, except for John Hall, and called the following witnesses by deposition only: Kara Thomas (Controller at Vesta Realty) and Courtney Merritt (Controller at Vesta Realty). The transcripts of the witnesses' respective depositions are cited using the witnesses' last name and "Dep. Tr." The decision notes in citation form where a witness was designated to testify under Rule 30(b)(6). This decision cites the following declaration by the declarant's last name: Christopher Rogers (Partner at Capital Fund Law Group), Dkt. 86 ("Rogers Decl.").

[2] JX-185; Trial Tr. at 6:23–7:4 (Kulick). Some of Kulick's 34 assets have a tenancy in common ("TIC") ownership structure that results in two or more entities serving as the ultimate owners of the TIC assets. Trial Tr. at 7:5–8:1 (Kulick).

34 separate, single-purpose limited liability companies (the "Title Owners").[3] Each Title Owner is owned by one or more holding company (the "Intermediate Holding Companies").[4] The Title Owners are capitalized by investments at the Intermediate Holding Company level.[5]

Plaintiffs Vesta Holdings, LLC and Asset Holder, LLC (with Kulick, the "Plaintiffs")[6] are Kulick's personal investment vehicles.[7] Kulick is the sole owner and manager of Vesta and Asset Holder.[8] Vesta and Asset Holder hold membership interests in several Intermediate Holding Companies.[9] Kulick also holds an interest in all the Title Owners.[10]

**B. Plaintiffs Seek Short-Term Loans From Defendant.**

In 2024, Kulick was in search of short-term financing for one of the Properties.[11] An acquaintance introduced Kulick to Efraim Diveroli. Diveroli is the

---

3 Trial Tr. at 7:5–8:1, 115:22–116:17 (Kulick); JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A; *compare* PTO ¶ 6 *with* JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803.

4 Trial Tr. at 7:5–8:1 (Kulick); *see* JX-198.

5 Trial Tr. at 7:5–8:1 (Kulick).

6 *Id.* at 8:7–18 (Kulick).

7 *Id.* at 8:7–24 (Kulick).

8 *Id.* at 8:7–8:18 (Kulick).

9 *Id.* at 9:2–9:14 (Kulick).

10 *Id.* at 49:17–51:1 (Kulick).

11 JX-3 at 1; Trial Tr. at 9:18–10:8 (Kulick); Trial Tr. at 146:21–147:22 (Diveroli).

principal of Defendant YSA Investments 1, LLC ("Defendant" or "YSA"),[12] a special purpose vehicle for Diveroli's commercial lending.[13] Kulick connected with Diveroli in September 2024. Kulick urged Diveroli to finance some of his loans, claiming "[i]t's the easiest money you'll ever make" and that Diveroli has no reason to worry about losing his investment.[14]

On September 7, 2024, Kulick provided YSA a form agreement for the proposed loan.[15] On September 29, Kulick and his counsel provided YSA's counsel and Diveroli the material loan terms.[16] The terms included: a loan of $775,000, an interest rate of 7% per month (84% annualized), a 2% closing fee for YSA, and a right of first refusal in favor of YSA.[17] Kulick, Diveroli, and YSA's counsel discussed the proposed loan.[18] After, YSA's counsel proposed more detailed descriptions of the material terms, and

---

[12] Dkt. 81 ¶ 12.

[13] Trial Tr. at 146:10–20 (Diveroli); *see* Dkt. 81 ¶ 12.

[14] JX-3 at 4; JX-4 (attaching a draft loan agreement). The initial draft of the loan document contemplated an interest rate of 20% per annum, compounding annually. JX-4 at 2. Kulick explained his goal for the interest rate was to provide Diveroli "10% over the 3-month term." JX-3 at 10.

[15] JX-4 (providing Diveroli initial versions of a promissory note and a collateral pledge and security agreement); JX-3 at 2–12; *see* JX-6 at 4. The "form agreement" Kulick provided the borrower would have "[n]o right of rescission, setoff, abatement, diminution, counterclaim, or defense . . . with respect to this Note or any other Loan Documents." JX-4 at 4.

[16] JX-6; Trial Tr. at 10:11–13 (Kulick).

[17] JX-5 at 1–2 ("Efraim and I have basically finished our deal for Parc 1010 EM."); JX-3 at 2–12.

[18] *See* JX-46.

the parties deferred to Kulick's counsel to revise the documents consistent with that proposal.[19]

Kulick agreed to the revised terms on October 2 and his attorney agreed to update the drafts.[20]

The parties closed the transaction on October 8, 2024 (the "October 8 Loan").[21] The October 8 Loan included a Promissory Note ("Note"), a Collateral Pledge and Security Agreement ("CPSA"), and a Personal Guaranty and Right of First Offer (the "Guaranty" and collectively, the "Loan Documents").[22]

The October 8 Loan made Asset Holder the Borrower, Vesta the Pledgor, and YSA as the Lender.[23] YSA loaned Asset Holder $775,000, maturing ninety days after closing.[24] Asset Holder and Pledgor secured the October 8 Loan with "Collateral" defined as "Unencumbered Interests" and "Encumbered Interests" in the form of membership interests that Kulick held in the Intermediate Holding Companies.[25]

---

[19] JX-5 at 1–2 (noting that Kulick's counsel "prefer[ed] to make the initial edits" to the documents Kulick previously provided); JX-46 at 7–8.

[20] JX-6.

[21] PTO ¶ 7; JX-10.

[22] Kulick Day 1 Dep. Tr. at 28:19–23.

[23] JX-10 at 1.

[24] *Id.*

[25] *Id.* at 9. For the October 8 Loan, the Unencumbered Interests were Kulick's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC, Remington Ranch Investors, LLC, Copperfield Investors, LLC, and Putnam Investors, LLC. *Id.* Kulick represented that Asset Holder, as borrower, "owns the Unencumbered Collateral absolutely and free of any . . . encumbrance" and Asset Holder "has the unencumbered and unrestricted right to pledge the Unencumbered Collateral." *Id.* at 11.

The CPSA included a Power of Attorney provision applicable in the event of a borrower breach proposed by YSA on October 3. That day, YSA's counsel asked Kulick to provide a list of suits filed against "Vesta and its affiliated entities" and to identify any UCC liens.[26] A UCC search precipitated YSA's request.[27] Kulick then identified nine civil actions and stated that "none of the entities that are a party to this loan have any UCCs filed against them[.]"[28] YSA proposed additional terms, including the Power of Attorney provision. The Power of Attorney provision, quoted more fully in the below legal analysis, gave YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests . . . includ[ing] but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral."[29] Kulick agreed to most of the proposed terms but noted that he would need a few hours to consider the Power of Attorney,[30] which Kulick later agreed to.[31]

---

[26] JX-7 at 4.

[27] *Id.*

[28] *Id.* at 3.

[29] JX-9 at 2–3.

[30] *Id.* at 2; JX-3 at 15; JX-46 (discussing representations and warranties of the loan). For instance, Kulick agreed to "waive any defense or asset protection mechanism that may be available in the event of a default." JX-9 at 2.

[31] Trial Tr. at 54:2–56:5 (Kulick); JX-46.

The October 8 Loan was due with interest on January 8, 2025,[32] when Kulick was obligated to remit payment of $829,250.[33] But Kulick requested a one-week extension on January 8,[34] when he informed Diveroli he was short over $500,000.[35] Diveroli agreed to a short extension on the condition that Kulick pay an additional $25,000.[36] Kulick paid the $829,250 and additional $25,000 on January 21.[37] And YSA continued loaning Kulick money.

### C. Defendants Provide Additional Loans Subject To A Joinder.

By February 2025, YSA had loaned Kulick $4,775,000 over six loans.[38] That month, Kulick approached YSA requesting a $1,500,000 loan, nearly twice the amount of any previous Loan.[39] Diveroli wanted to loan the money to Kulick. Diveroli considered Kulick "a fantastic salesman" and "very persist[ent]," noting that Kulick "presents as trustworthy."[40]

---

[32] *Id.* at 2; JX-3 at 22–23 ("If money doesn't come in as expected would you be open to a week extension for an additional 25k of interest paid today.").

[33] JX-10 at 2.

[34] JX-3 at 22–24.

[35] JX-3 at 23.

[36] *Id.* at 22–24.

[37] JX-58; JX-22.

[38] JX-10 at 1 (October 8 Loan for $775,000); JX-60 at 2 (loaning Plaintiffs $750,000 on January 21, 2025); JX-63 at 2 (loaning Plaintiffs $750,000 on January 24, 2025); JX-65 at 2 (loaning Plaintiffs $800,000 on January 30, 2025); JX-67 at 2 (loaning Plaintiffs $850,000 on February 4, 2025); JX-71 at 2 (loaning Plaintiffs $850,000 on February 10, 2025).

[39] Trial Tr. at 149:3–22 (Diveroli); Rogers Decl. ¶ 4; *compare* JX-16 at 1 *with* JX-71 at 2.

[40] Trial Tr. at 151:19–152:5 (Diveroli).

But given that Kulick repaid the October 8 Loan late, and the amount requested, YSA "made it crystal clear" it would need "significantly more collateral" before agreeing to Kulick's request.[41] Diveroli directed his office to "cease almost all other activities" to review Kulick's portfolio of assets prior to extending additional capital.[42] And YSA searched for a consultant "familiar with multi-family residential real estate" who could assist in "making sure [YSA] [is] as protected by the collateral" as it was made to believe.[43]

On February 13, YSA requested that Kulick provide preliminary diligence materials.[44] Kulick resisted YSA's requests initially,[45] expressing his desire to end the parties' relationship, and even requested that YSA "release all liens . . . from the [October 8 Loan]."[46]

Kulick then changed his tune. The next morning, Kulick offered to move forward if YSA would accept a subset of the requested materials.[47] YSA agreed based on Kulick's offer to provide: "[a]ll tax returns"; "[a]ll mortgage statements"; "a

---

[41] *Id.* at 149:23–152:5 (Diveroli).

[42] *Id.* at 149:23–151:10 (Diveroli); JX-73; *see* JX-222.

[43] JX-222; *see* JX-73.

[44] JX-76 at 2 (Defendant requested the following materials: (i) bank statements for the preceding six months for all entities; (ii) financial statements from the last three years; (iii) tax returns from the last three years; (iv) internal analytics for the properties Kulick developed; (v) "all Loan Documents related to loans currently encumbering one or multiple properties that will be securing the loan"; and (vi) "[a]ny and all active UCC filings related to any of the entities/properties.").

[45] JX-73.

[46] JX-76 at 1.

[47] *Id.*

portfolio p&l" statement; and "[c]onstant live access to data curated between [Kulick's] team and [YSA]."[48]

YSA's counsel reviewed the materials. Because the materials did not clearly identify the entity associated with each property, YSA's counsel requested additional information.[49] YSA also asked whether any encumbrances on the properties would be senior to the contemplated loan.[50] Kulick provided additional documentation, including a broker's valuation opinion for one property and operating agreements for five of the entities.[51]

The following morning, Kulick texted Diveroli and Robert Miley, YSA's counsel, to check on the status of the Loan.[52] Miley responded by sharing an image of the CPSA provision that defined "Unencumbered Interests" and "Encumbered Interests."[53] Miley asked Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, could you please send me a paragraph that I can copy into it with the other entities?"[54]

Kulick immediately responded stating: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole[.]"[55]

---

[48] *Id.*

[49] JX-77 at 2–3.

[50] *Id.*

[51] JX-77 at 1.

[52] JX-12.

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.*

Miley then asked the group for "consensus on the entity language for the collateral agreement."[56] He noted that, given certain covenants in the CPSA, it was critical to keep the unencumbered and encumbered interests separate.[57] Kulick responded stating: "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?"[58]

Miley said that the joinder "may" work.[59] Miley then emailed Kulick updated drafts of the Confession of Judgment and Guaranty.[60] In the same email, Miley again flagged for the group Kulick's suggestion of adding a joinder to the CPSA. He noted that the CPSA does not clearly state which entities are intended to be "unencumbered vs encumbered."[61] Kulick responded: "No change to this document at all except to add a joinder that joins *any asset controlled by any affiliate of mine*."[62] YSA's counsel circulated a revised CPSA that included a one-paragraph joinder consistent with Kulick's proposal (the "February Joinder").[63]

On February 18, 2025, the parties entered the new loan agreement (the "February 2025 Loan").[64] The February 2025 Loan comprises: a promissory note (the

---

[56] *Id.* at 3.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] JX-13 at 1.

[61] *Id.*

[62] *Id.* (emphasis added).

[63] JX-15 at 1, 18, 32.

[64] PTO ¶ 7; *see generally* JX-16.

"February Note"); a collateral pledge and security agreement (the "February CPSA"), a Personal Guaranty and Right of First Offer (the "February Guaranty"); and a Joinder.[65] The February 2025 Loan is governed by Delaware law.[66]

Section 5(c) of the February Guaranty requires Kulick, as Guarantor, to "deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor. . . ."[67] Kulick delivered the required schedule of real estate owned, which identified the Title Owners.[68] Again, requiring a schedule of real estate owned by Kulick, the Guarantor, reinforces the terms and purpose of the February Joinder.

The February Guaranty, like the February CPSA, granted YSA a broad power of attorney (the "February Guaranty POA").[69] The February POA, in relevant part, provided: "Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests. . . ."[70]

---

65 JX-16

66 *Id.* at 6–7.

67 *Id.* at 26.

68 JX-27 at 39–40; JX-169 §§ 1–3, Ex. A (providing Louis Investments, LLC an entity solely owned and managed by Kulick "directly or indirectly, owns or controls" the entities listed on Exhibit A, which includes the Title Owners).

69 JX-16 at 28.

70 *Id.*

### D. Plaintiffs Default On Four Loans.

Plaintiffs ultimately defaulted on four loans (the "Defaulted Loans"): (1) the February 2025 Loan; (2) the "April 2025 Loan"; (3) the "July 16, 2025 Loan"; and (4) the "July 31, 2025 Loan."[71] Each Defaulted Loan followed the format of the February 2025 Loan,[72] in that each involved a Note, a CPSA, a Guaranty, and a Joinder.[73]

The principal amount of the February 2025 Loan is $1,500,000. Plaintiffs defaulted on May 19, 2025.[74] The interest rate is 133.333% per annum, compounded monthly.[75] Plaintiffs owe approximately $3.3 million under the February 2025 Loan.[76]

The principal amount of the April 2025 Loan is $300,000.[77] The purpose of the April 2025 Loan was to finance Kulick's closing costs related to the acquisition of Parc

---

71 JX-16; JX-17; JX-20; JX-21; *see* JX-28.

72 Trial Tr. at 14:2–8, 51:6–54:12 (Kulick).

73 *See generally* JX-16; JX-17; JX-20; JX-21.The identity of the Borrower Entity providing the "Encumbered Interests" and the Pledgor Entity providing the "Unencumbered Interests" differ. JX-16 at 9 (identifying Vesta as Pledgor and Asset Holder as Borrower); JX-17 at 11 (identifying Kulick Manager, LLC as Pledgor and Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC as Borrowers); JX-20 at 9 (identifying Vesta as Pledgor and Borrower); JX-21 at 9 (identifying Vesta as Pledgor and Borrower). The April 2025 Loan included one bespoke feature, a membership interest pledge and assignment agreement ("MIPAA"). JX-17 at 34–42. The April 2025 Loan stands apart from the other Defaulted Loans in that regard. The MIPAA is not relevant to the resolution of this action.

74 JX-94; JX-201; JX-28 at 2–4; *see* JX-104.

75 JX-16 at 1.

76 JX-28 at 2–4.

77 PTO ¶ 17. The loan went to three entities owned by Kulick Manager, LLC—Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. PTO ¶ 17.

1010, an apartment complex in Tulsa, Oklahoma.[78] It was a short-term loan, due to be repaid ten days after closing.[79] But the transaction never closed.[80] The interest rate of the April 2025 Loan was 1,500% per annum, compounded monthly.[81] Plaintiffs owe approximately $3 million on the loan.[82]

---

Kulick manages each of the entities. JX-17 at 8–9. Under the April 2025 Loan, Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC are each a "Borrower" and the "Pledgor" is Kulick Manager, LLC. *Id.* at 1.

[78] PTO ¶ 17.

[79] *Id.* at 1–2.

[80] Trial Tr. at 117:20–118:1 (Kulick).

[81] JX-17 at 1. Kulick proposed repaying YSA $425,000, inclusive of principal and interest, in exchange for April 2025 Loan with a face value of $300,000. JX-3 at 53.

[82] Diveroli consistently messaged Kulick seeking payment once Kulick defaulted on the April 2025 Loan. JX-3 at 56–82; *see* JX-99 at 1. On June 16, Diveroli contacted Kulick to work out a plan for the two defaulted Loans, Kulick responded asking for a new loan and stating that: "you already have way more secure loan docs than anything else I've ever used." JX-3 at 83; *see* JX-104 at 1. On June 15, Kulick requested a new loan of $315,000 from Diveroli (the "June 2025 Loan"). JX-104. Kulick proposed satisfying the June 2025 Loan by repaying Diveroli $515,000 by July 1. *Id.* Kulick acknowledged he was in default under the April 2025 Loan and that failure to satisfy that Loan "would be a default on this loan." *Id.* Kulick also proposed including a $1,000,000 penalty if the June 2025 Loan negatively impact either the February 2025 Loan or the April 2025 Loan. *Id.* On June 19, Kulick and YSA closed on the June 2025 Loan. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan included a Note, an Affidavit of Confession of Judgment, a CPSA, and a Guaranty. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan reflected the terms proposed by Kulick. *Compare* JX-104 *with* JX-108. The principal amount of the June 2025 Loan was $315,000 and Kulick was obligated to repay $515,000 by July 1. JX-108 at 1–2. The interest rate of the June 2025 Loan is for 1565% per annum, compounded daily. JX-108 at 1. Also on June 19, Kulick executed a Confidential Side Letter Related to the February 2025 Loan, April 2025 Loan, and June 2025 Loan granting YSA the right to seek repayment from reserves held by entities identified on Schedule 3. JX-112; Trial Tr. at 114:4–116:22 (Kulick). The properties on Schedule 3 appear to overlap significantly with properties owned by the Title Owners. *Compare* JX-112 at Schedule 3 *with* PTO ¶ 6. Exhibit C to the Confidential Side Letter does not provide the full names of the listed entities and, since the names of the Title Owner

The principal amount of the July 15, 2025 Loan is $365,000.[83] Plaintiffs defaulted on July 30, 2025.[84] The interest rate is 960% per year, compounded daily.[85] Plaintiffs owe approximately $5 million on the loan.[86]

The principal amount of the July 31, 2025 Loan is $317,000. Plaintiffs defaulted on August 5, 2025.[87] The interest rate is 7,000% per year, compounded daily.[88] Plaintiffs owe a staggering $921 million on the loan.[89]

Kulick testified that he proposed the interest rates on each loan by reverse engineering whatever payment he thought appropriate on the loan amount.[90] He calculated that payment amount assuming timely payment.[91] But he knew that YSA implied the interest rate that appeared in the Loan Documents from those amounts.[92]

When asked at trial about the interest rates of the Defaulted Loans, Kulick testified that "I'm not playing the victim on paying high interest rates on my loans. I

---

and Intermediate Holding Companies share some names, it is difficult to discern the exact identity of each entity provided on Exhibit C. Also around this time, Diveroli offered Kulick a $5 to $10 million payoff option, which Kulick declined. Trial Tr. at 188:17–189:13 (Diveroli).

[83] JX-20 at 1

[84] *Id.*

[85] *Id.*

[86] JX-28 at 2.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 3.

[90] Trial Tr. at 91:9–19 (Kulick).

[91] *Id.* at 29:9–18 (Kulick).

[92] *Id.* at 91:9–93:3 (Kulick).

understand that, you know, my cash position was bad, it was stressed. I was having trouble getting investors to fund pro rata capital calls."[93] He also acknowledged that he kept returning to YSA because he was "desperate" for funding.[94]

### E. Defendant Records Second Mortgages.

By August 2025, Plaintiffs had defaulted on four loans and owed approximately $900 million under the Defaulted Loans.[95] (By trial, Plaintiffs owed $932,149,606.85 under the Defaulted Loans.)[96]

In October 2025, Diveroli and two YSA representatives visited Kulick in Tulsa, Oklahoma, to diligence the Properties in connection with a contemplated loan where YSA would provide Plaintiffs tranche financing.[97] Diveroli asked to see "the worst units at the worst properties" to evaluate whether it made sense to move forward

---

[93] *Id.* at 94:20–24 (Kulick).

[94] *Id.* at 29:11–17, 84:16–18, 122:24–123:1 (Kulick).

[95] JX-28 at 4; *see* JX-24 (informing Kulick he owed $897,744,576 under the Defaulted Loans on December 2, 2025). Kulick complained throughout this litigation about Defendant's delays in providing a payoff summary. He testified that he made multiple requests for a payoff summary as early as November 2025. Dkt. 22 ¶ 28 ("On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars. . . ."). At trial Kulick testified he did not receive a payoff from YSA until February 6, 2026. Trial Tr. at 45:15–46:5 (Kulick); Dkt. 103 at 11. But in the Amended Complaint Plaintiffs plead having received a payoff summary on December 2, 2025, which is supported by contemporaneous evidence. JX-24.

[96] JX-28 at 2.

[97] Trial Tr. at 29:22–35:7 (Kulick).

with the requested tranche financing.[98] After the tour, they asked Kulick to join for a meeting at their hotel conference room.[99]

During the meeting, Diveroli informed Kulick that he owed them "well over a billion dollars" due to the compounding interest rates.[100] Diveroli told Kulick that he could "either do this *the easy way or the hard way*[.]"[101] As Kulick recalled, "[t]hey told me that basically they *now own my entire portfolio*[.]"[102] Kulick understood the "easy way" would entail handing over to YSA the deeds to the Properties in lieu of YSA seeking to foreclose on the Properties.[103] Kulick claims YSA offered cash if he were to hand over the deeds.[104] Kulick understood the "hard way" as involving litigation, as YSA had brought a draft complaint to the meeting.[105] YSA also threatened to alert persons in Kulick's professional network, including his Rabi and wife.[106]

---

[98] *Id.* at 32:2–24 (Kulick).

[99] *Id.* at 33:1–20 (Kulick).

[100] *Id.* at 33:1–19 (Kulick).

[101] *Id.* at 33:13–33:19 (Kulick) (emphasis added).

[102] *Id.* (Kulick) (emphasis added).

[103] *Id.* at 34:6–35:6 (Kulick).

[104] *Id.* (Kulick).

[105] *Id.* at 34:6–37:14 (Kulick).

[106] *Id.* at 34:19–35:6 (Kulick); *see* JX-23 (providing Plaintiffs and Plaintiffs' counsel the Complaint YSA filed in Superior Court noting "YSA also intends to submit litigation preservation letters to various third parties, including but not limited to Vesta employees, investors, and lenders that are believed to have either benefited from or borne witness to Defendants' misconduct"). In addition to attaching the Superior Court Complaint, YSA shared with Plaintiffs and Plaintiffs' counsel drafts of an amended complaint and motion for a temporary restraining order and noted

Diveroli pursued the hard way.[107] On October 31, 2025, YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas.[108] The Properties are owned by the Title Owners.[109] Kulick identified the Properties in compliance with Section 5(c)'s requirement under the February Guaranty to provide YSA the "complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly)" by Kulick, in connection with the February

---

"YSA is willing to forego further litigation, including the filing of the amended complaint, in exchange for Mr. Kulick executing deeds-in-lieu of foreclosure voluntarily turning over ownership of each of the subject properties. . . ." *Id.*

[107] Diveroli testified that it was only because YSA "discovered the fraud and deceit" coupled with the poor conditions of the Properties that YSA decided to record the second mortgages. Trial Tr. at 188:21–189:13 (Diveroli). Kulick acknowledged at trial that he repeatedly recorded second mortgages on properties owned by Title Owners. *Id.* at 110:24–113:7 (Kulick). Kulick admitted that two weeks before commencing this action he granted a second mortgage on another property owned by a Title Owner. *Id.* at 112:1–20 (Kulick); JX-170 (granting second mortgage on Jenk's Best Living on October 30, 2025); JX-168 (granting second mortgage on Eaton Place Best Living, LLC on October 24, 2025); JX-155 (granting second mortgage on Bartlesville Best Living, LLC on September 24, 2025). Kulick explained that 32 of Vesta's 34 properties routinely need cash, and his solution was to have Vesta make a loan to the cash-strapped property, to allow the property to get their reserve funded, and then subsequently pay back to the loan to Vesta. Trial Tr. at 115:7–116:18 (Kulick). Kulick acknowledged comingling his personal funds with Vesta's to create a "lending pool" to move cash around to pay the debts of one property with proceeds from another. Trial Tr. at 128:15–18, 129:9–13, 131:6–22 (Kulick). YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts. JX-198; JX-194 ("In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the net operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.").

[108] Dkt. 81 ¶ 21; JX-27; PTO ¶ 6.

[109] JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A.

2025 Loan.[110] Kulick testified that he personally owns interests in each Title Owner.[111]

### F. Plaintiffs File This Litigation.

Plaintiffs were first to file litigation. On November 13, 2025, Plaintiffs filed their Complaint against YSA, seeking an order from this Court requiring Defendant to remove the second mortgages.[112] At the same time, Plaintiffs moved for expedition and separately moved for expedited preliminary and permanent injunctive relief.[113]

On November 25, 2025, the court heard argument on Plaintiffs' motions to expedite and for injunctive relief.[114] In seeking preliminary injunctive relief, Plaintiffs claimed "many of these properties are under contract or actively being marketed for sale" including one property set to close the next day.[115] At the

---

[110] JX-16 at 26 ("By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of provided as of [Date] remains true, correct and complete as of February 14, 2025, in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof."); JX-27 at 39–40.

[111] Trial Tr. at 8:2–9:11 (Kulick).

[112] Dkt. 1 ¶¶ 37–44.

[113] Dkt. 1 at Plaintiffs' Motion to Expedite; Dkt. 1 at Plaintiffs' Motion for Expedited Preliminary and Permanent Injunction.

[114] Dkt. 14.

[115] 11/25/25 Hr'g Tr. at 4:6–5:10.

preliminary stage, Plaintiffs also claimed Kulick lacked authority to record second mortgages directly on the Title Owners' properties.[116]

The court denied Plaintiffs' request for preliminary injunctive relief because the relief requested—ordering Defendant to lift the second mortgages—was mandatory in nature and thus foreclosed, absent discovery to resolve factual disputes.[117] But the court granted expedition. The court directed the parties to "take some targeted discovery" to allow the court to determine "whether the defendant has the authority to impose these mortgages on a full discovery record that reflects the parties' intent."[118] The court did enjoin YSA from imposing additional second mortgages.[119]

On December 5, Plaintiffs filed their Amended Complaint.[120] The Amended Complaint asserts one claim.[121] Plaintiffs claim that Defendant unlawfully recorded the second mortgages and seek a declaratory judgment that the second mortgages are void, coupled with an order from this court directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[122]

---

[116] *Id.* at 15:24–17:5.

[117] *Id.* at 42:17–43:8.

[118] *Id.* at 44:1–8.

[119] *Id.* at 43:9–24.

[120] Dkt. 22.

[121] *Id.* ¶¶ 39–48 (alleging the second mortgages "are invalid" and seeking a "permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage[s].").

[122] *Id.* ¶¶ 42–48.

Plaintiffs again moved for Expedited Preliminary and Permanent Injunctive relief (the "Motion").[123] Defendant opposed the Motion.[124]

After the court preliminarily enjoined additional second mortgages, Defendants moved to set an injunction bond under Court of Chancery Rule 65 (the "Bond Motion").[125] On December 30, the court granted the Bond Motion, requiring Plaintiffs to post a bond in the amount of $22,368,257.93.[126] On January 7, 2026, Defendant informed the court that Plaintiffs were unable to post the bond.[127] Plaintiffs' failure to post bond caused the ordered injunction to dissolve by operation of law.[128]

On February 11, Defendant filed an Amended Answer and brought counterclaims and third-party claims.[129] Defendant asserted counterclaims against Kulick and Vesta and brought third-party claims against 46 named third-party defendants and Does 1-100 and Roe Entities 1-100.[130] On March 6, Plaintiffs

---

[123] Dkt. 23.

[124] Dkt. 32.

[125] Dkt. 29; Ct. Ch. R. 65(c).

[126] Dkt. 60 ("In connection with this Court's entry of a temporary restraining order [] in connection with the above-captioned action, within five (5) calendar days of the entry of this Order, Plaintiffs shall post with this Court a secured bond. . . .").

[127] Dkt. 64.

[128] Ct. Ch. R. 65(c).

[129] Dkt. 81.

[130] *Id.* ¶¶ 4–49.

answered the Counterclaims.[131] In May, Defendant began to effectuate service on the counterclaim/third-party defendants.[132]

The court held trial on March 5, 2026.[133] The parties completed post-trial briefing on March 26, 2026.[134]

## II. LEGAL ANALYSIS

Plaintiffs seek permanent injunctive relief, asking the court to order Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[135] To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction."[136] A party need not show imminent irreparable harm to obtain a permanent injunction.[137] There are other ways to demonstrate no adequate remedy at law.[138]

Permanent injunctive relief comes in one of two forms: prohibitive or mandatory. "A permanent injunction is a form of final relief that prohibits a party

---

131 Dkt. 93.

132 Dkt. 107; Dkt. 108; Dkt. 109; Dkt. 110; Dkt. 111; Dkt. 112; Dkt. 113.

133 Dkt. 92.

134 Dkt. 103.

135 Dkt. 22 ¶ 48.

136 *In re COVID-Related Restrictions on Religious Svcs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).

137 *Id.* at 1228–31; 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d ed.) ("[I]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.").

138 *Id.* at 1230.

from taking action or compels a party to take action."[139] Its negative version serves as a prohibitive injunction, "whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[140] Its affirmative or mandatory version compels a party to take specific action.[141]

An order directing YSA to undertake specific affirmative actions to remove the second mortgages is mandatory in nature.[142] Kulick bears the burden of proving that the second mortgages are "invalid" as a matter of law and that he has "clearly established" the legal right to have the court order YSA to cancel the second mortgages.[143] To show success on the merits, therefore, Plaintiffs must "clearly establish" the legal right they seek to enforce.[144] "The showing on the merits required

---

[139] *Glob. Cap. P'rs LLC v. Green Sapphire Hldgs., Inc.*, 2026 WL 709819, at *45 (Del. Ch. Mar. 13, 2026), *judgment entered*, (Del. Ch. 2026).

[140] *Id.* (quoting James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879)); *see In re COVID*, 285 A.3d at 1228; *NEC Fund VI HE Lender, LLC v. Hecate Hldgs. LLC*, 2026 WL 527007, at *7 (Del. Ch. Feb. 25, 2026).

[141] *In re COVID*, 285 A.3d at 1226 n.4; 43A C.J.S. Injunctions § 19 ("A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury."); *Hughes Tool Co. v. Fawcett Publications, Inc.*, 315 A.2d 577, 579 (Del. 1974); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02[c] (2025) ("[A] mandatory injunction requires an individual to perform a specific act.").

[142] Dkt. 22 ¶ 48.

[143] *DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 434 (Del. Ch. 2021).

[144] *DeMarco*, 263 A.3d at 434; *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *3 (Del. Ch. Aug. 7, 1989); *see Pomilio v. Caserta*, 215 A.2d 924, 925 (Del. 1965) ("There is no right to an injunction as a matter of course; and this is especially

by the 'clearly established' standard is 'more than a reasonable probability of success.'"[145] Satisfying the 'clearly established' standard requires "a showing that the petitioner is entitled as a matter of law to the relief" sought.[146]

Plaintiffs' claim flounders on the first element—Plaintiffs have not clearly established the right at issue. Plaintiffs' primary argument is that neither the CPSAs, nor the Joinders, nor the POAs, define Collateral to include properties held by the Title Owners. In the alternative, Plaintiffs argue that the CPSAs are usurious and cannot be enforced even if the CPSAs support Defendant's right to record the second mortgages.[147]

### A. Contractual Entitlement

Plaintiffs argue that Defendant must remove the second mortgages because the definition of "Collateral" in the Loan Documents did not create a security interest

---

so as to the mandatory writ which is issuable only in the exercise of extraordinary judicial caution.").

[145] *DeMarco*, 263 A.3d at 423 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 14.03[b][6], at 14-03.44 (2021)); *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990) ("Upon an application for mandatory preliminary relief, however, plaintiff must show more than a reasonable probability of success on the merits; he must clearly establish the legal right he seeks to protect or the duty he seeks to enforce.").

[146] *Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008); *Bertucci's Rest. Corp. v. New Castle Cnty.*, 836 A.2d 515, 519 (Del. Ch. 2003) ("[T]he Court of Chancery has consistently applied an exacting standard, requiring that an applicant seeking mandatory preliminary injunctive relief clearly establish the legal right he seeks to protect or the duty he seeks to enforce." (internal quotation omitted)).

[147] Dkt. 95 at 33.

in the Properties.[148] Defendant disputes Plaintiffs' interpretation of Collateral but says that it does not matter, because Defendant had the right to record the second mortgages even assuming Plaintiffs' interpretation.[149] This decision rules in Defendant's favor, concluding that Defendant had the right to record the mortgages even under Plaintiffs' interpretation.

The court's task is to interpret the Loan Documents in a way that carries out the parties' intent.[150] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[151] The contract terms will be given their "plain, ordinary meaning."[152] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[153] The court must "reconcile all the provisions of the instrument" if possible.[154] When a

---

[148] *Id.* at 19–21.

[149] Dkt. 100 at 23–24; Dkt. 106 at 45.

[150] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[151] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[152] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[153] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[154] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

transaction consists of multiple documents, Delaware courts will interpret the documents as one singular contract.[155]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[156] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[157] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[158] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[159] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[160] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[161]

---

155 *See, e.g., E.I. du Pont de Nemours & Co.*, 498 A.2d at 1115 ("The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction . . . Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (internal citations omitted)); *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002).

156 *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

157 *Id.* (citing *Osborn*, 991 A.2d at 1160).

158 *Id.* (quoting *Osborn*, 991 A.2d at 1160).

159 *Id.* (quoting *Osborn*, 991 A.2d at 1160).

160 *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

161 *Salamone*, 106 A.3d at 374 (citation omitted).

Plaintiffs rest their contract claim on the definition of "Collateral" in the CPSAs. Under the CPSAs, Borrower[162] and Pledgor[163] agreed to "pledge, grant, and assign to Lender a security interest in and lien upon the Collateral . . . to secure the payment and the performance of the Obligations . . . ."[164] The CPSA defines "Collateral" to include "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, . . ."[165] The CPSAs define "Interests" with reference to two other defined terms—"Unencumbered Interests" and "Encumbered Interests."[166] Those terms are defined as Borrower's and Pledgor's "membership interest[s]" in the Intermediate Holding Companies listed in the recitals of the CPSAs.[167] In Plaintiffs' view, the

---

[162] Asset Holder, Vesta, and Parc 1010 HoldCo., LLC are each a "Borrower" under one of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[163] Vesta and Kulick Manager, LLC are each a "Pledgor" under one or more of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[164] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[165] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[166] JX-16 at 9; JX-17 at 11; JX-20 at 9; JX-21 at 9.

[167] *See, e.g.*, JX-16 at 9 (defining the Unencumbered Interests as the Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); *id.* (defining the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living

definition of "Collateral" does not extend to the assets held by these entities, which include the Properties.[168] Rather, the CPSAs gave Defendant a security interest in Plaintiffs' *membership interests* in the entities, full stop.

Plaintiffs' argument is a red herring. Defendant concedes that the Loan Documents did not create a secured interest in the Properties.[169] Rather, they created a secured interest in the entities that own the Properties. The Loan Documents also gave Defendant the right to take action against real property owned by those entities, including the Properties.

Defendant's interpretation begins with the Joinder. The Joinder states that:

> [Marc Kulick], as a manager, member or other authorized person *of any and all Guarantor Entities* and *any other entities in which the undersigned does now own or control or may herein after own or control* during the term of that certain [February CPSA, April CPSA, and July CPSAs] hereby agrees *to jointly and severally assume all obligations of Pledgor* under the [February CPSA, April CPSA, and July CPSAs] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [February CPSA, April CPSA, and July CPSAs] as fully as if [Marc Kulick] had personally and individually executed

---

Investors, LLC; Muntage Vesta Investors, LLC); JX-20 at 9 (identifying the Unencumbered Interests as Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); JX-21 at 9 (identifying the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; Muntage Vesta Investors, LLC); *see* PTO ¶ 10.

[168] Dkt. 95 at 15–21.

[169] *See* Dkt. 100 at 18–24.

> and delivered the [February CPSA, April CPSA, and July CPSAs] as of the date thereof.[170]

Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ."[171]

Under the CPSA, "Guarantor Entities" includes the Title Owners.[172] The CPSA defined "Guarantor Entities" as "any entity directly or indirectly controlled or managed by [Kulick]," or "directly or indirectly owned by [Kulick] in whole or in part with respect to which Guarantor receives notices in the ordinary course of business[.]"[173]

This definition of Guarantor Entities sweeps in the Title Owners in multiple ways. First, the definition includes entities that Kulick owns in part. At trial, Kulick admitted that he had an investment in each of the Title Owners and Properties.[174]

---

[170] Trial Tr. at 20:2–21:6, 61:12–65:15 (Kulick); JX-16 at 22; JX-17 at 25; JX-20 at 22; JX-21 at 22. The Joinders are substantively identical. The only difference among the Joinders is the identity of the Kulick-affiliated entities named as Pledgor under the respective CPSA. *See* JX-16 at 1 (identifying Vesta as Pledgor); JX-17 at 1 (identifying Kulick Manager, LLC as Pledgor); JX-20 at 1 (identifying Vesta as Pledgor); JX-21 at 1 (identifying Vesta as Pledgor).

[171] Trial Tr. at 61:12–62:7 (Kulick).

[172] JX-169 ¶¶ 1–3, Ex. A (providing Kulick is the "sole Member" and "100%" owner of Louis Investments, LLC, and identifying the Title Owners as "directly or indirectly" owned by Louis Investments, LLC).

[173] JX-16 at 12; JX-20 at 12; JX-21 at 12.

[174] Trial Tr. at 69:1–2 (Kulick) ("I have an investment in each property."); JX-169 ¶¶ 1–3, Ex. A.

And Kulick identified every one of the Title Owners in response to a provision in his Guaranty requiring him to provide a "complete schedule of . . . entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor."[175] Thus, at a minimum, Kulick "indirectly own[s] . . . in part" each Title Owner. Second, Kulick controls or manages the Title Owners, as he testified at trial.[176] That too brings them within the scope of the Guarantor Entities.

Because each Title Owner is a Guarantor Entity, each Title Owner assumed "all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [CPSA]" by operation of the Joinder.[177] Thus, the Joinder renders each Title Owner an additional Pledgor under the CPSA, subject to the Pledgor's obligations under the CPSA.

Each Pledgor has obligations under the Power of Attorney provision of the CPSA. The Power of Attorney states that:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.[178]

---

[175] JX-16 at 26; JX-27 at 39–40.

[176] Trial Tr. at 63:24–67:21 (Kulick); *see* JX-168 at Ex. A.

[177] JX-16 at 22; JX-20 at 22; JX-21 at 22.

[178] JX-16 at 13; JX-20 at 13; JX-21 at 13.

The first sentence of this provision gives YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests."[179] This expressly includes "doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."[180] This power is not tied to or limited by the definition of Collateral. The second sentence does reference "taking action against the Collateral" but as a non-exclusive right. It reads: "This shall include *but not be limited to* taking any action against any of the Collateral. . . ."[181] By defining "action against the Collateral" as a non-exclusive right encompassed by the preceding sentence, the language and structure of the Power of Attorney indicate that the parties intended for YSA's rights to extend beyond the right to take "action against the Collateral."

Eliminating all doubt, the Power of Attorney provision uses the word "secure."[182] It gives YSA the right to take "whatever steps that it deems necessary in its sole discretion to *secure* and protect its interests[.]," including "whatever . . . is necessary to . . . collect all amounts due" to YSA.[183] The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against those entities bound by the Joinder, including the Title Owners, to facilitate payment of

[179] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[180] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[181] JX-16 at 13; JX-20 at 13; JX-21 at 13 (emphasis added).

[182] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[183] JX-16 at 13; JX-20 at 13; JX-21 at 13. (emphasis added).

amounts due to YSA. YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it.[184] Plaintiffs do not argue otherwise.

Plaintiffs instead argue that Defendant's interpretation runs afoul of Article Nine of the UCC.[185] According to Plaintiffs, the CPSAs had to describe the Collateral consistent with Article Nine of the UCC.[186] Under Article Nine, and a recent case interpreting it, that description must "reasonably identif[y] what is described."[187] The Loan Documents provided the full name and state of incorporation of each Intermediate Holding Companies entity comprising the Collateral.[188] But it did not list the details of the Properties. It does not so much as list: the Title Owners, the Properties, or the Properties' addresses.[189] Plaintiffs say that neither the CPSAs nor

---

[184] Trial Tr. at 190:15–191:13 (Diveroli); *id.* at 196:17–200:6 (Miley).

[185] Dkt. 95 at 20–21; Dkt. 103 at 3–6.

[186] Dkt. 103 at 3–6; *see Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995) ("Article 9 generally governs the creation, perfection, and enforcement of security interests in property and applies to 'any transaction (regardless of its form) which is intended to create a security interest in personal property.'" (quoting 6 *Del. C.* § 9-102(1)(a))).

[187] 6 *Del. C.* § 9-108(a) ("[A] description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."); *Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069, at *22 (Del. Ch. Oct. 7, 2025) ("[T]he description must objectively identify the collateral so that, at a minimum, it 'puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved.'" (quoting *Bishop v. All. Banking Co.*, 412 S.W.3d 217, 220 (Ct. App. KY, 2013))); *see* 6 *Del. C.* § 9-108, cmt. 2. ("The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).").

[188] JX-16 at 9; JX-20 at 9; JX-21 at 9.

[189] *See generally* JX-16; *see also* Trial Tr. at 205:24–206:6 (Miley).

any of the Loan Documents reasonably identify the Properties consistent with Article Nine.[190] Plaintiffs, therefore, contend that Article Nine prevents a security interest from attaching to the Properties because the Properties are not mentioned, let alone described in the CPSAs.[191]

But again, Plaintiffs' argument is of no moment. Defendant admits that the Loan Documents standing alone did not create a secured interest in the Properties. Defendant argues that they did not have to, because the Loan Documents gave Defendant the right in its "sole discretion to secure and protect its interests" by "taking any action against . . . . any real or personal property owned by the Collateral," including the Properties. And the Loan Documents reasonably describe the Collateral by providing the full name and state of incorporation of each entity comprising the Collateral.

Contrary to Plaintiffs' contentions, the Loan Documents granted YSA expansive rights to take actions against real property owned by Collateral. YSA exercised that right by recording the second mortgages on real property owned by the Collateral, in this case Properties owned by the Intermediate Holding Companies.

Parol evidence confirms what the plain language of the Loan Documents requires. When Kulick requested a substantially larger loan from YSA, he had only

---

[190] Dkt. 95 at 20–21.

[191] *Id.* at 3, 20–21, 29–30.

just repaid the October 8 Loan three weeks late.[192] YSA required more protection than it had on previous loans.[193] In a February 10, 2025 email to his colleague, Miley explained that YSA needed to hire a lawyer or other professional to advise on "a loan whereby we would be providing funding to a multi-family real estate firm which would be secured by the firm's real estate portfolio."[194]

On February 18, 2025, Miley texted Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities?"[195] Kulick was in a rush to get funded,[196] and so Kulick told Miley to leave

---

[192] JX-10 at 2 (identifying January 8, 2025 as the maturity date of the October 8 Loan); JX-58 (informing Diveroli on January 13, 2025 the October 8 Loan would be repaid on January 20); JX-22 (providing the October 8 Loan was repaid on January 21, 2025); JX-3 at 35 (requesting a "longer term" Loan on January 31); JX-222 (searching for a real estate consultant on February 10 regarding a "loan to Vesta" and seeking expertise to ensure YSA is "as protected by the collateral as we think we are").

[193] Trial Tr. at 149:23–151:24 (Diveroli); JX-77 at 2 (requesting Kulick identify the owner of each Property); JX-76 (requesting Kulick submit to "due diligence" in connection with the February 2025 Loan); JX-73 at 2.

[194] JX-222 at 1.

[195] JX-12 at 2.

[196] JX-73 at 2. Shortly after Miley asked Kulick if he had a paragraph to use for the Joinder Kulick exclaimed, "[M]y biggest concern is as usual (lol) funding. Do we have enough time to get this done?" JX-12 at 2. Less than 15 minutes later, Kulick asked: "Efraim can we please get sign off so we can push ahead[.]" *Id.* at 3. Two hours later, Kulick again pled for the Loan to be funded that day. *Id.* at 3 ("Can we find a way to fund today still[?]").

it the same.[197] Kulick texted back: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole."[198]

Putting a fine point on it, in the preceding text message, Miley asked two questions: (1) "are we expanding to rest of portfolio"; and (2) "can you please send me a paragraph?" Kulick responded to each in turn: (1) "yes"; and (2) "no."[199] Yes, they were expanding to the rest of the portfolio. No, no language was necessary. Instead, Kulick suggested "a joinder to the portfolio as a whole."[200] Vesta's website refers to the word "portfolio" as individual real properties owned or controlled by Vesta,[201] supporting that Kulick intended "portfolio" to refer to real properties.[202]

Kulick also referred in the exchanges that day to "a joinder with any asset controlled by any affiliate of mine," and "a joinder that joins any asset controlled by any affiliate of mine."[203] If Kulick intended the Joinder to be limited to adding entities to stand behind the same Collateral in the CPSA, there would have been no reason to refer to joining "any asset of any affiliate."

---

[197] JX-12; *see* JX-13 ("No change to [CPSA] at all except to add a joinder *that joins any asset controlled by any affiliate of mine.*" (emphasis added)).

[198] JX-12 at 2.

[199] *Id.*

[200] *Id.*

[201] JX-185.

[202] Trial Tr. at 149:23–151:9 (Diveroli); *id.* at 82:2–23 (Kulick).

[203] JX-13.

Consistent with this contemporaneous evidence, both Diveroli and Miley testified that, prior to the February 2025 Loan, Kulick agreed to pledge his entire portfolio to support the next loan.[204]

Plaintiffs also argue that it does not make sense that Kulick would pledge $900 million worth of additional property to support a $1.5–2 million loan. But Kulick wanted the loans, YSA wanted greater protection, this is the compromise that Kulick proposed and ultimately the deal the parties struck.[205]

### B. Usury Defense

Plaintiffs separately raise a usury defense, contending that the interest rates of the Loans are "facially unreasonable[.]"[206] But Section 2306 forecloses any defense based on the interest rate charged because here the borrower of each Loan was a limited liability company.[207] Section 2306 provides: "No corporation, limited partnership, statutory trust, business trust or *limited liability company*, . . . *shall interpose the defense of usury in any action*."[208] Delaware courts have consistently declined invitations to deviate from Section 2306's mandate, even where the

---

[204] Trial Tr. at 185:5–9 (Diveroli); *id.* at 196:17–197:7 (Miley).

[205] Trial Tr. at 29:9–17 (Kulick) (testifying that "[t]hroughout 2025 I was desperate for access to money to come into my business"); *id.* at 84:13–18 (Kulick) ("I was not of the opinion that they needed additional collateral. . . . But this was meant to solve an issue that was stopping us from getting the loan done that I desperately needed.").

[206] Dkt. 95 at 32–34.

[207] 6 *Del. C.* § 2306.

[208] *Id.* (emphasis added).

individual indorser or guarantor is a natural person.[209] Because the defense of usury would not be available to the entity Borrowers under the Loan Documents, the defense is not available to Kulick.[210]

## III. CONCLUSION

Because Plaintiffs have not demonstrated clear legal entitlement to the mandatory injunctive relief they seek, this decision need not reach the other elements of the claim or the other arguments raised by Defendant.[211] Plaintiffs' failure to prove an essential element of their claim warrants judgment for Defendant.

---

[209] *Bank of Delaware v. NMD Realty Co.,* 325 A.2d 108, 111 (Del. Super. 1974) (holding that "individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes"); *MacNeil v. Cusato*, 1998 WL 1029267, at *4 (Del. Super. Nov. 30, 1998) ("Whether Defendant's position is termed privy, guarantor, or accommodation party, the result consistently is estoppel from asserting usury where such defense was not available to the original debtor. . . . Defendant, as guarantor, was no stranger to the corporation's preclusion from the defense of usury. Upon the Corporation's expiration, the Defendant-guarantor was not transformed into an individual-debtor who could then assert the defense of usury."); *River Bank Am. v. Tally-Ho Assocs., L.P.*, 1991 WL 35719, at *6 (Del. Super. Feb. 22, 1991) ("Under Delaware law, an individual who is surety or guarantor of the corporate obligation is under the same disability to assert the defense of usury as the corporation.").

[210] *NMD Realty Co.*, 325 A.2d at 111.

[211] YSA raised other arguments including that Kulick, Vesta, and Asset Holder lacked standing because none hold title to the Properties subject to the second mortgages. Dkt. 100 at 12. Having found that Plaintiffs failed to establish a right to have the second mortgages removed, the court need not reach any other argument.