**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 26-12825-SAH** |
| | § | |
| **727 LOFTS BEST LIVING, LLC**[1] | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | **Chapter 11** |
| | § | |
| **-----------------------------------------------------** | | |
| | § | |
| | § | |
| **YSA INVESTMENTS 1, LLC** | § | **Case No. 26-12806** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |

**SUPPLEMENT TO TRUSTEES' JOINT AMENDED APPLICATION TO EMPLOYPROPERTY MANAGERS AND ASSET MANAGERS**

**TO THE HONORABLE SARAH A. HALL,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Daniel J. Sherman ("Trustee Sherman"), Chapter 11 Trustee for the above referenced jointly administered debtors (the "727 Debtors") in their bankruptcy cases (the "727 Chapter 11 Cases") and Michael E. Deeba ("Trustee Deeba" and collectively, the "Trustees"), Chapter 11 Trustee for YSA Investments 1, LLC ("YSA") in the above referenced bankruptcy case (the "YSA Chapter 11 Case" and together with the 727 Chapter 11 Cases, the "Chapter 11 Cases") file this supplement to the *Trustees' Joint Amended Application to Employ Property Managers and Asset Managers*

[1] The jointly administered debtors and their respective case numbers are as follows: 727 Lofts Best Living, LLC, Case No. 26-12825-SAH; 727 Lofts Holdings, LLC, Case No. 26-12826-SAH; Remington Ranch's Best Living, LLC, Case No. 26-12842-SAH; Lofts at North Penn Best Living, LLC, Case No. 26-12844-SAH; A-V Village Creek Owner, LLC, Case No. 26-12846-SAH; Barcelona Best Living, LLC, Case No. 26-12850-SAH; Louis Investments, LLC, Case No. 26-12851-SAH; Woodland Manor Best Living, LLC, Case No. 26-12858-SAH; Woodland Manor TIC 1, LLC, Case No. 26-12859-SAH; and Ridge Best Living, LLC, Case No. 26-12869-SAH.

[Dkt. No. 311, 727 Chapter 11 Cases; Dkt. No. 567, YSA Chapter 11 Case] (the "Amended Applications").[2]

After filing the Amended Applications, the Trustees have negotiated and are proposing to enter into the following Employment Agreements (the "Proposed Employment Agreements") with the applicable professional party thereto:

(1) the Residential Management Agreement among the Trustees and Capital Assets, Inc. ("Capital Assets") attached hereto as Exhibit 1 (the Capital Assets Property Management Agreement");
(2) each Multifamily Property Management Agreements among the Trustees and PEC Multifamily, LLC ("Price Edwards") attached hereto as Exhibits 3, 4, 5, 6, 7, 8, 9, 10, and 11 (the "Price Edwards Property Management Agreements"); and
(3) the Real Estate Consulting and Advisory Services Agreement among the Trustees and Jim Parrack ("Parrack" and together with Hilco, Capital Assets, and Price Edwards, the "Professionals") attached hereto as Exhibit 12 (the "Parrack Asset Management Agreement").

Each Proposed Employment Agreement was negotiated at arm's length and in good faith by the Trustees and the applicable Professional Party thereto. Each Trustee believes the retention of each Professional requested in his Amended Application is in the best interest of each bankruptcy estate that he is administering.

The Trustees file this Supplement to attach the Proposed Employment Agreements as the following exhibits to each Amended Application: (1) the Capital Assets Property Management Agreement as Exhibit B-1 thereto, (2) the Price Edwards Property Management Agreements as Exhibits B-2, B-3, B-4, B-5, B-6, B-7, B-8, B-9, B-10, and B-11 thereto, and (3) the Parrack Asset Management Agreement as Exhibit B-12 thereto.

In support of the relief requested in the Amended Applications, the Trustees submit the declarations (the "Declarations") of Greg Wright, President of Capital Assets, and of Jim Parrack,

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Applications.

Chief Operating Officer of Price Edwards and individually, attached hereto as Exhibits 13, 14, and 15 respectively.

To the best of each Trustee's knowledge, except as set forth in the applicable Declaration, each Professional (i) does not hold or represent any interest adverse to the estates of YSA or the 727 Debtors and (ii) is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code, as required by Section 327(a) of the Bankruptcy Code. The Trustees have been informed that each Professional will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances arise, and if any such circumstances arise or are discovered, each Professional will promptly supplement the disclosures contained in the applicable Declaration.

WHEREFORE, the Trustees hereby supplement each Amended Application by appending the Proposed Employment Agreements attached hereto as Exhibits 1 through 12 as Exhibits B-1 through B-12 thereto respectively and reiterate their request for relief contained in the Amended Applications for an order authorizing the retention of each Professional party thereto as either an asset manager or a property manager on the terms and conditions set forth in each Amended Application and the applicable Executed Employment Agreement and granting such other and further relief as this Court may deem just, equitable, and proper.

Respectfully submitted,

*/s/ Nicholas K. Gurguis*
Daniel J. Sherman
TX State Bar No. 18241000 (*Admitted Pro Hac*)
Nicholas K. Gurguis
TX State Bar No. 24106036
SHERMAN & YAQUINTO, L.L.P.
509 N. Montclair Ave.
Dallas, TX 75208-5450
Telephone: (214) 942-5502
Facsimile: (214) 946-7601
Email: djsherman@syllp.com; nick@syllp.com

Kevin D. McCullough
TX State Bar No. 00788005 (*Admitted Pro Hac*)
Shannon S. Thomas
TX State Bar No. 24088442 (*Admitted Pro Hac*)
ROCHELLE MCCULLOUGH PLLC
901 Main Street, Suite 3200
Dallas, Texas 75202
Telephone: (214) 953-0182
Facsimile: (888) 467-5979
Email: kdm@romclaw.com;
sthomas@romclaw.com

***Co-General Counsel for Daniel J. Sherman, Chapter 11 Trustee***

*/s/ J. Clay Christensen*
J. Clay Christensen (OBA # 11789)
Jonathan M. Miles (OBA # 31152)
Brock Z. Pittman (OBA # 32853)
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Telephone (405) 232-2020
Facsimile (405) 228-1113
Clay@christensenlawgroup.com
Jon@christensenlawgroup.com
Brock@christensenlawgroup.com

***Proposed Counsel for Trustee Michael E. Deeba***

## CERTIFICATE OF SERVICE

I hereby certify that, on November 11, 2026, a copy of this document was electronically filed in this case with the Clerk of the United States Bankruptcy Court by using the CM/ECF system, and a copy was served on all parties who receive notice via the Court's ECF notification system.

*/s/ Nicholas K. Gurguis*
Nicholas K. Gurguis

# Exhibit 1

## Residential Management Agreement – Capital Assets

# RESIDENTIAL MANAGEMENT AGREEMENT

## ARTICLE 1. PARTIES

Daniel J. Sherman, solely in his capacities as Chapter 11 Trustee (in such capacities, the "Louis Trustee") of (i) Chapter 11 Trustee of Barcelona Best Living, LLC ("Barcelona"), (ii) Chapter 11 Trustee of 727 Lofts Best Living, LLC, and (iii) Chapter 11 Trustee of Louis Investments, LLC, Michael E. Deeba, solely in his capacity as Chapter 11 Trustee (the "YSA Trustee" and together with the Louis Trustee, the "Trustees") of YSA Investments 1, LLC, and Capital Assets, Inc., an Oklahoma corporation, hereinafter referred to as "Manager", in consideration of the mutual promises herein contained, agree as follows:

## ARTICLE 2. PROFESSIONAL MANAGEMENT STANDARDS

Section 2.01. Manager is hereby retained by each Trustee to act as his agent to manage, operate, lease, and rent the respective properties managed by such Trustee set forth on Exhibit A hereto, hereinafter referred to as the "Properties":

See Attached List

Section 2.02. Manager agrees to exert its best efforts to furnish the services of its organization and to use due diligence in managing the Properties for the period and upon the terms herein provided. Manager shall perform the services under this Agreement in a businesslike manner, with reasonable care and diligence as an experienced property manager would perform, in each case in accordance with the standard of management and leasing for comparable apartment communities (in terms of size, quality and rental rates) in the submarket in which the individual buildings comprising the Property are located. Manager shall act as a fiduciary to Trustees regarding the Properties, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Trustees' interests at all times. Trustees shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

Section 2.03. Manager will prepare and submit to Trustees for Trustees' approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least thirty forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Trustees will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified, and approved by the applicable Trustee managing the relevant Property in writing shall be deemed the "Approved Budget." The current, distressed nature of the Properties is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Properties. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform the applicable Trustee of the facts and expected variance as promptly as possible and shall

be required to obtain the applicable Trustee's prior written consent for such variance, which approval shall not be unreasonably withheld.

## ARTICLE 3. LEASING OF PROPERTY

### Obligation to Lease

Section 3.01. Manager agrees to use its best efforts, utilizing the full range of services and facilities of its organization, to obtain tenants for presently vacant space within the property, or space, which may become vacant during the term of this Agreement.

### Advertisements

Section 3.02. Manager is authorized to and agrees to promote leasing and renting by full use of available advertising devices such as newspapers, signs, media campaigns, press releases and press conferences, direct mail, and brochures in accordance with the Approved Budget. Actual hard costs for materials and travel expense relative to these devices will be included in the Proposed Budget and paid by Trustees, but all other salaries and overhead are included in the management fee. Additional outside public relations services and other promotions for resident retention and leasing may also be employed by Trustees or Manager at Trustees' expense and with Trustees' written approval.

### Leasing Standards

Section 3.03. The Manager will prepare all residential leases and parking permits (if any), and will carry out the same in its name, identified thereon as agent for the Trustees. Residential leases will be in a form approved by the applicable Trustee, but individual dwelling leases and parking permits need not be submitted for approval by the applicable Trustee, so long as such leases and permits shall be on standard twelve (12) month terms. Any month-to-month leases must be approved by the applicable Trustee in writing. Rent for units and parking permits will be determined by the Manager based on its assessment of market conditions and will be subject to review by, and written approval of, the applicable Trustee. The Manager and the Trustees agree that they are aware of the requirements of the Fair Housing Amendment Act of 1988, the Rehabilitation Act of 1974, and the Americans with Disabilities Act of 1992, and the Manager will conduct all rental activities in accordance with these acts at all times.

### Action Authorized With Respect to Leases

Section 3.04. Manager will use reasonable best efforts to secure full compliance by each tenant with the term of the tenant's lease. Manager is authorized to negotiate and execute on behalf of the Trustees, all leases, rental agreements, renewals and cancellations on the terms and conditions provided by Trustees or, in the event that Trustees fails to provide such terms and conditions, upon terms and conditions deemed reasonable by Manager. The Manager may lawfully terminate any tenancy when sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Manager is

authorized to consult with legal counsel to bring actions for eviction and to execute notices to vacate and judicial pleadings incident to such actions provided, however, that the Manager will keep the Trustees informed of such actions and will follow such instructions as the Trustees may prescribe for the conduct of any such action. Manager may discontinue any such action or proceeding, compromise or settle any such action or proceeding brought in any Trustee's name only with such Trustee's approval, but such Trustee's approval will not be required in the event that such action or proceeding is brought in Manager's name. Notwithstanding anything to the contrary herein, the engagement of legal counsel on behalf of any Trustee is subject to such Trustee's prior written consent and, to the extent required, the approval of the Bankruptcy Court; Manager may recommend counsel to any Trustee but shall not retain counsel. .

Tenant's Problems

Section 3.05. Manager shall maintain business-like relations with tenants who place service requests and shall deal with such requests in a manner which Manager deems reasonable and appropriate but in no event less than a commercially reasonable and diligent manner. Problems determined by Manager to be of a serious nature shall be reported to the applicable Trustee with appropriate recommendations. The Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified, and will keep records of the same.

## ARTICLE 4. OPERATIONS AND MAINTENANCE

Employees

Section 4.01. Manager shall have full responsibility and authority for recruiting, hiring, firing, training, and supervising adequate personnel and scheduling work for all permanent or part time services of Manager under this Agreement, it being understood that the salary, payroll costs and taxes, along with fringe benefits of these employees shall be an expense of the applicable Trustee, paid by Manager, and repaid to Manager out of the Operating Account. Manager shall, on behalf of Trustees, fully comply with all applicable laws and regulations having to do with Workers' Compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer-employee related subjects. Manager, as Trustees' representative, agrees that it has heretofore and will continue to be an equal opportunity employer.

Maintenance and Repairs

Section 4.02. (a) Manager shall cause the Properties and its appurtenances and grounds, to be maintained in good condition and repair and according to standards acceptable to Trustees, including, but not limited to, interior and exterior cleaning, painting, decorating, plumbing, heating and ventilating systems, elevators, carpentry and such other normal maintenance and repair work as may be necessary. Manager will familiarize itself with the character, location, construction layout, plan and operation of the Properties and especially of the electrical, heating, plumbing, air conditioning and ventilation systems, the elevator, and all other mechanical equipment. Manager agrees to use commercially reasonable efforts to obtain contract materials, supplies and services

at the lowest possible cost and on the terms most advantageous to the Property and, provided that there are sufficient funds therefore, to secure and credit to the Property all available discounts.

(b) In fulfillment of its duties under (a) of this section, Manager is authorized to purchase, at the expense of the Trustees, such supplies, equipment, and services as are necessary for the operation and maintenance of the property in accordance with the Approved Budget; provided, however, that no disbursement for this purpose shall be made in excess of $5,000 in respect of a Property unless specifically authorized by the applicable Trustee, except that emergency repairs involving manifest danger to life or property, or immediately necessary for the preservation and safety of the property, or for the safety of its tenants, or required to avoid suspension of any necessary service to the property, may be made by Manager irrespective to the cost limitation imposed by this section. Manager will contract with qualified independent contractors for extraordinary maintenance and repairs beyond the capability of regular maintenance employees at the Properties. Notwithstanding this authority as to emergency repairs, it is understood and agreed that Manager will, if at all possible, confer with Trustees regarding every such expenditure before proceeding. Any expenditure outside the ordinary course of business remains subject to the requirements of the Bankruptcy Code, including Section 363(b), and to any required approval of the Bankruptcy Court.

## Services and Utilities

Section 4.03. Manager is authorized to contract, on behalf of Trustees, in the property's name or the name of Trustees, for all services and utilities necessary for the efficient operation and maintenance of the Properties that are included in an Approved Budget that has been approved by the Court or the applicable secured lender, including, but not limited to, water, electricity, gas, fuel, telephone, pest control, rubbish hauling, and window cleaning; provided, however, that Manager shall not enter into any contract on behalf of any Trustee lasting more than one year from its execution without prior written approval of such Trustee or enter into any arrangement not an arm's length transaction and consistent with pricing for the market in which the applicable Property is located.

## Compliance with Governmental Regulations

Section 4.04. Manager and manager's employees shall comply with all local, state, and federal laws in the management of the Property. Manager shall use reasonable diligence to discover and correct conditions which are (a) hazardous to human health and safety, (b) detrimental to the preservation of the Property, and (c) in violation of local, state, or federal laws, including but not limited to employment discrimination, employee safety requirements, employment hiring practices, employee screening, employee drug testing, drug policies, handicap/disability construction requirements, gas pipeline safety, freon recapture, resident security and safety, lighting, self-closing and self-latching devices for swimming pool fences, and landlord-tenant relationships. Manager's right to expend money to remedy unsafe or unlawful conditions shall be subject to Trustees' approval and funding of any costs of remedying such conditions. Manager shall make recommendations to Trustees for any capital expenditures and security/safety measures which are reasonably needed in Manager's judgment.

Insurance Coverage

Section 4.05. Manager shall advise and consult with Trustees concerning all insurance.

(a) Trustees' general liability insurance. Trustees shall, at Trustees' expense, carry and maintain the insurance set forth on Exhibit B. All mortgagees of the Property shall be named as mortgagees on fire and casualty policies. Trustees shall furnish to Manager a list of names, addresses, and telephone number of all mortgagees. Certificates of such insurance shall be provided by Manager to any lender(s) having a lien in the Property.

(b) Manager's liability insurance. Manager shall, at Manager's expense, carry and maintain the insurance set forth on Exhibit B. The Manager will investigate and furnish the Trustees will full reports as to all accidents, claims, and potential claims for damage relating to the Property, and will cooperate with the Trustees' insurers in connection therewith.

(c) Workers' comp insurance - on-site personnel. Manager shall carry workers' compensation insurance for all on-site employees. Trustees shall reimburse Manager for the cost of same as an expense of the Property.

(d) Fidelity bond. Manager shall, at Manager's sole expense, carry a fidelity bond on all employees who have depository or check-writing authority for Trustees' funds in amount sufficient to protect the Trustees against misapplication of Property funds by the Manager and its employees.

(e) Notice of insurance cancellation. Manager and Trustees shall obtain a provision in all of Trustees' insurance policies that Trustees will be given at least 30-days notice prior to alteration, cancellation or material change by endorsement of the coverage, to the extent that same is lawful and obtainable. (Insurance carriers are not required by law to give more than 10 days advance notice to Trustees).

(f) Evidence of insurance. If Manager contracts for any insurance relating to the Properties, Manager shall be the custodian of any policies or certificates of insurance furnished by the carriers and shall promptly provide Trustees a copy of same upon Trustees' request. If Trustees contracts directly for any insurance relating the Property, Trustees shall promptly provide Manager with a copy of such policies, including waivers of subrogation or satisfactory evidence of same.

Taxes

Section 4.06. Manager shall, if so requested, obtain and verify bills for real estate and personal property taxes, improvements, assessments and other like charges which are or may become liens against the Project and recommend payment or appeal, whichever, in its best judgment, it may decide. Manager shall forward such bills to Trustees (or, in lieu thereof, a designated escrow agent) for payment by Trustees in such time to permit Trustees to avoid penalty for late payments or to take advantage of discounts or Manager shall make such payments to the extent cash receipts (excluding security deposits) received by Manager from the Properties are available and contained in an Approved Budget.

## ARTICLE 5.
## COLLECTION AND DISBURSEMENT OF REVENUES

Collection of Rent

Section 5.01. Manager shall use its best efforts to collect all rents and revenues from the property.

Deposit of Collections

Section 5.02. For each Property, Manager shall establish and maintain, in a bank whose bank deposits are insured by the Federal Deposit Insurance Corporation and on the list of approved depository institutions maintained by the United States Trustee, a trust account for the deposit of monies collected from the property under the control and direction of the applicable Trustee. Such account will be kept and maintained separately and apart from the accounts of the Manager and the applicable Trustee's funds will not be commingled with the Manager's funds. Manager shall have the authority to draw on this account for payments which Manager must make to discharge liabilities or obligations incurred pursuant to this Agreement, all of which payments shall be subject to the limitations of this Agreement, the Bankruptcy Code, and any orders of the Bankruptcy Court. Manager shall not draw, deduct, or set off its own compensation from this account or from any funds Trustee or estate; Manager's compensation shall be paid only as authorized by the Bankruptcy Court. Where law requires that tenant security deposits be separately maintained, a separate account (or separate interest-bearing account) for each Property will be opened by Manager. Such accounts shall be maintained in accordance with applicable law. Such accounts will be used only for maintaining tenant security deposits. Adjustments to this account to reflect actual deposit balances will be made each month.

Access to Account

Section 5.03. Through the use of signature cards, authorized representatives of the Trustees shall be permitted access to any and all funds in the bank accounts described in Section 5.02 above and funds will be disbursed or transferred only as the Trustees may from time to time direct in writing.

Authorized Expenditures

Section 5.04. From the funds collected and deposited in the trust account, Manager shall cause to be disbursed regularly and punctually, all expenses authorized in other sections of this Agreement. In addition, upon request of the Trustees or in accordance with any Approved Budget, Manager shall cause to be disbursed punctually, mortgage, interest and amortization, real estate and other taxes, water and sewer rents and all other expenses, charges, licenses, taxes or assessments of every nature with respect to the property, including Manager's compensation. Manager shall not be liable for failure to pay any expense of any Property if sufficient funds are not made available to Manager. These expenses may include but are not limited to:

(a) Cost of printed forms and supplies required for use at the Property;
(b) Actual and reasonable cost of making all repairs, decorations and alterations to the property and grounds;
(c) Legal fees of attorneys, provided such attorneys have been approved of by Trustees in advance of retention and the specific amount of such attorney's fee has been approved by Trustees in advance of payment;
(d) Cost of collection of delinquent rentals collected through a collection agency which has been approved in writing in advance by Trustees and Manager (provided the Trustees retain any actual amounts covered through such process);
(e) Cost of capital expenditures, as approved in advanced in writing by Trustees;
(f) Cost of printed checks, and bank charges for each bank account required by Trustees;
(g) Cost of office furniture and equipment at property, as approved in advanced in writing by Trustees;
(h) Cost of service contracts approved by Trustees and cost of utilities (subject to the requirements of this Agreement).
(i) Costs of forms, papers, ledgers and other supplies used in the Manager’s office for the Property so long as such costs are in accordance with the Budget;
(j) Postage and telephone and photocopies; and,
(k) Payroll processing costs.

ARTICLE 6.
FINANCIAL RECORDS AND REPORTS

Records

Section 6.01. Manager agrees to keep accurate, complete and separate records in accordance with accepted accounting standards and procedures, showing income and expenditures in connection with the operation of the property, to the end that any accounts payable, other obligations, cash, accounts receivable, and other assets pertaining thereto can be identified and the amount determined at all times. Trustees shall have the right at any reasonable time, through their respective representatives or in person, to inspect any record of Manager which, in his opinion, may verify the financial or monthly reports, including, but not limited to, all checks, bills, vouchers, statements, cash receipts, correspondence, and all other records in connection with the management of the property. Trustees shall further have the right to cause an audit to be made of all account books and records connected with the management of the Properties, at Trustees’ expense.

Monthly and Annual Statements

Section 6.02. (a) Manager shall prepare and deliver to Trustees for all Properties the following: a monthly statement showing in detail all receipts and disbursements for the previous

month, itemizing all delinquent accounts and vacant space, and an annual statement summarizing receipts and disbursements of the preceding calendar year or portion thereof.

(b) Trustees shall make every effort to maintain sufficient funds in the trust account for their respective Properties to enable Manager to pay all obligations of the property in a timely manner.

## Reports

Section 6.03. By the 15th day of the following month, the Manager will furnish Trustees with a statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, and reconciled bank statements as of the end of the previous month. Month end reports to include the following:

(a) All payroll forms and reports concerning property employees.
(b) Workers' Compensation forms.
(c) Business Tax Forms and Oklahoma Sales Tax Report.
(d) Personal property declarations.
(e) Budget/Actual Variance Report Statement of Operations
(f) Statement of Cash Flows
(g) Balance Sheet
(h) Accounts Payable Aging
(i) Detailed Rent Roll
(j) Delinquency Report
(k) Reconciled Bank Statements
(l) Disbursement Summary
(m) Such other reports as the Trustees require, including but not limited to any reports necessary for Rent Manager.

All corporate and individual income tax returns are the responsibility of Trustees, except that the records and reports furnished to the Trustees by Manager shall be sufficient for these purposes.

## Trustees' Responsibility to Furnish Documents

Section 6.04. Trustees shall promptly furnish Manager with all documents and records required for the property management of their respective Properties including, but not limited to, all leases and rental agreements, and amendments and pertinent correspondence relating thereto; the status of rental payments; mortgage loan information and payment instructions; copies of all service contracts in effect; and all applicable insurance policies which are carried by Trustees from time to time during the term of this Agreement and the endorsement called for herein.

## ARTICLE 7. COMPENSATION

Fees

Section 7.01. For services rendered pursuant to this Agreement, the applicable Trustee shall pay Manager three percent (3.00%), of the Gross Monthly Income collected from a Property, or a minimum of $6,000 for Properties below 400 units, or a minimum of $7,500 for Properties 400 units and above, whichever is greater, Manager shall invoice such fee to the applicable Trustee monthly; the fee shall not be deducted, drawn, or set off by Manager, but shall be paid only as authorized by the Bankruptcy Court. The fee may be adjusted from time to time upon prior written agreement executed by both parties and, to the extent required, the approval of the Bankruptcy Court. The Manager will be owed a "disposition fee" of $15,000 for the properties less than 400 units and $20,000 for the properties above 400 units, in each case, upon the sale of the property for duties associated with the sales and closing process, and finalizing accounting, provided that such disposition fee shall be disclosed and approved as part of the sale process and is subject to approval of the Bankruptcy Court. All compensation payable to Manager under this Agreement is subject to approval of the Bankruptcy Court

Leasing Commissions

Section 7.02. Manager shall not be entitled to any commission upon the leasing of space within the property, or upon the renewal or extension of any leases. The applicable Trustee may authorize leasing or occupancy related bonuses or other incentive programs shared by Manager's employees. Commissions paid other brokers for such services shall be deemed an operating expense of the property.

Definition of Income

Section 7.03. "Gross Monthly Income" shall mean, with respect to any Property, all receipts from the rental (not including security deposits prior to forfeiture, but including the proceeds of rent or business interruption insurance) of apartments at such Property together with all receipts otherwise derived from the operation of such Property such as, but not limited to, receipts from garage rentals, laundry, utility income, late charges, ice or other vending machine or service-type equipment. Gross Monthly Income with respect to any Property shall not include: (i) fire loss or other insurance proceeds (other than rental or business interruption insurance); (ii) security deposits and pet security deposits (except for the portion applied to past-due rent or in the event of indemnification or compensation for loss, damage or liability sustained by the applicable Trustee); (iii) prepaid rents except for that portion applied to the then-current month; (iv) interest on any funds in a bank account; (v) income or awards arising out of the sale or taking by eminent domain of the Property; (vi) tax refunds or abatements; (vii) sums collected or paid for sales, excise or use taxes; (viii) the proceeds of any financing, sale, exchange or other disposition or encumbrance of all or any part of the Property; (ix) discounts and dividends on insurance policies; (x) delinquent rents (until paid); (xi) refund of overpayments; (xii) the applicable Trustee's capital contributions or working capital advances (including any interest advanced thereon), or (xiii) utility charges or utility reimbursements.

Limitations on Compensation

Section 7.04. Except as otherwise herein expressly provided, Manager shall not collect or charge any undisclosed fee, rebate, discount, or commission relating to the operation of and purchasing of supplies and services for any Property without crediting same to the account of the applicable Trustee.

ARTICLE 8. CONTRACT TERMS

Base Period

Section 8.01. Subject to Section 8.16, this Agreement shall become effective as of November ____, 2026 and shall continue until midnight on November 31, 2027, unless earlier terminated in accordance with this Agreement.

Renewals

Section 8.02. Unless written notice from a Trustee to Manager or Manager to a Trustee is received thirty (30) days before the expiration of this Agreement, this Agreement shall be renewed for additional twelve (12) month periods and the same notice and renewal terms shall apply to each renewed period.

Early Termination

Section 8.03. Manager may elect to cancel and terminate this Agreement with respect to either or both Trustees for any reason whatsoever by giving written notice to such Trustee not less than thirty (30) days prior to the effective termination date. Each Trustee may elect to cancel and terminate this Agreement with respect to Manager for any or all of the Properties managed by such Trustee for any reason whatsoever by giving written notice to Manager not less than thirty (30) days prior to the effective termination date.

Each Trustee shall have the right to terminate this Agreement with respect to any or all of the Properties managed by such Trustee if the Manager shall breach any term, covenant or condition of this Agreement (other than related to the payment of money due by Trustees hereunder) and does not cure such breach within ten (10) days after written notice from such Trustee specifying the breach; provided, however, that if such breach cannot reasonably be cured within such ten (10) day period, the Manager shall have such additional time as may reasonably be necessary to cure such breach as long as the Manager begins the cure within such ten (10) day period and thereafter diligently continues such cure to completion. Each Trustee shall also have the right to terminate this Agreement due to the failure by the Manager to timely pay any and all amounts required to be paid to such Trustee here under within five (5) business days after such amounts become due and payable.

The Manager shall have the right to terminate this Agreement with respect to a Trustee if such Trustee shall breach any material term, covenant or condition of this Agreement and does not cure such breach (i) within ten (10) business days after written notice from the Manager in the event such breach is the failure of such Trustee to pay any undisputed amount due to the Manager under this Agreement or to remit funds to the Manager to cover any deficiency required hereunder, (ii) within thirty (30 days after written notice from the Manager specifying the breach in the event of any other breach hereunder; provided, however, that if a breach specified under this clause (ii) cannot reasonably be cured within such ten (10) day period, such Trustee shall have such additional time as may reasonably be necessary to cure such breach as long as such Trustee begins the cure within such ten (10) day period and thereafter diligently continues such cure to completion.

Termination Upon Sale

Section 8.04. Each Trustee shall notify Manager of any anticipated transfer of title of any Property managed by such Trustee, and upon such transfer of title, this Agreement shall automatically terminate with respect to Property. This Agreement may not be transferred or assigned by any party except with the prior written consent of the other parties. Nothing in this Agreement shall limit, restrict, or condition the Trustees' rights under the Bankruptcy Code, including the right to sell the Properties free and clear under Section 363 and to assume, assume and assign, or reject this Agreement under Section 365

Consequences of Termination

Section 8.05. Upon termination of this Agreement, it is agreed:

(a) That copies of all of the records in the possession of Manager pertaining to the operation of the Properties, together with any other property of the applicable Trustee in Manager's possession, shall be immediately delivered to applicable Trustee in an orderly and timely manner.

(b) That Manager's right to compensation shall immediately cease, except for any amounts payable hereunder before the date of termination and any out-of-pocket costs involved in performing the acts upon termination as required by this Agreement, which shall be paid by the applicable Trustee upon court approval thereof.

(c) That the limited agency created hereby shall immediately cease, and Manager shall have no further right or obligation to act for the applicable Trustee.

(d) Upon termination, the Manager shall (i) deliver to the applicable Trustee a final accounting reflecting the balance of the deposits, income and expenses of the applicable Property as of the date of the termination of this Agreement, together with all funds generated from the Property which Manager has in its possession or has deposited in a bank account for the benefit of the applicable Trustee (including, without limitation, any tenant security deposits), (ii) reasonably cooperate with the applicable Trustee in the transition of the management of the applicable Property to the applicable Trustee or another management company as determined by such Trustee, (iii) deliver to the applicable Trustee all materials and supplies, keys and documents, and

such other accountings, papers and records pertaining to this Agreement, as such Trustee reasonably requests; (d) to the extent not in applicable Trustee's name, assign all existing contracts relating to the operations and maintenance of the applicable Property to such Trustee; and (e) at its sole cost vacate any occupied space on the applicable Property.

Indemnification

Section 8.06. [Reserved.]

Notice

Section 8.07. All notices required under this Agreement shall be in writing delivered by registered or certified mail, postage prepaid, return receipt requested, or by personal delivery. Notices shall be deemed communicated forty-eight (48) hours after deposit in the United States mail, or upon personal delivery, as the case may be. The places to which notices shall be addressed to each party appear after the signatures below; provided, however, that each party may change its address by notice in accordance with this section.

Miscellaneous

Section 8.08. This Agreement may not be amended, altered, or modified except by a writing signed by the party against whom such amendment, alteration, or modification is to be enforced.

Section 8.09. This Agreement is intended to be interpreted in accordance with the laws of the State of Oklahoma, and any action based upon this Agreement, or the respective rights or obligations of the parties hereunder, shall be brought in the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"). Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy Court with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without limitation, as an inconvenient forum.

Section 8.10. Captions are for convenience only and shall not be considered an interpretation of any of the provisions of this Agreement.

Section 8.11. Should it be necessary for either party to institute legal action to enforce such party's rights hereunder, the prevailing party in such action shall be entitled to recover its reasonable attorney's fees and actual, out-of-pocket costs from the losing party in addition to any other recovery to which such party may be entitled.

Section 8.12. In the event of a casualty loss to a Property, and the applicable Trustee managing such Property requests in writing Manager to supervise the resulting repair and rehabilitation, Manager shall be entitled to a fee equal to five percent (5%) of the greater of the cost of repairs or the amount of the casualty loss proceeds, upon the applicable Trustee's prior approval. Such casualty loss is defined as a loss in excess of one thousand dollars ($1,000).

Manager, acting in the capacity of supervisor and upon the applicable Trustee's prior written approval, shall also be entitled to a five percent (5%) fee for special rehabilitation or capital improvement projects where the cost of the project exceeds ten thousand dollars ($10,000) per occurrence.

Section 8.13. The applicable Trustee agrees to reimburse Manager for travel expenses incurred by property management and marketing personnel supervising the property operation so long as such costs are in accordance with the Budget. The monthly travel allowance for this purpose will not exceed actual costs.

Section 8.14. Nothing contained herein shall be deemed to render the Manager and the Trustees as joint ventures or partners of each other and neither shall have the power to bind or obligate the other party, except in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Manager shall have right to undertake the day-to-day management and operation of the Properties, subject to the terms and conditions set forth in this Agreement.

Section 8.15 This agreement together with all exhibits attached hereto and made a part hereof, supersedes and takes the place of any and all previous management agreements entered into between the parties hereto.

Section 8.16 The effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. This Agreement, and Manager's retention, employment, and compensation hereunder, are subject to the Bankruptcy Code and all orders entered in the bankruptcy cases of the Trustees' respective estates. In the event of any conflict between this Agreement and the Bankruptcy Code or any order of the Bankruptcy Court (including any order granting employment of Manager), the Bankruptcy Code and such orders shall control. Nothing in this Agreement shall be construed to limit or waive any right, power, or duty of any Trustee under the Bankruptcy Code.

[SIGNATURES ON THE FOLLOWING PAGE]

EXECUTED on this the ____th day of November, 2026.

MANAGER:

CAPITAL ASSETS, INC.
Greg Wright

BY: ______________________________
President

ADDRESS:
8002 S. 101st E. Ave.
TULSA, OK 74133

YSA Trustee:

Michael E. Deeba, solely in his capacity as Chapter 11 Trustee of YSA Investments 1, LLC

____________________________________
Chapter 11 Trustee

ADDRESS:

[_____]

Louis Trustee

Daniel J. Sherman, solely in his capacity as Chapter 11 Trustee of each of
727 Lofts Best Living, LLC, Barcelona Best Living, LLC, and Louis Investments, LLC

___________________________________

ADDRESS:
509 N. Montclair Avenue
Dallas, Texas 75208

**EXHIBIT A**

Properties Included in Management Agreement

| No. | Property | Property address | Property Owner | Applicable Trustee |
|---|---|---|---|---|
| 1. | Barcelona Apartments | 5160 S Yale Ave, Tulsa, OK 74135 | Barcelona Best Living LLC | Louis Trustee |
| 2. | 727 Lofts | 727 E Main Pl, Jenks, OK 74037 | 727 Lofts Best Living LLC | Louis Trustee |
| 3. | The Capitol on 28th | 215 NE 28th St, Oklahoma City, OK 73105 | TRDWind Capitol LLC | YSA Trustee |
| 4. | 23 East | 11321 E 23rd St, Tulsa, OK 74129 | A-V 23 East Owner LLC | YSA Trustee |
| 5. | Lakeside Place | 2186 S 99th E Ave, Tulsa, OK 74129 | Lakeside Best Living LLC | YSA Trustee |
| 6. | Lexington Commons (Bartlesville) | 5530 Colony Way, Bartlesville, OK 74006 | Bartlesville Best Living LLC | YSA Trustee |
| 7. | One Eton Square | 8111 E 60th St, Tulsa, OK 74145 | One Eton Square LLC<br>One Eton TIC 1 LLC | YSA Trustee |
| 8. | Riverpark at Kensington | 7803 S Wheeling Ave, Tulsa, OK 74136 | Riverpark Best Living LLC | YSA Trustee |
| 9. | Shoreline | 9601 E 21st Pl, Tulsa, OK 74129 | Shoreline's Best Living LLC | YSA Trustee |
| 10. | Thrive Jenks | 204 S Riverfront Dr, Jenks, OK 74037 | Jenk's Best Living LLC | YSA Trustee |
| 11. | Villas at Midtown | 2001 E Skelly Dr, Tulsa, OK 74105 | Villas at Midtown Best Living LLC | YSA Trustee |

# EXHIBIT B

***Trustees' Insurance Requirements***

Trustees shall maintain, at its expense, during the term of this Agreement, the following insurance policies and coverages:

"All-risk" or "special perils" commercial property insurance on replacement cost terms for the full value of the structure and improvements, including builder's risk insurance (when applicable) and demolition, debris removal, loss adjustment expense, loss of rental income, business interruption and extra expense coverage to cover physical loss or damage to the Property from all perils.

Commercial general liability insurance, on an occurrence (not claims-made) form, with limits of at least $5,000,000 each occurrence with respect to the Properties and covering third-party personal injury, property damage, and bodily injury (including death). Such limits may be achieved through the purchase of several policies including an excess or umbrella insurance policy. Trustees shall ensure that the Manager is named as an additional insured by definition or endorsement.

Boiler and machinery insurance covering the building, fixtures and equipment located at the Properties for mechanical failure or explosion of pipes or boilers (such insurance to include loss of use coverage/business interruption due to such failures).

# Exhibit 2

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Remington Ranch Apartments

**AMENDED AND RESTATED**
**MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT**

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacities as chapter 11 trustee (in such capacities, "Louis Trustee") of each of Louis Investments, LLC ("Louis") and Remington Ranch's Best Living, LLC ("Remington Ranch"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On June 26, 2026, Remington Ranch filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-32804.

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12842.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

On October 19, 2026, the Manager and Daniel J. Sherman, as chapter 11 trustee for Lofts at NP entered into that certain Multifamily Property Management Agreement (the "Prior Management Agreement").

YSA, Louis, and Remington Ranch assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Remington Ranch Apartments, located at 1815 N Boomer Road, Stillwater, Oklahoma 74075 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. <u>Exclusive Agency</u>. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and

management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a “Lease”) on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner’s approval a recommended operating budget (the “Proposed Budget”) (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the “Approved Budget.”

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the Louis Trustee (after consultation with the YSA Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the Louis Trustee (after consultation with the YSA Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the Louis Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by Louis Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by Louis Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the Louis Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement, except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The Louis Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the Louis Trustee and the Louis Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, Louis Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of Louis Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by

any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager’s office or on-site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for

payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms. Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the Louis Trustee, with all notices to be addressed to the Louis Trustee, in care of Manager, at Manager's address. All utility deposits will be in the Louis Trustee's name in care of Manager, and all utility deposit refunds will be remitted directly to the Louis Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the Louis Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision,

compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager’s concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The Louis Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the Louis Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the Louis Trustee, Manager will obtain such insurance on the Louis Trustee's behalf, subject to the Louis Trustee's approval thereof, but at the Louis Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the Louis Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the Louis Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the Louis Trustee or Manager will include Manager or the Louis Trustee, as applicable, as an additional insured Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall

furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the Louis Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4.0%** of "Gross Rental Receipts" or a minimum of **$7,000**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest

therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager's malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager's breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Remington Ranch's Best Living, LLC
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough

Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 Robinson, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, and no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use

reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings:

"Anti-Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all

administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

m. Amendment and Restatement. This parties hereto agree that upon effectiveness of this Agreement, the terms and provisions of the Prior Management Agreement shall be and hereby are amended and restated in their entirety by the terms and conditions of this Agreement and the terms and provisions of the Prior Management Agreement shall be superseded by this Agreement.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee for Remington Ranch's Best Living, LLC and Louis Investments, LLC**

By:______________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:______________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:______________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 3

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Village Creek Apartments

**AMENDED AND RESTATED**
**MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT**

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacities as chapter 11 trustee (in such capacities, "Louis Trustee") of each of Louis Investments, LLC ("Louis") and A-V Village Creek Owner, LLC ("Village Creek"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On July 2, 2026, Village Creek filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-32920.

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12844.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

On October 19, 2026, the Manager and Daniel J. Sherman, as chapter 11 trustee for Village Creek entered into that certain Multifamily Property Management Agreement (the "Prior Management Agreement").

YSA, Louis, and Village Creek assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Village Creek at 67th Apartments, located at 6630 S Zunis Ave, Tulsa, Oklahoma 74136 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope

or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the Louis Trustee (after consultation with the YSA Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the Louis Trustee (after consultation with the YSA Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the Louis Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by Louis Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by Louis Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the Louis Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement, except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The Louis Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the Louis Trustee and the Louis Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, Louis Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of Louis Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary

compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on-site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the

monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms. Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the Louis Trustee, with all notices to be addressed to the Louis Trustee, in care of Manager, at Manager's address. All utility deposits will be in the Louis Trustee's name in care of Manager, and all utility deposit refunds will be remitted directly to the Louis Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the Louis Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for

purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager’s concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The Louis Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the Louis Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the Louis Trustee, Manager will obtain such insurance on the Louis Trustee's behalf, subject to the Louis Trustee's approval thereof, but at the Louis Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the Louis Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the Louis Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the Louis Trustee or Manager will include Manager or the Louis Trustee, as applicable, as an additional insured Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material

change in coverage under Manager's policies. In cases where the Louis Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of 4.0% of "Gross Rental Receipts" or a minimum of $7,500. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager's malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager's breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. <u>Assignment</u>. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. <u>Notices</u>. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of A-V Village Creek Owner, LLC
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba

Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 Robinson, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, and no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL

BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings:

"Anti-Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions,

including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

m. Amendment and Restatement. This parties hereto agree that upon effectiveness of this Agreement, the terms and provisions of the Prior Management Agreement shall be and hereby are amended and restated in their entirety by the terms and conditions of this Agreement and the terms and provisions of the Prior Management Agreement shall be superseded by this Agreement.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee for A-V Village Creek Owner, LLC and Louis Investments, LLC**

By:____________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:____________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:____________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 4

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Lofts at North Penn Apartments

**AMENDED AND RESTATED**
**MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT**

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacities as chapter 11 trustee (in such capacities, "Louis Trustee") of each of Louis Investments, LLC ("Louis") and Lofts at North Penn Best Living, LLC ("Lofts at NP"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On July 2, 2026, the Lofts at NP filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-32920.

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12844.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

On October 19, 2026, the Manager and Daniel J. Sherman, as chapter 11 trustee for Lofts at NP entered into that certain Multifamily Property Management Agreement (the "Prior Management Agreement").

YSA, Louis, and the Lofts at NP assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Lofts at North Penn Apartments, located at 15501 N. Pennsylvania Avenue, Edmond, Oklahoma 73013 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the

management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform

Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the Louis Trustee (after consultation with the YSA Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the Louis Trustee (after consultation with the YSA Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the Louis Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by Louis Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by Louis Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the Louis Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement, except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner’s prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3)

protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The Louis Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the Louis Trustee and the Louis Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, Louis Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of Louis Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager’s office or on-site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue

items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms. Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the Louis Trustee, with all notices to be addressed to the Louis Trustee, in care of Manager, at Manager's address. All utility deposits will be in the Louis Trustee's name in care of Manager, and all utility deposit refunds will be remitted directly to the Louis Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the Louis Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of

such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The Louis Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the Louis Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the Louis Trustee, Manager will obtain such insurance on the Louis Trustee's behalf, subject to the Louis Trustee's approval thereof, but at the Louis Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the Louis Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the Louis Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the Louis Trustee or Manager will include Manager or the Louis Trustee, as applicable, as an additional insured Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and

will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the Louis Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$5,000**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption

insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager's malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager's breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. <u>Assignment</u>. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. <u>Notices</u>. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Lofts at North Penn Best Living, LLC
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200

Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 Robinson, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, and no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each (“Laws”). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by

Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings:

"Anti-Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially

Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

m. Amendment and Restatement. This parties hereto agree that upon effectiveness of this Agreement, the terms and provisions of the Prior Management Agreement shall be and hereby are amended and restated in their entirety by the terms and conditions of this Agreement and the terms and provisions of the Prior Management Agreement shall be superseded by this Agreement.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacities as Chapter 11 Trustee for The Lofts at North Penn Best Living, LLC and Louis Investments, LLC**

By:________________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:________________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:________________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 5

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Woodscape Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Woodscape Apartments, located at 4200 North Meridian Avenue, Oklahoma City, Oklahoma 73112 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. <u>Exclusive Agency</u>. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$10,000**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;

b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or

c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:________________________________________

Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:________________________________________

Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:________________________________________

Jim Parrack, Chief Operating Officer

# Exhibit 6

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Capitol on 28th Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Capitol on 28th Apartments, located at 215 NE 28th Street, Oklahoma City, Oklahoma 73013 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for the which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$5,000**. “Gross Rental Receipts” as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, “Gross Receipts” shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager’s Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:______________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:______________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:______________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 7

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Tuscany Village Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA"), and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Tuscany Village Apartments**,** located at 6900 London Way, Oklahoma City, OK 73132 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$5,000**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:______________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:______________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:______________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 8

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Putnam Green Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA") and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Putnam Green Apartments, located at 7525 Knight Lake Drive, Oklahoma City, OK 73132 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$5,000**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. <u>Assignment</u>. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. <u>Notices</u>. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws. Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;

b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or

c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:________________________________________

Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:________________________________________

Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:________________________________________

Jim Parrack, Chief Operating Officer

# Exhibit 9

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Bryan Hill Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA") and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Bryan Hill Apartments, located at 7204 NW 36th St, Bethany, OK 73008 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$3,500**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;

b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or

c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:____________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:____________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:____________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 10

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Springdale Village Apartments

**MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT**

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA") and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Springdale Village Apartments, located at 4330 S. Barnes Ave, Oklahoma City, OK 73119 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee's name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant's obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager's policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor's or subcontractor's expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager's own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4.5%** of "Gross Rental Receipts" or a minimum of **$2,500**. "Gross Rental Receipts" as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, "Gross Receipts" shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager's Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;
b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or
c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:______________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:______________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:______________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 11

## Multifamily Property Management Agreement – PEC Multifamily, LLC
## Summer Oaks Apartments

# MULTIFAMILY PROPERTY MANAGEMENT AGREEMENT

This Agreement (the "Agreement") is made effective as of November 13, 2026, by and between Daniel J. Sherman, solely in his capacity as chapter 11 trustee ("Louis Trustee") of Louis Investments, LLC ("Louis"), and Michael E. Deeba, solely in his capacity as chapter 11 trustee ("YSA Trustee" , and together with the Louis Trustee, the "Owner") of YSA Investments 1, LLC ("YSA") and PEC Multifamily, LLC ("Manager").

On July 10, 2026, Louis filed a voluntary petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Texas Bankruptcy Court"), commencing Case No. 26-33110 (the "Texas Bankruptcy Case").

On August 17, 2026, the Texas Bankruptcy Court issued its *sua sponte* order transferring the Texas Bankruptcy Case to the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Bankruptcy Court"), Case No. 26-12851.

On July 28, 2026, YSA filed a voluntary petition under the Bankruptcy Code in the United Stated Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), Case No. 26-11178 (the "Delaware Bankruptcy Case").

On August 14, 2026, the Delaware Bankruptcy Court issued an order transferring the Delaware Bankruptcy Case to the Bankruptcy Court, Case No. 26-12806.

YSA and Louis assert each assert some direct or indirect ownership and/or management rights to the apartment project known as the Summer Oaks Apartments, located at 5770 NW 16th St, Oklahoma City, OK 73127 (the "Property").

Manager is engaged in the business of real estate management and leasing.

Manager desires to act as leasing agent and manager for the Property, and Owner desires to engage Manager in these capacities.

NOW, THEREFORE, OWNER AND MANAGER AGREE AS FOLLOWS:

1. Exclusive Agency. Subject to the terms and conditions of this Agreement, Owner hereby appoints Manager as the exclusive agent for the leasing and management of the Property and Manager accepts such appointment. As manager of the Property, Manager shall be responsible for all marketing, leasing, management of Owner's relationship with tenants, and the management, operation and maintenance of the Property. Owner shall set the basic leasing and management guidelines for Manager, subject to reasonable acceptance by Manager. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall act as a fiduciary to Owner regarding the Property, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Manager shall deal at arm's length with all third parties and serve Owner's interests at all times. Owner shall make available to Manager sufficient sums to pay the costs thereof consistent with an Approved Budget (as defined below) and this Agreement.

2. Duties and Responsibilities.

a. Property Information and Equipment. Promptly upon execution of this Agreement, Owner will furnish Manager with all information reasonably available to Owner and useful in management of the Property, including but not limited to current tenant rent rolls, copies of all current leases and leasing forms, use restrictions applicable to all or any part of the Property, complete plans and specifications of all improvements on the Property, all operating

and maintenance contracts and warranties for the Property and any equipment located on the Property or used in management of the Property, operating manuals for all building equipment, and maintenance history information for the Property and all equipment. Owner shall deliver to Manager all spare parts, tools, and equipment held by Owner and necessary or useful to the maintenance of the Property. During the term of this Agreement, Owner shall promptly provide Manager with all additional information, parts, tools, and equipment that may become available to Owner.

b. Marketing and Leasing. Manager shall (i) subject to any limitations in the Approved Budget, advertise and promote the Property as Manager may deem appropriate, or as requested by Owner (ii) have exclusive responsibility for leasing available space in the Property in accordance with the leasing guidelines established by Owner from time to time, (ii) independently solicit prospective tenants for the Property and otherwise endeavor at all times to keep the Property fully leased, (iii) investigate prospective tenants, (iv) prepare all leases, modifications and amendments (each, a "Lease") on standard forms furnished by Owner, and (v) manage all Leases and other documentation related to leasing of apartment units to prospective tenants.

c. Consultation. Manager shall be available to advise and consult with Owner, its agents, representatives, architects, contractors and others as reasonably requested by Owner on (i) current and proposed standard provisions of lease and lease modification forms, (ii) marketing of the Property, (iii) anticipated tenant requirements, and (iv) the nature and quality of standard amenities to be furnished to tenants.

d. Budget. Manager will prepare and submit to Owner for Owner's approval a recommended operating budget (the "Proposed Budget") (i) within thirty (30) days following the effective date of this Agreement, for the remaining portion of the calendar year beginning with the effective date of this Agreement, and (ii) at least forty-five (45) days before the beginning of each subsequent year beginning during the term of this Agreement. Owner will promptly inform Manager of any changes made to the proposed budget. The recommended budget, as so modified and approved by Owner in writing shall be deemed the "Approved Budget."

The current, distressed nature of the Property is expressly acknowledged by the parties to this Agreement. It is acknowledged and understood that Manager will likely encounter variances to the budget in its attempt to stabilize, maintain and manage the Property. To the extent there is a significant variance (exceeding 5%) in expected expenditures for any single category, as compared to what was included in the Approved Budget, Manager will inform Owner of the facts and expected variance as promptly as possible and shall be required to obtain Owner's prior written consent for such variance, which approval shall not be unreasonably withheld.

e. Management Account. Manager will establish an account for the Property (the "Management Account") under the direction and control of the YSA Trustee (after consultation with the Louis Trustee), separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee (after consultation with the Louis Trustee) and whose deposits are insured by an agency of the United States government. Subject to Section 2.f., all monies collected from, or in connection with, the Property shall be deposited in the Management Account. Manager's authority to draw against such accounts may be terminated at any time by Owner with reasonable notice to Manager. If required by Owner at any time, all Manager's signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

f. Security Deposit Account. Manager will establish an account for the Property (the "Security Deposits Account") that will be carried in the YSA Trustee’s name, separate from all other accounts and funds, with a bank or other financial institution which is approved by the YSA Trustee and whose deposits are insured by an agency of the United States government. All tenant security deposits will be deposited to the Security Deposit Account and maintained in such account. Manager will maintain books and records accurately reflecting receipt and disbursement of from the Security Deposits Account, by tenant. Funds held in the Security Deposit Account under each tenant shall be disbursed only for the purpose of satisfying such tenant’s obligations secured by such deposit, with the balance to be paid to such tenant upon satisfaction of all such obligations. If required by the YSA Trustee at any time, all Manager’s signatories on all bank accounts established by Manager hereunder shall be bonded and/or covered by employee dishonesty insurance required to be maintained under this Agreement.

g. Collection of Rents. Manager shall collect all rents, charges, and other amounts payable with respect to the operation of the Property and promptly deposit such amounts into the Management Account. To the extent tenant Leases so require, Manager shall timely make or verify any calculations that are required to determine the amount of rent due from tenants and, where required, will give timely notice thereof to each tenant pursuant to the terms of such tenant's Lease.

h. Maintenance and Repairs. Subject to the availability of funds as required by this Agreement, in accordance with the Approved Budget, and as directed by the YSA Trustee (after consultation with the Louis Trustee) from time to time, Manager shall provide for the maintenance and repair of the Property in accordance with the following:

i. Manager will make periodic inspections of the Property to determine necessary and appropriate repairs and maintenance requirements.

ii. Manager shall contract for, schedule, carry out and/or supervise all routine and non routine repairs, maintenance and preventive maintenance to the Property, including painting and improvements to prepare vacated apartments for occupancy, and capital repairs and improvements such as the maintenance and repair of the plumbing, electrical, HVAC systems, and landscaping.

iii. Manager shall contract for appropriate security services for the Property and improvements located thereon (including exterior areas).

iv. Manager shall be authorized to purchase, on behalf of Owner, all supplies, tools and equipment incidental to the performance of Manager's obligations under this Agreement,

except to the extent that such supplies, tools and equipment are provided by another independent contractor performing services on the Property in accordance herewith.

v. Manager will obtain the prior approval of Owner for any expenditure which exceeds $2,500 in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Property, except for (i) expenses within the limits of the Approved Budget, (ii) emergency repairs involving manifest danger to persons or Property, or (iii) expenses required to avoid suspension of any necessary service to the Property. In either of the last two circumstances Manager will inform Owner of the facts as promptly as possible. Notwithstanding the foregoing, for expenses of $2,500 or less, Manager shall be required to obtain Owner's prior written consent for such expenses if the aggregate of such expenses in any twelve (12) month period exceed (or will exceed upon payment of any such expense) five percent (5%) of the total amount allocated to maintenance and repairs in the Approved Budget.

i. Utilities and Services. In accordance with the Approved Budget, Manager will enter into such contracts as will be necessary to obtain water, electricity, gas, fuel oil, sewage and trash disposal, pest extermination, decorating and maintenance of the grounds and landscaping, and other services and supplies necessary to the operation of the Property.

j. Payment of Property Expenses.

i. To the extent funds held in the Management Account are sufficient, Manager shall, without further consent of the Owner, promptly pay, as and when due and payable all charges incurred directly or indirectly in the operation and management of the Property, to the extent set forth in the Approved Budget, for property taxes and assessments, repairs and maintenance, insurance, utilities and services, other expenses incurred in the ordinary course of managing and operating the Property, management fees, reimbursement payable to Manager, and, if so requested by Owner, payments for debt service on mortgages secured by the Property. Manager may, without prior approval by Owner, pay for emergency repairs not included in the Approved Budget which Manager determines in the exercise of its professional judgment to be necessary to (1) prevent additional damage or a greater total expenditure, (2) protect the Property from damage, or maintain services or conditions on the Property, or (3) protect the safety of occupants of or any other persons on the Property or their belongings; provided that Manager promptly notifies Owner of any such repairs.

ii. In no event will Manager be required to use its own funds to pay any expenses of the Property.

iii. The YSA Trustee shall, from time to time, deposit such other amounts into the Management Account as reasonably necessary to ensure that the balance of the Management Account is not less than **$5,000.00** at any given time (the "Minimum Balance"). In the event that the balance in the Management Account is at any time less than the Minimum Balance or insufficient to pay disbursements due and payable hereunder, Manager will inform the YSA Trustee and the YSA Trustee will then remit to Manager sufficient funds to cover the deficiency within five (5) days. If funds in the Management Account are insufficient to pay all such expenses, and if Owner fails to replenish the Management Account as required by this Agreement, the YSA Trustee shall pay all such expenses, or reimburse Manager if Manager pays such expenses from its own funds for the account of the YSA Trustee.

iv. Non-reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursed by the Owner: (a) cost of insurance purchased by Manager for its own account; (b) Manager's cost of overhead, salaries and other items except as expressly set forth in this Agreement; (c) costs expressly specified in this Agreement to be borne by Manager; (d) cost of gross salary and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's off-site personnel not identified in an Approved Budget; (e) general accounting and reporting services which are within the reasonable scope of Manager's responsibility to Owner; (f) cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Property; (g) cost of electronic data processing equipment, or any pro rata charge thereon, located at Manager's office off the Property or data processing provided by computer service companies; (h) political or charitable contributions, except to the extent made after prior written approval by Owner; (i) advances made to employees and cost of travel by Manager's employees or agents to and from the Property; (j) losses arising from gross negligence, willful misconduct, or fraud on the part of Manager or Manager's employees, agents, or representatives; (k) cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; (l) training and related travel expenses unless specifically approved by Owner in the applicable Approved Budget or in writing; (m) employment fees for non-on-site employees, including advertisement costs, unless specifically approved by Owner in the applicable Approved Budget or in writing; (n) all help desk and phone support costs for software to the extent not included in the Approved Budget; and (o) all employee parties, events, travel, and recognition related costs to the extent not included in the Approved Budget. Under no circumstances shall such costs and expenses constitute costs and expenses of the Property.

k. Tenant Matters. Manager will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified. Manager will perform or cause to be performed services or other work which Owner is obligated to perform under any Lease.

l. Enforcement of Leases and Contracts. Manager will use commercially reasonable efforts to secure full compliance by each tenant in accordance with the terms of its Lease and by any third-party vendor or contractor in accordance with the terms of its contract. Voluntary compliance will be emphasized. Nevertheless, Manager may lawfully terminate any tenancy when, in Manager's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the tenant's Lease. Manager shall, without prior approval of Owner, sign and serve notices of default, abandonment, to cure or quit, or other similar notices to enforce Leases. Manager shall institute and prosecute actions (i) to collect rents and other sums due to Owner and/or to evict tenants, (ii) to obtain an injunction against action(s) by tenants of the Property, (iii) to enforce any lease provisions which Manager and Owner consider necessary for the benefit of Owner and/or the Property, (iv) to terminate a lease, (v) to enforce the terms of any contract between Owner and any third-party vendor providing for services to or with respect to the Property, and (vi) to settle, compromise and release third parties from actions or suits or reinstitute tenancies. Manager shall select legal counsel approved by Owner, and supervise such counsel and such legal action and report to Owner the status of such matters on a regular periodic basis. Owner retains the right to control all legal action affecting the Property. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Management Account as project expenses; provided that Owner has approved the same in writing (or such

expenses are within the limits of the Approved Budget).

m. Reports. Manager will have the following responsibilities with respect to records and reports:

i. Manager will establish and maintain a system of records, books and accounts for the Property in a manner satisfactory to Owner. All records, books and accounts will be subject to examination at reasonable hours by any authorized representative of Owner.

ii. With respect to each fiscal year ending during the term of this Agreement, Manager will have an annual financial report prepared. The report will be certified by the Manager and will be submitted to Owner within ninety (90) days following the end of the fiscal year.

iii. Manager shall furnish reports of all financial transactions occurring from the first day of the month to the last day of the month. Manager will provide these reports to Owner no later than fifteen (15) days after the end of each month and will show all collections, delinquencies, uncollectible items, vacancies, and other matters pertaining to the management, operations, and maintenance of the Property during the month.

iv. Manager will furnish such additional information as may be reasonably requested by Owner from time to time with respect to the operation and physical and financial condition of the Property.

v. As additional support to the monthly financial statement, unless otherwise directed by the Owner, Manager shall maintain and make available at Manager's office or on- site, copies of the following: (a) all bank statements, bank deposit slips, bank debit and credit memos, canceled checks, and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) detailed trial balance for receivables and payables and billed and unbilled revenue items; (d) rent roll of tenants; (e) paid invoices (or copies thereof); (f) summaries of adjusting journal entries as part of the annual accounting process; (g) supporting documentation for payroll, payroll taxes and employee benefits; (h) appropriate details of accrued expenses and property records; and (i) market study of competition (quarterly only). In addition, Manager shall deliver to the Owner with the monthly financial statement copies of the documents described in (a) (statements and reconciliations only), (b), (c), (d), and (h) above as well as monthly balance sheet and the general ledger detail via excel file.

vi. The Owner and its representatives, at the Owner's expense, may examine all books, records and files maintained for the Owner by Manager. The Owner may perform any audit or investigations relating to Manager's activities at any office of Manager if such audit or investigation relates to Manager's activities for the Owner. Should Owner discover defects in internal control or errors in record keeping, Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform the Owner in writing of the action taken to correct any audit discrepancies.

n. Vendor Contracts.

i. Manager will use reasonable efforts to obtain favorable terms and conditions for all vendor contracts, including but not limited to price and performance terms.

Manager is authorized but not required to solicit bids, either formal or informal, for those items which can be obtained from more than one source. Manager will secure and credit to Owner all discounts, rebates or commissions reasonably obtainable with respect to purchases, service contracts and all other transactions on Owner's behalf. Manager shall oversee and monitor the work under all vendor contracts and enforce such contracts on behalf of Owner. Manager shall not enter into any vendor contract with an affiliated party, without the prior written consent of Owner.

ii. All vendor contracts will be in the name of the YSA Trustee, with all notices to be addressed to the YSA Trustee, in care of Manager, at Manager's address. All utility deposits will be in Owner's name in care of Manager, and all utility deposit refunds will be remitted directly to the YSA Trustee's operating account for the Property. Each such vendor contract shall (a) be assignable to the transferee of the YSA Trustee upon vendor approval and (b) be terminable on not more than thirty (30) days' notice except for those contracts approved in an Approved Budget such as trash removal or copier rental for which the contracts are not cancellable prior to the expiration of the initial or renewal term.

o. Property Representative and Other Personnel. In accordance with the Approved Budget, Manager will employ and supervise, as Manager's employees and contractors, a representative with primary responsibility for the Property, and such additional qualified personnel as may be necessary to provide the services required under all Leases, the management services for proper physical operation and maintenance of the Property, and secretarial and administrative services, including accounting, lease administration and tenant relations. Manager shall determine how the work is to be undertaken; provided, that all work shall be to Owner's reasonable satisfaction and subject to Owner's right to require Manager to terminate, discharge or reassign any employee or contractor for substandard performance. All expenses of such personnel, including Manager's overhead expense, shall be paid by Owner in accordance with the Approved Budget. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees, including, but not limited to, the immigration status of each employee, shall be the responsibility of Manager. All personnel responsible for providing services under the terms of this Agreement shall be direct employees of Manager, and Manager shall, for purposes of such employment relationship, be acting as an independent contractor and not as an agent or employee of Owner. All salaries and benefits and positions of employees who perform work in connection with the Property shall be consistent with the Approved Budget. Manager shall fully comply with all laws having to do with Manager's employees, including, but not limited to, those regarding antidiscrimination, workers' compensation, employer's liability insurance, immigration, social security, unemployment insurance, hours of labor, wages, working conditions, and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements), and Manager shall not do any act, nor permit any act to be done that would constitute a violation of any such laws. Manager represents that it is and will continue to be an equal opportunity employer, and shall advertise as such, and that Manager shall not engage in any form of discrimination in the employment or hiring as independent contractors of any personnel, including, without limitation, discrimination as to race, color, creed, religion, age, gender, marital status, sexual preference, national origin, or physical disability. Manager shall indemnify and hold Owner harmless from and against any losses or claims of whatsoever kind and nature which may be asserted by any governmental body, entity, or person by reason of any act or failure to act by Manager in accordance with or in violation of any applicable laws if such act or failure to act is not caused or directed by Owner. All employment arrangements are solely Manager's concern and Owner shall have no liability with respect thereto.

p. Insurance.

i. The YSA Trustee will carry commercially sufficient property damage insurance, or builders risk insurance, where applicable, to cover physical loss or damage to the Property from fire and extended coverage perils, including vandalism and malicious mischief, and commercial liability insurance with respect to the Property, and also including earthquake coverage, and flood coverage if applicable, covering third-party bodily injury, property damage and personal injury. All such insurance will be in such amounts and with such insureds as the YSA Trustee may determine and will include Manager as an additional insured thereunder. If requested in writing by the YSA Trustee, Manager will obtain such insurance on the YSA Trustee's behalf, subject to the YSA Trustee's approval thereof, but at the YSA Trustee's cost and expense. Manager will at all times comply with all the warranties, terms and conditions of such insurance. Manager will notify the YSA Trustee, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice the YSA Trustee in its defense to a claim based on such loss, damage or injury.

ii. All insurance required under this Agreement to be maintained by the YSA Trustee or Manager will include Manager or the YSA Trustee, as applicable, as an additional insured. Manager will at all times comply with all the warranties, terms and conditions of all applicable policies. Manager will notify Owner, and the applicable insurance carrier, within twenty-four (24) hours after Manager receives notice of any loss, damage or injury, and will not take any action which might prejudice Owner in its defense to a claim based on such loss, damage or injury. All insurance required hereunder shall be in force, and each party shall furnish the other with certificates of insurance evidencing insurance coverage as required under this Agreement at the time of execution of this Agreement, except that Manager may delay, for up to 30 days following the date hereof, delivery of certificates evidencing that Owner is an additional insured and that Owner will be given at least thirty (30) days prior written notice of cancellation or material change in coverage under Manager’s policies. In cases where the YSA Trustee and Manager maintain insurance policies that duplicate coverage, then Owner’s policies shall provide primary coverage.

iii. Manager shall require that each contractor and subcontractor hired to perform work at the Property maintain insurance at such contractor’s or subcontractor’s expense, against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss.

iv. Additional Insurance. Any insurance obtained by Manager for its own account, and not for the benefit of the Owner, or the Property, shall be at Manager’s own expense.

Each certificate shall contain an endorsement that Owner shall be given at least thirty (30) days' prior written notice of cancellation of or any material change in the policy. Owner shall not reimburse Manager for Manager's cost of such insurance or for any and all other coverages that Manager obtains for its own account, other than workers' compensation insurance and fidelity and crime insurance for on-site employees. Manager's respective insurance carriers shall waive all rights of subrogation against Owner regarding losses payable under such policies. Owner shall be named as an additional insured on Manager's commercial general liability and business auto liability insurance.

q. Compliance with Government Requirements. Manager will take such actions as may be reasonably necessary to comply promptly with any and all governmental orders or requirements affecting the Property. Nevertheless, Manager shall take no such actions so long as Owner is contesting or has affirmed its intention to contest any such order or requirement.

r. Taxes. Manager shall have no duties in connection with the payment of real estate and personal property taxes on the Property unless otherwise directed by Owner in writing. Manager shall keep Owner fully informed in a timely manner of any developments, notices and billings regarding such taxes.

s. Compensation for Management Services. As compensation for management services, Owner shall pay Manager a monthly management fee equal to the greater of **4%** of "Gross Rental Receipts" or a minimum of **$3,500**. “Gross Rental Receipts” as used herein shall include all gross receipts derived from the operation of the Property, including all rent, fees, and all other sums and charges received from tenants. Notwithstanding the foregoing, “Gross Receipts” shall not include: (1) security deposits or other deposits unless and not until such deposits are applied as rental income in accordance with the terms of the applicable Leases; (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) insurance proceeds (other than rental interruption insurance) and condemnation awards; (4) any funds furnished by Owner; (5) any refunds of real estate taxes; (6) all proceeds from financings or refinancings of the Property or any interest therein or components thereof; (7) all proceeds of any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or any interest therein or components thereof; (8) any capital contributions made to Owner; or (9) condemnation proceeds or any security or other deposits prior to forfeiture thereof.

A construction management fee of 5% shall be paid to Manager for any work overseen by Manager in excess of $10,000; the fee shall be paid out of the operating account upon completion of the work.

A monthly accounting software fee of $500 shall be charged during the term of this agreement. After the first year of this agreement, the fee will be set and approved as part of the annual property budget.

3. Miscellaneous.

a. Manager’s Standard of Performance. Manager will carry out its duties and obligations in a diligent, careful and commercially reasonable manner, and in keeping with professional standards for property management of similar properties in the locale of the Property. Manager will make available to Owner the benefit of the judgment, experience and advice of the employees of Manager's organization.

b. Conflicts of Interest. Owner acknowledges that Manager is in the business of providing leasing and property management services to owners of commercial real estate properties and providing full-service real estate brokerage services, including both owner and tenant representation. Accordingly, Manager may, during the term of this Agreement, be engaged by owners of other properties to provide such services with respect to properties similar to and competing for tenants with the Property. Manager shall use reasonable efforts in leasing the Property to assure that prospective tenants are provided appropriate information about and access to the Property and given appropriate attention so as to provide a reasonable opportunity to such tenants to enter into lease negotiations for space in the Property, but shall have no duty to give priority to leasing and marketing activities for the Property over leasing and marketing of other properties for which Manager acts as leasing agent. Manager shall have no duty to disclose to Owner confidential information about other clients of Manager.

c. Performance of Obligations. Each of Owner and Manager shall perform each of its obligations under this agreement promptly, promptly provide all necessary information and respond to all requests from the other party, and otherwise fully cooperate with the other party so as to facilitate the proper leasing and management of the Property as contemplated by this Agreement.

d. Term and Termination.

i. The term of this Agreement shall be for an initial period of one (1) year commencing on the Effective Date and shall be automatically renewed for successive one-year terms unless Owner or Manager gives notice of termination to the other not less than thirty (30) days prior to expiration of the applicable term.

ii. This Agreement shall terminate as follows:

a) Manager may terminate this Agreement at the end of any calendar month upon ninety (90) days prior written notice to Owner.

b) Owner may terminate this Agreement at the end of any calendar month upon thirty (30) days prior written notice to Manager.

c) This Agreement shall terminate automatically upon the termination of dissolution of Manager or Owner, a sale of the Property by Owner or termination of Owner's right to collect the rents from the Property.

d) Owner may terminate this Agreement in the event of Manager’s malfeasance, misfeasance, or nonfeasance in the performance of its duties under this Agreement.

e) Owner may terminate this Agreement in the event of Manager’s breach of or default under this Agreement.

iii. Upon termination, Manager will submit to Owner any required financial statements, and Owner promptly will pay Manager all compensation and reimbursement due hereunder. Following termination, Manager may retain copies of all documents and information relevant to the performance of its obligations under this Agreement prior to termination.

iv. Notwithstanding the termination of this Agreement, the parties agree that (a) Owner's obligation to pay management fees earned prior to such termination or expiration, and (b) Owner's obligation to reimburse Manager for expenses of the Property incurred pursuant to this Agreement prior to such termination shall survive the termination of this Agreement.

e. Assignment. Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

f. Notices. For the purpose of this Agreement, and until changed by written notice to Manager, Owner's mailing address shall be:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza
901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Phone: (214) 953-0182

Michael E Deeba
Chapter 11 Trustee of YSA Investments 1, LLC
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Phone: 405.232.2020

For the purpose of this Agreement, and until changed by written notice to Owner, Manager's mailing address shall be:

Jim Parrack
PEC Multifamily, LLC
211 N Robinson Ave, Suite N-1000
Oklahoma City, OK 73102

All notices shall be sent by certified or registered mail or delivered by hand to Manager and Owner at the foregoing addresses. This paragraph shall apply to notices provided for in this Agreement or by the laws of the State of Oklahoma.

g. Leases and Vendor Contracts. Owner shall fully and promptly perform each of its obligations under the Leases and vendor contracts.

h. Entire Agreement. This Agreement constitutes the entire agreement between Owner and Manager with respect to the leasing, management, and operation of the Property, a no change will be valid unless made by supplemental written agreement, executed and approved by the parties hereto.

i. Compliance with Laws: Without limiting anything in this Agreement, Owner and Manager will comply with and abide by all material rules, orders, determinations, ordinances and laws of all federal, state and municipal authorities applicable to each ("Laws"). If Manager fails or refuses to comply with or abide by any Law, Owner, upon giving twenty-four hours written notice mailed to the other party at its address as hereinafter set forth, may terminate this Agreement.

j. Governing Law; WAIVER OF JURY TRIAL.

i. This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, and to the extent applicable, the Bankruptcy Code.

ii. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

k. Dispute Resolution.

i. The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Bankruptcy Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without

limitation, as an inconvenient forum.

ii. Compliance Matters. Neither Manager nor any director, officer, employee, shareholder or other person or entity acting on behalf of the Manager in relation to the transactions contemplated by this Agreement is or has been a Restricted Party. There is no pending or threatened action, suit, proceeding, or investigation before any court or other Governmental Entity against the Manager that relates to an alleged or potential violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws. In connection with the services contemplated by this Agreement, Manager and its Representatives shall not:

a) offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any person or entity to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer;

b) engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party; or

c) otherwise violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

Prior to executing any lease, Manager shall follow the leasing and screening criteria as provided by Owner, which, in all events, shall include an OFAC sanctions lists screening by Yardi of each proposed tenant, to confirm prospective tenant is not a Restricted Party. Manager will not knowingly violate or knowingly cause Owner to violates Anti-Corruption Laws, Anti- Money Laundering Laws, or Sanctions and Export Control Laws, and Manager shall use reasonable best efforts to assist Owner with reasonable written requests made by Owner concerning Owner's compliance with its (or any of its affiliates in compliance with their) obligations under all Anti-Corruption Laws, Anti Money Laundering Law or Sanctions and Export Control Laws.

For purposes of this Section, the following terms shall have the following meanings: "Anti-

Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"Anti-Money Laundering Laws" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal, or other government; (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising or entitled to exercise any administrative, executive,

judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private), any regulatory or supervisory authority or any self-regulatory organization.

"Representatives" means any owner or shareholder, director, officer, employee, representative, or agent of the Manager.

"Restricted Party" means any person or entity (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (for example, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine); (c) owned or controlled by, or acting on behalf of, any of the foregoing; or (d) with whom U.S. persons are otherwise prohibited from transacting under Sanctions and Export Control Laws.

"Restricted Party Lists" means sanctioned and other restricted party lists maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction including but not limited to the following lists: the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"Sanctions and Export Control Laws" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the European Union, any European Union Member State, the United Nations, or His Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures (in each case except to extent inconsistent with U.S. law).

l. Bankruptcy Court Approval. This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. If any part of this Agreement is not approved by the Bankruptcy Court for any reason, this Agreement will be null and void and of no further force and effect.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Property Management Agreement as of the day and year first above written.

OWNER:

**Daniel J. Sherman, Solely in his Capacity as Chapter 11 Trustee of Louis Investments, LLC**

By:______________________________________
Daniel J. Sherman, Trustee

**Michael E. Deeba, Solely in his Capacity as Chapter 11 Trustee of YSA Investments 1, LLC**

By:______________________________________
Michael E. Deeba, Trustee

MANAGER:

**PEC Multifamily, LLC**

By:______________________________________
Jim Parrack, Chief Operating Officer

# Exhibit 12

## Real Estate Consulting and Advisory Services Agreement – Jim Parrack

# REAL ESTATE CONSULTING AND ADVISORY SERVICES AGREEMENT

This Asset Management Agreement (the "Agreement") is entered into by and between (1) Jim Parrack, an individual residing in the State of Oklahoma ("Parrack") (2) Daniel J. Sherman, solely in his capacities as chapter 11 trustee of each of (i) Barcelona's Best Living, LLC and Louis Investments, LLC (in such capacities, the "Louis Trustee"), and (3) Michael E. Deeba, solely in his capacity as chapter 11 trustee of YSA Investments 1, LLC (the "YSA Trustee", and together with the Louis Trustee, the "Trustees", and the Trustees together with Parrack, each a "Party", collectively, the "Parties").

## Recitals:

WHEREAS, Trustees are the Trustees of the real property set forth on Exhibit A attached hereto (each a "Property", and collectively, the "Properties");

WHEREAS, the Louis Trustee is the duly appointed chapter 11 trustee in each of the debtors' chapter 11 bankruptcy cases currently pending in the United States Bankruptcy Court for the Western District of Oklahoma, Oklahoma City Division (the "Court") and being jointly administered under case number 26-12825;

WHEREAS, the YSA Trustee is the duly appointed chapter 11 trustee in the chapter 11 bankruptcy case of YSA currently pending in the Court under case number 26-12806;

WHEREAS, Trustees are the Trustees of the respective real properties set forth on Exhibit A attached hereto (each a "Property", and collectively, the "Properties");

WHEREAS, Trustees seek to engage Parrack to provide certain asset management services for the Properties.

## Agreement:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Trustees and Parrack agree as follows:

1. Asset Management Services. At Trustees' request, Parrack shall provide the asset management services described below (collectively, the "Services") with respect to the Properties. In no event shall the scope or quality of services provided by Parrack hereunder be less than those generally performed by professional asset managers of similar properties in the market where the applicable Property is located. Parrack shall act as a fiduciary to the Trustees regarding the Properties, in accordance with, and subject to the terms of, this Agreement, and in this capacity, Parrack shall deal at arm's length with all third parties and serve Trustees' interests at all times.

a) *Liaison with Trustees and Court*: Serve as the principal operational liaison among the property management companies, Trustees, and as appropriate, the Court and its authorized representatives.

b) *Strategic Direction*: Develop and recommend property-level and portfolio wide operating strategies in consultation with the applicable Trustee, with the objective of preserving and maximizing asset value.

c) *Stakeholder Coordination*: Serve as a designated point of contact for lenders, creditors, insurance representatives, governmental entities, consultants, and other stakeholders regarding property operations and asset performance, subject to the applicable Trustee's direction.

d) *Property Management Oversight*: Monitor and evaluate the performance of certain designated property management companies, including operating results, staffing, leasing, maintenance, resident relations and compliance with approved business plans.

e) *Financial Oversight*: Review property-level financial statements, operating budgets, cash flow, occupancy, collections, delinquency and significant variances from approved budgets.

f) *Cash Flow and Funding Requirements*: Evaluate property-level cash flow and funding needs, identify projected shortfalls, prioritize expenditures, and coordinate funding requests with the Trustees.

g) *Insurance and Property Taxes*: Assist the Trustees with oversight of insurance coverage, claims, property tax assessments, appeals, and related matters, including coordination with appropriate professionals.

h) *Capital Expenditure Oversight*: Evaluate and prioritize significant repairs, deferred maintenance, and capital improvements, including review of proposals, budgets, and recommendations for Trustee approval.

i) *Risk Management and Asset Preservation*: Identify material operational, financial, physical, and regulatory risks affecting the properties and recommend corrective actions.

j) *Third-Party Professional Coordination*: Assist the Trustees in coordinating appraisers, engineers, environmental consultants, insurance professionals, brokers and other professionals engaged in connection with the properties.

k) *Bankruptcy Reporting Support*: Provide operating information, financial analyses, cash flow projections, and other property related information reasonably requested by the Trustee to support required bankruptcy filings and Court reporting. Provide operating information, financial analyses, cash flow projections and other property related information reasonably requested by the Trustees to support required bankruptcy filings and Court reporting.

l) *Transition and Turnover Coordination*: Assist with the orderly transition of property operations, books and records, contracts, tenant information, and funds upon sale, transfer, change in management, or conclusion of the Trustees' administration.

2. Term. The term (the "Initial Term") of this Agreement shall commence upon the execution hereof and shall expire on the date that is twelve (12) months therefrom; provided that at the expiration of the Initial Term, the Agreement shall automatically renew for additional one (1) month increments (each an "Extended Term", and together with the Initial Term, the "Term") until a Party affirmatively terminates the Agreement in accordance with the terms hereof.

3. Termination. Parrack may terminate this Agreement with respect to a Trustee upon written notice to such Trustee for any reason or no reason. Each Trustee may terminate this Agreement with Parrack with respect to any or all Properties managed by such Trustee upon written notice to Parrack for any reason or no reason. Notwithstanding the foregoing, any termination notice sent by any Party shall not be effective before the sixtieth (60th) day after such notice is sent by the applicable Party.

4. Effect of Termination. Upon termination of this Agreement by a Trustee, Parrack shall: (a) immediately discontinue all Services to such Trustee; and (b) deliver to such Trustee all information, reports, papers, and other materials prepared or obtained by Parrack in performing the Services, whether completed or in process. Upon termination, Trustees shall be liable for payment of accrued and unpaid fees and expenses of Parrack as of the effective date of the termination, in accordance with Section 7 below.

5. Authority. Parrack is authorized only to provide the Services set forth in this Agreement at the direction and on the behalf of the Trustees, but not to commit the Trustees to any agreement or arrangement or to sign any instrument on behalf of the Trustees.

6. Additional Properties. Trustees may add additional properties to Exhibit A with the consent of Parrack (which consent may be provided in email) in which case such additional properties shall be considered "Properties" for purposes of this Agreement.

7. Compensation.

(a) *Fees*. In consideration of the Services, Parrack shall earn a monthly fee equal to $4,000 per Property ("Fees"). Invoices for Fees are due and payable by the applicable Trustee upon receipt.

(b) *Additional Services*. In the event Parrack provides Additional Services at the request of the Trustees, the Parties shall mutually agree upon the scope and fees applicable for any such Additional Services in writing ("Additional Services").

(c) *Expenses*. The Trustees shall reimburse Parrack for all reasonable and documented out-of-pocket expenses incurred by Parrack in connection with its performance of the Services hereunder (collectively, "Expenses"). Expenses means all reasonable, documented (through receipts or invoices) out-of-pocket expenses incurred by Parrack in connection with its performance of its Services hereunder, including, without limitation: reasonable expenses of advertising, marketing, travel and transportation, including, the cost of out-of-town travel and postage and courier/overnight express fees, travel to the Properties, and other mutually agreed upon expenses incurred in connection with performing the services required by this Agreement.

Expenses shall be due and payable upon thirty (30) days after the date of invoice and court approval thereof. All fees and expenses payable to Parrack hereunder shall be free and clear of any liens, claims and encumbrances, including the liens of any secured parties. Parrack shall not be responsible for any other fees or commissions in connection with the property management or disposition of the Properties.

8. No Guaranty. Parrack has not guaranteed, and is not hereby guaranteeing, any specific result on asset management of the Properties.

9. [Reserved.]

10. Representations, Warranties and Additional Covenants.

(a) Trustees represents and warrants to Parrack that as of the date hereof: (i) Trustees has all legal right and authority over the Properties, (ii) Trustees has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby, and other than the Retention Order, no further consent or approval is required for Trustees to enter into and deliver the Agreement and to perform its obligations under the Agreement, and (iii) no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Trustees' consummation of, the transactions contemplated by this Agreement. Trustees further represents and warrants to Parrack that any amounts due and payable hereunder shall be free and clear of any liens, claims, or encumbrances of any kind whatsoever.

(b) Parrack represents and warrants to Trustees that he is a natural person of the age of majority and has full legal capacity, right, and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

11. General Provisions.

(a) Trustees shall promptly file a motion under section 327 and 328 of title 11 of the United States Code (the "Bankruptcy Code") authorizing Trustees' entry into this Agreement, which Trustees agrees to use its reasonable efforts to obtain (the "Retention Order"). Trustees will use its reasonable efforts to ensure that such order shall specifically provide that: (i) Parrack is being retained pursuant to sections 327 and 328 of the Bankruptcy Code by Trustees; (ii) the payment of all fees and expenses hereunder to Parrack shall be free and clear of all liens, claims and encumbrances; (iii) all such payments of fees and expenses hereunder shall be made without further order of the Bankruptcy Court; (iv) notwithstanding the liens or claims of Trustees' secured lenders, including any debtor in possession financing lender, any amounts paid to Parrack hereunder, will not be reduced or capped by the terms or conditions of any debtor in possession financing, cash collateral, or related order; (v) the payment of all fees and expenses to Parrack related to the Services shall be included in any approved debtor-in-possession, cash collateral, or other post-petition financing budget; and (vi) all such fees and expenses due and owing to Parrack hereunder shall be included in any carve-out provided in any debtor in possession financing, cash collateral, or related order.

(b) Trustees acknowledges and confirms that, in rendering the Services, Parrack will be using and relying on, and assuming the accuracy of, without any independent verification, data, material, and other information (collectively, the "Information") furnished to Parrack by or on behalf of Trustees or other third parties (including their agents, counsel, employees, and representatives). Trustees understands that Parrack will not be responsible for independently verifying the accuracy of the Information and shall not be liable for inaccuracies in any such Information. Trustees will cooperate with Parrack in all phases of Parrack's performance of the Services. Parrack assumes no responsibility to revise or update any information contained in any report or deliverable prepared in connection with the Services (each, a "Deliverable"). Our performance of the Services will be dependent upon Trustees providing us with accurate and timely information, as applicable. The Services and any Deliverable may not be relied upon by any person or entity other than Trustees. Parrack makes no representations or warranties of any kind regarding the Services or any Deliverable.

(c) Neither party may assign this Agreement or any interest therein, without the written consent of the other. Subject to such limitation, this Agreement shall in all respects be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

(d) Trustees and Parrack shall deal with each other in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement.

(e) Any correspondence or required notice shall be addressed as follows and shall be deemed given (i) when received if hand delivered, (ii) three (3) business days after depositing in the United States mail if sent first-class certified mail, and (iii) on the next business day if sent by overnight mail:

If to Parrack:

PEC Multifamily, LLC
c/o Jim Parrack
211 N. Robinson, Suite N-1000
Oklahoma City, OK 73102
Email: jparrack@creekpe.com
Attn: Jim Parrack
Phone: (405) 239-1217

If to Louis Trustee:

Daniel J. Sherman
Chapter 11 Trustee of Louis Investments
509 N. Montclair Avenue
Dallas, Texas 75208
Email: corky@syllp.com
Phone: (214) 942-5502

(with a copy, which shall not constitute notice, to)

Rochelle McCullough, L.L.P.
Bank of America Plaza

901 Main St #3200
Dallas, TX 75202
Attn: Kevin McCullough
Email: kdm@romclaw.com
Phone: (214) 953-0182

If to YSA Trustees:

Michael E. Deeba
Chapter 11 Trustee of YSA Investments
119 N Robinson, #300
Oklahoma City, OK 73102
Phone: (405) 615-1010
Email: mike.d@medeeba.com

(with a copy, which shall not constitute notice, to)

Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Attn: J. Clay Christensen
Email: Clay@christensenlawgroup.com
Phone: (405) 232-2020

(f) This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

(g) By executing or otherwise accepting this Agreement, Trustees and Parrack acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

(h) This Agreement may be executed in original counterparts, and if executed and delivered via facsimile or email shall be deemed the equivalent of an original.

(i) This Agreement creates no third-party beneficiaries.

(j) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect, and the invalid or unenforceable provision shall be reformed to the minimum extent required to render it valid and enforceable and to effect the intent of this Agreement.

(k) No modification, amendment or waiver of any of the provisions contained

in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such party. The failure by either party to enforce, or the delay by either party in enforcing, any of said party's rights under this Agreement shall not be construed as a waiver of such rights, and said party may, within such time as is provided by the laws established by any government with applicable jurisdiction, commence appropriate suits, actions or proceedings to enforce any or all of such rights. A waiver by either party of a default in one or more instances shall not be construed as a waiver in other instances.

(l) This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party to this Agreement except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

(m) All headings and captions in this Agreement are for convenience only and shall not be interpreted to enlarge or restrict the provisions of the Agreement.

(n) The construction, validity and interpretation of this Agreement will be governed by the internal law of the State of Illinois, without regard to any choice of law principle that might otherwise result in the application of the law of any other jurisdiction, and to the extent applicable, the Bankruptcy Code. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other in respect of any matter arising out of or in connection with this Agreement.

(o) The parties hereby agree, understand, and acknowledge that any and all suits or claims arising out of a dispute as to the meaning of or performance under this Agreement shall be filed and maintained only in the Court, and that such court will have exclusive jurisdiction over any claims arising out of or concerning any term, part or provision of this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy Court with respect to any action to approve or enforce this Agreement and waive any right to commence any action in any other forum or to contest the Bankruptcy Court's jurisdiction, including, without limitation, as an inconvenient forum.

(p) This effectiveness of this Agreement and each party's rights and obligations hereunder are conditioned in all respects on the approval of this Agreement by the Court.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, Trustees and Jim Parrack have executed and delivered this Agreement as of the date first above written.

**DANIEL J. SHERMAN, CHAPTER 11 TRUSTEE OF BARCELONA BEST LIVING, LLC AND LOUIS INVESTMENTS, LLC**

______________________________

Title: Chapter 11 Trustee

Date:

**JIM PARRACK**

______________________________

Date:

**MICHAEL E. DEEBA, CHAPTER 11 TRUSTEE OF YSA INVESTMENTS 1, LLC**

______________________________

Title: Chapter 11 Trustee

Date:

## Exhibit A

### Properties

| No. | Property | Property address | Property Owner | Applicable Trustee |
|---|---|---|---|---|
| 1. | Barcelona Apartments | 5160 S Yale Ave, Tulsa, OK 74135 | Barcelona Best Living, LLC | Trustee Sherman |
| 2. | Copperfield Apartments | 2400 NW 30th St., Oklahoma City, OK 73112 | Copperfield Apartments Limited Partnership | Trustee Deeba |
| 3. | Lexington Commons Apartments | 5530 Colony Way, Bartlesville, OK 74006 | Bartlesville Best Living, LLC | Trustee Deeba |
| 4. | Seminole Ridge Apartments | 125 W I-240 Service Road, Oklahoma City, OK 73139 | Vesta – Seminole Ridge, LLC | Trustee Deeba |

# Exhibit 13

## Declaration of Greg Wright

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 26-12825-SAH** |
| | § | |
| **727 LOFTS BEST LIVING, LLC**[1] | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | **Chapter 11** |
| | § | |
| | § | |

---

| | | |
|---|---|---|
| | § | |
| | § | |
| **YSA INVESTMENTS 1, LLC** | § | **Case No. 26-12806** |
| | § | |
| **Debtor.** | § | **Chapter 11** |

---

**DECLARATION OF GREG WRIGHT**
**IN SUPPORT OF TRUSTEES' JOINT AMENDED APPLICATION TO EMPLOY PROPERTY MANAGERS AND ASSET MANAGERS**

---

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, I, GREG WRIGHT, declare that the following is true to the best of my knowledge, information, and belief:

1. This declaration (this "Declaration") is submitted in support of the *Trustees' Joint Amended Application to Employ Property Managers and Asset Managers* (the "Amended Application").[2]

2. I am the President of Capital Assets, Inc. ("Capital Assets"), which maintains an office at 8002 S. 101st E. Ave. Tulsa, OK 74133, and I am authorized to execute this Declaration on behalf of Capital Assets.

---

[1] The jointly administered debtors and their respective case numbers are as follows: 727 Lofts Best Living, LLC, Case No. 26-12825-SAH; 727 Lofts Holdings, LLC, Case No. 26-12826-SAH; Remington Ranch's Best Living, LLC, Case No. 26-12842-SAH; Lofts at North Penn Best Living, LLC, Case No. 26-12844-SAH; A-V Village Creek Owner, LLC, Case No. 26-12846-SAH; Barcelona Best Living, LLC, Case No. 26-12850-SAH; Louis Investments, LLC, Case No. 26-12851-SAH; Woodland Manor Best Living, LLC, Case No. 26-12858-SAH; Woodland Manor TIC 1, LLC, Case No. 26-12859-SAH; and Ridge Best Living, LLC, Case No. 26-12869-SAH.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amended Application.

3. The facts set forth in this declaration are based upon my personal knowledge, discussions with other Capital Assets employees, and Capital Assets' business records that were reviewed by me or other Capital Assets employees acting under my supervision and direction. To the extent any information disclosed in this declaration requires amendment or modification upon Capital Assets' completion of further review or as additional information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended and modified information.

4. Capital Assets is a Tulsa-based multifamily property manager founded in 1979. It reports more than 45 years of regional experience, a portfolio of approximately 4,500 units, and approximately $400 million of assets under management in Oklahoma and Northwest Arkansas. Capital Assets specializes in multifamily operations, lease-up, maintenance, financial reporting, and related services.

5. On July 17, 2026, Capital Assets and YSA Investments 1, LLC executed a Residential Management Agreement and Capital Assets began serving as a property manager for the following properties that YSA claimed ownership of (the "Subject Properties"):

a. 5530 Colony Way, Bartlesville, OK 74006 ("Lexington Commons");
b. 7803 S. Wheeling Ave., Tulsa, OK 74136 ("Riverpark")
c. 204 S Riverfront Dr, Jenks, OK 74037 ("Thrive Jenks");
d. 2186 S 99th E Ave, Tulsa, OK 74129 ("Lakeside Place");
e. 2001 E Skelly Dr, Tulsa, OK 74105 ("Villas at Midtown");
f. A-V Village Creek Owner LLC ("Village Creek");
g. 5160 S Yale Ave, Tulsa, OK 74135 ("Barcelona Apartments");
h. 9601 E 21st Pl, Tulsa, OK 74129 ("Shoreline");
i. 727 E Main Pl, Jenks, OK 74037 ("727 Lofts");
j. 8111 E 60th St, Tulsa, OK 74145 ("One Eton Square"); and
k. 11321 E 23rd St, Tulsa, OK 74129 ("23 East")

6. While Capital Assets was retained approximately eight (8) days prior to the date of YSA's petition in bankruptcy on July 28, 2026, Capital Assets did not receive any pre-petition compensation from the estate. There was no pre-petition unpaid balance owed to Capital Assets as no expenses were incurred pre-petition.

7. Post-petition, Capital Assets has only received compensation as approved by an order or the Court or with the consent of the applicable secured lender to use cash its collateral to make the payment. As of the date hereof, Capital Assets is owed management fees from the bankruptcy estates of YSA, Barcelona Best Living, LLC, and A-V Village Creek Owner, LLC.

8. After the Trustees were appointed in their respective bankruptcy cases, Capital Assets continued to manage the Subject Properties. In their Amended Application, the Trustees propose to retain Capital Assets to continue serving as property manager at the Subject Properties.

9. The anticipated scope of services to be provided by Capital Assets to the Trustees are as follows:

a. Recruit, train, supervise, and evaluate on-site personnel; implement company policies and operating procedures; and maintain appropriate staffing levels for leasing, administration, and maintenance.

b. Serve as the primary point of contact for residents; respond to inquiries and service requests; enforce lease terms and community rules; and promote a well-maintained community residents can proudly call home.

c. Collect rents and other charges; post and track payments; pursue delinquent accounts; and, when necessary, initiate and manage notices, collections, and eviction proceedings in accordance with law and owner direction.

d. Oversee routine, preventive, and emergency maintenance; inspect units and common areas; manage work orders; supervise vendors and contractors; and keep the physical asset in good repair.

e. Prepare accountings, operating budgets and capital plans; monitor income and expenses against budget; implement cost controls; and manage accounts payable and receivable.

f. Maintain property books and records using property-management software; provide regular financial reporting, rent rolls, occupancy reports, variance analyses, and other owner-requested reports; and support year-end and audit

needs.

g. Administer the Property in compliance with leases, fair housing laws, applicable housing program requirements (if any), insurance requirements, and owner policies; maintain required notices, files, and records.

h. Solicit, negotiate, and oversee contracts for utilities, landscaping, trash, security, make-ready, and other services, subject to owner approval where required.

i. Provide regular performance updates, attend owner meetings as requested, and maintain a collaborative, transparent working relationship so the Property is managed to the owner's stated objectives and highest reasonably attainable earnings potential.

10. The Residential Management Agreement, attached to each *Trustees' Joint Application to Employ Property Managers and Asset Managers* as Exhibit B, provides, in part, that the applicable Trustee agrees to pay Capital Assets as follows:[3]

> Section 7.01. For services rendered pursuant to this Agreement, [Trustees] shall pay [Capital Assets] three percent (3.00%), of the gross monthly income collected from the property, or a minimum of $6,000 for the properties less than 400 units and $7,500 for the properties 400 units plus, whichever is greater, which shall be deducted by [Capital Assets] each month from the gross monthly income. The fee may be adjusted from time to time upon prior written agreement executed by both parties. [Capital Assets] will be owed a "disposition fee" of $15,000 for the properties less than 400 units and $20,000 for the properties above 400 units, upon the sale of the property for duties associated with the sales and closing process and finalize accounting.

11. Capital Assets intends to apply for compensation for its professional services rendered to the Trustees in YSA's bankruptcy case and in the 727 Debtors' bankruptcy cases and reimbursement of expenses incurred in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

12. Except as specifically set forth herein or on Schedule 1 hereto, neither I nor Capital

---

[3] The following summary is intended to be illustrative and not a complete representation of all terms and conditions of the Engagement Agreement. To the extent this paragraph is inconsistent with the Engagement Agreement, the terms of the Engagement Agreement shall control. entities, its creditors, or any other parties in interest herein, or its respective attorneys and accountants, except as otherwise disclosed herein.

Assets, to the best of my knowledge, represents any other entity in conjunction with the YSA bankruptcy case or the 727 Debtors' bankruptcy cases. In addition, except as specifically set forth herein or on Schedule 1 hereto, to the best of my knowledge, neither I nor Capital Assets is an insider of YSA or the 727 Debtors, nor has any connection with YSA or the 727 Debtors, any affiliated entity of YSA or the 727 Debtors, any creditors of YSA or the 727 Debtors, or any other party in interest in the bankruptcy cases of YSA or the 727 Debtors, or any of their respective attorneys and accountants, except as otherwise disclosed herein or set forth on Schedule 1 hereto.

13. Capital Assets and its principals: (i) are not equity security holders, or insiders of YSA or the 727 Debtors or any of their bankruptcy estates; (ii) other than the post-petition services rendered by Capital Assets prior to the date hereof described herein, have not been, within three years before the date of the filing of the petition, property managers for YSA or the 727 Debtors; (iii) are and were not, within two years before the date of the filing of the petition, directors, officers, or employees of YSA or the 727 Debtors; and (iv) do not have an interest materially adverse to the interest of the estates of YSA or the 727 Debtors or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, YSA or the 727 Debtors, or for any other reason, except as specifically disclosed and described herein or on Schedule 1 hereto.

14. I believe Capital Assets is a "disinterested person" within the meaning of Bankruptcy Code section 101.

15. No promises have been received by Capital Assets as to compensation or payment in connection with this case other than in accordance with the provisions of the Bankruptcy Code. Capital Assets has no agreement with any other entity to share with such entity any compensation received by Capital Assets in connection with the YSA bankruptcy case or the 727 Debtors

bankruptcy cases.

I hereby declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on November 10, 2026

Greg Wright
Capital Assets, Inc., President

**Schedule 1**
**Disclosures**

1. In 2010, Jim Parrack of Price Edwards was appointed as receiver over the Cimarron Apartments located in Tulsa, Oklahoma and retained Capital Assets to serve as his property manager.

2. From time to time, Capital Assets and/or its affiliates have collaborated with, transacted with or engaged the professional services of Crowe & Dunlevy, a professional corporation.

**Exhibit 14**

**Declaration of Jim Parrack, Chief Operating Officer of PEC Multifamily, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 26-12825-SAH** |
| | § | |
| **727 LOFTS BEST LIVING, LLC**[1] | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | **Chapter 11** |
| | § | |
| **----------------------------------------------------** | | |
| | § | |
| | § | |
| **YSA INVESTMENTS 1, LLC** | § | **Case No. 26-12806** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |

---

**DECLARATION OF**
**JIM PARRACK AS CHIEF OPERATING OFFICER OF PEC MULTIFAMILY, LLC IN SUPPORT OF TRUSTEES' JOINT AMENDED APPLICATION TO EMPLOY PROPERTY MANAGERS AND ASSET MANAGERS**

---

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, I, **JIM PARRACK**, declare that the following is true to the best of my knowledge, information, and belief:

1. This declaration (this "Declaration") is submitted in support of each *Trustees' Joint Amended Application to Employ Property Managers and Asset Managers* (the "Amended Applications").[2]

2. I am the Chief Operating Officer of PEC Multifamily, LLC ("Price Edwards"),

[1] The jointly administered debtors and their respective case numbers are as follows: 727 Lofts Best Living, LLC, Case No. 26-12825-SAH; 727 Lofts Holdings, LLC, Case No. 26-12826-SAH; Remington Ranch's Best Living, LLC, Case No. 26-12842-SAH; Lofts at North Penn Best Living, LLC, Case No. 26-12844-SAH; A-V Village Creek Owner, LLC, Case No. 26-12846-SAH; Barcelona Best Living, LLC, Case No. 26-12850-SAH; Louis Investments, LLC, Case No. 26-12851-SAH; Woodland Manor Best Living, LLC, Case No. 26-12858-SAH; Woodland Manor TIC 1, LLC, Case No. 26-12859-SAH; and Ridge Best Living, LLC, Case No. 26-12869-SAH.
[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amended Applications.

which maintains an office at 211 N Robinson, Suite N-1000, Oklahoma City, Oklahoma, and I am authorized to execute this declaration (this "Declaration") on behalf of Price Edwards.

3. The facts set forth in this Declaration are based upon my personal knowledge, discussions with other Price Edwards employees, and Price Edwards' business records that were reviewed by me or other Price Edwards employees acting under my supervision and direction. To the extent any information disclosed in this Declaration requires amendment or modification upon Price Edwards' completion of further review or as additional information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended and modified information.

4. Price Edwards has been retained by Trustee Sherman to serve as a property manager for the following properties, each of which are owned by an affiliate of the Debtor.

| Property Name | Debtor Affiliate | Property Address |
|---|---|---|
| Remington Ranch | Remington Ranch's Best Living LLC | 1815 N Boomer Rd, Stillwater, OK 74075 |
| Village Creek | A-V Village Creek Owner LLC | 6630 S Zunis Ave, Tulsa, OK 74136 |
| Lofts at North Penn | Lofts at North Penn Best Living LLC | 15501 N Pennsylvania Ave, Edmond, OK 73013 |

5. Price Edwards is now proposed to serve as the property manager for the Trustees for the following Properties (the "Properties" or each, individually, a "Property"):

| Property Name | Property Address |
|---|---|
| Remington Ranch Apartments | 1815 N Boomer Rd, Stillwater, OK 74075 |
| Village Creek Apartments | 6630 S Zunis Ave, Tulsa, OK 74136 |
| Lofts at North Penn Apartments | 15501 N Pennsylvania Ave, Edmond, OK 73013 |
| Woodscape Apartments | 4200 North Meridian Avenue, Oklahoma City, OK 73112 |

| Property Name | Property Address |
|---|---|
| Capitol on 28th Apartments | 215 Northeast 28th Street, Oklahoma City, OK 73105 |
| Tuscany Village Apartments | 6900 London Way, Oklahoma City, OK 73132 |
| Putnam Green Apartments | 7525 Knight Lake Drive, Oklahoma City, OK 73132 |
| Bryan Hill Apartments | 7204 NW 36th St, Bethany, OK 73008 |
| Springdale Village Apartments | 4330 S Barnes Ave, Oklahoma City, OK 73119 |
| Summer Oaks Apartments | 5770 NW 16th St, Oklahoma City, OK 73127 |

6. Price Edwards is an affiliate of Creek Price Edwards. Creek Price Edwards is a full-service commercial real estate firm serving Oklahoma, formed in 2026 through the merger of Creek CRE and Price Edwards & Company. Combining Creek CRE's entrepreneurial energy and modern approach with Price Edwards & Company's nearly 38-year legacy of market leadership, Creek Price Edwards is Oklahoma's largest and most capable commercial real estate company. Creek Price Edwards has provided distressed property services to over 50 properties comprising over 3.6 million square feet of office, retail, and industrial space, and over 7,000 apartment units. Price Edwards has extensive familiarity with multifamily operations, lease-up, maintenance, financial reporting, and related services.

7. The anticipated scope of services to be provided by Price Edwards to the estates of YSA and the 727 Debtors include, but are not limited to, the following: collecting rent for the Properties; rendering monthly financial statements and budgets; maintaining and making minor repairs to the Properties; responding to tenant inquiries; recruiting, training, and supervising on-site personnel for leasing, administration and maintenance; advertising if there are vacancies; contracting with third party vendors to provide water, electricity, gas, sewage and trash disposal; pest termination; paying operating expenses; and other services necessary to the operation of the

Properties.

8. The Amended and Restated Multifamily Property Management Agreements and the Multifamily Property Management Agreements, attached as Exhibit B to the Amended Applications, provide, in part, that the Trustees agree to pay Price Edwards the fees set forth in the table below for each of the Properties:[3]

| Property Name | Management Fees | Other Fees |
| --- | --- | --- |
| Lofts at North Penn Apartments | Greater of 4% monthly collections or $5,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Remington Ranch Apartments | Greater of 4% monthly collections or $7,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Woodscape Apartments | Greater of 4% monthly collections or $10,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| The Capital on 28th Apartments | Greater of 4% monthly collections or $5,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Tuscany Village Apartments | Greater of 4% monthly collections or $5,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Bryan Hill Apartments | Greater of 4.0 percent of monthly collections or $3,500 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Springdale Village Apartments | Greater of 4.5 percent of monthly collections or $2,500 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Summer Oaks Apartments | Greater of 4.0 percent of monthly collections or $3,500 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |
| Putnam Green Apartments | Greater of 4% monthly collections or $5,000 | 5% construction management fee for projects in excess of $10,000; $500 per month technology fee |

9. Price Edwards intends to apply for compensation for its professional services

[3] The following summary is intended to be illustrative and not a complete representation of all terms and conditions of the Employment Agreements. To the extent this paragraph is inconsistent with the Employment Agreements, the terms of the Employment Agreements shall control.

rendered to the Trustee's in the YSA bankruptcy case and the bankruptcy cases of the 727 Debtors in their respective bankruptcy cases and reimbursement of expenses incurred in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules of the Bankruptcy Court for the Western District of Oklahoma.

10. Except as specifically set forth herein, neither I nor Price Edwards, to the best of my knowledge, represents any other entity in conjunction with the bankruptcy cases of YSA and the 727 Debtors. In addition, except as specifically set forth herein, to the best of my knowledge, neither I nor Price Edwards is an insider of the YSA or any 727 Debtor, nor has any connection with YSA or any 727 Debtor, any of their affiliated entities, their creditors, or any other parties in interest herein, or its respective attorneys and accountants, except as otherwise disclosed herein. It is understood that, prior to the filing of the petitions in bankruptcy by YSA and each 727 Debtor, Price Edwards was either appointed as a receiver, or a motion to appoint Price Edwards as a receiver, was filed by the applicable lender in a state court case involving the following properties which are owned or affiliated with one of the Debtors.

| **Property Name** | **Debtor/Affiliate** | **Property Address** | **Lender Name** |
|---|---|---|---|
| Canopy Apartments | Canopy Best Living LLC | W 12th St / Twin Lakes, Little Rock, AR | Federal National Mortgage Association ("Fannie Mae") |
| Remington Ranch | Remington Ranch's Best Living LLC | 1815 N Boomer Rd, Stillwater, OK 74075 | Fannie Mae |
| Lexington Commons | Bartlesville Best Living LLC | 5530 Colony Way, Bartlesville, OK 74006 | Fannie Mae |
| Lofts at North Penn | Lofts at North Penn Best Living LLC | 15501 N Pennsylvania Ave, Edmond, OK 73013 | CREO QRS NP LLC |
| Muntage Apartments | Muntage Best Living LLC | 3041 NW 41st St, Oklahoma City, OK 73112 | The Bancorp Bank |
| Riverpark at Kensington | Riverpark Best Living LLC | 7803 S Wheeling Ave, Tulsa, OK 74136 | Axonic Multifamily Bridge SPV (BC) Trust |

| Property Name | Debtor/Affiliate | Property Address | Lender Name |
|---|---|---|---|
| Bryan Hill | Bryan Hill's Best Living LLC | 7204 NW 36th St, Bethany, OK 73008 | Silver Hill Capital |
| Tuscany Village | Tuscany Village Best Living LLC | 6900 London Way, Oklahoma City, OK 73132 | Silver Hill Capital |
| Springdale Village Apartments | Springdale Village's Best Living, LLC | 4330 S Barnes Ave, Oklahoma City, OK 73119 | Silver Hill Capital |
| Summer Oaks | Summer Oaks Best Living LLC;<br>Summer Oaks TIC 1 LLC;<br>Summer Oaks TIC 2 LLC;<br>Summer Oaks TIC 3 LLC | 5744 NW 16th St, Oklahoma City, OK 73127 | Silver Hill Capital |

11. Other than as set forth above, neither I nor Price Edwards, insofar as I have been able to ascertain, holds or represents any interest adverse to the estates of YSA and the 727 Debtors with respect to the matters upon which Price Edwards is to be engaged.

12. Price Edwards and its principals: (i) are not equity security holders, or insiders of YSA or the 727 Debtors, or their respective bankruptcy estates; (ii) are and were not, within two years before the date of the filing of the petition, directors, officers, or employees of YSA or any 727 Debtor; and (iii) do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, YSA or any 727 Debtor, or for any other reason, except as specifically disclosed and described herein.

13. I believe Price Edwards is a "disinterested person" within the meaning of Bankruptcy Code section 101.

14. No promises have been received by Price Edwards as to compensation or payment in connection with this case, other than in accordance with the provisions of the Bankruptcy Code. Price Edwards has no agreement with any other entity to share with such entity any compensation received by Price Edwards in connection with the YSA bankruptcy case or the 727 Debtors

bankruptcy cases.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on November 10, 2026

Jim Parrack
PEC Multifamily, LLC, Chief Operating Officer

# Exhibit 15

## Declaration of Jim Parrack

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 26-12825-SAH** |
| | § | |
| **727 LOFTS BEST LIVING, LLC**[1] | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | **Chapter 11** |
| | § | |
| ---------------------------------------------------- | | |
| | § | |
| | § | |
| **YSA INVESTMENTS 1, LLC** | § | **Case No. 26-12806** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |

---

**DECLARATION OF**
**JIM PARRACK IN SUPPORT OF TRUSTEES' JOINT AMENDED APPLICATION TO EMPLOY PROPERTY MANAGERS AND ASSET MANAGERS**

---

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, I, **JIM PARRACK**, declare that the following is true to the best of my knowledge, information, and belief:

1. This declaration (this "Declaration") is submitted in support of each *Trustees' Joint Amended Application to Employ Property Managers and Asset Managers* (the "Amended Applications").[2]

2. I am serve as the Chief Operating Officer of PEC Multifamily, LLC ("Price Edwards"), which maintains an office at 211 N Robinson, Suite N-1000, Oklahoma City,

[1] The jointly administered debtors and their respective case numbers are as follows: 727 Lofts Best Living, LLC, Case No. 26-12825-SAH; 727 Lofts Holdings, LLC, Case No. 26-12826-SAH; Remington Ranch's Best Living, LLC, Case No. 26-12842-SAH; Lofts at North Penn Best Living, LLC, Case No. 26-12844-SAH; A-V Village Creek Owner, LLC, Case No. 26-12846-SAH; Barcelona Best Living, LLC, Case No. 26-12850-SAH; Louis Investments, LLC, Case No. 26-12851-SAH; Woodland Manor Best Living, LLC, Case No. 26-12858-SAH; Woodland Manor TIC 1, LLC, Case No. 26-12859-SAH; and Ridge Best Living, LLC, Case No. 26-12869-SAH.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amended Applications.

Oklahoma, and I am competent to this declaration (this "Declaration").

3. The facts set forth in this Declaration are based upon my personal knowledge, that were reviewed by me. To the extent any information disclosed in this Declaration requires amendment or modification my completion of further review or as additional information becomes available, a supplemental declaration will be submitted to the Court reflecting such amended and modified information.

4. Price Edwards has been retained by Trustee Sherman to serve as a property manager for the following properties, each of which are owned by an affiliate of the Debtor.

| Property Name | Debtor Affiliate | Property Address |
|---|---|---|
| Remington Ranch | Remington Ranch's Best Living LLC | 1815 N Boomer Rd, Stillwater, OK 74075 |
| Village Creek | A-V Village Creek Owner LLC | 6630 S Zunis Ave, Tulsa, OK 74136 |
| Lofts at North Penn | Lofts at North Penn Best Living LLC | 15501 N Pennsylvania Ave, Edmond, OK 73013 |

5. Price Edwards is now proposed to serve as the property manager for the Trustees for the following properties:

| Property Name | Property Address |
|---|---|
| Remington Ranch Apartments | 1815 N Boomer Rd, Stillwater, OK 74075 |
| Village Creek Apartments | 6630 S Zunis Ave, Tulsa, OK 74136 |
| Lofts at North Penn Apartments | 15501 N Pennsylvania Ave, Edmond, OK 73013 |
| Woodscape Apartments | 4200 North Meridian Avenue, Oklahoma City, OK 73112 |
| Capitol on 28th Apartments | 215 Northeast 28th Street, Oklahoma City, OK 73105 |
| Tuscany Village Apartments | 6900 London Way, Oklahoma City, OK 73132 |
| Putnam Green Apartments | 7525 Knight Lake Drive, Oklahoma City, OK 73132 |
| Bryan Hill | 7204 NW 36th St, Bethany, OK 73008 |

| Property Name | Property Address |
|---|---|
| Apartments | |
| Springdale Village Apartments | 4330 S Barnes Ave, Oklahoma City, OK 73119 |
| Summer Oaks Apartments | 5770 NW 16th St, Oklahoma City, OK 73127 |

6. As Chief Operating Officer at Price Edwards, I am very experienced in all aspects of commercial real estate management. In that role, I have frequently served as a receiver and property manager in numerous cases, which included cases involving distressed properties. I have extensive familiarity with multifamily operations, lease-up, maintenance, financial reporting, and related services.

7. I was contacted by the Trustees to serve as asset manager for the following properties (the "Subject Properties"):

| No. | Property | Property address | Property Owner | Applicable Trustee |
|---|---|---|---|---|
| 1. | Barcelona Apartments | 5160 S Yale Ave, Tulsa, OK 74135 | Barcelona Best Living, LLC | Trustee Sherman |
| 2. | Copperfield Apartments | 2400 NW 30th St., Oklahoma City, OK 73112 | Copperfield Apartments Limited Partnership | Trustee Deeba |
| 3. | Lexington Commons Apartments | 5530 Colony Way, Bartlesville, OK 74006 | Bartlesville Best Living, LLC | Trustee Deeba |
| 4. | Seminole Ridge Apartments | 125 W I-240 Service Road, Oklahoma City, OK 73139 | Vesta – Seminole Ridge, LLC | Trustee Deeba |

8. The anticipated scope of services to be provided by me to the estates of YSA and the 727 Debtors are as follows:

a. *Liaison with Trustees and Court*: Serve as the principal operational liaison among the property management companies, Trustees, and as appropriate, the Court and its authorized representatives.

b. *Strategic Direction*: Develop and recommend property-level and portfolio wide operating strategies in consultation with the applicable Trustee, with the objective of preserving and maximizing asset value.

c. *Stakeholder Coordination*: Serve as a designated point of contact for lenders, creditors, insurance representatives, governmental entities, consultants, and other stakeholders regarding property operations and asset performance, subject to the applicable Trustee's direction.
d. *Property Management Oversight*: Monitor and evaluate the performance of certain designated property management companies, including operating results, staffing, leasing, maintenance, resident relations and compliance with approved business plans.
e. *Financial Oversight*: Review property-level financial statements, operating budgets, cash flow, occupancy, collections, delinquency and significant variances from approved budgets.
f. *Cash Flow and Funding Requirements*: Evaluate property-level cash flow and funding needs, identify projected shortfalls, prioritize expenditures, and coordinate funding requests with the Trustees.
g. *Insurance and Property Taxes*: Assist the Trustees with oversight of insurance coverage, claims, property tax assessments, appeals, and related matters, including coordination with appropriate professionals.
h. *Capital Expenditure Oversight*: Evaluate and prioritize significant repairs, deferred maintenance, and capital improvements, including review of proposals, budgets, and recommendations for Trustee approval.
i. *Risk Management and Asset Preservation*: Identify material operational, financial, physical, and regulatory risks affecting the properties and recommend corrective actions.
j. *Third-Party Professional Coordination*: Assist the Trustees in coordinating appraisers, engineers, environmental consultants, insurance professionals, brokers and other professionals engaged in connection with the properties.
k. *Bankruptcy Reporting Support*: Provide operating information, financial analyses, cash flow projections, and other property related information reasonably requested by the Trustee to support required bankruptcy filings and Court reporting. Provide operating information, financial analyses, cash flow projections and other property related information reasonably requested by the Trustees to support required bankruptcy filings and Court reporting.
l. *Transition and Turnover Coordination*: Assist with the orderly transition of property operations, books and records, contracts, tenant information, and funds upon sale, transfer, change in management, or conclusion of the Trustees' administration.

9. The Real Estate Consulting and Advisory Services Agreement, attached to the Amended Application as Exhibit B, provides, in part, that the applicable Trustee agrees to pay me a monthly fee equal to $4,000 per Property.

10. I intend to apply for compensation for its professional services rendered to the Trustee's in the YSA bankruptcy case and the bankruptcy cases of the 727 Debtors in their

respective bankruptcy cases and reimbursement of expenses incurred in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules of the Bankruptcy Court for the Western District of Oklahoma.

11. Except as specifically set forth herein, I do not, to the best of my knowledge, represents any other entity in conjunction with the bankruptcy cases of YSA and the 727 Debtors. In addition, except as specifically set forth herein, to the best of my knowledge, I am not an insider of the YSA or any 727 Debtor, nor has any connection with YSA or any 727 Debtor, any of their affiliated entities, their creditors, or any other parties in interest herein, or its respective attorneys and accountants, except as otherwise disclosed herein. It is understood that, prior to the filing of the petitions in bankruptcy by YSA and each 727 Debtor, that I, in my role at Price Edwards, was either appointed as a receiver, or a motion to appoint me, in my role at Price Edwards, as a receiver, was filed by the applicable lender in a state court case involving the following properties which are owned or affiliated with one of the Debtors.

| **Property Name** | **Debtor/Affiliate** | **Property Address** | **Lender Name** |
|---|---|---|---|
| Canopy Apartments | Canopy Best Living LLC | W 12th St / Twin Lakes, Little Rock, AR | Federal National Mortgage Association ("Fannie Mae") |
| Remington Ranch | Remington Ranch's Best Living LLC | 1815 N Boomer Rd, Stillwater, OK 74075 | Fannie Mae |
| Lexington Commons | Bartlesville Best Living LLC | 5530 Colony Way, Bartlesville, OK 74006 | Fannie Mae |
| Lofts at North Penn | Lofts at North Penn Best Living LLC | 15501 N Pennsylvania Ave, Edmond, OK 73013 | CREO QRS NP LLC |
| Muntage Apartments | Muntage Best Living LLC | 3041 NW 41st St, Oklahoma City, OK 73112 | The Bancorp Bank |
| Riverpark at Kensington | Riverpark Best Living LLC | 7803 S Wheeling Ave, Tulsa, OK 74136 | Axonic Multifamily Bridge SPV (BC) Trust |
| Bryan Hill | Bryan Hill's Best Living LLC | 7204 NW 36th St, Bethany, OK 73008 | Silver Hill Capital |

| Property Name | Debtor/Affiliate | Property Address | Lender Name |
|---|---|---|---|
| Tuscany Village | Tuscany Village Best Living LLC | 6900 London Way, Oklahoma City, OK 73132 | Silver Hill Capital |
| Springdale Village Apartments | Springdale Village's Best Living, LLC | 4330 S Barnes Ave, Oklahoma City, OK 73119 | Silver Hill Capital |
| Summer Oaks | Summer Oaks Best Living LLC; Summer Oaks TIC 1 LLC; Summer Oaks TIC 2 LLC; Summer Oaks TIC 3 LLC | 5744 NW 16th St, Oklahoma City, OK 73127 | Silver Hill Capital |

12. Other than as set forth above, I, insofar as I have been able to ascertain, do not hold or represent any interest adverse to the estates of YSA or the 727 Debtors with respect to the matters upon which I am to be engaged.

13. I: (i) am not an equity security holder, or insider of YSA or the 727 Debtors, or their respective bankruptcy estates; (ii) am not and was not, within two years before the date of the filing of the petition, directors, officers, or employees of YSA or any 727 Debtor; and (iii) do not have an interest materially adverse to the interest of the estates of YSA and the 727 Debtors or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, YSA or any 727 Debtor, or for any other reason, except as specifically disclosed and described herein.

14. I believe I am a "disinterested person" within the meaning of Bankruptcy Code section 101.

15. No promises have been received by me as to compensation or payment in connection with this case, other than in accordance with the provisions of the Bankruptcy Code. I have no agreement with any other entity to share with such entity any compensation received by me in connection with the YSA bankruptcy case or the 727 Debtors bankruptcy cases.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on November 10, 2026

Jim Parrack